ACCEPTED
07-14-00405-CV
SEVENTH COURT OF APPEALS
AMARILLO, TEXAS
2/18/2015 4:43:44 PM
Vivian Long, Clerk

**APPELLATE NO. 07-14-00405-CV**

**IN THE COURT OF APPEALS
FOR THE SEVENTH JUDICIAL DISTRICT
AMARILLO, TEXAS**

FILED IN
7th COURT OF APPEALS
AMARILLO, TEXAS
2/18/2015 4:43:44 PM
VIVIAN LONG
CLERK

**CITY OF PLAINVIEW TEXAS, WILLIAM MULL, IN HIS OFFICIAL
CAPACITY AS CHIEF OF POLICE OF THE CITY OF PLAINVIEW
POLICE DEPARTMENT, AND KEN COUGHLIN, IN HIS OFFICIAL
CAPACITY AS CHIEF OF POLICE OF THE CITY OF PLAINVIEW
POLICE DEPARTMENT**

*Appellants,*

**v.**

**KOREY FERGUSON**

*Appellee.*

*Appeal From No. A38274-1112
64th District Court, Hale County, Texas
The Honorable Robert W. Kinkaid, Jr.*

**BRIEF OF APPELLANTS
CITY OF PLAINVIEW TEXAS, WILLIAM MULL, IN HIS OFFICIAL
CAPACITY AS CHIEF OF POLICE OF THE CITY OF PLAINVIEW
POLICE DEPARTMENT, AND KEN COUGHLIN, IN HIS OFFICIAL
CAPACITY AS CHIEF OF POLICE OF THE CITY OF PLAINVIEW
POLICE DEPARTMENT**

**Sprouse Shrader Smith PLLC
Mark D. White, Texas State Bar No. 21317900
mark.white@sprouselaw.com**

**Malerie T. Anderson, Texas State Bar No. 24087102
malerie.anderson@sprouselaw.com**

**701 S. Taylor, Suite 500**
**Amarillo, Texas  79101**
**Phone: (806) 468-3300**
**Fax: (806) 373-3454**

**and**

**City of Plainview**
**Leslie Spear, Texas State Bar No. 21202700**
**lpearce@ci.plainview.tx.us**
**901 Broadway Street**
**Plainview, Texas 79072**
**Phone: (806) 296-1127**
**Fax: (806) 296-1125**

**ATTORNEYS FOR APPELLANT**
**CITY OF PLAINVIEW TEXAS, WILLIAM MULL, IN HIS OFFICIAL**
**CAPACITY AS CHIEF OF POLICE OF THE CITY OF PLAINVIEW**
**POLICE DEPARTMENT, AND KEN COUGHLIN, IN HIS OFFICIAL**
**CAPACITY AS CHIEF OF POLICE OF THE CITY OF PLAINVIEW**
**POLICE DEPARTMENT**

**February 18, 2015**
*Oral Argument Requested*

**IN THE COURT OF APPEALS
FOR THE SEVENTH JUDICIAL DISTRICT
AMARILLO, TEXAS**

---

**CITY OF PLAINVIEW TEXAS, WILLIAM MULL, IN HIS OFFICIAL
CAPACITY AS CHIEF OF POLICE OF THE CITY OF PLAINVIEW
POLICE DEPARTMENT, AND KEN COUGHLIN, IN HIS OFFICIAL
CAPACITY AS CHIEF OF POLICE OF THE CITY OF PLAINVIEW
POLICE DEPARTMENT**

*Appellants,*

**v.**

**KOREY FERGUSON**

*Appellee.*

---

## LIST OF PARTIES AND COUNSEL

Pursuant to TEX. R. APP. P. 38.1(A), Appellants, the City of Plainview Texas, William Mull, In His Official Capacity as Chief of Police of the City of Plainview Police Department, and Ken Coughlin, In His Official Capacity as Chief of Police of the City of Plainview Police Department, certify that the following is a complete list of the names and addresses of the parties and their counsel:

|  | *Parties* | *Counsel* |
|---|---|---|
| *Appellants* | City of Plainview Texas, William Mull, In His Official Capacity as Chief of Police of the City of Plainview Police Department, and Ken Coughlin, In His Official Capacity as | SPROUSE SHRADER SMITH PLLC<br>701 S. Taylor, Suite 500<br>P.O. Box 15008<br>Amarillo, Texas 79105-5008<br>Mark D. White, Esq.<br>Malerie T. Anderson, Esq.<br>and<br>City of Plainview |

| | Chief of Police of the City of Plainview Police Department | 901 Broadway Street<br>Plainview, Texas 79072<br>Leslie Spear, Esq. |
|---|---|---|
| *Appellee* | Korey Ferguson | Texas Municipal Police Association<br>6200 La Calma Drive, Suite 200<br>Austin, Texas 78752<br>Randall C. Doubrava, Esq.<br>  and<br>DeShazo & Nesbitt, L.L.P.<br>809 West Avenue<br>Austin, Texas 78701<br>Rachel Noffke, Esq.<br>  and<br>Law Office of Lance F. Wyatt, PLLC<br>141 Countryside Court, Suite 150<br>Southlake, Texas 76092<br>Lance F. Wyatt, Esq. |

## REQUEST FOR ORAL ARGUMENT

Pursuant to TEX. R. APP. P. 39.7, Appellants, the City of Plainview Texas, William Mull, In His Official Capacity as Chief of Police of the City of Plainview Police Department, and Ken Coughlin, In His Official Capacity as Chief of Police of the City of Plainview Police Department request permission to make oral arguments upon submission of this cause to the Court of Appeals.

# TABLE OF CONTENTS

Page

LIST OF PARTIES AND COUNSEL.................................................................. iii

REQUEST FOR ORAL ARGUMENT .................................................. iv

INDEX OF AUTHORITIES.......................................................... vii

STATEMENT OF THE CASE.........................................................11

ISSUES PRESENTED...................................................................13

1. The Trial Court erred in determining reinstatement is mandatory for noncompliance with Texas Government Code section 614.023..............13

2. The Trial Court erred in ordering reinstatement because the evidence adduced at trial is insufficient to support reinstatement. ..........13

3. The Trial Court abused its discretion by ordering the City to reinstate Korey Ferguson to his former position at the rate of pay at the time of dismissal. ...................................................................13

STATEMENT OF FACTS ...............................................................14

SUMMARY OF THE ARGUMENT ..................................................22

BRIEF OF THE ARGUMENT.........................................................24

I. STANDARD OF REVIEW.......................................................24

II. THE TRIAL COURT ERRED IN DETERMINING REINSTATEMENT WAS MANDATORY FOR NONCOMPLIANCE OF TEXAS GOVERNMENT CODE SECTION 614.023. ........................26

III. THE TRIAL COURT ERRED IN ORDERING REINSTATEMENT THE BECAUSE EVIDENCE ADDUCED AT TRIAL IS INSUFFICIENT TO SUPPORT REINSTATEMENT. ..............................30

    A. Legal Insufficiency.................................................... 30

B. Factual Insufficiency ........................................................................ 34

IV. THE TRIAL COURT ABUSED ITS DISCRETION IN ORDERING APPELLANT TO REINSTATE APPELLEE TO HIS FORMER POSITION AT THE RATE OF PAY AT THE TIME OF DISMISSAL....36

A. The Trial Court's Order to Reinstate Appellant Is Against Public Policy .................................................................................. 36

V. THE REMEDY OF REINSTATEMENT DOES NOT FIT THE CIRCUMSTANCES PRESENTED ............................................................ 40

CONCLUSION AND PRAYER .......................................................................... 45

CERTIFICATE OF SERVICE ............................................................................. 47

CERTIFICATE OF COMPLIANCE ..................................................................... 48

APPENDIX ......................................................................................................... 49

# INDEX OF AUTHORITIES

**Page**

**Cases**

*Baca v. City of Dallas,*
    796 S.W.2d 497 (Tex. App.—Dallas 1990) ..................................................44

*Barber v. Colorado ISD,*
    901 S.W.2d 447 (Tex. 1995) ...................................................................24

*Bowie Mem'l Hosp. v. Wright,*
    79 S.W.2d 48 (Tex. 2002) ............................................................... 26, 36

*Bracey v. City of Killeen,*
    417 S.W.3d at 110 .......................................................................... 29, 42

*Cain v. Bain,*
    709 S.W.2d 175 (Tex. 1986) ............................................................ 25, 34

*City of DeSoto v. White,*
    288 S.W.3d 389 (Tex. 2009) ................................................ 28, 29, 42, 43

*City of Keller v. Wilson,*
    168 S.W.3d 802 (Tex. 2005) ........................................................ 25, 31, 33

*City of Pasadena v. Smith,*
    292 S.W.3d 14 (Tex. 2009) ............................................................. 42, 43

*Cleveland Brd. of Educ.v. Loudermill,*
    470 U.S. 532, 538 (1985) ......................................................................44

*Croucher v. Croucher,*
    660 S.W.2d 55 (Tex. 1983) .............................................................. 25, 34

*El Paso Nat. Gas Co. v. Minco Oil & Gas, Inc.,*
    8 S.W.3d 309 (Tex. 1999) .....................................................................24

*ERI Consulting Engineers, Inc. v. Swinnea,*
    318 S.W.3d 867 (Tex. 2010) ..................................................................41

*Garza v. Alviar,*
    395 S.W.2d 821 (Tex. 1965) ............................................................ 26, 35

*Gooch v. Am. Sling Co.*,
   902 S.W.2d 181(Tex. App.—Fort Worth 1995, no writ)........................ 26, 34

*Guthery v. Taylor*,
   112 S.W.3d 715 (Tex. App.—Houston [14th Dist.] 2003) .................... 27, 28

*Helena Chem. Co. v. Wilkins*,
   47 S.W.3d 486 (Tex. 2001) ...........................................................................28

*Hinds v. Slagel*,
   Civ. A. No. 3:00-cv-2372-D, 2001 WL 548906, *1 (N.D. Tex. May 18,
   2001) ...........................................................................................................19

*In re Doe*,
   19 S.W.3d 249 (Tex. 2000) ...........................................................................26

*In re Southwest Bell Telephone Co., L.P.*,
   226 S.W.3d 400 (Tex. 2007) ........................................................................39

*Kentucky v. Graham*,
   473 U.S. 159 (1985)......................................................................................19

*Marathon Corp. v. Pitzner*,
   106 S.W.3d 724 (Tex. 2003) ........................................................... 25, 31, 33

*Maritime Overseas Corp. v. Ellis*,
   971 S.W.2d 402 (Tex. 1998) ............................................................... 26, 35

*Mayhew v. Town of Sunnyvale*,
   964 S.W.2d 922 (Tex. 1998) .......................................................................24

*McAshan v. Cavitt*,
   149 Tex 147 ..................................................................................................27

*McMillin v. State Farm Lloyds*,
   180 S.W.3d 183 (Tex. App.—Austin 2005, pet. denied)....................... 26, 34

*Nelson v. City of Dallas*,
   278 S.W.3d 90 (Tex. App.—Dallas 2009) ...................................... 39, 40, 44

*Playboy Enters. v. Editorial Caballero, S.A. de C.V.*,
   202 S.W.3d 250 (Tex. App.—Corpus Christi 2006, pet. denied) .......... 25, 34

*Quick v. City of Austin*, 7 S.W.3d
109 (Tex. 1998) ................................................................. 24, 31

*Raw Hide Oil & Gas, Inc. v. Maxus Expl. Co.*,
766 S.W.2d 264 (Tex. App.—Amarillo 1988, writ denied)............. 25, 34, 35

*Raw Hide Oil & Gas, Inc.*,
766 S.W.2d at 275 ....................................................................30

*Ray v. Farmers State Bank of Hart*,
576 S.W.2d 607 n.1 (Tex. 1979) .................................................27

*Serv. Corp. v. Guerra*,
348 S.W.3d 221 (Tex. 2011) ............................................. 25, 31, 33

*Turner v. Perry*,
278 S.W.3d 806 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) .......28

*Walker v. Packer*,
827 S.W.2d 833 (Tex. 1992) ................................................ 26, 36

**Statutes**

Tex. Civ. Prac. & Rem. Code § 51.012 ...............................................11

Tex. Const., art. XI at § 5........................................................ 37, 44

TEX. GOVT. CODE § 614.021 .................................................... 11, 16

Tex. Govt. Code § 614.022........................................................ 11, 16

Tex. Govt. Code § 614.023 ................................................ 11, 16, 31, 40

TEX. LOC. GOVT. CODE § 51.071 ................................................. 37, 44

**Other Authorities**

H.B. 639,
79th Leg. Sess. (Tex. 2005), HOUSE RESEARCH ORG. BILL ANALYSIS .........28

Powers of the City;
Tex. Const., art. XI, § 5 (Vernon's Supp. 2014) ...........................................36

Texas Local Government Code,
Chapter 143 (Vernon's 2008)................................................................36

ix

## STATEMENT OF THE CASE

This is an appeal from the Trial Court's Final Judgment signed August 20, 2014, in favor of Plaintiff Korey Ferguson, pursuant to Tex. Civ. Prac. & Rem. Code § 51.012. The underlying suit was brought by Korey Ferguson ("Appellee"), against the City of Plainview Texas, William Mull, In His Official Capacity as Chief of Police of the City of Plainview Police Department, and Ken Coughlin, In His Official Capacity as Chief of Police of the City of Plainview Police Department (the "City" or "Appellants") based on a violation of Tex. Govt. Code § 614.021, 614.022, and 614.023. C.R. 14–20; 234–44.

After a bench trial on the merits, the Honorable Judge Kinkaid issued a letter decision holding that Appellants did not comply with the mandates as outlined in Texas Government Code, Section 614.023(a) and (b) and rendered judgment in favor of Korey Ferguson and ordered Appellants to reinstate Korey Ferguson to his position as a police officer with the City of Plainview, Texas, at the rate of pay at the time of dismissal. C.R. 300–01, 331–33. Appellants requested Findings of Fact and Conclusions of Law. C.R. 335–37. Appellants also filed a Motion to Modify the Judgment as to reinstatement and a Motion for New Trial. C.R. 338–41; 342–44. The Court ultimately adopted Korey Ferguson's proposed Findings of Fact and Conclusions of Law. C.R. 345–46; 350, 355–63.

The City of Plainview Texas, William Mull, In His Official Capacity as Chief of Police of the City of Plainview Police Department, and Ken Coughlin, In His Official Capacity as Chief of Police of the City of Plainview Police Department, timely filed their notice of appeal. C.R. 370–72.

## ISSUES PRESENTED

1.  The Trial Court erred in determining reinstatement is mandatory for noncompliance with Texas Government Code section 614.023.

2.  The Trial Court erred in ordering reinstatement because the evidence adduced at trial is insufficient to support reinstatement.

3.  The Trial Court abused its discretion by ordering the City to reinstate Korey Ferguson to his former position at the rate of pay at the time of dismissal.

## STATEMENT OF FACTS

This case arises out of the City's failure to provide Amber Washington's signed complaint against Korey Ferguson to him within a reasonable time after she filed the complaint and before disciplinary action was taken; thus, not complying with comply Texas Government Code Sections 614.023 (a) and (b). C.R. 355–63. Ferguson claimed he was terminated from the City of Plainview, Texas, Police Department based on Amber Washington's written complaint, that he did not receive a physical copy of the signed complaint within a reasonable time, and was terminated before he was provided this piece of paper. C.R. 14–20; 234–44. For the City's noncompliance with the statute, Korey Ferguson requested the Trial Court issue a writ of mandamus and injunction against the City for disciplining Korey Ferguson for the Amber Washington complaint in the future and attorney's fees.[1]  C.R. 355–366, at 360 ¶¶ 37, 38. Korey Ferguson also requested that the Trial Court reinstate him to his previous position as police officer with the same seniority level and rate of pay at the time the City of Plainview, Texas, Police Department terminated his employment.  R.R. Vol. 5, p. 70, l. 24–p. 71, l. 5; C.R. 234–44.

On February 17, 2011, Korey Ferguson was a peace officer on duty for the City of Plainview, Texas Police Department and was called to the Plainview

---

[1] Of all of the relief Ferguson requested and the Trial Court ordered, in this appeal the City only challenges the order to reinstate Ferguson as a City of Plainview, Texas, police officer.

Police Department lobby to address Amber Washington's domestic concerns. R.R. Vol. 5, p. 17, l. 19–p. 18, l. 10. A confrontation erupted between Korey Ferguson and Amber Washington. R.R. Vol. 5, p. 20, l. 9–p. 2, ln. 8. The incident escalated and Amber Washington was "throw[n] . . . onto the floor and . . . charg[ed] . . . with disorderly conduct when there was no one even in the building." R.R. Vol. 5, p. 78, l. 13–p. 79, l. 12. Korey Ferguson clearly violated Amber Washington's rights when he used excessive force and put Amber Washington in jail. R.R. Vol. 5, p. 19, l. 2–5; p. 60, l. 23–p. 61, l. 5 (Ferguson acknowledged that other people could view his conduct on the video recording that night and conclude it was improper.); R.R. Vol. 5, p. 78, l. 13–p. 79, l. 12. The following day, Amber Washington made a verbal complaint to the Plainview Police Department against Korey Ferguson; the complaint was later documented in writing as a formal complaint. R.R. Vol. 3, p. 103, l. 15–p. 104, l. 17, l. 21–24; R.R. Vol. 5, p. 65, l. 24–p. 66, l. 2; C.R. 355–363, at 356 ¶ 7.

 I. As part of the investigation, on February 23, 2011, the City of Plainview Police Department asked Korey Ferguson to provide a written memo about the Amber Washington arrest. R.R. Vol. 5, p. 24, l. 8–p. 25, l. 11; C.R. 355–63, 356 ¶ 10. At this time, the City had not told Korey Ferguson he was under investigation based on a

complaint filed by Amber Washington.[2] R.R. Vol. 3, p. 35, l. 25–p. 36, l. 3; Vol. 5, p. 25, l. 16–p. 26, l. 8; C.R. 355–363, at 356 ¶ 9. The City of Plainview Police Department's investigation determined there was sufficient evidence to support an allegation of misconduct. R.R. Vol. 5, p. 28, l. 1–p. 29, l. 23; C.R. 300–01; 355–63, at 356, ¶ 10.

On March 9, 2011, Chief of Police William Mull terminated Korey Ferguson from the City of Plainview, Texas, Police Department. C.R. 355–363, at 356 ¶ 11. The Trial Court's Findings of Fact state that Korey Ferguson did not actually receive a copy of Amber Washington's written complaint prior to his termination from the Police Department.[3] R.R. Vol. 5, p. 56, l. 7–10; C.R. 300–01, C.R. 355–363, at 357 ¶ 15; TEX. GOVT. CODE § 614.023(a) and (b). Although Ferguson did not receive the actual piece of paper within a reasonable time or before he was terminated, only days after Amber Washington filed her complaint the City asked Ferguson to prepare a memo about the Amber Washington incident. R.R. Vol. 5, p. 24, l. 18–p. 25, l. 11. In fact, Korey Ferguson testified that Chief Mull "reached over the desk and handed [the complaint] to [him] and [he] read it and started kind of skimming through it"

---

[2] However, the Texas Government Code does not require that the officer be informed that he is "under investigation," only that the City provide the officer a copy of the written complaint before taking disciplinary action. TEX. GOVT. CODE § 614.022 –.023.

[3] Notably, the City does not challenge this finding on appeal. Rather, the City's finding is limited to the improper remedy of reinstatement under these circumstances.

16

but he gave the document back to Chief Mull and was not provided a copy for his attorney. R.R. Vol. 5, p. 31, l. 12–p. 32, l. 5. It is clear that Ferguson was aware that Amber Washington filed a written complaint about his excessive force taking her down to the floor on February 17, 2011, and had ample opportunity to consult a lawyer about the incident. R.R. Vol. 5, p. 31, l. 12–p. 32, l. 5; p. 65, l. 10–p. 66, l. 3.

Pursuant to the City of Plainview, Texas' personnel procedures, Korey Ferguson appealed his termination to the city grievance committee and had a panel chosen in accordance with the City personnel procedures[4] to review the Amber Washington incident, including the video from the lobby that night. R.R. Vol. 5, p. 63, l. 8–p. 64, l. 12. The hearing before the committee at which Korey Ferguson was represented by legal counsel and given the opportunity to argue and cross-examine witnesses, including Amber Washington herself lasted "all day". R.R. Vol. 5, p. 6, l. 3–14; l. 24–p. 10, l. 8; p. 11, l. 12–16, 22–p. 12, l. 1; p. 63, l. 8–p. 64, l. 12; p. 67, l. 2–7. The committee unanimously upheld the decision to terminate Korey Ferguson. *Id*. Korey Ferguson appealed to the City Manager who reviewed the circumstances and agreed with the committee's

---

[4] *See* City of Plainview Personnel Policy at Part X, Section 10.5.D. Employee Grievance Committee detailing the procedure for reviewing employee discipline and indicating the committee is comprised of two director and supervisors specifically trained to handle disciplinary matters.

decision to terminate his employment. R.R. Vol. 5, p. 11, l. 12–16, 22–p. 12, l. 1; p. 67, l. 2–7.

Aside from the overwhelming evidence that Korey Ferguson's inappropriate conduct amounted to excessive force against Amber Washington and warranted his termination as a police officer, Korey Ferguson does not believe he did one single thing wrong. C.R. 355–63, 356 ¶ 10; R.R. Vol. 5, p. 60, l. 12–22. Korey Ferguson refuses to take responsibility for any bad judgment, bad conduct, use of excessive force, or lack of good decision-making for the Amber Washington incident. R.R. Vol. 5, p. 60, l. 12–22. Notably, when given the opportunity Korey Ferguson did not testify that upon reinstatement he would amend his behavior in any way; thus, revealing that the treatment of Amber Washington could happen again to another unprovoked citizen in the future.

Korey Ferguson testified he is eligible to return to work because his TCLEOSE training is up to date and requested reinstatement as a remedy for the City's noncompliance with Texas Government Code Sections 614.023(a) and (b). R.R. Vol. 5, p. 70, l. 24–p. 71, l. 10; C.R. 234–44. Former Police Chief William Mull[5] testified that reinstatement of Korey Ferguson would not

---

[5] Chief William Mull retired from Chief of Police after Korey Ferguson's termination date and prior to the date of trial. Chief Kenneth Coughlin replaced Mull in April 2014 and Korey Ferguson sued Coughlin in his official capacity as the Chief of Police for the City of

be proper considering the circumstances surrounding his termination. R.R. Vol. 4, p. 73, l. 21–p. 74, l. 11; p. 78, l. 16–22; p. 79, l. 7–p. 80, l. 13. Chief Mull testified that Korey Ferguson's misconduct on February 17, 2011, "show[ed] more or less a lack of experience and a lack of expertise." R.R. Vol. 4, p. 73, l. 21–p. 74, l. 11. Most disconcerting to the former Chief of Police was the incredibly short time frame from the time Amber Washington requested assistance and Korey Ferguson threw her to the ground resulting in an unreasonable "amount of force" on Amber Washington when he arrested her. R.R. Vol. 4, p. 78, l. 16–22. Korey Ferguson's incident with Amber Washington makes it clear that his being a police officer is "unsafe" "[does not] benefit the citizens . . . [or] the Police Department. . . ." R.R. Vol. 4, p. 73, l. 21–p. 74, l. 11.; p. 79, l. 7–p. 80, l. 13.

Given that upon reinstatement to the department, Chief Coughlin will be Korey Ferguson's ultimate supervisor, Chief Coughlin reviewed materials related to Amber Washington's complaint, including but not limited to the investigating officers' letters of recommendation, Korey Ferguson's report and memo, and the video of Korey Ferguson using force and arresting Amber

Plainview, Texas. Ferguson named the City of Plainview and both Chiefs in their official capacities; however, due to the straightforward allegations regarding statutory compliance and the fact that this was a nonjury trial, the City elected to overlook the duplicative named parties and did not file motions to remove Coughlin or Mull as defendants. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985); *Hinds v. Slagel*, Civ. A. No. 3:00-cv-2372-D, 2001 WL 548906, *1 (N.D. Tex. May 18, 2001).

19

Washington. R.R. Vol. 5, p. 76, l. 16–p. 77, l. 15. Chief Coughlin has extensive experience in law enforcement and after evaluating the evidence, he testified Ferguson's misconduct is a barrier to him serving as an officer, "not only in Plainview, but anywhere in the United States." R.R. Vol. 5, p. 77, l. 21–p. 78, l. 12; R.R. Vol. 5, p. 78, l. 7–p. 79, l. 12; R.R. Vol. 5, p. 80, l. 15–22. Chief Coughlin testified that he could not employ Korey Ferguson as a police officer, "giving [him] a badge[,] . . . a gun[,] and the authority to put people in custody," because Ferguson is clearly unable to control himself when confronted with a distraught citizen upset about her missing child. R.R. Vol. 5, p. 76, l. 1–11; p. 77, l. 16–p. 79, 14. Ferguson threw Amber Washington to the floor when she did not do anything "even . . . close to warranting a charge of resisting arrest." R.R. Vol. p. 79, l. 24–p. 80, l. 14. Korey Ferguson's unprofessional treatment of Amber Washington and his use of excessive force, which was recorded on video and the leading factor for his termination from the police department, amounted to citizen abuse and clearly demonstrates Korey Ferguson is "not suited to be a police officer". R.R. Vol. 5, p. 78, l. 7–p. 79, l. 12. To reinstate Korey Ferguson to his previous position with the City would provide him the "opportunity to abuse [] more citizens". R.R. Vol. 5, p. 80, l. 15–22.

The City of Plainview Police Department has a modest budget and reinstating Korey Ferguson, with his proven inability to act professionally and honorably serve the citizens of Plainview, requires Chief Coughlin to "create" a position for Ferguson that would not involve "be[ing] out on the street working with the public". R.R. Vol. 5, p. 80, l. 15–p. 81, l. 21. In turn, reinstatement will result in "one less officer on the street" in Plainview which disadvantages the department and the citizens for whom they work to protect. R.R. Vol. 5, p. 81, l. 22–p. 82, l. 4. Further, Chief Coughlin anticipates problems with the limited number of supervising officers available and Korey Ferguson ultimately working under the supervision of officers to whom he claims are untruthful. R.R. Vol. 5, p. 81, l. 11–21.

After the Trial Court received all evidence, argument of counsel and proposed judgments, the Trial Court ruled in favor of Ferguson and found "non-compliance of the mandates outlined in [sections] 614.023(a) and (b) require[d] that [Korey Ferguson] is entitled to the relief he requests." C.R. 300–01. The City of Plainview, Texas was ordered to reinstate Korey Ferguson to his previous position as a police officer at the rate of pay at the time of dismissal. C.R. 300–01.

## SUMMARY OF THE ARGUMENT

The Trial Court ordered the City to reinstate Korey Ferguson to his former position as a police officer. Based on the letter to counsel from Judge Kinkaid and his subsequent findings of fact and conclusions of law, evidently the Court arrived at this determination because Judge Kinkaid believed reinstatement for noncompliance with Texas Government Code section 614.023 was mandatory. The statute at issue does not contain a required remedy for noncompliance and Korey Ferguson is not entitled to the extreme relief of reinstatement simply because he requested it as a remedy.

Additionally, the Trial Court erred in ordering reinstatement because the evidence adduced at trial is insufficient to support reinstatement. There is a complete lack of evidence supporting the notion that Ferguson is currently, or was at the time of trial, a qualified police officer whose reinstatement would not cause a disruption among the police department. Rather, there is uncontroverted evidence that supports the opposite; the evidence clearly shows that after the Amber Washington incident, Ferguson is unfit to be a police officer.

Lastly, the Trial Court abused its discretion in ordering the City to reinstate Ferguson to his former position at the rate of pay at the time of dismissal. Judge Kinkaid's order to reinstate Korey Ferguson as a police officer

22

violates public policy because the order disregards the Chief of Police's assessment and strong opinion that Korey Ferguson should not be a police officer at all, and places this dangerous officer on the streets of Plainview, Texas. The Trial Court's order reinstating Korey Ferguson is completely diametric of the testimony heard at trial from the former Chief of Police who terminated Korey Ferguson for misconduct and the current Chief of Police, who has extensive law enforcement experience and is responsible for hiring and maintaining a professional, ethical, and safe fleet of police officers, declared that Korey Ferguson is unsafe and unfit to be a police officer. Also, numerous City of Plainview, Texas employees, including the City Manager, evaluated the decision to terminate Ferguson in connection with Amber Washington's complaint and further agreed his misconduct warranted termination. Moreover, Judge Kinkaid's order to reinstate Korey Ferguson squarely conflicts with his finding that Amber Washington's complaint contained sufficient evidence to support an allegation of misconduct.

## BRIEF OF THE ARGUMENT

### I.     STANDARD OF REVIEW

The City presents three (3) issues on appeal, each with a different standard of review. Issue number one involves a misinterpretation of the law whereby the Trial Court determined reinstatement was a mandatory remedy because the City failed to comply with Texas Government Code section 614.023. In issue one, the Trial Court erred in applying the law; therefore, the proper standard of review is de novo. *See El Paso Nat. Gas Co. v. Minco Oil & Gas, Inc.*, 8 S.W.3d 309, 312 (Tex. 1999); *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 928 (Tex. 1998); *Barber v. Colorado ISD*, 901 S.W.2d 447, 450 (Tex. 1995). Under a de novo standard of review, the appellate court does not defer to the Trial Court's conclusions; instead, it conducts its own review of the record to reach a legal conclusion, which the appellate court may then substitute in place of the Trial Court's erroneous conclusion. *See Quick v. City of Austin*, 7 S.W.3d 109, 116 (Tex. 1998).

Issue number two addresses a point of error whereby the Trial Court examined the evidence and ultimately ordered the City to reinstate Korey Ferguson to his former position as a police officer for the City of Plainview, Texas. There is a complete lack of evidence to support reinstatement; therefore, the appellate court reviews this issue under the legal sufficiency standard. *Raw*

*Hide Oil & Gas, Inc. v. Maxus Expl. Co.*, 766 S.W.2d 264, 275–76 (Tex. App.—Amarillo 1988, writ denied). Because Korey Ferguson had the burden to show he was entitled to reinstatement and failed to do so, the appellate court must sustain the City's no-evidence complaint if the record shows one of the following: 1) there is no evidence supporting the challenged element, 2) the evidence establishes the opposite of the challenged element, 3) the evidence offered to prove the challenged element is no more than a mere scintilla, or 4) the court is barred from considering the only evidence offered to prove the challenged element. *See Serv. Corp. v. Guerra*, 348 S.W.3d 221, 228 (Tex. 2011); *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *Marathon Corp. v. Pitzner*, 106 S.W.3d 724, 727 (Tex. 2003).

Under issue number two the City also asserts the Trial Court's finding of reinstatement is so contrary to the overwhelming weight of the evidence adduced at trial that it is clearly wrong and unjust; therefore, the proper standard of review is factual sufficiency. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Playboy Enters. v. Editorial Caballero, S.A. de C.V.*, 202 S.W.3d 250, 264 (Tex. App.—Corpus Christi 2006, pet. denied). Under the factual sufficiency standard when the City did not have the burden of proof at trial, the appellate court bases their review on insufficient evidence. *See Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983); *McMillin v. State Farm Lloyds*, 180

S.W.3d 183, 201 (Tex. App.—Austin 2005, pet. denied); *Gooch v. Am. Sling Co.*, 902 S.W.2d 181, 184 (Tex. App.—Fort Worth 1995, no writ); *see also Raw Hide Oil & Gas, Inc.*, 766 S.W.2d at 276. In reviewing the record for insufficient evidence under the factual sufficiency standard, the appellate court considers and weighs all the evidence to determine whether the finding should be set aside because it is so weak or so contrary to the overwhelming weight of the evidence. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965); *see Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998); *Raw Hide Oil & Gas, Inc.*, 766 S.W.2d at 276.

Issue number three directly concerns the Trial Court's subjective determination; therefore, the proper standard of review is abuse of discretion. *See In re Doe*, 19 S.W.3d 249, 253 (Tex. 2000). The appellate court reviews the Trial Court under this standard to determine whether the Court acted arbitrarily or unreasonably, or without regard to guiding rules and principles. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.2d 48, 52 (Tex. 2002); *Walker v. Packer*, 827 S.W.2d 833 (Tex. 1992).

## II. THE TRIAL COURT ERRED IN DETERMINING REINSTATEMENT WAS MANDATORY FOR NONCOMPLIANCE OF TEXAS GOVERNMENT CODE SECTION 614.023.

It is clear that the Trial Court arrived at the remedy of reinstatement because Judge Kinkaid "believe[s] that the case law holds that the non-

26

compliance of the mandates outlined in 614.023 (a) and (b) *require* that [Korey Ferguson] is entitled to the relief he requests." C.R. 300–301, at 301 (emphasis added). Judge Kinkaid goes on in the letter to counsel to "grant [Ferguson's] request to be reinstated to his position as a police officer of the City of Plainview, Texas, at the rate of pay at the time of dismissal." *Id.* Here Judge Kinkaid erred in applying the law because non[]compliance of the mandates in section 614.023 does not *require* the City to reinstate Korey Ferguson.[6]

Although the Trial Court's decision to reinstate Korey Ferguson claims it is supported by case law, this case is unlike those where an officer did not receive a copy of the complaint before the City took disciplinary action and as a remedy of noncompliance, the officer was granted the relief he requested. *See generally Guthery v. Taylor*, 112 S.W.3d 715 (Tex. App.—Houston [14th Dist.] 2003) (emphasizing the "complaint" against Officer Guthery was essentially a "Notice of Proposed Disciplinary Action" prepared by the Chief after a citizen made only a verbal complaint that Guthery damaged her front door when he knocked with his flashlight). Here, the Amber Washington's complaint against Korey Ferguson was not so minor as to amount to mere property damage but instead involves allegations of excessive force and even a video recording that

---

[6] Please note this conclusion of law challenged by Appellant is inaccurately under the heading "Findings of Fact" signed by the judge. "The designation is not controlling" and it must be considered for what it truly is. *See, e.g.*, *Ray v. Farmers State Bank of Hart*, 576 S.W.2d 607, 608 n.1 (Tex. 1979) (citing *McAshan v. Cavitt*, 149 Tex 147).

supported Chief Mull's decision to terminate Ferguson. R.R. Vol. 4, p. 73, l. 21–p. 74, l. 11. Additionally, Korey Ferguson had all the information the statute was designed to give an officer prior to disciplinary action; however, he did not have a piece of paper in his hand. While granting the relief requested in *Guthery* may have been appropriate for an incident of minor property damage, Korey Ferguson's request for reinstatement to his position as a police officer and his misconduct demonstrates such a remedy is inappropriate. R.R. Vol. 4, p. 73, l. 21–p. 74, l. 8; p. 78, l. 16–22; p. 79, l. 7–p. 80, l. 13; *and* R.R. Vol. 5, p. 77, l. 21–p. 78, l. 12; p. 78, l. 7–p. 79, l. 12; p. 80, l. 15–22.

Section 614.023 does not include a specific remedy for noncompliance. *But see Guthery v. Taylor*, 112 S.W.3d 715, 724 (stating the Chief "had a clear duty to refrain from taking disciplinary action"). "When the statute is silent as to the consequences for noncompliance, we look to the statute's purpose in determining the proper remedy". *See City of DeSoto v. White*, 288 S.W.3d 389, 389 (Tex. 2009) (quoting *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 493 (Tex. 2001)). The legislative history reveals Texas Government Code Chapter 614 provisions are intended to eliminate the "risk of being disciplined over a baseless accusation." H.B. 639, 79th Leg. Sess. (Tex. 2005), HOUSE RESEARCH ORG. BILL ANALYSIS; *see also Turner v. Perry*, 278 S.W.3d 806, 823 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) (finding that sections 614.021,

28

.022, and .023 provide police officers with "procedural safeguards to reduce the risk that adverse employment actions would be based on unsubstantiated complaints" in a case where disciplinary action was taken without a complaint from the alleged victim of misconduct). Additionally, the purpose of sections 614.021–.023 is to leave discretion with the local departments in deciding whether the evidence proves an allegation of misconduct. H.B. 639, 79th Leg. Sess. (Tex. 2005), HOUSE RESEARCH ORG. BILL ANALYSIS.

Not only does section 614.023 lack a remedy for noncompliance, it does not establish compliance as a prerequisite to the City's authority to follow its administrative process when there are allegations that an officer uses excessive force against a citizen. If cities could not cure a technical error through an administrative process, then an officer would evade all consequences of discipline for grievous acts against citizens based solely on a mere technicality. *White*, 288 S.W.3d at 396–97; *Bracey v. City of Killeen*, 417 S.W.3d at 110 (applying this argument to a Civil Service Commission hearing examiner's jurisdiction). The absence of reinstatement language supports the notion that unfit officers should not escape discipline simply on a technicality; according to *White*, "'we must honor that difference'". *White*, 288 S.W.3d at 396. Here, the Trial Court's determination that reinstatement is mandatory ignores the legislature's deliberate omission of declaring a required remedy for

29

noncompliance with section 614.023 of the Texas Government Code.

An independent analysis of the record shows that section 614.023 exists to prevent police officers from being subjected to disciplinary actions without the existence of a valid complaint. *See* H.B. 639, 79th Leg. Sess. (Tex. 2005), HOUSE RESEARCH ORG. BILL ANALYSIS; *see also Turner*, 278 S.W.3d at 823. It is undisputed that Amber Washington filed a written, signed complaint against police officer Korey Ferguson for his conduct and excessive force toward her. R.R. Vol. 5, p. 65, l. 24–p. 66, l. 2; C.R. 355–363, at 356 ¶ 7. The City investigated Amber Washington's complaint and even the Trial Court found "there was sufficient evidence to support an allegation of misconduct." C.R. 355–63, 356 ¶ 10. In this case, it is clear that the Trial Court's legal conclusion is erroneous and reinstatement is merely *one* remedy for noncompliance with section 614.023, not the *required* remedy. *See Quick*, 7 S.W.3d at 116 (describing the de novo standard of review).

## III. THE TRIAL COURT ERRED IN ORDERING REINSTATEMENT THE BECAUSE EVIDENCE ADDUCED AT TRIAL IS INSUFFICIENT TO SUPPORT REINSTATEMENT.

A. Legal Insufficiency

This point of error is reviewed for legal insufficiency because there is no evidence in the record to support reinstatement. *Raw Hide Oil & Gas, Inc.*, 766 S.W.2d at 275–76. At trial, Korey Ferguson had the burden and failed to show

that after the Amber Washington incident he was entitled to reinstatement as a police officer for the City of Plainview, Texas.

First, the record is devoid of evidence supporting the appropriateness of Korey Ferguson's reinstatement. *See Serv. Corp.*, 348 S.W.3d at 228; *Wilson*, 168 S.W.3d at 827; *Marathon Corp.*, 106 S.W.3d at 727. The Trial Court did not make express findings of fact that Korey Ferguson is well-suited or possesses the necessary skills and expertise to serve as a police officer. C.R. 355–363. Rather, the Trial Court's determination to reinstate Ferguson was based on the erroneous conclusion that noncompliance with Texas Government Code § 614.023 made it mandatory for Ferguson to receive the relief he requested, i.e. reinstatement. *See* C.R. 355–363, at 360 ¶ 36. As mentioned in section II, it is clear that this legal conclusion was incorrect and the appellate court should substitute its own analysis for the Trial Court's misguided conclusion. *See Quick*, 7 S.W.3d at 116 (describing the appellate court's role in a de novo review for a pure question of law).

Second, the evidence in the record establishes the opposite of the challenged element. *See Serv. Corp.*, 348 S.W.3d at 228; *Wilson*, 168 S.W.3d at 827; *Marathon Corp.*, 106 S.W.3d at 727. Korey Ferguson acknowledged that numerous people reviewed his conduct in regard to his treatment of Amber Washington and assessed whether it was appropriate. R.R. Vol. 5, p. 59, l. 8–

31

11 (noting his supervisors reviewing the incident within the police department had more training and experience in law enforcement as compared to him). Every person—from the City of Plainview, Texas Police Department, to the City Grievance Committee and eventually the City Manager—who reviewed Ferguson's interaction with Amber Washington determined there was clearly evidence of misconduct that warranted his expulsion from the police force. Even the Trial Court found sufficient evidence to support an allegation of misconduct; all the while, Korey Ferguson maintains he did not do one single thing wrong. C.R. 355–63, 356 ¶ 10; R.R. Vol. 5, p. 60, l. 12–22. Ferguson does not take responsibility for any bad judgment, bad conduct, use of excessive force, or lack of good decision-making. R.R. Vol. 5, p. 60, l. 12–22.

Former Chief of Police William Mull testified that Korey Ferguson's incident with Amber Washington showed a "lack of experience and lack of expertise" for a law enforcement officer. R.R. Vol. 4, p. 73, l. 21–p. 74, l. 8. Current Chief of Police Kenneth Coughlin reviewed Ferguson's conduct with Amber Washington, including the video showing Ferguson's excessive use of force against her. R.R. Vol. 5, p. 76, l. 16–p. 77, l. 15. The record contains extensive evidence that reinstatement is not proper; specifically, Chief Coughlin's testimony that after the incident with Amber Washington, it is clear that Korey Ferguson is not an acceptable police officer and falls well below the

standards for the City of Plainview, Texas, Police Department. R.R. Vol. 5, p. 77, l. 21–p. 78, l. 12. Chief Coughlin testified that at this point in time, Ferguson is "not suited to be a police officer" and to reinstate Korey Ferguson to his previous position with the City of Plainview, Texas, Police Department would provide him the "opportunity to abuse [] more citizens". R.R. Vol. 5, p. 78, l. 7–p. 79, l. 12; p. 80, l. 15–22.

Alternatively, any evidence offered to prove that Korey Ferguson is qualified and entitled to reinstatement as a police officer amounts to no more than a mere scintilla. *See Serv. Corp.*, 348 S.W.3d at 228; *Wilson*, 168 S.W.3d at 827; *Marathon Corp.*, 106 S.W.3d at 727. For legal insufficiency on this point of error, the City concedes Ferguson's previous discipline history alone did not warrant his termination; however, the Amber Washington incident marked a point in time in which Korey Ferguson exhibited conduct that was so unprofessional that Ferguson was no longer able to perform his duties as a law enforcement officer for the City of Plainview, Texas. The only evidence in the record that could possibly be construed as supportive in reinstating Ferguson, because of his qualifications is his own testimony that he is eligible to return to work, is his required TCLEOSE training is up to date. R.R. Vol. 5, p. 71, l. 6–10. The minimal amount of evidence that Korey Ferguson may scrounge from the record is not more than a mere scintilla, and like the other two factors

mentioned above, will lead the appellate court to find there is no evidence to support Korey Ferguson's reinstatement on the basis that he is a good, professional, qualified, and reputable law enforcement officer whom is fit to serve the City of Plainview, Texas.

B.    Factual Insufficiency

There is factually insufficient evidence to support a finding of reinstatement after Ferguson's use of excessive force against Amber Washington. Upon a review of the record, it is clear that the overwhelming weight of the evidence adduced at trial is contrary to reinstatement; therefore this finding should be set aside.

The testimony at trial from former Chief of Police William Mull and notably the current Chief of Police Kenneth Coughlin makes it clear that the Trial Court's order for the City to reinstate Korey Ferguson is simply wrong and unjust. *Cain*, 709 S.W.2d at 176; *Playboy Enters.*, 202 S.W.3d at 264. Here, Korey Ferguson did not carry his burden to show reinstatement was supported by facts in the record. *See Croucher*, 660 S.W.2d at 58 (the appellate court bases a factual sufficiency review on insufficient evidence when Appellant does not have the burden at trial); *McMillin*, 180 S.W.3d at 201; *Gooch*, 902 S.W.2d at 184; *see also Raw Hide Oil & Gas, Inc.*, 766 S.W.2d at 276.

Upon reinstatement, Chief Coughlin will be Korey Ferguson's ultimate supervisor. R.R. Vol. 5, p. 76, l. 16–p. 77, l. 15. The current Chief of Police has extensive law enforcement experience and made it clear that it would violate public trust to allow Ferguson to resume his position and cloak him with "a badge and a gun and the authority to put people in custody." R.R. Vol. 5, p. 76, l. 1–11; p. 77, l. 16–p.78, 12. The uncontroverted evidence at trial demonstrates that "Mr. Ferguson is not suited to be a police officer, not only in Plainview, but anywhere in the United States." R.R. Vol. 5, p. 78, l. 7–12. Further, the evidence showed that reinstatement would cause a grave disruption among the City of Plainview, Texas Police Department in that in order to uphold his duties to the public and refrain from placing Appellant in a position where he has the "opportunity to abuse [] more citizens", Chief Coughlin "would have to create a position" for Korey Ferguson. R.R. Vol. 5, p. 80, l. 15–22; p. 81, l. 4–21. The record shows that reinstatement is not only disruptive to the City but is dangerous because reinstating Korey Ferguson would cause Plainview to have "one less officer on the street". R.R. Vol. 5, p. 81, l. 22–p. 82, l. 4. The Trial Court's finding that Korey Ferguson should be reinstated to his position as a police officer is clearly contrary to the overwhelming weight of the evidence. *Garza*, 395 S.W.2d at 823; *see Maritime Overseas Corp.*, 971 S.W.2d at 407; *Raw Hide Oil & Gas, Inc.*, 766 S.W.2d at 276.

**IV. THE TRIAL COURT ABUSED ITS DISCRETION IN ORDERING APPELLANT TO REINSTATE APPELLEE TO HIS FORMER POSITION AT THE RATE OF PAY AT THE TIME OF DISMISSAL.**

A.    The Trial Court's Order to Reinstate Appellant Is Against Public Policy

The Trial Court ordered the City to reinstate Korey Ferguson "to his position as a police officer of the City of Plainview, Texas[,] at the rate of pay at the time of dismissal" without reference to guiding rules or principles. *Bowie Mem'l Hosp.*, 79 S.W.2d at 52; *Walker*, 827 S.W.2d at 839. The City of Plainview is a home rule municipal corporation with broad discretionary powers limited only by the Texas Constitution that states no charter or ordinance "shall contain any provision inconsistent with the Constitution of the State, or of the general laws enacted by the Legislature of this State." City of Plainview Charter, Art. I, Powers of the City; Tex. Const., art. XI, § 5 (Vernon's Supp. 2014); and TEX. LOC. GOVT. CODE, § 51.071 (Vernon's 2008). As a home rule municipality, the City looks to the legislature for limits on their power, and absent any, it possesses the full power of self-government. *Id.*

The City of Plainview has not adopted state civil service provisions at Texas Local Government Code, Chapter 143 (Vernon's 2008). Rather, City employees are subject to the City of Plainview Charter, Section 3.04(1), which states the City Manager's powers and duties in regard to disciplinary matters as follows:

36

"(1) [a]ppoint and, when necessary for the good of the service, suspend or remove all city employees and appointive administrative officers provided for by or under this charter, except as otherwise provided for by law, this charter or personnel rules adopted pursuant to this charter. . . ."

City of Plainview Charter, Art. III, Section 3.04(1). Further, the City of Plainview Charter declares the City of Plainview is an at-will employer; in accordance with the Charter, the City Manager has approved and amended personnel policies applicable to all City employees, including the police department. *See* City of Plainview Charter, Art. IV, Section 4.02 (delegating power to the City Manager); City of Plainview Personnel Policy, Part X, Discipline. This policy states that dismissals are "effective upon the approval of the employee's director and the City Manager." City of Plainview Personnel Policy, § 10.2.E. The grievance procedure and administrative appeal is set out in the personnel policy for all City employees. Essentially, the administrative appeal allows an employee to seek redress with 1) a joint meeting with the supervisor and director, 2) a grievance committee hearing, and 3) a final appeal to the City Manager. City of Plainview Personnel Policy, § 10.5.E.

In this case, the City complied with the administrative remedies mandated by the City of Plainview Charter and Personnel Policies. City of Plainview Charter, Article I, Powers of the City; Tex. Const., art. XI at § 5; and TEX. LOC. GOVT. CODE § 51.071. Korey Ferguson and his attorney stepped through the administrative process presenting evidence, confronting Amber

37

Washington, and arguing Ferguson should not be terminated solely because the City failed to give Korey Ferguson a physical copy of Amber Washington's complaint prior to taking any disciplinary action. Tex. Govt. Code § 614.023. Aside from the City's failure to comply with section 614.023, there was ample support during the administrative process to determine Korey Ferguson subjected a Plainview citizen to excessive force and acted improperly. C.R. 355–63, at 356 ¶ 10. As such, following the investigation and numerous reviews and appeals provided by the City, the City Manager ultimately made the decision that Ferguson's actions warranted his termination. R.R. Vol. 5, p. 11, l. 12–16, 22–p. 12, l. 1; p. 67, l. 2–7. Korey Ferguson was afforded a lengthy hearing before the grievance committee whereby the City reviewed the Amber Washington incident and allegations of misconduct; the grievance committee upheld Ferguson's termination based on their review of the evidence. R.R. Vol. 5, p. 6, l. 3–14; l. 24–p. 10, l. 8. Accordingly, the Trial Court found that Amber Washington's complaint was investigated and Korey Ferguson's misconduct warranted termination. C.R. 356.

The Texas Supreme Court stated that deference should be given to the administrative agencies "when (1) the agency is staffed with experts trained in handling complex problems within the agency's purview, and (2) great benefit is derived from the agency's uniform interpretation of laws within its purview

and the agency's rules and regulations when courts and juries might reach differing results under similar fact situations". *In re Southwest Bell Telephone Co., L.P.*, 226 S.W.3d 400, 403 (Tex. 2007) . In this regard, the Trial Court upheld the determination of the City's decision-makers within the administrative process agreeing the evidence supported the finding that Korey Ferguson subjected a Plainview citizen to excessive force. *See* C.R. 355–63, at 356 ¶ 10.

During the grievance process, the grievance committee upheld the police department's decision to terminate Ferguson after hearing witnesses, viewing evidence, and hearing from Mr. Ferguson's attorney. R.R. Vol. 5, p. 11, l. 12–16, 22–p. 12, l. 1; p. 67, l. 2–7. Korey Ferguson and his attorney even confronted the complainant on her story after she told the Committee what he did to her. *Id.* After the hearing, the City Manager made the final determination to terminate the officer for his excessive force against a Plainview citizen. *Id.*

A city is staffed with people trained to handle complex problems resulting when an officer's actions may warrant discipline, and if necessary, determine the appropriate level of discipline to impose. *See In re Southwest Bell Telephone Co., L.P.*, 226 S.W.3d at 403; *Nelson v. City of Dallas*, 278 S.W.3d 90, 96 (Tex. App.—Dallas 2009). Allowing courts and juries to

determine police disciplinary issues is likely to produce varied results for similar factual situations creating uncertainty and less uniformity in addressing police disciplinary issues. The uncertainty and lack of uniformity undermines "both the City's authority to operate and manage the department and the confidence of the public and the police officers that discipline issues will be handled in a uniform manner." *Nelson*, 278 S.W.3d at 96.

The Trial Court's order that the City reinstate Korey Ferguson essentially amounts to requiring the City of Plainview to violate its public trust of its citizens and allow an unfit officer to serve in a public safety position. R.R. Vol. 5, p. 77, l. 21–p. 79, l. 12. Reinstatement under these circumstances is clearly without reference to guiding principles and unreasonably requires the City to breach its duty to the public to provide its citizens health and safety within the community and reinstate an unsafe officer to the police force.

## V.     THE REMEDY OF REINSTATEMENT DOES NOT FIT THE CIRCUMSTANCES PRESENTED

The order reinstating Korey Ferguson is arbitrary and unreasonable because it applies a severe penalty for the City's technical failure to comply with section 614.023 that is not supported within the statute itself, its legislative history or purpose, lacks legal and factual sufficiency, and is against public policy. TEX. GOVT. CODE § 614.023. The Trial Court has broad discretion; however, a "'remedy . . . must fit the circumstances presented". *ERI Consulting*

*Engineers, Inc. v. Swinnea*, 318 S.W.3d 867, 874 (Tex. 2010) (discussing the equitable remedy of forfeiture concerning a trustee's breach of trust). When the Court orders an equitable remedy it must consider "[t]he gravity and timing of the violation . . . and whether a violation is clear and serious". *Id*. Here, the City's noncompliance in failing to provide Korey Ferguson with a piece of paper before taking disciplinary action, which was cured, is a hyper-technical violation that does not deserve such a severe remedy as reinstating a dangerous and unfit police officer.

Similar to noncompliance with Texas Government Code section 614.023, courts have addressed the imbalance of reinstating an officer whose misconduct is so unacceptable because of a City's hyper-technical procedural violation in the civil service setting. For example, the City of Athens police chief indefinitely suspended a police officer for engaging in sexual relations with a woman while on duty as well as committing other departmental policy violations. *City of Athens v. MacAvoy*, 353 S.W.3d 905, 906 (Tex. App.—Tyler 2011). The Tyler court did not agree with the hearing examiner that an officer should be reinstated solely because the City did not comply with Texas Government Code § 614.023. This court followed the Texas Supreme Court's analysis and concluded that this statute did not contain specific consequences for a City's noncompliance. *Id*. at 909–10 (citing *White*, 288 S.W.3d at 395–

41

397 and *City of Pasadena v. Smith*, 292 S.W.3d 14, 21 (Tex. 2009)). The court explained that if the complainant's statement must be given before discipline can be imposed, then a police officer could not be relieved of his duties after he committed a grave breach of the public's trust. *MacAvoy*, 353 S.W.3d at 909–10. In interpreting a very similar statute imposing a mandatory duty on municipalities related to an employee's termination, the Supreme Court plainly states that noncompliance with that duty does not indicate the employee cannot be disciplined absent the legislature's specific statement to the contrary. *Id*. at 910 (citing *White*, 288 S.W.3d at 395–97). Without a "legislative directive that the failure to provide a complainant's statement prior to discipline means that the officer will escape discipline," the Trial Court exceeded its jurisdiction in mandating reinstatement solely on a violation of the statute. *See MacAvoy*, 353 S.W.3d at 910 (citing *Smith*, 292 S.W.3d at 21).

As mentioned previously under Section I., the legislature failed to state a specific remedy for noncompliance which opens the door to options such as some form of abatement or the opportunity to cure the noncompliance as the Court in *White* did. *See generally White*, 288 S.W.3d 389. Reinstating an officer that the City knows inflicted excessive force on a Plainview citizen would violate the City's public trust given the vital role police officers perform for our society. *Id*. at 396–97; *Bracey*, 417 S.W.3d at 109. The Texas Supreme

42

Court stated that curing the notice requirement allows the City to assure "appellate rights without dismissing a case against a potentially unfit officer... ." *White*, 288 S.W.3d at 399 (analyzing the pre-suit notice requirement for civil service employees). The knowledge that communities do not need "unfit officers" on their police force for public safety purposes may be the very reason the legislature deliberately left the door open for remedies for noncompliance; without a prescribed remedy, the relief for noncompliance with the statute can fit the fact situation that led to the disciplinary action against a police officer. *See generally id.*; *Smith*, 292 S.W.3d 14 (applying this same analysis to the Civil Service Commission's remedy for noncompliance with notice requirements).

In the case at bar, Korey Ferguson was provided the opportunity to defend himself against Amber Washington's allegations before the City Manager finalized his termination; the City afforded Ferguson a number of appeals through the administrative process to ensure the officer's rights were not violated. R.R. Vol. 5, p. 6, l. 3–14; l. 24–p. 10, l. 8; p. 11, l. 12–16, 22–p. 12, l. 1; p. 63, l. 8–p. 64, l. 12; p. 67, l. 2–7. Ferguson had an attorney through the administrative process, knew the allegations against him, presented evidence and confronted his accuser in a hearing. *Id*. Here, the failure to hand Korey Ferguson a piece of paper did not deprive him of any rights regarding his

termination nor has he ever claimed a violation of such rights.[7] *See generally,*

*Baca v. City of Dallas*, 796 S.W.2d 497, 499 (Tex. App.—Dallas 1990);

*Nelson*, 278 S.W.3d at 97; *see Cleveland Brd. of Educ.v. Loudermill*, 470 U.S.

532, 538 (1985). The City acted in accordance with their charter and personnel

policies and followed their administrative process for disciplining an employee.

As a home rule municipal corporation, the City was exercising its broad

discretionary powers not limited by the Texas Constitution or the laws of the

State. *See* City of Plainview Charter, Art. I, Powers of the City; Tex. Const.,

art. XI at § 5; TEX. LOC. GOVT. CODE § 51.071. Consequently, the Trial Court's

order to reinstate Korey Ferguson is arbitrary and unreasonable because it

requires the City of Plainview, Texas, to reinstate an unfit officer who was

terminated for excessive force against a Plainview citizen when she was seeking

help from the police department because "[h]er child [was] missing". R.R. Vol.

5, p. 78, l. 13–p. 79, 12.

---

[7] Korey Ferguson's complaint in the underlying suit was limited to noncompliance with Tex. Govt. Code § 614.023 in not being provided with a copy of Amber Washington's complaint before he was terminated by Chief Mull on March 9, 2013. In fact, Korey Ferguson testified that Chief Mull "reached over the desk and handed [the complaint] to [him] and [he] read it and started kind of skimming through it" but he gave the document back to Chief Mull and was not provided a copy for his attorney. R.R. Vol. 5, p. 31, l. 12–p. 32, l. 5.

## CONCLUSION AND PRAYER

The Trial Court's determination that reinstatement is mandatory for noncompliance of Texas Government Code Section 614.023 is a misinterpretation of the law. The statute deliberately lacks a specified remedy for noncompliance and the Trial Court's order of reinstatement ignores the purposeful construction and purpose of the law. As such, the Trial Court's determination is error and the appellate court's analysis should be substituted in its place.

Reinstatement is not supported in the record because there is a clear lack of evidence that Korey Ferguson is an honorable law enforcement officer capable of performing his duties and interacting with the public following the Amber Washington incident. The record is devoid of evidence that supports the Trial Court's order to reinstate Korey Ferguson; therefore, this finding should be set aside.

The Trial Court abused its discretion in ordering the City to reinstate Korey Ferguson as it is against public policy for a District Court to force a city to arm an unfit officer against the overwhelming evidence that Korey Ferguson used excessive force against a citizen. Korey Ferguson possessed all of the information the statute at issue was designed to provide, but simply did not have a piece of paper in front of him. Thus, the hyper-technical violation of

noncompliance that occurred here does not warrant the remedy of reinstatement because it does not fit the circumstances presented and was arbitrary and unreasonable.

Respectfully submitted,

SPROUSE SHRADER SMITH P.C.
Mark D. White, SBN. 21317900
mark.white@sprouselaw.com
Malerie T. Anderson, SBN. 24087102
malerie.anderson@sprouselaw.com
701 S. Taylor, Suite 500
P. O. Box 15008
Amarillo, Texas 79105-5008
Phone: (806) 468-3300;
Fax: (806) 373-3454

/s/ Mark D. White
Mark D. White

and

CITY OF PLAINVIEW
Leslie Spear, SBN. 21202700
lschmidt@plainviewtx.org
901 Broadway Street
Plainview, Texas 79072
Phone: (806) 296-1127
Fax: (806) 296-1125

**ATTORNEYS FOR APPELLANTS CITY OF PLAINVIEW TEXAS, WILLIAM MULL, IN HIS OFFICIAL CAPACITY AS CHIEF OF POLICE OF THE CITY OF PLAINVIEW POLICE DEPARTMENT, AND KEN COUGHLIN, IN HIS OFFICIAL CAPACITY AS CHIEF OF POLICE OF THE CITY OF PLAINVIEW POLICE DEPARTMENT**

# CERTIFICATE OF SERVICE

I hereby certify that on February 18, 2015, I electronically filed the foregoing document using the electronic case filing system. The electronic case filing system will send a "Notice of Electronic Filing" to the following attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means:

**ATTORNEY FOR APPELLEE:**

| | |
|---|---|
| TEXAS MUNICIPAL POLICE ASSOCIATION<br>Randall C. Doubrava<br>6200 La Calma Drive, Suite 200<br>Austin, Texas 78752 | *Via Certified Mail, RRR*<br>*& email* |
| DESHAZO & NESBITT, L.L.P.<br>Rachel Noffke<br>809 West Avenue<br>Austin, Texas 78701 | *Via Certified Mail, RRR*<br>*& email* |
| LAW OFFICE OF LANCE F. WYATT, PLLC<br>Lance F. Wyatt<br>141 Countryside CT Ste 150<br>Southlake, Texas 76092 | *Via Certified Mail, RRR*<br>*& email* |

/s/ Mark. D. White
Mark D. White

## CERTIFICATE OF COMPLIANCE

Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements:

1.      This brief complies with the type-volume limitation of Texas Rule of Appellate Procedure 9.4(i) because:

This brief contains 8,553 words, excluding the parts of the brief exempted by the Texas Rules of Appellate Procedure.

2.      This brief complies with the typeface requirements of Texas Rule of Appellate Procedure 9.4(e) and the style requirements of Texas Rule of Appellate Procedure 9.4(b)-(c) because:

This brief has been prepared in a proportionally spaced typeface using Microsoft® Office Word 2007 in Times New Roman 14 font size.

/s/ Mark D. White
Mark D. White

827894_1.docx
2326.01

# APPENDIX

1. TEX. GOVT. CODE § 614.021

2. TEX. GOVT. CODE § 614.022

3. TEX. GOVT. CODE § 614.023

4. TEX. LOC. GOVT. CODE, § 51.071 (Vernon's 2008)

5. City of Plainview Charter, Art. I, Powers of the City

6. Tex. Const., art. XI, § 5 (Vernon's Supp. 2014)

7. City of Plainview Personnel Policy

8. Cases



APPENDIX 1

Vernon's Texas Statutes and Codes Annotated
  Government Code (Refs & Annos)
    Title 6. Public Officers and Employees (Refs & Annos)
      Subtitle A. Provisions Generally Applicable to Public Officers and Employees
        Chapter 614. Peace Officers and Fire Fighters
          Subchapter B. Complaint Against Law Enforcement Officer or Fire Fighter

V.T.C.A., Government Code § 614.021

§ 614.021. Applicability of Subchapter

Effective: September 1, 2005
Currentness

(a) Except as provided by Subsection (b), this subchapter applies only to a complaint against:

(1) a law enforcement officer of the State of Texas, including an officer of the Department of Public Safety or of the Texas Alcoholic Beverage Commission;

(2) a fire fighter who is employed by this state or a political subdivision of this state;

(3) a peace officer under Article 2.12, Code of Criminal Procedure, or other law who is appointed or employed by a political subdivision of this state; or

(4) a detention officer or county jailer who is appointed or employed by a political subdivision of this state.

(b) This subchapter does not apply to a peace officer or fire fighter appointed or employed by a political subdivision that is covered by a meet and confer or collective bargaining agreement under Chapter 143 or 174, Local Government Code, if that agreement includes provisions relating to the investigation of, and disciplinary action resulting from, a complaint against a peace officer or fire fighter, as applicable.

**Credits**
Added by Acts 1993, 73rd Leg., ch. 268, § 1, eff. Sept. 1, 1993. Amended by Acts 2005, 79th Leg., ch. 507, § 1, eff. Sept. 1, 2005.

Notes of Decisions (5)

V. T. C. A., Government Code § 614.021, TX GOVT § 614.021
Current through the end of the 2013 Third Called Session of the 83rd Legislature

End of Document

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

# APPENDIX 2

Vernon's Texas Statutes and Codes Annotated
  Government Code (Refs & Annos)
    Title 6. Public Officers and Employees (Refs & Annos)
      Subtitle A. Provisions Generally Applicable to Public Officers and Employees
        Chapter 614. Peace Officers and Fire Fighters
          Subchapter B. Complaint Against Law Enforcement Officer or Fire Fighter

V.T.C.A., Government Code § 614.022

§ 614.022. Complaint to Be in Writing and Signed by Complainant

Effective: September 1, 2005
Currentness

To be considered by the head of a state agency or by the head of a fire department or local law enforcement agency, the complaint must be:

(1) in writing; and

(2) signed by the person making the complaint.

**Credits**

Added by Acts 1993, 73rd Leg., ch. 268, § 1, eff. Sept. 1, 1993. Amended by Acts 2005, 79th Leg., ch. 507, § 1, eff. Sept. 1, 2005.

Notes of Decisions (11)

V. T. C. A., Government Code § 614.022, TX GOVT § 614.022
Current through the end of the 2013 Third Called Session of the 83rd Legislature

**End of Document**
© 2015 Thomson Reuters. No claim to original U.S. Government Works.

APPENDIX 3

Vernon's Texas Statutes and Codes Annotated
    Government Code (Refs & Annos)
        Title 6. Public Officers and Employees (Refs & Annos)
            Subtitle A. Provisions Generally Applicable to Public Officers and Employees
                Chapter 614. Peace Officers and Fire Fighters
                    Subchapter B. Complaint Against Law Enforcement Officer or Fire Fighter

V.T.C.A., Government Code § 614.023

§ 614.023. Copy of Complaint to Be Given to Officer or Employee

Effective: September 1, 2005
Currentness

(a) A copy of a signed complaint against a law enforcement officer of this state or a fire fighter, detention officer, county jailer, or peace officer appointed or employed by a political subdivision of this state shall be given to the officer or employee within a reasonable time after the complaint is filed.

(b) Disciplinary action may not be taken against the officer or employee unless a copy of the signed complaint is given to the officer or employee.

(c) In addition to the requirement of Subsection (b), the officer or employee may not be indefinitely suspended or terminated from employment based on the subject matter of the complaint unless:

  (1) the complaint is investigated; and

  (2) there is evidence to prove the allegation of misconduct.

**Credits**
Added by Acts 1993, 73rd Leg., ch. 268, § 1, eff. Sept. 1, 1993. Amended by Acts 2005, 79th Leg., ch. 507, § 1, eff. Sept. 1, 2005.

Notes of Decisions (15)

V. T. C. A., Government Code § 614.023, TX GOVT § 614.023
Current through the end of the 2013 Third Called Session of the 83rd Legislature

End of Document    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

APPENDIX 4

> Vernon's Texas Statutes and Codes Annotated
>   Local Government Code (Refs & Annos)
>     Title 2. Organization of Municipal Government
>       Subtitle D. General Powers of Municipalities
>         Chapter 51. General Powers of Municipalities
>           Subchapter E. Provisions Applicable to Home-Rule Municipality

V.T.C.A., Local Government Code § 51.071

§ 51.071. Subchapter Applicable to Home-Rule Municipality

Currentness

This subchapter applies only to a home-rule municipality.

**Credits**

Acts 1987, 70th Leg., ch. 149, § 1, eff. Sept. 1, 1987.

**Editors' Notes**

**REVISOR'S NOTE**

**2008 Main Volume**

The revised law adds this section as a drafting convenience. The source law for this subchapter applies only to a home-rule municipality.

Notes of Decisions (1)

V. T. C. A., Local Government Code § 51.071, TX LOCAL GOVT § 51.071
Current through the end of the 2013 Third Called Session of the 83rd Legislature

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

# APPENDIX 5

## Article I
## Powers of the City

### Section 1.01.  Powers of the City
The City shall have all powers possible for a city to have under the constitution and laws of this State as fully and completely as though they were specifically enumerated in this charter.

### Section 1.02.  Construction.
The powers of the City under this charter shall be construed liberally in favor of the city, and the specific mention of particular powers in the charter shall not be construed as limiting in any way the general power granted in this charter or by the State.

### Section 1.03.  Intergovernmental Relations.
The City may exercise any of its powers or perform any of its functions and may participate in the financing thereof, jointly or in cooperation, by contract or otherwise, with any one or more states or any state civil division or agency, or the United States or any of its agencies.

### Section 1.04.  Corporate Name.
All inhabitants of the City of Plainview, Hale County, Texas, within the corporate limits, shall constitute a body politic, incorporated under the laws of the State of Texas, and to be known by the name and designation of the "City of Plainview" with all rights, powers, privileges, immunities, and duties herein granted and defined, and as may be provided by any amendments of the Charter of the City of Plainview.

## Article II
## CITY COUNCIL

### Section 2.01.  Powers and Duties.
a.  All powers of the City shall be vested in the mayor and city council except as otherwise provided by law or this charter and the mayor and city council shall provide for the exercise thereof and for the performance of all duties and obligations imposed on the city by law.

b.  Directors will be reviewed by the Mayor and City Council every two years for job performance from the date of their original appointment.

### Section 2.02.  Composition, Eligibility, Election and Terms.
(a) **Composition.**  There shall be a city council composed of the mayor and seven (7) members.  One council member shall be elected by the voters in each of seven (7) council districts.  The mayor shall be elected at-large.

(b) **Eligibility.**  Only those citizens who are eligible to become registered voters

of the City shall be eligible to hold the office of councilmember or mayor. Councilmembers and the mayor shall have resided within the City for one year; Councilmembers shall have resided within the district from which said councilmember is to be elected for at least six (6) months; and not have served more than two (2) consecutive full **terms**, immediately preceding the year in which elective office is sought. In the event a boundary change, caused by redistricting of the boundaries within the city limits, results in a potential councilmember failing to reside in the district for the required six months, he/she will be allowed to run for election in the current district in which he/she resides, provided all other eligibility requirements are met. Additionally, should a boundary change result in an incumbent councilmember failing to reside in the district from which he/she was elected, he/she shall serve the remainder of the term for the district from which he/she was elected. At the next regular election, he/she will required to run for election from the newly determined district, if they wish to continue to serve on the city council.

(c) **Election and Terms of Councilmembers.** The regular election of Councilmembers shall be held on the first uniform election date in May in each even-numbered year in the manner provided by law. At the first regular election under this charter, in 1996, Councilmembers from council districts five, six and seven shall be elected, and shall serve for terms of four (4) years. At the second regular election under this charter, in 1998, Councilmembers from council districts one, two, three and four shall be elected, and shall serve for terms of four (4) years. Thereafter, all Councilmembers shall serve for terms of four (4) years.

## Section 2.03. Mayor

The regular election of mayor shall be held at the second regular election under this charter, in 1998, and shall be at-large. The mayor shall serve for a term of two (2) years. Effective with the 2000 elections the mayor, thereafter, shall serve for a term of four (4) years; and not have served more than two (2) consecutive full terms immediately preceding the year in which elective office is sought.

The mayor shall be a member of the city council, shall have the power to vote and shall preside at meetings of the council, represent the city in intergovernmental relationships, present an annual state of the city message, and perform other duties specified by the council. The mayor shall be recognized as head of the city government for all ceremonial purposes and by the governor for purposes of military law, but shall have no administrative duties. The council shall, at the first regular meeting following the regular scheduled election for council, elect from among its members a **mayor-pro tempore** who shall act as mayor during the absence or disability of the mayor and, if a vacancy occurs, shall become mayor until a new mayor is elected.

## Section 2.04. Compensation; Expenses.

The mayor and city council may determine the annual salary of the mayor and Councilmembers by ordinance, but no ordinance increasing such salary shall become effective until the date of commencement of the terms of Councilmembers elected at the next regular election. The mayor and Councilmembers shall receive their actual and necessary expenses incurred in the performance of their duties of office.

### Section 2.05. Prohibitions.

(a) **Holding Other Office.** Neither the Mayor or councilmember shall hold any other city office or employment during the term for which the member was elected to the council. No former mayor or councilmember shall hold any compensated appointive office or employment with the City until one year after the expiration of the term for which the member was elected to the council. Nothing in this section shall be construed to prohibit the council from selecting any current or former mayor or councilmember to represent the city on the governing board of any regional or other intergovernmental agency.

(b) **Appointments and Removals.** Neither the mayor or city council members shall in any manner control or demand the appointment or removal of any administrative officer or employee whom the city manager or any subordinate of the city manager is empowered to appoint, but the council may express its views and fully and freely discuss with the city manager anything pertaining to appointment and removal of such officers and employees.

(c) **Interference with Administration.** Except for the purpose of inquiries and investigations under ə 2.09, the mayor and Councilmembers shall deal with the City officers and employees who are subject to the direction and supervision of the city manager solely through the city manager, and neither the mayor or councilmembers shall give orders to any such officer or employee, either publicly or privately.

### Section 2.06. Vacancies; Forfeiture of Office; Filling of Vacancies.

(a) **Vacancies.** The office of mayor or councilmember shall become vacant upon the member's death, resignation, removal from office or forfeiture of office in any manner authorized by law.

(b) **Forfeiture of Office.** A councilmember, including the mayor, shall forfeit that office if the councilmember during the term of office for which elected:

(1) lacks at any time any **qualification** for the office prescribed by this charter or by law.

(2) violates any **express prohibition** of this charter.

(3) is convicted of a crime involving **moral turpitude**; A moral turpitude is defined as an act of baseness, vileness or depravity in the private and social duties which human beings owe their fellow human beings or to society in general, contrary to the accepted and customary rule of right and duty between human beings.

(4) fails to **attend** three consecutive regular meetings of the council without being excused by the council.

The above list is not to be construed as being all-inclusive.

(c) **Filling Vacancies.** A vacancy in the City Council, including the Mayor, shall not be filled by appointment, but must be filled by majority vote of the qualified voters at a special election called for such purpose within one hundred twenty (120) days after such vacancy occurs. Vacancies filled by special elections shall be for the remainder of the term.

### Section 2.07. Judge of Qualifications.

The mayor and city council shall be the judge of the election and qualifications of its members and of the grounds for forfeiture of their office. The mayor and council shall have the power to set additional standards of conduct for its members, by ordinance, beyond those specified in the charter and may provide for such penalties as it deems appropriate, including forfeiture of office. In order to exercise these powers, the council shall have the power to subpoena witnesses, administer oaths, and require production of evidence. A member charged with conduct constituting grounds for forfeiture of office shall be entitled to a public hearing on demand and notice of such hearing shall be published in one or more newspapers of general circulation in the city at least one week in advance of the hearing. Decisions made by the council under this section shall be subject to judicial review.

### Section 2.08. City Secretary.

The city secretary shall give notice of council meetings to its members and the public, keep the journal of its proceedings and perform such other duties as are assigned by this charter or by the council or by the city manager or by state law.

### Section 2.09. Investigations.

The city council may make an investigation into the affairs of the city and the conduct of any city department, office or agency and for this purpose may subpoena witnesses, administer oaths, take testimony, and require the production of evidence. Failure or refusal to obey a lawful order issued in the exercise of these powers by the council shall be a class C misdemeanor.

### Section 2.10. Independent Audit.

The mayor and city council shall provide for an independent annual audit of all City accounts and may provide for more frequent audits as it deems necessary, such audits shall be made by a certified public accountant or firm in accordance with generally accepted governmental accounting principals and generally accepted governmental auditing standards of such accountants. The mayor and council may, without requiring competitive bids, designate such accountant or firm annually or for a period not exceeding five (5) years, but designation for any particular fiscal year shall be made no later than 30 days after the beginning of such fiscal year. If the state makes such an audit, the council may accept it as satisfying the requirements of this section.

## Section 2.11. Procedure

(a) **Meetings.** The mayor and council will meet regularly at least once in every month at such times and places as the council may prescribe by resolution. Special meetings may be held on the call of the mayor or of three (3) or more members. Except as allowed by state law, all meetings shall be public.

(b) **Rules and Journal.** The city council will determine its own rules and order of business and shall provide for keeping a journal of its proceedings. This journal shall be a public record.

(c) **Voting.** Voting, except on procedural motions, shall be by roll call and the ayes and nays shall be recorded in the journal. Five (5) members of the council shall constitute a quorum. No action of the council, except as otherwise provided in this charter or state law, shall be valid or binding unless adopted by a majority of those council members present and voting.

## Section 2.12. Action Requiring an Ordinance.

In addition to other acts required by law or by specific provision of this charter to be done by ordinance, those acts of the city council shall be by ordinance which:

(1) Adopt or amend an administrative code or establish, alter, or abolish any city department, office or agency.

(2) Provide for a fine or other penalty or establish a rule of regulation for violation of which a fine or other penalty is imposed.

(3) Levy taxes.

(4) Grant, renew, or extend a franchise.

(5) Regulate the rate charged for its services by a public utility.

(6) Authorize the borrowing of money.

(7) Convey or lease or authorize the conveyance or lease of any lands of the city.

(8) Regulate land use and development; and

(9) Amend or repeal any ordinance previously adopted.

(10) Set the rate for services, fees or licenses provided by the City.

Acts other than those referred to in the preceding sentence may be done either by ordinance or by resolution or by motion.

## Section 2.13. Ordinances in General.

(a) **Form.** Every proposed ordinance shall be introduced in writing and in the form required for final adoption. No ordinance shall contain more than one subject which shall be clearly expressed in its title. The enacting clause shall be "The City of Plainview hereby ordains". Any ordinance which repeals or amends an existing ordinance or part of the city code shall set out in full the ordinance, sections, or subsections to be repealed or amended, and shall indicate matters to be omitted by enclosing in brackets or by strike out type and shall indicate new matters by underscoring or by italics, or some other method.

5

(b) **Procedure.** An ordinance may be introduced by any member at a regular or special meeting of the council. An ordinance can not be acted upon at the meeting it is introduced, unless an emergency exists. Upon introduction of any ordinance, the city secretary shall (1) distribute a copy to each councilmember and to the city manager (2) file a reasonable number of copies in the office of the city secretary and such other public places as the council may designate. The council may adopt the ordinance with or without amendment or reject it, but if it is amended as to any matter of substance, the council shall not adopt it until the ordinance or its amended section(s) have been subjected to all the procedures herein before required in the case of a newly introduced ordinance. As soon as practicable after adoption, the city secretary shall have the ordinance and a notice of its adoption published, if required by this charter, state law or the ordinance, and made available to the public at a reasonable price.

(c) **Effective Date.** Except as otherwise provided in the ordinance, state law or this charter, every adopted ordinance shall become effective immediately after its adoption by the city council. All ordinances, resolutions, rules and regulations now in force in the City, and not in conflict herewith, shall remain in force under this Charter until altered, amended or repealed by the city council, after this charter shall take effect.

(d) **"Publish" Defined.** As used in this section, the term "publish" means to print in one or more newspapers of general circulation in the city: (1) The ordinance or a brief summary thereof or a caption thereof, and (2) the places where copies of it have been filed and the times when they are available for public inspection and purchase at a reasonable price.

## Section 2.14. Emergency Ordinances.

To meet a public emergency affecting life, health, property or the public peace, the city council may adopt one or more emergency ordinances, but such ordinances may not levy taxes, grant, renew or extend a franchise, regulate the rate charged by any public utility for its services or authorize the borrowing of money except as provided in ϶ 5.07(b). An emergency ordinance shall be introduced in the form and manner prescribed for ordinances generally except that it shall be plainly designated as an emergency ordinance and shall contain, after the enacting clause, a declaration stating that an emergency exists and describing it in clear and specific terms. An emergency ordinance may be adopted with or without amendment or rejected at the meeting at which it is introduced pursuant to Section 2.11 of this Chapter, except that an affirmative vote of the greater of four (4) members or a majority of those present and voting shall be required for adoption. After its adoption the ordinance shall be published and printed as prescribed for other adopted ordinances. It shall become effective upon adoption or at such later time as it may specify. Every emergency ordinance except one made pursuant to ϶5.07(b) shall automatically stand repealed as of the 61st day following the date on which it was adopted, but this shall not prevent re-enactment of the ordinance in the manner

specified in this section if the emergency still exists. An emergency ordinance may also be repealed by adoption of a repealing ordinance in the same manner specified in this section for adoption of emergency ordinances.

## Section 2.15. Code of Technical Regulations.

The city council may adopt any standard code of technical regulations by reference thereto in an adopting ordinance. The procedure and requirements governing such an adopting ordinance shall be as prescribed for ordinances generally except that:

(1) The requirements of ₃2.13 for distribution and filing of copies of the ordinance shall be construed to include copies of the code of technical regulations as well as of the adopting ordinance, and

(2) A copy of each adopted code of technical regulations as well as of the adopting ordinance shall be authenticated and recorded by the city secretary pursuant to ₃2.16(a).

Copies of any adopted code of technical regulations shall be made available by the city secretary for distribution or for purchase at actual cost to the City.

## Section 2.16. Authentication and Recording; Codification; Printing.

(a) **Authentication and Recording.** The city secretary shall authenticate by signing and shall record in full in a properly indexed book kept for the purpose, all ordinances and resolutions adopted by the city council.

(b) **Codification.** Within three years after adoption of this charter and at least every five years thereafter, the city council shall provide for the preparation of a general codification of all city ordinances and resolutions having the force and effect of law. The general codification shall be adopted by the council by ordinance and shall be printed promptly in bound or loose leaf form, together with this charter and any amendments thereto, pertinent provisions of the constitution and other laws of the State of Texas, and such code of technical regulations and other rules and regulations as the council may specify. This compilation shall be known and cited officially as "The Code of the City of Plainview, Texas." Copies of the code shall be furnished to city officers, placed in libraries and public offices for free public reference and made available for purchase by the public at actual cost to the City.

(c) **Printing of Ordinances and Resolutions.** The city council shall cause each ordinance and resolution having the force and effect of law and each amendment to this charter to be printed promptly following its adoption, and the printed ordinances, resolutions, and charter amendments shall be distributed or sold to the public at actual cost to the City. Following publication of the first Code of the City of Plainview, Texas and at all times thereafter, the ordinances, resolutions, and charter amendments shall be printed in substantially the same style as the code currently in effect and shall be suitable in form for integration therein. The council shall make such further arrangements as it deems desirable with respect to reproduction and distribution of any current changes in or additions to the provisions of the constitution

and other laws of the State of Texas, or the codes of technical regulations and other rules and regulations included in the code.

## Section 2.17. Training.

The city council, by ordinance, shall establish minimum training and continuing education requirements for city council, and shall establish penalties for not complying with those requirements, including removal from office.

## Article III
## CITY MANAGER

### Section 3.01. Appointment and Qualifications.

The Mayor and City Council by five (5) affirmative votes shall appoint a city manager for an indefinite term and fix the manger's compensation. The city manager shall be appointed solely on the basis of executive and administrative qualifications. The manager need not be a resident of the city or state at the time of appointment, but must secure and maintain permanent residency within the City within six (6) months of his/her initial employment. Failure to comply with residency requirement will result in termination without severance pay. The City Council may offer a contract to the City Manager, but said contract shall never exceed three (3) years.

### Section 3.02. Removal.

The city manager may be suspended by a resolution approved by five (5) affirmative votes of the Mayor and City Council which shall set forth the reasons for suspension and proposed removal. A copy of such resolution shall be served immediately upon the city manager. The city manager shall have fifteen (15) days in which to reply thereto in writing, and upon request, shall be afforded a public hearing, which shall occur not earlier than ten (10) days nor later than fifteen (15) days after such hearing is requested. After the public hearing, if requested, and after full consideration, the city council by a majority vote of its total membership may adopt a final resolution of removal. The city manager shall continue to receive full salary until the effective date of a final resolution of removal. The City Manager is an at-will employee.

### Section 3.03. Acting City Manager.

By letter filed with the city secretary, the mayor and city council shall designate a city officer or employee to exercise the powers and perform the duties of city manager during the manager's temporary absence or disability. The mayor and city council may revoke such designation at any time and appoint another officer of the city to serve until the city manager returns.

### Section 3.04. Powers and Duties of the City Manager.

The city manager shall be the chief administrative officer of the city, responsible to the Council for the administration of all city affairs placed in the manager's charge by or under this charter. The city manager shall:

(1) Appoint and, when necessary for the good of the service, suspend or remove all city employees and appointive administrative officers provided for by or under this charter, except as otherwise provided for by law, this charter or personnel rules adopted pursuant to this charter. Director appointments shall be approved by the city council before said director assumes his/her official duties. The city manager may authorize any administrative officer subject to the manager's direction and supervision to exercise these powers with respect to subordinates in that officer's department, office or agency;

(2) Direct and supervise the administration of all departments, offices, and agencies of the city, except as otherwise provided by this charter or by law;

(3) Attend all city council meetings. The city manager shall have the right to take part in discussion but shall not have a vote;

(4) See that all laws, provisions of this charter and acts of the city council, subject to enforcement by the city manager or by officers subject to the city manager's direction and supervision, are faithfully executed;

(5) Submit the initial annual budget and capital program to the city council;

(6) Submit to the city council and make available to the public a complete report on the finances and administrative activities of the city as of the end of each fiscal year;

(7) Make such other reports as the city council may require concerning the operations of city departments, offices, and agencies subject to the city manager's direction and supervision;

(8) Keep the city council fully advised as to the financial condition and future needs of the city;

(9) Make recommendations to the city council concerning the affairs of the city;

(10) Provide staff support services for the mayor and councilmembers; and

(11) Perform such other duties as are specified in this charter or may be required by the city council.


## Article IV
## DEPARTMENTS, OFFICES, AND AGENCIES

**Section 4.01. General Provisions.**

(a) **Creation of Departments.** The city council may establish city departments, offices, or agencies in addition to those created by this charter and may prescribe the functions of all departments, offices, and agencies, except that no function assigned by this charter to a particular department, office or agency may be discontinued or, unless this charter specifically so provides, assigned to any other.

(b) **Direction by City Manager.** All departments, offices, and agencies under the direction and supervision of the city manager shall be administered by an officer

appointed by and subject to the direction and supervision of the manager. With the consent of the city council, the city manager may serve as the head of one or more such departments, offices or agencies or may appoint one person as the head of two or more of them.

### Section 4.02. Personnel System.
(a) **At-will employer.** The City of Plainview is an at-will employer.
(b) **Personnel policies.** The city manager shall approve, and amend from time to time, the personnel policies of the city.

### Section 4.03. Legal Officer.
There shall be a legal officer of the city appointed by the city council. The legal officer shall serve as chief legal advisor to the council, the city manager, and all city departments, offices, and agencies, shall represent the city in all legal proceedings and shall perform any other duties prescribed by the charter or by ordinance. For the purposes of this charter a legal officer is defined as an attorney who has been duly licensed to practice law within the State of Texas whose title may be city counselor, city attorney, corporation counsel, or municipal attorney. The legal officer is an at will employee of the city council.

### Section 4.04. Municipal Court
A municipal court judge shall be appointed by the city manager, subject to the approval of the city council, to serve a term of two years, but subject to removal by the city manager at any time.

## Article V
## FINANCIAL PROCEDURES

### Section 5.01. Fiscal Year.
The fiscal year of the city shall begin on the first day of October and end on the last day of September.

### Section 5.02. Submission of Initial Budget and Budget Message.
On or before the first day of July of each year, the city manager shall submit to the city council an initial budget for the ensuing fiscal year and an accompanying message.

### Section 5.03. Budget Message.
The city manager's message shall explain the budget both in fiscal terms and in terms of the work programs. It shall outline the proposed financial policies of the city for the ensuing fiscal year, describe the important features of the budget, indicate any major changes from the current year in financial policies, expenditures, and revenues together with the reasons for such changes, summarize the city's debt

position and include such other material as the city manager deems desirable.

## Section 5.04. Budget.

The budget shall provide a complete financial plan of all city funds and activities for the ensuing fiscal year and, except as required by law or this charter, shall be in such form as the city manager deems desirable or the city council may require. The budget shall begin with a clear, general summary of its contents, shall show in detail all estimated income, indicating the proposed property tax levy, and all proposed expenditures, including debt service, for the ensuing fiscal year, and shall be so arranged as to show comparative figures for actual and estimated income and expenditures of the current fiscal year and actual income and expenditures of the preceding fiscal year. It shall indicate in separate sections:

(1) The **proposed goals and objectives** and expenditures for current operations during the ensuing fiscal year, detailed for each fund by organizational unit, and program, purpose, or activity, and the method of financing such expenditures.

(2) Proposed **capital expenditures** during the ensuing fiscal year, detailed for each fund by organizational unit when practicable, and the proposed method of financing each such capital expenditure; and

(3) The **anticipated income and expense** and profit and loss for the ensuing year for each utility or other enterprise fund operated by the city.

For any fund, the total of proposed expenditures shall not exceed the total of estimated income plus carried forward fund balance, exclusive of reserves.

## Section 5.05. City Council Action on Budget.

(a) **Notice and Hearing.** The city council shall publish in one or more newspapers of general circulation in the city the general summary of the budget and a notice stating:

(1) The times and places where copies of the message and budget are available for inspection by the public; and

(2) The time and place, not less than two weeks after such publication, for a public hearing on the budget.

(b) **Amendment Before Adoption.** After public hearing, the city council may adopt the budget with or without amendment. In amending the budget, it may add or increase programs or amounts and may delete or decrease any programs and amounts, except expenditures required by law or for debt service or for an estimated cash deficit, provided that no amendment to the budget shall increase the authorized expenditures to an amount greater than total estimated income plus carried forward fund balance, exclusive of reserves.

(c) **Adoption.** The city council shall adopt the budget on or before the last day of the month of the fiscal year currently ending. If it fails to adopt the budget by this date, the budget proposed by the city manager shall go into effect.

## Section 5.06. Appropriation and Revenue Ordinances.

To implement the adopted budget, the city council shall adopt, prior to the beginning of the ensuing fiscal year:

(a) an **appropriation ordinance** making appropriations by department or major organizational unit and authorizing a single appropriation for each program.

(b) a **tax levy ordinance** authorizing the property tax levy or levies and setting the tax rate or rates; and

(c) any **other ordinances** required to authorize new revenues or to amend the rates or other features of existing taxes or other revenue sources.

## Section 5.07. Amendments after Adoption.

(a) **Supplemental Appropriations**. If during the fiscal year the city manager certifies that there are available for appropriation revenues in excess of those estimated in the budget, the city council by ordinance may make supplemental appropriations for the year up to the amount of such excess.

(b) **Emergency Appropriations**. To meet a public emergency affecting life, health, property, or the public peace, the city council may make emergency appropriations. Such appropriations may be made by emergency ordinance in accordance with the provision of ⸗ 2.11. To the extent that there are no available unappropriated revenues or a sufficient fund balance to meet such appropriations, the council may, by such emergency ordinance, authorize the issuance of emergency notes, which may be renewed from time to time, but the emergency notes and renewals of any fiscal year shall be paid not later than the last day of the fiscal year next succeeding that in which the emergency appropriation was made.

(c) **Reduction of Appropriations**. If at any time during the fiscal year it appears probable to the city manager that the revenues or fund balances available will be insufficient to finance the expenditures for which appropriations have been authorized, the manager shall report to the city council without delay, indicating the estimated amount of the deficit, any remedial action taken by the manager and recommendations as to any other steps to be taken. The council shall then take such further action as it deems necessary to prevent or reduce any deficit and, for that purpose, it may by ordinance reduce one or more appropriations.

(d) **Transfer of Appropriations**. At any time during the fiscal year, the city council may by resolution transfer part or all of the unencumbered appropriation balance from one department or major organizational unit to the appropriation for other departments or major organizational units. The manager may transfer part or all of any unencumbered appropriation balances among programs within a department or organizational unit and shall report such transfers to the council in writing in a timely manner.

(e) **Limitations; Effective Date**. No appropriation for debt service may be reduced or transferred, and no appropriation may be reduced below any amount required by law to be appropriated or by more than the amount of the unencumbered balance thereof. The aggregate debt of the City of Plainview shall not exceed five

12

percent (5%) of the aggregate ad valorem taxable value of the City of Plainview as ascertained by the tax assessor. No issuance of Certificates of Obligation or other debts, however designated, which are payable or guaranteed with tax revenue from any source shall exceed two percent (2%) of the aggregate ad valorem taxable value of the City as ascertained by the tax assessor, without voter approval. The supplemental and emergency appropriations and reduction or transfer or appropriations authorized by this section may be made effective immediately upon adoption.

### Section 5.08. Lapse of Appropriations.

Every appropriation, except an appropriation for a capital expenditure, shall lapse at the close of the fiscal year to the extent that it has not been expended or encumbered. An appropriation for a capital expenditure shall continue in force until expended, revised, or repealed. The purpose of any such appropriation shall be deemed abandoned if three years pass without any disbursement from or encumbrance of the appropriation.

### Section 5.09. Administration of the Budget.

The city council shall provide by ordinance the procedures for administering the budget.

### Section 5.10. Overspending of Appropriations Prohibited.

No payment shall be made or obligation incurred against any allotment or appropriation except in accordance with appropriations duly made and unless the city manager or the manager's designee first certifies that there is a sufficient unencumbered balance in such allotment or appropriation and that sufficient funds therefrom are or will be available to cover the claim or meet the obligation when it becomes due and payable. Any authorization of payment or incurring of obligation in violation of the provisions of this charter shall be void and any payment so made illegal. A violation of this provision shall be cause for removal of any officer who knowingly authorized or made such payment or incurred such obligation. Such officer may also be liable to the city for any amount so paid. Except where prohibited by law, however, nothing in this charter shall be construed to prevent the making or authorizing of payments or making of contracts from capital improvements to be financed wholly or partly by the issuance of bonds or to prevent the making of any contract or lease providing for payments beyond the end of the fiscal year, but only if such action is made or approved by ordinance.

### Section 5.11. Capital Program.

(a) **Submission to City Council**. The city manager shall prepare and submit to the city council a five-year capital program no later than the final date for submission of the budget.

(b) **Contents**. The capital program shall include:

(1) A clear general summary of its contents;

(2) A list of all capital improvements and other capital expenditures which are proposed to be undertaken during the five fiscal years next ensuing, with appropriate supporting information as to the necessity for each;

(3) Cost estimates and recommended time schedules for each improvement or other capital expenditure;

(4) Method of financing, upon which each capital expenditure is to be reliant; and

(5) The estimated annual cost of operating and maintaining the facilities to be constructed or acquired.

The above shall be revised and extended each year with regard to capital improvements still pending or in process of construction or acquisition.

## Section 5.12.  City Council Action on Capital Program.

(a) **Notice and Hearing.**  The city council shall publish, in one or more newspapers of general circulation in the city, the general summary of the capital program and a notice stating:

(1) The times and places where copies of the capital program are available for inspection by the public; and

(2) The time and place, not less then two weeks after such publication, for a public hearing on the capital program.

(b) **Adoption.**  The city council by resolution shall adopt the capital program with or without amendment after the public hearing and on or before the last day of the month of the current fiscal year.

## Section 5.13.  Public Records.

Copies of the budget, capital program, and appropriation and revenue ordinances shall be public record and shall be made available to the public at suitable places in the city.

## Section 5.14.  Retirement and/or Pension Funds

The City of Plainview shall not be financially responsible for City of Plainview and/or employee retirement contributions lost by a fund which is not directly managed by the City Council.

## Article VI
## ELECTIONS

## Section 6.01.  City Elections.

(a) **Regular Elections.**  The regular city election shall be held in May on even numbered years.

(b) **Registered Voter Defined.**  All citizens legally registered under the

14

constitution and laws of the State of Texas to vote in the city shall be registered voters of the city within the meaning of this charter.

(c) **Conduct of Elections**. The provision of the general election laws of the State of Texas shall apply to the elections held under this charter. All elections provided for by the charter shall be conducted by the city secretary. Candidates shall run for office without party designation. For the conduct of city elections, for the prevention of fraud in such elections and for the recount of ballots in cases of doubt or fraud, the city council shall adopt ordinances consistent with law and this charter, and the city secretary may adopt further regulations consistent with law and this charter and the ordinances of the council. Such ordinances and regulations pertaining to elections shall be publicized in the manner of city ordinances generally.

**Section 6.02. Council Districts; Adjustments of Districts.**

(a) **Number of Districts**. There shall be seven (7) city council districts.

(b) **Districting Commission; Composition; Appointment; Terms; Vacancies; Compensation.**

(1) There shall be a districting commission consisting of nine (9) members. The City Council shall appoint six (6) members. These six (6) members shall, with the affirmative vote of at least four (4), choose three (3) more members. The commission shall select is own chairperson.

(2) No member of the commission shall be employed by the city or hold any other elected or appointed position in the city.

(3) The City Council shall appoint the commission no later than one year and five months before the first general election of the city council after each federal decennial census. The commission's terms shall end upon adoption of a districting plan, as set forth in section з 6.02(c).

(4) In the event of a vacancy on the Commission by death, resignation or otherwise, the City Council shall appoint a new member to serve the balance of the term remaining.

(5) No member of the districting commission shall be removed from office by the City Council except for cause and upon notice and hearing.

(6) The members of the commission shall serve without compensation except that each member shall be allowed actual and necessary expenses to be audited in the same manner as other city charges.

(7) The commission may hire or contract for necessary staff assistance and may require agencies of city government to provide technical assistance. The commission shall have a budget as provided by the city council.

(c) **Powers and Duties of the Commission; Hearing, Submissions and Approval of Plan.**

(1) Following decennial census, the commission shall consult the city council and shall prepare a plan for dividing the city into districts for the election of councilmembers. In preparing the plan, the commission shall be guided by the criteria set forth in з 6.02(d). The report on the plan shall include a map and

description of districts recommended.

(2) The commission shall hold one or more public hearings not less than one month before it submits the plan to the City Council. The commission shall make its plan available to the public for inspection and comment not less than one month before its public hearing.

(3) The commission shall submit its plan to the City Council not less than one year before the first general election of the city council after each decennial census.

(4) The plan shall be deemed adopted by the City Council unless disapproved within three weeks by the vote of the majority of all members of the city council. If the city council fails to adopt the plan, it shall return the plan to the commission with its objections, and with the objections of individual members of the council.

(5) Upon rejection of its plan, the commission shall prepare a revised plan and shall submit such revised plan to the city council no later than nine (9) months before the first general election of the city council after such decennial census. Such revised plan shall be deemed adopted by the city council unless disapproved within two weeks by the vote of two-thirds (2/3) of all the members of the city council, or unless by two-thirds (2/3) of all its members the city council votes to file a petition in the District Court, Hale County, Texas, for a determination that the plan fails to meet the requirements of this charter. The city council shall file its petition no later than ten (10) days after its disapproval of the plan. Upon a final determination upon appeal, if any, the plan shall be deemed adopted by the city council and the commission shall deliver the plan to the city secretary. The plan delivered to the city secretary shall include a map and description of the districts.

(6) If in any year population figures are not available at least one year and five months before the first general election following the decennial census, the City Council may by ordinance shorten the time period provided for districting commission action in subsection (2),(3),(4), and (5) of this section.

(d) **Districting Plan; Criteria**. In preparation of its plan for dividing the city into districts for the election of councilmembers, the commission shall apply the following criteria which, to the extent practicable, shall be applied and given priority in the order in which they are herein set forth.

(1) Districts shall be equal in population except where deviation from equality result from the application of the provisions hereinafter set forth, but no such deviation may exceed five percent (5%) of the average population for all city council districts according to the figures available from the most recent census.

(2) No city block shall be divided in the formation of districts.

(e) **Effect of Enactment**. The new city council districts and boundaries as of the date of enactment shall supersede previous council districts and boundaries for all purposes of the next regular city election, including nominations. The new districts and boundaries shall supersede previous districts and boundaries for all other purposes as of the date on which all councilmembers elected at that regular city election take office.

## Article VII
## GENERAL PROVISIONS

### Section 7.01.  Conflicts of Interest;  Ethics

**Conflicts of Interest.**  The use of public office for private gain is prohibited.  The city council shall implement this prohibition by ordinance.  Regulations to this end shall include but are not limited to:  acting in an official capacity on matters in which the official has a private financial interest clearly separate from that of the general public;  the acceptance of gifts and other things of value;  acting in a private capacity on matters dealt with as a public official;  the use of confidential information;  and appearances by city officials before other city agencies on behalf of private interests.  This ordinance shall provide for reasonable public disclosure of finances by officials with major decision making authority over monetary expenditures and contractual matters and, insofar as permissible under state law, shall provide for penalties.

### Section 7.02.  Prohibitions.

(a) **Activities Prohibited.**

(1)  No person shall be appointed to or removed from, or in any way favored or discriminated against with respect to any city position or appointive city administrative office because of race, gender, age, disability, religion, country of origin or political affiliation.

(2)  No person shall willfully make any false statement, certificate, mark, rating or report in regard to any test, certification or appointment under the provisions of this charter or the rules and regulations made thereunder, or in any manner commit or attempt to commit any fraud preventing the impartial execution of such provisions, rules and regulations.

(3)  No person who seeks appointment or promotion with respect to any city position or appointive city administrative office shall directly or indirectly give, render or pay any money, service or other valuable thing to any person for or in connection with her or his test, appointment, proposed appointment, promotion or proposed promotion.

(4)  No city employee shall knowingly or willfully make, solicit or receive any contribution to the campaign funds of any political party or committee to be used in a city election or to campaign funds to be used in support of or opposition to any candidate for election to city office or city ballot issue.  Further, no city employee shall knowingly or willfully participate in any aspect of any political campaign on behalf of or opposition to any candidate for city office.  This section shall not be construed to limit any person's right to exercise rights as a citizen to express opinions or to cast a vote nor shall it be construed to prohibit any person from active participation in political campaigns at other level of government.

(b) **Penalties.**  Any person found guilty of a violation of this section shall be ineligible for a period of five (5) years following such finding to hold any city office or

position and, if an officer or employee of the city, shall immediately forfeit her or his office or position. The city council shall establish by ordinance such further penalties as it may deem appropriate.

## Section 7.03. Annexation

The boundaries and limits of the City of Plainview may be hereafter changed by annexation or disannexation in the manner provided in Chapter 43 of the Texas Local Government Code.

## Article VIII
## CHARTER AMENDMENT

### Section 8.01. Proposal of Amendment.

Amendments to this charter may be framed and proposed in the manner provided by law.

## Article IX
## TRANSITION/SEVERABILITY PROVISION

### Section 9.01. Officers and Employees.

Rights and Privileges Preserved. Nothing in this charter except as otherwise provided shall affect or impair the rights or privileges of persons who are city officers or employees at the time of its adoption.

### Section 9.02. State and Municipal Laws.

In General. All city ordinances, resolutions, orders, and regulations which are in force when this charter becomes fully effective are repealed to the extent that they are inconsistent or interfere with the effective operation of this charter or of ordinances or resolutions adopted pursuant thereto. To the extent that the constitution and laws of the State of Texas permit, all laws relating to or affecting this city or its agencies, officers or employees which are in force when this charter becomes fully effective are superseded to the extent that they are inconsistent or interfere with the effective operation of this charter or of ordinances or resolutions adopted pursuant thereto.

### Section 9.03. Schedule.

(a) **First Election**. At the time of its adoption, this charter shall be in effect to the extent necessary in order that the first election of members of the city council may be conducted in accordance with the provisions of this charter.

### Section 9.04. Severability.

If any provision of this charter is held invalid, the other provision of the charter shall not be affected thereby. If the application of the charter or any of its provisions to any person or circumstance is held invalid, the application of the charter and its

provisions to other persons or circumstances shall not be affected thereby.

## Article X
## INITIATIVE, REFERENDUM, RECALL

### Section 10.01. General Authority.

The powers of initiative and referendum are hereby reserved to the electors of the city. The provisions of the election law of the State of Texas, as they currently exist or may hereafter be amended or superseded, shall govern the exercise of the powers of initiative and referendum under this charter.

A. **Initiative.** The qualified voters of the city shall have the power to propose ordinances to the city council and, if the council fails to adopt an ordinance so proposed without any change in substance, to adopt or reject said ordinance at a city election, provided that such power shall not extend to the budget, or capital program or any ordinance relating to appropriation of money, levy of taxes, user fees or salaries of city officers or employees.

Such initiative power may be used to enact a new ordinance or to repeal or amend sections of an existing ordinance.

B. **Referendum:** The qualified voters of the city shall have the power to require reconsideration by the city council of any adopted ordinance and, if the council fails to repeal any ordinance so reconsidered, to approve or reject it at a city election, provided that such power shall not extend to the budget or capital program or any properly enacted emergency ordinance, ordinance relating to appropriation of money or levying of taxes or ordinance relating to the control of armed or violent insurrection, revolt, rebellion or riot.

### Section 10.02. Initiation of Proceedings; Petitioners' Committee; Affidavit.

Any ten (10) qualified voters may begin initiative or referendum proceedings by filing with the city secretary an affidavit stating they constitute the petitioners' committee and will be responsible for circulating the petition and filing it in proper form; stating their names and addresses and specifying the address to which all notices to the committee are to be sent, and setting out in full the proposed initiative ordinance or the ordinance sought to be reconsidered.

Immediately after the affidavit of the petitioners' committee is filed, the city secretary shall issue the appropriate petition blanks to the petitioners' committee.

After the affidavit of the petitioners' committee has been filed, the ordinance sought to be amended or repealed shall not be repealed, or amended or re-enacted by the city council unless:

A. The action taken by the city council is that which the petition requests, or

B. The petition has not been filed within the prescribed time limit, or

C. There is a final determination of the insufficiency of the petition, or

D. The petition is withdrawn by the petitioners' committees, or

E. One year has elapsed since the city council or voter action has been taken on the petition, or

19

F. The ordinance sought to be amended or repealed relates to the control of insurrection or riot.

## Section 10.03. Petitions.

(a) **Number of signatures.** Initiative and referendum petitions must be signed by currently qualified voters of the city equal in number to at least ten percent (10%) of the current registered voters.

(b) **Form and Content**: All papers of petition shall be uniform in size and style and shall be assembled as one instrument for filing. To be certified, each signature shall be the same as the name of a voter appearing on the current certified list of voter registrations, shall have been personally signed by such voter in ink, and shall be followed by the address of the person signing. Petitions shall contain or have attached thereto throughout their circulation the full text of the ordinance proposed or sought to be reconsidered.

(c) **Affidavit of Circulator:** When filed, each paper of the petition shall have attached to it an affidavit executed by the circulator thereof stating that she/he personally circulated the paper, the number of signatures thereon, that all the signatures were affixed in her/his presence, that she/he believes them to be the genuine signatures of the persons whose names they purport to be and that each signer had an opportunity before signing to read the full text of the ordinance proposed or sought to be reconsidered.

(d) **Time for Filing Petitions:** Referendum petitions must be initiated within thirty (30) days after adoption by the city council of the ordinance sought to be reconsidered. Initiative petitions must be filed within thirty (30) days after issuance of the appropriate petition blanks to the petitioners' committee. Additional time as specified in Section 10.04(e), shall be allowed for amending petitions.

## Section 10.04. Determination of Sufficiency.

(a) **Certificate of city secretary:** Within ten (10) working days after the petition is filed, the city secretary shall complete a certificate as to its sufficiency, specifying, if it is insufficient, the particulars wherein it is defective and shall immediately upon completion of certification send a copy of the certificate to the petitioners' committee by registered mail.

(b) **Sufficient Petition, Final Determination:** If the petition is certified sufficient, the city secretary shall present the certificate to the city council at the next regularly scheduled council meeting and the certificate shall then be a final determination as to the sufficiency of the petition.

(c) **Insufficient Petition, Final Determination:** If a petition is certified insufficient, and the petitioners' committee does not elect to amend or request council review under sub-sections (d) and (e) of this section within the time required, the city secretary shall present a certificate to the city council at the next regularly scheduled council meeting which shall be a final determination of the sufficiency of the petition.

(d) **Insufficient Petition, Appeal:** If a petition has been certified insufficient and the petitioners' committee does not file notice of intention to amend it as in Section 10.04(e), the committee may, within two working days after receiving the copy of such certificate, file a request that it be reviewed by the city council. The city council shall review the certificate at its next meeting following the filing of such request and approve or disapprove it, and the Council's determination shall then be a final determination as to the sufficiency of the petition.

(e) **Insufficient Petition, Amending:** A petition certified insufficient for lack of required number of valid signatures may be amended once if the petitioners' committee files a notice of intention to amend it with the city secretary within two (2) working days after receiving the copy of her/his certificate, and files a supplementary petition with additional names within two weeks after receiving the copy of such certificate. Such supplementary petition shall comply with the requirements of Sections 10.03 (b) and (c).

Within five (5) working days after an amended petition is filed, the city secretary shall complete a certificate as to the sufficiency of the petition as amended and shall within twenty-four (24) hours send a copy of such certificate to the petitioners' committee by registered mail as in the case of an original petition. The final determination as to the sufficiency of an amended petition shall be determined in the same manner as prescribed for original petitions in Sections 10.04 (b), (c) and (d), and no petition, once amended, may be amended again.

(f) **Court Review; New Petition:** A final determination as to the sufficiency of a petition shall be subject to review in a county court of record and higher. A final determination of insufficiency, even if sustained upon court review, shall not prejudice the filing of a new petition of the same purpose.

## Section 10.05. Referendum Petitions; Suspension of Effect of Ordinance.

When a referendum petition is filed with the city secretary, the ordinance sought to be reconsidered shall be suspended from taking effect. Such suspension shall terminate when:

(a) there is a final determination of insufficiency of the petition, or

(b) the petitioner's committee withdraws the petition, or

(c) the council repeals the ordinance, or

(d) the vote of the people in a referendum election determines whether the ordinance sought to be repealed is repealed or is sustained and the election results are certified by the election officials.

All action previously taken under such ordinance or resolution shall be suspended and its legality or validity determined by the final disposition of the referendum petition.

## Section 10.06. Action on Petitions.

(a) **Action by Council:** The city council shall promptly consider the proposed initiative ordinance in the manner prescribed for enacting ordinances or reconsider

the referred ordinance by voting its repeal. Within sixty (60) days after the date the initiative or referendum petition has been finally determined sufficient the city council shall either (1) adopt a proposed initiative ordinance without any change in substance, or (2) repeal a referred ordinance, or (3) call an election on the proposed or referred ordinance, said election to be held not later than thirty (30) days from the date called.

(b) **Submission to Voters:** The vote of the city on a proposed or referred ordinance shall be held not later than thirty (30) days from the date called by council, except that when a regular city election is to be held within one hundred twenty (120) days, but not less than thirty (30) days, after the final council vote, the vote on the ordinance shall be held at the same time as the regular city election.

Copies of the proposed or referred ordinance shall be made available at the polls and shall also be made available at the city secretary's office for fifteen (15) days immediately preceding the election and shall be posted at the regular posting places for fifteen (15) days immediately preceding the election.

(c) **Withdrawal of Petitions:** An initiative or referendum petition may be withdrawn at any time prior to the twentieth (20th) day preceding the day scheduled for a vote of the city by filing with the city secretary a request for withdrawal signed by at least six members of the petitioners' committee. Upon filing of such request the petition shall have no further force or effect and all proceedings thereon shall be terminated.

## Section 10.07. Results of Election.

(a) **Initiative:** If a majority of the qualified electors voting on a proposed initiative ordinance vote in its favor, it shall be considered adopted upon certification of the election results and shall be treated in all respects in the same manner as ordinances of the same kind adopted by the city council. If conflicting ordinances are approved at the same election, the one receiving the greatest number of affirmative votes shall prevail to the extent of such conflict.

(b) **Limitation of Council Repeal:** The city council may not repeal or amend the initiated ordinance for one (1) year after the effective date and then only by the affirmative vote of five (5) members of the city council.

(c) **Referendum:** If a majority of the qualified electors voting on a referred ordinance vote against it, it shall be considered repealed upon certification of the election results.

## Section 10.08. Power of Recall.

The qualified voters shall have the power to recall any elected official of the city on grounds of incompetency, noncompliance with this charter, misconduct or malfeasance in office. Such power shall be exercised by filing with the city secretary a petition, signed by currently qualified voters of the city equal in number to at least twenty percent (20%) of the total number of qualified voters registered to vote at the last regular city election, per district effected, demanding the removal of such elected

official. The petition shall be signed and verified in the manner required for an initiative petition.

### Section 10.09. Recall Election.

The provisions regulating initiation, certification, amendment and withdrawal of initiative petitions shall apply to recall petitions. If the petition is certified by the city secretary to be sufficient, the city council shall order an election forthwith to determine whether such officer shall be recalled.

### Section 10.10. Results of Recall Election.

If a majority of the votes cast at a recall election shall be against removal of the elected official named on the ballot, she/he shall continue in office. If the majority of the votes cast at the election are for the removal of the elected official named on the ballot, the city council shall immediately declare her/his office vacant and such vacancy shall be filled in accordance with the provisions of this charter for the filling of vacancies. An elected official thus removed shall not be a candidate to succeed herself/himself.

### Section 10.11. Limitation on Recall.

No elected official shall be subjected to more than one (1) recall in a twelve (12) month period.

The elected official whose removal is sought may, within five (5) days after such recall petition has been presented to the city council, request that a public hearing be held to permit her/him to present facts pertinent to the charges specified in the recall petition. In this event, the city council shall order such public hearing to be held, not less than five (5) days or more than fifteen (15) days after receiving such request for a public hearing.

### Section 10.12. Failure of City Council to Call an Election.

In case all of the requirements of this charter shall have been met and the city council fails or refuses to receive the recall petition, or order such recall election, or discharge other duties imposed upon said city council by the provisions of this charter with reference to such recall, then the County Judge of Hale County, Texas, shall discharge any such duties herein provided to be discharged by the city secretary or by the city council. In addition, any qualified voter in the city may seek judicial relief in the District Court of Hale County, Texas, to have any of the provisions of this charter pertaining to recall carried out by the proper official.

# APPENDIX 6

THE TEXAS CONSTITUTION

ARTICLE 11. MUNICIPAL CORPORATIONS

Sec. 1.  COUNTIES AS LEGAL SUBDIVISIONS.  The several counties of this State are hereby recognized as legal subdivisions of the State.

Sec. 2.  JAILS, COURT-HOUSES, BRIDGES, AND ROADS.  The construction of jails, court-houses and bridges and the laying out, construction and repairing of county roads shall be provided for by general laws.

(Amended Nov. 2, 1999.)  (TEMPORARY TRANSITION PROVISIONS for Sec. 2: See Appendix, Note 1.)

Sec. 3.  SUBSCRIPTIONS TO CORPORATE CAPITAL; DONATIONS; LOAN OF CREDIT.  No county, city, or other municipal corporation shall hereafter become a subscriber to the capital of any private corporation or association, or make any appropriation or donation to the same, or in anywise loan its credit; but this shall not be construed to in any way affect any obligation heretofore undertaken pursuant to law or to prevent a county, city, or other municipal corporation from investing its funds as authorized by law.

(Amended Nov. 7, 1989.)

Sec. 4.  CITIES AND TOWNS WITH POPULATION OF 5,000 OR LESS; CHARTERED BY GENERAL LAW; TAXES; FINES, FORFEITURES, AND PENALTIES. Cities and towns having a population of five thousand or less may be chartered alone by general law.  They may levy, assess and collect such taxes as may be authorized by law, but no tax for any purpose shall ever be lawful for any one year which shall exceed one and one-half per cent of the taxable property of such city; and all taxes shall be collectible only in current money, and all licenses and occupation taxes levied, and all fines, forfeitures and penalties accruing to said cities and towns shall be collectible only in current money.

(Amended Aug. 3, 1909, and Nov. 2, 1920.)


     Sec. 5.   CITIES OF MORE THAN 5,000 POPULATION; ADOPTION OR
AMENDMENT OF CHARTERS; TAXES; DEBT RESTRICTIONS.   (a)   Cities having
more than five thousand (5000) inhabitants may, by a majority vote of
the qualified voters of said city, at an election held for that
purpose, adopt or amend their charters.   If the number of inhabitants
of cities that have adopted or amended their charters under this
section is reduced to five thousand (5000) or fewer, the cities still
may amend their charters by a majority vote of the qualified voters of
said city at an election held for that purpose.   The adoption or
amendment of charters is subject to such limitations as may be
prescribed by the Legislature, and no charter or any ordinance passed
under said charter shall contain any provision inconsistent with the
Constitution of the State, or of the general laws enacted by the
Legislature of this State.   Said cities may levy, assess and collect
such taxes as may be authorized by law or by their charters; but no
tax for any purpose shall ever be lawful for any one year, which shall
exceed two and one-half per cent. of the taxable property of such
city, and no debt shall ever be created by any city, unless at the
same time provision be made to assess and collect annually a
sufficient sum to pay the interest thereon and creating a sinking fund
of at least two per cent. thereon, except as provided by Subsection
(b).   Furthermore, no city charter shall be altered, amended or
repealed oftener than every two years.

     (b)   To increase efficiency and effectiveness to the greatest
extent possible, the legislature may by general law authorize cities
to enter into interlocal contracts with other cities or counties
without meeting the assessment and sinking fund requirements under
Subsection (a).

(Amended Aug. 3, 1909, Nov. 5, 1912, Nov. 5, 1991, and Nov. 8, 2011.)


     Sec. 6.   (Repealed Nov. 2, 1999.)

(TEMPORARY TRANSITION PROVISIONS for Sec. 6: See Appendix, Note 1.)


     Sec. 7.   COUNTIES AND CITIES ON GULF OF MEXICO; TAX FOR SEA

WALLS, BREAKWATERS, AND SANITATION; BONDS; CONDEMNATION OF RIGHT OF WAY. (a) All counties and cities bordering on the coast of the Gulf of Mexico are hereby authorized upon a vote of the majority of the qualified voters voting thereon at an election called for such purpose to levy and collect such tax for construction of sea walls, breakwaters, or sanitary purposes, as may now or may hereafter be authorized by law, and may create a debt for such works and issue bonds in evidence thereof. But no debt for any purpose shall ever be incurred in any manner by any city or county unless provision is made, at the time of creating the same, for levying and collecting a sufficient tax to pay the interest thereon and provide at least two per cent (2%) as a sinking fund, except as provided by Subsection (b); and the condemnation of the right of way for the erection of such works shall be fully provided for.

(b) To increase efficiency and effectiveness to the greatest extent possible, the legislature may by general law authorize cities or counties to enter into interlocal contracts with other cities or counties without meeting the tax and sinking fund requirements under Subsection (a).

(Amended Nov. 8, 1932, Nov. 6, 1973, Nov. 6, 2001, and Nov. 8, 2011.) (TEMPORARY TRANSITION PROVISION for Sec. 7: See Appendix, Note 3.)


Sec. 8. DONATION OF PORTION OF PUBLIC DOMAIN TO AID IN CONSTRUCTION OF SEA WALLS OR BREAKWATERS. The counties and cities on the Gulf Coast being subject to calamitous overflows, and a very large proportion of the general revenue being derived from those otherwise prosperous localities, the Legislature is especially authorized to aid by donation of such portion of the public domain as may be deemed proper, and in such mode as may be provided by law, the construction of sea walls, or breakwaters, such aid to be proportioned to the extent and value of the works constructed, or to be constructed, in any locality.


Sec. 9. PROPERTY EXEMPT FROM FORCED SALE AND FROM TAXATION. The property of counties, cities and towns, owned and held only for public purposes, such as public buildings and the sites therefor, fire engines and the furniture thereof, and all property used, or intended

for extinguishing fires, public grounds and all other property devoted exclusively to the use and benefit of the public shall be exempt from forced sale and from taxation, provided, nothing herein shall prevent the enforcement of the vendors lien, the mechanics or builders lien, or other liens now existing.

Sec. 10.   (Repealed Aug. 5, 1969.)

Sec. 11.   TERM OF OFFICE EXCEEDING TWO YEARS IN HOME RULE AND GENERAL LAW CITIES; VACANCIES.  (a) A Home Rule City may provide by charter or charter amendment, and a city, town or village operating under the general laws may provide by majority vote of the qualified voters voting at an election called for that purpose, for a longer term of office than two (2) years for its officers, either elective or appointive, or both, but not to exceed four (4) years; provided, however, that tenure under Civil Service shall not be affected hereby; provided, however, that such officers, elective or appointive, are subject to Section 65(b), Article XVI, of this Constitution, providing for automatic resignation in certain circumstances, in the same manner as a county or district officer to which that section applies.

(b)   A municipality so providing a term exceeding two (2) years but not exceeding four (4) years for any of its non-civil service officers must elect all of the members of its governing body by majority vote of the qualified voters in such municipality.

(c)   Any vacancy or vacancies occurring on such governing body shall not be filled by appointment but must be filled by majority vote of the qualified voters at a special election called for such purpose within one hundred and twenty (120) days after such vacancy or vacancies occur except that the municipality may provide by charter or charter amendment the procedure for filling a vacancy occurring on its governing body for an unexpired term of 12 months or less.

(Added Nov. 4, 1958; amended Nov. 6, 2001; Subsec. (b) amended and (c) added Nov. 5, 2013.)  (TEMPORARY TRANSITION PROVISION for Sec. 11: See Appendix, Note 3.)

Sec. 12.   EXPENDITURES FOR RELOCATION OR REPLACEMENT OF SANITATION SEWER OR WATER LATERALS ON PRIVATE PROPERTY.  The

legislature by general law may authorize a city or town to expend public funds for the relocation or replacement of sanitation sewer laterals  or water laterals on private property if the relocation or replacement is done in conjunction with or immediately following the replacement or relocation of sanitation sewer mains or water mains serving the property.  The law must authorize the city or town to affix, with the consent of the owner of the private property, a lien on the property for the cost of relocating or replacing the laterals on the property and must provide that the cost shall be assessed against the property with repayment by the property owner to be amortized over a period not to exceed five years at a rate of interest to be set as provided by the law.  The lien may not be enforced until after five years have expired since the date the lien was affixed.

(Added Nov. 8, 1983; amended Nov. 5, 1985.)


     Sec. 13.  CLASSIFICATION OF MUNICIPAL FUNCTIONS.  (a) Notwithstanding any other provision of this constitution, the legislature may by law define for all purposes those functions of a municipality that are to be considered governmental and those that are proprietary, including reclassifying a function's classification assigned under prior statute or common law.
     (b)  This section applies to laws enacted by the 70th Legislature, Regular Session, 1987, and to all subsequent regular or special sessions of the legislature.

(Added Nov. 3, 1987.)

APPENDIX 7

# CITY OF PLAINVIEW

# <u>PERSONNEL POLICY</u>

Incorporates all Personnel
Policy Amendments through
March 9, 2006

supervisor, director, and the City Manager is required for such leave. In an effort to encourage self-development, training, and education, the City offers a tuition reimbursement program as an additional benefit for regular full-time employees. Information and application forms for tuition reimbursement are available in the Personnel Department.

Section 9.8 Employee Suggestions. Employees on the frontlines of City operations can detect shortcomings and unforeseen problems when work theories and principles are put into practice. The City encourages each employee to make suggestions which could improve any facet of municipal service or working conditions.

Section 9.9 Telephone.

A. Telephone Technique. Employees are expected to use rules of everyday courtesy in using the telephone. Employees should always identify themselves and their department. If the inquiry has been misdirected, every reasonable effort should be made to direct the call to the proper person and department.

B. Personal Calls. The City telephone is installed for business purposes, and personal calls should be kept to an absolute minimum. Long distance calls and personal communications that incur user charges should be placed on a collect basis or be charged directly to the employee's personal credit card. As warranted by special or emergency circumstances, an employee's supervisor may allow him/her to place a call on the City's telephone account. However, employees shall reimburse the City for the cost of any personal phone calls. Employees shall forward sufficient information on such calls (date, time, and number called) to the Finance Department so that said expense can be charged back to the responsible employee. Employees shall reimburse the City within seven (7) days of being notified of the expense.

C. Cellular Services. Cellular telephones and cellular services may not be purchased for City use without prior approval of the City Manager. Requests for new cellular phones and services shall be submitted in writing and shall consider other less expensive means of communications. All purchases of cellular telephones and cellular service must be made through the telephone coordinator designated by the City Manager. No third party contracts will be authorized or paid by the City.

D. Call-back. As a condition of employment, an employee may be required to have a home telephone. City employees may be subject to "call back" as determined by their supervisor.

E. Monthly Reporting. Each month the Finance Department shall forward an itemized departmental phone service bill to the head of the department accountable. Each department head will review phone records and monitor for misuse and continued benefit to the City.

## PART X: DISCIPLINE

Section 10.1 Basis for Discipline. Supervisors are charged with maintaining proper working standards and discipline within their departments. The following list includes offenses which constitute grounds for disciplinary action, up to and including dismissal. The list is not intended to be all inclusive but is informational in nature. Ignorance of any official rule, regulation, or special order is not an excuse for its violation.

A. Absence without leave or excessive absenteeism.

B. Bribery.

C. Conviction of a felony, class A or B misdemeanor offense, or a crime of moral turpitude.

D. Damaging, destroying, or wasting City property or supplies.

E. Discourteous, offensive, or abusive language or conduct in the line of duty.

F. Endangering or threatening to endanger another person.

G. Failing to report an injury, accident, or damage to City property.

H. Falsification, unauthorized disclosure, or improper use of official information.

I. Habitual tardiness.

J. Inciting, attempting to incite, or participating in a strike against the City.

K. Incompetence, inefficiency, or negligence in the performance of duty.

L. Insubordination.

M. Misconduct.

N. Participation in prohibited political activities.

O. Possession of or being under the influence of drugs or alcohol while on duty.

P. Theft or misuse of City property, funds, or services.

Q. Unauthorized or improper use of official authority.

R. Violation of any provision of the Plainview City Charter, Personnel Policy, or approved departmental policy.

Section 10.2 Progressive Discipline. The City endorses a policy of progressive discipline to provide employees with notice of deficiencies and opportunities to improve. Progressive discipline steps may include, but are not limited to, the following:

A. Verbal Warning. First offenses and minor violations may result in the supervisor speaking with the employee.

B. Written Reprimand. Repeat offenses and more serious violations may result in the supervisor formally reprimanding the employee in writing.

C. Suspension With or Without Pay. Depending on the circumstances, an employee may be suspended by his/her supervisor with or without pay for up to thirty (30) days or longer. The number of days an employee is suspended will depend on the seriousness of the offense.

D. Reduction in pay, classification, or both. The gravity of certain offenses may be best addressed by demotions and/or reductions in pay. Reductions shall be made upon supervisor recommendation with City Manager and director approval.

E. Dismissal. The disciplinary process may culminate in an employee's termination or may occur immediately as the first step, if warranted. Dismissals shall be based upon the

recommendation of the employee's supervisor. Dismissals are only effective upon the approval of the employee's director and the City Manager.

F. Written Record. Supervisors shall maintain written records of all offenses and disciplinary actions taken. Records of disciplinary actions taken should include at least the following: a description of the occurrence in detail, any related prior violations, the consequences of uncorrected behavior, and recommendations for improvement. Records of verbal warnings need only be maintained in the supervisor's file. The supervisor shall provide copies of all other formal, written rebukes to the employee, the Personnel Department, his/her director, and the City Manager.

G. Exempt Employees. Employees classified as exempt under the FLSA are not subject to disciplinary deductions in pay of less than a full work week at a time, except for disciplinary actions taken as a result of major violations of safety rules.

Section 10.3 Pre-termination Procedures. Whenever possible, a supervisor considering a disciplinary termination should meet with the employee in a pre-termination conference. If warranted, a supervisor may elect to have another staff member present during the meeting. The supervisor, after stating his/her reasons, shall give the employee a chance to respond. Any notice of termination shall be personally delivered to the employee or his/her designee. Alternatively, a termination notice may be mailed by certified mail, return receipt requested, to the employee's last known address.

Section 10.4 Right to Appeal. Any employee who believes that he/she has been treated unfairly may utilize the employee grievance procedure.

Section 10.5 Employee Grievance Procedure.

A. Purpose. This procedure allows employees an opportunity to present their work-related complaints and to appeal decisions through a dispute resolution process. The grievance procedure is the exclusive remedy for employees with appropriate grievances.

B. Grounds. The City will attempt to prevent the occurrences of grievances and to resolve promptly all grievances which are appropriate for handling under this policy.

Matters considered appropriate for handling through the grievance procedure include: (1) a belief that City policies, practices, rules, regulations, or procedures (but not the policies, practices, rules, regulations, or procedures themselves) have been applied in a manner detrimental to an employee; (2) unfair treatment; (3) improper or unfair administration of employee benefits or conditions of employment; and (4) improper working conditions.

Grievances which pertain to harassment should be handled in accordance with the procedure established in Section 10.6.

C. Rights. Any employee who presents a complaint in good faith and in a reasonable manner will be free from any restraint, interference, discrimination, or reprisal. An employee will have the right, with or without his/her representative, to discuss such matters with his/her immediate supervisor and higher levels of supervision. Any information concerning an employee grievance will be handled as confidentially as possible. The matters are to be discussed only with individuals who have a need to know or who can supply necessary information. The City may, at its discretion, refuse to proceed with any complaint which it determines is improper under this policy.

D. Employee Grievance Committee.

1. The Employee Grievance Committee shall consist of seven (7) members: two (2) members of the City administrative staff (except the director of the appealing employee); two (2) supervisors (except the supervisor of the appealing employee); and three (3) employees (except representatives of the Personnel Department). Except as noted all members of the City administrative staff and all supervisors are permanent members of the Employee Grievance Committee and, as such, are subject to be called to hear a grievance at any time. Members of the committee shall be drawn by lot by the employee filing the grievance.

2. The Personnel Department will provide a resource person who serves as secretary to the grievance committee.

3. In January of each year, the employees of each City department shall nominate one (1) person from their department to serve on the Employee Grievance Committee as employee nominees. Departmental foremen, supervisors, sergeants, lieutenants, and captains are not eligible for nomination. Employee nominees will serve for one (1) year.

E. Procedure.

1. Step One. An employee shall first discuss the complaint or grievance with his/her supervisor and director in a joint meeting. The meeting shall be held within seven (7) calendar days of the incident's occurrence.

a. If an employee's immediate supervisor is the director or if the department is temporarily operating without a director, the employee will draw by lot the name of a member of the City administrative staff. The individual chosen will be present at the meeting in a strictly advisory capacity.

b. For purposes of this policy, "City administrative staff" includes: the Director of Public Works; Police Chief; Fire Chief; Director of Finance; Director of Community Development; and Municipal Court Judge.

c. The decision of the director or department head (if a department is temporarily operating without a director) shall be made in writing within seven (7) calendar days. It shall be delivered to the employee and his/her supervisor.

2. Step Two. An employee may appeal to the Employee Grievance Committee within seven (7) calendar days of the previous decision. The employee shall deliver the notice of appeal to the Personnel Department. The written notice shall state the reason(s) for the appeal.

a. The Employee Grievance Committee shall convene a joint meeting with everyone concerned within seven (7) calendar days of the receipt of the written appeal.

b. The Employee Grievance Committee will render its decision in writing within seven (7) calendar days of the meeting's conclusion. The written decision shall be delivered to the employee and his/her supervisor and director.

3. Step Three. A final appeal may be made in writing by the employee or his/her supervisor to the City Manager within five (5) calendar days of the previous decision. The City Manager shall render a decision in writing on the grievance within ten (10) calendar days. His/Her decision shall be final and binding upon all parties.

APPENDIX 8

796 S.W.2d 497
Court of Appeals of Texas,
Dallas.

Jesse BACA, Appellant,

v.

CITY OF DALLAS, Appellee.

No. 05–89–00819–CV.   |   July 11, 1990.

City civil service trial board upheld discharge of policeman. Discharged policeman sought judicial review. The 193rd Judicial District Court, Dallas County, Michael O'Neill, J., sustained discharge. Discharged policeman appealed. The Court of Appeals, Howell, J., held that: (1) discharged policeman did not have constitutional right to jury trial, and (2) due process principles did not entitle discharged policeman to full evidentiary trial court review.

Affirmed.

West Headnotes (5)

**[1]**    **Jury**
           Trial on Appeal or Other Proceeding for Review

Discharged policeman did not have right to jury trial on appeal from city's civil service trial board decision upholding policeman's discharge. U.S.C.A. Const.Amends. 7, 14; Vernon's Ann.Texas. Const. Art. 1, § 15; Art. 5, § 10.

1 Cases that cite this headnote

**[2]**    **Jury**
           Application of Provisions of Federal Constitution to State Courts

The United States Constitution does not guarantee the right to trial by jury in any state court in any character of civil action. U.S.C.A. Const.Amend. 7.

2 Cases that cite this headnote

**[3]**    **Constitutional Law**
           Source of Right or Interest

Property interests are not created by the United States Constitution; they are created and their dimensions are defined by existing rules or understandings that stem from independent source such as state law. U.S.C.A. Const.Amends. 5, 14.

Cases that cite this headnote

**[4]**    **Constitutional Law**
           Termination or Discharge

Due process requires public employer to provide its employee oral or written notice of charges against him, explanation of employer's evidence, fair opportunity for employee to present his side of the story, and full evidentiary posttermination hearing conducted at meaningful time. U.S.C.A. Const.Amends. 5, 14.

3 Cases that cite this headnote

**[5]**    **Constitutional Law**
           Termination or Discharge
           **Municipal Corporations**
           Review in General

Due process principles did not entitle discharged policeman to full evidentiary trial court review of city's civil service trial board determination upholding policeman's discharge; discharged policeman had been allowed to present evidence and arguments at hearing before the board, and city's charter provided for district court appeal based only upon review of record made before the trial board. U.S.C.A. Const.Amends. 5, 14.

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*498**  Thomas J. Turner, Dallas, for appellant.

Craig Hopkins, Dallas, for appellee.

Before HOWELL, LAGARDE and THOMAS, JJ.

## OPINION

HOWELL, Justice.

The City of Dallas (City) discharged Jesse Baca (Employee), a policeman, on March 22, 1985. Employee appealed his discharge to the City of Dallas Civil Service Trial Board. The trial board conducted a hearing, during which both Employee and City presented evidence and arguments. After the trial board upheld his discharge, Employee appealed to the district court. The district court denied Employee's motion for a jury trial and refused to allow Employee to present evidence other than the statement of facts from the trial board hearing. The district court then sustained Employee's discharge. Employee contends that he has a constitutional right to a jury trial and a right under the Due Process Clause of the United States Constitution to present additional evidence in his appeal to the district court. Because we hold that neither the federal constitution nor the state constitution requires a jury trial in a case such as this and that all due process procedural requirements were met, we affirm the judgment of the trial court.

In his first point of error, Employee contends that the trial court erred in denying his request for a jury trial. He argues that the denial of a jury trial is a violation of article I, section 15 and article V, section 10 of the Texas Constitution and amendments VII and XIV of the United States Constitution.

 [1]    [2]    After reviewing applicable law, we conclude that Employee had no constitutional right to have a jury trial in his appeal of his termination. The United States Constitution does not guarantee the right to a trial by jury in any *state* court in any character of civil action. *White v. White,* 108 Tex. 570, 579, 196 S.W. 508, 511 (1917); *Huguley v. Board of Adjustment,* 341 S.W.2d 212, 217 (Tex.Civ.App.—Dallas 1960, no writ). Therefore, Employee had no federal constitutional right to a jury trial. Additionally, Texas case law has long held that under the Texas Constitution, a party is entitled to a jury trial only "if that practice prevailed in this state, according to the then existing laws, at the time of the adoption of said provisions as portions of our present State Constitution of 1876." *White,* 108 Tex. at 581, 196 S.W. at 512; *Adams v. Texas State Bd. of Chiropractic Examiners,* 744 S.W.2d 648, 651 (Tex.App.—Austin 1988, no writ); *City of Houston v. Blackbird,* 658 S.W.2d 269, 273 (Tex.App.—Houston [1st Dist.] 1983, writ **\*499** dism'd); *Huguley,* 341 S.W.2d at 217; *Texas Liquor Control Bd. v. Jones,* 112

S.W.2d 227, 229 (Tex.Civ.App.—Texarkana 1937, no writ). In *Huguley,* this Court quoted a law review article stating: "Since appeals from administrative decisions were unknown to Texas law at the time of the adoption of the Constitution there is no right to a jury trial in actions brought to review administrative decisions, unless statute so provides." *Id.* at 217 (quoting Harris, *The Administrative Law of Texas,* 29 Tex.L.Rev. 213, 223 (1951)). Since the decision to terminate Employee was an administrative decision, Employee has no state constitutional right to a jury trial. We overrule Employee's first point of error.

In his second point of error, Employee contends that the district court erred in refusing to allow him to present evidence or testimony. He cites as authority for this contention the Fourteenth Amendment to the United States Constitution which reads in part: "Nor shall any State deprive any person of life, liberty, or property without due process of law...." Employee argues that the trial court's refusal to allow him to present evidence or testimony should be considered a violation of due process. City replies that, as a home-rule municipal corporation, it possesses plenary powers by virtue of article 11, section 5 of the Texas Constitution, subject only to limitations imposed by its own charter and ordinances. *See Interstate Circuit, Inc. v. City of Dallas,* 247 F.Supp. 906, 909 (N.D.Tex.1965); *City of Dallas v. Parker,* 737 S.W.2d 845, 847 (Tex.App.—Dallas 1987, no writ). Therefore, City contends that since its charter provides for a district court appeal by a discharged employee based only upon a review of the record made before the trial board, the district court correctly denied additional evidence.

 [3]    To bring himself within the protection of the due process clause, Employee must show that he had a property right in his employment with City. *See Board of Regents v. Roth,* 408 U.S. 564, 576–78, 92 S.Ct. 2701, 2708–10, 33 L.Ed.2d 548 (1972); *City of Amarillo v. Hancock,* 239 S.W.2d 788, 791 (Tex.1951). Property interests are not created by the United States Constitution; "they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law...." *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985) (quoting *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709). Although the due process clause also protects interests of life and liberty, Employee has not contended that he has been deprived of either of these.

 [4]    [5]    Employee contends that he had a right to continued employment with City and that such was a form of property

right. However, we need not decide this issue; we conclude that the procedures employed by City and the district court met due process minimums. Due process requires a public employer to provide its employee: (1) oral or written notice of the charges against him; (2) an explanation of the employer's evidence; (3) a fair opportunity for the employee to present his side of the story; and (4) a full evidentiary post-termination hearing conducted at a meaningful time. *See Loudermill,* 470 U.S. at 546, 105 S.Ct. at 1495; *City of San Antonio v. Lopez,* 754 S.W.2d 749, 752 (Tex.App.—San Antonio 1988, writ denied). Employee does not claim a violation of any of these requirements. Instead, he would take the requirements a step further, i.e., a full evidentiary trial court review. The constitution does not require this additional step. Not only is judicial review of local government dismissals limited in Texas, but it is limited in most, if not all, other jurisdictions. *See* 2A C. ANTIEAU, MUNICIPAL CORPORATION LAW § 22.195 (1976). We overrule Employee's second point of error and affirm the judgment of the trial court.

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

901 S.W.2d 447
Supreme Court of Texas.

Austin David BARBER et al., Petitioners,

v.

COLORADO INDEPENDENT

SCHOOL DISTRICT, Respondent.

No. 94–0054.   |   Argued Nov. 16, 1994.   |   Decided June 22, 1995.

Class action was brought to challenge legality under state constitutional of hair length and earring restrictions imposed by school district upon male high school students. The 32nd District Court, Mitchell County, Jess Holloway, J., granted permanent injunction against enforcement of district's regulations, and district appealed. The Court of Appeals, 864 S.W.2d 806, reversed. Application for writ of error was filed. The Supreme Court, Gonzalez, J., held that claims did not manifest such affront to constitutional rights to equal protection as to merit Court's intervention.

Affirmed.

Gammage and Spector, JJ., filed dissenting opinions.

West Headnotes (4)

[1]     **Appeal and Error**
            Cases Triable in Appellate Court

Supreme Court is obliged to decide issues of law de novo.

49 Cases that cite this headnote

[2]     **Constitutional Law**
            Right to Education

**Constitutional Law**
    Students

**Constitutional Law**
    Students

**Constitutional Law**
    Dress and grooming

**Constitutional Law**
    Elementary and secondary education

**Education**
    Grooming and dress

Claims that school district's hair length restrictions and earring prohibition for male high school students, as applied to students who had reached age of majority, violated state constitutional rights to equal protection, to freedom of expression, to education, and to privacy did not manifest such affront to constitutional rights as to merit intervention by Supreme Court. Vernon's Ann.Texas Const. Art. 1, § 3a.

6 Cases that cite this headnote

[3]     **Education**
            Reasonableness and validity in general

Constitutional rights of students in public schools are not coextensive with rights of adults in other settings.

2 Cases that cite this headnote

[4]     **Constitutional Law**
            Children and minors, rights of

Although minors have constitutional rights, they do not have same constitutional rights as adults; consequently, state has more control over conduct of minors than it does over adults.

4 Cases that cite this headnote

**Attorneys and Law Firms**

**\*447** Pat Barber, Colorado City, James C. Harrington, Austin, for petitioners.

T.L. Rees, C. Michael Ratliff, Colorado City, for respondent.

**Opinion**

GONZALEZ, Justice delivered the opinion of the Court, in which PHILLIPS, Chief Justice, and HIGHTOWER, HECHT, CORNYN, ENOCH and OWEN, Justices, join.

This is a class action challenging the legality under the state constitution of hair length and earrings restrictions imposed by Colorado Independent School District (CISD)

upon its male high school students. The trial court held that CISD's grooming code violated the Texas Constitution and granted a permanent injunction against the school district, prohibiting enforcement of the regulations. The court of appeals reversed the judgment of the trial court, holding that judicial intervention was inappropriate in this case. 864 S.W.2d 806. We refuse to use the Texas Constitution to micro-manage Texas high schools. Therefore, we affirm the judgment of the court of appeals.

In 1992, Austin Barber was an eighteen-year-old high school senior in Colorado City, Texas. CISD's school rules included the following regulation:

 **\*448** The District's dress code is established to teach grooming and hygiene, instill discipline, prevent disruption, avoid safety hazards, and teach respect for authority.

**Boys may wear hair to the bottom of the collar, the bottom of the ear and combed out of the eyes. Boys may not wear earrings of any kind.** Caps and hats not a part of women's formal attire may not be worn in the building. Sudden, unbecoming fashions or anything designed to attract undue attention to the individual or activities are not acceptable. These guidelines are subject to administrative discretion. Extra-curricular organizations may impose a more stringent dress code.

(Emphasis added.) Barber and his family had a contrary view about whether he was required to observe CISD's grooming policy. They notified the school board that Barber had reached the age of majority and requested that CISD suspend enforcement of the grooming regulation as to him and other students aged eighteen and over. They stated that the regulation's restrictions for males regarding hair length and earrings violated Barber's fundamental constitutional rights because the policy did not apply to female students. They concluded that if CISD did not exempt Barber and other adult males from the regulation, they were going to sue. By a 4–to–2 vote, the CISD board members refused to suspend enforcement of the regulation.

Consequently, with the assistance of his father, an attorney, Barber brought a class action against CISD to enjoin its enforcement of the regulation. Barber challenged the constitutionality of CISD's dress code regulation as it pertains to adult male students. Over CISD's objections, the trial court certified the class as all male students attending CISD schools who were eighteen years of age at the time of suit and in the future. Over CISD's objections, the trial court designated Barber the class representative. The case was tried to the court without the benefit of a jury. A summary of the evidence presented at trial follows.

O'Henry Young testified that he has been an attorney for thirty years and has served as a member of the Abilene Independent School Board for many years. He compared Abilene ISD grooming and dress codes to CISD's and stated that Abilene ISD chose to "get out of the hair business," in part because the school board was unsure whether it could legally regulate this area. He did not think that CISD's regulation served a useful purpose.

Gary Paterson, the principal of Snyder High School, testified that Snyder ISD did not have a specific rule regarding hair length for the general student population. (It did have a rule that boys could not wear earrings.) For boys in sports, Snyder ISD gave coaches the authority to set standards about the hair length of boys on their teams. Snyder ISD also regulated skirt lengths for girls. Paterson testified that if a boy showed up in school in a dress, he would be presumed disruptive and be asked to change his attire. He did not think that it would be wise to have a different standard for students merely because they were eighteen years old.

Joe Marlett, principal of Sweetwater High School, testified that his school board did not regulate boys' hair length but distinguished between the sexes as to earrings. Boys could wear a stud but not dangling earrings; girls could wear dangling earrings. As to the disparity of rules between the different school districts, Marlett testified that "local policy would govern what is best for their particular school district" and that each school district's regulations represent the societal values of a particular locale. He added that what may be appropriate and in good taste in one district may not be in another.

Raymond Hollis, the superintendent of schools at Westbrook ISD, testified that although his schools' grooming rules do not mention hair length, none of the boys in his schools had hair longer than their collars. Westbrook ISD's grooming rules require that girls' skirts not be shorter than the top of the knee. Hollis indicated that arbitrary rules for hair length and earrings were an important teaching device, which would instill discipline in students by teaching them that there are consequences for not following rules.

**\*449** James McSwain, the high school principal of CISD, testified about the grooming code in question and about the consequences when a student did not follow the rules. In the high school, about twenty-five or thirty male students had been asked to cut their hair, and only two were suspended from school. McSwain testified that the grooming regulation was the result of "a collaborative effort between community and faculty and students." Ultimately the seven-person school board formulated the policies. McSwain opined that there was a compelling reason for the grooming rules, stating that:

> [A] student must comply substantially with the rules of an institution. School has to have rules, obviously, to carry out its business. I think that is part of our responsibility to educate kids. I think it is an educational tool to teach compliance with rules, and that is an integral part of society and is a part of our responsibility to teach students that they must comply with rules even if they don't agree with the rule.

McSwain added that Barber was in a "home-bound" program due to knee surgery, and that he attended classes at school part of the time, but that most of his school work was done at home.

Barber testified that he cut his hair to appear in a community theater play; that he has never served in-school suspension time due to the length of his hair; that because school administrators threatened him twice with in-school suspension because of the length of his hair, he got it cut; and that he had served in-school suspension time twice during his sophomore year (once for leaving school without signing out and once for being tardy four times to his first period class). Barber testified that he brought the lawsuit for the following reasons:

> Because I don't feel that four members of a School Board should be able to dictate to an adult student matters of hairstyle, which to me is an expression of individualism and personal freedom. I would like to be free from sexual discrimination.

He also questioned the utility of the hair length and earrings restrictions for males, particularly since they did not apply equally to females. Barber concluded that he wanted to decide for himself the length of his hair and whether and when to wear an earring.

Dwayne Harris, a farmer and member of the CISD school board, testified that the district's grooming regulation corresponds to community values.

Pat Barber, the plaintiff's father who represented his son in this lawsuit, and another attorney testified as to attorney fees.

The foregoing testimony was the sum total of Barber's case.

The defendant, CISD, elicited the testimony of Dr. Edwin Headrick, a professor of psychology at Abilene Christian University. The professor testified that now, more than ever, due to the breakdown of the family, it is important that schools teach students how to live in society. He explained that rules such as the grooming regulation at issue are one way to teach students discipline and respect for authority, as well as personal grooming and hygiene. Headrick stated that rules differ with the community standards of each locale, and that students need to learn how to comply with rules of which they do not approve. He concluded that CISD's grooming rules were an important part of the educational process.

The trial court held that the hair and earrings provisions of CISD's grooming code violated the state Equal Rights Amendment, TEX. CONST. art. I, § 3a, and the constitutional rights to freedom of expression, to an education, and to privacy. It issued an injunction against CISD to prohibit the district from enforcing the regulation as to its adult male students. The trial court also awarded Barber $13,600 in attorneys' fees. The court of appeals reversed and rendered a take-nothing judgment against Barber. 864 S.W.2d at 808. It held that Barber's cause of action did not justify judicial intervention in CISD's enforcement of the grooming code. *Id.* at 807.

**[1]** The trial court rendered judgment solely on the Equal Rights Amendment, TEX. CONST. art. I, § 3a. It filed findings of fact and conclusions of law. The finding of fact most relevant to the ultimate issue is as follows:

> **\*450** C.I.S.D.'s dress and grooming code objectives, enumerated above, may be accomplished by many reasonable means other than the gender-based discrimination expressed in said regulations. All of the credible testimony and other credible evidence establishes that said regulations are not reasonably necessary for the

accomplishment of said objectives, and any evidence to the contrary is specifically found to be not credible.

The finding is one of mixed law and fact, and we are obliged to decide de novo the issues of law. *See generally Richards v. League of United Latin Am. Citizens,* 868 S.W.2d 306, 310–12 (Tex.1993).

 **[2]**    Barber's claims do not manifest such an affront to his constitutional rights as to merit our intervention in this case. *See Ferrell v. Dallas Ind. Sch. Dist.,* 392 F.2d 697, 702–04 (5th Cir.1968) (finding that a school district's high school grooming code did not violate the state or federal constitution). The Fifth Circuit Court of Appeals has a bright line rule for federal district courts in Texas, Louisiana, and Mississippi to apply in these matters. The Fifth Circuit differentiates between college and high school settings. *Compare Karr v. Schmidt,* 460 F.2d 609, 611 (5th Cir.1972) (stating that a high school student's "asserted right to be free of school regulations governing the length of his hair is one that is not cognizable in federal courts"), *cert. denied,* 409 U.S. 989, 93 S.Ct. 307, 34 L.Ed.2d 256 (1972), *with Lansdale v. Tyler Junior College,* 470 F.2d 659, 663 (5th Cir.1972) (en banc) (disapproving enforcement of a junior college's grooming code and stating, "the place where the line of permissible hairstyle regulation is drawn is between the high school door and the college gate"), *cert. denied,* 411 U.S. 986, 93 S.Ct. 2268, 36 L.Ed.2d 964 (1973). It concludes that at the **college** level, a school's asserted educational and disciplinary needs do not justify grooming codes absent exceptional circumstances.

 **[3]**    Because the constitutional rights of students in public high schools are not coextensive with the rights of adults in other settings, *see New Jersey v. T.L.O.,* 469 U.S. 325, 339, 105 S.Ct. 733, 741–42, 83 L.Ed.2d 720 (1985) (easing Fourth Amendment requirements to balance a student's rights against school officials' substantial interest in maintaining discipline), we agree with the Fifth Circuit's sensible approach when reviewing grooming codes in high schools.

It is a matter of common sense that the state judiciary is less competent to deal with students' hair length than a parent, school board, administrator, principal, or teacher. A similar case arose more than twenty years ago in El Paso, Texas, and the Fifth Circuit drew a similar conclusion with regard to the federal judiciary. In *Karr,* the court noted:

> There can, of course, be honest differences of opinion as to whether

any government, state or federal, should as a matter of public policy regulate the length of haircuts, but it would be difficult to prove by reason, logic, or common sense that the federal judiciary is more competent to deal with hair length than are the local school authorities and state legislatures of all our 50 States.

460 F.2d at 611.

Mr. Justice Black, in denying the stay of an injunction that would have barred the El Paso school authorities from enforcing the grooming policy, wrote words that ring true today:

> [T]he record ... [is] calculated to leave the impression that this case over the length of hair has created or is about to create a great national "crisis." I confess my inability to understand how anyone would thus classify this hair length case. The only thing about it that borders on the serious to me is the idea that anyone should think the Federal Constitution imposes on the United States courts the burden of supervising the length of hair that public school students should wear.

*Karr v. Schmidt,* 401 U.S. 1201, 1202–03, 91 S.Ct. 592, 593, 27 L.Ed.2d 797 (1971). This statement is no less applicable to the Texas Constitution and state courts.

In *Mercer v. Board of Trustees,* 538 S.W.2d 201, 206 (Tex.Civ.App.—Houston [14th Dist.] 1976, writ ref'd n.r.e.), a high school student challenged a school grooming regulation similar to CISD's under the state Equal Rights Amendment, and sought to enjoin **\*451** enforcement of the regulation. After obtaining no relief in the trial court, he appealed to the court of appeals which refused to intervene. That court noted that elementary and high school students:

> are in a formative period of their lives wherein their values are being established by parents, church, and school. All may reasonably establish rules of conduct arising out of the

relationship without intervention of the courts.

*Id.* at 206. The student in *Mercer* appealed to this Court. Without issuing an opinion, we also refused to intervene. We subsequently cited *Mercer* with approval in *Eanes Indep. Sch. Dist. v. Logue,* 712 S.W.2d 741, 742 (Tex.1986), in which we directed a trial judge to rescind an order affecting how three high schools conducted their extracurricular sports programs.

 **[4]**    Although minors have constitutional rights, they do not have the same constitutional rights as adults. *See, e.g., In re J.T.H.,* 779 S.W.2d 954, 956 (Tex.App.—Austin 1989, no writ) (holding that a statute allowing the imprisonment of juveniles without presenting an indictment was valid under the state and federal constitutions); *Strange v. State,* 616 S.W.2d 951, 953 (Tex.Civ.App.—Houston [14th Dist.] 1981, no writ) (holding that minors do not have a constitutional right to a jury trial in the adjudicative stage of a juvenile proceeding); Diamond, *The First Amendment and Public Schools: The Case Against Judicial Intervention,* 59 TEX.L.REV. 477, 489 (1981) (discussing *McKeiver v. Pennsylvania,* 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971), which held that minors do not have the right to a jury trial in criminal proceedings against them). In *Bellotti v. Baird,* 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979), the United States Supreme Court explained the purpose for the distinction between the constitutional rights of minors and adults as follows:

> We have recognized three reasons justifying the conclusion that the constitutional rights of children cannot be equated with those of adults: the peculiar vulnerability of children; their inability to make critical decisions in an informed, mature manner; and the importance of the parental role in child-rearing.

*Id.* at 634, 99 S.Ct. at 3043 (plurality opinion). Consequently, the state has more control over the conduct of minors than it does over adults. *Ginsberg v. New York,* 390 U.S. 629, 638, 88 S.Ct. 1274, 1280, 20 L.Ed.2d 195 (1967) (quoting *Prince v. Massachusetts,* 321 U.S. 158, 170, 64 S.Ct. 438, 444, 88 L.Ed. 645 (1944)).

For all of these reasons, we affirm the judgment of the court of appeals.

GAMMAGE, Justice, dissenting.

The majority summarily dismisses Austin David Barber's constitutional claims without the benefit of legal analysis and fails to find that CISD's hair-length regulation implicates the Texas Equal Rights Amendment. It is wrong for several reasons.

First, Barber pleaded his case exclusively on state constitutional grounds. He brought this suit against CISD because the high school's "hair code" restrictions, which apply only to male students, violated his constitutionally protected rights of privacy and symbolic speech, and freedom from gender discrimination under the Texas ERA. (Although Barber's privacy and free speech claims under the Texas Constitution are significant, I would dispose of this case on the grounds clearly presented by the Texas ERA.) Second, the CISD regulation reads:

> Boys may wear hair to the bottom of the collar, the bottom of the ear and combed out of the eyes. Boys may not wear earrings of any kind.

This regulation, on its face, provides for different treatment of males and females. "Any classification based upon sex is a suspect classification and any law or regulation that classifies persons for different treatment on the basis of their sex is subject to strictest judicial scrutiny." *Mercer v. Board of Trustees, North Forest Ind. Sch. Dist.,* 538 S.W.2d 201, 206 (Tex.Civ.App.—Houston [14th Dist.] 1976, writ ref'd n.r.e.). Because this regulation is facially discriminatory and Barber brought his cause of action for gender discrimination, we must apply an ERA analysis.

 **\*452**    Article I, section 3a of the Texas Constitution mandates that "[e]quality under the law shall not be denied or abridged because of sex, race, color, creed, or national origin." The Texas constitution provides broader protection than federal law in matters of gender discrimination because the Texas Equal Rights Amendment "is more extensive and provides more specific protection than both the United States and Texas due process and equal protection guarantees." *In re McLean,* 725 S.W.2d 696, 698 (Tex.1987). Our jurisprudence recognizes gender as a suspect classification in this state. *Id.; see also Maloy v. City of Lewisville,* 848 S.W.2d 380 (Tex.App.—Fort Worth 1993, no writ); *Williams v. City of Fort Worth,* 782 S.W.2d 290 (Tex.App.—Fort Worth 1989, writ denied); *In re Baby Girl S.,* 628 S.W.2d. 261 (Tex.App.—Eastland 1982, writ ref'd n.r.e.); *Mercer v. Board*

*of Trustees, North Forest Ind. Sch. Dist.,* 538 S.W.2d 201 (Tex.Civ.App.—Houston [14th Dist.] 1976, writ ref'd n.r.e.). We recognize that "[t]he first step in a case invoking this provision is to determine whether equality under the law has been denied.... Our next inquiry is whether equality was denied *because of* a person's membership in a protected class of sex, race, color, creed, or national origin." *McLean,* 725 S.W.2d at 697.

The school district acknowledges that its restriction prohibiting hair extending over a student's collar applies only to males. Accordingly, under the strict scrutiny we must give a gender-based code, regulation or rule, a governmental entity must demonstrate that it has a compelling state interest in discriminating on the basis of gender which cannot be achieved in any other manner. Here, the district maintains that it is sufficient reason to discriminate against male students, if, as the Colorado I.S.D.'s Code of Conduct handbook states, the purpose in regulating the hair length of only males is "to teach grooming and hygiene, instill discipline, prevent disruptions, avoid safety hazards, and teach respect for authority." At trial and in argument, the school district admitted that what might be its sole compelling interest for this rule is preventing disruptions that long hair on male students may cause. Counsel for the school district, however, conceded before this Court that the district offered no evidence and made no attempt to prove that long hair on male students caused any disruption within the schools. To the contrary, in the words of the district's own counsel:

> [T]he only thing we can do to disprove or prove a compelling point on this matter is to prove disruption. How can you do that? A long-haired student is just as peaceful, he's a good athlete, good academic, he sits in the back row and does just as good a job as everybody else in that classroom. HOW DO WE PROVE THAT THAT IS DISRUPTIVE? WE CAN'T..

Other courts addressing school districts' arguments that long hair on male students is disruptive have also noted:

> Educators testifying for the defendants stated that in their *opinions* long hair on male students *could* be disruptive, and, thus, they believed the maximum hair length rule to be necessary to promote the educational process.

As we read the record, none of these defense witnesses documented a factual basis for his opinion that there was any *cause and effect* relationship between short hair and better education or between long hair and inferior education.

*Neuhaus v. Federico,* 12 Or.App. 314, 505 P.2d 939, 945 (1973) (emphasis in original).

Nor are the hair-length restrictions even rationally related to the goals of promoting safety and hygiene. "[A]lthough girls engage in substantially the same activities in gym and biology classes, only boys have been required to cut their hair in order to attend classes.... [D]efendants have offered no reasons why health and safety objectives are not equally applicable to high school girls." *Crews v. Cloncs,* 432 F.2d 1259, 1266 (7th Cir.1970). CISD's argument that its policy promotes grooming and hygiene among the entire student body is suspect because the regulation only addresses the length of a male student's hair, not its style or cleanliness. *See Neuhaus,* 505 P.2d at 945. Because CISD can offer no proof that any purported objectives of educational policy are met by regulating the hair length of male students only, the hair-length rule cannot survive even minimum rationality scrutiny.

**\*453** Finally, CISD's grooming policy fails the minimum scrutiny of a rational basis test because it significantly intrudes into the private lives of students with proportionately little justification.

> [W]hile the intention of such a rule is to control hair length during school hours, its necessary effect is to control hair length for 24 hours a day and out-of-school activity is therefore regulated more than is in-school activity. Since hair cannot, in the nature of things, be short at school and yet the length preferred by a student and his parent at other times, this rule is more akin to a regulation forbidding students from attending parties in the evening, than one prohibiting metal shoes in a school building.... A rule imposing such a significant invasion into the private lives of children and their parents requires a showing of greater

justification and demonstrable need by the school board than one regulating purely in-school appearance, such as a rule about lengths of skirts.

*Independent Sch. Dist. No. 8 of Seiling, Dewey County v. Swanson,* 553 P.2d 496 (Okla.1976.); *see also Neuhaus, supra.* CISD's argued justification for this dramatic incursion into male students' private lives is too unsubstantial to support the legitimacy of its hair-length policy.

The school district admittedly cannot prove that this gender-based discriminatory hair length rule could meet even the much less stringent standards of a rational basis test. It argues, instead, that the rule is a mandatory "teaching device," reflecting "the community's societal values. It's harder for a person in Colorado City, Texas to get a job if they have long hair." The majority of this Court chooses, without the requirement or offer of any proof, to accept this specious explanation for a gender-based, discriminatory regulation without any concern for its infringement of constitutionally guaranteed personal liberties. While dress and grooming codes do not, per se, violate the constitution, they must be based upon compelling educational goals and may not be arbitrary and without foundation in furthering the educational mission of schools or avoiding disruptions. By its own admission, CISD's gender-based hair-length rule is "arbitrary" and does not achieve the rule's purported educational goal. This provision of the grooming code, consequently, cannot withstand analysis under the Texas Equal Rights Amendment.

A school district is not an autonomous branch of government; it is a creation of the Legislature—a political subdivision of the State. TEX. CONST. art. 7, §§ 1, 3 (Vernon's 1993) and TEX.REV.CIV.STAT.ANN. arts. 2656, 2780. It is axiomatic that a school district has only those powers granted it by the Legislature, and the Legislature cannot grant to school districts powers which it does not itself possess. The Legislature has no power to act in violation of the constitution and it may not grant Colorado Independent School District's Board the power to do so. Where a school board acts, it acts on behalf of the state, and its actions are those of the state.

The school districts of this state are charged with an educational mission, and are endowed by the Legislature with the necessary constitutional authority to perform that mission. The Colorado I.S.D. School Board neither argues nor offers any evidence that this gender-based rule contributes to or is in any way calculated to aid in accomplishing

that mission. The constitution exists to establish a form of government, provide for its operations, and to protect citizens from government intrusions upon their rights and liberties. Because public school districts are institutions of government and legislatively-created political subdivisions of the state, school district action is government action and, absent some permissible bases founded upon an adequate standard, government may not violate constitutional prohibitions or intrude upon citizens' constitutionally protected liberties.

The majority also inappropriately adopts the Fifth Circuit Court of Appeal's judicial nonintervention policy in grooming code cases. This Court is properly reluctant to intervene with the "heavy hand of justice" in local school matters. But when the heavy hand of local government arbitrarily discriminates against its citizens in violation of constitutionally guaranteed limitations, and is challenged by its citizens in our courts, the **\*454** courts are required to respond. As the majority notes, the Fifth Circuit Court of Appeals has declined to act on challenges to school grooming codes. *See Ferrell v. Dallas Ind. Sch. Dist.,* 392 F.2d 697 (5th Cir.1968). This case is not a federal cause of action, however, but was brought in Texas courts under the Texas Constitution. We are aware that some state courts adopt wholesale the federal judiciary's approach to federal constitutional issues in interpreting their own state constitutions, disregarding whether their state constitutions contain the same clauses or provisions as the federal constitution. Hans A. Linde, *State Constitutions Are Not Common Law: Comments on Gardner's Failed Discourse,* 24 Rutgers L.J. 927, 928 (1993). But state courts *are not* bound to follow the analysis or approach of federal courts, and state governments *are* bound by the constraints of their own constitutions which may exceed federal constitutional limits on government action. "We are not a branch of the federal judiciary; we are a court created by the Constitution of [this state] and we owe our primary obligation to that fundamental document." *Sands v. Morongo Unified Sch. Dist.,* 53 Cal.3d 863, 281 Cal.Rptr. 34, 60, 809 P.2d 809, 835 (1991) (Mosk, J., concurring). In fact, this Court recognizes that "federal precedent is not controlling when considering a case under the Texas Equal Rights Amendment.... [N]o federal constitutional counterpart exists, efforts to secure ratification of a national E.R.A. having met with a lack of success.... We decline to give the Texas Equal Rights Amendment an interpretation identical to that given state and federal due process and equal protection guarantees." *In re McLean,* 725 S.W.2d at 697. The court in *Mercer* recognized the inappropriateness of applying a federal analysis to an identical case expressly

because "the present claim is based on a provision of the Texas Constitution that is not contained in the United States Constitution.... Therefore, appellants' claim must stand or fall on an interpretation of the ERA contained in the Constitution of the State of Texas." *Mercer,* 538 S.W.2d at 203.

Even the court in *Karr v. Schmidt,* 460 F.2d 609 (5th Cir.1972), decided before the ERA was enacted, acknowledged that state legislatures are more competent to address local issues such as hair-length regulation than is the federal judiciary. By enacting the Texas ERA, the legislature and the people of Texas codified the state's intolerance of gender discrimination. Because our constitution, unlike the federal constitution, specifically prohibits gender discrimination, we cannot properly utilize a federal approach in this case. As the state's highest court, we are bound to enforce the Texas Constitution's mandate under the ERA. We consequently must decline to follow the Fifth Circuit Court of Appeals' policy of judicial inaction in school grooming challenges when properly brought under our state constitution.

Of the fifteen other American jurisdictions having such provisions in their constitutions, none have been called upon to decide this issue under their respective state ERAs [1] . This is because, in most cases, before those states' ERAs were enacted, their respective state or federal district courts had already found alternative grounds for invalidating gender-based hair-length restrictions. For example, the Supreme Court of Alaska held that such regulations violated students' rights under the state constitution because schools had no compelling interest in regulating hair length. *Breese v. Smith,* 501 P.2d 159 (Alaska 1972). Consequently, future litigants were not compelled to invoke the states' ERAs because the prohibited practices had already been dealt with under lesser degrees of constitutional scrutiny. (Presumably, one of the purposes of enacting state equal rights amendments is to provide greater protection against gender discrimination by elevating the standard of judicial constitutional scrutiny.) *See also Richards v. Thurston,* 424 F.2d 1281 (1st Cir.1970) (invalidating hair-length restriction under a personal liberty analysis); *Massie v. Henry,* 455 F.2d 779 (4th Cir.1972) (striking grooming code for lack of rational basis).

 **\*455** "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Shelton v. Tucker,* 364 U.S. 479, 487, 81 S.Ct. 247, 251, 5 L.Ed.2d 231 (1960). School officials, like all other public officials, must exercise their delegated

authority within constitutional boundaries. The majority has nevertheless chosen to overlook CISD's unconstitutional exercise of authority by attempting to characterize this case as one involving nonconstitutional issues and by summarily determining that the hair-length rule meets a rational basis test without the benefit of any proper analysis. One would hope that no other prohibited form of invidious discrimination based on an immutable characteristic would be similarly tolerated by this Court, even with respect to grooming rules. Hopefully this Court would not adopt the position that judicial intervention would be improper if a school board promulgated a regulation which read: "Hispanic–American students may wear hair to the bottom of the collar, the bottom of the ear and combed out of the eyes. Hispanic–Americans may not wear earrings of any kind." Surely such a rule would be acknowledged as an outrage by this court because it facially discriminates on the basis of ethnicity. The majority, however, adopts an inappropriate extrajudicial nonintervention policy in school grooming code cases which would allow this facially unconstitutionally discriminatory regulation to survive. Such a court-made policy not only fails to protect students from unwarranted government infringements upon their constitutionally guaranteed rights, but also fails even to teach them the "lesson" that CISD proclaims as invaluable to its students; that is, "that the local employer in Colorado City or Blockbuster in Dallas doesn't conform to the constitution." (Oral argument of Tom Rees, counsel for CISD, November 16, 1994)

By its decision today, the majority renders meaningless the action of the people of Texas in placing the ERA in their state constitution, engaging in nothing less than the gratuitous judicial nullification of an act of the people of Texas and totally disregarding their expressed constitutional will by simply defining it out of existence. CISD's grooming code unconstitutionally discriminates against the District's male students in violation of the Texas Equal Rights Amendment.

Baseless and irrational discrimination in all its forms, at whomever directed and whatever its source or motivation, is still baseless and irrational discrimination. In a free society we may not always be able to prevent its private exercise, but in Texas our fundamental law does not permit it in our public schools and other governmental institutions. They should not teach it, condone it, or engage in it, and our courts and other legal institutions should not—even passively and benignly—enforce it. I dissent.

SPECTOR, Justice, dissenting.

Gender bias is not a trivial matter. Just last year, this Court appointed a committee to implement recommendations for the elimination of gender bias in the Texas legal system. [1] Today, this same Court turns its back on an indisputable finding of sex discrimination, and unashamedly proclaims that such matters are not worthy of this Court's consideration. I dissent.

Under the policy at issue, the Colorado Independent School District removes from its classrooms any male students that wear their hair below the bottom of the collar or the bottom of the ear. The trial court found that this policy discriminates against adult male students solely on the basis of gender, and that it is "totally unrelated to the proper objectives of the operation of public high schools."

The court of appeals did not dispute that the school district's policy is unconstitutional. It decided, however, that school districts have broad authority to impose unconstitutional policies, and that "the judiciary should not intervene" in such matters. 864 S.W.2d 806, 807. This Court today upholds this decision, immunizing the school boards of Texas from claims of gender discrimination.

**\*456** Since 1972, the Texas Constitution has included an Equal Rights Amendment providing that "[e]quality of the law shall not be denied or abridged because of sex, race, color, creed, or national origin." TEX. CONST. art. I, § 3a. I agree with Justice Gammage that this provision requires a reversal in this case.

In the majority's view, the Equal Rights Amendment simply does not apply to school boards—particularly if the rights at stake are related to gender. To the members of the class in the present case, the majority explains that claims of gender discrimination "do not manifest such an affront to [their] constitutional rights as to merit our intervention in this case." *Supra* at 450.

This view cannot be reconciled with the mandate of the Equal Rights Amendment. The adoption of the ERA reflects this state's commitment to the principles of tolerance, respect for others, and equality under the law. The school district's policy is at odds with all of these ideals.

The school district does not claim that its policy guards against gang activity, or avoids disruption of the educational process in any way. Instead, it asserts that the policy is a device that "teaches the community's societal values." [2] According to the district, students must learn that a private employer has "the right to be irrational":

> If [a student] walks out of our school system with the naive opinion that everybody has to comply with the constitution, we haven't taught him everything there is about the real world. [3]

Thus, the school district's position is that the very irrationality and unconstitutionality of the policy teach the important lesson of obedience to arbitrary rules, and that judicial interference hinders the teaching of that lesson.

The only real lesson taught by the school district's policy—and, for that matter, by today's decision—is that local school officials are free to make arbitrary distinctions based solely on gender. Young Texans will thus learn that gender stereotypes have this state's blessing. The Constitution may appear to say otherwise; but in reality, the law is irrelevant.

Until we start taking gender bias claims seriously, the Texas ERA will never have the effect it was meant to have. For the present, we can only hope that the school boards of Texas will show greater respect for individuals' rights under the ERA than this Court has shown today.

**Parallel Citations**

64 USLW 2043, 101 Ed. Law Rep. 1241, 58 A.L.R.5th 799, 38 Tex. Sup. Ct. J. 902

Footnotes

[1]  The jurisdictions with equal rights amendments in their state constitutions are Alaska, Colorado, Connecticut, Hawaii, Maryland, Massachusetts, Montana, New Hampshire, New Mexico, Pennsylvania, Utah, Virginia, Washington, and Wyoming, as well as Puerto Rico.

[1]  Order Appointing Gender Bias Reform Implementation Committee, Misc. Docket No. 94–9175 (Oct. 18, 1994).

[2]  Oral argument of T.L. Rees, Sr., counsel for Colorado Independent School District, November 16, 1994.

[3]  *Id.*

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

79 S.W.3d 48
Supreme Court of Texas.

BOWIE MEMORIAL HOSPITAL a/
k/a Bowie Hospital District d/b/a
Bowie Hospital District Authority d/b/
a Bowie Memorial Hospital, Petitioner,
v.
Barbara WRIGHT and P.L. Wright, Respondents.

No. 01–0814.　|　June 13, 2002.

Patient brought medical malpractice action against hospital, physician, physician's assistant, and others, alleging that failure to timely discover that her foot was fractured led to necessity of two additional surgeries. The 78th District Court, Wichita County, Keith Nelson, J., dismissed patient's claims. Patient appealed. The Fort Worth Court of Appeals, 48 S.W. 3d 443, affirmed in part, reversed in part, and remanded. Upon grant of hospital's petition for review, the Supreme Court held that expert report submitted by patient did not constitute a good-faith effort to summarize causal relationship between hospital's alleged failure to meet applicable standards of care and patient's injury under Medical Liability and Insurance Improvement Act.

Reversed.

West Headnotes (8)

[1]　Health
　　Affidavits of merit or meritorious defense; expert affidavits

Expert report submitted by patient did not constitute a good-faith effort to summarize causal relationship between hospital's alleged failure to meet applicable standards of care and patient's injury under Medical Liability and Insurance Improvement Act; report lacked information linking expert's conclusion, which was that patient might have had a better outcome, to hospital's alleged breach, which was that it did not correctly read and act upon x-rays, thus requiring dismissal of patient's medical malpractice action against hospital, alleging that failure to timely discover that her foot was

fractured led to necessity of two additional surgeries. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(*l*), (r)(6).

207 Cases that cite this headnote

[2]　Health
　　Affidavits of merit or meritorious defense; expert affidavits

For an expert's report to constitute a "good-faith effort" to comply with statutory definition of an expert report, pursuant to the Medical Liability and Insurance Improvement Act, report must provide enough information to fulfill two purposes: (1) report must inform defendant of specific conduct plaintiff has called into question, and (2) equally important, report must provide basis for trial court to conclude that claims have merit. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(*l*), (r)(6).

253 Cases that cite this headnote

[3]　Health
　　Affidavits of merit or meritorious defense; expert affidavits

In determining the adequacy of an expert report under the Medical Liability and Insurance Improvement Act, the trial court should look no further than the report. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(*l*).

10 Cases that cite this headnote

[4]　Health
　　Affidavits of merit or meritorious defense; expert affidavits

For an expert's report to satisfy the requirements of the Medical Liability and Insurance Improvement Act, the report need not marshal all the plaintiff's proof, but it must include the expert's opinion on each of the three elements that the Act identifies: standard of care, breach, and causal relationship. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(*l*).

114 Cases that cite this headnote

**[5]    Health**

⚷ Affidavits of merit or meritorious defense; expert affidavits

In determining the adequacy of an expert report under the Medical Liability and Insurance Improvement Act, a report cannot merely state the expert's conclusions about standard of care, breach, and causal relationship; rather, the expert must explain the basis of his statements to link his conclusions to the facts. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(*l*).

213 Cases that cite this headnote

**[6]    Appeal and Error**

⚷ Rulings on Motions Relating to Pleadings

Trial court's order dismissing a claim for failure to comply with Medical Liability and Insurance Improvement Act's requirements for an expert report is reviewed under an abuse-of- discretion standard. Vernon's Ann.Texas Civ.St. art. 4590i, § 13.01(*l*), (r)(6).

71 Cases that cite this headnote

**[7]    Appeal and Error**

⚷ Abuse of discretion

A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles.

164 Cases that cite this headnote

**[8]    Appeal and Error**

⚷ Power to Review

When reviewing matters committed to the trial court's discretion, a court of appeals may not substitute its own judgment for the trial court's judgment.

84 Cases that cite this headnote

**Attorneys and Law Firms**

**\*50** Gregory J. Lensing, Charles T. Frazier, Jr. Cowles & Thompson, Dallas, Susan Irene Nelson, Dallas, for Petitioner.

Britta Jean Gordon, Michael Kevin Queenan, Queenan Law Firm, DeSoto, for Respondents.

**Opinion**

PER CURIAM.

This case involves the Medical Liability and Insurance Improvement Act's ("the Act") expert-report requirements. *See* TEX.REV.CIV. STAT. art. 4590i, § 13.01. The trial court dismissed the plaintiffs' medical malpractice claims after it determined that their expert report did not satisfy the Act's requirements. The court of appeals concluded that the trial court abused its discretion when it dismissed the plaintiffs' claims, because the expert report represented a good-faith effort to comply with the Act. 48 S.W.3d 443, 448. We disagree. Accordingly, we reverse the court of appeals' judgment and dismiss with prejudice the Wrights' claims against Bowie Memorial Hospital.

Barbara Wright was admitted to Bowie after she sustained injuries in a car accident. While at Bowie, Michael Layne, a physician's assistant that Bowie employed, x-rayed Barbara's right knee and foot and diagnosed her with a fractured patella. However, Layne allegedly misplaced or misread the foot x-ray and, therefore, did not discover that Barbara had also fractured her right foot in the accident. Shortly after Barbara was admitted to Bowie, Dr. Hodde, Layne's supervisor, recommended that Bowie refer her to an orthopedic surgeon. Barbara was immediately referred to an orthopedic surgeon and transferred to another hospital. Her accompanying medical report, which Layne prepared, only indicated that Barbara had a fractured knee.

Nearly a month after the accident, Barbara's orthopedic surgeon discovered Barbara's fractured foot. By that time, the surgeon had already operated on Barbara's knee. The Wrights claim that the surgeon could have operated on Barbara's foot at the same time if he had known about the injury. Instead, Barbara had two additional surgeries over the next ten months.

Barbara and her husband sued Bowie, Layne, and Dr. Hodde for medical malpractice. The Wrights also sued the orthopedic surgeon, another treating doctor, and three

medical clinics not associated with Bowie. The Wrights' allegations pertinent here are that Bowie personnel did not: diagnose Barbara's foot fracture; protect her foot; review diagnostic tests ordered and administered at the hospital; or properly supervise Layne.

The Wrights filed an expert medical report about Bowie's, Dr. Hodde's, and another doctor's alleged negligence. *See* TEX.REV.CIV. STAT. art. 4590i, § 13.01(d). The expert report states, in part:

> I have reviewed the material you sent me on the above case. I believe that the hospital fell below the appropriate standard of care in not having a defined mechanism in place whereby x-rays taken in the E.R. are read by a physician specialized in interpreting the films in a timely manner (i.e., less than 24 hrs). X-rays taken in the E.R. need to have re-reads performed within 24 hrs and if **\*51** there is a discrepency [sic] in the x-ray readings a system should be in place to inform the patient of this. There did not appear to be any procedure that the hospital has for tracking x-rays. The hospital also doesn't seem to have a system of orienting health care professionals working in the E.R. nor any form of Q/A for P.A.'s staffing the E.R. There didn't appear to be any organized system or protocols for P.A. supervision in the E.R.
>
> ...
>
> I do believe that it is reasonable to believe that if the x-rays would have been correctly read and the appropriate medical personnel acted upon those findings then Wright would have had the possibility of a better outcome.

Bowie moved to dismiss the Wrights' claims, alleging that the expert report "fails to establish how any act or omission of employees of Bowie Memorial Hospital caused or contributed to Ms. Wright's injuries." Therefore, Bowie argued, the report does not satisfy the Act's requirements.

The trial court held two hearings to determine if the report represents a good-faith effort to meet the Act's requirements. *See* TEX.REV.CIV. STAT. art. 4590i, § 13.01(*l* ). At the first hearing, the trial court asked about the causal relationship between Bowie's conduct and Barbara's injury. The Wrights explained that if Bowie had diagnosed Barbara's fractured foot earlier, then she "probably would have had a better outcome." They also conceded that the orthopedic specialist Barbara saw immediately after leaving Bowie "had an independent duty to verify" Bowie's medical report.

Nevertheless, the Wrights claimed that, if Bowie's report had indicated that Barbara had a broken foot, it would have been "much easier" for the orthopedic doctor to make a proper diagnosis. After the second hearing, the trial court granted Bowie's motion to dismiss. The record indicates that the trial court did not believe the Wrights' claims against Bowie, "the people who transferred [Barbara]," had merit, given that the orthopedic surgeon "could have done his own work."

The court of appeals reversed and remanded, holding that the trial court abused its discretion when it dismissed the Wrights' claims against Bowie. 48 S.W.3d at 448. The court concluded that the report inadequately summarizes the causal relationship between Bowie's alleged negligence and Barbara's injury. However, it determined that the report represents a good-faith effort to comply with the Act, because it raises the possibility that, but for Bowie's breach, Barbara "would have had a better outcome." 48 S.W.3d at 447.

**[1]** Medical-malpractice plaintiffs must provide each defendant physician and health-care provider an expert report with the expert's curriculum vitae, or they must voluntarily nonsuit the action. *See* TEX.REV.CIV. STAT. art. 4590i, § 13.01(d); *American Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 877 (Tex.2001). The expert report must provide "a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." TEX.REV.CIV. STAT. art. 4590i, § 13.01(r)(6). If a plaintiff timely files an expert report and the defendant moves to dismiss because of the report's inadequacy, the trial court must grant the motion "*only if* it appears to the court, after hearing, that the report does not represent a *good faith effort* to comply with the definition of an expert report in Subsection (r)(6) of this **\*52** section." TEX.REV.CIV. STAT. art. 4590i, § 13.01(*l* ) (emphasis added).

**[2]** We recently discussed the Act's expert-report requirement for medical-malpractice cases. *See Palacios,* 46 S.W.3d at 877–80. In *Palacios,* we explained that, when considering a motion to dismiss under section 13.01(*l* ), "[t]he issue for the trial court is whether 'the report' represents a good-faith effort to comply with the statutory definition of an expert report." *Palacios,* 46 S.W.3d at 878. To constitute a "good-faith effort," the report must provide enough information to fulfill two purposes: (1) it must inform

the defendant of the specific conduct the plaintiff has called into question, and (2) it must provide a basis for the trial court to conclude that the claims have merit. *Palacios,* 46 S.W.3d at 879.

 **[3]** **[4]** **[5]** The trial court should look no further than the report itself, because all the information relevant to the inquiry is contained within the document's four corners. *Palacios,* 46 S.W.3d at 878. The report need not marshal all the plaintiff's proof, but it must include the expert's opinion on each of the three elements that the Act identifies: standard of care, breach, and causal relationship. *Palacios,* 46 S.W.3d at 878. A report cannot merely state the expert's conclusions about these elements. *Palacios,* 46 S.W.3d at 879. "[R]ather, the expert must explain the basis of his statements to link his conclusions to the facts." *Earle v. Ratliff,* 998 S.W.2d 882, 890 (Tex.1999).

 **[6]** **[7]** **[8]** We review a trial court's order dismissing a claim for failure to comply with section 13.01(d)'s expert-report requirements under an abuse-of-discretion standard. *Palacios,* 46 S.W.3d at 878. A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985). When reviewing matters committed to the trial court's discretion, a court of appeals may not substitute its own judgment for the trial court's judgment. *See Flores v. Fourth Ct. of Appeals,* 777 S.W.2d 38, 41 (Tex.1989).

Here, the parties do not dispute that the expert report fairly summarizes the alleged standard of care, because it states that a hospital should have established procedures to read and interpret x-rays in a timely manner and to inform patients about the results. *See* TEX.REV.CIV. STAT. art. 4590i, § 13.01(r)(6). Also, the parties do not dispute that the report fairly summarizes how Bowie allegedly breached the standard of care, because the report states that Bowie did not have a procedure to track x-rays. *See* TEX.REV.CIV. STAT. art. 4590i, § 13.01(r)(6). Consequently, the parties only contest whether the report constitutes a "good-faith effort" to fairly summarize the causal relationship between Bowie's alleged breach and Barbara's injury. *See* TEX.REV.CIV. STAT. art. 4590i, § 13.01(r)(6); *Palacios,* 46 S.W.3d at 879.

Contrary to the court of appeals' conclusion, it is not enough that the expert report "provided insight" about the plaintiff's claims. *See* 48 S.W.3d at 447. Rather, to constitute a good-faith effort to establish the causal-relationship element, the

expert report must fulfill *Palacios* 's two-part test. *See Palacios,* 46 S.W.3d at 879. Thus, under the *Palacios* test, we must determine whether the trial court acted unreasonably and without reference to guiding principles when it dismissed the Wrights' claims against Bowie. *See Downer,* 701 S.W.2d at 241–42.

The Wrights primarily rely on one statement in the report to establish causation: "if the x-rays would have been correctly read and the appropriate medical personnel **\*53** acted upon those findings then Wright would have had the possibility of a better outcome." In their brief to this Court, the Wrights contend that this statement "explains why Petitioners' damages were caused by Bowie Hospital's breach: if the proper medical personnel at Bowie had reviewed the x-rays, [Barbara] would have had a chance of diagnosis and treatment of her foot fracture."

Bowie responds that the report's statement about causation is conclusory, because it does not explain how Bowie's failing to correctly read or act upon the x-rays caused injury to Barbara. Moreover, Bowie asserts, the statement does not even identify the specific injuries Bowie's conduct allegedly caused.

In reviewing the report's adequacy, the court of appeals focused on "whether the report provides a basis to conclude that the claims have merit." 48 S.W.3d at 447 (citing *Palacios,* 46 S.W.3d at 878–79). Although the causation statement recognizes only the "possibility"—rather than the "reasonable medical probability"—that Barbara might have had a better outcome, the court of appeals concluded that the report's adequacy should not turn "solely upon the claimant's failure to use magical words like 'reasonable probability.' " 48 S.W.3d at 447. Accordingly, the court of appeals held that the report met the good-faith effort test, because it gave the trial court a basis to conclude that the Wrights' claims against Bowie have merit. 48 S.W.3d at 448.

We agree with the court of appeals' conclusion that a report's adequacy does not depend on whether the expert uses any particular "magical words." Nothing in the Act's plain language, or in *Palacios,* suggests that, for these purposes, an expert report must express the causal relationship in terms of "reasonable medical probability." However, we disagree with the court of appeals' conclusion that the trial court abused its discretion in dismissing the Wrights' claims against Bowie. We have held that the only information relevant to whether a report represents a good-faith effort to comply with the statutory requirements is the report itself. *Palacios,* 46

S.W.3d at 878. And, we have held that we review a trial court's decision about whether a report constitutes a good-faith effort to comply with the Act under an abuse-of-discretion standard. *Palacios,* 46 S.W.3d at 878.

After reviewing this report, we conclude that the trial court could have reasonably determined that the report does not represent a good-faith effort to summarize the causal relationship between Bowie's failure to meet the applicable standards of care and Barbara's injury. *See* TEX.REV.CIV. STAT. art. 4590i, § 13.01(r)(6); *Palacios,* 46 S.W.3d at 879. That is because the report simply opines that Barbara might have had "the possibility of a better outcome" without explaining how Bowie's conduct caused injury to Barbara. We cannot infer from this statement, as the Wrights ask us to, that Bowie's alleged breach precluded Barbara from obtaining a quicker diagnosis and treatment for her foot. Rather, the report must include the required information within its four corners. *See* TEX.REV.CIV. STAT. art. 4590i, § 13.01(r) (6); *Palacios,* 46 S.W.3d at 878. Because the report lacks information linking the expert's conclusion (that Barbara might have had a better outcome) to Bowie's alleged breach (that it did not correctly read and act upon the x-rays), the

trial court could have reasonably determined that the report was conclusory. *See Palacios,* 46 S.W.3d at 880; *Earle,* 998 S.W.2d at 890. A conclusory report does not meet the Act's requirements, because it does not satisfy the *Palacios* test. *Palacios,* 46 S.W.3d at 879.

**\*54** For these reasons, we hold that the trial court did not abuse its discretion when it concluded that the report did not represent a good-faith effort to meet the Act's requirements. Therefore, the trial court had no discretion but to dismiss the plaintiffs' claims against Bowie. *See* TEX.REV.CIV. STAT. art. 4590i, § 13.01(*l* ); *Palacios,* 46 S.W.3d at 880. In reviewing the trial court's order, the court of appeals improperly substituted its own judgment for the trial court's judgment. *See Flores,* 777 S.W.2d at 41. Accordingly, we grant Bowie's petition for review. Without hearing oral argument, we reverse the court of appeals' judgment and dismiss with prejudice the Wrights' claims against Bowie. *See* TEX.R.APP. P. 59.1.

**Parallel Citations**

45 Tex. Sup. Ct. J. 833

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

417 S.W.3d 94
Court of Appeals of Texas,
Austin.

Tramel R. BRACEY, Appellant

v.

CITY OF KILLEEN, Texas; and Police
Chief Dennis Baldwin, Appellees.

No. 03–12–00199–CV.   |   Nov. 6, 2013.

**Synopsis**
**Background:** City police officer sought review of decision of hearing examiner upholding his indefinite suspension under the Civil Service Act. The 169th Judicial District Court, Bell County, Rick Morris, J., entered summary judgment in favor of city. Officer appealed.

**Holdings:** The Court of Appeals, Bob Pemberton, J., held that:

[1] district court had subject matter jurisdiction to determine whether hearing examiner properly construed and applied Government Code subchapter governing procedures applicable when law enforcement agencies are presented with a "complaint" against one of their officers, and

[2] hearing examiner did not have jurisdiction to impose reinstatement as an automatic remedy for violations of Government Code subchapter.

Affirmed.

West Headnotes (19)

[1]    **Appeal and Error**
         Cases Triable in Appellate Court

Appellate court reviews the district court's summary judgment rulings de novo.

Cases that cite this headnote

[2]    **Judgment**

         Presumptions and burden of proof

Under the "traditional" standard for summary judgment, the movant has the initial burden of conclusively negating at least one essential element of a claim or defense on which the non-movant has the burden of proof of conclusively establishing each element of a claim or defense on which the movant has the burden of proof; once the movant has done so, and only if it does, the burden shifts to the non-movant to produce evidence creating a genuine issue of material fact as to the challenged element or elements in order to defeat the summary judgment. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(c).

Cases that cite this headnote

[3]    **Appeal and Error**
         Cases Triable in Appellate Court

Appellate court reviews questions of statutory construction de novo.

Cases that cite this headnote

[4]    **Statutes**
         Intent

A court's primary objective in statutory construction is to give effect to the Legislature's intent.

Cases that cite this headnote

[5]    **Statutes**
         Language and intent, will, purpose, or policy

A court seeks legislative intent first and foremost in the statutory text.

Cases that cite this headnote

[6]    **Statutes**
         Statute as a Whole; Relation of Parts to Whole and to One Another

A court conducting statutory construction is to consider a statute as a whole, interpreting it to give effect to every part.

Cases that cite this headnote

**[7]** **Statutes**
**⚷** Context

Statutory words cannot be examined in isolation, but must be informed by the context in which they are used.

Cases that cite this headnote

**[8]** **Statutes**
**⚷** Prior or existing law in general

A court assumes that when enacting a statute, the Legislature was aware of the background law and acted with reference to it.

Cases that cite this headnote

**[9]** **Statutes**
**⚷** Purpose and intent; unambiguously expressed intent

Where statutory text is clear, that text is determinative of legislative intent.

Cases that cite this headnote

**[10]** **Statutes**
**⚷** Plain language; plain, ordinary, common, or literal meaning
**Statutes**
**⚷** Extrinsic Aids to Construction

A court gives clear statutes their plain meaning without resort to rules of construction or extrinsic aids.

Cases that cite this headnote

**[11]** **Statutes**
**⚷** Purpose and intent; determination thereof

Only when statutory text is susceptible to more than one reasonable interpretation is it appropriate to look beyond its language for assistance in determining legislative intent.

Cases that cite this headnote

**[12]** **Appeal and Error**
**⚷** Particular orders or rulings reviewable in general
**Appeal and Error**
**⚷** Rendering Final Judgment

Where parties assert competing motions for summary judgment on overlapping issues and the trial court grants one motion and denies the other, the appellate court considers all of the summary-judgment evidence, determines all questions presented, and, if the trial court erred, renders the judgment the trial court should have rendered.

Cases that cite this headnote

**[13]** **Officers and Public Employees**
**⚷** Hearing and Determination

Civil Service Act does not empower a hearing examiner to make rules. V.T.C.A., Local Government Code § 143.001 et seq.

1 Cases that cite this headnote

**[14]** **Constitutional Law**
**⚷** Delegation of Powers

A delegation of power by the Legislature without reasonable standards to govern its exercise is an abdication of the authority to set governmental policy which the Constitution assigns to the legislative department.

Cases that cite this headnote

**[15]** **Constitutional Law**
**⚷** To non-governmental entities

Delegations of power to private entities are permissible under the Texas Constitution only if the legislative purpose is discernable and there is protection against the arbitrary exercise of power.

Cases that cite this headnote

**[16]** **Constitutional Law**

🔑 Presumptions and Construction as to Constitutionality

When faced with multiple constructions of a statute, a court must interpret the statutory language in a manner that renders it constitutional if it is possible to do so.

Cases that cite this headnote

[17]  **Officers and Public Employees**
   🖙 Hearing and Determination

A hearing examiner exceeds his jurisdiction in a disciplinary action under the Civil Service Act when his acts are not authorized by the Act or are contrary to it, or when they invade the policy-setting realm protected by the nondelegation doctrine. V.T.C.A., Local Government Code § 143.057.

1 Cases that cite this headnote

[18]  **Municipal Corporations**
   🖙 Review in general

District court, reviewing hearing examiner's decision upholding city police officer's indefinite suspension under the Civil Service Act, had subject matter jurisdiction to determine whether hearing examiner properly construed and applied Government Code subchapter governing procedures applicable when law enforcement agencies are presented with a "complaint" against one of their officers. V.T.C.A., Local Government Code §§ 143.057, 614.021.

1 Cases that cite this headnote

[19]  **Municipal Corporations**
   🖙 Review in general

Hearing examiner reviewing city police officer's indefinite suspension under the Civil Service Act lacks jurisdiction to impose reinstatement as an automatic remedy for violations of Government Code subchapter governing procedures applicable when law enforcement agencies are presented with a "complaint" against one of their officers. V.T.C.A., Local Government Code §§ 143.057, 614.021.

Cases that cite this headnote

**Attorneys and Law Firms**

 **\*96**  Mr. R. John Cullar, Cullar & McLeod, L.L.P., Waco, TX, for Appellant.

Mr. Stuart Smith, Naman, Howell, Smith & Lee, P.L.L.C., Waco, TX, for Appellee.

Before Justices PURYEAR, PEMBERTON, and FIELD.

*OPINION*

BOB PEMBERTON, Justice.

This appeal presents two sets of issues regarding statutes that govern the employment relationship between Texas police officers and the municipalities they serve. First, we must address the scope of the subject-matter jurisdiction that the Legislature has conferred upon Texas courts to review the decisions of independent hearing examiners under the Civil Service Act. [1] Second, assuming we determine that Texas courts have jurisdiction to reach the question in the context of an appeal from a hearing examiner's decision, we must consider the relationship between (1) the notice-and-hearing requirements applicable to disciplinary suspensions and dismissals under the Civil Service Act, [2] and (2) Subchapter B of Government Code chapter 614, which prohibits "disciplinary action" against a police officer based on a "complaint" unless the "complaint" is reduced to writing, signed, and provided to the officer. [3] More specifically, we must decide whether an independent hearing examiner "exceeded her jurisdiction" within the  **\*97**  meaning of the Civil Service Act's judicial-review provisions in upholding a police officer's indefinite suspension (i.e., dismissing him) when the disciplinary action fully complied with the requirements specified within the Civil Service Act, yet originated with "complaints" that were not reduced to writing, signed, and provided to the officer as Subchapter B requires. Under the circumstances here, we conclude that the examiner acted within her jurisdiction.

**BACKGROUND**

Before turning to the specific dispute underlying this appeal, it is helpful to begin with a brief overview of the statutory context from which it arose.

**Civil Service Act**

In municipalities that have voted to adopt it, the Civil Service Act—nowadays codified as chapter 143 of the Local Government Code—supplants at-will employment of police officers with a regime of merit-based, just-cause employment that is intended to "secure efficient ... police departments composed of capable personnel who are free from political influence and who have permanent employment tenure as public servants." [4] The regime is administered by a local civil service commission whose duties include promulgating rules that prescribe, within statutory parameters, the acts or conditions that constitute cause for suspending or removing a police officer from employment. [5] Of particular significance to this appeal are the Act's procedures and limitations governing determination of whether such cause exists and the appropriate personnel actions in response, which for purposes of this case are found primarily within subchapter D of chapter 143, titled "Disciplinary Actions." [6]

In relevant part, the Act authorizes the head of a police department to suspend a police officer within his supervision or jurisdiction for "a reasonable period not to exceed 15 calendar days" or "an indefinite period," the latter being "equivalent to dismissal," "for the violation of a civil service rule." [7] Upon suspending an officer, the department head must, within 120 hours of the suspension, file with the municipality's civil service commission a "written statement," also termed a "letter of disciplinary action," "giving the reasons for the suspension," and also "immediately deliver a copy of the statement in person to the suspended ... police officer." [8] This statement or letter "must point out each civil service rule alleged to have been violated by the suspended ... police officer" and "describe the alleged acts of the person that the department head contends are in violation of the civil service rules," and "[i]t is **\*98** not sufficient for the department head merely to refer to the provisions of the rules alleged to have been violated." [9] "If the department head does not specifically point out in the written statement the act or acts of the ... police officer that allegedly violated the civil service rules," the Act mandates that the civil service commission "shall promptly reinstate the person." [10]

In addition to providing such notice regarding the department head's asserted grounds for suspension, the copy of the statement or letter given to the officer must also give notice regarding the officer's rights to appeal the suspension, [11] which we will describe shortly. However, in contrast to the notice requirements regarding the grounds for the suspension, the Act does not prescribe any particular remedy or consequences for failure to provide the required notice of appeal rights.

The department head's suspension of a police officer is subject to appeal through two alternative procedural mechanisms. First, the officer may appeal the suspension—including the "truth of the charge[s] as made" in the department head's written statement, "the legal sufficiency of the charge[s]," and the discipline that should be imposed for any rule violations—through an evidentiary hearing before the municipality's civil service commission. [12] At the hearing, the department head "is restricted to [his or her] original written statement and charges, which may not be amended." [13] The commission "may consider only the evidence submitted at the hearing" [14] and "shall render a just and fair decision." [15] The commission has discretion to: (1) "permanently dismiss[ ]" the officer from the police department; [16] (2) order a temporary suspension of the officer for a period not to exceed fifteen days; [17] or (3) "restore" the officer to his or her former position—i.e., return to duty without any suspension—with back pay and benefits for the period in which the officer was suspended. [18] But the commission has discretion to impose dismissal or temporary suspension, as opposed to restoration, "only for violation[s] of civil service **\*99** rules and only after a finding by the commission of the truth of specific charges against the ... police officer." [19]

Alternatively, the officer may bring the appeal before an independent hearing examiner, [20] a forum often perceived to present less risk of pro-employer bias than the municipality's civil service commission. [21] The hearing examiner is chosen either by agreement of the officer and department head or through a process of selection from a list of "seven qualified neutral arbitrators" obtained from the American Arbitration Association (AAA) or the Federal Mediation and Conciliation Service (FMCS). [22] Once selected, the examiner "has the same duties and powers as the commission," [23] including the requirement that he or she hear evidence, [24] and has the same discretion in regard to discipline. [25]

The Act provides a right of further appeal or judicial review in district court, but the scope of that review varies dramatically depending on whether the officer has chosen to proceed before a civil service commission versus an independent hearing examiner. If the officer has opted to appeal to the civil service commission, the Act allows the officer, if "dissatisfied" with the commission's decision, to obtain trial de novo in the district court, and that court is empowered to "grant the appropriate legal and equitable relief necessary to carry out the purposes of [the Act]." [26] In contrast, the Act makes a hearing examiner's decision "final and binding on all parties," and the officer's election to proceed in that forum is deemed to waive his rights of further appeal, except to the extent of the following limited grant of subject-matter jurisdiction to the district court:

> A district court may hear an appeal of a hearing examiner's award only on the grounds that the arbitration panel [i.e., the hearing examiner [27]] was without jurisdiction or exceeded its jurisdiction or that the order was procured by fraud, collusion, or other unlawful means. [28]

**Subchapter B**

Subchapter B of Government Code chapter 614 imposes regulations—including a type of notice requirement—that apply when certain law enforcement agencies are presented with a "complaint" against one of their officers. [29] Although Subchapter B does not define or elaborate on the nature of a "complaint," a panel of this Court has construed the term to encompass "any allegation of misconduct that could result in disciplinary action," regardless **\*100** whether the source is external to the law enforcement agency or originates within it. [30]

Within Subchapter B, section 614.022 specifies that in order for a "complaint" "[t]o be considered by the head of a ... local law enforcement agency," it must be "in writing" and "signed by the person making the complaint." [31] Section 614.023, in turn, requires that "[a] copy of a signed complaint ... shall be given to the officer or employee within a reasonable time after the complaint is filed," [32] and that:

> Disciplinary action may not be taken against the officer or employee unless a copy of the signed complaint is given to the officer or employee. [33]

Section 614.023 further prohibits the indefinite suspension or termination of an officer "based on the subject matter of the complaint unless: (1) the complaint is investigated; and (2) there is evidence to prove the allegation of misconduct." [34]

Prior to September 1, 2005, Subchapter B applied, in pertinent part, to a "complaint" against "a police officer who is not covered by a civil service statute." [35] However, in its regular session earlier that year, the Seventy–Ninth Legislature broadened this facet of the statute's coverage to include "a peace officer under Article 2.12, Code of Criminal Procedure, or other law who is appointed or employed by a political subdivision of this state," and excluding only those "appointed or employed by a political subdivision that is covered by a meet and confer or collective bargaining agreement ... if that agreement includes provisions relating to the investigation of, and disciplinary actions resulting from, a complaint against a peace officer ...." [36] Consequently, Subchapter B in its amended form facially extends to at least some law enforcement officers who are covered by the Civil Service Act and who, for that reason, would previously have been explicitly excluded from Subchapter B's coverage. The implications of this change are at the center of this appeal.

**The dispute**

Appellant Tramel Bracey was formerly an officer with the police department of the City of Killeen, appellee. Killeen is among the municipalities that have adopted the Civil Service Act, and it is the Act, not a meet-and-confer or collective-bargaining agreement, that governs its employment relationship with its police officers. **\*101** There is no dispute that Bracey was fully entitled to the civil-service protections that the Act provides to Killeen police officers, [37] or that he likewise came within the coverage of Subchapter B in its current form as "a peace officer ... appointed or employed by a political subdivision" (Killeen) who was not excluded by virtue of a labor agreement. [38]

In December 2010, following an internal investigation, the head of Killeen's police department—Police Chief Dennis Baldwin, appellee—indefinitely suspended Bracey based on his alleged violation of several Killeen civil service rules. In accordance with the Civil Service Act, Chief Baldwin prepared, filed, and delivered to Bracey a letter of disciplinary action detailing the civil service rules that Baldwin contended Bracey had violated and the alleged acts that Baldwin viewed as constituting such violations. To summarize this letter,

Baldwin alleged that Bracey had violated the cited rules, some of which incorporated police department general orders and Penal Code provisions, by providing false information when opening two bank accounts,[39] then subsequently being "untruthful" about the underlying events. As factual support for these allegations, Baldwin referenced evidence purportedly compiled during a search of Bracey's home by Killeen Police Detective Charles Dinwiddie[40] and through interviews conducted by an investigator, Captain Jeff Fholer.[41]

Bracey timely perfected an appeal of his suspension and opted to proceed before an independent hearing examiner rather than Killeen's civil service commission. Before the hearing examiner, Bracey contested both the merits of the allegations against him and, as a threshold matter, whether he was subject to discipline in the first place. While not complaining of any deficiency in the letter of disciplinary action Bracey had provided him under the Civil Service Act or seeking reinstatement on that basis,[42] Bracey insisted that Baldwin had failed to comply with the notice requirements imposed by Subchapter B. More specifically, Bracey urged that the factual allegations originating with the two fellow officers who had investigated his alleged misconduct, Captain Fholer and Detective Dinwiddie, constituted "complaints" that Subchapter B required to be reduced to writing, signed, and provided to him. Because these actions had never been performed, according to Bracey, his suspension violated Subchapter B's proviso that "[d]isciplinary action may not be taken against the officer or employee unless a copy of the signed complaint is given to the officer or employee."[43] Accordingly, **\*102** Bracey reasoned, Subchapter B mandated that he be reinstated.

Following the evidentiary hearing, the examiner found that Bracey had violated all of the civil service rules that Chief Baldwin had charged and that "[t]he facts in evidence support the ... indefinite suspension." The examiner rejected Bracey's arguments regarding Subchapter B, citing *City of Athens v. MacAvoy,*[44] and further observed that Bracey "has had ample opportunity to defend himself and bring forth facts in the investigation for the investigators, the decision makers and ultimately the hearing examiner to deliberate." We will explore the *MacAvoy* case in detail as it becomes relevant to our analysis, but to summarize its holdings, the Tyler Court of Appeals concluded that while Subchapter B applies to the discipline upheld or imposed by an independent hearing examiner under the Civil Service Act, an examiner

nonetheless "exceeded his jurisdiction" under the Act by reinstating an indefinitely suspended police officer on the sole basis that "complaints" required by Subchapter B had not been provided to the officer.[45]

Bracey then appealed the hearing examiner's decision to district court. In attempting to invoke the district court's limited jurisdiction over such appeals, Bracey asserted that the examiner had "exceeded her jurisdiction" by "ignoring" the mandates of Subchapter B and dismissing rather than reinstating him. He prayed that the court sustain his appeal and award him reinstatement with back pay and benefits, plus attorney's fees. Additionally, based on the same underlying allegations, Bracey asserted claims under the Uniform Declaratory Judgments Act[46] against Chief Baldwin, in his official capacity, seeking declarations that Baldwin had violated Subchapter B. Along with his requested declarations, Bracey purported to seek "equitable and mandamus relief" of reinstatement, salary, and benefits, plus attorney's fees.

Appellees answered and filed a motion for final summary judgment on all of Bracey's claims, asserting two related grounds. First, relying primarily on "the holding and reasoning in *City of Athens v. MacAvoy,*" appellees argued that the hearing examiner had not "exceeded her jurisdiction" in refusing to reinstate Bracey based on their alleged failure to comply with Subchapter B, but instead had no "jurisdiction" to award him reinstatement on that basis. Second, in what they phrased in terms of an "arbitration and award" defense, appellees argued that the hearing examiner's decision foreclosed Bracey's declaratory claims by resolving the same underlying issue. "Regardless of whether the City violated [Subchapter B]," appellees urged, "[Bracey] received a civil service hearing and presented the appeal of the suspension to the Hearing Examiner."

Bracey responded and also filed a cross-motion for partial summary judgment seeking to establish, as a matter of law, that Subchapter B applied to him; that no written, signed "complaint" from either Dinwiddie or Fholer had ever been provided to him; that this failure violated Subchapter B and triggered the statute's prohibition against "disciplinary action"; and that—joining issue with appellees' motion—the hearing examiner's failure to enforce this prohibition "exceeded her jurisdiction" and rendered the error subject to **\*103** judicial review and correction. In support of his motion, Bracey presented copies of admissions and deposition testimony from appellees confirming that he came within the coverage of Subchapter B and that no signed,

written allegations from either Dinwiddie or Fholer had ever been given to him. Appellees filed a response to Bracey's cross-motion that was substantively an exact duplicate of their own summary-judgment motion.

The district court granted appellees' summary-judgment motion, denied Bracey's competing motion, and rendered final judgment dismissing Bracey's claims with prejudice. It is from this judgment that Bracey appeals.

## ANALYSIS

In two issues, Bracey contends that the district court erred in granting the appellees' summary-judgment motion and denying his cross-motion.

### Standard of review

**[1]** **[2]** We review the district court's summary judgment rulings de novo.[47] Summary judgment is proper when there are no disputed issues of material fact and the movant is entitled to judgment as a matter of law.[48] We take as true all evidence favorable to the non-movant, and we indulge every reasonable inference and resolve any doubts in the non-movant's favor.[49] Under the "traditional" standard for summary judgment—the standard on which both sides have relied—the movant has the initial burden of conclusively negating at least one essential element of a claim or defense on which the non-movant has the burden of proof or conclusively establishing each element of a claim or defense on which the movant has the burden of proof.[50] Once the movant has done so, and only if it does, the burden shifts to the non-movant to produce evidence creating a genuine issue of material fact as to the challenged element or elements in order to defeat the summary judgment.[51]

**[3]** **[4]** **[5]** **[6]** **[7]** **[8]** **[9]** **[10]** **[11]** However, as will become apparent as we proceed with our analysis, the propriety of summary judgment in this case turns principally upon the application of statutory language to undisputed material facts. We review questions of statutory construction de novo.[52] Our primary objective in statutory construction is to give effect to the Legislature's intent.[53] We seek that intent "first and foremost" in the statutory text.[54] We are to consider the statute as a whole, interpreting it to give effect to every part.[55] The words cannot be examined in isolation, but must be informed by the context in which they are used.[56] We assume that when enacting a statute, the Legislature was aware of the background law and acted with reference **\*104** to it.[57] "Where text is clear, text is determinative" of legislative intent.[58] We give such statutes their plain meaning without resort to rules of construction or extrinsic aids.[59] Only when statutory text is susceptible to more than one reasonable interpretation is it appropriate to look beyond its language for assistance in determining legislative intent.[60]

**[12]** Where, as here, parties assert competing motions for summary judgment on overlapping issues and the trial court grants one motion and denies the other, we consider all of the summary-judgment evidence, determine all questions presented, and, if the trial court erred, render the judgment the trial court should have rendered.[61]

### Appeal of hearing examiner's decision

As previously noted, the Civil Service Act confers subject-matter jurisdiction on district courts to review hearing examiner decisions only on grounds that the examiner "was without jurisdiction or exceeded [his or her] jurisdiction or that the order was procured by fraud, collusion, or other unlawful means."[62] These grounds likewise define the bases for judicial relief in such an appeal.[63] Bracey's central contentions on appeal, as they were below, are that appellees violated Subchapter B of Government Code chapter 614 by failing to provide him written, signed "complaints" from Detective Dinwiddie and Captain Fholer; that these omissions further triggered Subchapter B's prohibition against "[d]isciplinary action ... taken against the officer or employee unless a copy of the signed complaint is given to the officer or employee"; and that the hearing examiner's failure or refusal to enforce Subchapter B by reinstating him amounted to conduct "exceeding her jurisdiction" that is susceptible to judicial review and correction under the Civil Service Act. Bracey does not assert that the hearing examiner's decision "was procured by fraud, collusion, or other unlawful means" or that the examiner "was without jurisdiction" to decide his appeal of the suspension in the first instance. It is also worth noting that Bracey does not dispute, apart from his contentions in reliance on Subchapter B, that the acts of the hearing examiner were within her "jurisdiction" under the Civil Service Act and that appellees likewise fully complied with the Act's requirements. He does not complain, for example, that Chief Baldwin's letter

of suspension failed to give the notice of "the act or acts of the ... police officer that allegedly violated the civil service rules" mandated by the **\*105** Act, [64] that he was entitled to reinstatement for that reason, [65] or that the hearing examiner "exceeded her jurisdiction" (apart from his view of Subchapter B's implications) in determining, based on the evidence presented, that Bracey had violated each of the civil service rules Chief Baldwin had charged and that dismissal was the appropriate disciplinary sanction for the misconduct she had found.

In response, appellees bring forward their arguments that the hearing examiner did not "exceed her jurisdiction" in dismissing Bracey regardless of whether they complied with Subchapter B. On appeal, however, appellees further suggest (contrary to *Treadway* [66]) that Subchapter B applies only to "citizen complaints" and that, in any event, they complied with the statute by providing Bracey the required written "complaints" in the form of Chief Baldwin's letter of suspension, a prior "Charging Memorandum signed by his chain of command," and "a copy of the personnel complaint form which initiated the internal investigation." But, as Bracey emphasizes, appellees did not contest the applicability of Subchapter B in their summary-judgment motion or response, nor that their conduct in regard to Dinwiddie and Fholer's misconduct allegations had triggered the statute's prohibition against "disciplinary action." Rather, appellees' summary-judgment papers effectively presumed —similar to the *MacAvoy* court [67]—that their actions had triggered Subchapter B's prohibition against "disciplinary action," and argued that the hearing examiner did not "exceed her jurisdiction" regardless. It is on the grounds appellees actually presented that the district court's summary-judgment rulings must stand or fall. [68] In other words, the pivotal issue in the posture of this appeal is as Bracey suggests: whether the hearing examiner "exceeded her jurisdiction," as contemplated by the Civil Service Act's judicial-review limitations, by dismissing rather than reinstating Bracey under circumstances where Subchapter B says that "[d]isciplinary action may not be taken."

Analysis of a hearing examiner's "jurisdiction" and whether or when it is "exceeded" is guided by several recent decisions from the Texas Supreme Court. As the high court has observed, the Civil Service Act's limits on judicial review of hearing examiner decisions appear to have been "borrowed" from the Texas Arbitration Act, and "almost identical" language also appears in the Federal Arbitration Act. [69]

Consequently, the Civil Service Act could, as with arbitration awards, potentially insulate from judicial review not only factual errors by a hearing examiner, but a wide range of legal ones as well. [70] In fact, several of our sister courts, taking a cue **\*106** from arbitration decisions, had previously construed the Act that way. [71] But, in its recent decisions, the Texas Supreme Court expressly disapproved of these cases and the underlying notion that judicial review of hearing examiner decisions works the same way as review of arbitration awards, [72] reasoning that the "jurisdiction" of a Civil Service Act hearing examiner—and thus the range of decisions that are insulated from judicial review—is much narrower than that of the typical arbitrator. The court has pointed to two basic reasons for this.

[13]     First, the high court has observed that while arbitrators usually derive their authority from broadly worded contractual agreements, and that these powers are further augmented by legal principles favoring arbitration, "an independent hearing examiner's jurisdiction is created by the Act and comes with significant constraints." [73] These constraints include numerous "deadlines, procedures, and limitations" under the Act that "both confer[ ] and limit[ ] the power of a hearing examiner." [74] Further, the court has concluded, "the Act does not empower a hearing examiner to make rules." [75]

[14]     [15]     [16]     The second distinction emphasized by the supreme court, related to the first, is that the Act's delegation of decision-making authority to a hearing examiner potentially implicates the constitutional limitations on delegations of "legislative" power to private entities, which the court apparently considers hearing examiners to be. [76] A delegation of power by the Legislature without "reasonable standards" to govern its exercise "is an abdication of the authority to set governmental policy which the Constitution assigns to the legislative department," and the risk of such evils is considered to be especially grave when the delegation is made to a private entity as opposed to a public one. [77] Accordingly, private delegations are permissible under the Texas Constitution, to summarize the relevant limitations, only "if the legislative purpose is discernable and there is protection against the arbitrary exercise of power." [78] Although the Texas Supreme Court **\*107** has not yet definitively addressed whether the Act's delegation of decision-making authority to hearing examiners comports with these limitations, it has strongly cautioned

that the delegation raises "constitutional concerns" if the Act's provisions that define and constrain hearing examiners' authority cannot be enforced through "meaningful" judicial review: [79]

> [I]f the Act does not bind hearing examiners to definite standards for reaching decisions and instead gives them broad latitude in determining not only factual disputes but the applicable law, they become not merely independent arbiters but policy makers, which is a legislative function. This would raise nondelegation concerns.... It is one thing for a hearing examiner to determine whether conduct for which an officer ... has been disciplined occurred as charged; it is quite another thing for a hearing examiner to decide whether conduct that did occur deserves discipline. If a city can invoke judicial review to require that a hearing examiner's ruling be made according to law, one concern of the nondelegation doctrine is satisfied. But ... "if the right of appeal provided by [the Act] does not afford a city meaningful review of a hearing examiner's decision, ... delegation of grievance decisions to an independent hearing examiner may raise constitutional problems." [80]

And it follows, in the supreme court's view, that these constitutional concerns must also guide construction of a hearing examiner's "jurisdiction" as it bears upon whether the Act permits judicial review of a particular action or decision of the examiner:

> Thus, in construing the scope of judicial review permitted by [the Act], we must be mindful ... that "[w]hen faced with multiple constructions of a statute, we must interpret the statutory language in a manner that renders it constitutional if it is possible to do so." [81]

 [17]    The supreme court has acknowledged that "[i]t is difficult to distill from these statutory and constitutional constraints a simple, precise standard for determining whether a hearing examiner has exceeded his jurisdiction." [82] But in *City of Pasadena v. Smith,* it offered the following as "[t]he most accurate test we can state":

> [A] hearing examiner exceeds his jurisdiction when his acts are not authorized by the Act or are contrary to it, or when they invade the policy-setting realm protected by the nondelegation doctrine. [83]

To date, the supreme court's specific applications of these concepts have focused on whether a hearing examiner's acts were "authorized by the Act or ... contrary to it," as opposed to being consistent with the Act yet nonetheless "invad[ing] the policy-setting realm." In *City of Waco v. Kelley,*  **\*108** the court held that a hearing examiner "exceeded his jurisdiction" in imposing disciplinary remedies the court concluded were not authorized by the Civil Service Act under the circumstances presented-a temporary suspension exceeding fifteen days in duration, a demotion, and back pay to the extent the employee was awarded compensation during a period of suspension. [84] Similarly, in *Smith*, the supreme court held that a hearing examiner had exceeded his jurisdiction in summarily reinstating an indefinitely suspended employee based solely on noncompliance with an Act provision that the examiner erroneously believed to require the department head to personally attend the hearing. [85] The court reasoned that (1) the Act required the hearing examiner to hear evidence and base his decision on it, yet he had refused to hear evidence; (2) in contrast to the Act's provisions requiring immediate reinstatement if the letter of suspension failed to provide adequate notice of the grounds for suspension, nothing in the Act required or authorized reinstatement as the penalty for noncompliance with the provision on which the examiner had relied; and (3) the provision of the Act on which the examiner relied had not applied in the first place. [86]

Also instructive is *City of DeSoto v. White,* in which the court held that a department head's failure to provide the notice regarding appeal rights that the Civil Service Act required to be included with the letter of suspension did not deprive the hearing examiner of his jurisdiction under the Act to proceed with the appeal and impose discipline (i.e., mandate immediate reinstatement), but should be remedied instead by abating the hearing to afford the municipality opportunity to cure the omission. [87] Applying the *Dubai* analysis of whether a statutory notice requirement is "jurisdictional" (i.e., a prerequisite to a tribunal's subject-matter jurisdiction) as opposed to merely mandatory, [88] the *White* court looked to whether the Act evidenced "clear legislative intent" to make the notice requirement a prerequisite for a hearing examiner's "jurisdiction" to hear an appeal and impose discipline, considering the Act's text, "the presence or absence of specific consequences for noncompliance," and the consequences that would result from each alternative construction. [89] To reach its conclusion, the supreme court reasoned that, first, the Act did not expressly make the

notice requirement jurisdictional, nor was the requirement made a statutory prerequisite to suit.[90] It next observed that the Act had not specified any particular consequences for noncompliance with the notice requirement, which it found particularly significant when contrasted with the Act's requirement of "prompt [ ] reinstate[ment]" where the letter of suspension "does not specifically point out ... the act or acts ... that allegedly violated the civil service rules...."[91] "By arguing that the City's failure to provide the required notice is jurisdictional," the court emphasized, "White seeks the same remedy provided **\*109** for in section 143.052(f) [the provision mandating 'prompt[ ] reinstate[ment]' for inadequate notice of charges]—dismissal," and that " '[w]hen the Legislature includes a right or remedy in one part of a code but omits it in another, that may be precisely what the Legislature intended,' and 'we must honor that difference.' "[92] Finally, regarding the "consequences" of holding that the notice requirement was jurisdictional, the court reasoned that reinstating an officer "without an adjudication of the very serious allegations against him," which included abusing sick leave policy and "subsequently l[ying] to a supervisor about his actions ... cannot be the result the Legislature intended," given "the vital role of police officers ... in our society, and the need for continued public trust in the exercise of their duties," and "especially where an interpretation which concludes that the provision is not jurisdictional would still protect the officer's appellate rights" through the abatement remedy.[93]

*MacAvoy*—the Tyler Court of Appeals decision on which appellees and the hearing examiner relied—applied the Texas Supreme Court's reasoning from *Smith* and *White* to resolve a dispute, similar to the present one, regarding whether or how a municipality's noncompliance with Subchapter B affects a hearing examiner's authority to impose discipline under the Civil Service Act. MacAvoy, a police officer for the City of Athens, was indefinitely suspended by the police chief pursuant to the Civil Service Act after an internal investigation revealed that he had engaged in sexual relations with a woman while on duty and committed other violations of departmental policy.[94] The investigation had been triggered when the woman's husband had notified the police department of MacAvoy's actions. MacAvoy appealed the suspension to an independent hearing examiner and argued, similar to Bracey here, that Subchapter B barred his suspension and required his reinstatement because he had not been provided a signed, written "complaint" from the woman or her husband.[95] Although the hearing examiner proceeded

to hear evidence (a fact distinguishing the case from *Smith* ), he ultimately agreed with MacAvoy that Subchapter B barred his discipline and, on that sole basis, ordered him reinstated.[96] The City of Athens appealed the hearing examiner's decision to the district court, which granted summary judgment that the examiner had not "exceeded his jurisdiction" in ordering MacAvoy reinstated.[97] Concluding otherwise, the Tyler Court of Appeals reversed.

While conceding that Subchapter B, by its terms, applied to "disciplinary actions" reviewed or imposed by Civil Service Act hearing examiners, the Tyler court found fault with the examiner's reinstatement of the officer on the sole basis that the City had not complied with Subchapter B. In the court's view, this application of Subchapter B made it tantamount to a jurisdictional prerequisite that must be satisfied in order for a hearing examiner to have power to impose discipline under the Civil Service Act.[98] Because hearing examiners have no authority to create procedural rules, per *Smith*, the controlling question, the court reasoned, became whether **\*110** the Legislature had intended Subchapter B itself to impose this sort of "jurisdictional" limitation on hearing examiners under the Civil Service Act. Following the Texas Supreme Court's analysis in *White,* the Tyler court concluded that Subchapter B was not intended to be this sort of requirement. It observed that while Subchapter B's requirements were clearly mandatory, nothing in that statute purported to make them jurisdictional; that Subchapter B "contains no specific consequences for noncompliance"; and that the consequences of the alternative constructions further suggested that the Legislature had not intended Subchapter B to defeat the jurisdiction of a hearing examiner under the Civil Service Act:

> If the tendering of a complainant's statement prior to discipline is jurisdictional, a police officer cannot be relieved of duty even for very serious infractions if the statement is not provided prior to the imposition of discipline. On the other hand, if the statement requirement is not jurisdictional, a hearing examiner can hear a case where the officer['s] ... right to due process is respected even if the statement is presented at a time after the initial discipline is imposed.[99]

In light of these considerations, the Tyler court held that "[i]n the absence of a legislative directive that the failure to provide a complainant's statement prior to discipline means that the officer will escape discipline, the hearing examiner exceeded his jurisdiction by crafting such a rule."[100]

Bracey emphasizes that *MacAvoy* is not binding precedent on this Court, and urges that we should not follow its analysis here. He disputes the Tyler court's assessment that Subchapter B "contains no specific consequences for noncompliance" that are material to hearing examiners, insisting that "*[d]isciplinary action may not be taken* against the officer" could not be any clearer in specifying the consequences for failing to give "a copy of the signed complaint ... to the officer." But more fundamentally, Bracey asserts that *MacAvoy* asked and answered the wrong question. What *MacAvoy* addressed, Bracey suggests, is whether compliance with Subchapter B affects the "jurisdiction" of a hearing examiner only in the sense of whether "his acts are not authorized by the [Civil Service] Act or are contrary to it"— i.e., the first two components of the "test" the Texas Supreme Court announced in *Smith.* [101] In fact, Bracey goes as far as to concede that, at least in this sense, "[appellees'] failure to comply with Subchapter B did not cause the hearing examiner to be without jurisdiction." But the real question presented in cases like these, Bracey reasons, instead concerns the third component of the *Smith* test—whether the hearing examiner, even if otherwise acting consistently with the Civil Service Act, nonetheless "exceeded his jurisdiction" through acts that "invade the policy-setting realm protected by the nondelegation doctrine." [102] Specifically, Bracey contends that Subchapter B embodies the Legislature's intent and policy judgment that failure to provide a police officer a written "complaint" as required under Subchapter B is of sufficient gravity to preclude "disciplinary action," including that reviewed or imposed by hearing examiners **\*111** in appeals under the Civil Service Act, and require reinstatement. By failing to give effect to Subchapter B, Bracey insists, the hearing examiner supplanted the Legislature's policy judgments with her own.

Appellees counter in part that even if the hearing examiner somehow failed to construe or apply Subchapter B properly, that error would be insulated from judicial review because it would not implicate the examiner's "jurisdiction" as contemplated by the Civil Service Act. They reason that the Act empowers hearing examiners to construe and apply statutes like Subchapter B in the course of deciding disciplinary appeals, that hearing examiner decisions are "final and binding on all parties" so long as the examiner remains within this "jurisdiction," and that "getting it wrong" is not the same as lacking jurisdiction to decide a question in the first place. We disagree with appellees that the Act permits

or requires courts to ignore the question of Subchapter B's implications for and effects on a hearing examiner's authority.

**[18]** While the Texas Supreme Court continues to recognize that " '[a]sserting that a decision made by a hearing examiner is incorrect is not the same as asserting that the hearing examiner did not have jurisdiction,' " [103] the reasoning of its recent decisions guides us to classify the error of which Bracey complains as going to the examiner's "jurisdiction" and not just the merits of her decision. If, as Bracey argues, the Legislature intended Subchapter B's prohibition against "disciplinary action," once activated, to require Civil Service Act hearing examiners to reinstate a suspended police officer regardless of whether discipline would otherwise be authorized under the Act, a hearing examiner's disregard of that prohibition (or even the existence of delegated power to do so) would, if unchecked by "meaningful judicial review," represent the sort of "broad latitude in determining not only factual disputes but the applicable law" and "whether conduct that did occur deserves discipline" that the supreme court considers to imperil the constitutional validity of the Act's delegation of decision-making authority to hearing examiners under the nondelegation doctrine. [104] Whether viewed as "policymaking" (as Bracey characterizes it) or in terms of an external statutory limitation on the disciplinary authority that a hearing examiner would otherwise possess under the Civil Service Act (as the *MacAvoy* court analyzed it), the hearing examiner's failure to give effect to Subchapter B would "exceed her jurisdiction," construed in light of these "constitutional concerns." It follows that the district court had subject-matter jurisdiction to determine—and necessarily had to determine—whether Subchapter B actually had this intent and effect in order to decide whether the hearing examiner's decision "exceeded her jurisdiction." [105] In contending that the Act instead bars further judicial inquiry about Subchapter B's proper construction and effect, appellees rely—tellingly—on court of appeals' decisions that were explicitly disapproved by the Texas Supreme Court in *Smith.* [106]

**\*112** **[19]** As for whether Subchapter B required the hearing examiner to reinstate Bracey, appellees again rely heavily on *MacAvoy*. Notwithstanding Bracey's attempts to distinguish the case, we find several facets of its analysis instructive and persuasive. Whether viewed in terms of the *White* and *Dubai* analysis of "jurisdictional" requirements or whether hearing examiners are "policymaking" in lieu of following the governing law, the gravamen of *MacAvoy*

is that even if the "disciplinary actions" prohibited under Subchapter B include the discipline reviewed or imposed by Civil Service Act hearing examiners, neither Subchapter B nor the Act reflects legislative intent to mandate automatic reinstatement as the sole remedy hearing examiners can impose (per the *White* analysis) and that, in the absence of such a mandate in the statute, hearing examiners actually *lack* jurisdiction to impose reinstatement as an automatic or categorical remedy (per *Smith* ). In effect, the *MacAvoy* court reconciled what were potentially conflicting statutory commands—"thou shalt not impose 'disciplinary action,' " sayeth Subchapter B, while the Civil Service Act, at least as construed in *Smith,* seems to forbid the converse, automatic reinstatement—by construing the statutes collectively to mean that hearing examiners are bound to enforce Subchapter B, but through some remedy other than automatic reinstatement, presumably some form of abatement or other opportunity to cure the notice defect, as in *White.* We agree with this view of the relationship between Subchapter B and the Civil Service Act.

On one hand, Bracey unquestionably comes within the class of law enforcement officers who are now protected by Subchapter B, and assuming (as we must in the posture of this appeal) that appellees failed to provide him a written "complaint" as the statute required, Subchapter B states unambiguously that "[d]isciplinary action may not be taken" against him "unless a copy of the signed complaint is given to [him]." Yet nothing in either Subchapter B nor the Civil Service Act states that automatic reinstatement is the sole remedy or means by which this prohibition can be enforced. The absence of such language stands in contrast to the Act's explicit requirement of "prompt[ ] reinstate[ment]" if the letter of suspension "does not specifically point out ... the act or acts ... that allegedly violated the civil service rules." [107] Such distinctions in the rights and remedies available in those situations, as the Texas Supreme Court emphasized in *White,* " 'may be precisely what the Legislature intended' "—"and 'we must honor that difference.' " [108] The supreme court emphasized a similar distinction in *Smith*, pointing out that the statutory provision on which the hearing examiner had erroneously relied in reinstating an employee based on the failure of the department head to attend the hearing did "not authorize rendition of a default judgment as an automatic penalty for noncompliance" and relying in part on the absence of such an authorization in holding that the hearing examiner "exceeded his jurisdiction" in imposing such a remedy. [109] Informed by *Smith* and *White,* we conclude, as did the *MacAvoy* court, that the hearing examiner would have

"exceeded her jurisdiction" had she reinstated Bracey based solely on appellees' failure to comply **\*113** with Subchapter B. [110]

Bracey's sole complaint is that the hearing examiner "exceeded her jurisdiction" by failing to reinstate him based on Subchapter B. We have concluded that, to the contrary, the examiner had no jurisdiction to award him that remedy based solely on any failure by appellees to provide him one or more written "complaints" required by Subchapter B. Bracey has not preserved any complaint that the hearing examiner failed to enforce Subchapter B through a remedy that would be within her jurisdiction to award. Accordingly, the hearing examiner did not "exceed her jurisdiction" as a matter of law. [111] The district court did not err in granting appellees' summary-judgment motion or denying Bracey's motion as to Bracey's appeal of the hearing examiner's decision.

**Declaratory-judgment claims**

Bracey next argues that the district court erred in granting summary judgment as to his declaratory-judgment claims. He principally argues that the ground on which appellees relied, which was framed in terms of "arbitration and award," is inapposite because proceedings before independent hearing examiners under the Civil Service Act are not, strictly speaking, arbitration. [112] Whatever the merits of this conceptual distinction, the hearing examiner's decision, which we have now concluded was properly upheld by the district court on summary judgment, gives rise to a more fundamental—and jurisdictional—barrier to Bracey's declaratory claims. [113]

In the absence of an applicable waiver of governmental immunity, Bracey can seek to enforce Subchapter B solely through the ultra-vires exception to sovereign and governmental immunity. [114] Bracey's declaratory-judgmentt **\*114** t claims against Chief Baldwin, in his official capacity, would be in the nature of such a claim: he seeks to compel the City of Killeen, through Chief Baldwin, to enforce what Bracey contends is a mandatory statutory prohibition against "disciplinary action." [115] Further, as Bracey points out, some of our sister courts, albeit in cases not involving the Civil Service Act, have granted declaratory and injunctive relief to compel reinstatement of police officers based on Subchapter B violations. [116] But as the Texas Supreme Court has more recently made clear in *City of El Paso v. Heinrich*, the sole relief that Bracey could obtain through the ultra

vires exception would be declaratory or injunctive relief to compel prospective compliance with Subchapter B—i.e., to reinstate him going forward from the time of judgment —and governmental immunity would continue to bar any retrospective relief, such as retroactive reinstatement and back pay. [117] And while governmental immunity would not bar Bracey's claim for prospective reinstatement, the hearing examiner's decision renders that claim moot—whatever the theoretical merits of Bracey's declaratory claim, it remains that Bracey would still be dismissed from the Killeen Police Department by virtue of a hearing examiner decision that he cannot overturn. [118] Bracey's declaratory-judgment claim, in other words, seeks no relief that the district court has subject-

matter jurisdiction to award, and the district court properly dismissed it. [119]

## *115  CONCLUSION

We affirm the district court's judgment dismissing Bracey's claims.

## Parallel Citations

37 IER Cases 158

Footnotes

1      *See generally* Tex. Loc. Gov't Code § 143.057.

2      *See generally id.* §§ 143.051–.053, .057.

3      *See generally* Tex. Gov't Code §§ 614.021–.023.

4      *See* Tex. Loc. Gov't Code §§ 143.001(a), .006, .008, .051, .052(b), .053(g), .057(f); *see generally id.* §§ 143.001–.363. The Civil Service Act also protects fire fighters, but our focus here is limited to its application to police officers.

5      *See id.* §§ 143.001(b), .008(c), .051.

6      *See id.* §§ 143.051–.057. Certain of the provisions within subchapter D exclude municipalities with a population of 1.5 million or more, but there is no dispute that the current population of the municipality at issue here, the City of Killeen, falls under this threshold. We express no opinion as to the extent our analysis might have implications for municipalities not directly governed by subchapter D. *Cf. City of Houston v. Clark,* 197 S.W.3d 314, 317 n. 4 (Tex.2006).

7      Tex. Loc. Gov't Code § 143.052(b); *see id.* § 143.051.

8      *Id.* § 143.052(c); *see id.* § 143.057(a) (referring to "the letter of disciplinary action"); *City of DeSoto v. White,* 288 S.W.3d 389, 392–93 & n. 3 (Tex.2009) (observing that the "written statement" referenced in section 143.052 and section 143.057(a)'s "letter of disciplinary action" "appear to refer to the same document").

9      Tex. Loc. Gov't Code § 143.052(e).

10     *Id.* § 143.052(f).

11     *See id.* §§ 143.052(d) ("The copy of the written statement [given to the officer] must inform the suspended ... officer that if the person wants to appeal to the commission, the person must file a written appeal with the commission within 10 days after the date the person receives the copy of the statement."), .057(a) ("In addition to the other notice requirements prescribed by this chapter, ... the letter of disciplinary action ... issued to a ... police officer must state that in an appeal of an indefinite suspension, [or] a suspension ... the appealing ... police officer may elect to appeal to an independent third party hearing examiner instead of to the commission. The letter must also state that if the ... police officer elects to appeal to a hearing examiner, the person waives all rights to appeal to a district court except as provided by Subsection (j).").

12     *Id.* §§ 143.010(b), (g), .053.

13     *Id.* § 143.053(c).

14     *Id.* § 143.010(g); *see also id.* § 143.053(d) ("The commission may deliberate the decision in closed session but may not consider evidence that was not presented at the hearing.").

15     *Id.* § 143.010(g).

16     *Id.* § 143.053(e)(1).

17     *Id.* § 143.053(e)(2), (f); *see City of Waco v. Kelley,* 309 S.W.3d 536, 545–48 (Tex.2010) (although not made explicit within section 143.053, duration of "temporary suspension" authorized therein is governed by same fifteen-day limit that expressly limits department head's discretion).

18     *See* Tex. Loc. Gov't Code § 143.053(e)(3), (f); *Kelley,* 309 S.W.3d at 548–49.

19     Tex. Loc. Gov't Code § 143.053(g).

*See id.* § 143.057.

*See City of Pasadena v. Smith,* 292 S.W.3d 14, 15 & n. 8 (Tex.2009).

Tex. Loc. Gov't Code § 143.057(d).

*Id.* § 143.057(f).

*See Smith,* 292 S.W.3d at 20.

*See Kelley,* 309 S.W.3d at 544–49.

Tex. Loc. Gov't Code § 143.015.

*See Clark,* 197 S.W.3d at 318 n. 5 (presuming that reference to "the arbitration panel" within section 143.1016, subsection (j), which applies to municipalities with populations of 1.5 million or more and closely mirrors section 143.057, subsection (j), necessarily refers to the individual hearing examiner who rendered the decision).

Tex. Loc. Gov't Code § 143.057(c), (j); *see also Clark,* 197 S.W.3d at 317–24 & n. 4 (holding that municipalities, not just officers, enjoy the Act's limited right to appeal hearing examiner decisions to district court).

*See* Tex. Gov't Code §§ 614.021–.023. Like the Civil Service Act, Subchapter B of chapter 614 also protects fire fighters, but, again, our focus here is on its application to law enforcement officers.

*Treadway v. Holder,* 309 S.W.3d 780, 782–86 (Tex.App.-Austin 2010, pet. denied); *id.* at 786–89 & n. 1 (Waldrop, J., dissenting) (although "agree[ing] with the majority that there is no distinction between 'external' complaints relating to an employee and 'internal' complaints—i.e., between complaints generated outside the organization and those generated within the organization—for purposes of the application of Subchapter B," urging that "complaint" did not include those generated within the officer's own chain of command).

Tex. Gov't Code § 614.022.

*Id.* § 614.023(a).

*Id.* § 614.023(b).

*Id.* § 614.023(c).

Act of May 16, 1969, 61st Leg., R.S., ch. 407, § 1, 1969 Tex. Gen. Laws 1333, 1333–34, *recodified by* Act of May 4, 1993, 73d Leg., R.S., ch. 268, § 1, secs. 614.021–.023, 1993 Tex. Gen. Laws 583, 678–79 (amended 2005) (current version at Tex. Gov't Code §§ 614.021–.023); *see also Guthery v. Taylor,* 112 S.W.3d 715, 717 (Tex.App.-Houston [14th Dist.] 2003, no pet.) (observing that pre–2005 versions of "Texas Government Code sections 614.022 and 614.023 ... apply only to those police officers who are not covered by a civil service statute").

Act of May 19, 2005, 79th Leg., R.S., ch. 507, § 1, sec. 614.021, 2005 Tex. Gen. Laws 1394, 1394 (current version at Tex. Gov't Code §§ 614.021(a)(3), (b)).

*See* Tex. Loc. Gov't Code § 143.003(5) (defining "police officer" covered by the Act).

Tex. Gov't Code § 614.021(a)(3), (b).

Bracey's falsehoods, according to Chief Baldwin, included utilizing his infant son's social security number and an incorrect home address in an attempt to avoid detection by the bank. Bracey's motive, Baldwin suggested, was to avoid having to repay the bank approximately $1,000 he owed for a previous overdraft.

Chief Baldwin stated that Detective Dinwiddie had conducted the search pursuant to a warrant "obtained and executed as a result of an unrelated criminal investigation where[ ] you [Bracey] were listed as the suspect."

Incidentally, Baldwin's letter also noted that Bracey had been the subject of a separate disciplinary action within the past sixty months that had culminated, according to Baldwin, with a fifteen-day suspension for "neglect of duty."

*See* Tex. Loc. Gov't Code § 143.052(e), (f).

Tex. Gov't Code § 614.023(b).

353 S.W.3d 905 (Tex.App.-Tyler 2011, pet. denied).

*See id.* at 907–11.

*See* Uniform Declaratory Judgments Act (UDJA), Tex Civ. Prac. & Rem.Code §§ 37.001–.011.

*See Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 661 (Tex.2005).

Tex.R. Civ. P. 166a(c); *Western Invs., Inc. v. Urena,* 162 S.W.3d 547, 550 (Tex.2005).

*Urena,* 162 S.W.3d at 550.

*See* Tex.R. Civ. P. 166a(c); *Science Spectrum, Inc. v. Martinez,* 941 S.W.2d 910, 911 (Tex.1997).

*See Walker v. Harris,* 924 S.W.2d 375, 377 (Tex.1996).

*State v. Shumake,* 199 S.W.3d 279, 284 (Tex.2006).

*Id.*

54    *Lexington Ins. Co. v. Strayhorn,* 209 S.W.3d 83, 85 (Tex.2006).

55    *See City of San Antonio v. City of Boerne,* 111 S.W.3d 22, 25 (Tex.2003).

56    *See TGS–NOPEC Geophysical Co. v. Combs,* 340 S.W.3d 432, 441 (Tex.2011).

57    *See In re Allen,* 366 S.W.3d 696, 706 (Tex.2012) (orig. proceeding) (quoting *Acker v. Texas Water Comm'n,* 790 S.W.2d 299, 301 (Tex.1990)).

58    *Entergy Gulf States, Inc. v. Summers,* 282 S.W.3d 433, 437 (Tex.2009) (op. on reh'g) (citing *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson,* 209 S.W.3d 644, 651–52 (Tex.2006); *Shumake,* 199 S.W.3d at 284).

59    *Texas Lottery Comm'n v. First State Bank of DeQueen,* 325 S.W.3d 628, 635, 637 (Tex.2010).

60    *See In re Smith,* 333 S.W.3d 582, 586 (Tex.2011) (orig. proceeding).

61    *Valence Operating Co.,* 164 S.W.3d at 661.

62    Tex. Loc. Gov't Code § 143.057(j); *cf. Texas Dep't of Protective & Regulatory Servs. v. Mega Child Care, Inc.,* 145 S.W.3d 170, 172 (Tex.2004) (recognizing that sovereign immunity generally bars judicial review of administrative decisions unless right of judicial review is provided by statute).

63    *See, e.g., Clark,* 197 S.W.3d at 324 (discussing "scope of review" under Civil Service Act's provisions governing appeal of hearing examiner's decision).

64    Tex. Loc. Gov't Code § 143.052(e), (f).

65    *See id.* § 143.052(f).

66    *See Treadway,* 309 S.W.3d at 784.

67    353 S.W.3d at 907–11.

68    *See* Tex.R. Civ. P. 166a(c); *McConnell v. Southside Indep. Sch. Dist.,* 858 S.W.2d 337, 341 (Tex.1993); *City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678 (Tex.1979).

69    *Smith,* 292 S.W.3d at 19, 21; *see* Tex. Civ. Prac. & Rem.Code § 171.088(a)(3)(A); *see also* 9 U.S.C. § 10 (identical language in Federal Arbitration Act).

70    *See, e.g., East Tex. Salt Water Disposal Co., Inc. v. Werline,* 307 S.W.3d 267, 272 (Tex.2010) ("Because Texas law favors arbitration, judicial review of an arbitration award is extraordinarily narrow."); *Universal Computer Sys., Inc. v. Dealer Solutions, L.L.C.,* 183 S.W.3d 741, 752 (Tex.App.-Houston [1st Dist.] 2005, pet. denied) ("Review [of an arbitration award] is so limited that a court may not vacate an arbitration award even if it is based upon a mistake of fact or law.").

71    *See, e.g., City of Houston v. Clark,* 252 S.W.3d 561, 567 (Tex.App.-Houston [14th Dist.] 2008, no pet.) (concluding that courts "lack jurisdiction to review the merits of the hearing examiner's decision, including issues regarding whether the hearing examiner abused his discretion and ignored or misinterpreted controlling law"); *City of Pasadena v. Smith,* 263 S.W.3d 80, 84–85 (Tex.App.-Houston [1st Dist.] 2006) (holding that trial court lacked jurisdiction to review hearing examiner's decision that erred in applying law), *rev'd,* 292 S.W.3d at 17–22.

72    *E.g., Smith,* 292 S.W.3d at 21.

73    *Id.* at 20.

74    *Kelley,* 309 S.W.3d at 541–42 (citing *Smith,* 292 S.W.3d at 20).

75    *Smith,* 292 S.W.3d at 20.

76    *See id.* at 17–20. As previously noted, a hearing examiner may be chosen by the parties' agreement or through a process of selection from a list of "qualified" and "neutral" arbitrators prepared by either the AAA, a private entity, or the FMCS, which is a federal agency. *See* Tex. Loc. Gov't Code § 143.057(d); *Proctor v. Andrews,* 972 S.W.2d 729, 734 (Tex.1998) (citing 29 U.S.C. § 171). Although the Texas Supreme Court suggested in *Proctor* that the constitutionality of the Civil Service Act's delegation of power to FMCS to select the list of proposed hearing examiners might be analyzed differently than its delegation of the same power to AAA, *see Proctor,* 972 S.W.2d at 734, the court has not drawn any such distinctions when analyzing the Act's delegation of authority to a hearing examiner, once chosen, to decide the appeal. *See Kelley,* 309 S.W.3d at 541–42; *Smith,* 292 S.W.3d at 17–18.

77    *Smith,* 292 S.W.3d at 17–18.

78    *Clark,* 197 S.W.3d at 320 (quoting *Proctor,* 972 S.W.2d at 735); *see also Texas Boll Weevil Eradication Found., Inc. v. Lewellen,* 952 S.W.2d 454, 472 (Tex.1997) (prescribing eight-factor test for determining whether private delegation of legislative power exceeds constitutional limitations).

79    *See Kelley,* 309 S.W.3d at 541–42; *Smith,* 292 S.W.3d at 17–18; *see also Lewellen,* 952 S.W.2d at 472 (identifying susceptibility of private delegate's actions "to meaningful review by a state agency or other branch of state government" as one of the eight factors applied when evaluating constitutionality of private delegation).

80    *Smith,* 292 S.W.3d at 18–19; *accord Kelley,* 309 S.W.3d at 541–42 (quoting *Smith,* 292 S.W.3d at 18–19).

81    *Smith,* 292 S.W.3d at 19 (quoting *Clark,* 197 S.W.3d at 320).

82 *Id.* at 21.

83 *Id.*

84 309 S.W.3d at 541–49.

85 292 S.W.3d at 17–18.

86 *See id.* at 17–21 & n. 47.

87 288 S.W.3d at 393–401.

88 *See Dubai Petroleum Co. v. Kazi,* 12 S.W.3d 71, 75–77 (Tex.2000).

89 *See White,* 288 S.W.3d at 393–97 (citing *Helena Chem. Co. v. Wilkins,* 47 S.W.3d 486, 495 (Tex.2001); *Dubai Petroleum Co.,* 12 S.W.3d at 75–77).

90 *See id.* at 395–96.

91 *Id.* at 396 (quoting Tex. Loc. Gov't Code § 143.052(f)).

92 *Id.* (quoting *PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd. P'ship,* 146 S.W.3d 79, 84 (Tex.2004)).

93 *Id.* at 396–97 & n. 6.

94 353 S.W.3d at 906.

95 *Id.*

96 *Id.* at 906, 910 n. 5.

97 *Id.*

98 *See id.* at 908, 910 n. 5.

99 *Id.* at 909–10 (footnote omitted).

100 *See id.* at 910 (citing *Smith,* 292 S.W.3d at 21, for proposition that "a hearing examiner exceeds his jurisdiction when his acts are not authorized by the Act or are contrary to it").

101 292 S.W.3d at 21 ("a hearing examiner exceeds his jurisdiction when his acts are not authorized by the Act or are contrary to it").

102 *Id.*

103 *Id.* (quoting *Smith,* 263 S.W.3d at 85).

104 *Id.* at 19–20.

105 *See Harris Cnty. v. Sykes,* 136 S.W.3d 635, 642 (Tex.2004) (noting "courts always have jurisdiction to determine their own subject-matter jurisdiction" (citing *Camacho v. Samaniego,* 831 S.W.2d 804, 809 (Tex.1992))).

106 *See City of Laredo v. Leal,* 161 S.W.3d 558, 563 (Tex.App.-San Antonio 2004, pet. denied); *Nuchia v. Tippy,* 973 S.W.2d 782, 786 (Tex.App.-Tyler 1998, no pet.); *see also Smith,* 292 S.W.3d at 21 & nn. 49 & 50 (noting that cited opinions failed to "accurately restate[ ] the restrictions on a hearing examiner's authority").

107 Tex. Loc. Gov't Code § 143.052(f).

108 288 S.W.3d at 396 (quoting *PPG Indus., Inc.,* 146 S.W.3d at 84).

109 292 S.W.3d at 20.

110 In the alternative, if Subchapter B and the Civil Service Act cannot be reconciled in this manner, then we would hold that the Act's provisions defining and limiting the hearing examiner's "jurisdiction" would control under the principle that a specific statute will ordinarily prevail over a general statute when the two cannot be reconciled. *See, e.g., City of Waco v. Lopez,* 259 S.W.3d 147, 153–54 (Tex.2008) (holding specific statutory scheme in Human Rights Act provided exclusive remedy to aggrieved employee and controlled over more general procedures and remedies in Whistleblower Act).

111 We express no opinion as to whether appellees' provision of the letter of suspension to Bracey—which, as the hearing examiner suggested, would seem to contain substantively the same information regarding Dinwiddie and Fholer's allegations against Bracey that would have been provided in the signed, written "complaints" Bracey demands, if not more—sufficed to cure any violation of Subchapter B. Certainly the safer approach for employers in appellees' position would be to provide the information in the form of the signed, written "complaints" described in Subchapter B.

112 *See City of League City v. Blevins,* 821 S.W.2d 212, 215 (Tex.App.-Houston [14th Dist.] 1991, no writ) (holding "proceedings held before an independent third party hearing examiner pursuant to [the Civil Service Act] are not in the nature of an arbitration and are not subject to the provisions of the Texas General Arbitration Act").

113 Even if not squarely raised by appellees, we have the power and duty to consider these jurisdictional concerns sua sponte. *See Rusk State Hosp. v. Black,* 392 S.W.3d 88, 95–96 (Tex.2012); *Texas Ass'n of Bus. v. Texas Air Control Bd.,* 852 S.W.2d 440, 446 (Tex.1993).

114 *See Mission Consol. Indep. Sch. Dist. v. Garcia,* 253 S.W.3d 653, 656 & n. 2 (Tex.2008) (noting that "governmental immunity protects subdivisions of the State, including municipalities" from lawsuits and liability for money damages); *cf. Texas Dep't of Transp. v.*

*Sefzik,* 355 S.W.3d 618, 620–21 (Tex.2011) (per curiam) (noting that sovereign immunity provides similar protection to suits against the state); *Texas A & M Univ. Sys. v. Koseoglu,* 233 S.W.3d 835, 844 (Tex.2007) (sovereign immunity generally extends to Texas state officials who are sued in their official capacities because that is merely " ' another way of pleading an action against the entity of which [the official] is an agent' " (quoting *Kentucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985))). Although the UDJA provides limited waivers of immunity, Bracey's claims regarding violations of Subchapter B fall outside of them. *See Sefzik,* 355 S.W.3d at 620–22.

115 *See id.* at 620–21 & n. 2 (observing that claims that sought "to compel a government official ... to perform some act that [the plaintiff] considers to be nondiscretionary" distinguished them as "within the ultra vires rationale").

116 *See Guthery,* 112 S.W.3d at 724 (rendering judgment that city and police chief violated Subchapter B by failing to provide copies of signed "complaints" and ordering reinstatement of disciplined officer with back pay and benefits).

117 284 S.W.3d 366, 373–77 (Tex.2009).

118 *See Klein v. Hernandez,* 315 S.W.3d 1, 3 (Tex.2010) ( "Appellate courts are prohibited from deciding moot controversies because the separation-of-powers article prohibits advisory opinions on abstract questions of law." (citing Tex. Const. art. II, § 1; *Brooks v. Northglen Ass'n,* 141 S.W.3d 158, 164 (Tex.2004))).

119 In urging that the hearing examiner's decision should not be deemed to foreclose his declaratory claims, Bracey refers us to a Dallas Court of Appeals decision involving a similar declaratory judgment claim alleging that the City of Dallas had violated Subchapter B and disciplined an employee in spite of it. *Nelson v. City of Dallas,* 278 S.W.3d 90, 92 (Tex.App.-Dallas 2009, pet. denied). The *Nelson* court held that an administrative tribunal under Dallas's civil service system had primary jurisdiction to decide whether the city had violated and erroneously applied Subchapter B and, accordingly, that the declaratory claim should be abated pending the administrative process. *See id.* at 98 ("Even if the City erroneously applies [Subchapter B], that error can be addressed in the administrative process and ultimately in the courts under the judicial review provided by the City charter and ordinances."). The gist of Bracey's complaint is that the Civil Service Act and *Nelson* collectively force him unfairly into an administrative process that deprives him of any remedy for appellees' violations of Subchapter B. If that is so, it is a function of the disciplinary procedures that the Legislature has provided in the Civil Service Act, which we are bound to enforce. Consequently, Bracey's remedy for this perceived flaw in the Act would lie with that branch of government, not the courts.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

709 S.W.2d 175
Supreme Court of Texas.

James CAIN, d/b/a James Cain
Company, et al., Petitioners,
v.
James Lee BAIN et ux., Respondents.

No. C–4764. | Feb. 12, 1986.
| Rehearing Denied June 4, 1986.

Purchasers of home brought action against real estate agency for violations of Deceptive Trade Practices Act, after being unable to sell house which they procured through agency because of foundation defect. The 215th District Court, Harris County, Charles L. Price, granted agency's motion for directed verdict and rendered take-nothing judgment against purchasers, and purchasers appealed. The Texarkana Court of Appeals, Sixth Court of Appeals District, reversed, determining that flaws and evidence of defects in house did not point unerringly to substantial foundation defect, such that purchasers were put on notice of defect, as jury found, and agency petitioned for writ of error. The Supreme Court held that proper standard of review for Court of Appeals in determining factual sufficiency of evidence is to consider and weigh all evidence and set aside verdict only if it is so contrary to overwhelming weight of evidence as to be clearly wrong and unjust.

Court of Appeals affirmed in part, reversed in part, and cause remanded thereto.

West Headnotes (1)

**[1]**  **Appeal and Error**
 &#128273; Extent of Review

**Appeal and Error**
 &#128273; Great or Overwhelming Weight or Preponderance

Proper standard of review which Court of Appeals should have used in reviewing jury verdict to determine factual sufficiency of evidence was to consider and weigh all evidence, and to set aside verdict only if it was so contrary to overwhelming weight of evidence as to be clearly wrong and unjust.

2990 Cases that cite this headnote

**Attorneys and Law Firms**

**\*175**  Ross, Banks, May, Cron & Cavin by John A. Cavin, Houston, for petitioners.

Ross, Banks, May, Cron & Cavin, Gordon A. Holloway, and N. Carlene Rhodes, Houston, for respondents.

**Opinion**

PER CURIAM.

James and Karen Bain purchased a 20-year-old house in 1976 from George and Carroll Banks. The real estate agent for the transaction was an employee of James Cain Company. In 1978, the Bains tried to sell their house but were unable to find a buyer because of a foundation defect. They sued James Cain Company for violations of the Texas Deceptive Trade Practices Act. The trial court granted Cain's Motion for Directed Verdict and rendered a take nothing judgment against the Bains. In an unpublished opinion, the court of appeals reversed the trial court's judgment. Tex.R.Civ.P. 452.

The trial court submitted Issue No. 7 asking the jury:

Do you find from a preponderance of the evidence that on or before October 13, 1977 the Plaintiffs James Lee Bain and wife Karen Sue Bain either had knowledge of such substantial foundation structural defect, or were on notice of such facts as would cause a reasonable, prudent person to make inquiry which could lead to the discovery of such defect by the exercise of reasonable diligence?

Answer: "We do" or "We do not"

Answer: <u>We do</u>

The evidence revealed that when the Bains moved into the house they noticed a bulge under one window, a crack in the kitchen wall, and a sticking door. Within six or seven months after occupying the house, they noticed a foundation crack near the patio. Karen Bain testified that during the spring or summer of 1977 she was told there might be a slab problem with the house.

The Bains presented some evidence to the contrary. They consulted with a foundation  **\*176**  expert in April 1978, who

informed them that there was not a substantial foundation defect. Also, they argue the flaws in the house could have been indicative of problems other than a foundation defect, such as ordinary subsidence problems common to the Houston area, or the effects of age, dampness and weathering on a 20-year-old house.

On appeal, the Bains asserted that the jury finding that they were on constructive notice of the foundation defect was against the great weight and preponderance of the evidence. The court of appeals reversed the trial court's judgment and remanded the cause, holding the flaws and evidence of defects in the house "do not point unerringly to a substantial foundation defect." This is not the correct standard of review for a challenge to the sufficiency of the evidence.

When reviewing a jury verdict to determine the factual sufficiency of the evidence, the court of appeals must consider and weigh all the evidence, and should set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Dyson v. Olin Corp.,* 692 S.W.2d 456, 457 (Tex.1985); *In Re King's Estate,* 150 Tex. 662, 664–65, 244 S.W.2d 660, 661 (1951).

The court of appeals imposed a different standard—that the evidence supporting the jury's finding must point "unerringly" to the conclusion found by the jury. The court also held the evidence was "much too slight and indefinite" to support the jury verdict. The jury's task is to decide a fact issue based on the preponderance of the evidence. We hold that the court of appeals has decided this case under an inappropriate standard of law. There is some evidence to support the jury verdict. Therefore, pursuant to Rule 483, we grant Cain's application for writ of error and, without hearing oral argument, reverse the judgment of the court of appeals on the insufficiency of evidence point and remand the cause to that court to consider the insufficiency points of error under the proper test. We affirm the judgment of the court of appeals in all other respects.

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

353 S.W.3d 905
Court of Appeals of Texas,
Tyler.

CITY OF ATHENS, Texas, Appellant,
v.
James MacAVOY, Appellee.

No. 12–10–00259–CV.   |   June 30, 2011.

**Synopsis**

**Background:** City petitioned for judicial review of decision by independent hearing examiner that ordered police officer's reinstatement. The 392nd Judicial District Court, Henderson County, James Ray Fry, J., granted police officer's plea to jurisdiction. City appealed, and the Court of Appeals, 260 S.W.3d 676, reversed and remanded. On remand, the District Court entered summary judgment in officer's favor, and city appealed.

**[Holding:]** The Court of Appeals, Brian T. Hoyle, J., held that statutory requirement that police officer be provided with copy of signed complaint against him in disciplinary proceeding was not prerequisite to hearing officer's jurisdiction to terminate officer.

Reversed and remanded.

West Headnotes (2)

**[1]    Municipal Corporations**
        👈 Charges

Statutory requirement that police officer be provided with copy of signed complaint against him in disciplinary proceeding was not prerequisite to hearing officer's jurisdiction to terminate officer. V.T.C.A., Government Code § 614.023.

4 Cases that cite this headnote

**[2]    Municipal Corporations**
        👈 Removal, Discharge, Transfer or Demotion

Even when there is a mandatory duty imposed on a municipality related to the dismissal of an employee, it does not follow that the failure to carry out that duty means the employee may not be disciplined, unless the legislature is very specific about that result.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*906** Julia J. Gannaway, Lubbock, Bettye Lynn, Fort Worth, Conor G. Bateman, for Appellant.

Christopher D. Livingston, for Appellee.

Panel consisted of WORTHEN, C.J., GRIFFITH, J., and HOYLE, J.

*OPINION*

BRIAN T. HOYLE, Justice.

The City of Athens appeals from the trial court's order granting James MacAvoy's motion for summary judgment, which had the effect of reinstating him as a police officer with the City. In two issues, the City argues that a hearing examiner exceeded his jurisdiction by reinstating the officer on the basis of a procedural defect in the disciplinary process. We reverse and remand.

*BACKGROUND*

The police chief for the City of Athens Police Department placed James MacAvoy, a police officer, on indefinite suspension after an investigation revealed that MacAvoy had engaged in sexual relations with a woman while on duty and committed various other violations of department policy. The investigation began after MacAvoy's actions were brought to the attention of the police department by the woman's husband.

An indefinite suspension ends a police officer's employment, and MacAvoy appealed his termination. Pursuant to law, MacAvoy requested that the appeal be heard by an independent hearing examiner. A two day hearing was held.

Section 614.023, Texas Government Code, requires that a signed complaint be provided to a police officer before discipline can be imposed. The police chief had treated himself as the complainant, and did not provide the statements of the woman and her husband before imposing discipline. The hearing examiner determined that the woman and her husband were the complainants and that discipline could not be imposed because their signed complaints had not been provided. Therefore, the hearing examiner ordered MacAvoy to be reinstated with back pay.

The City of Athens appealed the hearing examiner's order to the district court. The City argued that the hearing examiner was without jurisdiction to apply Section 614.023 and that his interpretation of the statute exceeded his jurisdiction. MacAvoy made a plea to the jurisdiction, arguing that the district court lacked jurisdiction to consider the City's appeal. The district court granted MacAvoy's plea to the jurisdiction, and the City appealed. This court reversed and remanded in part, holding that the question of whether the hearing examiner had jurisdiction to apply Section 614.023 was a question the district court had jurisdiction to review. [1]

The district court decided that the hearing examiner did not exceed his jurisdiction, granted MacAvoy's motion for summary judgment, and entered a final order in which it ordered MacAvoy to be reinstated. The City appealed.

### *JURISDICTION*

 **[1]** In two issues, the City argues that the hearing examiner exceeded his jurisdiction by applying Section 614.023, Texas Government Code, and overturning the discipline imposed on MacAvoy because a signed copy of the complaint had not been served on him prior to his discipline.

### *Applicable Law and Standard of Review*

Employment matters for police officers and firefighters, including hiring and firing, **\*907** are governed by statute, unless the municipality and the workers have reached a separate collective bargaining agreement. *See generally* TEX. LOC. GOV'T CODE ANN. ch. 143 (Vernon 2008). A police officer who is fired, or placed on an indefinite suspension, can appeal that determination. *Id.* § 143.053. The appeal is to the Police Officers' Civil Service Commission. *Id.* §§ 143.003(1), 143.053(b). However, the police officer may elect to have an independent hearing examiner hear the appeal. *Id.* § 143.057.

The hearing examiner's decision is final and binding on all parties. *Id.* § 143.057(c). A party [2] may appeal the hearing examiner's decision on the grounds that the examiner "was without jurisdiction or exceeded [his] jurisdiction or that the order [of the examiner] was procured by fraud, collusion, or other unlawful means." *Id.* at § 143.057(j). [3] Appeal is to the district court. *Id.*

Section 614.023 requires that a copy of a "signed complaint against a law enforcement officer" must be served on the officer "within a reasonable time after the complaint is filed." TEX. GOV'T CODE ANN. § 614.023(a) (Vernon Supp.2010). The statute further requires that the officer or employee may not be indefinitely suspended or terminated from employment unless the subject matter of the complaint is investigated and there is evidence to prove the allegation of misconduct. *Id.* § 614.023(c). Finally, the statute provides that disciplinary action may not be taken against an officer unless a copy of the signed complaint is given to him. *Id.* § 614.023(b).

Summary judgments are reviewed de novo. *See Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 661 (Tex.2005). There are no disputed facts in this case, and the issues raised in this appeal involve statutory construction, which is also subject to de novo review. *See City of Rockwall v. Hughes,* 246 S.W.3d 621, 625 (Tex.2008). In determining the legislature's intent in enacting a statute, courts should look to the plain meaning of the words used in the statute. *See Fireman's Fund Cnty. Mut. Ins. Co. v. Hidi,* 13 S.W.3d 767, 768–69 (Tex.2000).

### *Analysis*

The question presented is whether the hearing examiner had jurisdiction to dismiss the discipline imposed on MacAvoy because the City failed to provide him with a copy of the signed complaints before imposing discipline. In the first appeal in this case, we noted that the case was similar to *City of Pasadena v. Smith,* 263 S.W.3d 80 (Tex.App.-Houston [1st Dist.] 2006), *rev'd by* 292 S.W.3d 14, 22 (Tex.2009). In that case, the hearing examiner applied a statute that required the department head to be present at the hearing to review the discipline imposed on an officer, and reinstated the officer because the department head was not present. *City of Pasadena,* 292 S.W.3d at 16. The hearing examiner did this under the authority of a statute that applied to employment disputes for larger cities, but not to the city of Pasadena.

*Id.* (referencing **\*908** TEX. LOC. GOV'T CODE ANN. 143.1015(k) (Vernon 2008)).

The court of appeals held that the city's argument that the hearing examiner applied a statute which was, by its own terms, inapplicable, was not a challenge to the jurisdiction of the hearing examiner, and could not be reviewed. *City of Pasadena,* 263 S.W.3d at 85. In reversing, the supreme court held that the hearing examiner exceeded his jurisdiction by applying a statute that did not pertain to that dispute. *City of Pasadena,* 292 S.W.3d at 20. The court also went further to write about the role of hearing examiners. Specifically, the court found it important that the civil service commission, whose authority is the same as a hearing examiner, was permitted to consider "only the evidence submitted at the hearing" when reaching a decision. *Id.* (citing TEX. LOC. GOV'T CODE ANN. § 143.010(g) (Vernon 2008)). The court combined that requirement with the hearing examiner's application of an inapplicable statute to determine that he exceeded his jurisdiction. *Id.* at 20. In defining the scope of the hearing examiner's jurisdiction, the court held that a hearing examiner exceeds his jurisdiction "when his acts are not authorized by the Act or are contrary to it, or when they invade the policy-setting realm protected by the nondelegation doctrine." *Id.* at 21.

The court did not apply the full test of the nondelegation doctrine in *City of Pasadena* because, by using an inapplicable statute, the hearing examiner created a procedural rule, something that he had no authority to do. *Id.* at 20 ("[Appellee] argues that the hearing examiner could reasonably have concluded that since section 143.1015(k) requires the presence of the department head at civil service appeal proceedings in Houston, the same rule should apply in other cities. But the Act does not empower a hearing examiner to make rules."). If this is interpreted strictly, as the City would have us do, the conclusion could be reached that Section 614.023(b) does not apply to hearing examiner hearings because that section is outside of the Fire Fighters and Police Officers' Civil Service Act (Chapter 143 of the Texas Local Government Code). *See id.* at 15. There are problems with this construction, however. First, the legislature specifically stated that Subchapter B of Chapter 614, Texas Government Code, which includes Section 614.023, applies to complaints against law enforcement officers. *See* TEX. GOV'T CODE ANN. § 614.021 (Vernon Supp.2010). Indeed, as then—Justice Guzman wrote in *Turner v. Perry,* 278 S.W.3d 806, 823 (Tex.App.-Houston [14th Dist.] 2009, pet. denied),

[b]y enacting sections 614.021–.023, of the Government Code, the State provided covered employees with procedural safeguards to reduce the risk that adverse employment actions would be based on unsubstantiated complaints. Moreover, the State determined that the value of these protections outweighs the fiscal and administrative burdens incurred by complying with statutory requirements.

*Turner,* 278 S.W.3d at 823. If the hearing examiner were permitted to apply Section 614.023, it seems reasonable, as we wrote in our first opinion, that the examiner would have some flexibility to define terms like "complainant" and to make other reasonable determinations. *See City of Athens,* 260 S.W.3d 676, 680–81 (Tex.App.-Tyler 2008, no pet.). However, the hearing examiner in this case did more than simply construe undefined terms in a statute. On MacAvoy's motion, the hearing examiner dismissed the discipline. This had the effect of making Section 614.023 a jurisdictional requirement for discipline. The hearing examiner did not find that MacAvoy's due process rights were violated **\*909** apart from the statute or that his ability to prepare a defense was impaired. Furthermore, most of the hearing examiner's written opinion pertains to the initial claims of misconduct. The examiner duly notes that the chief of police signed a subsequent complaint for insubordination when MacAvoy disregarded an order to cease further contact with an individual. But the opinion fails to distinguish between the first claim, in which the complainant's statements were not timely provided, and the insubordination claim, where complaint of the aggrieved party, the police department, was provided.

The supreme court made clear in *City of DeSoto v. White,* 288 S.W.3d 389, 394 (Tex.2009), when construing a different but similar due process requirement, that the analysis of whether a notice statute creates a jurisdictional requirement begins with the presumption that the legislature did not intend to make a statutory requirement jurisdictional and that the presumption may be overcome only by clear legislature intent to the contrary. *Id.* at 394. At issue in *City of DeSoto* was a statutory provision that requires notice to a person being disciplined of the consequences for choosing an appeal to a hearing examiner. *Id.* at 391 (citing TEX. LOC. GOV'T CODE ANN. § 143.057(a)).

To determine if that notice requirement was jurisdictional, the court attempted to ascertain the legislative intent by examining the plain language of the statutes. *City of DeSoto,* 288 S.W.3d at 395. More particularly, the court looked to the specific language of the statute, any enumerated consequences for failure to comply, and the policy ramifications of either interpretation. *Id.* In both *City of DeSoto* and here, the relevant statute creates a mandatory requirement. In *City of DeSoto,* the statute said that a letter of disciplinary action "must" state that the employee waives certain rights. *Id.* (citing TEX. LOC. GOV'T CODE ANN. § 143.057(a)). In this case, Section 614.023 states that a copy of a signed complaint "must" be given to the law enforcement officer and that disciplinary action "may not" be taken unless that complaint is provided. TEX. GOV'T CODE ANN. § 614.023(a),(b). The phrase "may not" is synonymous with "shall not" and imposes a prohibition. TEX. GOV'T CODE ANN. § 311.016(5) (Vernon 2008). The term "must" creates or recognizes a condition precedent. *Id.* § 311.016(3). Both are mandatory, but as the court recognized in *City of DeSoto,* " 'just because a statutory requirement is mandatory does not mean that compliance with it is jurisdictional.' " *City of DeSoto,* 288 S.W.3d at 395 (quoting *Albertson's, Inc. v. Sinclair,* 984 S.W.2d 958, 961 (Tex.1999)).

As with the notice requirement in *City of DeSoto,* Section 614.023 contains no specific consequence for noncompliance. Furthermore, there is a good fit between this case and the analysis in *City of DeSoto* with respect to the consequences of interpretation of the statute. If the tendering of a complainant's statement prior to discipline is jurisdictional, a police officer cannot be relieved of duty even for very serious infractions if the statement is not provided prior to the imposition of discipline.[4] On the other hand, if the statement requirement is not jurisdictional, a hearing examiner can hear a case where the officer or firefighter's right to due process is respected even if the statement **\*910** is presented at a time after the initial discipline is imposed.

Finally, there is the issue of precedent. The legislature is presumed to know of appellate consideration of statutes, and a slight inference can be drawn when a statute is interpreted by an appellate court and the legislature does not take corrective action. *See e.g., Entergy Gulf States, Inc. v. Summers,* 282 S.W.3d 433, 470–71 (Tex.2009); *but see Fort Worth Osteopathic Hosp., Inc. v. Reese,* 148 S.W.3d 94, 97 (Tex.2004). In two divergent cases, the courts considered and construed statutes requiring a complainant's statement to be provided before the imposition of discipline. *See Guthery v. Taylor,* 112 S.W.3d 715, 724 (Tex.App.-Houston [14th Dist.] 2003, no pet.); *Fudge v. Haggar,* 621 S.W.2d 196, 197–98 (Tex.App.-Texarkana 1981, writ ref'd n.r.e.); *see also Treadway v. Holder,* 309 S.W.3d 780, 781–82 (Tex.App.-Austin 2010, pet. denied). The issue in those cases was not whether providing the complainant's statement was a condition precedent to the imposition of discipline, but the opinions treated it as if it were. However, any inference that could be drawn from legislative inaction or acquiescence is slight because there have been so few cases on this issue, because the issue was not squarely presented in *Guthery* and *Fudge,* and because such inferences are of questionable weight. *See Entergy Gulf States,* 282 S.W.3d at 470–71.

[2] On balance, we are compelled by the very similar and recent *City of DeSoto* opinion to conclude that Section 614.023 is not jurisdictional. The hearing examiner treated the complaint requirement as a jurisdictional threshold.[5] In light of the recent opinions from the Texas Supreme Court in *City of DeSoto* and *City of Pasadena,* we conclude that the hearing examiner exceeded his jurisdiction by treating Section 614.023 as jurisdictional. The *City of DeSoto* opinion makes clear, when construing a very similar statute, that even when there is a mandatory duty imposed on a municipality related to the dismissal of an employee, it does not follow that the failure to carry out that duty means the employee may not be disciplined, unless the legislature is very specific about that result *City of DeSoto,* 288 S.W.3d at 395–97. In the absence of a legislative directive that the failure to provide a complainant's statement prior to discipline means that the officer will escape discipline, the hearing examiner exceeded his jurisdiction by crafting such a rule.[6] *See City of Pasadena,* 292 S.W.3d at 21 ("... a hearing examiner exceeds his jurisdiction when his acts are not authorized by the Act or are contrary to it....").

**\*911** Furthermore, the *City of Pasadena* opinion clearly states the statutory scheme for hearing examiners is organized around the examiners acting as fact finders with respect to the allegations against covered employees. *City of Pasadena,* 292 S.W.3d at 20 ("[The statute] mandates that a decision be made on evidence submitted at the hearing."). While the examiner in this case did hold a hearing, his ruling was based on the issue of statutory compliance, and he imposed a remedy that, in light of the *City of Pasadena* and *City of DeSoto* opinions, was not authorized by the Act and beyond his jurisdiction. Because we hold that the hearing examiner exceeded his jurisdiction, we also hold that the trial court erred in granting

MacAvoy's motion for summary judgment. We sustain the City's first and second issues.

Having sustained the City's first and second issues, we *reverse* the judgment of the trial court and *remand* this case to the trial court.

### *DISPOSITION*

Footnotes

1    *See City of Athens v. MacAvoy,* 260 S.W.3d 676 (Tex.App.-Tyler 2008, no pet.).

2    Although not specifically provided for by statute, a city may appeal an independent hearing examiner's decision. *City of Houston v. Clark,* 197 S.W.3d 314, 315, 324 (Tex.2006); *Nuchia v. Tippy,* 973 S.W.2d 782, 785 (Tex.App.-Tyler 1998, no pet.).

3    Section 143.057(j) states that it is the decision of the "arbitration panel" that can be appealed to the district court. Because the statute refers to a hearing examiner, the Texas Supreme Court, while finding the language "difficult to explain," applied it as if it were the hearing examiner's decision that could be appealed. *Clark,* 197 S.W.3d at 318 n. 5.

4    In most cases, a municipality will not have the opportunity to rectify a problem with providing the complainant's statement prior to the imposition of discipline because the law provides that discipline may not be imposed, for noncriminal acts, unless it is done within 180 days of discovery. *See* TEX. LOCAL GOV'T CODE § 143.052(h) (Vernon 2008).

5    Although he held a hearing on the merits, the hearing examiner ultimately dismissed the discipline against MacAvoy because of the failure to tender what he determined was the appropriate complainant statement prior to the imposition of discipline. The hearing examiner did not describe the disclosure of the statements as a precondition to his own jurisdiction. However, he described it as a threshold issue, and his decision to overturn the discipline because the statements were not provided timely had the effect of making it a jurisdictional requirement. MacAvoy did not show, or argue, that his actual ability to defend himself was impaired, and he did not, and does not, raise an independent due process claim. Indeed, MacAvoy did not dispute the principal allegations against him and admitted most of the allegations that were made.

6    It bears noting that the hearing examiner was diligent and thorough in his work on this case, including the way he conducted the hearing and the quality of his written work. The *DeSoto* and *Pasadena* decisions were handed down after he delivered his ruling, and his ruling was an interpretation of the precedent as it existed at the time of his ruling.

---

**End of Document**    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

288 S.W.3d 389
Supreme Court of Texas.

CITY OF DESOTO, Texas, Petitioner,

v.

Justin WHITE, Respondent.

NO. 07–1031. | Argued Dec. 11,
2008. | Decided June 19, 2009.

**Synopsis**

**Background:** Following former city police officer's indefinite suspension by police chief, hearing examiner upheld suspension. Officer appealed, alleging that hearing examiner lacked jurisdiction. The 160th District Court, Dallas County, Nancy Thomas, J., entered summary judgment in favor of officer. City appealed. The Court of Appeals, 232 S.W.3d 379, affirmed, and city filed petition for review.

**Holdings:** The Supreme Court, Green, J., held that:

[1] requirement that city inform officer of limited rights to appeal hearing officer decision was not jurisdictional;

[2] abatement was proper remedy for city's failure to inform officer of limited appeal rights; and

[3] officer was entitled to extension of ten-day appeal deadline in order to decide whether to appeal before Civil Service Commission or hearing examiner.

Court of Appeals reversed; remanded to district court.

West Headnotes (12)

[1]     **Courts**
        👉 Acts and proceedings without jurisdiction

        The failure of a jurisdictional requirement deprives a court of the power to act, other than to determine that it has no jurisdiction, and ever to have acted, as a matter of law; if the requirement is not jurisdictional, however, the tribunal may hear the case, although other consequences may

flow from a party's failure to comply with the requirement.

14 Cases that cite this headnote

[2]     **Statutes**
        👉 Jurisdictional statutes

        To determine whether a statutory requirement is jurisdictional, a court applies statutory interpretation principles.

21 Cases that cite this headnote

[3]     **Statutes**
        👉 Plain Language; Plain, Ordinary, or Common Meaning

        When interpreting a statutory provision, a court's goal is to ascertain legislative intent by examining the statute's plain language.

13 Cases that cite this headnote

[4]     **Appeal and Error**
        👉 Cases Triable in Appellate Court

        An appellate court reviews questions of statutory interpretation de novo.

7 Cases that cite this headnote

[5]     **Statutes**
        👉 Jurisdictional statutes

        Since the Legislature is bound to know the consequences of making a statutory requirement jurisdictional, in trying to determine legislative intent, it must be determined whether the Legislature intended those consequences.

14 Cases that cite this headnote

[6]     **Municipal Corporations**
        👉 Reinstatement

        Statutory requirement, that city inform suspended police officer of limited right to appeal from independent hearing examiner decision, was not jurisdictional, and thus examiner's decision upholding suspension was valid and officer was not entitled to



reinstatement, even though city failed to inform officer of requirement in letter outlining officer's rights to review of suspension; although requirement was mandatory, statute did not explicitly indicate that requirement was jurisdictional and did not require reinstatement of officer as a result of failure to fulfill requirement. V.T.C.A., Local Government Code § 143.057(a).

7 Cases that cite this headnote

[7]     **Statutes**
          Mandatory or directory statutes

Just because a statutory requirement is mandatory does not mean that compliance with it is jurisdictional.

13 Cases that cite this headnote

[8]     **Municipal Corporations**
          Review in general

Abatement was the proper remedy for city's failure to inform suspended police officer, in letter outlining officer's rights to review of suspension, of his limited right to appeal if he chose to challenge suspension before an independent hearing examiner rather than before Civil Service Commission. V.T.C.A., Local Government Code § 143.057(a).

2 Cases that cite this headnote

[9]     **Statutes**
          Purpose

When a statute is silent as to the consequences for noncompliance, a court looks to the statute's purpose in determining the proper remedy.

3 Cases that cite this headnote

[10]    **Municipal Corporations**
          Review in general

       **Municipal Corporations**
          Review

Purpose of statute, requiring that a municipality inform a police officer or firefighter of limited

right to appeal from a decision of an independent hearing examiner after the examiner's review of an employment decision affecting the officer, is to ensure that firefighters and police officers are fully aware of a significant consequence that will result if they elect to have an independent hearing examiner, rather than the Civil Service Commission, hear their appeal. V.T.C.A., Local Government Code § 143.057(a).

8 Cases that cite this headnote

[11]    **Municipal Corporations**
          Review in general

       **Municipal Corporations**
          Review

Ten-day statutory deadline for a police officer or firefighter to appeal a suspension is to be strictly enforced when the officer's failure to appeal within deadline is attributable to the officer, but when the officer's failure to appeal within the deadline is not attributable to the officer, the statute permits a reasonable extension of time. V.T.C.A., Local Government Code § 143.010(a).

1 Cases that cite this headnote

[12]    **Municipal Corporations**
          Review in general

Police officer was entitled to extension of ten-day deadline to appeal suspension, in order for officer to decide whether to appeal before Civil Service Commission or independent hearing examiner, where city failed to inform officer of his limited right to appeal from hearing examiner decision, and officer, in declining to change his appeal election at hearing, may have reasonably relied on strict enforcement of ten-day deadline in *City of Temple Firemen's and Policemen's Civil Service Commission v. Bender*. V.T.C.A., Local Government Code §§ 143.057(a), 143.010(a).

5 Cases that cite this headnote

**Attorneys and Law Firms**

**\*391** Peter G. Smith, Amber L. Slayton, Braden Ward Metcalf, Nichols Jackson Dillard Hager & Smith, LLP, Dallas, TX, for Petitioner.

Lance Franklin Wyatt, Attorney At Law, Arlington, TX, Rhonda Elaine Cates, Law Office of Rhonda E. Cates, PLLC, Garland, TX, Randy Doubrava, Texas Municipal Police Assn., Austin, TX, for Respondent.

**Opinion**

Justice GREEN delivered the opinion of the Court.

A police officer who has been suspended from duty has a right to appeal that action to either a civil service commission or to an independent, third-party hearing examiner. If the officer appeals to a hearing examiner, his ability to seek further review in a district court is severely limited. The suspended police officer in this case elected to appeal to a hearing examiner, but the City failed to inform him of the appeal limitation, as it was required to do by statute. The court of appeals concluded that the notification requirement is jurisdictional, and that its omission deprives a hearing examiner of authority to hear an appeal. 232 S.W.3d 379, 383–84. However, we hold that the pre-appeal notice provision is not jurisdictional. Accordingly, we reverse the court of appeals' judgment.

**I**

Justin White, a member of the DeSoto Police Department, was suspended following two internal investigations which the Department alleged revealed improper conduct. The police chief delivered a letter of indefinite suspension to White, alleging that he abused sick time policy, lied to an investigator, and interfered with a prosecution, all of which violated numerous department policies. The letter met almost all of the applicable requirements required by statute. *See generally* TEX. LOC. GOV'T CODEE §§ 143.001–.363. It was issued timely, and it notified White that an appeal had to be filed with either the Civil Service Commission or an independent third-party hearing examiner within ten days of receipt. *See id.* §§ 143.052(c), (d); .057(a). However, the letter did not notify White that an appeal to a hearing examiner would limit his ability to seek further review with a district court, as required by the Code. *See id.* § 143.057(a), (j).

White elected to appeal the suspension to a hearing examiner, where he was represented by counsel. As soon as the hearing began, White complained that the examiner was without jurisdiction to hear his appeal because the City's letter failed to notify him of the appeal limitation, as required by the Code. In an attempt to rectify the omission, the examiner offered White an abatement, a continuance, and the opportunity to change his election, all of which White refused. The examiner then proceeded with the hearing, finding that jurisdiction was proper, as the City had substantially complied with the notice requirements under the Code. After the **\*392** hearing, the examiner upheld White's suspension.

White filed suit in district court, arguing that the examiner was without jurisdiction to hear his appeal. *See id.* § 143.057(j) (permitting judicial review of hearing examiner decision on grounds that the examiner was without jurisdiction). The trial court agreed, granting summary judgment in favor of White and ordering the City to reinstate White, correct his employment records, and pay his attorney's fees. The court of appeals affirmed, holding that the notice requirements under the Code were jurisdictional, and that substantial compliance with those requirements did not suffice. 232 S.W.3d at 383–84. The court of appeals also held that White could recover attorney's fees under the Code. *Id.* at 384.

The City petitioned the Court, arguing: (1) the notice provision is not jurisdictional; (2) even if it is jurisdictional, substantial compliance satisfies the notice requirements under the Code; and (3) if White is entitled to relief, the trial court's grant of attorney's fees exceeded the remedies available under the Code. We agree with the City that notice of the appeal limitation as required by section 143.057(a) is not jurisdictional. Therefore, we need not reach the City's other two issues.

**II**

Chapter 143 of the Local Government Code, known as the Fire Fighter and Police Officer Civil Service Act, outlines the disciplinary process by which a municipality may suspend an officer and how that officer may appeal the suspension. TEX. LOC. GOV'T CODEE §§ 143.051–.057.[1] A police department may suspend an officer for a violation of civil service rules. *Id.* § 143.052(b). The officer may then appeal the suspension to either the Fire Fighters' and Police Officers' Civil Service Commission, or an independent third-party

hearing examiner. *Id.* §§ 143.010, .053, .057(b). If the officer appeals to the Commission, the officer may seek review of the Commission's decision with a district court, which conducts a *de novo* review. *Id.* § 143.015(b). However, if the officer appeals to a hearing examiner, the officer waives subsequent review by a district court, *id.* § 143.057(c), except "on the grounds that the [hearing examiner] [2] was without jurisdiction or exceeded its jurisdiction or that the order was procured by fraud, collusion, or other unlawful means." *Id.* § 143.057(j).

The Code specifies how the officer makes this appellate election. Within 120 hours of the suspension, the department head "shall ... file a written statement with the commission giving the reasons for the suspension," and also immediately deliver a copy of the statement to the suspended officer. *Id.* § 143.052(c). The statement, also referred to as a letter of **\*393** disciplinary action, [3] "must point out each civil service rule alleged to have been violated ... and must describe the alleged acts of the person that the department head contends are in violation of the civil service rules." *Id.* § 143.052(e). It must inform the suspended officer that if he chooses to appeal, he must file a written appeal within ten days [4] of receiving the letter, *id.* § 143.052(d), and that he "may elect to appeal to an independent third party hearing examiner instead of to the commission." *Id.* § 143.057(a). Of importance to this case, the letter must also inform the officer "that if [he] elects to appeal to a hearing examiner, [he] waives all rights to appeal to a district court," *id.* § 143.057(a), except on the grounds that "the arbitration panel was without jurisdiction or exceeded its jurisdiction or that the order was procured by fraud, collusion, or other unlawful means." *Id.* § 143.057(j).

Here, it is undisputed that the letter of disciplinary action failed to inform White that if he elected to appeal to a hearing examiner, his rights of review by a district court were waived, except under limited circumstances. *See id.* § 143.057(a), (c), (j). The question is whether that omission deprived the hearing examiner of jurisdiction to hear the appeal.

### III

### A

 [1]    "The failure of a jurisdictional requirement deprives the court of the power to act (other than to determine that it has no jurisdiction), and ever to have acted, as a matter of law." *Univ.*

*of Tex. Sw. Med. Ctr. at Dallas v. Loutzenhiser,* 140 S.W.3d 351, 359 (Tex.2004). [5] If the requirement is not jurisdictional, however, the tribunal may hear the case, although other consequences may flow from a party's failure to comply with the requirement. *Dubai Petroleum Co. v. Kazi,* 12 S.W.3d 71, 75–77 (Tex.2000); *see also Loutzenhiser,* 140 S.W.3d at 359 ("The failure of a non-jurisdictional requirement mandated by statute may result in the loss of a claim, but that failure must be timely asserted and compliance can be waived."). We recognized in *Dubai* that deeming a provision jurisdictional "opens the way to making judgments vulnerable to delayed attack for a variety of irregularities that perhaps better ought to be sealed in a judgment." *Dubai,* 12 S.W.3d at 76 (citing RESTATEMENT (SECOND) OF JUDGMENTS § 12 cmt. b, at 118 (1982)). "[T]he modern direction of policy is to reduce the vulnerability of final judgments to attack on the ground that the tribunal lacked subject matter jurisdiction." *Id.* (citing RESTATEMENT (SECOND) OF JUDGMENTS § 11 cmt. e, at 113 (1982)). Because of these consequences, we have been reluctant to conclude that a provision is jurisdictional, absent clear legislative intent to that effect. *Id.* at 75–76; *see also Igal v. Brightstar Info. Tech. Group, Inc.,* 250 S.W.3d 78, 83 (Tex.2008).

 **\*394**   As an initial matter, White argues that *Dubai's* reasoning does not apply here because *Dubai* dealt with a court of general jurisdiction, whereas a hearing examiner is a tribunal of very limited jurisdiction as prescribed by statute. *Dubai* was a wrongful death action in which the deceased was a foreign citizen. 12 S.W.3d at 73. The plaintiff filed suit under a statute, which permitted the claim as long as the deceased's country had "equal treaty rights" with the United States. *Id.* at 74. We held that the plaintiff did not have to establish "equal treaty rights" to invoke the jurisdiction of the trial court. *Id.* at 73. In reaching this conclusion, we rejected an earlier distinction we had made when reviewing jurisdictional questions, where we differentiated between specially-created statutory claims and common-law claims. *Id.* at 76 (overruling *Mingus v. Wadley,* 115 Tex. 551, 285 S.W. 1084 (1926), "to the extent that it characterize the plaintiff's failure to establish the statutory prerequisite as jurisdictional"). Instead, we adopted an approach to jurisdictional questions designed to strengthen finality and reduce the possibility of delayed attacks on judgments, regardless of whether the claim was anchored in common law or was a specially-created statutory action. *Id.* at 75–76. Thus, White misses our focus, post-*Dubai.* We recognize that a hearing examiner is a tribunal of very limited jurisdiction, and that it exercises special functions as dictated by statute.

*See* TEX. LOC. GOV'T CODEE § 143.057. But even though the examiner hears a limited type of case, consistent with *Dubai,* our focus is to avoid a result that leaves the decisions and judgments of the hearing examiner in limbo and subject to future attack, unless that was the Legislature's clear intent. *See Igal,* 250 S.W.3d at 84.

White argues that in an administrative context, the possibility of a delayed attack on a judgment is not present, in part because a later challenge to subject-matter jurisdiction is limited to the appeal process outlined in the Code. *See* TEX. LOC. GOV'T CODEE § 143.057(j) (permitting appeal to district court from hearing examiner "only on the grounds that the [hearing examiner] was without jurisdiction or exceeded its jurisdiction or that the order was procured by fraud, collusion, or other unlawful means"). White cites no authority for this proposition, and we are not convinced that a delayed attack on an administrative judgment is an illusory concern. *See, e.g.,* RESTATEMENT (SECOND) OF JUDGMENTSSSS § 12 cmt. e., at 123 (1982) ("There remain courts and administrative tribunals staffed by judges untrained in law or whose jurisdiction is so narrow as to be nearly ministerial. The opportunity to challenge subject matter jurisdiction in such a forum may therefore be inadequate. When this is so, a challenge to subject matter jurisdiction may properly be permitted through subsequent attack on the judgment."); *see also Igal,* 250 S.W.3d at 83 (applying *Dubai's* reasoning in an administrative context).

Consistent with *Dubai,* then, we begin with the presumption that the Legislature did not intend to make the notice under section 143.057(a) jurisdictional; a presumption overcome only by clear legislative intent to the contrary.

### B

 **[2]**    **[3]**    **[4]**    **[5]**    To determine whether a statutory requirement is jurisdictional, we apply statutory interpretation principles. *Igal,* 250 S.W.3d at 84. As with any statutory provision, our goal is to ascertain legislative intent by examining the statute's plain language. *F.F.P. Operating Partners, L.P. v. Duenez,* 237 S.W.3d 680, 684 (Tex.2007). We review this statutory interpretation question de novo. *Id.* at 683. **\*395** "Since the Legislature is bound to know the consequences of making a requirement jurisdictional, one must ask, in trying to determine legislative intent, whether the Legislature intended those consequences." *Loutzenhiser,* 140 S.W.3d at 359.

 **[6]**    We consider a number of factors in determining whether the Legislature intended that a provision be jurisdictional. *See generally Helena Chem. Co. v. Wilkins,* 47 S.W.3d 486, 495 (Tex.2001). But, as with any statute, we begin with the text. *Meritor Automotive, Inc. v. Ruan Leasing Co.,* 44 S.W.3d 86, 89 (Tex.2001); *Helena Chem.,* 47 S.W.3d at 493. Section 143.057(a) provides:

> In addition to the other notice requirements prescribed by this chapter, the written notice for a promotional bypass or the letter of disciplinary action, as applicable, issued to a fire fighter or police officer must state that in an appeal of an indefinite suspension, a suspension, a promotional bypass, or a recommended demotion, the appealing fire fighter or police officer may elect to appeal to an independent third party hearing examiner instead of to the commission. *The letter must also state that if the fire fighter or police officer elects to appeal to a hearing examiner, the person waives all rights to appeal to a district court except as provided by Subsection (j).*

TEX. LOC. GOV'T CODEE § 143.057(a) (emphasis added). Subsection (j) states the limited exception: "[a] district court may hear an appeal of a hearing examiner's award only on the grounds that the [hearing examiner] was without jurisdiction or exceeded its jurisdiction or that the order was procured by fraud, collusion, or other unlawful means." *Id.* § 143.057(j).

Section 143.057(a) clearly requires that the letter notify the officer of the appeal limitation. It provides that the letter *must* inform the officer of the limitation. *Id.* § 143.057(a). The Code Construction Act explains that " 'must' creates or recognizes a condition precedent," TEX. GOV'T CODE § 311.016(3), and we have recognized that "must" generally means mandatory. *Helena Chem.,* 47 S.W.3d at 493. The rest of the Code and its apparent objective also indicate this provision is mandatory. *See id.* at 494 ("To determine whether the Legislature intended a provision to be mandatory or directory, we consider the plain meaning of the words used, as well as the entire act, its nature and object, and the consequences that would follow from each construction."). The Code establishes two alternative means for officers to

appeal: to the Commission or to the hearing examiner. TEX. LOC. GOV'T CODEE §§ 143.053, .057. These two avenues of appeal, however, diverge on the right to further judicial review. If the officer does not know of these limitations, then the officer is unable to properly assess which appeal route to take. This notice protects the officer's appellate rights. Thus, we hold that the notice provision under section 143.057(a) is mandatory.

 [7]    But "just because a statutory requirement is mandatory does not mean that compliance with it is jurisdictional." Albertson's, Inc. v. Sinclair, 984 S.W.2d 958, 961 (Tex.1999). The Code does not contain any explicit language indicating that this notice requirement is jurisdictional. White points to another provision, section 311.034 of the Government Code, and argues that it provides the language necessary to deem this notice requirement jurisdictional. Section 311.034, part of the Code Construction Act, provides: "Statutory prerequisites to a suit, including the provision of notice, are jurisdictional requirements in all suits against a governmental entity." TEX. GOV'T CODE § 311.034. But this provision does not control in this **\*396**  case. First, this provision does not apply to the construction of all statutes. Section 311.034 specifically addresses waivers of sovereign immunity, an issue not implicated here. *See id.* ("In order to preserve the [L]egislature's interest in managing state fiscal matters through the appropriations process, a statute shall not be construed as a *waiver of sovereign immunity* unless the waiver is effected by clear and unambiguous language." (emphasis added)). Also, the notice requirement here is not a statutory prerequisite to suit. As noted below, the statute requires notice, but it does not specifically mandate it as a prerequisite to suit or appeal. Thus, the text of the statute does not indicate that the Legislature intended the provision to be jurisdictional.

We have also looked for "the presence or absence of specific consequences for noncompliance" in determining whether a provision is jurisdictional. *Helena Chem.,* 47 S.W.3d at 495. Here, the statute does not provide a specific consequence for noncompliance. *See generally* TEX. LOC. GOV'T CODEE §§ 143.001–.363. As a comparison, section 143.052(e) provides that the letter of disciplinary action provided to the officer "must point out each civil service rule alleged to have been violated ... and must describe the alleged acts." *Id.* § 143.052(e). Subsection (f) provides the remedy: "If the department head does not specifically point out in the written statement the act or acts of the ... police officer that allegedly violated the civil service rules, the commission shall promptly reinstate the person." *Id.* §

143.052(f). By arguing that the City's failure to provide the required notice is jurisdictional, White seeks the same remedy provided for in section 143.052(f)—dismissal. In fact, the trial court dictated this very result in its order granting summary judgment in favor of White. However, "[w]hen the Legislature includes a right or remedy in one part of a code but omits it in another, that may be precisely what the Legislature intended," and "we must honor that difference." *PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd. P'ship,* 146 S.W.3d 79, 84 (Tex.2004). So, we must assume the Legislature did not intend that a dismissal be the consequence for noncompliance.

Finally, we look to "the consequences that result from each possible interpretation." *Helena Chem.,* 47 S.W.3d at 495. One possible interpretation is that section 143.057(a)'s notice requirement is jurisdictional. The consequence of this interpretation is evident in this very case. The trial court's order reinstated White, permitting him to rejoin the police force without an adjudication of the very serious allegations against him. [6]  Reinstating an officer in this situation is troubling, given the vital role of police officers and fire fighters in our society, and the need for continued public trust in the exercise of their duties. *See* Code Construction Act, TEX. GOV'T CODE § 311.021(5) ("In enacting a statute, it is presumed that ... public interest is favored over any private interest"). This cannot be the result the **\*397**  Legislature intended, especially where an interpretation which concludes that the provision is not jurisdictional would still protect the officer's appellate rights, as discussed below.

### C

White urges that our decision in *City of Temple Firemen's and Policemen's Civil Service Commission v. Bender* precludes a finding that the notice provision is non-jurisdictional. 787 S.W.2d 951 (Tex.1990) (per curiam). *Bender* recognized the need for strict adherence to the Code when an officer invokes the Civil Service Commission appellate process. *See generally id.* at 951. In *Bender,* the question was "whether a civil service commission's jurisdiction has been invoked under section 143.010(b) of the Texas Local Government Code if a fire fighter's or police officer's notice of appeal fails to allege the basis of the appeal." *Id.* Section 143.010(b) provides:

> The appeal must include the basis
> for the appeal and a request for

a commission hearing. The appeal must also contain a statement denying the truth of the charge as made, a statement taking exception to the legal sufficiency of the charge, a statement alleging that the recommended action does not fit the offense or alleged offense, or a combination of these statements.

TEX. LOC. GOV'T CODEE § 143.010(b). Officer Bender was suspended indefinitely and attempted to appeal to the Civil Service Commission. *Bender,* 787 S.W.2d at 951–52. His attorney mailed a letter to the Commission, advising of Bender's intention to appeal, but the letter failed to list the specific grounds for appeal as required by section 143.010(b). *Id.* at 952. After the city attorney notified him of the omission, Bender submitted an amended notice, which the Commission refused as untimely under the ten-day deadline imposed by the Code. *Id.; see also* TEX. LOC. GOV'T CODEE § 143.010(a). We held that "one of the statements contained within section 143.010(b) is required to be included in a notice of appeal in order to invoke the jurisdiction of a civil service commission," and because his first notice did not, Bender failed to invoke the Commission's jurisdiction. *Bender,* 787 S.W.2d at 952. We then held that Bender's amended notice of appeal also failed to invoke the jurisdiction of the Commission because the ten-day deadline under section 143.010(a) "is mandatory and must be strictly followed." *Id.* at 953.

White argues *Bender* dictates that a failure to meet a particular statutory requirement must be jurisdictional. But *Bender* focused on whether the officer had timely and properly invoked the Commission's jurisdiction—ensuring the case was properly before the Commission. *Id.* at 951–53; *see also Essenburg v. Dallas County,* 988 S.W.2d 188, 189 (Tex.1998) (per curiam) (citing *Morrow v. Corbin,* 122 Tex. 553, 62 S.W.2d 641, 644 (1933) and noting that the hallmark of a jurisdictional provision is that it "seeks to assure the appropriate body adjudicates the dispute"). Under the Civil Service Code, only a police officer or fire fighter may invoke the appeals process. *See* TEX. LOC. GOV'T CODEE §§ 143.010(a); .057(a); *see also City of Houston v. Clark,* 197 S.W.3d 314, 318 (Tex.2006). Thus, when it comes to invoking the jurisdiction of the Commission or hearing examiner, the focus must always be on the officer's actions. The City's notice letter does not invoke the appeals process. It is similar to a pre-suit notice requirement, which is not jurisdictional. *See, e.g., Hines v. Hash,* 843 S.W.2d 464,

469–70 (Tex.1992) (holding that defendant had waived pre-suit notice requirement under the Deceptive Trade Practices–Consumer Protection Act by failing to request **\*398** an abatement). Thus, *Bender* is distinguishable. [7]

## D

For these reasons, we hold that the City's failure to provide the mandatory notice under section 143.057(a) did not deprive the hearing examiner of jurisdiction to hear White's appeal.

## IV

[8] [9] [10] Having determined that the notice provision is not jurisdictional, we must determine the proper remedy, if any, for the City's failure to comply. "When the statute is silent as to the consequences for noncompliance, we look to the statute's purpose in determining the proper remedy." *Helena Chem.,* 47 S.W.3d at 493. Section 143.001(a) provides:

The purpose of this chapter is to secure efficient fire and police departments composed of capable personnel who are free from political influence and who have permanent employment tenure as public servants.

TEX. LOC. GOV'T CODEE § 143.001(a). As discussed above, dismissal of the case and the charges against the officer cannot be the remedy. The statute's purpose of seeking "efficient" and "capable" personnel is not served by dismissing the case and permitting potentially unfit officers to return to the force without a determination of the substance of the complaint against them. At the same time, the possibility of imposing no consequences is troubling, given that the required notice is intended to inform the officer of important appellate rights. The provision is certainly an important one: "The Legislature's apparent purpose in [enacting the provision] was to ensure that fire fighters and police officers are fully aware of a significant consequence that will result if they elect to have an independent hearing examiner, rather than the Commission, hear their appeal." *Clark,* 197 S.W.3d at 319–20. Thus, we believe the statute requires some remedy.

An abatement is generally appropriate to cure pre-suit notice deficiencies. *Hubenak v. San Jacinto Gas Transmission Co.,*

141 S.W.3d 172, 184 (Tex.2004) (holding that abatement, for a reasonable period of time, rather than dismissal, is appropriate remedy until parties meet the pre-suit requirement that they are "unable to agree" on the amount of damages in a condemnation proceeding); *Hines,* 843 S.W.2d at 468 (holding that abatement is proper remedy for failure to give pre-suit notice in Deceptive Trade Practices–Consumer Protection Act case); *Schepps v. Presbyterian Hosp. of Dallas,* 652 S.W.2d 934, 938 (Tex.1983) (holding that abatement is appropriate for failure to give notice in health care liability claim). We recognize the statute here is unique. Normally, the party that eventually files suit is required to provide pre-suit notice. *See, e.g., Hines,* 843 S.W.2d at 465. Under the Civil Service Act, however, **\*399** the City provides notice, and then the officer appeals. We nonetheless conclude that an abatement is the appropriate remedy because it cures the notice omission: it allows the City to notify White of his appellate rights without dismissing a case against a potentially unfit officer, and it allows White an opportunity to make an appellate election with full knowledge of the consequences of choosing each path.

White argues the statute does not permit an abatement because a ten-day election deadline is imposed on White, a deadline long since passed. *See* TEX. LOC. GOV'T CODE E § 143.052(d) ("[T]he [fire fighter or police officer] must file a written appeal with the commission within 10 days after the date the person receives the copy of the [disciplinary] statement."). He contends that the abatement remedy, or a dismissal allowing him to make a new election after the City provides the appropriate notice, is precluded by our decisions in *Bichsel v. Carver,* 159 Tex. 393, 321 S.W.2d 284 (1959), and *Bender,* 787 S.W.2d 951. We disagree, and hold that an abatement is appropriate under the Code, as well as under *Bichsel's* and *Bender's* analyses.

In *Bichsel,* we analyzed a City's ability to amend a written statement filed with the Civil Service Commission. 321 S.W.2d at 285. The chief of police suspended Officer Carver, alleging that he violated police department rules. *Id.* Carver appealed to the Commission, arguing that the charges were legally insufficient because the Code required an allegation that the officer violated the civil service rules. *Id.* The City agreed and withdrew the charges, reinstated Carver, and then the Chief re-suspended him the following day. *Id.* The City then filed a second set of charges, this time properly alleging a violation of the civil service rules. *Id.* Before the Commission could hold a hearing, Carver sought injunctive and mandamus relief in district court, which was granted. *Id.* We held

that the City could not amend the original charges, as the Code prevented it: "In any Civil Service hearing hereunder, the department head [the Chief] *is hereby restricted to his original written statement and charges which shall not be amended.*" *Id.* at 286 (citing section 16 of the Fireman's and Policeman's Civil Service Act) (emphasis in original). [8] We reasoned that a second set of charges were equivalent to an amendment to the original written statement, which was prohibited under the Code. *See id.* at 286–87. We also stated that, even if the second set of charges were considered new, "original" charges, these would be barred by the 120–hour deadline for filing charges following the suspension. *Id.* at 287. [9] We summarized the barriers to any new or amended charges:

> If the new charges be regarded as corrections to the original charges arising out of the same incident, they were invalid under that part of the statute prohibiting amendment of the charges. If they were new 'original' charges arising out of the same incident, they came long after 120 hours from Carver's suspension on September 19. They were thus filed too late.

**\*400** *Id.* The dissent pointed out a third barrier: new, "original" charges would likely be precluded by the rule that the department may not suspend an officer for acts that occurred more than six months (now 180 days) prior to the suspension. *Id.* at 290 (Culver, J. dissenting). [10] Thus, *Bichsel* laid out a strict rule against amended letters of disciplinary action, and recognized the strict time constraints preventing the use of replacement letters. 321 S.W.2d at 287.

[11] *Bender* set out its own strict rules. As discussed above, we held in *Bender* that the ten-day deadline to elect whether to appeal to the Commission or to the hearing examiner "is mandatory and must be strictly followed." 787 S.W.2d at 953. Thus, *Bichsel* and *Bender* both require strict adherence to the Code's requirements. [11] *Bichsel* restricts the City to its original letter in proceedings before the Commission, while *Bender* requires that appellants (police officers and fire fighters) strictly adhere to the appeal invocation requirements. Nonetheless, an abatement is permissible under *Bichsel's* and *Bender's* frameworks. We find nothing under the Code to prevent the hearing examiner from doing what he did in this case—offering White an abatement and a chance to change his election, having full knowledge of the appeal limitations. An amended letter of disciplinary action is not necessary, as long as the officer has actual knowledge of the appeal limitation when he makes his

election. The purpose of the notice provision is satisfied by ensuring the officer has this knowledge in some way, prior to making the election. *See Clark,* 197 S.W.3d at 319–20 (finding that the purpose of the provision "was to ensure that fire fighters and police officers are fully aware of a significant consequence"). During the abatement, should the officer choose to change his election and appeal to the Commission, the hearing examiner may dismiss the case, so that the officer is permitted a reasonable time to appeal to the Commission. The Code requires an appeal within ten days of the notice of suspension, a requirement strictly enforced in *Bender. See* TEX. LOC. GOV'T CODEE § 143.010(a); *Bender,* 787 S.W.2d at 953. But in interpreting this deadline, we must presume the Legislature intended "a just and reasonable result" and "a result feasible of execution." TEX. GOV'T CODE § 311.021(3), (4). Therefore, we hold that *Bender* applies when the officer's failure to appeal within the ten-day deadline is attributable to the officer, but when, as here, the officer's failure to appeal within the deadline is not attributable to the officer, the statute permits a reasonable extension of time. [12]

## V

 **[12]** Officer White was given an opportunity to change his election by the hearing **\*401** examiner before the hearing commenced. He declined. Generally, because we hold that the notice provision is not jurisdictional, we would also hold White waived any complaint of the omission, given that White had full knowledge of the appeal limitation under section 143.057(j). *See Loutzenhiser,* 140 S.W.3d at 358–

59. However, we recognize that, in making his decision to decline the opportunity to change his election, White could have been reasonably relying on *Bender's* strict enforcement of the ten-day election deadline. Under these circumstances, White should be given an opportunity to make a new election. Although not directly applicable, section 16.064 of the Texas Civil Practice and Remedies Code provides us guidance. Section 16.064 suspends the limitations period when a party mistakenly, and in good faith, files suit in one court, when jurisdiction was only proper in another, so that the plaintiff has an opportunity to re-file the case. TEX. CIV. PRAC. & REM.CODE § 16.064. We conclude that the same policy reasons behind section 16.064 apply here to permit White an opportunity to make a new election. For these reasons, we remand the case to the district court with instructions to remand to the hearing examiner, so that White has an opportunity to make an appellate election with full knowledge of his appellate rights and with knowledge of our guidance in this opinion.

## VI

We reverse the court of appeals' judgment and remand the case to the district court for further proceedings in accordance with this opinion. *See* TEX.R.APP. P. 60.3 (permitting remand in the interest of justice).

### Parallel Citations

29 IER Cases 555, 52 Tex. Sup. Ct. J. 893

Footnotes

1   The Code distinguishes between municipalities with a population of less than 1.5 million, and those with a population of 1.5 million or more. *See, e.g.,* TEX. LOC. GOV'T CODEE §§ 143.201–.209; 143.101–.135 (both subchapters addressing municipalities with population of 1.5 million or more). While there are some differences between the two schemes, the appellate process provisions are similar. *Compare id.* §§ 143.053, .057, *with id.* §§ 143.1015, .1016. Thus, our holding with regard to the non-jurisdictional nature of the notice provision applies with equal force under each scheme. *See City of Houston v. Clark,* 197 S.W.3d 314, 317 n. 4 (Tex.2006) (noting that, even though the case implicated a municipality a with a population of more than 1.5 million, the decision also applied to those municipalities with less than 1.5 million people).

2   This provision uses the term "arbitration panel," rather than "hearing examiner." TEX. LOC. GOV'T CODEE § 143.057(c). However, we have noted that "arbitration panel" is synonymous with "hearing examiner" in this context. *Clark,* 197 S.W.3d at 318 n. 5.

3   The Code refers to a "written statement" and a "letter of disciplinary action." *Compare, e.g.,* TEX. LOC. GOV'T CODEE § 143.057(a), *with id.* § 143.052(d). These terms appear to refer to the same document. For purposes of this opinion, we will not make a distinction between the two and will refer to the document provided to White as a "letter of disciplinary action." *See id.* § 143.057(a).

4   An officer working for a municipality with a population of 1.5 million or more has fifteen days to file an appeal. TEX. LOC. GOV'T CODE E § 143.1015(a).

5    We recently noted in that "[a]lthough the Legislature subsequently provided that the notice requirement at issue in *Loutzenhiser* was jurisdictional, the Court's reasoning [with regard to statutory analysis of alleged jurisdictional provisions] remains valid." *Igal v. Brightstar Info. Tech. Group, Inc.,* 250 S.W.3d 78, 84 (Tex.2008).

6    The City alleged White abused the Department's sick time policy during a holiday weekend and subsequently lied to a supervisor about his actions. The City states that, due to an internal investigation which found White was untruthful, the District Attorney's office was forced to alert defense counsel in all pending cases in which White was a potential witness, which the City states lead to the dismissal of twenty-one pending criminal cases. The City also alleges that White asked "an Assistant District Attorney to reduce or drop charges against an individual he had arrested for driving while under the influence of alcohol" and that after failing to appear at trial, White informed the prosecutor "that he had become friends with the suspect and despite having effectuated the arrest, he could no longer testify that the suspect was intoxicated."

7    Two other cases cited by White are distinguishable for the same reasons. *See City of Lubbock v. Elkins,* 896 S.W.2d 346, 352 (Tex.App.-Amarillo 1995, no writ) (citing *Bender,* 787 S.W.2d at 953, and holding that an officer's failure to file an appeal within ten days of receiving a copy of the written statement of charges deprived the Commission of jurisdiction under section 143.052(d)); *City of Plano Firefighters' & Police Officers' Civil Serv. Comm'n v. Maxam,* 685 S.W.2d 125, 128 (Tex.App.-Dallas 1985, writ ref'd n.r.e.) (holding that because the officer failed to list the specific basis for appeal as required under the Civil Service Code, the Commission lacked jurisdiction to hear the appeal). Each of these cases, including *Bender,* were issued prior to *Dubai,* where we extended the presumption against jurisdictional findings from common-law claims to statutory actions. *See Dubai,* 12 S.W.3d at 75. We note this, not to call into question *Bender's* continuing applicability, but rather, to emphasize the proper focus in this jurisdictional inquiry.

8    *Bichsel* analyzed former section 16 of the Civil Service Act, which is now codified in substantially similar form at section 143.053(c) of the Local Government Code. 321 S.W.2d at 286; *see also* TEX. LOC. GOV'T CODEE § 143.053(c).

9    The 120–hour rule is now codified at section 143.052(c) of the Local Government Code. TEX. LOC. GOV'T CODEE § 143.052(c) ("If the department head suspends a fire fighter or police officer, the department head shall, within 120 hours after the hour of suspension, file a written statement with the commission giving the reasons for the suspension. The department head shall immediately deliver a copy of the statement in person to the suspended fire fighter or police officer.")

10   The 180–day rule is codified at section 143.052(h) of the Local Government Code. TEX. LOC. GOV'T CODEE § 143.052(h) ("In the original written statement and charges and in any hearing conducted under this chapter, the department head may not complain of an act that occurred earlier than the 180th day preceding the date the department head suspends the fire fighter or police officer.")

11   We have recognized the Code's strict requirements in other contexts, stating that "[t]he full performance of all conditions established by the civil service laws is an essential prerequisite to the jurisdiction of the removing body over the subject matter of the removal of an officer." *City of Sherman v. Arnold,* 148 Tex. 516, 226 S.W.2d 620, 622 (1950). In *Arnold,* the City of Sherman attempted to suspend Arnold before the newly-appointed Civil Service Commission had completed all of the steps necessary to set up the Commission—namely, promulgating rules and regulations to govern its functions. *Id.*

12   We are not presented with a situation where the officer first became aware of the appellate limitations during the midst of the hearing, or after the hearing examiner's judgment was issued. White argued from the start that the hearing examiner was without jurisdiction, at which time the examiner offered an abatement. We see nothing in the Code preventing a hearing examiner from informing the police officer or fire fighter of the appellate limitations at the start of the hearing, so as to avoid this type of situation. We also note that the Code grants the hearing examiner discretion in conducting the hearing. *See* TEX. LOC. GOV'T CODEE § 143.010(g) ("the commission shall conduct the hearing fairly and impartially as prescribed by this chapter and shall render a just and fair decision"); § 143.057(f) ("the hearing examiner has the same duties and powers as the commission").

---

**End of Document**                         © 2015 Thomson Reuters. No claim to original U.S. Government Works.

168 S.W.3d 802
Supreme Court of Texas.

The CITY OF KELLER, Petitioner,

v.

John W. WILSON, Grace S. Wilson, Johnny
L. Wilson and Nancy A. Wilson, Respondents.

No. 02–1012. | Argued Oct. 19,
2004. | Decided June 10, 2005.
| Rehearing Denied Sept. 2, 2005.

**Synopsis**

**Background:** Landowners brought action against city to recover damages for inverse condemnation and for violations of Water Code. The 96th District Court, Tarrant County, Jeff Walker, J., entered judgment on jury verdict in favor of landowners. City appealed. The Fort Worth Court of Appeals, 86 S.W.3d 693, affirmed. City filed petition for review.

**Holdings:** The Supreme Court, Brister, J., held that:

[1] both the "exclusive" and "inclusive" standards for no-evidence review are correct, in that the two standards reach the same result, and

[2] no evidence established that city's approval of revised drainage plans, which resulted in flooding of landowners' farm property, was an intentional taking.

Judgment of Court of Appeals reversed; case remanded.

O'Neill, J., filed concurring opinion in which Medina, J., joined.

West Headnotes (54)

[1]     **Eminent Domain**
        Nature and grounds in general
        To recover damages from city for inverse condemnation, landowners had to prove the city intentionally took or damaged their property for public use, or was substantially certain that

would be the result. Vernon's Ann.Texas Const. Art. 1, § 17.

2 Cases that cite this headnote

[2]     **Appeal and Error**
        Total failure of proof
        The traditional scope of no-evidence review does not disregard contrary evidence if there is no favorable evidence, or if contrary evidence renders supporting evidence incompetent or conclusively establishes the opposite.

268 Cases that cite this headnote

[3]     **Appeal and Error**
        Sufficiency of Evidence in Support
        When conducting a legal-sufficiency review, evidence can be disregarded whenever reasonable jurors could do so, an inquiry that is necessarily fact-specific.

119 Cases that cite this headnote

[4]     **Appeal and Error**
        Sufficiency of Evidence in Support
        When courts conducting legal-sufficiency review use the "exclusive" standard and disregard contrary evidence, they must recognize certain exceptions to it.

2 Cases that cite this headnote

[5]     **Libel and Slander**
        Construction of language used
        Publications alleged to be defamatory must be viewed as a whole—including accompanying statements, headlines, pictures, and the general tenor and reputation of the source itself.

3 Cases that cite this headnote

[6]     **Appeal and Error**
        Review of constitutional questions
        A court reviewing legal sufficiency, in an action alleging a defamatory publication, cannot disregard parts of a publication, considering only

false statements to support a plaintiff's verdict or only true ones to support a defense verdict.

4 Cases that cite this headnote

**[7]    Contracts**
Construction as a whole

Reviewing courts must construe contracts as a whole; courts do not consider only the parts favoring one party and disregard the remainder, as that would render the latter meaningless.

10 Cases that cite this headnote

**[8]    Contracts**
Construing instruments together

Writings executed at different times must be considered together if they pertain to the same transaction.

4 Cases that cite this headnote

**[9]    Appeal and Error**
Sufficiency of Evidence in Support

In reviewing intentional infliction of emotional distress claims for legal sufficiency, appellate court considers the context and the relationship between the parties.

4 Cases that cite this headnote

**[10]    Appeal and Error**
Sufficiency of Evidence in Support

When conducting legal-sufficiency review, evidence cannot be taken out of context in a way that makes it seem to support a verdict when in fact it never did.

4 Cases that cite this headnote

**[11]    Appeal and Error**
Extent of Review

If evidence may be legally sufficient in one context but insufficient in another, the context cannot be disregarded when conducting legal-sufficiency review, even if that means rendering judgment contrary to the jury's verdict.

2 Cases that cite this headnote

**[12]    Judgment**
Evidence to sustain judgment

**Judgment**
Defects and objections

Incompetent evidence is legally insufficient to support a judgment, even if admitted without objection.

11 Cases that cite this headnote

**[13]    Appeal and Error**
Extent of Review

Evidence showing supporting evidence to be incompetent cannot be disregarded when conducting legal-sufficiency review, even if the result is contrary to the verdict.

3 Cases that cite this headnote

**[14]    Appeal and Error**
Extent of Review

**Evidence**
Opinions of Witnesses in General

When expert testimony is required, lay evidence supporting liability is legally insufficient; in such cases, a no-evidence review cannot disregard contrary evidence showing the witness was unqualified to give an opinion.

7 Cases that cite this headnote

**[15]    Appeal and Error**
Extent of Review

If an expert's opinion is based on certain assumptions about the facts, an appellate court conducting legal-sufficiency review cannot disregard evidence showing those assumptions were unfounded.

10 Cases that cite this headnote

**[16]    Appeal and Error**
Matters or Evidence Considered in Determining Question

An appellate court conducting a no-evidence review cannot consider only an expert's bare opinion, but must also consider contrary evidence showing it has no scientific basis.

5 Cases that cite this headnote

**[17]** **Appeal and Error**

Total failure of proof

Evidence that might be "some evidence" when considered in isolation is nevertheless rendered "no evidence" when contrary evidence shows it to be incompetent.

4 Cases that cite this headnote

**[18]** **Appeal and Error**

Sufficiency of Evidence in Support

In claims or defenses supported only by meager circumstantial evidence, the evidence does not rise above a scintilla, and thus is legally insufficient, if jurors would have to guess whether a vital fact exists.

131 Cases that cite this headnote

**[19]** **Appeal and Error**

Inferences from facts proved

When the circumstances are equally consistent with either of two facts, neither fact may be inferred, and the appellate court must view each piece of circumstantial evidence, not in isolation, but in light of all the known circumstances.

15 Cases that cite this headnote

**[20]** **Appeal and Error**

Sufficiency of Evidence in Support

When the circumstantial evidence of a vital fact is meager, a reviewing court conducting legal-sufficiency review must consider not just favorable but all the circumstantial evidence, and competing inferences as well.

281 Cases that cite this headnote

**[21]** **Appeal and Error**

Matters or Evidence Considered in Determining Question

An appellate court conducting a legal-sufficiency review cannot disregard undisputed evidence that allows of only one logical inference; by definition, such evidence can be viewed in only one light, and reasonable jurors can reach only one conclusion from it.

55 Cases that cite this headnote

**[22]** **Evidence**

Uncontroverted evidence

**Trial**

Uncontroverted facts or evidence

Jurors are not free to reach a verdict contrary to undisputed evidence that allows of only one logical inference; indeed, uncontroverted issues need not be submitted to a jury at all.

7 Cases that cite this headnote

**[23]** **Appeal and Error**

Sufficiency of Evidence in Support

Undisputed contrary evidence becomes conclusive, and thus cannot be disregarded when conducting legal-sufficiency review, when it concerns physical facts that cannot be denied.

8 Cases that cite this headnote

**[24]** **Appeal and Error**

Sufficiency of Evidence in Support

Undisputed contrary evidence may become conclusive, such that it cannot be disregarded when conducting legal-sufficiency review, when a party admits it is true.

23 Cases that cite this headnote

**[25]** **Appeal and Error**

Sufficiency of Evidence in Support

Evidence is conclusive, such that it cannot be disregarded during legal-sufficiency review, only if reasonable people could not differ in their conclusions, a matter that depends on the facts of each case.

214 Cases that cite this headnote

**[26]** **Appeal and Error**
🔑 Sufficiency of Evidence in Support

For purposes of conducting legal-sufficiency review, undisputed evidence and conclusive evidence are not the same—undisputed evidence may or may not be conclusive, and conclusive evidence may or may not be undisputed.

17 Cases that cite this headnote

**[27]** **Appeal and Error**
🔑 Sufficiency of Evidence in Support

Proper legal-sufficiency review prevents reviewing courts from substituting their opinions on credibility for those of the jurors, but proper review also prevents jurors from substituting their opinions for undisputed truth.

5 Cases that cite this headnote

**[28]** **Appeal and Error**
🔑 Extent of Review

When evidence contrary to a verdict is conclusive, it cannot be disregarded when conducting legal-sufficiency review.

40 Cases that cite this headnote

**[29]** **Appeal and Error**
🔑 Sufficiency of Evidence in Support

The standard for legal sufficiency works in tandem with the standard of review—whenever the standard of proof at trial is elevated, the standard of appellate review must likewise be elevated.

27 Cases that cite this headnote

**[30]** **Appeal and Error**
🔑 Verdict

Cases involving what a party knew or why it took a certain course of action are not amenable to legal-sufficiency review under the "exclusive"

standard, under which all contrary evidence is disregarded.

1 Cases that cite this headnote

**[31]** **Appeal and Error**
🔑 Province of jury

**Appeal and Error**
🔑 Province of jury or trial court

Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony.

123 Cases that cite this headnote

**[32]** **Appeal and Error**
🔑 Conclusiveness in General

**Evidence**
🔑 Credibility of witnesses in general

Jurors may choose to believe one witness and disbelieve another, and reviewing courts cannot impose their own opinions to the contrary.

72 Cases that cite this headnote

**[33]** **Appeal and Error**
🔑 Verdict

Reviewing courts must assume jurors decided all of credibility questions in favor of the verdict if reasonable human beings could do so.

13 Cases that cite this headnote

**[34]** **Evidence**
🔑 Uncontroverted evidence

Jurors may disregard even uncontradicted and unimpeached testimony from disinterested witnesses.

5 Cases that cite this headnote

**[35]** **Evidence**
🔑 Testimony of Experts

Uncontroverted expert testimony does not bind jurors unless the subject matter is one for experts alone.

6 Cases that cite this headnote

**[36]** **Trial**
 Credibility of Witnesses

Jury's decisions regarding credibility must be reasonable.

1 Cases that cite this headnote

**[37]** **Evidence**
 Uncontroverted evidence

Jurors cannot ignore undisputed testimony that is clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted.

34 Cases that cite this headnote

**[38]** **Evidence**
 Credibility of witnesses in general

Jurors are not free to believe testimony that is conclusively negated by undisputed facts.

17 Cases that cite this headnote

**[39]** **Appeal and Error**
 Verdict

Whenever reasonable jurors could decide what testimony to discard, a reviewing court must assume they did so in favor of their verdict, and disregard it in the course of legal-sufficiency review.

9 Cases that cite this headnote

**[40]** **Trial**
 Conflicting evidence

It is the province of the jury to resolve conflicts in the evidence.

20 Cases that cite this headnote

**[41]** **Appeal and Error**
 Verdict

Courts reviewing all the evidence in a light favorable to jury's verdict must assume that jurors resolved all conflicts in accordance with that verdict.

22 Cases that cite this headnote

**[42]** **Appeal and Error**
 Verdict

In every circumstance in which reasonable jurors could resolve conflicting evidence either way, reviewing courts must presume they did so in favor of the prevailing party, and disregard the conflicting evidence in their legal-sufficiency review.

33 Cases that cite this headnote

**[43]** **Trial**
 Uncontroverted facts or evidence
**Trial**
 Inferences from evidence

Even if evidence is undisputed, it is the province of the jurors to draw from it whatever inferences they wish, so long as more than one is possible and the jury must not simply guess.

6 Cases that cite this headnote

**[44]** **Appeal and Error**
 Verdict

Courts reviewing all the evidence in a light favorable to the verdict must assume jurors made all inferences in favor of their verdict if reasonable minds could, and disregard all other inferences in their legal-sufficiency review.

73 Cases that cite this headnote

**[45]** **Appeal and Error**
 Verdict

Both the "exclusive" standard for scope of no-evidence review, under which contrary evidence is disregarded, and the "inclusive" standard, under which reviewing court considers all of the evidence in the light favorable to verdict, are correct; the two standards reach the same result.

8 Cases that cite this headnote

**[46]  Appeal and Error**

⚷ Conclusiveness in General

A reviewing court cannot substitute its judgment for that of the trier-of-fact, so long as the evidence falls within the zone of reasonable disagreement.

141 Cases that cite this headnote

**[47]  Appeal and Error**

⚷ Verdict

**Appeal and Error**

⚷ Inferences from facts proved

Whether a reviewing court conducting legal-sufficiency review starts with all or only part of the record, the court must consider evidence in the light most favorable to the verdict, and indulge every reasonable inference that would support it; but if the evidence allows of only one inference, neither jurors nor the reviewing court may disregard it.

743 Cases that cite this headnote

**[48]  Trial**

⚷ Sufficiency of evidence

Legal sufficiency of the evidence is a question of law, not of fact.

132 Cases that cite this headnote

**[49]  Appeal and Error**

⚷ Sufficiency of Evidence in Support

**Judgment**

⚷ Weight and sufficiency

**Judgment**

⚷ Where directed verdict or binding instructions would have been proper

**Trial**

⚷ Nature and Grounds

The test for legal sufficiency should be the same for summary judgments, directed verdicts, judgments notwithstanding the verdict (JNOV), and appellate no-evidence review.

65 Cases that cite this headnote

**[50]  Evidence**

⚷ Sufficiency to support verdict or finding

The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review.

638 Cases that cite this headnote

**[51]  Appeal and Error**

⚷ Verdict

Whether a reviewing court begins by considering all the evidence or only the evidence supporting the verdict, legal-sufficiency review in the proper light must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not.

1750 Cases that cite this headnote

**[52]  Eminent Domain**

⚷ Weight and sufficiency

**Evidence**

⚷ Nature of Subject

No evidence established that city's approval of revised drainage plans, which resulted in flooding of landowners' farm property, was an intentional taking, although landowners' expert testified that flooding was inevitable, city knew that development would increase runoff at the head of drainage system, and prior drainage plan had required drainage ditch across landowners' property; three sets of engineers had certified that revised plans met city's codes and regulations and thus would not increase downstream flooding, and no evidence showed that city knew more than it was told by the engineers. Vernon's Ann.Texas Const. Art. 1, § 17.

3 Cases that cite this headnote

**[53]  Eminent Domain**

⚷ Appeal and error

In conducting legal-sufficiency review of finding that city's approval of revised drainage plans, which resulted in flooding of landowners' farm

property, was an intentional taking, appellate court could not disregard contrary evidence explaining why city had approved the revised drainage plans; critical question in the case was city's state of mind, i.e., whether city knew or should have known that flooding was substantially certain, and appellate court could not evaluate what city knew by disregarding most of what it was told. Vernon's Ann.Texas Const. Art. 1, § 17.

4 Cases that cite this headnote

[54]    **Evidence**
👈 Testimony of Experts

When a case involves scientific or technical issues requiring expert advice, jurors cannot disregard a party's reliance on experts hired for that very purpose without some evidence supplying a reasonable basis for doing so.

3 Cases that cite this headnote

**Attorneys and Law Firms**

\*807 Dabney D. Bassel, Larry Bracken, Law Snakard & Gambill, P.C., Fort Worth, Douglas H. Conner III, L. Stanton Lowry, Boyle & Lowry, L.L.P., Irving, for petitioner.

James B. Barlow, Barlow & Garsek, Fort Worth, Robert L. Russell Bush, Bush & Morrison, Arlington, David R. Casey, Hurst, for respondents.

Jay Doegey, Assistant City Attorney for the City of Corpus Christi, Texas, Corpus Christi, Theodore P. Gorski Jr., Office of the City Attorney for City of Fort Worth, Mark G. Daniel, Evans Gandy Daniel & Moore, Fritz Quast, Taylor Olson Adkins Sralla & Elam, LLP, Fort Worth, Monte Akers, Texas Municipal League, Austin, Michael A. Bucek, Senior Assistant City Attorney, Irving, Robert F. Brown, Brown & Hofmeister, L.L.P., Richardson, Bruce S. Powers, Assistant County Attorney, Michael A. Stafford, Harris County Attorney, Houston, for Amicus Curiae.

**Opinion**

Justice BRISTER delivered the opinion of the Court, in which Chief Justice JEFFERSON, Justice HECHT, Justice

WAINWRIGHT, and Justice GREEN joined, and in which Justice O'NEILL and Justice MEDINA joined as to Parts I through IV.

Must an appellate court reviewing a verdict for legal sufficiency start by considering all the evidence or only part? Over the years, we have stated both as the proper scope of review. While some see the standards as opposing, we disagree; like a glass that is half-full or half-empty, both arrive at the same point regardless of where they start.

But both standards must be properly applied. Rules and reason sometimes compel that evidence must be credited or discarded whether it supports a verdict or contradicts it. Under either scope of review, appellate courts must view the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. As we find the evidence here meets neither standard, we reverse.

**I. Factual and Procedural History**

The City of Keller is one of several fast-growing communities on the outskirts of  \*808 Fort Worth. [1] As part of that growth, the City approved plans for two new subdivisions, Estates of Oak Run and Rancho Serena, including plans for storm water drainage.

The Wilsons own property southeast of the new subdivisions, with a tract owned by Z.T. Sebastian lying between. Before development, surface water flowed generally north to south from the land where the subdivisions were built, across the Sebastian and Wilson properties, and into the Little Bear Creek Watershed.

In 1991, the City adopted a Master Drainage Plan providing for drainage easements across both the Sebastian and Wilson properties, and thence into Little Bear Creek. The City's codes require developers to comply with the Master Plan, to provide drainage for a 100–year rain event, and to avoid increasing the volume or velocity of water discharged upon downhill properties.

The developers of Oak Run and Rancho Serena submitted plans to the City indicating they would buy a drainage easement and build a ditch forty-five feet wide and more than two hundred yards long across the Sebastian property,

and deed both to the City upon completion.[2] The plans also included detention basins on the subdivision properties, but omitted any drainage easement or ditch across the Wilsons' property. The City's director of public works approved the developers' plans, and the City accepted the works on completion.

In accordance with the Master Plan, the City built a box culvert south of the Wilsons' property. But as the developers' drainage ditch ended at the Wilsons' north property line, there was no link between the two. The Wilsons alleged and the jury found this omission increased flooding on the Wilsons' property, ruining eight acres of farmland the jury valued at almost $300,000.

 [1]   To recover damages for inverse condemnation, the Wilsons had to prove the City intentionally took or damaged their property for public use, or was substantially certain that would be the result.[3] They do not allege the City intentionally flooded their land, but do allege it approved revised plans that it knew were substantially certain to have that effect.

The City contends no evidence supports the jury's finding of an intentional taking. It presented evidence that engineers for the developers, for the City, and for an outside firm the City retained all certified that the revised drainage plan complied with the City's codes and regulations—including the ban against increasing downstream runoff. Thus, the City asserts it had no reason to be substantially certain the opposite would occur, until it did.

A divided court of appeals rejected this contention.[4] In its legal sufficiency review, the court refused to consider the various engineers' certifications because "we are to consider only the evidence and inferences that tend to support the finding and disregard all evidence and inferences to the contrary."[5] The City challenges **\*809** this omission as applying the wrong scope of review.

We have on many occasions stated the scope of review precisely as the court of appeals says (the "exclusive" standard).[6] But we have also stated that a reviewing court must consider "*all* of the evidence" in the light favorable to the verdict (the "inclusive" standard).[7] Sometimes we have mentioned neither reviewing all evidence nor disregarding some part of it.[8] Finally, we have sometimes expressly mentioned both.[9]

Although this Court has used both the exclusive and the inclusive standards interchangeably over the years, commentators say the two are different.[10] Because this **\*810** important issue is dispositive here, we address it in some detail, and reserve for another day the City's arguments that a governmental entity cannot be liable for approving a developer's plans, or accepting rather than constructing the works at issue.

## II. Contrary Evidence That Cannot Be Disregarded

The question presented here is not a new one. More than 40 years ago, then Justice Calvert[11] addressed the standards for reviewing legal and factual sufficiency in the most-cited law review article in Texas legal history.[12] Frustrated that despite this Court's efforts to explain those standards "a growing number of recent decisions indicate a continuing misunderstanding,"[13] the author summarized and attempted to clarify Texas law up to 1960.[14] The article's impact remains substantial today, having been cited more than 100 times by Texas courts in the last five years.

According to the article:

> "No evidence" points must, and may only, be sustained when the record discloses one of the following situations: (a) a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; (d) the evidence establishes conclusively the opposite of the vital fact.[15]

We have quoted a similar formulation on many occasions.[16]

Notably, Justice Calvert then proceeded to put the question before us in the proper context:

> It is in deciding "no evidence" points in situation (c) that the courts follow the further rule of viewing the

evidence in its most favorable light in support of the finding of the vital fact, considering only the evidence and the inferences which support the finding and rejecting the evidence and the inferences which are contrary to the finding. [17]

 **[2]** Clearly, the traditional rule in Texas has never been that appellate courts must reject contrary evidence in every no-evidence review. Instead, the traditional scope of review does not disregard contrary evidence if there is no favorable evidence **\*811** (situation (a) above), or if contrary evidence renders supporting evidence incompetent (situation (b) above) or conclusively establishes the opposite (situation (d) above).

 **[3]** **[4]** As the following examples show, this has remained the rule since. We do not presume to categorize all circumstances in which contrary evidence must be considered in a legal sufficiency review. Evidence can be disregarded whenever reasonable jurors could do so, [18] an inquiry that is necessarily fact-specific. But it is important that when courts use the exclusive standard and disregard contrary evidence, they must recognize certain exceptions to it.

### A. Contextual Evidence

In Justice Calvert's first situation—a complete absence of evidence of a vital fact—it is generally irrelevant whether a reviewing court considers contrary evidence. [19] If supporting evidence is absent, opposing evidence cannot change that result. But in a number of cases, the lack of supporting evidence may not appear until all the evidence is reviewed in context.

 **[5]** **[6]** For example, publications alleged to be defamatory must be viewed as a whole—including accompanying statements, headlines, pictures, and the general tenor and reputation of the source itself. [20] A court reviewing legal sufficiency cannot disregard parts of a publication, considering only false statements to support a plaintiff's verdict or only true ones to support a defense verdict. [21]

 **[7]** **[8]** Similarly, reviewing courts must construe contracts as a whole; we do not consider only the parts favoring one party and disregard the remainder, as that would render the

latter meaningless. [22] Even writings executed at different times must be considered together if they pertain to the same transaction. [23]

 **[9]** It is not just writings that reviewing courts must consider in context. For example, in reviewing intentional infliction of emotional distress claims for legal sufficiency, "we consider the context and the relationship between the parties." [24] Acts that might constitute outrageous conduct when dealing with a hearing-impaired consumer [25] may be legally insufficient between **\*812** business parties. [26] In our no-evidence reviews of successful claims, we have invariably reviewed not just evidence showing the conduct was outrageous, but also evidence showing that, in context, it was not. [27]

 **[10]** More generally, evidence cannot be taken out of context in a way that makes it seem to support a verdict when in fact it never did. [28] If a witness's statement "I did not do that" is contrary to the jury's verdict, a reviewing court may need to disregard the whole statement, but cannot rewrite it by disregarding the middle word alone.

 **[11]** Thus, if evidence may be legally sufficient in one context but insufficient in another, the context cannot be disregarded even if that means rendering judgment contrary to the jury's verdict. Either "evidence contrary to the verdict" must be defined to exclude material contextual evidence, or it must be an exception to the general rule.

### B. Competency Evidence

 **[12]** **[13]** It has long been the rule in Texas that incompetent evidence is legally insufficient to support a judgment, even if admitted without objection. [29] Thus, evidence showing it to be incompetent cannot be disregarded, even if the result is contrary to the verdict. If the rule were otherwise, incompetent evidence would *always* be legally sufficient, because the evidence showing it to be incompetent could never be considered.

Thus, for example, if an eyewitness's location renders a clear view of an accident "physically impossible," it is no evidence of what occurred, even if the eyewitness thinks otherwise. [30] Similarly, an employee's testimony that he was in the course and scope of his employment is legally insufficient to support

a verdict against his employer if the evidence shows that legal conclusion to be incompetent. [31]

 **[14]**     **[15]**     This exception frequently applies to expert testimony. When expert testimony is required, lay evidence supporting liability is legally insufficient. [32]  In  **\*813** such cases, a no-evidence review cannot disregard contrary evidence showing the witness was unqualified to give an opinion. [33]  And if an expert's opinion is based on certain assumptions about the facts, we cannot disregard evidence showing those assumptions were unfounded. [34]

 **[16]**     After we adopted gate-keeping standards for expert testimony, [35] evidence that failed to meet reliability standards was rendered not only inadmissible but incompetent as well. [36]  Thus, an appellate court conducting a no-evidence review cannot consider only an expert's bare opinion, but must also consider contrary evidence showing it has no scientific basis. [37]  Similarly, review of an expert's damage estimates cannot disregard the expert's admission on cross-examination that none can be verified. [38]

 **[17]**     Thus, evidence that might be "some evidence" when considered in isolation is nevertheless rendered "no evidence" when contrary evidence shows it to be incompetent. Again, such evidence cannot be disregarded; it must be an exception either to the exclusive standard of review or to the definition of contrary evidence.

### C. Circumstantial Equal Evidence

As noted above, Justice Calvert believed the exclusive standard applied only when a no-evidence challenge asserted the evidence was no more than a scintilla. [39]  But he went on to note a "variation" that required contrary inferences to be considered when the equal-inference rule applied. [40]

 **[18]**     **[19]**     In claims or defenses supported only by meager circumstantial evidence, the evidence does not rise above a scintilla (and thus is legally insufficient) if jurors would have to guess whether a vital fact exists. [41]  "When the circumstances are equally consistent with either of two facts, neither fact may be inferred." [42]  In such cases, we must "view each piece of circumstantial  **\*814**  evidence, not in isolation, but in light of all the known circumstances." [43]

Justice Calvert argued there was "no necessity for the variation" because drawing an inference based on meager evidence was unreasonable whether or not the reviewing court considered the opposing inferences. [44]  Nevertheless, he recognized that "[t]he opposing inference is present and it does no harm to note its presence." [45]

In subsequent cases this Court has continued to note rather than disregard the presence of equal but opposite inferences, often because lower courts have overlooked them. Thus, for example, one might infer from cart tracks in spilled macaroni salad that it had been on the floor a long time, but one might also infer the opposite—that a sloppy shopper recently did both. [46]  Similarly, when injury or death occurs without eyewitnesses and only meager circumstantial evidence suggests what happened, we cannot disregard other meager evidence of equally likely causes. [47]

 **[20]**     Thus, when the circumstantial evidence of a vital fact is meager, a reviewing court must consider not just favorable but all the circumstantial evidence, and competing inferences as well.

### D. Conclusive Evidence

 **[21]**     **[22]**     Next, Justice Calvert noted that Texas courts conducting a no-evidence review traditionally do not disregard contrary evidence that conclusively establishes the opposite of a vital fact. [48]  He argued that this is to some extent not a "true" no-evidence claim, as proponents may have to show not only that no evidence supports the verdict but that the opposite was proved as a matter of law. [49]  There are several types of conclusive evidence. First, an appellate court conducting a legal sufficiency review cannot "disregard undisputed evidence that allows of only one logical inference." [50]  By definition, such evidence can be viewed in only one light, and reasonable jurors can reach only one conclusion from it. Jurors are not free to reach a verdict contrary to such evidence; [51]  indeed, uncontroverted issues  **\*815**  need not be submitted to a jury at all. [52]

Reviewing legal sufficiency in such cases encompasses a general no-evidence review, because if some evidence supports the verdict then the contrary evidence was not "undisputed." But the review does not stop there; the evidence

must also have only one logical inference. Undisputed evidence that reasonable jurors could disbelieve has two: (1) it is true, or (2) it is not.

 **[23]**    Most often, undisputed contrary evidence becomes conclusive (and thus cannot be disregarded) when it concerns physical facts that cannot be denied. Thus, no evidence supports an impaired-access claim if it is undisputed that access remains along 90 percent of a tract's frontage. [53] Evidence that a buyer believed a product had been repaired is conclusively negated by an accompanying letter to the contrary. [54] And an insured's liability has not been determined by an "actual trial" if the insured did not appear, present evidence, or challenge anything presented by his opponent. [55]

 **[24]**    Undisputed contrary evidence may also become conclusive when a party admits it is true. Thus, a claimant's admission that he was aware of a dangerous premises condition is conclusive evidence he needed no warning about it. [56] Similarly, an ex-employee's admission that she obtained other employment may prove conclusively that she did not detrimentally rely on a defendant's promise to re-hire her. [57] And jurors may not find that an indictment was based on a defendant's misleading report when the district attorney admits it was his own mistake. [58]

 **[25]**    It is impossible to define precisely when undisputed evidence becomes conclusive. For example, an injured employee's return to work may prove conclusively that an injury was not total, [59] or it may not. [60] Circumstances in which a body is found may conclusively establish suicide, [61] or allow  **\*816**  jurors to infer otherwise. [62] Evidence is conclusive only if reasonable people could not differ in their conclusions, [63] a matter that depends on the facts of each case.

 **[26]**    There is another category of conclusive evidence, in which the evidence *is* disputed. Undisputed evidence and conclusive evidence are not the same—undisputed evidence may or may not be conclusive, and conclusive evidence may or may not be undisputed.

Thus, for example, in *Murdock v. Murdock,* we found no evidence to support a verdict establishing the defendant's paternity when blood tests conclusively proved he was not the child's father. [64] The evidence was directly disputed—the

child's mother testified she had conjugal relations with no one else during the relevant time. [65] Nevertheless, we held there was no evidence to support the paternity verdict because of conclusive evidence to the contrary. [66]

Similarly, in *Texas & New Orleans Railroad Co. v. Compton,* we found no evidence that a railroad's negligence caused an automobile to slam into the sixtieth car of a slow-moving train. [67] Again, the evidence was hotly disputed—while railroad witnesses testified that warning signs were in place at the crossing, the car's driver and a passenger testified they saw nothing, and would have been able to stop if they had. [68] Nevertheless, we held there was no evidence to support the claim because, if the driver could not see the side of a train before he hit it, he could not have seen a crossing sign either. [69]

Of course, there are few instances in which disputed evidence is conclusive, and many instances in which undisputed evidence is not. As our sister court has noted, testimony by a paid informant is legally sufficient to support a conviction, even if "[t]wenty nuns testify that the defendant was with them at the time, far from the scene of the crime ... [and] [t]wenty more nuns testify that they saw the informant commit the crime." [70] But a more famous clerical hypothetical by Judge Learned Hand shows the opposite limit:

> If, however, it were proved by twenty bishops that either party, when he used the words [in a contract], intended something else than the usual meaning which the law imposes upon them, he would still be held.... [71]

While jurors may generally believe either sinners or saints, their discretion is limited when it is proved beyond question that an "eyewitness" was actually far away in prison or totally blind on the day of the crime.

 **[27]**     **[28]**    Proper legal-sufficiency review prevents reviewing courts from substituting  **\*817**  their opinions on credibility for those of the jurors, but proper review also prevents jurors from substituting their opinions for undisputed truth. When evidence contrary to a verdict is conclusive, it cannot be disregarded.

### E. Clear–and–Convincing Evidence

[29]    Since the time of Justice Calvert's article, new claims and burdens of proof have arisen that require additions to the four types of no-evidence review Justice Calvert considered exhaustive. Beginning with the United States Supreme Court's opinion in *Jackson v. Virginia,* appellate courts have recognized that, while "one slender bit of evidence" may be all a reviewing court needs to affirm a verdict based on the preponderance of the evidence, a higher burden of proof requires a higher standard of review.[72] As we recently stated, the standard for legal sufficiency works in tandem with the standard of review—"whenever the standard of proof at trial is elevated, the standard of appellate review must likewise be elevated."[73] If the rule were otherwise, legally sufficient evidence to support a preponderance-of-the-evidence verdict would satisfy the higher burdens as well, thus rendering their differences meaningless.[74]

Accordingly, we have held that a legal sufficiency review must consider *all* the evidence (not just that favoring the verdict) in reviewing cases of parental termination,[75] defamation,[76] and punitive damages.[77] In such cases, again, evidence contrary to a verdict cannot be disregarded.

### F. Consciousness Evidence

[30]    Further, we have had to particularize legal-sufficiency review in cases involving what a party knew or why it took a certain course, as they are not amenable to review under the exclusive standard.

Long before gross negligence had to meet a clear-and-convincing burden, we recognized in *Burk Royalty Co. v. Walls* that no-evidence review of such findings had to include "all of the surrounding facts, circumstances, and conditions, not just individual elements or facts."[78] As then Chief Justice Greenhill noted in concurring, speeding and running a red light may not be legally sufficient evidence of gross negligence if one's wife and daughter are bleeding to death in the back seat.[79] Reviewing courts assessing evidence of conscious indifference cannot disregard part of what a party was conscious of.[80]

For the same reasons, the exclusive standard of review has proven problematic in insurance bad-faith cases. Liability in **\*818** such cases requires proof that the insurer denied coverage after it became reasonably clear.[81] But that standard will always be met if reviewing courts must disregard any evidence that coverage was unclear.[82] Subsequent cases show that reviewing courts are in fact looking at *all* the evidence to determine whether coverage was reasonably clear.[83]

This problem arises in other contexts as well. In discrimination cases, discharged employees will never have to prove that the reason given for termination was a pretext if no-evidence review must disregard that reason.[84] Government officials will never be entitled to immunity if we consider only evidence suggesting they should have acted differently.[85] And limitations will never run under the discovery rule if reviewing courts must disregard all evidence that claimants knew of their claims.[86]

This is not to say a reviewing court may credit a losing party's explanations or excuses if jurors could disregard them. For example, while an insurer's reliance on an expert report may foreclose bad faith recovery,[87] it will not do so if the insurer had some reason to doubt the report.[88] But a reviewing court cannot review whether jurors could reasonably disregard a losing party's explanations or excuses without considering what they were.

### III. Contrary Evidence That Must Be Disregarded

As trials normally focus on issues that jurors could decide either way, reviewing **\*819** courts must disregard evidence contrary to the verdict far more often than they must consider it. Just as no-evidence review that starts by disregarding contrary evidence often must end up considering considerably more, no-evidence review that begins by considering all the evidence must usually end up considering considerably less.

Again, we do not presume to categorize all circumstances in which contrary evidence must be disregarded; a few examples serve to demonstrate that even under the inclusive standard, viewing all the evidence in a light favorable to the verdict often requires that much of it be disregarded.

### A. Credibility Evidence

[31]    [32]    Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony.[89] They

may choose to believe one witness and disbelieve another. [90] Reviewing courts cannot impose their own opinions to the contrary. [91]

 [33]   Most credibility questions are implicit rather than explicit in a jury's verdict. Thus, reviewing courts must assume jurors decided all of them in favor of the verdict if reasonable human beings could do so. Courts reviewing all the evidence in a light favorable to the verdict thus assume that jurors credited testimony favorable to the verdict and disbelieved testimony contrary to it. [92]

For example, viewing the evidence in the light favorable to the verdict means that if both parties in a traffic accident testify they had the green light, an appellate court must presume the prevailing party did and the losing party did not. If the parties to an oral contract testify to conflicting terms, a reviewing court must presume the terms were those asserted by the winner. When all the evidence is viewed in the light most favorable to the jury verdict, some of it must be completely discounted. Though not disregarded at the outset, the end result is the same.

This has always been our practice in cases using the inclusive scope of review. Thus, we have concluded that a bailee sold cotton without the bailor's consent, despite the former's denials, because the jury verdict favored the latter. [93] And we have affirmed a gross negligence verdict based on testimony that the defendant's speed was 80 miles per hour, without mentioning his own testimony to a speed half that. [94]

 [34]   [35]   Nor is it necessary to have testimony from both parties before jurors **\*820** may disbelieve either. Jurors may disregard even uncontradicted and unimpeached testimony from disinterested witnesses. [95] Thus, an architect's uncontradicted testimony that he relied on a 20–year warranty was not binding on jurors when the bid specifications he prepared included only much shorter warranties. [96] Nor was an insured's uncontradicted testimony about lost furnishings binding on jurors when the fire scene contained several indications of arson but few of burnt furniture. [97] Even uncontroverted expert testimony does not bind jurors unless the subject matter is one for experts alone. [98]

 [36]   [37]   [38]   [39]   Of course, "[t]he jury's decisions regarding credibility must be reasonable." [99]

Jurors cannot ignore undisputed testimony that is clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted. [100] And as noted above, they are not free to believe testimony that is conclusively negated by undisputed facts. But whenever reasonable jurors could decide what testimony to discard, a reviewing court must assume they did so in favor of their verdict, and disregard it in the course of legal sufficiency review.

## B. Conflicting Evidence

 [40]   [41]   It is the province of the jury to resolve conflicts in the evidence. [101] Accordingly, courts reviewing all the evidence in a light favorable to the verdict must assume that jurors resolved all conflicts in accordance with that verdict. [102]

Again, this has always been the case even in those cases using the inclusive scope of review. For example, in such cases we have sometimes detailed only the evidence that supported a jury's fraud finding. [103] We have affirmed a bad-faith verdict for legal sufficiency despite "significant evidence" that the insurer acted in **\*821** good faith. [104] We have found some evidence of lost profits, even though income tax returns showed the contrary. [105] And we have affirmed a jury's negligence finding despite a defendant's evidence asserting it could not have prevented the accident. [106]

In none of these cases did we state that the scope of review required us to disregard evidence contrary to the verdict; instead, we started by considering the entire record in each. But in each case we either discounted or never mentioned conflicting evidence contrary to the verdict because viewing the evidence in the light favorable to the verdict required us to do so.

Of course, it is not always clear whether evidence is conflicting. Evidence is not conflicting just because the parties cannot agree to it. For example, evidence that a hospital controlled a doctor's rotation and patient assignments raises no material conflict with evidence that a different entity controlled the details of medical treatment, as only the latter is material in a malpractice case. [107] Similarly, evidence showing the terms of one loan does not conflict

with undisputed evidence that the parties never reached an agreement regarding the terms of another. [108]

**[42]** But in every circumstance in which reasonable jurors could resolve conflicting evidence either way, reviewing courts must presume they did so in favor of the prevailing party, and disregard the conflicting evidence in their legal sufficiency review.

### C. Conflicting Inferences

**[43]** Even if evidence is undisputed, it is the province of the jury to draw from it whatever inferences they wish, so long as more than one is possible and the jury must not simply guess. Thus, in product liability cases jurors may find evidence of a defect from subsequent modifications, even if there were plenty of other reasons for the changes. [109] Even if a defendant admits approaching an intersection from the wrong way on a one-way street, jurors may infer the plaintiff failed to keep a proper lookout, as that is one possible inference from the accident itself. [110] Similarly, jurors may infer that relatives tore down posters of a missing child to assist the child's father, even though another inference was that the signs simply embarrassed them. [111]

**[44]** Accordingly, courts reviewing all the evidence in a light favorable to the verdict must assume jurors made all inferences in favor of their verdict if reasonable minds could, and disregard all other inferences in their legal sufficiency review.

### IV. Reconciling the Standards

**[45]** Having noted the dual lines of authority stating the scope of no-evidence review, and the proper application and exceptions to each, we turn to the question of which one is correct. For the reasons **\*822** discussed below, we believe the answer is both.

### A. Goals: The Standards Must Be The Same

**[46]** Whether a court begins by reviewing all the evidence or disregarding part in a legal-sufficiency review, there can be no disagreement about where that review should end. If the evidence at trial would enable reasonable and fair-minded

people to differ in their conclusions, then jurors must be allowed to do so. [112] A reviewing court cannot substitute its judgment for that of the trier-of-fact, so long as the evidence falls within this zone of reasonable disagreement. [113]

**[47]** Similarly, there is no disagreement about how a reviewing court should view evidence in the process of that review. Whether a reviewing court starts with all or only part of the record, the court must consider evidence in the light most favorable to the verdict, and indulge every reasonable inference that would support it. [114] But if the evidence allows of only one inference, neither jurors nor the reviewing court may disregard it. [115]

Given these premises, it is no coincidence that the two standards should reach the same result—indeed they *must*. Any scope of appellate review smaller than what reasonable jurors could believe will reverse some verdicts that are perfectly reasonable; any scope of review larger than what reasonable jurors could believe will affirm some verdicts that are not.

**[48]** Further, the two must coincide if this Court is to perform its constitutional duties. Although factual sufficiency has been the sole domain of the intermediate appellate courts in Texas since 1891, our jurisdiction has always included legal sufficiency, as that is a question of law, not of fact. [116] Construing either standard to require us to do less would be just as unconstitutional as construing either to allow us to do more.

This is not to say judges and lawyers will always agree whether evidence is legally **\*823** sufficient. As discussed more fully below, reasonable people may disagree about what reasonable jurors could or must believe. But once those boundaries are settled, *any* standard of review must coincide with those boundaries—affirming jury verdicts based on evidence within them and reversing jury verdicts based on evidence that is not. Any standard that does otherwise is improperly applied.

### B. Other Motions: The Standards Must Be The Same

**[49]** Just as the scope of no-evidence review must coincide with its goals, the scope of review should not depend upon the motion in which it is asserted. Judgment without or against a jury verdict is proper at any course of the proceedings

only when the law does not allow reasonable jurors to decide otherwise. Accordingly, the test for legal sufficiency should be the same for summary judgments, directed verdicts, judgments notwithstanding the verdict, and appellate no-evidence review.

Our statements of the standard for reviewing a directed verdict present the same mixed bag found with general no-evidence review. We have most often used the exclusive standard, stating that courts reviewing directed verdicts must consider only evidence supporting the nonmovant's case and disregard all contrary evidence. [117] But we have also stated that reviewing courts should use the inclusive standard, considering all the evidence in a light contrary to the directed verdict. [118] And we have sometimes stated both, requiring reviewing courts to consider all the evidence in a light contrary to the directed verdict and then to disregard all conflicting evidence that supports it. [119]

By contrast, cases concerning judgments non obstante veredicto most often utilize the inclusive scope of review. Beginning with the 1931 amendment authorizing trial judges to grant them, [120] we have generally reviewed such orders by considering all the evidence in a light favorable to the **\*824** verdict that was set aside. [121] In later years we have sometimes adopted the exclusive standard, [122] but our opinions doing so usually cite to general no-evidence cases in which no judgment n.o.v. was involved. [123]

The one exception in which both standards do not expressly appear is in the scope of review for summary judgments. Here, there is only one standard—a reviewing court must examine the entire record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion. [124] Reviewing courts do *not* disregard the evidence supporting the motion; **\*825** if they did, all summary judgments would be reversed.

In practice, however, a different scope of review applies when a summary judgment motion is filed without supporting evidence. [125] In such cases, evidence supporting the motion is effectively disregarded because there is none; under the rule, it is not allowed. Thus, although a reviewing court must consider all the summary judgment evidence on file, in some cases that review will effectively be restricted to the evidence contrary to the motion.

The standards for taking any case from the jury should be the same, no matter what motion is used. If only one standard were proper, we would not expect both to appear in cases reviewing directed verdicts, judgments notwithstanding the verdict, and summary judgments. But both do.

### C. Federal Courts: The Standards Are The Same

The federal courts have had a similar split of authority between the inclusive and exclusive standards for scope of review. But no longer—the United States Supreme Court recently concluded in *Reeves v. Sanderson Plumbing Products, Inc.* that the two tests are the same. [126]

Under Rule 50 of the federal rules of procedure, a court should render judgment as a matter of law when "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." [127] In deciding whether all or only part of the evidence should be considered, the Supreme Court stated:

> The Courts of Appeals have articulated differing formulations as to what evidence a court is to consider in ruling on a Rule 50 motion. Some decisions have stated that review is limited to that evidence favorable to the nonmoving party, while most have held that review extends to the entire record, drawing all reasonable inferences in favor of the nonmovant.
>
> On closer examination, this conflict seems more semantic than real. Those decisions holding that review under Rule 50 should be limited to evidence favorable to the nonmovant appear to have their genesis in *Wilkerson v. McCarthy* [128]. In *Wilkerson,* we stated that "in passing upon whether there is sufficient evidence to submit an issue to the jury we need look only to the evidence and reasonable inferences which tend to support the case of" the nonmoving party. [129] But subsequent decisions have clarified that this passage was referring to the evidence to which the trial court should *give credence,* not the evidence that the court should *review.* In the analogous context of summary judgment under Rule 56, we have stated that the court must review the record "taken as a whole." And the standard for granting summary judgment "mirrors" the standard for judgment as a matter of law, such that "the inquiry under each is the same." It therefore follows that, in entertaining a motion

for judgment as a **\*826** matter of law, the court should review all of the evidence in the record. [130] We address the Supreme Court's conclusion as to the most appropriate standard below; the relevant point here is its conclusion that differences between the inclusive and exclusive standards are more semantic than real.

### D. Objections: The Standards Are Not The Same

While we have used the two standards for the scope of review interchangeably for many years in many different contexts, several arguments suggest they are not the same.

First, the courts of appeals often use the two standards in illustrations of the difference between legal and factual sufficiency, with the exclusive standard tied to the former and the inclusive standard to the latter:

> When [reviewing] legal sufficiency, we consider *only* the evidence and inferences that tend to support the award of damages and disregard all evidence and inferences to the contrary.... When we review factual sufficiency, we consider and weigh *all* of the evidence and will set aside the verdict only if it is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. [131]

But there have always been exceptions to this distinction. [132] As demonstrated in Parts II and III above, it is generally true that the *result* of legal-sufficiency review is to disregard contrary evidence, but there are exceptions when a reviewing court cannot. It is not surprising that in drawing the general distinction between legal and factual sufficiency, courts have not complicated that distinction by listing the several exceptions in which the scope of review—though not the standard of review—may overlap.

Second, it has been argued that the exclusive standard "is an important prophylactic" against invasion of the jury's province, as appellate judges are less likely to consider contrary evidence when they should not if the exclusive standard is used. [133] But if that is true, the opposite should also be the case—appellate courts are less likely to consider

contrary evidence *when they must* (as shown in Part II) if the exclusive standard is used. No matter which standard is used, appellate courts must take care not to consider or disregard too little or too much.

**\*827** Conversely, several factors appear to favor application of the inclusive standard. First, when we have said "we must look only at that evidence which tends to support the judgment," [134] we could not have been speaking literally; no glasses filter evidence, and judges cannot abandon such judgments to law clerks or litigants. It is often hard to say whether evidence does or does not support a verdict —the same facts may support different conclusions, [135] or may support one part of a verdict but not another. [136] Nor can evidence supporting a verdict be identified by which party offered it—parties depend on admissions and cross-examination during their opponent's case, and minimize damaging evidence by presenting it during their own. As a practical matter, a court cannot begin to say what evidence supports a verdict without reviewing it all.

Second, an appellate court that begins by disregarding one party's evidence may strike many citizens as extending something less than justice for all. Concerns about open government and open courts suggest an appellate process that considers all the evidence, though deferring to the jury's verdict. While there is some dispute whether Lady Justice should wear a blindfold, [137] the metaphor was surely never intended to suggest that justice disregards the facts.

In sum, the exclusive standard is helpful in recognizing the distinctive roles of judge and jury, intermediate and supreme court. By contrast, the inclusive standard is helpful in recognizing what courts actually do, and must be seen to do. Both are important; we should avoid choosing between them if we can.

### E. Conclusion: The Standards Are The Same

As both the inclusive and exclusive standards for the scope of legal-sufficiency review have a long history in Texas, as both have been used in other contexts to review matter-of-law motions, as the federal courts have decided the differences between the two are more semantic than real, and as both— properly applied—must arrive at the same result, we see no compelling reason to choose among them.

 **[50]**  **[51]**  The key qualifier, of course, is "properly applied." The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. Whether a reviewing court begins by considering all the evidence or only the evidence supporting the verdict, legal-sufficiency review in the proper light must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not.

While judges and lawyers often disagree about legal sufficiency in particular cases, **\*828** the disagreements are almost always about what evidence jurors can or must credit and what inferences they can or must make. It is inevitable in human affairs that reasonable people sometimes disagree; thus, it is also inevitable that they will sometimes disagree about what reasonable people can disagree about. This is not a new problem; Justice Calvert noted it almost fifty years ago:

> The rule as generally stated is that if reasonable minds cannot differ from the conclusion that the evidence lacks probative force it will be held to be the legal equivalent of no evidence. The application of the rule can lead to strange results. It is theoretically possible, and sometimes not far from actual fact, that five members of the Supreme Court will conclude that the evidence supporting a finding of a vital fact has no probative force, and in reaching the conclusion through application of the rule will thus hold, in effect, that the trial judge who overruled a motion for instructed verdict, the twelve jurors who found the existence of the vital fact, the three justices of the Court of Civil Appeals who overruled a "no evidence" point of error and four dissenting justices of the Supreme Court are not men [138] of "reasonable minds." [139]

It is not hubris that occasionally requires an appellate court to find a jury verdict has no reasonable evidentiary basis. As Justice Frankfurter stated long ago:

> Only an incompetent or a wilful judge would take a case from the jury when the issue should be left to the jury. But since questions of negligence are questions of degree, often very nice differences of degree, judges of competence and conscience have in the past, and will in the future, disagree whether proof in a case is sufficient to demand submission to the jury. The fact that [one] thinks there was enough to leave the case to the jury does not indicate that the other [is] unmindful of the jury's function. The easy but timid way out for a trial judge is to leave all cases tried to a jury for jury determination, but in so doing he fails in his duty to take a case from the jury when the evidence would not warrant a verdict by it. A timid judge, like a biased judge, is intrinsically a lawless judge. [140]

## V. Application to the Facts

It remains to apply the scope of review to the facts presented.

 **[52]**  A majority of the court of appeals affirmed the verdict for the Wilsons, finding legally sufficient evidence that the City knew increased flooding on the Wilsons' property was substantially certain to occur. [141] The majority pointed to the following proof. First, the Wilsons' expert testified that the revised plan was certain to **\*829** create flooding. [142] Second, as the City admittedly knew that development would increase runoff and the Sebastian ditch would channel it toward the Wilsons, so it knew "with absolute certainty" that flooding would be the result. [143] Third, the City "did not explain" why the Master Plan required a drainage ditch across the Wilsons' property but the revised plan did not, thus allowing jurors to infer that the City knew this omission would cause flooding. [144]

 **[53]**  Of course, the City *did explain* why it approved the new plan—because three sets of engineers said the omitted ditch was unnecessary—but the court felt compelled by the scope of review to disregard that evidence.

For several of the reasons stated earlier, we believe the court of appeals did not properly apply the scope of review. The

critical question in this case was the City's state of mind—the Wilsons had to prove the City *knew* (not should have known) that flooding was substantially certain. A reviewing court cannot evaluate what the City knew by disregarding most of what it was told.

 **[54]**    Moreover, when a case involves scientific or technical issues requiring expert advice (as this one does), jurors cannot disregard a party's reliance on experts hired for that very purpose without some evidence supplying a reasonable basis for doing so. [145] Here, it was uncontroverted that three sets of engineers certified that the revised plans met the City's codes and regulations—and thus would not increase downstream flooding. The same firm that drew up the original Master Plan certified the revised one; unless the City had some reason to know the first certification was true and the second one was false (of which there was no evidence), there was only one logical inference jurors could draw.

None of the evidence cited by the court of appeals showed the City knew more than it was told by the engineers. The Wilsons' expert testified that flooding was (in his opinion) inevitable, but not that *the City* knew it was inevitable. The Wilsons' expert gave no opinion on the latter point.

Second, ending a ditch at a neighbor's property line may be evidence that a defendant was substantially certain of the result in some cases, but not in the context of this one. City witnesses admitted knowing development would increase runoff at the head of this drainage system, but not flooding at its foot. Calculating the effect of detention ponds and absorption in a grassy drainage ditch forty-five feet wide and over two hundred yards long required hydrological formulas, computer models, and mathematical calculations. The omission of the ditch across the Wilsons' property obviously raised concerns that the City investigated, but was no evidence that the City knew the advice it received in response was wrong.

The Wilsons also point to a letter Sebastian's attorney wrote the City demanding indemnity in case the new ditch flooded the Wilsons. But attorneys must protect a client from potential liability whether it is **\*830** real or imagined—and justly so. In the letter, the attorney never purports to be an expert in hydrology, or cite the opinions of anyone who was. This letter may have required the City to investigate, but again is no evidence it knew the advice it received was wrong. [146]

Our concurring colleagues believe reasonable jurors could nevertheless disregard what all the engineers certified because the City had a financial incentive to believe them rather than pay the Wilsons. Of course, defendants have a financial incentive to avoid paying damages in every case; if that incentive alone is some evidence of liability, then plaintiffs create enough evidence to go to the jury every time they file suit.

But more important, this ignores what the Wilsons had to prove—not that the City *might* have disbelieved the engineers' reports, but that it *did.* This requires evidence of "objective indicia of intent" showing the City knew identifiable harm was occurring or substantially certain to result. [147] Jurors' doubts about the engineers' reports or the City's motives could not supply them with objective indicia that the City knew flooding would occur. Constitutional concerns about the roles of judge and jury do not allow either to make such evidence up.

We agree with the court of appeals that the Wilsons presented some evidence that the City damaged their property, and that in drawing up and approving drainage plans it was acting for a public purpose. The missing piece in the evidence here is proof that the City knew the plans it approved were substantially certain to increase flooding on the Wilsons' properties. While the City certainly knew that fact after the flooding started, the Wilsons never pleaded or submitted to the jury any takings theory other than the City's initial approval.

Crediting all favorable evidence that reasonable jurors could believe and disregarding all contrary evidence except that which they could not ignore, we hold there was no evidence the City's approval of the revised drainage plan was an intentional taking.

Accordingly, we reverse the court of appeals' judgment against the City under article I, section 17 of the Texas Constitution. Because the court of appeals declined to address the jury's alternate verdict for the Wilsons on a claim under the Texas Water Code, we remand the case to that court to determine that issue.


Justice O'NEILL filed a concurring opinion in which Justice MEDINA joined.

Justice JOHNSON did not participate in the decision.

Justice O'NEILL, joined by Justice MEDINA, concurring.
The Court does an excellent job of explaining the appropriate scope of no-evidence review: the reviewing court "must view the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." 168 S.W.3d at 807. I agree with this standard and join Parts I through IV of the Court's opinion. But I cannot join Part V, because the Court misapplies the standard that it so carefully **\*831** articulates by crediting evidence the jury could reasonably disregard.

The City of Keller's Master Drainage Plan required it in part to condemn a 2.8–acre drainage easement on the Wilson property for construction of an earthen channel forty-five feet wide and five feet deep that would funnel water from the adjoining Sebastian property over the Wilson property into the Little Bear Creek Watershed. The City chose not to proceed with this portion of the plan, though, claiming reliance on engineers' assurances that the developers' installation of retention ponds on neighboring land could prevent flooding. The drainage channel that was actually built ended at the edge of the Sebastian property and funneled water directly onto the Wilsons' land, destroying eight acres of farmland worth almost $300,000. The Court holds that the jury was required to believe the City's testimony that it relied on the engineers' assurances and thus did not know flooding was substantially certain to occur, stating that when a case requires expert testimony "jurors cannot disregard a party's reliance on experts hired for that very purpose without some evidence supplying a reasonable basis for doing so." 168 S.W.3d at 829. Even if this were an appropriate review standard—which it hasn't been until today—I believe the jury had a reasonable basis upon which to disregard the City's professed reliance; the City had a financial incentive to disclaim knowledge of the flooding, and the Wilsons presented some evidence that the City had independent knowledge flooding was substantially certain to occur. In my view, the jury was the proper body to weigh the witnesses' credibility and resolve these disputed fact issues. I nevertheless agree that the City cannot be liable for a taking in this case because I believe that a city's mere act of approving a private development plan cannot constitute a taking for public use. Accordingly, I concur in the Court's judgment but not its reasoning.

I

Questions of intent are generally proved only by circumstantial evidence; as the court of appeals in this case aptly noted, "defendants will rarely admit knowing to a substantial certainty that given results would follow from their actions," and therefore the jury must be "free to discredit defendants' protestations that no harm was intended and to draw inferences necessary to establish intent." 86 S.W.3d 693, 704. I agree with the Court that the jury's ability to disbelieve the City's protestations is not itself "evidence of liability." 168 S.W.3d at 830. Instead, the jury's ability to weigh the witnesses' credibility means that the City's testimony did not conclusively establish its lack of liability. Because liability is not conclusively negated, we must examine the record to see if there is legally sufficient evidence from which the jury could infer that the City knew flooding was substantially certain to occur. I would hold that the evidence of intent that was presented in this case allowed the jury to draw such an inference.

At trial, the Wilsons presented evidence that the City had independent sources of knowledge that flooding was substantially certain to occur. First, they demonstrated that the developers' plan itself was flawed. Rather than incorporate a drainage ditch running across the Wilson property, as the City's Master Plan required, the developers' plan ended the drainage ditch abruptly at the edge of the Wilson property. The Wilsons' expert testified that the plan's implementation would necessarily "increase the volume and flow of water across the Wilson property from the rate of fifty-five cubic feet per second to ninety-three cubic feet per second." **\*832** 86 S.W.3d at 703. Second, the City was aware that water flowed across the Wilson property before the development commenced, and, as the court of appeals pointed out, the City's Director of Public Works admitted that the City knew the development would increase the water's flow and velocity; specifically, he testified that "the City knew the upstream water would be absorbed less and would flow faster due to the removal of trees and vegetation from the developments and from the forty-five-foot-wide earthen channel" that ended at the Wilson property's edge. Id. at 705. Finally, there was evidence that the City received a letter warning that the developers' plan would subject the Wilson property to flooding.

While I believe there is some evidence that the City knew flooding was substantially certain to occur, there is also

some evidence that it did not. City officials testified that they relied on the representations of engineers who assured them retention ponds could substitute for a drainage easement and the Wilson property would not be damaged. If the jury accepted this evidence as true, I agree that the intent element would be negated, which would preclude the City's takings liability. But I do not agree that the jury was bound to accept the City's testimony as true. The Court itself notes that jurors "may choose to believe one witness and disbelieve another," and that "[c]ourts reviewing all the evidence in a light favorable to the verdict thus assume that jurors credited testimony favorable to the verdict and disbelieved testimony contrary to it." 168 S.W.3d at 819. This statement mirrors our prior jurisprudence, which has long provided that a jury "has several alternatives available when presented with conflicting evidence" because it "may believe one witness and disbelieve others," "may resolve inconsistencies in the testimony of any witness," and "may accept lay testimony over that of experts." *McGalliard v. Kuhlmann,* 722 S.W.2d 694, 697 (Tex.1986) (citations omitted).

As the Court itself states, jurors are required to credit undisputed testimony only when it is "clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted." 168 S.W.3d at 820. The City's testimony does not meet this standard. The City Manager did testify that the City "would not have approved the developments unless [it was] assured that the developments did not increase the velocity of water or the flow of water" onto the neighboring property. 86 S.W.3d at 706. But the Wilsons disputed whether the City's protestations were credible, pointing out that the City had a powerful incentive to profess a lack of knowledge through reliance on the engineers' assurances because it would then avoid the considerable expense of compensating the Wilsons for the property that would otherwise have been condemned under the Master Drainage Plan. *See id.* at 705.

Moreover, the Court's conclusion that juries cannot disregard a party's reliance on expert opinions is not consistent with our jurisprudence. The Court cites two cases for this proposition, but neither supports the Court's analysis; instead, both cases support the conclusion that the jury, as the finder of fact, should appropriately resolve factual disputes regarding a party's reliance on hired experts. *Provident Am. Ins. Co. v. Castañeda,* 988 S.W.2d 189, 194–95 (Tex.1998); *State Farm Lloyds v. Nicolau,* 951 S.W.2d 444, 448–50 (Tex.1997).

In *Castañeda,* a bad-faith insurance case, there was no question that the insurer had relied on an expert's assurances and thus no dispute about whether the **\*833** jury could have disregarded that evidence. *Castañeda,* 988 S.W.2d at 194–95. In that case, we performed a traditional legal sufficiency analysis and concluded there was no evidence that the defendant acted in bad faith. *Id.* at 194. We did state that reliance on an expert's opinion will not preclude a finding of bad faith if the expert's opinion was "unreliable and the insurer knew or should have known that to be the case." *Id.* However, we did not hold that the jury must credit a party's testimony that it relied on an expert.

We reiterated this point in *Nicolau,* another bad-faith insurance case. There, the Court noted "we have never held that the mere fact that an insurer relies upon an expert's report to deny a claim automatically forecloses bad faith recovery as a matter of law," and again concluded that purported "reliance upon an expert's report, standing alone, will not necessarily shield" the defendant from liability. *Nicolau,* 951 S.W.2d at 448. The Court conceded that "[w]ere we the trier of fact in this case, we may well have concluded that [the insurer] did not act in bad faith," but concluded that the "determination is not ours to make" because "the Constitution allocates that task to the jury and prohibits us from reweighing the evidence." *Id.* at 450 (citing TEX. CONST. art. I, § 15, art. V, §§ 6, 10).

The same is true in this case. The jury was not required to believe that the City did not know flooding was substantially certain to occur because it relied on assurances to the contrary; as a reviewing Court, we should "assume that jurors credited testimony favorable to the verdict and disbelieved testimony contrary to it." 168 S.W.3d at 819. Such credibility determinations are uniquely suited and constitutionally committed to the fact finder. *See* TEX. CONST. art. I, § 15, art. V, § 6; *see also Nicolau,* 951 S.W.2d at 450.

## II

Although I disagree with the Court's conclusion that the jury was required to credit the City's testimony, I agree with its judgment in the City's favor because, in my view, the City's mere approval of the private development plans did not result in a taking for public use, as the constitutional standard requires for a compensable taking. TEX. CONST. art. I, § 17. The City did not appropriate or even regulate the use of the Wilsons' land, nor did it design the drainage plan for the proposed subdivisions. Instead, the City merely approved

subdivision plans designed by private developers, and that design included inadequate drainage capabilities. The City argues, and I agree, that its mere approval of private plans did not transfer responsibility for the content of those plans from the developers to the City. Municipalities review subdivision plats "to ensure that subdivisions are safely constructed and to promote the orderly development of the community." *City of Round Rock v. Smith,* 687 S.W.2d 300, 302 (Tex.1985); *see* TEX. LOC. GOV'T CODE § 212.002. Such a review is intended to protect the city's residents; it is not intended to transfer responsibility for a flawed subdivision design from the developers to the municipality. *See, e.g., City of Round Rock,* 687 S.W.2d at 302; *see also Cootey v. Sun Inv., Inc.,* 68 Haw. 480, 718 P.2d 1086, 1091 (1986) (holding that "[t]he permit process by which the County approves or disapproves the development of a proposed subdivision reflects an effort by government to require the developer to meet his responsibilities under the subdivision rules, regulations, and laws," and that "the primary responsibility of providing an adequate and safe development rests with ... the developer, and not with the County").

Because the primary responsibility for a development's design rests with the developer, **\*834** and because the plat-approval process does not transfer such responsibility to the municipality, mere plat approval cannot be a basis upon which to predicate takings liability. We have held that, to be liable for a taking, a governmental entity must "perform certain acts in the exercise of its lawful authority ... which resulted in the taking or damaging of plaintiffs' property, and which acts were the *proximate cause* of the taking or damaging of such property." *State v. Hale,* 136 Tex. 29, 146 S.W.2d 731, 736 (1941) (emphasis added). In this case, flooding resulted from the developers' defective drainage design, not from the City's approval of the plat; thus, the City's approval was not the proximate cause of the damage to the Wilson property.

Other courts, faced with similar facts, have also concluded that a governmental entity cannot be liable for a taking when its only action is to approve a private development plan. *See Phillips v. King County,* 136 Wash.2d 946, 968 P.2d 871, 879 (1998); *see also Pepper v. J.J. Welcome Constr. Co.,* 73 Wash.App. 523, 871 P.2d 601, 606 (1994). In *Phillips,* the Washington Supreme Court observed that there is no public aspect to a private development and concluded that "[i]f the county or city were liable for the negligence of a private developer, based on approval under existing regulations, then the municipalities, and ultimately

the taxpayers, would become the guarantors or insurers for the actions of private developers whose development damages neighboring properties." *Phillips,* 968 P.2d at 878. The court in *Pepper* similarly examined an inverse condemnation claim based upon a county's approval of private developments with defective drainage plans; it, too, concluded that the county's approval did not cause the resultant flooding and did not result in an unconstitutional taking. *Pepper,* 871 P.2d at 606. The court noted that the flooding was "not the result of the County appropriating or regulating their use of the land," and held that "[t]he fact that a county regulates development and requires compliance with road and drainage restrictions does not transform a private development into a public project." *Id.* The court concluded that because "land use regulation of [the plaintiffs'] property did not cause the damages, no inverse condemnation was involved." *Id.* I am persuaded by the reasoning of the courts in *Phillips* and *Pepper,* and would similarly conclude that the City's plat approval in this case did not amount to an unconstitutional taking as a matter of law.

The court of appeals in this case advanced an alternative reason for affirming the trial court's judgment, suggesting that even if the City could not be liable for merely approving a subdivision plat, it could nevertheless be held liable for failing to condemn a drainage easement across the Wilson property. 86 S.W.3d at 707. The court of appeals stated that "the City chose not to condemn any of the Wilson property," but instead "allow[ed] the water flowing from the Sebastian easement to discharge, uncontrolled, across the Wilson property." *Id.* As noted above, however, it was the developers' plan—not the City's actions—that allowed the water to flood the Wilson property. Because the City's action did not cause the flooding, I disagree that the City's failure to condemn an easement is relevant to takings liability. If the City were responsible for the flooding but chose not to condemn the property, it might be subject to inverse-condemnation liability. *See Tarrant County Reg'l Water Dist. v. Gragg,* 151 S.W.3d 546, 554 (Tex.2004) ("When the government takes private property without first paying for it, the owner may recover damages for inverse condemnation."). However, if a governmental entity's actions are not the **\*835** "proximate cause of the taking or damaging" of the property, then the entity cannot be liable for a taking. *Hale,* 146 S.W.2d at 736. Accordingly, the entity need not condemn property merely because a private entity is causing damage. This rule does not leave owners of flooded property without a remedy; when a private development floods neighboring land, the owner of the damaged property will ordinarily have recourse against the private parties causing the damage. *See* TEX.

WATER CODE § 11.086(a), (b) (providing that "[n]o person may divert or impound the natural flow of surface waters in this state ... in a manner that damages the property of another by the overflow of the water diverted or impounded" and that "[a] person whose property is injured by an overflow of water caused by an unlawful diversion or impounding has remedies at law and in equity and may recover damages occasioned by the overflow"). Because the developers' design of the plat—not the City's approval—caused the flooding damage in this case, I would hold that the City cannot be held liable for an unconstitutional taking under Article I, Section 17 of the Texas Constitution.

## III

Because I believe the Court fails to give due regard to the jury's right to make credibility determinations, I cannot join Part V of the Court's opinion. But because I conclude that the City's mere act of approving a private development plan did not cause the Wilson property to be "taken, damaged or destroyed for or applied to public use," TEX. CONST. art. I, § 17, I agree that the City cannot be held liable for a taking in this case. Accordingly, I concur in the Court's judgment.

**Parallel Citations**

48 Tex. Sup. Ct. J. 848

Footnotes

1    The City of Fort Worth asserts in an amicus brief that in 2001 alone it approved 325 subdivision plats creating 5,857 residential lots within its extraterritorial jurisdiction, which of course excludes surrounding communities.

2    Evidence at trial and briefs by amici indicate that cities normally acquire title to these easements to ensure they are properly mowed and maintained after the developers' departure.

3    TEX. CONST. art. I, § 17; *City of Dallas v. Jennings,* 142 S.W.3d 310, 313–14 (Tex.2004).

4    86 S.W.3d 693, 715, 717.

5    *Id.* at 700.

6    *See, e.g., Wal–Mart Stores, Inc. v. Canchola,* 121 S.W.3d 735, 739 (Tex.2003) (per curiam); *Bradford v. Vento,* 48 S.W.3d 749, 754 (Tex.2001); *City of Fort Worth v. Zimlich,* 29 S.W.3d 62, 69 (Tex.2000); *Wal–Mart Stores, Inc. v. Gonzalez,* 968 S.W.2d 934, 936 (Tex.1998); *Cont'l Coffee Prods. Co. v. Cazarez,* 937 S.W.2d 444, 450 (Tex.1996); *Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 499 (Tex.1995); *Browning–Ferris, Inc. v. Reyna,* 865 S.W.2d 925, 928 (Tex.1993); *Holt Atherton Indus., Inc. v. Heine,* 835 S.W.2d 80, 84 (Tex.1992); *Weirich v. Weirich,* 833 S.W.2d 942, 945 (Tex.1992); *Havner v. E–Z Mart Stores, Inc.,* 825 S.W.2d 456, 458 (Tex.1992); *Lewelling v. Lewelling,* 796 S.W.2d 164, 166 (Tex.1990); *Burkard v. ASCO Co.,* 779 S.W.2d 805, 806 (Tex.1989) (per curiam); *Brown v. Edwards Transfer Co.,* 764 S.W.2d 220, 223 (Tex.1988); *City of Gladewater v. Pike,* 727 S.W.2d 514, 518 (Tex.1987); *King v. Bauer,* 688 S.W.2d 845, 846 (Tex.1985); *Tomlinson v. Jones,* 677 S.W.2d 490, 492 (Tex.1984); *Glover v. Tex. Gen. Indem. Co.,* 619 S.W.2d 400, 401 (Tex.1981) (per curiam); *Holley v. Adams,* 544 S.W.2d 367, 370 (Tex.1976); *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965); *Wininger v. Ft. Worth & D.C. Ry. Co.,* 105 Tex. 56, 143 S.W. 1150, 1152 (1912).

7    *See, e.g., St. Joseph Hosp. v. Wolff,* 94 S.W.3d 513, 519 (Tex.2002) (plurality op.); *Associated Indem. Corp. v. CAT Contracting, Inc.,* 964 S.W.2d 276, 285–86 (Tex.1998); *State Farm Lloyds Ins. Co. v. Maldonado,* 963 S.W.2d 38, 40 (Tex.1998); *Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 48 (Tex.1998); *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997); *White v. Southwestern Bell Tel. Co.,* 651 S.W.2d 260, 262 (Tex.1983); *Burk Royalty v. Walls,* 616 S.W.2d 911, 922 (Tex.1981); *Harbin v. Seale,* 461 S.W.2d 591, 592 (Tex.1970); *De Winne v. Allen,* 154 Tex. 316, 277 S.W.2d 95, 97 (1955); *Hall v. Med. Bldg. of Houston,* 151 Tex. 425, 251 S.W.2d 497, 498 (1952).

8    *Tarrant Reg'l Water Dist. v. Gragg,* 151 S.W.3d 546, 552 (Tex.2004); *Bostrom Seating, Inc. v. Crane Carrier Co.,* 140 S.W.3d 681, 684 (Tex.2004); *Lozano v. Lozano,* 52 S.W.3d 141, 144 (Tex.2001) (per curiam); *La.-Pac. Corp. v. Andrade,* 19 S.W.3d 245, 247 (Tex.1999); *Latham v. Castillo,* 972 S.W.2d 66, 68 (Tex.1998); *Brown v. Bank of Galveston, Nat'l Ass'n,* 963 S.W.2d 511, 513 (Tex.1998).

9    *See, e.g., Coastal Transp. Co. v. Crown Cent. Petroleum Corp.,* 136 S.W.3d 227, 234 (Tex.2004); *Szczepanik v. First S. Trust Co.,* 883 S.W.2d 648, 649 (Tex.1994) (per curiam); *compare Biggers v. Cont'l Bus Sys., Inc.,* 157 Tex. 351, 303 S.W.2d 359, 363 (1957) ("We may consider *only* that evidence, if any, which, viewed in its most favorable light, supports the jury findings, and we must disregard all evidence which would lead to a contrary result.") (emphasis added), *with Biggers v. Cont'l Bus Sys., Inc.,* 157 Tex. 351, 298 S.W.2d 79, 81 (1956) ("[T]he duty of this Court [is] to examine and consider *all* of the evidence bearing on the controlling issues, and having done so to decide whether there is evidence of probative value to support the answers made by the jury to the issues.")

(quotation omitted) (emphasis added), *and Cartwright v. Canode,* 106 Tex. 502, 171 S.W. 696, 698 (1914) ("[W]e must reject all evidence favorable to the plaintiffs in error, and consider only the facts and circumstances which tend to sustain the verdict.... In considering this question, we must take into account all of the facts and circumstances attending the transaction.").

10 *See, e.g.,* W. Wendell Hall, *Standards of Review in Texas,* 34 ST. MARY'S L.J. 1, 159–62 (2002); William V. Dorsaneo, III, *Judges, Juries, & Reviewing Courts,* 53 SMU L.R. 1497, 1498, 1507–11 (2000); Phil Hardberger, *Juries Under Siege,* 30 ST. MARY'S L.J. 1, 40–41 (1998). *But see* William Powers, Jr., *Judge & Jury in the Texas Supreme Court,* 75 TEX. L.REV. 1699, 1699–1700, 1704–19 (1997) (concluding the Court is not changing the no-evidence standard of review but is moving away from broad definitions of duty and toward particularized definitions of duty).

11 Robert W. Calvert was an associate justice of this Court from 1950 to 1960, and Chief Justice from 1961 to 1972.

12 Robert W. Calvert, *"No Evidence" & "Insufficient Evidence" Points of Error,* 38 TEX. L.REV. 361 (1960).

13 *Id.* at 361.

14 "Most of what has been said here is repetitious of what has been said before in the cited cases and articles. The purpose of the writer here has been to try to bring former writings on the subject into compact form and under somewhat closer analysis." *Id.* at 371.

15 *Id.* at 362–63.

16 *See, e.g., King Ranch, Inc. v. Chapman,* 118 S.W.3d 742, 751 (Tex.2003); *Marathon Corp. v. Pitzner,* 106 S.W.3d 724, 727 (Tex.2003) (per curiam); *Uniroyal Goodrich Tire Co. v. Martinez,* 977 S.W.2d 328, 334 (Tex.1998); *Mar. Overseas Corp. v. Ellis,* 971 S.W.2d 402, 409 (Tex.1998); *Merrell Dow Pharm., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997); *Anderson v. City of Seven Points,* 806 S.W.2d 791, 795 n. 3 (Tex.1991); *Cecil v. Smith,* 804 S.W.2d 509, 510 n. 2 (Tex.1991); *Juliette Fowler Homes, Inc. v. Welch Assocs., Inc.,* 793 S.W.2d 660, 666 n. 9 (Tex.1990).

17 Calvert, *supra* note 12, at 364.

18 *See In re J.F.C.,* 96 S.W.3d 256, 266 (Tex.2002); *Uniroyal,* 977 S.W.2d at 340; *Triton Oil & Gas Corp. v. Marine Contractors & Supply, Inc.,* 644 S.W.2d 443, 446 (Tex.1982).

19 Calvert, *supra* note 12, at 364 ("If there is an absolute absence of evidence of a vital fact ... an appellate court has no occasion to concern itself with an abstract rule such as how minds of reasonable men might view the situation.").

20 *New Times, Inc. v. Isaacks,* 146 S.W.3d 144, 158–59 (Tex.2004); *Turner v. KTRK Television, Inc.,* 38 S.W.3d 103, 114 (Tex.2000); *Guisti v. Galveston Tribune,* 105 Tex. 497, 150 S.W. 874, 877–78 (1912).

21 *Bentley v. Bunton,* 94 S.W.3d 561, 581 (Tex.2002) (considering remarks in context of series of talk-show programs); *Turner,* 38 S.W.3d at 115 (holding defamation includes story in which details are right but gist is wrong).

22 *Shell Oil Co. v. Khan,* 138 S.W.3d 288, 292 (Tex.2004).

23 *DeWitt County Elec. Co-op., Inc. v. Parks,* 1 S.W.3d 96, 102 (Tex.1999).

24 *Tiller v. McLure,* 121 S.W.3d 709, 714 (Tex.2003) (per curiam); *see also Tex. Farm Bureau Mut. Ins. Cos. v. Sears,* 84 S.W.3d 604, 610–11 (Tex.2002); *GTE Southwest, Inc. v. Bruce,* 998 S.W.2d 605, 612 (Tex.1999).

25 *See George Grubbs Enters., Inc. v. Bien,* 881 S.W.2d 843, 852–53 (Tex.App.-Fort Worth 1994) (holding that efforts to pressure deaf-mute consumer to buy car were legally sufficient evidence of intentional infliction), *rev'd on other grounds,* 900 S.W.2d 337, 338 (Tex.1995).

26 *See Tiller,* 121 S.W.3d at 714 (holding efforts to pressure widow of contracting party to complete project were legally insufficient evidence of intentional infliction).

27 *See, e.g., id.* at 713–14 (discussing contrary evidence showing defendant's reasonable concerns about timeliness of plaintiff's work); *Sears,* 84 S.W.3d at 612 (discussing contrary evidence that defendant believed claimant was involved in suspicious dealings).

28 *Bostrom Seating, Inc. v. Crane Carrier Co.,* 140 S.W.3d 681, 684, 685 (Tex.2004) (holding no evidence supported defect as comments from deposition "were read out of context").

29 *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.,* 136 S.W.3d 227, 232 n. 1 (Tex.2004) (citing *Henry v. Phillips,* 105 Tex. 459, 151 S.W. 533, 538 (1912)). This rule was changed for hearsay evidence in 1983. *See* TEX.R. EVID. 802 ("Inadmissible hearsay admitted without objection shall not be denied probative value merely because it is hearsay.").

30 *Tex. & P. Ry. Co. v. Ball,* 96 Tex. 622, 75 S.W. 4, 6 (1903).

31 *Minyard Food Stores, Inc. v. Goodman,* 80 S.W.3d 573, 579 (Tex.2002) (holding defamation was not in course and scope of employment as duties required employee to cooperate in investigation but not to lie); *Robertson Tank Lines, Inc. v. Van Cleave,* 468 S.W.2d 354, 360 (Tex.1971) (holding truck driver was not in course of employment during social visit to his father).

32 *Bowles v. Bourdon,* 148 Tex. 1, 219 S.W.2d 779, 782–83 (1949) (affirming directed verdict against malpractice claim as inadequate expert testimony from doctor of same school or practice as defendant rendered proof legally insufficient).

33 *See Leitch v. Hornsby,* 935 S.W.2d 114, 119 (Tex.1996).

34    *See Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 499–500 (Tex.1995) (holding opinion that spray caused frostbite was legally insufficient as it assumed absence of redness when plaintiff admitted the contrary); *Roark v. Allen,* 633 S.W.2d 804, 809 (Tex.1982) (holding opinion that physician should have warned of possible skull fracture was legally insufficient as it assumed physician was aware of fracture when there was no proof he was).

35    *See E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 556 (Tex.1995) (adopting reasoning of *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)).

36    *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 714, 720 (Tex.1997).

37    *Id.* at 711, 724–30.

38    *Kerr–McGee Corp. v. Helton,* 133 S.W.3d 245, 254–57 (Tex.2004).

39    Calvert, *supra* note 12, at 364.

40    *Id.* at 364–65.

41    *Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 601 (Tex.2004) (holding evidence that truck caught fire unaccompanied by proof identifying any defect did not exceed a scintilla, as jurors would have to guess cause); *Marathon Corp. v. Pitzner,* 106 S.W.3d 724, 729 (Tex.2003) (per curiam); *Hammerly Oaks, Inc. v. Edwards,* 958 S.W.2d 387, 392 (Tex.1997); *W. Tel. Corp. v. McCann,* 128 Tex. 582, 99 S.W.2d 895, 900 (Tex.1937); Calvert, *supra* note 12, at 365.

42    *Tubelite, a Div. of Indal, Inc. v. Risica & Sons, Inc.,* 819 S.W.2d 801, 805 (Tex.1991); *see also Litton Indus. Prods., Inc. v. Gammage,* 668 S.W.2d 319, 324 (Tex.1984) (citing *Tex. Sling Co. v. Emanuel,* 431 S.W.2d 538, 541 (Tex.1968)).

43    *Lozano,* 52 S.W.3d at 167.

44    Calvert, *supra* note 12, at 365.

45    *Id.*

46    *Wal–Mart Stores, Inc. v. Gonzalez,* 968 S.W.2d 934, 938 (Tex.1998).

47    *See Marathon Corp. v. Pitzner,* 106 S.W.3d 724, 729 (Tex.2003) (per curiam); *McCann,* 99 S.W.2d at 900.

48    Calvert, *supra* note 12, at 363–64. But other commentators disagree. *See* Powers, *supra* note 10, at 1703–10. We have held that a "conclusively and as a matter of law" point may be asserted under a "no evidence" point. *O'Neil v. Mack Trucks, Inc.,* 542 S.W.2d 112, 113 (Tex.1976). And the cases in this section note that conclusive proof is often asserted by parties that do *not* carry the burden of proof. *See also Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 241 (Tex.2001) (per curiam) (court must first examine record for evidence supporting verdict, ignoring all evidence to the contrary; if there is no such evidence, the court then examines the entire record to see if the contrary finding is established as a matter of law).

49    Calvert, *supra* note 12, at 363–64. *But see, e.g., Cecil v. Smith,* 804 S.W.2d 509, 510 n. 2 (Tex.1991) ("Cecil's points that (1) there was no evidence to support the findings and (2) the contrary of each finding was established as a matter of law will hereinafter collectively be referred to as her "no evidence" points.").

50    *St. Joseph Hosp. v. Wolff,* 94 S.W.3d 513, 519–20 (Tex.2002) (plurality op.) (quoting *Universe Life Ins. Co. v. Giles,* 950 S.W.2d 48, 51 n. 1 (Tex.1997)).

51    *Tex. & N.O.R Co. v. Burden,* 146 Tex. 109, 203 S.W.2d 522, 528, 530 (1947); *see also Prudential Ins. Co. of Am. v. Krayer,* 366 S.W.2d 779, 783 (Tex.1963) (finding evidence of suicide undisputed after disregarding disputed portion of facts).

52    *Sullivan v. Barnett,* 471 S.W.2d 39, 44 (Tex.1971); *Wright v. Vernon Compress Co.,* 156 Tex. 474, 296 S.W.2d 517, 523 (1956) ("[T]he trial court is required to submit only controverted issues. No jury finding is necessary to establish undisputed facts."); *Clark v. Nat'l Life & Accident Ins. Co.,* 145 Tex. 575, 200 S.W.2d 820, 822 (1947) ( "Uncontroverted questions of fact need not be and should not be submitted to the jury for its determination."); *S. Underwriters v. Wheeler,* 132 Tex. 350, 123 S.W.2d 340, 341 (Tex.1939).

53    *County of Bexar v. Santikos,* 144 S.W.3d 455, 460–61 (Tex.2004).

54    *PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd. P'ship,* 146 S.W.3d 79, 97–98 (Tex.2004).

55    *State Farm Lloyds Ins. Co. v. Maldonado,* 963 S.W.2d 38, 40 (Tex.1998).

56    *Wal–Mart Stores, Inc. v. Miller,* 102 S.W.3d 706, 709–10 (Tex.2003) (per curiam).

57    *See Johnson & Johnson Med., Inc. v. Sanchez,* 924 S.W.2d 925, 930 (Tex.1996).

58    *King v. Graham,* 126 S.W.3d 75, 78–79 (Tex.2003) (per curiam) (holding no evidence supported malicious prosecution claim as district attorney admitted prosecution was due to item he overlooked rather than any false statements by defendants).

59    *Travelers Ins. Co. v. Seabolt,* 361 S.W.2d 204, 206 (Tex.1962) (return to regular job in which use of hand was required conclusively established claimant did not suffer total loss of use).

60    *Navarette v. Temple Indep. Sch. Dist.,* 706 S.W.2d 308, 309–10 (Tex.1986) (return to work did not conclusively establish injury was not total as claimant could not do regular work and employer voluntarily accommodated her with lesser duties).

61    *See, e.g., Prudential Ins. Co. of Am. v. Krayer,* 366 S.W.2d 779, 783 (Tex.1963).

62    *See Republic Nat'l Life Ins. Co. v. Heyward,* 536 S.W.2d 549, 552 (Tex.1976).

63  *Uniroyal Goodrich Tire Co. v. Martinez,* 977 S.W.2d 328, 340 (Tex.1998); *Triton Oil & Gas Corp. v. Marine Contractors & Supply, Inc.,* 644 S.W.2d 443, 446 (Tex.1982).

64  811 S.W.2d 557, 560 (Tex.1991).

65  *Id.* at 558.

66  *Id.* at 560. In defense of jurors, it should be noted that the trier-of-fact in *Murdock* was a judge.

67  135 Tex. 7, 136 S.W.2d 1113, 1115 (1940).

68  *Id.*

69  *Id.*

70  *Clewis v. State,* 922 S.W.2d 126, 133 n. 12 (Tex.Crim.App.1996) (en banc) (citation omitted).

71  *Hotchkiss v. Nat'l City Bank,* 200 F. 287, 293 (S.D.N.Y.1911).

72  443 U.S. 307, 320 n. 14, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

73  *Southwestern Bell Tel. Co. v. Garza,* 164 S.W.3d 607, 627 (Tex.2004).

74  Our sister court reviews the legal sufficiency of criminal convictions by considering "*all evidence* which the jury was permitted, whether rightly or wrongly, to consider" in the light most favorable to the prosecution. *Moff v. State,* 131 S.W.3d 485, 488 (Tex.Crim.App.2004); *see also Vodochodsky v. State,* 158 S.W.3d 502, 509 (Tex.Crim.App.2005).

75  *In re J.F.C.,* 96 S.W.3d 256, 266 (Tex.2002).

76  *Bentley v. Bunton,* 94 S.W.3d 561, 596 (Tex.2002); *Turner v. KTRK Television, Inc.,* 38 S.W.3d 103, 120 (Tex.2000).

77  *Garza,* 164 S.W.3d at 627.

78  616 S.W.2d 911, 922 (Tex.1981).

79  *Id.* at 926 (Greenhill, C.J., concurring).

80  *See Coastal Transp. Co. v. Crown Cent. Petroleum Corp.,* 136 S.W.3d 227, 234–35 (Tex.2004).

81  *Universe Life Ins. Co. v. Giles,* 950 S.W.2d 48, 55–56 (Tex.1997).

82  *See id.* at 51 (noting same problem with previous test whether insurer had reasonable basis for denying claim).

83  *See Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co.,* 77 S.W.3d 253, 262–63 (Tex.2002) (finding no evidence of bad faith based in part on defendant's correspondence showing misunderstanding regarding settlement terms); *State Farm Fire & Cas. Co. v. Simmons,* 963 S.W.2d 42, 45 (Tex.1998)(affirming bad-faith verdict after noting that insurer gave contradictory reasons for not interviewing potential arsonists); *Minn. Life Ins. Co. v. Vasquez,* 133 S.W.3d 320, 330 (Tex.App.-Corpus Christi 2004, pet. filed) (finding some evidence of bad faith because, though insurer showed hospital stymied its efforts to obtain records, insurer failed to seek same information from other sources); *Allstate Tex. Lloyds v. Mason,* 123 S.W.3d 690, 704–06 (Tex.App.-Fort Worth 2003, no pet.) (reversing bad-faith verdict for legal insufficiency because insurer reasonably relied on expert report); *Allison v. Fire Ins. Exch.,* 98 S.W.3d 227, 249–50 (Tex.App.-Austin 2002, pet. granted, judgm't vacated w.r.m.) (affirming bad-faith verdict after reviewing insurer's reasons for delay and insured's responsive evidence); *Oram v. State Farm Lloyds,* 977 S.W.2d 163, 167 (Tex.App.-Austin 1998, no pet.) (reversing bad-faith verdict for legal insufficiency because insurer's interpretation of exclusion was reasonable though incorrect).

84  *Wal–Mart Stores, Inc. v. Canchola,* 121 S.W.3d 735, 740 (Tex.2003) (per curiam) (noting liability may be established by proof of discrimination plus proof employer's reason was pretext); *Cont'l Coffee Prods. Co. v. Cazarez,* 937 S.W.2d 444, 452 (Tex.1996) (same).

85  *See, e.g., Univ. of Houston v. Clark,* 38 S.W.3d 578, 583 (Tex.2000) (noting good-faith test considers *all* circumstances on which official acted).

86  *See, e.g., PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd. P'ship,* 146 S.W.3d 79, 94 (Tex.2004) (holding no evidence supported jury verdict applying discovery rule based on contrary evidence that claimant's predecessor knew 3,000 windows had failed).

87  *See, e.g., Provident Am. Ins. Co. v. Castaneda,* 988 S.W.2d 189, 194–95 (Tex.1998) (finding no evidence insurer denied claim in bad faith due to conflicting medical evidence).

88  *See, e.g., State Farm Lloyds v. Nicolau,* 951 S.W.2d 444, 448 (Tex.1997) (holding some evidence showed expert report was pretext and thus denial of claim had no reasonable basis).

89  *Golden Eagle Archery, Inc. v. Jackson,* 116 S.W.3d 757, 761 (Tex.2003); *Jaffe Aircraft Corp. v. Carr,* 867 S.W.2d 27, 28 (Tex.1993); *McGalliard v. Kuhlmann,* 722 S.W.2d 694, 697 (Tex.1986); *Edrington v. Kiger,* 4 Tex. 89, 93 (1849).

90  *McGalliard,* 722 S.W.2d at 697; *Silcott v. Oglesby,* 721 S.W.2d 290, 293 (Tex.1986); *Ford v. Panhandle & Santa Fe Ry. Co.,* 151 Tex. 538, 252 S.W.2d 561, 563 (1952) (holding it was up to jurors "to resolve conflicts and inconsistencies in the testimony of any one witness as well as in the testimony of different witnesses"); *Houston, E. & W.T. Ry. Co. v. Runnels,* 92 Tex. 305, 47 S.W. 971, 972 (1898).

91  *Turner v. KTRK Television, Inc.,* 38 S.W.3d 103, 120 (Tex.2000).

92    *Runnels,* 47 S.W. at 972.

93    *Cochran v. Wool Growers Cent. Storage Co.,* 140 Tex. 184, 166 S.W.2d 904, 907 (1942) (noting the Court "read the entire statement of facts").

94    *Harbin v. Seale,* 461 S.W.2d 591, 594 (Tex.1970); *compare Harbin v. Seale,* 454 S.W.2d 271, 272 (Tex.Civ.App.-Dallas 1970) (reporting defendant's testimony that he was traveling only 40 miles per hour), *rev'd,* 461 S.W.2d 591 (Tex.1970).

95    *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.,* 995 S.W.2d 647, 653–54 (Tex.1999) (holding evidence allowed jurors to disbelieve defendant's experts' testimony even though plaintiff's expert's testimony was shown to be in error); *Runnels,* 47 S.W. at 972; *Cheatham v. Riddle,* 12 Tex. 112, 118 (1854).

96    *PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd. P'ship,* 146 S.W.3d 79, 100 (Tex.2004).

97    *Anchor Cas. Co. v. Bowers,* 393 S.W.2d 168, 169–70 (Tex.1965).

98    *Uniroyal Goodrich Tire Co. v. Martinez,* 977 S.W.2d 328, 338 (Tex.1998); *McGalliard v. Kuhlmann,* 722 S.W.2d 694, 697 (Tex.1986).

99    *Bentley v. Bunton,* 94 S.W.3d 561, 599 (Tex.2002).

100   *See* TEX.R. CIV. P. 166a(c); *Wal–Mart Stores, Inc. v. Reece,* 81 S.W.3d 812, 817 (Tex.2002) (finding no evidence that store knew of puddle based in part on uncontradicted testimony by only employee in the area); *In re Doe 4,* 19 S.W.3d 322, 325 (Tex.2000); *WFAA–TV, Inc. v. McLemore,* 978 S.W.2d 568, 574 (Tex.1998) (holding reporter's detailed explanation of foundation of report established lack of malice as matter of law).

101   *See, e.g., Dresser Indus., Inc. v. Lee,* 880 S.W.2d 750, 754 (Tex.1993); *Lyons v. Millers Cas. Ins. Co.,* 866 S.W.2d 597, 601 (Tex.1993); *Biggers v. Cont'l Bus Sys., Inc.,* 157 Tex. 351, 303 S.W.2d 359, 365 (1957); *Howard Oil Co. v. Davis,* 76 Tex. 630, 13 S.W. 665, 667 (1890) (holding reviewing court must uphold jury verdict despite strong evidence to the contrary if evidence is conflicting).

102   *See, e.g., Gen. Motors Corp. v. Sanchez,* 997 S.W.2d 584, 592 (Tex.1999); *Caller–Times Publ'g Co. v. Triad Communications, Inc.,* 826 S.W.2d 576, 580 (Tex.1992); *Bendalin v. Delgado,* 406 S.W.2d 897, 899 (Tex.1966).

103   *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 48–49 (Tex.1998).

104   *Associated Indem. Corp. v. CAT Contracting, Inc.,* 964 S.W.2d 276, 286 (Tex.1998).

105   *White v. Southwestern Bell Tel. Co.,* 651 S.W.2d 260, 262–63 (Tex.1983).

106   *Hall v. Med. Bldg. of Houston,* 151 Tex. 425, 251 S.W.2d 497, 502 (1952).

107   *St. Joseph Hosp. v. Wolff,* 94 S.W.3d 513, 542–43 (Tex.2002) (plurality op.).

108   *T.O. Stanley Boot Co. v. Bank of El Paso,* 847 S.W.2d 218, 221 (Tex.1992).

109   *Uniroyal Goodrich Tire Co. v. Martinez,* 977 S.W.2d 328, 341–42 (Tex.1998).

110   *De Winne v. Allen,* 154 Tex. 316, 277 S.W.2d 95, 98–99 (1955).

111   *Lozano v. Lozano,* 52 S.W.3d 141, 144 (Tex.2001) (per curiam); *id.* at 162–63 (Hecht, J., concurring and dissenting).

112   *See Tarrant Reg'l Water Dist. v. Gragg,* 151 S.W.3d 546, 552 (Tex.2004); *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.,* 136 S.W.3d 227, 234 (Tex.2004); *Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 601 (Tex.2004); *Mobil Oil Corp. v. Ellender,* 968 S.W.2d 917, 922 (Tex.1998); *Merrell Dow Pharm., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997); *Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 499 (Tex.1995); *Transp. Ins. Co. v. Moriel,* 879 S.W.2d 10, 25 (Tex.1994); *Orozco v. Sander,* 824 S.W.2d 555, 556 (Tex.1992); *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983); *Corbin v. Safeway Stores, Inc.,* 648 S.W.2d 292, 297 (Tex.1983) (per curiam).

113   *See* William Powers, Jr. & Jack Ratliff, *Another Look at "No Evidence" & "Insufficient Evidence,"* 69 TEX. L.R. 515, 517–20 (1991).

114   *Gragg,* 151 S.W.3d at 552; *St. Joseph Hosp. v. Wolff,* 94 S.W.3d 513, 519 (Tex.2002) (plurality op.); *Southwestern Bell Mobile Sys., Inc. v. Franco,* 971 S.W.2d 52, 54 (Tex.1998) (per curiam); *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 48 (Tex.1998); *Havner,* 953 S.W.2d at 711; *Universe Life Ins. Co. v. Giles,* 950 S.W.2d 48, 75 (Tex.1997) (Hecht, J., concurring); *Preferred Heating & Air Conditioning Co. v. Shelby,* 778 S.W.2d 67, 68 (Tex.1989) (per curiam); *Burk Royalty Co. v. Walls,* 616 S.W.2d 911, 922 (Tex.1981); *Harbin v. Seale,* 461 S.W.2d 591, 592 (Tex.1970); *W. Tel. Corp. v. McCann,* 128 Tex. 582, 99 S.W.2d 895, 898 (Tex.1937).

115   *See St. Joseph Hosp.,* 94 S.W.3d at 519–20 (Tex.2002) (plurality op.); *Giles,* 950 S.W.2d at 51 n. 1 (citing *Wininger v. Ft. Worth & D.C. Ry. Co.,* 105 Tex. 56, 143 S.W. 1150, 1152 (1912) and *Tex. & N.O. Ry. Co. v. Rooks,* 293 S.W. 554, 556–57 (Tex.Comm'n.App.1927)).

116   *Southwestern Bell Tel. Co. v. Garza,* 164 S.W.3d 607, 620 (Tex.2004) (citing *Choate v. San Antonio & A.P. Ry.,* 91 Tex. 406, 44 S.W. 69, 69 (1898); *Muhle v. N.Y., T. & M. Ry.,* 86 Tex. 459, 25 S.W. 607, 608 (1894)).

117   *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.,* 136 S.W.3d 227, 234 (Tex.2004); *Qantel Bus. Sys., Inc. v. Custom Controls Co.,* 761 S.W.2d 302, 303 (Tex.1988); *Hart v. Van Zandt,* 399 S.W.2d 791, 793 (Tex.1965); *Triangle Motors v. Richmond,* 152 Tex.

354, 258 S.W.2d 60, 61 (1953); *Ford v. Panhandle & Santa Fe Ry. Co.,* 151 Tex. 538, 252 S.W.2d 561, 562 (1952); *Anglin v. Cisco Mortgage Loan Co.,* 135 Tex. 188, 141 S.W.2d 935, 938 (1940).

118 *Bostrom Seating, Inc. v. Crane Carrier Co.,* 140 S.W.3d 681, 684 (Tex.2004); *S.V. v. R.V.,* 933 S.W.2d 1, 8 (Tex.1996); *Colvin v. Red Steel Co.,* 682 S.W.2d 243, 245 (Tex.1984); *White v. Southwestern Bell Tel. Co.,* 651 S.W.2d 260, 262 (Tex.1983); *Seideneck v. Cal Bayreuther Assocs.,* 451 S.W.2d 752, 753 (Tex.1970); *Dunagan v. Bushey,* 152 Tex. 630, 263 S.W.2d 148, 153 (1953); *Fitz–Gerald v. Hull,* 150 Tex. 39, 237 S.W.2d 256, 258 (1951); *Kelly v. McKay,* 149 Tex. 343, 233 S.W.2d 121, 122 (1950); *White v. White,* 141 Tex. 328, 172 S.W.2d 295, 296 (1943); *McAfee v. Travis Gas Corp.,* 137 Tex. 314, 153 S.W.2d 442, 445 (1941); *Wellington Oil Co. v. Maffi,* 136 Tex. 201, 150 S.W.2d 60, 61 (1941); *Chicago, R.I. & G. Ry. Co. v. Carter,* 261 S.W. 135, 135 (Tex.Com.App.1924, judgm't adopted); *Charles v. El Paso Elec. Ry. Co.,* 254 S.W. 1094, 1094–95 (Tex.Com.App.1923, holding approved, judgm't adopted).

119 *Szczepanik v. First S. Trust Co.,* 883 S.W.2d 648, 649 (Tex.1994) (per curiam); *Vance v. My Apartment Steak House of San Antonio, Inc.,* 677 S.W.2d 480, 483 (Tex.1984); *Corbin v. Safeway Stores, Inc.,* 648 S.W.2d 292, 295 (Tex.1983); *Jones v. Tarrant Util. Co.,* 638 S.W.2d 862, 865 (Tex.1982); *Collora v. Navarro,* 574 S.W.2d 65, 68 (Tex.1978); *Henderson v. Travelers Ins. Co.,* 544 S.W.2d 649, 650 (Tex.1976); *Jones v. Nafco Oil & Gas, Inc.,* 380 S.W.2d 570, 574 (Tex.1964).

120 Act of April 25, 1931, 42d Leg., R.S., ch. 77, § 1, 1931 Tex. Gen. Laws 119; *Myers v. Crenshaw,* 134 Tex. 500, 137 S.W.2d 7, 13 (Tex.1940); *Hines v. Parks,* 128 Tex. 289, 96 S.W.2d 970, 971 (Tex.1936). *Cf. Deal v. Craven,* 277 S.W. 1046, 1047 (Tex.Com.App.1925, judgm't adopted) ("It has long been settled in this state that the judgment must follow the verdict, and that the courts are without power to enter a judgment notwithstanding a verdict upon a material issue.").

121 *Brown v. Bank of Galveston, Nat'l Ass'n,* 963 S.W.2d 511, 513 (Tex.1998) ("[W]e consider the evidence in the light most favorable to the verdict and reasonable inferences that tend to support it."); *Trenholm v. Ratcliff,* 646 S.W.2d 927, 931 (Tex.1983) ("In acting on the motion [for judgment notwithstanding the verdict], *all* testimony must be viewed in a light most favorable to the party against whom the motion is sought, and every reasonable intendment deducible from the evidence is to be indulged in that party's favor.") (emphasis added); *Dowling v. NADW Mktg., Inc.,* 631 S.W.2d 726, 728 (Tex.1982) (same); *Douglass v. Panama, Inc.,* 504 S.W.2d 776, 777 (Tex.1974) (same); *Leyva v. Pacheco,* 163 Tex. 638, 358 S.W.2d 547, 550 (1962) (same); *Houston Fire & Cas. Ins. Co. v. Walker,* 152 Tex. 503, 260 S.W.2d 600, 603–04 (1953) (affirming trial court's implied disregard of one jury answer based on "consideration of the transcript as a whole"); *Burt v. Lochausen,* 151 Tex. 289, 249 S.W.2d 194, 199 (1952) ("[W]e must consider *all the testimony in the record* from the standpoint most favorable to the plaintiff.") (emphasis added); *Neyland v. Brown,* 141 Tex. 253, 170 S.W.2d 207, 211 (Tex.1943) (considering judgment non obstante veredicto "in the light of the record as a whole"); *Le Master v. Fort Worth Transit Co.,* 138 Tex. 512, 160 S.W.2d 224, 225 (1942) ("[W]e must view LeMaster's testimony, *as well as all other testimony in the record,* from a standpoint most favorable to him.") (emphasis added); *McAfee v. Travis Gas Corp.,* 137 Tex. 314, 153 S.W.2d 442, 445 (1941) ("[W]e must regard the evidence contained in this record in its most favorable light for McAfee ... because of the instructed verdict and judgment non obstante veredicto."); *see also Ballantyne v. Champion Builders, Inc.,* 144 S.W.3d 417, 424–29 (Tex.2004) (upholding judgment non obstante veredicto based on conclusive evidence contrary to verdict).

122 *See Tiller v. McLure,* 121 S.W.3d 709, 713 (Tex.2003) (per curiam); *Wal–Mart Stores, Inc. v. Miller,* 102 S.W.3d 706, 709 (Tex.2003) (per curiam); *Mancorp, Inc. v. Culpepper,* 802 S.W.2d 226, 227 (Tex.1990); *Best v. Ryan Auto Group, Inc.,* 786 S.W.2d 670, 671 (Tex.1990) (per curiam); *Navarette v. Temple Indep. Sch. Dist.,* 706 S.W.2d 308, 309 (Tex.1986); *Tomlinson v. Jones,* 677 S.W.2d 490, 492 (Tex.1984); *Williams v. Bennett,* 610 S.W.2d 144, 145 (Tex.1980); *Freeman v. Tex. Comp. Ins. Co.,* 603 S.W.2d 186, 191 (Tex.1980); *Dodd v. Tex. Farm Prods. Co.,* 576 S.W.2d 812, 814–15 (Tex.1979); *Campbell v. Northwestern Nat'l Life Ins. Co.,* 573 S.W.2d 496, 497 (Tex.1978); *Miller v. Bock Laundry Mach. Co.,* 568 S.W.2d 648, 650 (Tex.1977); *Sobel v. Jenkins,* 477 S.W.2d 863, 865 (Tex.1972); *C. & R. Transp., Inc. v. Campbell,* 406 S.W.2d 191, 193 (Tex.1966).

123 *See Tiller,* 121 S.W.3d at 713 (citing *Bradford v. Vento,* 48 S.W.3d 749, 754 (Tex.2001)); *Miller,* 102 S.W.3d at 709 (same); *Best,* 786 S.W.2d at 671 (citing *King v. Bauer,* 688 S.W.2d 845, 846 (Tex.1985)); *Tomlinson,* 677 S.W.2d at 492 (citing *Glover v. Tex. Gen. Indem. Co.,* 619 S.W.2d 400, 401 (Tex.1981)); *Campbell,* 573 S.W.2d at 497 (citing *Martinez v. Delta Brands, Inc.,* 515 S.W.2d 263, 265 (Tex.1974)); *Campbell,* 406 S.W.2d at 193 (citing *Cartwright v. Canode,* 106 Tex. 502, 171 S.W. 696, 697–98 (1914)).

124 *IHS Cedars Treatment Ctr. of Desoto, Tex., Inc. v. Mason,* 143 S.W.3d 794, 798 (Tex.2004); *Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 215–16 (Tex.2003); *Wal–Mart Stores, Inc. v. Rodriguez,* 92 S.W.3d 502, 506 (Tex.2002); *Gonzalez v. Mission Am. Ins. Co.,* 795 S.W.2d 734, 736 (Tex.1990); *Bayouth v. Lion Oil Co.,* 671 S.W.2d 867, 868 (Tex.1984).

125 *See* TEX.R. CIV. P. 166a(i).

126 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

127 FED.R.CIV.P. 50(a)(1).

128 336 U.S. 53, 69 S.Ct. 413, 93 L.Ed. 497 (1949).

129 *Id.* at 57, 69 S.Ct. 413.

130 *Reeves,* 530 U.S. at 149–50, 120 S.Ct. 2097 (citations omitted).

131 *Carter v. Steverson & Co.,* 106 S.W.3d 161, 166 (Tex.App.-Houston [1st Dist.] 2003, pet. denied) (emphasis added) (citation omitted); *accord Long v. Long,* 144 S.W.3d 64, 67 (Tex.App.-El Paso 2004, no pet.); *Gore v. Scotland Golf, Inc.,* 136 S.W.3d 26, 29 (Tex.App.-San Antonio 2003, pet. denied); *Exxon Corp. v. Breezevale Ltd.,* 82 S.W.3d 429, 438 (Tex.App.-Dallas 2002, pet. denied); *N. Am. Van Lines, Inc. v. Emmons,* 50 S.W.3d 103, 113 n. 3 (Tex.App.-Beaumont 2001, pet. denied); *Molina v. Moore,* 33 S.W.3d 323, 329 (Tex.App.-Amarillo 2000, no pet.); *Wal–Mart Stores, Inc. v. Itz,* 21 S.W.3d 456, 470 n. 3 (Tex.App.-Austin 2000, pet. denied); *see also In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951) (per curiam) (holding court of appeals erred in failing to distinguish between legal and factual sufficiency review by not weighing all the evidence when conducting the latter).

132 *Burk Royalty Co. v. Walls,* 616 S.W.2d 911, 922 (Tex.1981) (noting that review of gross negligence finding by considering all the evidence appeared to but did not conflict with traditional no-evidence test).

133 Dorsaneo, *supra* note 10, at 1503; *see also* Hardberger, *supra* note 10, at 17 (arguing exclusive standard is "designed to afford high deference to jury verdicts").

134 *State v. Biggar,* 873 S.W.2d 11, 13 (Tex.1994).

135 *See, e.g., CMH Homes, Inc. v. Daenen,* 15 S.W.3d 97, 102 (Tex.2000) (noting plaintiff argued defendant's frequent inspections of stairs showed knowledge of inherent danger, while court held it showed the opposite as inspections found nothing); *State Farm Fire & Cas. Co. v. Simmons,* 963 S.W.2d 42, 45 (Tex.1998) (affirming bad-faith verdict after noting insurer's reasons for denial were contradictory).

136 *See, e.g., Wal–Mart Stores, Inc. v. Alexander,* 868 S.W.2d 322, 327 (Tex.1993) (noting evidence of single previous minor stumble supported negligence finding but not gross negligence).

137 *See* Judith Resnik, *Managerial Judges,* 96 HARV. L.R.. 374, 382–83 (1982) (noting that images of justice appeared blindfolded only within the last four hundred years).

138 Justice Calvert's use of the masculine in 1960 may perhaps be forgiven, for although Hattie Hennenberg, Hortense Ward, and Ruth Brazzil served temporarily on this Court in 1925, and Sarah T. Hughes was appointed as a state district judge ten years later, it was not until 1954 that the Texas Constitution was amended to allow women to serve as jurors, and not until 1973 that Mary Lou Robinson became the first women to serve as a state appellate judge. See James T. "Jim" Worthen, *The Organizational & Structural Development of Intermediate Appellate Courts in Texas,* 46 S. TEX. L.REV. 33, 75 (2004); Robert L. Dabney, Jr. *We Were There,* HOUSTON B.J. Nov.-Dec.1999, at 42, 44.

139 Calvert, *supra* note 12, at 364.

140 *Wilkerson v. McCarthy,* 336 U.S. 53, 65, 69 S.Ct. 413, 93 L.Ed. 497 (1949) (Frankfurter, J., concurring).

141 86 S.W.3d 693, 709.

142 *Id.* at 703, 705.

143 *Id.* at 705.

144 *Id.* at 704–05.

145 *Provident Am. Ins. Co. v. Castañeda,* 988 S.W.2d 189, 194–95 (Tex.1998); *see also State Farm Lloyds v. Nicolau,* 951 S.W.2d 444, 448 (Tex.1997) (holding reliance on expert report did not foreclose bad-faith claim because claimant "presented evidence from which a fact-finder could logically infer that Haag's reports were not objectively prepared, that State Farm was aware of Haag's lack of objectivity, and that State Farm's reliance on the reports was merely pretextual.").

146 *Cf. Nissan Motor Co. Ltd. v. Armstrong,* 145 S.W.3d 131, 140 (Tex.2004) (holding complaint letters may require manufacturer to investigate, but are not evidence complaints are true).

147 *Tarrant Reg'l Water Dist. v. Gragg,* 151 S.W.3d 546, 555 (Tex.2004) (emphasis added).

292 S.W.3d 14
Supreme Court of Texas.

CITY OF PASADENA, Texas, Petitioner

v.

Richard SMITH, Respondent.

No. 06–0948. | Argued Sept. 10, 2008. | Decided Aug. 28, 2009.

**Synopsis**

**Background:** City, appealing decision by independent hearing examiner to dismiss city's notice of suspension against police officer, filed its original petition in district court. The 113th Judicial District Court, Harris County, Patricia Ann Hancock, J., granted police officer's plea to the jurisdiction and dismissed the city's lawsuit. City appealed. The Court of Appeals, 263 S.W.3d 80, Terry Jennings, J., affirmed. City petitioned for review.

**Holdings:** The Supreme Court of Texas, Hecht, J., held that:

[1] hearing examiner exceeded his jurisdiction in summarily reversing a municipal police officer's indefinite suspension, and

[2] city's petition was timely filed.

Reversed and remanded.

West Headnotes (6)

[1]     **Constitutional Law**
        Presumptions and Construction as to Constitutionality

        When faced with multiple constructions of a statute, the Supreme Court must interpret the statutory language in a manner that renders it constitutional if it is possible to do so.

        1 Cases that cite this headnote

[2]     **Municipal Corporations**
        
        Proceedings

        A hearing examiner may exceed his jurisdiction under the Local Government Code, in a disciplinary action involving a municipal employee, even if his decision is reasoned rather than arbitrary. V.T.C.A., Local Government Code § 143.057(j).

        5 Cases that cite this headnote

[3]     **Municipal Corporations**
        Proceedings

        A hearing examiner exceeds his jurisdiction, in a disciplinary action involving a municipal employee, when his acts are not authorized by the Local Government Code or are contrary to it, or when they invade the policy-setting realm protected by the nondelegation doctrine. V.T.C.A., Local Government Code § 143.057(j).

        12 Cases that cite this headnote

[4]     **Municipal Corporations**
        Review in general

        Independent hearing examiner in civil service disciplinary action exceeded his jurisdiction in summarily reversing municipal police officer's indefinite suspension and reinstating him with back pay and full benefits because the Local Government Code required the examiner to reach a decision based on evidence. V.T.C.A., Local Government Code §§ 143.010(g), 143.057(j).

        6 Cases that cite this headnote

[5]     **Municipal Corporations**
        Review in general

        In absence of express statutory provision for appeal by a city of independent hearing examiner's decision, city's appeal of decision by examiner to dismiss city's notice of suspension against municipal police officer was governed by analogous statute, providing for 10-day filing period for police officer's filing of petition to set aside, applicable to a city with a population of less than 1.5 million, rather than statute, providing 10-day filing period, applicable to

a cities with a population of more than 1.5 million. V.T.C.A., Local Government Code §§ 143.015(a), 143.1016(j).

2 Cases that cite this headnote

**[6]**    **Municipal Corporations**
           Review in general

City's appeal of decision by independent hearing examiner to dismiss city's notice of suspension against police officer was timely, where appeal was filed within ten days after receipt of decision. V.T.C.A., Local Government Code § 143.015(a).

7 Cases that cite this headnote

**Attorneys and Law Firms**

**\*15** Kevin D. Jewell, William S. Helfand, Norman R. Giles, Chamberlain, Hrdlicka, White, Williams & Martin, Houston, TX, for Petitioner.

Heidi Lee Widell, San Antonio, TX, for Respondent.

Marcus L. Dobbs, Senior Assistant City Attorney, Houston, TX, for Amicus Curiae–City of Houston.

Evelyn Waithira Njuguna, Texas Municipal League, Austin, TX, for Amicus Curiae–Texas Municipal League.

James C. Ho, Solicitor General of Texas, Austin, TX, for Amicus Curiae–State of Texas.

B. Craig Deats, Deats Durst Owen & Levy, P.L.L.C., Austin, TX, for Amicus Curiae–TX Assoc. of Firefighters.

**Opinion**

Justice HECHT delivered the opinion of the Court.

The Fire Fighters and Police Officers Civil Service Act [1] limits the grounds for judicial review of a hearing examiner's decision in an appeal from a disciplinary suspension, [2] but as we observed in *City of Houston v. Clark,* if those limitations do not allow for meaningful review, they may violate constitutional restrictions on the delegation of government authority to a private person. [3] One ground is that the

hearing officer exceeded his jurisdiction. [4] In this case we hold that the hearing examiner exceeded his jurisdiction in summarily reversing an officer's indefinite suspension and reinstating him with back pay and full benefits because the Act requires a hearing examiner to reach a decision based on evidence. Accordingly, we reverse the judgment of the court of appeals [5] and remand the case to the district court for further proceedings.

City of Pasadena Police Chief M.A. Massey suspended officer Richard Smith indefinitely. The Act gave Smith two routes of appeal—either to the City's civil service commission [6] or to an independent third-party hearing examiner [7]—independent third-party hearing examiner—and he chose the latter, as civil service employees often do. [8] The parties selected a hearing examiner from a list provided by the **\*16** American Arbitration Association. [9] When the hearing convened, counsel for the City announced ready, but counsel for Smith moved that the suspension be overturned and that Smith be reinstated without further ado because Chief Massey —the department head [10] on whose statement the suspension was based [11]—was not present. The City's counsel stated that he was prepared to prove the grounds for the suspension through Assistant Chief Rahr, who was present, but the hearing examiner agreed with Smith, concluding that "these charges should be dismissed". The hearing concluded in less than half an hour without any evidence being presented.

Later, in a written decision, the hearing examiner ruled that Smith should be reinstated, that he should be fully compensated for the time he had been suspended, and that all service credits and benefits should be restored. The written decision gave as the sole ground for the ruling: "As the Department Head failed to appear under Texas Local Government Code, Section 143.1015(2)(k)(4), at hearing on December 9, 2004, the Hearing Examiner upheld the appeal and dismissed the charges against Officer Smith." No such section exists. The hearing examiner apparently meant section 143.1015(k) of the Act, which states in part: "The director [of fire fighters' and police officers' civil service [12] ] may not send the hearing examiner the department head's original written statement. The department head shall submit the written statement and charges to the hearing examiner at the hearing." [13] The hearing examiner also appears to have overlooked the fact that some of the Act's provisions, including section 143.1015, apply only to a city with a

population of at least 1.5 million—viz, Houston.[14] The City of Pasadena, a Houston suburb, does not qualify.[15]

**\*17** The City petitioned the district court for review. Smith filed a plea to the jurisdiction, arguing that the City's petition was untimely. The court sustained the plea, and the City appealed. Without addressing the timeliness of the appeal,[16] the court held that the district court had no jurisdiction over the case under section 143.057(j) of the Act.[17] We granted the City's petition for review.[18]

Section 143.057(j), which is not limited to cities over 1.5 million,[19] states in pertinent part: "A district court may hear an appeal of a hearing examiner's award only on the grounds that the arbitration panel was without jurisdiction or exceeded its jurisdiction or that the order was procured by fraud, collusion, or other unlawful means."[20] Because subsection 143.057(j) is identical to the provision we construed in *Clark,* section 143.1016(j), though that section applies only to Houston,[21] *Clark* applies to all civil service cities.[22]

*Clark* rejected the argument that only a fire fighter or police officer can appeal to the district court and held that a municipality may appeal as well, even though the statute is silent on the subject.[23] In reaching that conclusion, we were mindful that "interpreting Section 143.1016(j) to foreclose municipalities' appellate rights could well render the Legislature's delegation of authority to independent hearing examiners constitutionally suspect."[24] The potential problem was the nondelegation doctrine— the Texas Constitution's restrictions on the delegation of governmental power, especially to private persons, which we thoroughly explained in *Texas Boll Weevil Eradication Foundation, Inc. v. Lewellen.*[25] There, we reiterated:

> The Texas Legislature may delegate its powers to agencies established to carry out legislative purposes, as long as it establishes reasonable standards to guide the entity to which the powers are delegated.
> * * *
> The separation of powers clause [TEX. CONST. art. II, § 1] requires that the standards of delegation be reasonably clear and hence acceptable as a standard **\*18** of measurement.[26]

A delegation of power without such standards is an abdication of the authority to set government policy which the Constitution assigns to the legislative department. While legislative delegations of authority to other governmental entities can raise constitutional concerns,

> private delegations clearly raise even more troubling constitutional issues than their public counterparts. On a practical basis, the private delegate may have a personal or pecuniary interest which is inconsistent with or repugnant to the public interest to be served. More fundamentally, the basic concept of democratic rule under a republican form of government is compromised when public powers are abandoned to those who are neither elected by the people, appointed by a public official or entity, nor employed by the government. Thus, we believe it axiomatic that courts should subject private delegations to a more searching scrutiny than their public counterparts.[27]

Applying eight factors,[28] we held that the delegation of power to the private entity in that case was unconstitutional.[29]

We do not determine here whether this Act's delegation of authority to a hearing examiner violates the nondelegation doctrine; we consider only whether the court of appeals' construction of section 143.057(j) raises constitutional concerns. Thus, we do not address all eight factors listed in *Boll Weevil* but focus on the first one—whether the hearing examiner's "actions [are] subject to meaningful review by a state agency or other branch of state government"[30]— because it is directly implicated by the scope of review in section 143.057(j). The Act's use of independent hearing examiners provides a forum for resolving civil service disputes that is detached from city government, thus furthering the Act's purpose of "secur[ing] efficient fire and police departments composed of capable personnel who are free from political influence and who have permanent employment tenure as public servants."[31] In *Proctor v. Andrews,* we rejected the contention that the Act violates the nondelegation doctrine by failing to provide adequate

standards for assuring that arbitrators are qualified and neutral. [32] Here, the State as amicus curiae argues that submission of civil service disputes to hearing examiners is simply a resort to arbitration and therefore raises no constitutional concerns. [33] But if the Act does not bind hearing examiners to definite **\*19** standards for reaching decisions and instead gives them broad latitude in determining not only factual disputes but the applicable law, they become not merely independent arbiters but policy makers, which is a legislative function. This would raise nondelegation concerns, an issue noted but not addressed in *Proctor.* [34] It is one thing for a hearing examiner to determine whether conduct for which an officer or fire fighter has been disciplined occurred as charged; it is quite another thing for a hearing examiner to decide whether conduct that did occur deserves discipline. If a city can invoke judicial review to require that a hearing examiner's ruling be made according to law, one concern of the nondelegation doctrine is satisfied. But as we observed in *Clark,* "if the right of appeal provided by Section 143.1016(j) does not afford a city meaningful review of the merits of a [hearing examiner's] decision, ... delegation of grievance decisions to an independent hearing examiner may raise constitutional problems." [35]

 **[1]** Thus, in construing the scope of judicial review permitted by section 143.057(j), we must be mindful as in *Clark* that "[w]hen faced with multiple constructions of a statute, we must interpret the statutory language in a manner that renders it constitutional if it is possible to do so". [36] The City argues that the hearing examiner's summary ruling exceeded his jurisdiction within the meaning of section 143.057(j). The statute actually refers to an "arbitration panel" exceeding its jurisdiction, but the term includes a hearing examiner. [37] The reference to arbitration suggests the source for the statutory text. The predecessor to section 143.057(j) was first enacted in 1983. [38] The Texas General Arbitration Act, enacted in 1965, uses similar language in providing that a court can vacate an arbitration award "procured by corruption, fraud or other undue means" or where "[t]he arbitrators exceeded their powers". [39] The Federal Arbitration Act, enacted in 1947, uses almost identical language. [40]

 **\*20** An arbitrator derives his power from the parties' agreement to submit to arbitration, [41] and because the law favors arbitration, and arbitration agreements are often quite broad, judicial review of an arbitration award is usually very

narrow. [42] By contrast, an independent hearing examiner's jurisdiction is created by the Act and comes with significant constraints. The Act states that "[i]n each hearing conducted [on appeal from a promotional bypass or disciplinary action], the hearing examiner has the same duties and powers as the [civil service] commission". [43] The Act prescribes various deadlines, procedures, and limitations on the commission, [44] which apply equally to hearing examiners. [45] Importantly, the Act states: "The commission shall conduct the hearing fairly and impartially as prescribed by this chapter and shall render a just and fair decision. The commission may consider only the evidence submitted at the hearing." [46] This provision both confers and limits the power of a commission and a hearing examiner. It mandates that a decision be made on evidence submitted at the hearing.

The hearing examiner in this case violated that requirement. His ruling was based entirely on the absence of the department head, a witness the City did not expect to offer. The hearing examiner did not allow evidence to be presented. Nothing in the Act permitted him to rule as he did. Smith argues that the hearing examiner could reasonably have concluded that since section 143.1015(k) requires the presence of the department head at civil service appeal proceedings in Houston, the same rule should apply in other cities. But the Act does not empower a hearing examiner to make rules. He had no authority to impose on the City a requirement that the Act makes quite clear does *not* apply. Moreover, even when section 143.1015(k) does apply, it does not authorize rendition of a default judgment as an automatic penalty for noncompliance. [47] Smith argues that the hearing examiner can be faulted only for a simple mistake of law, but it clearly exceeds a hearing examiner's jurisdiction to refuse to hear evidence before deciding that a police officer was improperly disciplined, contrary to the express requirement of the Act.

Smith faults the City for not pointing out to the hearing examiner the inapplicability of section 143.1015(k), and for not **\*21** requesting a continuance. Certainly, the City would have been better served had counsel done so. But the City's failure to object to an incorrect citation cannot expand the jurisdiction of a hearing examiner, any more than it could expand the jurisdiction of a trial court.

 **[2]** **[3]** We agree with the court of appeals: "[a]sserting that a decision made by the hearing examiner is incorrect is not the same as asserting that the examiner did not have jurisdiction." [48] In borrowing language from the Texas

Arbitration Act, the Act appears to intend a restrictive standard for judicial review. But the court of appeals failed to recognize that the Act imposes significant limits on hearing examiners' authority to determine disciplinary action disputes, and the nondelegation doctrine requires enforcement of those limits. Those limits restrict a hearing examiner's jurisdiction. It is difficult to distill from these statutory and constitutional constraints a simple, precise standard for determining whether a hearing examiner has exceeded his jurisdiction. Five courts of appeals have stated that it occurs when the ruling amounts to an abuse of authority. [49] Three of the five have added that "[a]n abuse of authority occurs when a decision is so arbitrary and unreasonable that it amounts to a clear and prejudicial error of law." [50] None of these expressions accurately restates the restrictions on a hearing examiner's authority. Even incidental errors in applying the law may be considered clear and prejudicial, and almost any decision seems unreasonable to the loser. A hearing examiner may exceed his jurisdiction even if his decision is reasoned rather than arbitrary. And while a hearing examiner abuses his authority if he exceeds his jurisdiction, the former phrase does nothing to inform the latter. The most accurate test we can state is that a hearing examiner exceeds his jurisdiction when his acts are not authorized by the Act or are contrary to it, or when they invade the policy-setting realm protected by the nondelegation doctrine.

 **[4]**  **[5]**  By that test, the hearing examiner in this case exceeded his jurisdiction, and therefore the City's appeal to the district court was authorized under section 143.057(j). The issue remains whether it was timely perfected. Since the Act does not expressly provide for an appeal by a city—we have construed it to do so to avoid constitutional problems —it understandably does not expressly set a deadline **∗22** for a city's appeal. We have held that "[w]hen a statute lacks an express limitations period, courts look to analogous causes of action for which an express limitations period is available either by statute or by case law." [51] Here, the parties disagree as to whether a deadline for appeal is jurisdictional or in the nature of limitations, and we need not resolve that

issue. In either event, the same rule applies: we look to a provision related to the right of appeal for a deadline. There are two possibilities in the Act. One is section 143.1016(j), applicable only to Houston, which provides that "[i]f the basis for the appeal of the hearing examiner's award is based on the grounds that the arbitration panel was without jurisdiction or exceeded its jurisdiction, the petition must be filed in district court within 10 days of the hearing examiner's decision." [52] The other is section 143.015(a), which applies to other cities:

> If a fire fighter or police officer is dissatisfied with any commission decision, the fire fighter or police officer may file a petition in district court asking that the decision be set aside. The petition must be filed within 10 days after the date the final commission decision:
>
>> (1) is sent to the fire fighter or police officer by certified mail; or
>>
>> (2) is personally received by the fire fighter or police officer or by that person's designee. [53]

We think the latter is the more closely analogous provision in this case, so that the same deadline applies to all appellants other than in Houston, whether cities, officers, or fire fighters.

 **[6]**  The undisputed facts are that the hearing examiner issued his ruling on March 31, 2005, that the decision was sent by regular mail to the City on April 7, that it was received April 11, and that the City filed its petition in the district court on April 20. Since the decision was not sent by certified mail, subsection (1) of section 143.015(a) does not apply. Under subsection (2), the City's petition, filed nine days after receipt, was timely.

Accordingly, we reverse the judgment of the court of appeals and remand the case to the district court for further proceedings consistent with this opinion.

**Parallel Citations**

29 IER Cases 1087, 52 Tex. Sup. Ct. J. 1171

Footnotes

1 TEX. LOC. GOV'T CODE Chapter 143, §§ 143.001–.363.

2 *Id.* § § 143.057(j) ("A district court may hear an appeal of a hearing examiner's award only on the grounds that the arbitration panel was without jurisdiction or exceeded its jurisdiction or that the order was procured by fraud, collusion, or other unlawful means."), 143.1016(j) (same for cities with a population of 1.5 million or more).

3      197 S.W.3d 314, 324 (Tex.2006) ("Of course, if the right of appeal provided by Section 143.1016(j) does not afford a city meaningful review of the merits of a decision, ... delegation of grievance decisions to an independent hearing examiner may raise constitutional problems.") (citing *Tex. Boll Weevil Eradication Found., Inc. v. Lewellen,* 952 S.W.2d 454, 472 (Tex.1997)).

4      *Supra* note 2.

5      263 S.W.3d 80 (Tex.App.-Houston [1st Dist.] 2006).

6      TEX. LOC. GOV'T CODE §§ 143.010, 143.053.

7      *Id.* § 143.057.

8      *See Proctor v. Andrews,* 972 S.W.2d 729, 736 (Tex.1998) ("It is likely a perception of bias in favor of the City, on the part of the Civil Service Commission, that prompts officers to request that their appeal be heard under section 143.057 [by an independent hearing examiner]."). Amicus curiae, the Texas State Association of Fire Fighters, confirms that fire fighters have a "strong desire ... to appeal ... to independent hearing examiners ... rather than to civil service commissions whose members are appointed solely by the cities' chief executives." Brief of Texas State Association of Fire Fighters as Amicus Curiae Supporting Respondent at 2.

9      TEX. LOC. GOV'T CODE § 143.057(d) ("If the appealing fire fighter or police officer chooses to appeal to a hearing examiner, the fire fighter or police officer and the department head, or their designees, shall first attempt to agree on the selection of an impartial hearing examiner. If the parties do not agree on the selection of a hearing examiner on or within 10 days after the date the appeal is filed, the director shall immediately request a list of seven qualified neutral arbitrators from the American Arbitration Association or the Federal Mediation and Conciliation Service, or their successors in function. The fire fighter or police officer and the department head, or their designees, may agree on one of the seven neutral arbitrators on the list. If they do not agree within five working days after the date they received the list, each party or the party's designee shall alternate striking a name from the list and the name remaining is the hearing examiner. The parties or their designees shall agree on a date for the hearing.").

10     *Id.* § 143.003(2) (" 'Department head' means the chief or head of a fire or police department or that person's equivalent, regardless of the name or title used.").

11     *Id.* § 143.052(c) ("If the department head suspends a fire fighter or police officer, the department head shall, within 120 hours after the hour of suspension, file a written statement with the commission giving the reasons for the suspension. The department head shall immediately deliver a copy of the statement in person to the suspended fire fighter or police officer.").

12     *Id.* § 143.003(3) (" 'Director' means the director of fire fighters' and police officers' civil service.").

13     *Id.* § 143.1015(k).

14     *Id.* § 143.101(a) ("Except as otherwise provided, this subchapter [G, containing sections 143.101–.135, including 143.1015] applies only to a municipality with a population of 1.5 million or more."); (b) ("Except as otherwise provided, the provisions of Subchapters A–F apply to each municipality covered under this subchapter.").

15     According to the 2000 United States census, the population of the City of Pasadena was 141,674. *See* U.S. Census Bureau, "Pasadena city, Texas QuickLinks", http://quickfacts.census.gov/qfd/states/48/4856000lk. html, http://factfinder.census.gov/servlet/QTTable?_bm =y&-qr_name=DEC_ 2000_SF1_U_DP1&-ds_name=DEC_2000_SF1_U&-_lang=en&-geo_id=16000US4856000.

16     263 S.W.3d 80, 85 n. 6 (Tex.App.-Houston [1st Dist.] 2006).

17     *Id.* at 85.

18     51 Tex. Sup.Ct. J. 866 (May 16, 2008) (granted on motion for rehearing); 51 Tex. Sup.Ct. J. 180 (Dec. 7, 2007) (prior disposition).

19     *See supra* note 14; *compare*TEX. LOC. GOV'T CODE §§ 143.053(a) and .052(a) ("This section does not apply to a municipality with a population of 1.5 million or more."), *with*§ 143.057.

20     TEX. LOC. GOV'T CODE § 143.057(j).

21     *Id.* § 143.101(a) (providing that subchapter G, which includes 143.1016, applies only to a municipality with a population of 1.5 million or more).

22     197 S.W.3d 314, 317 n. 4 (Tex.2006) ("Section 143.1016 was modeled on the language of Section 143.057. In particular, the language governing appeals of independent hearing examiner decisions in Sections 143.1016(c) and (j) exactly duplicates that of Sections 143.057(c) and (j). Therefore, our decision today is not limited to the City of Houston; it applies with equal force to all municipalities governed by Chapter 143 of the Local Government Code.").

23     *Id.* at 318–320.

24     *Id.* at 320.

25     952 S.W.2d 454 (Tex.1997).

26     *Id.* at 467 (citations and internal quotation marks omitted).

27     *Id.* at 469.

28     *Id.* at 472 ("1. Are the private delegate's actions subject to meaningful review by a state agency or other branch of state government? 2. Are the persons affected by the private delegate's actions adequately represented in the decisionmaking process? 3. Is the private

delegate's power limited to making rules, or does the delegate also apply the law to particular individuals? 4. Does the private delegate have a pecuniary or other personal interest that may conflict with his or her public function? 5. Is the private delegate empowered to define criminal acts or impose criminal sanctions? 6. Is the delegation narrow in duration, extent, and subject matter? 7. Does the private delegate possess special qualifications or training for the task delegated to it? 8. Has the Legislature provided sufficient standards to guide the private delegate in its work?").

29    *Id.* at 471, 475.

30    *Id.* at 472.

31    TEX. LOC. GOV'T CODE § 143.001(a).

32    972 S.W.2d 729 (Tex.1998).

33    Brief of the State of Texas as Amicus Curiae in Support of Respondent at 1–2.

34    972 S.W.2d at 735 ("The City does not contend that the Legislature impermissibly delegated authority to hear appeals to a private decisionmaker. While this broader delegation of authority was discussed in amici briefs submitted by the cities of Marshall, Amarillo, and Garland, and suggested at the oral argument of this case, it was not a part of the City's case either in the courts below or here.").

35    *City of Houston v. Clark,* 197 S.W.3d 314, 324 (Tex.2006).

36    *Id.* at 320 (citing *Brady v. Fourteenth Court of Appeals,* 795 S.W.2d 712, 715 (Tex.1990) ("[s]tatutes are given a construction consistent with constitutional requirements, when possible, because the legislature is presumed to have intended compliance with [the constitution]"), and TEX. GOV'T CODE § 311.021(1) ("In enacting a statute, it is presumed that ... compliance with the constitutions of this state and the United States is intended....")).

37    *Id.* at 318 n. 5 ("The Legislature's use of the phrase 'arbitration panel' is difficult to explain in the context of appeals to individual independent hearing examiners under Section 143.1016, since the hearing examiner, not an arbitration panel, provides a final decision. For purposes of this case, we presume Section 143.1016(j)'s reference to 'arbitration panel' includes an independent hearing examiner.").

38    Act of May 30, 1983, 68th Leg., R.S., ch. 420, § 9, 1983 Tex. Gen. Laws 2246, 2267, formerly codified as TEX.REV.CIV. STAT. ANN. art. 1269m, § 16c(f).

39    Act of May 29, 1965, 59th Leg., R.S., ch. 689, § 1, 1965 Tex. Gen. Laws 1593, 1599, formerly TEX.REV.CIV. STAT. ANN. art. 237, § A(1), (3), now TEX. CIV. PRAC. & REM.CODE § 171.088(a)(1), (3)(A).

40    9 U.S.C. § 10(1), (4); Pub.L. No. 80–282, 61 Stat. 669 (1947).

41    *Gulf Oil Corp. v. Guidry,* 160 Tex. 139, 327 S.W.2d 406, 408 (1959) ("[T]he authority of arbitrators is derived from the arbitration agreement and is limited to a decision of the matters submitted therein either expressly or by necessary implication.").

42    *CVN Group, Inc. v. Delgado,* 95 S.W.3d 234, 238 (Tex.2002) ( "[W]e have long held that 'an award of arbitrators upon matters submitted to them is given the same effect as the judgment of a court of last resort. All reasonable presumptions are indulged in favor of the award, and none against it.' ") (quoting *City of San Antonio v. McKenzie Constr. Co.,* 136 Tex. 315, 150 S.W.2d 989, 996 (1941)).

43    TEX. LOC. GOV'T CODE § 143.057(f).

44    *See, e.g., id.* §§ 143.010 and 143.051–.054.

45    *Id.* § 143.057(f).

46    *Id.* § 143.010(g).

47    *Cf.* § 143.052(f) ("If the department head does not specifically point out in the written statement the act or acts of the fire fighter or police officer that allegedly violated the civil service rules, the commission shall promptly reinstate the person."); *see also* § 143.1015(j) ("In any hearing relating to the appeal or review of an action of the department head that affects a fire fighter or police officer, the department head shall have the burden of proof. The department head is required to prove the allegations contained in the written statement, and the department head is restricted to the written statement and charges, which may not be amended.").

48    263 S.W.3d 80, 85 (Tex.App.-Houston [1st Dist.] 2006).

49    *See City of Weslaco v. Lucio,* 2008 WL 5275244, 2008 Tex.App. LEXIS 9540 (Tex.App.-Corpus Christi–Edinburg Dec. 22, 2008); *City of Waco v. Kelley,* 226 S.W.3d 672, 675 (Tex.App.-Waco 2007, pet. granted) (Supreme Court cause number 07–0485); *City of Laredo v. Leal,* 161 S.W.3d 558, 563 (Tex.App.-San Antonio 2004, pet. denied); *City of Garland v. Byrd,* 97 S.W.3d 601, 607 (Tex.App.-Dallas 2002, pet. denied); *Lindsey v. Fireman's & Policeman's Civil Serv. Comm'n,* 980 S.W.2d 233, 236–237 (Tex.App.-Houston [14th Dist.] 1998, pet. denied); *Nuchia v. Tippy,* 973 S.W.2d 782, 786 (Tex.App.-Tyler 1998, no pet.). *But see City of Houston v. Clark,* 252 S.W.3d 561, 567 (Tex.App.-Houston [14th Dist.] 2008, no pet.) ("the district court and [court of appeal] lack jurisdiction to review the merits of the hearing examiner's decision, including issues regarding whether the hearing examiner abused his discretion and ignored or misinterpreted controlling law"); *Bradford v. Pappillion,* 207 S.W.3d 841, 844 (Tex.App.-Houston [14th Dist.] 2006, no pet.) ("although there is overlap between the scope of the abuse of authority standard and the common meaning of the language used in section 143.1016(j), there is little, if any, basis to equate them").

50    *City of Waco,* 226 S.W.3d at 675;*City of Laredo,* 161 S.W.3d at 563;*City of Garland,* 97 S.W.3d at 607.

51    *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.,* 962 S.W.2d 507, 518 (Tex.1998).

52    TEX. LOC. GOV'T CODE § 143.1016(j); see also § 143.101(a).

53    *Id.* § 142.015(a).

**End of Document**                              © 2015 Thomson Reuters. No claim to original U.S. Government Works.

**Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532 (1985)**

105 S.Ct. 1487, 118 L.R.R.M. (BNA) 3041, 84 L.Ed.2d 494, 53 USLW 4306...

105 S.Ct. 1487
Supreme Court of the United States

CLEVELAND BOARD OF EDUCATION, Petitioner,

v.

James LOUDERMILL et al.
PARMA BOARD OF EDUCATION, Petitioner,

v.

Richard DONNELLY et al.
James LOUDERMILL, Petitioner,

v.

CLEVELAND BOARD OF EDUCATION et al.

Nos. 83–1362, 83–1363 and 83–6392. | Argued Dec. 3, 1984. | Decided March 19, 1985.

Terminated school district employees brought action against boards of education challenging propriety of their discharges. The District Court for the Northern District of Ohio, John M. Manos, J., dismissed the actions for failure to state claims on which relief could be granted, and the Court of Appeals affirmed in part and vacated and remanded in part. 721 F.2d 550. On certiorari, the Supreme Court, Justice White, held that process due to the terminated employees was pretermination opportunity to respond, coupled with posttermination administrative procedures as provided by Ohio statute and, because the employees alleged that they had no chance to respond, their complaints against boards of education sufficiently stated a claim.

Judgment of Court of Appeals affirmed; case remanded.

Justice Marshall filed opinion concurring in part and concurring in judgment.

Justice Brennan filed opinion concurring in part and dissenting in part.

Justice Rehnquist filed dissenting opinion.

Order on remand, 763 F.2d 202.

West Headnotes (8)

**[1]** **Constitutional Law**

 Public Employment Relationships

Public employees having property right in continued employment cannot be deprived of that property right by the state without due process. U.S.C.A. Const.Amends. 5, 14.

706 Cases that cite this headnote

**[2]** **Constitutional Law**

 Source of right or interest

Property interests protected by due process are not created by the Constitution but, rather, are created, and their dimensions defined, by existing rules or understandings that stem from an independent source such as state law. U.S.C.A. Const.Amends. 5, 14.

717 Cases that cite this headnote

**[3]** **Constitutional Law**

 Procedural due process in general

**Constitutional Law**

 Substantive Due Process in General

As relating to due process clause provision that substantive rights of life, liberty and property cannot be deprived except pursuant to constitutionally adequate procedures, categories of substance and procedure are distinct; once it is determined that the due process clause applies, question remains what process is due. U.S.C.A. Const.Amends. 5, 14.

511 Cases that cite this headnote

**[4]** **Constitutional Law**

 Duration and timing of deprivation; pre- or post-deprivation remedies

An essential principle of due process is that a deprivation of life, liberty or property be preceded by notice and opportunity for hearing appropriate to the nature of the case. U.S.C.A. Const.Amends. 5, 14.

1072 Cases that cite this headnote

**[5]** **Constitutional Law**

**Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532 (1985)**

105 S.Ct. 1487, 118 L.R.R.M. (BNA) 3041, 84 L.Ed.2d 494, 53 USLW 4306...

☞ Notice, hearing, proceedings, and review in general

Due process clause requires some kind of a hearing prior to discharge of employee who has a constitutionally protected property interest in his employment. U.S.C.A. Const.Amends. 5, 14.

2101 Cases that cite this headnote

**[6]    Constitutional Law**
☞ Notice and Hearing

Right to a hearing under the due process clause does not depend on a demonstration of certain success. U.S.C.A. Const.Amends. 5, 14.

223 Cases that cite this headnote

**[7]    Constitutional Law**
☞ Notice and hearing; proceedings and review
**Education**
☞ Pleadings

Process due to terminated school district employees was pretermination opportunity to respond, coupled with posttermination administrative procedures as provided by Ohio statute and, because the employees alleged that they had no chance to respond, their complaints against boards of education sufficiently stated a claim. Ohio R.C. § 124.34; U.S.C.A. Const.Amends. 5, 14.

2236 Cases that cite this headnote

**[8]    Education**
☞ Pleadings

Former school district employee's complaint reciting course of proceedings regarding his termination but which did not indicate that his wait for conclusion of the proceedings was unreasonably prolonged other than the fact that it took nine months failed to state a claim of a constitutional deprivation. U.S.C.A. Const.Amends. 5, 14.

71 Cases that cite this headnote

**\*\*1488   \*532** *Syllabus* [*]

In No. 83–1362, petitioner Board of Education hired respondent Loudermill as a security guard. On his job application Loudermill stated that he had never been convicted of a felony. Subsequently, upon discovering that he had in fact been convicted of grand larceny, the Board dismissed him for dishonesty in filling out the job application. He was not afforded an opportunity to respond to the dishonesty charge or to challenge the dismissal. Under Ohio law, Loudermill was a "classified civil servant," and by statute, as such an employee, could be terminated only for cause and was entitled to administrative review of the dismissal. He filed an appeal with the Civil Service Commission, which, after hearings before a referee and the Commission, upheld the dismissal some nine months after the appeal had been filed. Although the Commission's decision was subject to review in the state courts, Loudermill instead filed suit in Federal District Court, alleging that the Ohio statute providing for administrative review was unconstitutional on its face because it provided no opportunity for a discharged employee to respond to charges against him prior to removal, thus depriving him of liberty and property without due process. It was also alleged that the statute was unconstitutional as applied because discharged employees were not given sufficiently prompt postremoval hearings. The District Court dismissed the suit for failure to state a claim on which relief could be granted, holding that because the very statute that created the property right in continued employment also specified the procedures for discharge, and because those procedures were followed, Loudermill was, by definition, afforded all the process due; that the post-termination hearings also adequately protected Loudermill's property interest; and that in light of the Commission's crowded docket the delay in processing his appeal was constitutionally acceptable. In No. 83–1363, petitioner Board of Education fired respondent Donnelly from his job as a bus mechanic because he had **\*533** failed an eye examination. He appealed to the Civil Service Commission, which ordered him reinstated, but without backpay. He then filed a complaint in Federal District Court essentially identical to Loudermill's, and the court dismissed for failure to state a claim. On a **\*\*1489** consolidated appeal, the Court of Appeals reversed in part and remanded, holding that both respondents had been deprived of due process and that the compelling private interest in retaining employment, combined with the value of presenting evidence prior to

**Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532 (1985)**

105 S.Ct. 1487, 118 L.R.R.M. (BNA) 3041, 84 L.Ed.2d 494, 53 USLW 4306...

dismissal, outweighed the added administrative burden of a pretermination hearing. But with regard to the alleged deprivation of liberty and Loudermill's 9-month wait for an administrative decision, the court affirmed the District Court, finding no constitutional violation.

*Held:* All the process that is due is provided by a pretermination opportunity to respond, coupled with posttermination administrative procedures as provided by the Ohio statute; since respondents alleged that they had no chance to respond, the District Court erred in dismissing their complaints for failure to state a claim. Pp. 1491–1496.

(a) The Ohio statute plainly supports the conclusion that respondents possess property rights in continued employment. The Due Process Clause provides that the substantive rights of life, liberty, and property cannot be deprived except pursuant to constitutionally adequate procedures. The categories of substance and procedure are distinct. "Property" cannot be defined by the procedures provided for its deprivation. Pp. 1491–1493.

(b) The principle that under the Due Process Clause an individual must be given an opportunity for a hearing *before* he is deprived of any significant property interest, requires "some kind of hearing" prior to the discharge of an employee who has a constitutionally protected property interest in his employment. The need for some form of pretermination hearing is evident from a balancing of the competing interests at stake: the private interest in retaining employment, the governmental interests in expeditious removal of unsatisfactory employees and the avoidance of administrative burdens, and the risk of an erroneous termination. Pp. 1493–1495.

(c) The pretermination hearing need not definitively resolve the propriety of the discharge, but should be an initial check against mistaken decisions—essentially a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action. The essential requirements of due process are notice and an opportunity to respond. Pp. 1495–1496.

(d) The delay in Loudermill's administrative proceedings did not constitute a separate constitutional violation. The Due Process Clause **\*534** requires provision of a hearing "at a meaningful time," and here the delay stemmed in part from the thoroughness of the procedures. P. 1496.

721 F.2d 550 (6 Cir.1983), affirmed and remanded.

**Attorneys and Law Firms**

*James G. Wyman* argued the cause for petitioners in Nos. 83-1362 and 83-1363 and respondents in No. 83-6392. With him on the brief for petitioner in No. 83-1362 was *Thomas C. Simiele. John F. Lewis* and *John T. Meredith* filed a brief for petitioner in No. 83-1363. *John D. Maddox* and *Stuart A. Freidman* filed a brief for respondents Cleveland Civil Service Commission et al. in No. 83-6392.

*Robert M. Fertel,* by appointment of the Court, 468 U.S. 1203, argued the cause and filed briefs for respondents in Nos. 83-1362 and 83-1363 and petitioner in No. 83-6392.†

† Briefs of *amici curiae* urging reversal in Nos. 83-1362 and 83-1363 were filed for the State of Ohio et al. by *Anthony J. Celebrezze, Jr.,* Attorney General of Ohio, *Gene W. Holliker* and *Christine Manuelian,* Assistant Attorneys General, *Charles A. Graddick,* Attorney General of Alabama, *Robert K. Corbin,* Attorney General of Arizona, *Tany S. Hong,* Attorney General of Hawaii, *Lindley E. Pearson,* Attorney General of Indiana, *Robert T. Stephen,* Attorney General of Kansas, *Frank J. Kelley,* Attorney General of Michigan, *Hubert H. Humphrey III,* Attorney General of Minnesota, *William A. Allain,* Attorney General of Mississippi, *Michael T. Greely,* Attorney General of Montana, *Brian McKay,* Attorney General of Nevada, *Gregory H. Smith,* Attorney General of New Hampshire, *Irwin I. Kimmelman,* Attorney General of New Jersey, *Robert WeFald,* Attorney General of North Dakota, *Michael Turpen,* Attorney General of Oklahoma, *David Frohnmayer,* Attorney General of Oregon, *LeRoy S. Zimmerman,* Attorney General of Pennsylvania, *Mark V. Meierhenry,* Attorney General of South Dakota, *Bronson C. La Follette,* Attorney General of Wisconsin, and *Archie G. McClintock,* Attorney General of Wyoming; and for the National School Boards Association by *Gwendolyn H. Gregory* and *August W. Steinhilber.*

Briefs of *amici curiae* urging affirmance in Nos. 83-1362 and 83-1363 were filed for the American Civil Liberties Union of Cleveland Foundation by *Gordon J. Beggs, Edward R. Stege, Jr.,* and *Charles S. Sims;* for the American Federation of State, County, and Municipal Employees, AFL-CIO, by *Richard Kirschner;* and for the National Educational Association by *Robert H. Chanin* and *Michael H. Gottesman.*

**Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532 (1985)**

105 S.Ct. 1487, 118 L.R.R.M. (BNA) 3041, 84 L.Ed.2d 494, 53 USLW 4306...

**Opinion**

 **\*535**  Justice WHITE delivered the opinion of the Court.

In these cases we consider what pretermination process must be accorded a public employee who can be discharged only for cause.


**I**

In 1979 the Cleveland Board of Education, petitioner in No. 83–1362, hired respondent James Loudermill as a security guard. On his job application, Loudermill stated that he had never been convicted of a felony. Eleven months later, as part of a routine examination of his employment records, the Board discovered that in fact Loudermill had been convicted of grand larceny in 1968. By letter dated November 3, 1980, the Board's Business Manager informed Loudermill that he had been dismissed because of his dishonesty in filling out the employment application. Loudermill was not afforded an opportunity to respond to the charge of dishonesty or to  **\*\*1490**  challenge his dismissal. On November 13, the Board adopted a resolution officially approving the discharge.

Under Ohio law, Loudermill was a "classified civil servant." Ohio Rev.Code Ann. § 124.11 (1984). Such employees can be terminated only for cause, and may obtain administrative review if discharged. § 124.34. Pursuant to this provision, Loudermill filed an appeal with the Cleveland Civil Service Commission on November 12. The Commission appointed a referee, who held a hearing on January 29, 1981. Loudermill argued that he had thought that his 1968 larceny conviction was for a misdemeanor rather than a felony. The referee recommended reinstatement. On July 20, 1981, the  **\*536**  full Commission heard argument and orally announced that it would uphold the dismissal. Proposed findings of fact and conclusions of law followed on August 10, and Loudermill's attorneys were advised of the result by mail on August 21.

Although the Commission's decision was subject to judicial review in the state courts, Loudermill instead brought the present suit in the Federal District Court for the Northern District of Ohio. The complaint alleged that § 124.34 was unconstitutional on its face because it did not provide the employee an opportunity to respond to the charges against him prior to removal. As a result, discharged employees were deprived of liberty and property without due process. The complaint also alleged that the provision was unconstitutional as applied because discharged employees were not given sufficiently prompt postremoval hearings.

Before a responsive pleading was filed, the District Court dismissed for failure to state a claim on which relief could be granted. See Fed.Rule Civ.Proc. 12(b)(6). It held that because the very statute that created the property right in continued employment also specified the procedures for discharge, and because those procedures were followed, Loudermill was, by definition, afforded all the process due. The post-termination hearing also adequately protected Loudermill's liberty interests. Finally, the District Court concluded that, in light of the Commission's crowded docket, the delay in processing Loudermill's administrative appeal was constitutionally acceptable. App. to Pet. for Cert. in No. 83–1362, pp. A36–A42.

The other case before us arises on similar facts and followed a similar course. Respondent Richard Donnelly was a bus mechanic for the Parma Board of Education. In August 1977, Donnelly was fired because he had failed an eye examination. He was offered a chance to retake the examination but did not do so. Like Loudermill, Donnelly appealed to the Civil Service Commission. After a year of wrangling about the timeliness of his appeal, the Commission heard  **\*537**  the case. It ordered Donnelly reinstated, though without backpay.[1] In a complaint essentially identical to Loudermill's, Donnelly challenged the constitutionality of the dismissal procedures. The District Court dismissed for failure to state a claim, relying on its opinion in *Loudermill.*

The District Court denied a joint motion to alter or amend its judgment,[2] and the  **\*\*1491**  cases were consolidated for appeal. A divided panel of the Court of Appeals for the Sixth Circuit reversed in part and remanded. 721 F.2d 550 (1983). After rejecting arguments that the actions were barred by failure to exhaust administrative remedies and by res judicata—arguments that are not renewed here—the Court of Appeals found that both respondents had been deprived of due process. It disagreed with the District Court's original rationale. Instead, it concluded that the compelling private interest in retaining employment, combined with the value of presenting evidence prior to dismissal, outweighed the added administrative burden of a pretermination hearing. *Id., at 561–562.* With regard to the alleged deprivation of liberty, and Loudermill's 9-month wait for an administrative decision, the court affirmed the District Court, finding no constitutional violation. *Id., at 563–564.*

**Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532 (1985)**

105 S.Ct. 1487, 118 L.R.R.M. (BNA) 3041, 84 L.Ed.2d 494, 53 USLW 4306...

**\*538** The dissenting Judge argued that respondents' property interests were conditioned by the procedural limitations accompanying the grant thereof. He considered constitutional requirements satisfied because there was a reliable pretermination finding of "cause," coupled with a due process hearing at a meaningful time and in a meaningful manner. *Id.,* at 566.

Both employers petitioned for certiorari. Nos. 83–1362 and 83–1363. In a cross-petition, Loudermill sought review of the rulings adverse to him. No. 83–6392. We granted all three petitions, [467 U.S. 1204, 104 S.Ct. 2384, 81 L.Ed.2d 343 (1984)](), and now affirm in all respects.

## II

 **[1]** Respondents' federal constitutional claim depends on their having had a property right in continued employment. [3](/) *[Board of Regents v. Roth,](/)* 408 U.S. 564, 576–578, 92 S.Ct. 2701, 2708–2709, 33 L.Ed.2d 548 (1972); *[Reagan v. United States,](/)* 182 U.S. 419, 425, 21 S.Ct. 842, 845, 45 L.Ed. 1162 (1901). If they did, the State could not deprive them of this property without due process. See *[Memphis Light, Gas & Water Div. v. Craft,](/)* 436 U.S. 1, 11–12, 98 S.Ct. 1554, 1561–1562, 56 L.Ed.2d 30 (1978); *[Goss v. Lopez,](/)* 419 U.S. 565, 573–574, 95 S.Ct. 729, 735–736, 42 L.Ed.2d 725 (1975).

 **[2]** Property interests are not created by the Constitution, "they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law...." *[Board of Regents v. Roth, supra,](/)* 408 U.S., at 577, 92 S.Ct., at 2709. See also *[Paul v. Davis,](/)* 424 U.S. 693, 709, 96 S.Ct. 1155, 1164, 47 L.Ed.2d 405 (1976). The Ohio statute plainly creates such an interest. Respondents were "classified civil service employees," [Ohio Rev.Code Ann. § 124.11]() (1984), entitled to retain their positions "during good behavior and efficient service," who could not be dismissed "except ... for ... misfeasance, **\*539** malfeasance, or nonfeasance in office," [§ 124.34](). [4] The statute plainly supports the conclusion, reached by both lower courts, that respondents possessed property rights in continued employment. Indeed, this question does not seem to have been disputed below. [5]

 **\*\*1492** The Parma Board argues, however, that the property right is defined by, and conditioned on, the legislature's choice of procedures for its deprivation. Brief for Petitioner in No. 83–1363, pp. 26–27. The Board stresses that in addition to specifying the grounds for termination, the statute sets out procedures by which termination may take place. [6] The **\*540** procedures were adhered to in these cases. According to petitioner, "[t]o require additional procedures would in effect expand the scope of the property interest itself." *Id.,* at 27. See also Brief for State of Ohio et al. as *Amici Curiae* 5–10.

This argument, which was accepted by the District Court, has its genesis in the plurality opinion in *[Arnett v. Kennedy,](/)* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974). *Arnett* involved a challenge by a former federal employee to the procedures by which he was dismissed. The plurality reasoned that where the legislation conferring the substantive right also sets out the procedural mechanism for enforcing that right, the two cannot be separated:

> "The employee's statutorily defined right is not a guarantee against removal without cause in the abstract, but such a guarantee as enforced by the procedures which Congress has designated for the determination of cause.

> "[W]here the grant of a substantive right is inextricably intertwined with the limitations on the procedures which are to be employed in determining that right, a litigant in the position of appellee must take the bitter with the sweet." *[Id.,](/)* at 152–154, 94 S.Ct., at 1643–1644.

This view garnered three votes in *Arnett,* but was specifically rejected by the other six Justices. See *[id., at 166–167, 94 S.Ct., at 1650–1651]()* (POWELL, J., joined by BLACKMUN, J.,); *[id., at 177–178, 185, 94 S.Ct., at 1655–1656]()* (WHITE, J.,); *[id., at 211, 94 S.Ct., at 1672]()* (MARSHALL, J., joined by Douglas and BRENNAN, JJ.). Since then, this theory has at times seemed to gather some additional support. See *[Bishop v. Wood,](/)* 426 U.S. 341, 355–361, 96 S.Ct. 2074, 2082–2085, 48 L.Ed.2d 684 (1976) (WHITE, J., dissenting); *[Goss v. Lopez,](/)* 419 U.S., at 586–587, 95 S.Ct., at 742–743 (POWELL, J., joined **\*541** by BURGER, C.J., and BLACKMUN and REHNQUIST, JJ., dissenting). More recently, however, the Court has clearly rejected it. In *[Vitek v. Jones,](/)* 445 U.S. 480, 491, 100 S.Ct. 1254, 1263, 63 L.Ed.2d 552 (1980), we pointed out that "minimum [procedural] requirements [are] a matter of federal law, they are not diminished by the fact that

Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532 (1985)

105 S.Ct. 1487, 118 L.R.R.M. (BNA) 3041, 84 L.Ed.2d 494, 53 USLW 4306...

the State may have specified its own procedures that it may deem adequate for determining the preconditions to adverse official action." This conclusion was reiterated in *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 432, 102 S.Ct. 1148, 1155, 71 L.Ed.2d 265 (1982), where we reversed the lower court's holding that because the entitlement arose from a state statute, the legislature had **\*\*1493** the prerogative to define the procedures to be followed to protect that entitlement.

[3]  In light of these holdings, it is settled that the "bitter with the sweet" approach misconceives the constitutional guarantee. If a clearer holding is needed, we provide it today. The point is straightforward: the Due Process Clause provides that certain substantive rights—life, liberty, and property—cannot be deprived except pursuant to constitutionally adequate procedures. The categories of substance and procedure are distinct. Were the rule otherwise, the Clause would be reduced to a mere tautology. "Property" cannot be defined by the procedures provided for its deprivation any more than can life or liberty. The right to due process "is conferred, not by legislative grace, but by constitutional guarantee. While the legislature may elect not to confer a property interest in [public] employment, it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate procedural safeguards." *Arnett v. Kennedy, supra,* 416 U.S., at 167, 94 S.Ct., at 1650 (POWELL, J., concurring in part and concurring in result in part); see *id.,* at 185, 94 S.Ct., at 1659 (WHITE, J., concurring in part and dissenting in part).

In short, once it is determined that the Due Process Clause applies, "the question remains what process is due." *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). The answer to that question is not to be found in the Ohio statute.

**\*542 III**

[4]  [5]  An essential principle of due process is that a deprivation of life, liberty, or property "be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 313, 70 S.Ct. 652, 656, 94 L.Ed. 865 (1950). We have described "the root requirement" of the Due Process Clause as being "that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest."[7] *Boddie v. Connecticut,* 401 U.S. 371, 379, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971) (emphasis in original);

see *Bell v. Burson,* 402 U.S. 535, 542, 91 S.Ct. 1586, 1591, 29 L.Ed.2d 90 (1971). This principle requires "some kind of a hearing" prior to the discharge of an employee who has a constitutionally protected property interest in his employment. *Board of Regents v. Roth,* 408 U.S., at 569–570, 92 S.Ct., at 2705; *Perry v. Sindermann,* 408 U.S. 593, 599, 92 S.Ct. 2694, 2698, 33 L.Ed.2d 570 (1972). As we pointed out last Term, this rule has been settled for some time now. *Davis v. Scherer,* 468 U.S. 183, 192, n. 10, 104 S.Ct. 3012, 3018, n. 10, 82 L.Ed.2d 139 (1984); *id.,* at 200–203, 104 S.Ct., at 3022–3024 (BRENNAN, J., concurring in part and dissenting in part). Even decisions finding no constitutional violation in termination procedures have relied on the existence of some pretermination opportunity to respond. For example, in *Arnett* six Justices found constitutional minima satisfied where the employee had access to the material upon which the charge was based and could respond orally and in writing and present rebuttal affidavits. See also *Barry v. Barchi,* 443 U.S. 55, 65, 99 S.Ct. 2642, 2649, 61 L.Ed.2d 365 (1979) (no due process violation where horse trainer whose license was suspended "was given more than one opportunity to present his side of the story").

The need for some form of pretermination hearing, recognized in these cases, is evident from a balancing of the competing interests at stake. These are the private interests in **\*543** retaining employment, the governmental interest in the expeditious removal of unsatisfactory employees and the avoidance of administrative burdens, and the risk of an erroneous termination. **\*\*1494** See *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).

First, the significance of the private interest in retaining employment cannot be gainsaid. We have frequently recognized the severity of depriving a person of the means of livelihood. See *Fusari v. Steinberg,* 419 U.S. 379, 389, 95 S.Ct. 533, 539, 42 L.Ed.2d 521 (1975); *Bell v. Burson, supra,* 402 U.S., at 539, 91 S.Ct., at 1589; *Goldberg v. Kelly,* 397 U.S. 254, 264, 90 S.Ct. 1011, 1018, 25 L.Ed.2d 287 (1970); *Sniadach v. Family Finance Corp.,* 395 U.S. 337, 340, 89 S.Ct. 1820, 1822, 23 L.Ed.2d 349 (1969). While a fired worker may find employment elsewhere, doing so will take some time and is likely to be burdened by the questionable circumstances under which he left his previous job. See *Lefkowitz v. Turley,* 414 U.S. 70, 83–84, 94 S.Ct. 316, 325–326, 38 L.Ed.2d 274 (1973).

Second, some opportunity for the employee to present his side of the case is recurringly of obvious value in reaching

**Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532 (1985)**

105 S.Ct. 1487, 118 L.R.R.M. (BNA) 3041, 84 L.Ed.2d 494, 53 USLW 4306...

an accurate decision. Dismissals for cause will often involve factual disputes. Cf. *Califano v. Yamasaki,* 442 U.S. 682, 686, 99 S.Ct. 2545, 2550, 61 L.Ed.2d 176 (1979). Even where the facts are clear, the appropriateness or necessity of the discharge may not be; in such cases, the only meaningful opportunity to invoke the discretion of the decisionmaker is likely to be before the termination takes effect. See *Goss v. Lopez,* 419 U.S., at 583–584, 95 S.Ct., at 740–741; *Gagnon v. Scarpelli,* 411 U.S. 778, 784–786, 93 S.Ct. 1756, 1760–1761, 36 L.Ed.2d 656 (1973).[8]

**[6]** **\*544** The cases before us illustrate these considerations. Both respondents had plausible arguments to make that might have prevented their discharge. The fact that the Commission saw fit to reinstate Donnelly suggests that an error might have been avoided had he been provided an opportunity to make his case to the Board. As for Loudermill, given the Commission's ruling we cannot say that the discharge was mistaken. Nonetheless, in light of the referee's recommendation, neither can we say that a fully informed decisionmaker might not have exercised its discretion and decided not to dismiss him, notwithstanding its authority to do so. In any event, the termination involved arguable issues,[9] and the right to a hearing does not depend on a demonstration of certain success. *Carey v. Piphus,* 435 U.S. 247, 266, 98 S.Ct. 1042, 1053, 55 L.Ed.2d 252 (1978).

The governmental interest in immediate termination does not outweigh these interests. As we shall explain, affording the employee an opportunity to respond prior to termination would impose neither a significant administrative burden nor intolerable delays. Furthermore, the employer shares the employee's interest in avoiding disruption and erroneous decisions; and until the matter is settled, the employer would continue to receive the benefit of the employee's labors. It is preferable to keep **\*\*1495** a qualified employee on than to train a new one. A governmental employer also has an interest in keeping citizens usefully employed rather than taking the possibly erroneous and counterproductive step of forcing its employees onto the welfare rolls. Finally, in those situations where the employer perceives a significant hazard in **\*545** keeping the employee on the job,[10] it can avoid the problem by suspending with pay.

**IV**

**[7]** The foregoing considerations indicate that the pretermination "hearing," though necessary, need not be elaborate. We have pointed out that "[t]he formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings." *Boddie v. Connecticut,* 401 U.S., at 378, 91 S.Ct., at 786. See *Cafeteria Workers v. McElroy,* 367 U.S. 886, 894–895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961). In general, "something less" than a full evidentiary hearing is sufficient prior to adverse administrative action. *Mathews v. Eldridge,* 424 U.S., at 343, 96 S.Ct., at 907. Under state law, respondents were later entitled to a full administrative hearing and judicial review. The only question is what steps were required before the termination took effect.

In only one case, *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), has the Court required a full adversarial evidentiary hearing prior to adverse governmental action. However, as the *Goldberg* Court itself pointed out, see *id.,* at 264, 90 S.Ct., at 1018, that case presented significantly different considerations than are present in the context of public employment. Here, the pretermination hearing need not definitively resolve the propriety of the discharge. It should be an initial check against mistaken decisions— essentially, a determination of whether **\*546** there are reasonable grounds to believe that the charges against the employee are true and support the proposed action. See *Bell v. Burson,* 402 U.S., at 540, 91 S.Ct., at 1590.

The essential requirements of due process, and all that respondents seek or the Court of Appeals required, are notice and an opportunity to respond. The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement. See Friendly, "Some Kind of Hearing," 123 U.Pa.L.Rev. 1267, 1281 (1975). The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story. See *Arnett v. Kennedy,* 416 U.S., at 170–171, 94 S.Ct., at 1652–1653 (opinion of POWELL, J.); *id.,* at 195–196, 94 S.Ct., at 1664–1665 (opinion of WHITE, J.); see also *Goss v. Lopez,* 419 U.S., at 581, 95 S.Ct., at 740. To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee.

**Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532 (1985)**

105 S.Ct. 1487, 118 L.R.R.M. (BNA) 3041, 84 L.Ed.2d 494, 53 USLW 4306...

**V**

[8]  Our holding rests in part on the provisions in Ohio law for a full post-termination hearing. In his cross-petition Loudermill asserts, as a separate constitutional violation, that his administrative proceedings took too long. [11] The Court of **\*547  \*\*1496** Appeals held otherwise, and we agree. [12] The Due Process Clause requires provision of a hearing "at a meaningful time." *E.g., Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). At some point, a delay in the post-termination hearing would become a constitutional violation. See *Barry v. Barchi,* 443 U.S., at 66, 99 S.Ct., at 2650. In the present case, however, the complaint merely recites the course of proceedings and concludes that the denial of a "speedy resolution" violated due process. App. 10. This reveals nothing about the delay except that it stemmed in part from the thoroughness of the procedures. A 9-month adjudication is not, of course, unconstitutionally lengthy *per se.* Yet Loudermill offers no indication that his wait was unreasonably prolonged other than the fact that it took nine months. The chronology of the proceedings set out in the complaint, coupled with the assertion that nine months is too long to wait, does not state a claim of a constitutional deprivation. [13]

**VI**

We conclude that all the process that is due is provided by a pretermination opportunity to respond, coupled with post-termination **\*548** administrative procedures as provided by the Ohio statute. Because respondents allege in their complaints that they had no chance to respond, the District Court erred in dismissing for failure to state a claim. The judgment of the Court of Appeals is affirmed, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

Justice MARSHALL, concurring in part and concurring in the judgment.

I agree wholeheartedly with the Court's express rejection of the theory of due process, urged upon us by the petitioner Boards of Education, that a public employee who may be discharged only for cause may be discharged by whatever

procedures the legislature chooses. I therefore join Part II of the opinion for the Court. I also agree that, before discharge, the respondent employees were entitled to the opportunity to respond to the charges against them (which is all they requested), and that the failure to accord them that opportunity was a violation of their constitutional rights. Because the Court holds that the respondents were due all the process they requested, I concur in the judgment of the Court.

I write separately, however, to reaffirm my belief that public employees who may be discharged only for cause are entitled, under the Due Process Clause of the Fourteenth Amendment, to more than respondents **\*\*1497** sought in this case. I continue to believe that *before the decision is made to terminate an employee's wages,* the employee is entitled to an opportunity to test the strength of the evidence "by confronting and cross-examining adverse witnesses and by presenting witnesses on his own behalf, whenever there are substantial disputes in testimonial evidence," *Arnett v. Kennedy,* 416 U.S. 134, 214, 94 S.Ct. 1633, 1674, 40 L.Ed.2d 15 (1974) (MARSHALL, J., dissenting). Because the Court suggests that even in this situation due process requires no more than notice and an opportunity to be heard before wages are cut off, I am not able to join the Court's opinion in its entirety.

 **\*549**  To my mind, the disruption caused by a loss of wages may be so devastating to an employee that, whenever there are substantial disputes about the evidence, additional pre-deprivation procedures are necessary to minimize the risk of an erroneous termination. That is, I place significantly greater weight than does the Court on the public employee's substantial interest in the accuracy of the pretermination proceeding. After wage termination, the employee often must wait months before his case is finally resolved, during which time he is without wages from his public employment. By limiting the procedures due prior to termination of wages, the Court accepts an impermissibly high risk that a wrongfully discharged employee will be subjected to this often lengthy wait for vindication, and to the attendant and often traumatic disruptions to his personal and economic life.

Considerable amounts of time may pass between the termination of wages and the decision in a post-termination evidentiary hearing—indeed, in this case nine months passed before Loudermill received a decision from his postdeprivation hearing. During this period the employee is left in limbo, deprived of his livelihood and of wages on which he may well depend for basic sustenance. In that time,

Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532 (1985)

105 S.Ct. 1487, 118 L.R.R.M. (BNA) 3041, 84 L.Ed.2d 494, 53 USLW 4306...

his ability to secure another job might be hindered, either because of the nature of the charges against him, or because of the prospect that he will return to his prior public employment if permitted. Similarly, his access to unemployment benefits might seriously be constrained, because many States deny unemployment compensation to workers discharged for cause.[*] Absent an interim source of wages, the employee might be unable to meet his basic, fixed costs, such as food, rent or mortgage payments. He would be forced to spend his savings, if he had any, and to convert his possessions to **\*550** cash before becoming eligible for public assistance. Even in that instance

> "[t]he substitution of a meager welfare grant for a regular paycheck may bring with it painful and irremediable personal as well as financial dislocations. A child's education may be interrupted, a family's home lost, a person's relationship with his friends and even his family may be irrevocably affected. The costs of being forced, even temporarily, onto the welfare rolls because of a wrongful discharge from tenured Government employment cannot be so easily discounted," *id.,* at 221, 94 S.Ct., at 1677.

Moreover, it is in no respect certain that a prompt postdeprivation hearing will make the employee economically whole again, and the wrongfully discharged employee will almost inevitably suffer irreparable injury. Even if reinstatement is forthcoming, the same might not be true of back-pay—as it was not to respondent Donnelly in this case—and the delay in receipt of wages would thereby be transformed into a permanent deprivation. Of perhaps equal concern, the personal trauma experienced during the long months in which the employee awaits decision, during which he suffers doubt, humiliation, and the loss of an opportunity to perform work, will never be recompensed, and indeed probably could not be with dollars alone.

**\*\*1498** That these disruptions might fall upon a justifiably discharged employee is unfortunate; that they might fall upon a wrongfully discharged employee is simply unacceptable. Yet in requiring only that the employee have an opportunity to respond before his wages are cut off, without affording him any meaningful chance to present a defense, the Court is willing to accept an impermissibly high risk of error with respect to a deprivation that is substantial.

Were there any guarantee that the post-deprivation hearing and ruling would occur promptly, such as within a few days of the termination of wages, then this minimal pre-deprivation **\*551** process might suffice. But there is no such guarantee. On a practical level, if the employer had to pay the employee until the end of the proceeding, the employer obviously would have an incentive to resolve the issue expeditiously. The employer loses this incentive if the only suffering as a result of the delay is borne by the wage earner, who eagerly awaits the decision on his livelihood. Nor has this Court grounded any guarantee of this kind in the Constitution. Indeed, this Court has in the past approved, at least implicitly, an average 10 or 11-month delay in the receipt of a decision on Social Security benefits, *Mathews v. Eldridge,* 424 U.S. 319, 341–342, 96 S.Ct. 893, 905–906, 47 L.Ed.2d 18 (1976), and, in the case of respondent Loudermill, the Court gives a stamp of approval to a process that took nine months. The hardship inevitably increases as the days go by, but nevertheless the Court countenances such delay. The adequacy of the predeprivation and postdeprivation procedures are inevitably intertwined, and only a constitutional guarantee that the latter will be immediate and complete might alleviate my concern about the possibility of a wrongful termination of wages.

The opinion for the Court does not confront this reality. I cannot and will not close my eyes today—as I could not 10 years ago—to the economic situation of great numbers of public employees, and to the potentially traumatic effect of a wrongful discharge on a working person. Given that so very much is at stake, I am unable to accept the Court's narrow view of the process due to a public employee before his wages are terminated, and before he begins the long wait for a public agency to issue a final decision in his case.

Justice BRENNAN, concurring in part and dissenting in part. Today the Court puts to rest any remaining debate over whether public employers must provide meaningful notice and hearing procedures before discharging an employee for **\*552** cause. As the Court convincingly demonstrates, the employee's right to fair notice and an opportunity to "present his side of the story" before discharge is not a matter of legislative grace, but of "constitutional guarantee." *Ante,* at 1493, 1495. This principle, reaffirmed by the Court today, has been clearly discernible in our "repeated pronouncements" for many years. See *Davis v. Scherer,* 468 U.S. 183, 203, 104 S.Ct. 3012, 3023, 82 L.Ed.2d 139 (1984) (BRENNAN, J., concurring in part and dissenting in part).

Accordingly, I concur in Parts I–IV of the Court's opinion. I write separately to comment on two issues the Court does

**Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532 (1985)**

105 S.Ct. 1487, 118 L.R.R.M. (BNA) 3041, 84 L.Ed.2d 494, 53 USLW 4306...

not resolve today, and to explain my dissent from the result in Part V of the Court's opinion.

### I

First, the Court today does not prescribe the precise form of required pretermination procedures in cases where an employee disputes the *facts* proffered to support his discharge. The cases at hand involve, as the Court recognizes, employees who did not dispute the facts but had "plausible arguments to make that might have prevented their discharge." *Ante,* at 1494. In such cases, notice and an "opportunity to present reasons," *ante,* at 1495, are sufficient to protect the important interests at stake.

 **\*\*1499**  As the Court also correctly notes, other cases "will often involve factual disputes," *ante,* at 1494, such as allegedly erroneous records or false accusations. As Justice MARSHALL has previously noted and stresses again today, *ante* at 1497, where there exist not just plausible arguments to be made, but also "substantial disputes in testimonial evidence," due process may well require more than a simple opportunity to argue or deny. *Arnett v. Kennedy,* 416 U.S. 134, 214, 94 S.Ct. 1633, 1674, 40 L.Ed.2d 15 (1974) (MARSHALL, J., dissenting). The Court acknowledges that what the Constitution requires prior to discharge, in general terms, is pretermination procedures sufficient to provide "an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe  **\*553**  that the charges against the employee are *true* and support the proposed action." *Ante,* at 1495 (emphasis added). When factual disputes are involved, therefore, an employee may deserve a fair opportunity before discharge to produce contrary records or testimony, or even to confront an accuser in front of the decisionmaker. Such an opportunity might not necessitate "elaborate" procedures, see *ante,* at 1495, but the fact remains that in some cases only such an opportunity to challenge the source or produce contrary evidence will suffice to support a finding that there are "reasonable grounds" to believe accusations are "true."

Factual disputes are not involved in these cases, however, and the "very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Cafeteria Workers v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961). I do not understand Part IV to foreclose the views expressed above or by Justice MARSHALL, *ante,* p. 1497, with respect

to discharges based on disputed evidence or testimony. I therefore join Parts I–IV of the Court's opinion.

### II

The second issue not resolved today is that of administrative delay. In holding that Loudermill's administrative proceedings did not take too long, the Court plainly does *not* state a flat rule that 9-month delays in deciding discharge appeals will pass constitutional scrutiny as a matter of course. To the contrary, the Court notes that a full post-termination hearing and decision must be provided at "a meaningful time" and that "[a]t some point, a delay in the post-termination hearing would become a constitutional violation." *Ante,* at 1496. For example, in *Barry v. Barchi,* 443 U.S. 55, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979), we disapproved as "constitutionally infirm" the shorter administrative delays that resulted under a statute that required "prompt" postsuspension hearings for suspended racehorse trainers with decision to follow within 30 days of the hearing. *Id.,* at 61, 66, 99 S.Ct., at 2647, 2650. As Justice MARSHALL demonstrates, when an employee's wages are terminated pending  **\*554**  administrative decision, "hardship inevitably increases as the days go by." *Ante,* at 1498; see also *Arnett v. Kennedy, supra,* 416 U.S., at 194, 94 S.Ct., at 1664 (WHITE, J., concurring in part and dissenting in part) ("The impact on the employee of being without a job pending a full hearing is likely to be considerable because '[m]ore than 75 percent of actions contested within employing agencies require longer to decide than the 60 days required by ... regulations' ") (citation omitted). In such cases the Constitution itself draws a line, as the Court declares, "at some point" beyond which the State may not continue a deprivation absent decision. [1] The holding in Part V is merely that, in this particular case, Loudermill failed to allege facts sufficient  **\*\*1500**  to state a cause of action, and not that nine months can never exceed constitutional limits.

### III

Recognizing the limited scope of the holding in Part V, I must still dissent from its result, because the record in this case is insufficiently developed to permit an informed judgment on the issue of overlong delay. Loudermill's complaint was dismissed without answer from the respondent Cleveland Civil Service Commission. Allegations at this early stage are to be liberally construed, and "[i]t is axiomatic that a

Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532 (1985)

105 S.Ct. 1487, 118 L.R.R.M. (BNA) 3041, 84 L.Ed.2d 494, 53 USLW 4306...

complaint should not be dismissed unless 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *McLain v. Real Estate Bd. of New Orleans, Inc.,* 444 U.S. 232, 246, 100 S.Ct. 502, 511, 62 L.Ed.2d 441 (1980) (citation omitted). Loudermill alleged that it took the Commission over two and one-half months simply to hold **\*555** a hearing in his case, over two months *more* to issue a non-binding interim decision, and more than three and one-half months after *that* to deliver a final decision. Complaint ¶¶ 20, 21, App. 10. [2] The Commission provided no explanation for these significant gaps in the administrative process; we do not know if they were due to an overabundance of appeals, Loudermill's own foot-dragging, bad faith on the part of the Commission, or any other of a variety of reasons that might affect our analysis. We do know, however, that under Ohio law the Commission is obligated to hear appeals like Loudermill's "within thirty days." Ohio Rev.Code Ann. § 124.34 (1984). [3] Although this **\*\*1501** statutory limit has been **\*556** viewed only as "directory" by Ohio courts, those courts have also made it clear that when the limit is exceeded, "[t]he burden of proof [is] placed on the [Commission] to illustrate to the court that the failure to comply with the 30-day requirement ... was reasonable." *In re Bronkar,* 53 Ohio Misc. 13, 17, 372 N.E.2d 1345, 1347 (Com.Pl.1977). I cannot conclude on this record that Loudermill could prove "no set of facts" that might have entitled him to relief after nine months of waiting.

**\*557** The Court previously has recognized that constitutional restraints on the timing, no less than the form, of a hearing and decision "will depend on appropriate accommodation of the competing interests involved." *Goss v. Lopez,* 419 U.S. 565, 579, 95 S.Ct. 729, 738–739, 42 L.Ed.2d 725 (1975). The relevant interests have generally been recognized as threefold: "the importance of the private interest and the length or finality of the deprivation, the likelihood of governmental error, and the magnitude of the governmental interests involved." *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 434, 102 S.Ct. 1148, 1157, 71 L.Ed.2d 265 (1982) (citations omitted); accord, *Mathews v. Eldridge,* 424 U.S. 319, 334–335, 96 S.Ct. 893, 902–903, 47 L.Ed.2d 18 (1976); cf. *United States v. $8,850,* 461 U.S. 555, 564, 103 S.Ct. 2005, 2012, 76 L.Ed.2d 143 (1983) (four-factor test for evaluating constitutionality of delay between time of property seizure and initiation of forfeiture action). "Little can be said on when a delay becomes presumptively improper, for the determination necessarily depends on the facts of the particular case." *Id.,* at 565, 103 S.Ct., at 2012.

Thus the constitutional analysis of delay requires some development of the relevant factual context when a plaintiff alleges, as Loudermill has, that the administrative process has taken longer than some minimal amount of time. Indeed, all of our precedents that have considered administrative delays under the Due Process Clause, either explicitly or *sub silentio,* have been decided only after more complete proceedings in the District Courts. See, *e.g., $8,850, supra; Barry v. Barchi,* 443 U.S. 55, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979); *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974); *Mathews v. Eldridge, supra.* [4] Yet in Part V, the Court summarily holds Loudermill's allegations **\*558** insufficient, without adverting to any considered balancing of interests. Disposal of Loudermill's complaint without examining the competing interests involved marks an unexplained departure from the careful multifaceted analysis of the facts we consistently have employed in the past.

I previously have stated my view that

"[t]o be meaningful, an opportunity for a full hearing and determination must be afforded at least at a time when the potentially irreparable and substantial harm caused by a suspension can still be avoided—*i.e.,* either before or immediately after suspension." *Barry v. Barchi, supra,* 443 U.S., at 74, 99 S.Ct., at 2654 (BRENNAN, J., concurring in part).

**\*\*1502** Loudermill's allegations of months-long administrative delay, taken together with the facially divergent results regarding length of administrative delay found in *Barchi* as compared to *Arnett,* see n. 4, *supra,* are sufficient in my mind to require further factual development. In no other way can the third *Mathews* factor—"the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement [in this case, a speedier hearing and decision] would entail," 424 U.S., at 335, 96 S.Ct., at 903—sensibly be evaluated in this case. [5] I therefore would remand the delay issue to the District Court for further evidentiary proceedings consistent with the *Mathews* approach. I respectfully dissent from the Court's contrary decision in Part V.

**\*559** Justice REHNQUIST, dissenting.

In *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), six Members of this Court agreed that a public employee could be dismissed for misconduct without a full hearing prior to termination. A plurality of Justices agreed

that the employee was entitled to exactly what Congress gave him, and no more. The Chief Justice, Justice Stewart, and I said:

"Here appellee did have a statutory expectancy that he not be removed other than for 'such cause as will promote the efficiency of [the] service.' But the very section of the statute which granted him that right, a right which had previously existed only by virtue of administrative regulation, expressly provided also for the procedure by which 'cause' was to be determined, and expressly omitted the procedural guarantees which appellee insists are mandated by the Constitution. Only by bifurcating the very sentence of the Act of Congress which conferred upon appellee the right not to be removed save for cause could it be said that he had an expectancy of that substantive right without the procedural limitations which Congress attached to it. In the area of federal regulation of government employees, where in the absence of statutory limitation the governmental employer has had virtually uncontrolled latitude in decisions as to hiring and firing, *Cafeteria Workers v. McElroy,* 367 U.S. 886, 896–897, 81 S.Ct. 1743, 1749–1750, 6 L.Ed.2d 1230 (1961), we do not believe that a statutory enactment such as the Lloyd-La Follette Act may be parsed as discretely as appellee urges. Congress was obviously intent on according a measure of statutory job security to governmental employees which they had not previously enjoyed, but was likewise intent on excluding more elaborate procedural requirements which it felt would make the operation of the new scheme unnecessarily burdensome in practice. Where the focus of legislation was thus strongly on the procedural mechanism for enforcing the substantive **\*560** right which was simultaneously conferred, we decline to conclude that the substantive right may be viewed wholly apart from the procedure provided for its enforcement. The employee's statutorily defined right is not a guarantee against removal without cause in the abstract, but such a guarantee as enforced by the procedures which Congress has designated for the determination of cause." *Id.,* at 151–152, 94 S.Ct., at 1643.

In these cases, the relevant Ohio statute provides in its first paragraph that

"[t]he tenure of every officer or employee in the classified service of the state **\*\*1503** and the counties, civil service townships, cities, city health districts, general health districts, and city school districts thereof, holding a position under this chapter of the Revised Code, shall

be during good behavior and efficient service and no such officer or employee shall be reduced in pay or position, suspended, or removed, except ... for incompetency, inefficiency, dishonesty, drunkenness, immoral conduct, insubordination, discourteous treatment of the public, neglect of duty, violation of such sections or the rules of the director of administrative services or the commission, or any other failure of good behavior, or any other acts of misfeasance, malfeasance, or nonfeasance in office." Ohio Rev.Code Ann. § 124.34 (1984).

The very next paragraph of this section of the Ohio Revised Code provides that in the event of suspension of more than three days or removal the appointing authority shall furnish the employee with the stated reasons for his removal. The next paragraph provides that within 10 days following the receipt of such a statement, the employee may appeal in writing to the State Personnel Board of Review or the Commission, such appeal shall be heard within 30 days from the time of its filing, and the Board may affirm, disaffirm, or modify the judgment of the appointing authority.

**\*561** Thus in one legislative breath Ohio has conferred upon civil service employees such as respondents in these cases a limited form of tenure during good behavior, and prescribed the procedures by which that tenure may be terminated. Here, as in *Arnett,* "[t]he employee's statutorily defined right is not a guarantee against removal without cause in the abstract, but such a guarantee as enforced by the procedures which [the Ohio Legislature] has designated for the determination of cause." 416 U.S., at 152, 94 S.Ct., at 1643 (opinion of REHNQUIST, J.). We stated in *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972):

> "Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."

We ought to recognize the totality of the State's definition of the property right in question, and not merely seize upon one of several paragraphs in a unitary statute to proclaim that in that paragraph the State has inexorably conferred upon a civil service employee something which it is powerless under the United States Constitution to qualify in the next

**Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532 (1985)**

105 S.Ct. 1487, 118 L.R.R.M. (BNA) 3041, 84 L.Ed.2d 494, 53 USLW 4306...

paragraph of the statute. This practice ignores our duty under *Roth* to rely on state law as the source of property interests for purposes of applying the Due Process Clause of the Fourteenth Amendment. While it does not impose a federal definition of property, the Court departs from the full breadth of the holding in *Roth* by its selective choice from among the sentences the Ohio Legislature chooses to use in establishing and qualifying a right.

Having concluded by this somewhat tortured reasoning that Ohio has created a property right in the respondents in these cases, the Court naturally proceeds to inquire what process is "due" before the respondents may be divested of **\*562** that right. This customary "balancing" inquiry conducted by the Court in these cases reaches a result that is quite unobjectionable, but it seems to me that it is devoid of any principles which will either instruct or endure. The balance is simply an ad hoc weighing which depends to a great extent upon how the Court subjectively views the underlying interests at stake. The results in previous cases and in these cases have been quite unpredictable. To paraphrase Justice Black, today's balancing act requires a "pretermination opportunity to respond" **\*\*1504** but there is nothing that indicates what tomorrow's will be. *Goldberg*

*v. Kelly,* 397 U.S. 254, 276, 90 S.Ct. 1011, 1024, 25 L.Ed.2d 287 (1970) (Black, J., dissenting). The results from today's balance certainly do not jibe with the result in *Goldberg* or *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). [*] The lack of **\*563** any principled standards in this area means that these procedural due process cases will recur time and again. Every different set of facts will present a new issue on what process was due and when. One way to avoid this subjective and varying interpretation of the Due Process Clause in cases such as these is to hold that one who avails himself of government entitlements accepts the grant of tenure along with its inherent limitations.

Because I believe that the Fourteenth Amendment of the United States Constitution does not support the conclusion that Ohio's effort to confer a limited form of tenure upon respondents resulted in the creation of a "property right" in their employment, I dissent.

### Parallel Citations

105 S.Ct. 1487, 118 L.R.R.M. (BNA) 3041, 84 L.Ed.2d 494, 53 USLW 4306, 23 Ed. Law Rep. 473, 1 IER Cases 424

### Footnotes

[*]  The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

1  The statute authorizes the Commission to "affirm, disaffirm, or modify the judgment of the appointing authority." Ohio Rev.Code Ann. § 124.34 (1984). Petitioner Parma Board of Education interprets this as authority to reinstate with or without backpay and views the Commission's decision as a compromise. Brief for Petitioner in No. 83–1363, p. 6, n. 3; Tr. of Oral. Arg. 14. The Court of Appeals, however, stated that the Commission lacked the power to award backpay. 721 F.2d 550, 554, n. 3 (1983). As the decision of the Commission is not in the record, we are unable to determine the reasoning behind it.

2  In denying the motion, the District Court no longer relied on the principle that the state legislature could define the necessary procedures in the course of creating the property right. Instead, it reached the same result under a balancing test based on Justice POWELL's concurring opinion in *Arnett v. Kennedy,* 416 U.S. 134, 168–169, 94 S.Ct. 1633, 1651–1652, 40 L.Ed.2d 15 (1974), and the Court's opinion in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). App. to Pet. for Cert. in No. 83–1362, pp. A54–A57.

3  Of course, the Due Process Clause also protects interests of life and liberty. The Court of Appeals' finding of a constitutional violation was based solely on the deprivation of a property interest. We address below Loudermill's contention that he has been unconstitutionally deprived of liberty. See n. 13, *infra.*

4  The relevant portion of § 124.34 provides that no classified civil servant may be removed except "for incompetency, inefficiency, dishonesty, drunkenness, immoral conduct, insubordination, discourteous treatment of the public, neglect of duty, violation of such sections or the rules of the director of administrative services or the commission, or any other failure of good behavior, or any other acts of misfeasance, malfeasance, or nonfeasance in office."

5  The Cleveland Board of Education now asserts that Loudermill had no property right under state law because he obtained his employment by lying on the application. It argues that had Loudermill answered truthfully he would not have been hired. He therefore lacked a "legitimate claim of entitlement" to the position. Brief for Petitioner in No. 83–1362, pp. 14–15.

    For several reasons, we must reject this submission. First, it was not raised below. Second, it makes factual assumptions—that Loudermill lied, and that he would not have been hired had he not done so—that are inconsistent with the allegations of the

**Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532 (1985)**

105 S.Ct. 1487, 118 L.R.R.M. (BNA) 3041, 84 L.Ed.2d 494, 53 USLW 4306...

complaint and inappropriate at this stage of the litigation, which has not proceeded past the initial pleadings stage. Finally, the argument relies on a retrospective fiction inconsistent with the undisputed fact that Loudermill was hired and did hold the security guard job. The Board cannot escape its constitutional obligations by rephrasing the basis for termination as a reason why Loudermill should not have been hired in the first place.

After providing for dismissal only for cause, see n. 4, *supra,* § 124.34 states that the dismissed employee is to be provided with a copy of the order of removal giving the reasons therefor. Within 10 days of the filing of the order with the Director of Administrative Services, the employee may file a written appeal with the State Personnel Board of Review or the Commission. "In the event such an appeal is filed, the board or commission shall forthwith notify the appointing authority and shall hear, or appoint a trial board to hear, such appeal within thirty days from and after its filing with the board or commission, and it may affirm, disaffirm, or modify the judgment of the appointing authority." Either side may obtain review of the Commission's decision in the State Court of Common Pleas.

There are, of course, some situations in which a postdeprivation hearing will satisfy due process requirements. See *Ewing v. Mytinger & Casselberry, Inc.,* 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950); *North American Cold Storage Co. v. Chicago,* 211 U.S. 306, 29 S.Ct. 101, 53 L.Ed. 195 (1908).

This is not to say that where state conduct is entirely discretionary the Due Process Clause is brought into play. See *Meachum v. Fano,* 427 U.S. 215, 228, 96 S.Ct. 2532, 2540, 49 L.Ed.2d 451 (1976). Nor is it to say that a person can insist on a hearing in order to argue that the decisionmaker should be lenient and depart from legal requirements. See *Dixon v. Love,* 431 U.S. 105, 114, 97 S.Ct. 1723, 1728, 52 L.Ed.2d 172 (1977). The point is that where there is an entitlement, a prior hearing facilitates the consideration of whether a permissible course of action is also an appropriate one. This is one way in which providing "effective notice and informal hearing permitting the [employee] to give his version of the events will provide a meaningful hedge against erroneous action. At least the [employer] will be alerted to the existence of disputes about facts and arguments about cause and effect.... [H]is discretion will be more informed and we think the risk of error substantially reduced." *Goss v. Lopez,* 419 U.S., at 583–584, 95 S.Ct., at 740–741.

Loudermill's dismissal turned not on the objective fact that he was an ex-felon or the inaccuracy of his statement to the contrary, but on the subjective question whether he had lied on his application form. His explanation for the false statement is plausible in light of the fact that he received only a suspended 6-month sentence and a fine on the grand larceny conviction. Tr. of Oral Arg. 35.

In the cases before us, no such danger seems to have existed. The examination Donnelly failed was related to driving school buses, not repairing them. *Id.,* at 39–40. As the Court of Appeals stated, "[n]o emergency was even conceivable with respect to Donnelly." 721 F.2d, at 562. As for Loudermill, petitioner states that "to find that we have a person who is an ex-felon as our security guard is very distressful to us." Tr. of Oral Arg. 19. But the termination was based on the presumed misrepresentation on the employment form, not on the felony conviction. In fact, Ohio law provides that an employee "shall not be disciplined for acts," including criminal convictions, occurring more than two years previously. See Ohio Admin.Code § 124–3–04 (1979). Petitioner concedes that Loudermill's job performance was fully satisfactory.

Loudermill's hearing before the referee occurred two and one-half months after he filed his appeal. The Commission issued its written decision six and one-half months after that. Administrative proceedings in Donnelly's case, once it was determined that they could proceed at all, were swifter. A writ of mandamus requiring the Commission to hold a hearing was issued on May 9, 1978; the hearing took place on May 30; the order of reinstatement was issued on July 6.

Section 124.34 provides that a hearing is to be held within 30 days of the appeal, though the Ohio courts have ruled that the time limit is not mandatory. *E.g., In re Bronkar,* 53 Ohio Misc. 13, 17, 372 N.E.2d 1345, 1347 (Com.Pl.1977). The statute does not provide a time limit for the actual decision.

It might be argued that once we find a due process violation in the denial of a pretermination hearing we need not and should not consider whether the post-termination procedures were adequate. See *Barry v. Barchi,* 443 U.S. 55, 72–74, 99 S.Ct. 2642, 2653–2654, 61 L.Ed.2d 365 (1979) (BRENNAN, J., concurring in part). We conclude that it is appropriate to consider this issue, however, for three reasons. First, the allegation of a distinct due process violation in the administrative delay is not an alternative theory supporting the same relief, but a separate claim altogether. Second, it was decided by the court below and is raised in the cross-petition. Finally, the existence of post-termination procedures is relevant to the necessary scope of pretermination procedures.

The cross-petition also argues that Loudermill was unconstitutionally deprived of liberty because of the accusation of dishonesty that hung over his head during the administrative proceedings. As the Court of Appeals found, 721 F.2d, at 563, n. 18, the failure to allege that the reasons for the dismissal were published dooms this claim. See *Bishop v. Wood,* 426 U.S. 341, 348, 96 S.Ct. 2074, 2079, 48 L.Ed.2d 684 (1976).

\* See U.S. Dept. of Labor, Comparison of State Unemployment Insurance Laws §§ 425, 435 (1984); see also *id.,* at 4–33 to 4–36 (table of state rules governing disqualification from benefits for discharge for misconduct).

Post-termination administrative procedures designed to determine fully and accurately the correctness of discharge actions are to be encouraged. Multiple layers of administrative procedure, however, may not be created merely to smother a discharged employee with

Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532 (1985)

105 S.Ct. 1487, 118 L.R.R.M. (BNA) 3041, 84 L.Ed.2d 494, 53 USLW 4306...

"thoroughness," effectively destroying his constitutionally protected interests by over-extension. Cf. *ante,* at 1496 ("thoroughness" of procedures partially explains delay in this case).

2    The interim decision, issued by a hearing examiner, was in Loudermill's favor and recommended his reinstatement. But Loudermill was not reinstated nor were his wages even temporarily restored; in fact, there apparently exists no provision for such interim relief or restoration of backpay under Ohio's statutory scheme. See *ante,* at 1490, n. 1; cf. *Arnett v. Kennedy,* 416 U.S. 134, 196, 94 S.Ct. 1633, 1665, 40 L.Ed.2d 15 (1974) (WHITE, J., concurring in part and dissenting in part) (under federal civil service law, discharged employee's wages are only "provisionally cut off" pending appeal); *id., at 146* (opinion of REHNQUIST, J.) (under federal system, backpay is automatically refunded "if the [discharged] employee is reinstated on appeal"). See also N.Y.Civ.Serv.Law § 75(3) (McKinney 1983) (suspension without pay pending determination of removal charges may not exceed 30 days). Moreover, the final decision of the Commission to reverse the hearing examiner apparently was arrived at without any additional evidentiary development; only further argument was had before the Commission. 721 F.2d 550, 553 (CA6 1983). These undisputed facts lead me at least to question the administrative value of, and justification for, the 9-month period it took to decide Loudermill's case.

3    A number of other States similarly have specified time limits for hearings and decisions on discharge appeals taken by tenured public employees, indicating legislative consensus that a month or two normally is sufficient time to resolve such actions. No state statutes permit administrative delays of the length alleged by Loudermill. See, *e.g.,* Ariz.Rev.Stat.Ann. § 41–785(A), (C) (Supp.1984–1985) (hearing within 30 days, decision within 30 days of hearing); Colo.Rev.Stat. § 24–50–125(4) (Supp.1984) (hearing within 45 days, decision within 45 days of hearing); Conn.Gen.Stat.Ann. § 5–202(b) (Supp.1984) (decision within 60 days of hearing); Ill.Rev.Stat., ch. 24½, ¶ 38b14 (1983) (hearing within 45 days); Ind.Code § 4–15–2–35 (1982) (decision within 30 days of hearing); Iowa Code § 19A.14 (1983) (hearing within 30 days); Kan.Stat.Ann. § 75–2949(f) (Supp.1983) (hearing within 45 days); Ky.Rev.Stat. § 18A.095(3) (1984) (hearing within 60 days of filing, decision within 90 days of filing); Maine Rev.Stat.Ann., Tit. 5, § 753(5) (1979) (decision within 30 days of hearing); Md.Ann.Code, Art. 64A, §§ 33(b)(2), (e) (Supp.1984) (salary suspension hearing within 5 days and decision within 5 more days; discharge hearing within 90 days and decision within 45 days of hearing); Mass.Gen.Laws Ann., ch. 31, § 43 (Supp.1984–1985) (hearing within 10 days, findings "forthwith," decision within 30 days of findings); Minn.Stat. § 44.08 (1970) (hearing within 10 days, decision within 3 days of hearing); Nev.Rev.Stat. § 284.390(2) (1983) (hearing within 20 days); N.J.Stat.Ann. §§ 11:15–4, 11:15–6 (West 1976) (hearing within 30 days, decision within 15 days of hearing); Okla.Stat., Tit. 74, §§ 841.13, 841.13A (Supp.1984) (hearing within 35 days, decision within 15 days of hearing); R.I.Gen.Laws §§ 36–4–40, 36–4–40.2, 36–4–41 (1984) (initial hearing within 14 days, interim decision within 20 days of hearing, appeal decision within 30 more days, final decision of Governor within 15 more days); S.C.Code §§ 8–17–330, 8–17–340 (Supp.1984) (interim decision within 45 days of filing, final decision within 20 days of hearing); Utah Code Ann. § 67–19–25 (Supp.1983) (interim decision within 5–20 days, final hearing within 30 days of filing final appeal, final decision within 40 days of hearing); Wash.Rev.Code § 41.64.100 (1983) (final decision within 90 days of filing); Wis.Stat. § 230.44(4)(f) (Supp.1984–1985) (decision within 90 days of hearing); see also Ala.Code § 36–26–27(b) (Supp.1984) (hearings on citizen removal petitions within 20 days of service); D.C.Code § 1–617.3(a)(1)(D) (1981) ("Career and Educational Services" employees "entitled" to decision within 45 days); Ga.Code Ann. § 45–20–9(e)(1) (1982) (hearing officer's decision required within 30 days of hearing); Miss.Code Ann. § 21–31–23 (Supp.1984) (hearing required within 20 days of termination for "extraordinary circumstances").

4    After giving careful consideration to well-developed factual contexts, the Court has reached results that might be viewed as inconsistent in the abstract. Compare *Barchi,* 443 U.S., at 66, 99 S.Ct., at 2650 (disapproving statute requiring decision within 30 days of hearing), with *Arnett,* 416 U.S., at 194, 94 S.Ct., at 1664 (WHITE, J., concurring in part and dissenting in part) (approving statutory scheme under which over 50 percent of discharge appeals "take more than three months"). Rather than inconsistency, however, these differing results demonstrate the impossibility of drawing firm lines and the importance of factual development in such cases.

5    In light of the complete absence of record evidence, it is perhaps unsurprising that the Court of Appeals below was forced to speculate that "[t]he delays in the instant cases in all likelihood were inadvertent." 721 F.2d at 564, n. 19. Similarly, the Cleveland Board of Education and Civil Service Commission assert only that "[n]o authority is necessary to support the proposition" that administrative resolution of a case like Loudermill's in less than nine months is "almost impossible." Brief for Respondents in No. 83–6392, p. 8, n. 4. To the contrary, however, I believe our precedents clearly require demonstration of some "authority" in these circumstances.

*    Today the balancing test requires a pretermination opportunity to respond. In *Goldberg* we required a full-fledged trial-type hearing, and in *Mathews* we declined to require any pretermination process other than those required by the statute. At times this balancing process may look as if it were undertaken with a thumb on the scale, depending upon the result the Court desired. For example, in *Mathews* we minimized the importance of the benefit to the recipient, stating that after termination he could always go on welfare to survive. 424 U.S., at 340–343, 96 S.Ct., at 905–907; see also *id., at 350, 96 S.Ct., at 910* (BRENNAN, J., dissenting). Today, however, the Court exalts the recipient's interest in retaining employment; not a word is said about going on welfare. Conversely, in *Mathews* we stressed the interests of the State, while today, in a footnote, the Court goes so far as to denigrate the State's interest in firing a school security guard who had lied about a prior felony conviction. *Ante,* at 1495, n. 10.

**Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532 (1985)**

105 S.Ct. 1487, 118 L.R.R.M. (BNA) 3041, 84 L.Ed.2d 494, 53 USLW 4306...

Today the Court purports to describe the State's interest, *ante,* at 1495, but does so in a way that is contrary to what petitioner Boards of Education have asserted in their briefs. The description of the State's interests looks more like a make-weight to support the Court's result. The decision whom to train and employ is strictly a decision for the State. The Court attempts to ameliorate its ruling by stating that a State may always suspend an employee with pay, in lieu of a predischarge hearing, if it determines that he poses a threat. *Ante,* at 1495. This does less than justice to the State's interest in its financial integrity and its interest in promptly terminating an employee who has violated the conditions of his tenure, and ignores Ohio's current practice of paying back wages to wrongfully-discharged employees.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

660 S.W.2d 55
Supreme Court of Texas.

James W. CROUCHER, Jr. et al., Petitioners,
v.
Virginia M. CROUCHER, Respondent.

No. C–1855.　|　Nov. 2, 1983.
|　Rehearing Denied Dec. 14, 1983.

In will contest, the County Court No. 3, El Paso County, Ferguson, J., denied will probate based on jury finding that testator lacked testamentary capacity, and proponent of will appealed. The El Paso Court of Civil Appeals, Eighth Supreme Judicial District, 654 S.W.2d 475, Osborn, J., reversed, and testator's sons appealed. The Supreme Court, Spears, J., held that proponent failed to establish that testator had testamentary capacity at time he executed will.

Reversed.

Wallace, J., dissented.

West Headnotes (6)

**[1]　Wills**
　　 Presumptions and Burden of Proof

Burden of proving testamentary capacity was on proponent of will.

12 Cases that cite this headnote

**[2]　Wills**
　　Presumptions and Burden of Proof

Fact that will was self-proved did not shift burden of proof from proponent of will, where contest was filed before will was admitted to probate; therefore, court was required to sustain jury's finding that testator did not have testamentary capacity unless proponent conclusively proved that he did.

33 Cases that cite this headnote

**[3]　Wills**

　　Mental condition prior or subsequent to execution of will

Evidence of incompetency at other times can be used to establish incompetency on day will was executed if it demonstrates that condition persists and has some probability of being same condition which obtained at time of will's making.

26 Cases that cite this headnote

**[4]　Wills**
　　Weight and Sufficiency

Proponent of will did not establish that testator had testamentary capacity at time he executed will, where there was evidence indicating lack of testamentary capacity, including evidence that testator was at times confused and his memory was sketchy and that he had one completely occluded and one partially occluded carotid artery, and evidence from which jury could have inferred that testator's problems, shown to have existed before and after he executed will, kept him from having testamentary capacity when he executed will.

27 Cases that cite this headnote

**[5]　Appeal and Error**
　　Verdict, findings, or decision

When party having burden of proof appeals from adverse fact-finding in trial court, point of error should be that matter was established as matter of law, or that jury's finding was against great weight and preponderance of evidence.

339 Cases that cite this headnote

**[6]　Appeal and Error**
　　Scope and effect

Complaint by party with burden of proof that there was no evidence to support jury's finding invokes appellate jurisdiction to consider contention that opposite of finding was established as matter of law.

399 Cases that cite this headnote

**Attorneys and Law Firms**

**\*56**  Ken Powell, El Paso, for petitioners.

James T. Allen, El Paso, for respondent.

**Opinion**

SPEARS, Justice.

This case involves a will contest. James Croucher Sr. died in 1980, leaving a self-proving will devising his entire estate to his wife, respondent Virginia Croucher. Petitioners James Croucher Jr. and Kenneth Croucher, Mr. Croucher's sons by a previous marriage, contested the will, alleging that their father did not have testamentary capacity. Based on a jury finding that Mr. Croucher lacked such capacity, the trial court rendered judgment that the will be denied probate. The Court of Appeals reversed, holding that the evidence established as a matter of law that Mr. Croucher had testamentary capacity. We reverse the judgment of the Court of Appeals and affirm that of the trial court.

The evidence shows that Mr. Croucher had a history of physical problems, many of which stemmed from his being diabetic. In December 1979, he was admitted to the hospital to have two toes amputated. A brain scan done at that time indicated that Mr. Croucher had a diminished flow of blood to the brain in the right carotid artery. Another brain scan done shortly thereafter showed diminished flow in the corresponding left artery. In late January 1980, Mr. Croucher returned to the hospital to have his left leg amputated. He was readmitted in early March, and an arteriogram revealed that Mr. Croucher's right internal carotid artery was totally occluded. The report from a neurological examination done on that occasion recited that Mr. Croucher's "memory was sketchy and he seemed at times confused."

Mr. Croucher executed the will in question on July 7, 1980. Slightly over a month later, on August 12, he was admitted to the hospital once again. The evidence indicates that Mr. Croucher had suffered a stroke affecting his speech and memory. The hospital admission report stated that Mr. Croucher was suffering from "severe arteriosclerotic cardiovascular disease," and had been undergoing decreasing mental status for one month. Mr. Croucher died on August 17.

The record also contains evidence that Mr. Croucher had testamentary capacity on the date the will was executed. The attesting witnesses stated at trial that Mr. Croucher was lucid and knew what he was doing. Several persons who saw Mr. Croucher at a Fourth of July party, three days before the will was executed, testified that he was alert, was able to carry on a conversation, and participated in a card game. An acquaintance of Mr. Croucher who was also a medical doctor testified that he had seen Mr. Croucher around the same time, that he believed him to be competent, and that the blockage in the carotid arteries would not necessarily cause mental decline.

**\*57**  **[1]**  **[2]**  Against this background, the question is whether Mrs. Croucher established as a matter of law that her husband had testamentary capacity on July 7, 1980. The burden of proving capacity was on Mrs. Croucher. *Siegler v. Siegler,* 391 S.W.2d 403 (Tex.1965.) The fact that the will was self-proved does not shift the burden, because the contest was filed before the will was admitted to probate. *Reynolds v. Park,* 485 S.W.2d 807 (Tex.Civ.App.—Amarillo 1972, writ ref'd n.r.e.); *see also In re Price's Estate,* 375 S.W.2d 900, 903 (Tex.1964). Hence, we must sustain the jury's finding that Mr. Croucher did not have testamentary capacity unless Mrs. Croucher conclusively proved that he did. *See W.H. Hodges & Co. v. Donley County State Bank,* 407 S.W.2d 221, 223 (Tex.1966).

Mrs. Croucher clearly produced sufficient evidence to sustain a finding that Mr. Croucher had testamentary capacity. That evidence, if not contradicted, would be enough to establish the matter conclusively. We must determine, then, if James and Kenneth Croucher produced some evidence that their father was not competent to make a will.

 **[3]**  There is no direct evidence that Mr. Croucher lacked testamentary capacity on the day that he executed the will. Evidence of incompetency at other times can be used to establish incompetency on the day the will was executed if it "demonstrates that the condition persists and 'has some probability of being the same condition which obtained at the time of the will's making.' " *Lee v. Lee,* 424 S.W.2d 609 (Tex.1968) (quoting 1 McCormick and Ray, *Texas Law of Evidence* § 896, at 675 [2d ed. 1956] ).

Thus, the evidence adduced by the Croucher sons must pass two tests. First, was the evidence of the kind that would indicate lack of testamentary capacity? Second, if so, was that evidence probative of Mr. Croucher's capacity, or lack thereof, on July 7, 1980, when the will was executed?

**[4]** The answer to both questions is "yes." The evidence shows that in March of 1980, Mr. Croucher at times was confused and his memory was sketchy. He had one completely occluded and one partially occluded carotid artery. One of Mrs. Croucher's own witnesses, a doctor, admitted that this condition could have caused Mr. Croucher to be less than lucid at times. Mrs. Croucher's own witnesses testified that they had seen Mr. Croucher in late July, and that he had evidently suffered a stroke, could not talk, and was no longer able to care for himself. Mrs. Croucher admitted writing a letter, dated August 4, to James Croucher, which said, "Thank goodness that I got him to the VA while he was still lucid." A reasonable inference from that letter would have been that Mr. Croucher was no longer lucid. Certainly these facts would have constituted some evidence that Mr. Croucher was without capacity during August.

The Court of Appeals, citing *Cruz v. Prado,* 239 S.W.2d 650 (Tex.Civ.App.—San Antonio 1951, no writ), held that there was no evidence of lack of testamentary capacity, because all of James and Kenneth Croucher's proof indicated physical disability, from which mental incapacity cannot be inferred. *Cruz v. Prado* does not apply to this case. Here, the evidence did not simply demonstrate physical decline. Rather, the contestants produced evidence of physical problems, i.e. occlusion of the carotid arteries, consistent with mental incapacity.

There was also evidence from which the jury could have inferred that Mr. Croucher's problems, shown to have existed in March and August, kept him from having testamentary capacity on July 7. Mr. Croucher had a failing memory resulting from his arteriosclerosis in March, before the will was executed. That same disease incapacitated Mr. Croucher in August, after the will was made. That sequence of events alone is some evidence that Mr. Croucher suffered from the condition on July 7. Moreover, the August hospital report indicated that Mr. Croucher had suffered from decreasing mental status for one month.

**\*58** We hold that there was some evidence of lack of testamentary capacity. In the face of this record, we cannot say that Mrs. Croucher established as a matter of law that her husband had testamentary capacity at the time that he executed his will.

**[5]** **[6]** Mrs. Croucher also complained to the Court of Appeals that "there was no, or insufficient, evidence of lack of testamentary capacity to support the jury finding." Those points of error are appropriate when the party without the burden of proof complains of a jury finding. When, however, the party having the burden of proof appeals from an adverse fact finding in the trial court, the point of error should be that the matter was established as a matter of law, or that the jury's finding was against the great weight and preponderance of the evidence. *O'Neil v. Mack Trucks, Inc.,* 542 S.W.2d 112 (Tex.1978). A complaint by the party with the burden of proof that there was no evidence to support the jury's finding invokes appellate jurisdiction to consider the contention that the opposite of the finding was established as a matter of law. *O'Neil, supra.* In its opinion on motion for rehearing, the Court of Appeals, while recognizing this rule, held that Mrs. Croucher had failed to state a proper point of error concerning the factual sufficiency of the evidence. The correctness of that holding is not before us, because Mrs. Croucher has not complained of it by way of cross point. *Maddox v. Maxwell,* 369 S.W.2d 343 (Tex.1963).

The judgment of the Court of Appeals is reversed, and that of the trial court is affirmed.

WALLACE, J., notes his dissent.

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

8 S.W.3d 309
Supreme Court of Texas.

EL PASO NATURAL GAS CO., Petitioner,

v.

MINCO OIL & GAS, INC., and Charles F.
Doornbos as Trustee for the Charles F.
Doornbos Revocable Trust, Respondents.

No. 98–0478. | Argued Dec. 10,
1998. | Decided Nov. 18, 1999. |
Rehearing Overruled Jan. 27, 2000.

Property owners sued natural gas company for breach of take-or-pay gas purchase agreements, and company defended based on releases which it had previously obtained from property owners, prior to allowing them to sell their gas to other buyers. The 31st District Court, Hemphill County, Lee Waters, J., held that releases were unconscionable and entered judgment in favor of property owners on their claims, and gas company appealed. The Amarillo Court of Appeals, 964 S.W.2d 54, affirmed, and gas company appealed. The Supreme Court, Enoch, J., held that: (1) Uniform Commercial Code's (UCC) statutory duty of good faith and fair dealing in the performance, enforcement and modification of a commercial contract did not apply to final releases of liability executed by parties, and (2) gas company's failure to specifically challenge trial court's finding that letter terminating a take-or-pay agreement was ambiguous as to whether it was a release did not waive ambiguity issue on appeal.

Reversed and rendered.

West Headnotes (10)

[1] **Appeal and Error**
 ☞ Cases Triable in Appellate Court

 Issue of whether one has a duty to act in good faith is a question of law subject to de novo review.

 59 Cases that cite this headnote

[2] **Contracts**

 ☞ Terms implied as part of contract

 Generally, absent a special relationship, there is no duty between parties to a contract to act in good faith.

 3 Cases that cite this headnote

[3] **Release**
 ☞ Agreements to release

 Uniform Commercial Code's (UCC) statutory duty of good faith and fair dealing in the performance, enforcement and modification of a commercial contract did not apply to a final release of liability under a natural gas take-or-pay purchase agreement; release was neither the enforcement and performance of a contract for sale of goods nor a modification of an agreement, but was instead the formation of a separate contract to which the UCC's duty of good faith did not apply. V.T.C.A., Bus. & C. §§ 1.203, 2.209.

 9 Cases that cite this headnote

[4] **Sales**
 ☞ Nature of property

 Buying and selling oil and gas pursuant to take-or-pay gas purchase agreements is a transaction involving "goods" within the meaning of the Uniform Commercial Code's (UCC) good faith provisions. V.T.C.A., Bus. & C. §§ 1.203, 2.209.

 4 Cases that cite this headnote

[5] **Contracts**
 ☞ Agreement to make contract in future
 **Release**
 ☞ Agreements to release

 Uniform Commercial Code's (UCC) duty of good faith in performance of a contract does not extend to the formation of a contract, including a release. V.T.C.A., Bus. & C. § 1.203.

 1 Cases that cite this headnote

[6] **Release**
 ☞ Nature and requisites in general

"Release" is a contract by which the parties agree that there are no longer any duties to perform or enforce under the original contract; it acts as a voluntary settlement of the claims relating to each party's performance or non-performance of the original contract.

3 Cases that cite this headnote

[7] **Release**
   Agreements to release

Uniform Commercial Code's (UCC) duty of good faith when agreeing to modify a contract does not impose a duty of good faith on forming a final release. V.T.C.A., Bus. & C. § 2.209(a).

Cases that cite this headnote

[8] **Appeal and Error**
   Necessity of Specific Objection

Gas company's failure to specifically challenge trial court's finding that company's letter terminating a take-or-pay gas purchase agreement was ambiguous as to whether it was a release did not waive ambiguity issue on appeal, where trial court assumed that letter operated as a release and concluded that its operation as a release was unconscionable, rendering ambiguity finding unnecessary to its judgment.

7 Cases that cite this headnote

[9] **Contracts**
   Ambiguity in general

Whether or not a contract is ambiguous is a question of law for the court.

1 Cases that cite this headnote

[10] **Appeal and Error**
   Requisites and Sufficiency

Supreme Court liberally construes issues presented to obtain a just, fair, and equitable adjudication of the rights of the litigants.

11 Cases that cite this headnote

**Attorneys and Law Firms**

**\*311** Alene Ross Levy, Lynne Liberato, Kent Rutter, Michael K. Swan, James Cowan, S. Shawn Stephens, Houston, for Petitioner.

John Smithee, Joe W. Hayes, Amarillo, for Respondents.

**Opinion**

Justice ENOCH delivered the opinion of the Court, in which Chief Justice PHILLIPS, Justice HECHT, Justice BAKER, Justice ABBOTT, Justice O'NEILL, and Justice GONZALES joined.

This is an appeal from a judgment awarding respondents Minco Oil & Gas, Inc. and Charles F. Doornbos as Trustee for the Charles F. Doornbos Revocable Trust damages for breach of gas purchase agreements against petitioner, El Paso Natural Gas Company. As to Minco, the principal issue is whether the Uniform Commercial Code's good faith obligations apply to its final release of its agreement with El Paso. We conclude that the UCC [1] does not impose a duty of good faith upon the formation or procurement of a final release of liability. Thus, we hold that Minco's release is enforceable and releases El Paso from its take-or-pay obligations to Minco. Regarding Doornbos, the issue is whether El Paso waived error thus limiting the court of appeals' authority to render judgment for El Paso on the enforcement of Doornbos's release. Because we conclude El Paso did not waive error, we reach the question and conclude that Doornbos's release is enforceable and releases El Paso from its take-or-pay obligations to Doornbos. Accordingly, we reverse the court of appeals' judgment and render judgment for El Paso.

**BACKGROUND**

In 1979, Minco and Doornbos entered into separate agreements with El Paso containing identical "take-or-pay" clauses. The agreements' take-or-pay provisions required El Paso to purchase a stated minimum quantity of gas or pay Minco and Doornbos the difference between the quantity actually taken and the stated minimum quantity. Due to the mid–1980's sharp decline in natural gas prices and demand, El Paso determined that it was unprofitable to continue purchasing gas under the agreements' take-or-pay

requirements. To mitigate its losses, El Paso executed with Minco and Doornbos various amendments to the agreements that reduced El Paso's take-or-pay obligations and granted El Paso the right to unilaterally reduce the price it paid for gas. In addition, the parties executed over eighty other contracts ("monthly releases") that: (1) released El Paso from its monthly take-or-pay obligation; (2) allowed Minco and Doornbos to sell their gas on the spot market during the relevant time period; and (3) allowed El Paso the option either to reduce its annual take-or-pay obligation by the amount of gas Minco and Doornbos sold on the spot market or to disregard El Paso's obligation for the month covered by the contract.

In 1988, Minco requested and received from El Paso a final termination of its agreement and a mutual release of liabilities ("Minco termination letter"). Under this termination letter, El Paso and Minco released each other "from any and all claims, causes of action or liability that may have existed concerning the Agreement."

In 1991, El Paso decided to terminate its relationship with Doornbos and sent Doornbos and his predecessors-in-interest form letters that the parties signed agreeing to waive "[a]ll past liabilities that might exist between the parties."

**\*312** In 1992, Minco and Doornbos sued El Paso under the 1979 agreements' take-or-pay provisions. Minco and Doornbos argued that the releases were invalid, alleging that El Paso obtained the Minco and Doornbos amendatory agreements, monthly release letters, and termination letters unconscionably and in bad faith. El Paso responded that the parties had mutually released all claims through the Minco and Doornbos amendatory agreements, monthly release letters, and termination letters.

In a preliminary ruling, the trial court granted partial summary judgment for Minco and Doornbos, holding that the amendatory agreements, the monthly releases, and the Minco and Doornbos final termination letters were all unconscionable as a matter of law. In a bench trial on the remaining issues, the trial court not only reaffirmed its earlier ruling, but also concluded that El Paso procured the amendatory agreements, monthly releases, and the Minco termination letter in bad faith. But the trial court did not make a bad faith determination concerning the Doornbos termination letter. In any event, the court declined to enforce any of the releases and ordered El Paso to pay Minco

and Doornbos damages under the agreements' take-or-pay provisions.

The court of appeals reversed the trial court's finding of unconscionability as to all the agreements. [2] The court, however, agreed with the trial court's finding that El Paso procured the Minco final termination letter in bad faith and affirmed the judgment for Minco. Because unconscionability was the only ground upon which the trial court relied to void the Doornbos termination letter, the court of appeals concluded the release was valid and rendered judgment that Doornbos take nothing. [3]

On rehearing, the court of appeals concluded that El Paso had not properly preserved error on its defense that the Doornbos termination letter operated as a release. The court reasoned that because the trial court, in its findings of fact and conclusions of law, found the Doornbos termination letter to be ambiguous and expressly refused to rule upon whether the termination letter was a release, El Paso had the burden to show on appeal that it had raised the issue that the document was a release as a matter of law. But because El Paso failed to challenge the court's refusal to hold the letter a release, El Paso waived error on whether the document effectuated a release. The court thus concluded that it was without authority to now find the document was a release. [4] The court of appeals then considered whether the amendatory agreements and monthly releases were valid to determine if the Doornbos Agreement's take-or-pay provision was enforceable. In its analysis, the court considered whether El Paso had a duty to act in good faith in obtaining the amendatory agreements and monthly releases, and if so, whether El Paso had in fact breached the duty. The court of appeals, agreeing with the trial court, concluded that UCC section 1.203 imposed a duty on El Paso to act in good faith in procuring the amendatory agreements and monthly releases. The court then concluded that El Paso procured the amendatory agreements and monthly releases in bad faith and, therefore, held them unenforceable. Thus, on rehearing, the court of appeals also affirmed the trial court's judgment for Doornbos.

## MINCO—DUTY OF GOOD FAITH

 [1]    [2]    [3]    Because the issue of whether one has a duty to act in good faith is a question of law, our review is *de novo.* [5] The general rule is that, absent a special relationship, **\*313** there is no duty between parties to a contract to act in good

faith.[6] Here, the parties do not contend that a common law duty of good faith exists. Rather, they disagree over whether the UCC's statutory duty of good faith and fair dealing in the performance, enforcement and modification of a commercial contract applies to a final release of liability.[7]

Minco asserts that the UCC's duty to act in good faith applies to all the parties' agreements, including the final termination letter. Specifically, Minco contends that El Paso violated the UCC's good faith duty of "honesty in fact in the conduct or transaction concerned."[8] It further asserts that both UCC section 1.203's requirement that "[e]very contract or duty within this title imposes an obligation of good faith in its performance or enforcement" and UCC section 2.209's requirement that modifications meet the test of good faith impose a duty of good faith to all the parties' agreements, including the release.

El Paso, by contrast, contends that the court of appeals erred by applying the UCC's obligation of good faith to the formation or procurement of the final release. El Paso asserts that the UCC's duty of good faith applies to the "enforcement and performance" of contracts, including "modifications" of those contracts, but does not apply to the "formation" of contracts. Thus, El Paso reasons that because a final release of liability constitutes neither the "enforcement and performance" of a contract for sale of goods nor a "modification" of an agreement, but rather is the "formation" of a separate contract releasing the parties' obligations to each other, the UCC's duty of good faith does not apply. We agree.

[4] Buying and selling oil and gas pursuant to take-or-pay gas purchase agreements is a transaction involving "goods" within the meaning of the UCC's good faith provisions.[9] Accordingly, El Paso has a statutory obligation to act in good faith in the performance, enforcement and modification of these agreements.[10] But that does not mean that El Paso is under a statutory good faith obligation when it procures or forms those contracts.

[5] [6] The court of appeals concluded that the good faith obligation in sections 1.203 and 2.209, as defined in section 2.103, imposed a duty of good faith in procuring the final termination letter on El Paso. True, section 1.203 states that "[e]very contract or duty within this title imposes an obligation of good faith in its performance or enforcement."[11] And section 2.103 further defines "good faith" in the case of a merchant as "honesty in fact and

the observance of reasonable commercial standards of fair dealing in the trade."[12] But this duty of good faith does not extend to the formation of a contract.[13] And that includes releases because releases are contracts.[14] Indeed, a final release is a contract by which the parties agree that there are no longer any duties to perform or **\*314** enforce under the original contract.[15] And it acts as a voluntary settlement of the claims relating to each party's performance or non-performance of the original contract. Because section 1.203 applies to the performance and enforcement of an existing contract and not forming or procuring a contract, including a mutual release of liability, section 1.203 imposes no good faith duty on El Paso.

[7] Similarly, section 2.209 does not impose a duty of good faith on forming a final release. Subsection 2.209(a) states that "[a]n agreement modifying a contract within this chapter needs no consideration to be binding."[16] The court of appeals concluded that this subsection imposes a duty of good faith upon seeking a release.[17] Referring to section 2.209 comment 2, the court of appeals held that the UCC's good faith "duties apply not only to the performance of the contract but also to the *formation* and modification of those agreements."[18] But comment 2 does not mention forming an agreement; it refers only to modifications. The comment states that modifications made under subsection 2.209(a):

[m]ust meet the test of good faith imposed by this Act. The effective use of bad faith to escape performance on the original contract terms is barred, and the extortion of a "modification" without legitimate commercial reason is ineffective as a violation of the duty of good faith.[19]

It further states that:

[t]he test of "good faith" between merchants or as against merchants includes "observance of reasonable commercial standards of fair dealing in the trade" (Section 2–103), and may in some situations require an objectively demonstrable reason for seeking a modification.[20]

Neither section 2.209 nor the comments refer to a duty of good faith in the formation of a contract. Rather, the express language of section 2.209(a) and the comments establish that this subsection's duty of good faith applies only to contract "modifications." And as discussed above, a release of liability is not an agreement to modify a contract but is an agreement

to completely relinquish the parties' performance obligations to each other.

This is not to say that there are no constraints on a party's behavior in the negotiation and formation of a contract. The UCC's doctrine of unconscionability, for example, is intended to apply to the formation of contracts. [21] Further, subsections 2.209(b) and (d) apply to any "modification or rescission" of a contract. [22] But subsection 2.209(a) and corresponding comment 2's good faith obligation are limited to "modifications" only. [23]

Because the court of appeals' only basis for holding the Minco final termination letter unenforceable was its bad faith determination, and because we conclude that the UCC does not impose a good faith obligation on the formation of a final release, the Minco termination letter releases El Paso from the Agreement's take-or-pay obligations. We therefore reverse the court of appeals' judgment as to Minco and render judgment that Minco take nothing.

#### *315 DOORNBOS

 [8]    As to Doornbos, the trial court did not make a bad faith determination, but only held that the release was unconscionable and therefore unenforceable. Unique to Doornbos, the trial court found the termination letter to be ambiguous, but assumed that it was not, in order to reach the unconscionability issue. The only issue before us is whether the court of appeals properly determined that El Paso waived the release issue by failing to object to the trial court's finding of ambiguity.

Initially, the court of appeals reversed that part of the trial court's judgment holding the release unconscionable and awarding Doornbos damages and attorney's fees, and rendered judgment for El Paso. [24] In doing so, the court of appeals concluded that the trial court improperly found that the Doornbos release was ambiguous, and that the terms of the release unambiguously encompassed any take-or-pay liabilities. [25] But on rehearing, the court of appeals concluded that it had "wrongly raised and resolved the factual question of whether the [Doornbos termination letter] was a release." [26] The court reasoned that because the trial court refused to rule on whether the termination letter was a release, it was El Paso's burden to come forward with a challenge on appeal establishing that the document was a release as a

matter of law. In short the court of appeals held that El Paso waived the issue. We disagree.

 [9]    Whether or not a contract is ambiguous is a question of law for the court. [27] Accordingly, when the court of appeals held in its original opinion that the termination letter was an unambiguous release, it resolved a legal issue. And the court of appeals erred in concluding on rehearing that El Paso had to affirmatively challenge on appeal the trial court's finding of ambiguity. Furthermore, the legal issue of ambiguity was subsumed under El Paso's principal complaint that the release was not unconscionable, but rather should be enforced as written to bar Doornbos's claims.

In this case, the trial court made a factual finding of ambiguity. The finding arose out of a summary judgment proceeding. After hearing arguments, the trial court issued an "Order Finding Unconscionability as a Matter of Law," in which it held unenforceable the various amendments, modifications and releases, including the Doornbos termination letter. Although ostensibly rendered as a partial summary judgment, the court filed findings of fact and conclusions of law in support of its order and there mentioned that the Doornbos final termination letter was ambiguous. The trial judge stated:

> the Court *finds an ambiguity* in the "Agreements to Terminate Contracts" regarding the phrase, "All past liabilities that might exist between the parties are waived." The Court *makes no ruling herein as to whether such language is sufficient to operate as a release of past take-or-pay damages.* However, since El Paso takes the position that the language was intended to release past take-or-pay liabilities, the Court finds that the effect of such a release of past take-or-pay damages without any corresponding benefit to Plaintiffs would be so one-sided as to constitute the "substantive abuse" described in *Wade v. Austin* at the time of its execution. (emphasis added).

Thus the court did not resolve the ambiguity because it also determined that the agreement's operation as a release was unconscionable. Regardless, such a finding cannot form an alternative basis for its **\*316** judgment. In fact, the finding is immaterial to the court's final judgment.

First, to decide as the trial court did, that the Doornbos termination letter was unconscionable and therefore void, it necessarily decided that the release did exactly what it purported to do—release El Paso. That is to say, by concluding that the termination letter was unconscionable,

the court necessarily assumed that the agreement operated to release El Paso's take-or-pay obligations and thereby impliedly resolved the supposed ambiguity in El Paso's favor. A release that may not actually be a release because it is ambiguous cannot be said to be unconscionable as a matter of law. Thus the trial court's controlling conclusion of unconscionability rendered the ambiguity finding unnecessary to its judgment. As such, El Paso's failure to specifically challenge it did not constitute a waiver. [28]

 **[10]**    Further, we liberally construe issues presented to obtain a just, fair, and equitable adjudication of the rights of the litigants. [29]  In the court of appeals, El Paso argued that "the evidence does not support a finding of unconscionability. Had the trial court properly enforced the amendments and releases, [Doornbos's] claims would be barred." Liberally construing this argument to avoid waiver, we conclude that El Paso preserved its complaint that the trial court erred in failing to enforce the releases. [30]

## CONCLUSION

As a matter of law, the UCC does not impose a good faith obligation upon the formation of a final release. Thus, Minco's termination letter is enforceable and releases El Paso from the Minco agreement's take-or-pay obligations. Because El Paso did not waive its complaint that the Doornbos termination letter is also enforceable, we conclude that El Paso is also released from the Doornbos agreement's take-or-pay obligations. Consequently, we reverse the court of appeals' judgment and render judgment that Minco and Doornbos take nothing.

Justice OWEN and Justice HANKINSON did not participate in the decision.

### Parallel Citations

144 Oil & Gas Rep. 197, 40 UCC Rep.Serv.2d 84, 43 Tex. Sup. Ct. J. 116

Footnotes

1    TEX. BUS. & COM.CODE §§ 1.101 *et seq.*

2    *See* 964 S.W.2d 54, 66. Minco and Doornbos do not challenge the court of appeals' unconscionability holding in this Court.

3    *See id.*

4    *See id.* at 72–73.

5    *Barber v. Colorado I.S.D.,* 901 S.W.2d 447, 450 (Tex.1995).

6    *See Natividad v. Alexsis, Inc.,* 875 S.W.2d 695, 697 (Tex.1994).

7    *See* TEX. BUS. & COM.CODE §§ 1.203, 2.209.

8    *Id.* § 1.201(19)..

9    *See* TEX. BUS. & COM.CODE §§ 2.102, 2.107; *see also Lenape Resources Corp. v. Tennessee Gas Pipeline Co.,* 925 S.W.2d 565, 577 (Tex.1996) (Phillips, C.J., concurring and dissenting).

10    *See* TEX. BUS. & COM.CODE §§ 1.203, 2.209 cmt. 2.

11    *Id.* § 1.203.

12    *Id.* § 2.103; *see also* TEX. BUS. & COM.CODE § 1.201(19) (generally defining "good faith" as honesty in fact in the conduct or transaction concerned).

13    *See Tolbert v. First Nat'l Bank of Oregon,* 312 Or. 485, 823 P.2d 965, 969 (1991) ("Although every contract imposes upon each a duty of good faith and fair dealing in its performance and its enforcement, that duty does not to extend to formation of the contract.") (citations omitted).

14    *See Schlumberger Tech. Corp. v. Swanson,* 959 S.W.2d 171, 178 (Tex.1997).

15    *See* BLACK'S LAW DICTIONARY 1289 (7 [th] ed.1999) (defining release as "liberation from an obligation, duty, or demand; the act of giving up a right or claim to the person against whom it could have been enforced.").

16    TEX. BUS. & COM.CODE  § 2.209(a).

17    964 S.W.2d at 67.

18    *Id.* (emphasis added).

19    TEX. BUS. & COM.CODE § 2.209 cmt. 2.

20    *Id.*

21    *See* TEX. BUS. & COM.CODE § 2.302. ("If the court as a matter of law finds the contract ... to have been unconscionable at the time it was made the court may refuse to enforce the contract....").

22    *See* TEX. BUS. & COM.CODE § 2.209(b), (d).

23    *See id.* § 2.209(d) cmt.2.

24    *See* 964 S.W.2d at 71.

25    *See id.* at 66.

26    964 S.W.2d at 72.

27    *See National Union Fire Ins. Co. v. CBI Indus. Inc.,* 907 S.W.2d 517, 520 (Tex.1995).

28    *See* TEX.R.APP. P. 44.1(a)(1).

29    *See Consolidated Engineering Co. v. Southern Steel Co.,* 699 S.W.2d 188, 192 (Tex.1985) (holding that issue was adequately preserved when issues "are so inextricably entwined that one cannot be mentioned without automatically directing attention to the other.").

30    *See Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex.1989); *Ginther v. Taub,* 675 S.W.2d 724, 728 (Tex.1984).

---

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

318 S.W.3d 867
Supreme Court of Texas.

ERI CONSULTING ENGINEERS, INC.
and Larry G. Snodgrass, Petitioners,

v.

J. Mark SWINNEA, Brady Environmental, Inc.,
and Malmeba Company, Ltd., Respondents.

No. 07–1042.  |  Argued Dec. 17,
2009.  |  Decided May 7, 2010.
|  Rehearing Denied Oct. 1, 2010.

**Synopsis**

**Background:** Employer and its shareholder brought action against former employee, his company, and employer's landlord to recover for fraud, breach of contract, breach of fiduciary duty, and conspiracy in connection with buyout agreement involving employee's sale of stock back to employer without disclosing formation of business and shareholder's transfer of his partnership interest in landlord. Defendants filed counterclaim for breach of contract and conspiracy, and landlord alleged anticipatory breach of lease agreement. Following a bench trial, the 114th Judicial District Court, Smith County, Cynthia S. Kent, J., entered judgment in favor of plaintiffs, awarding them actual damages of $1,020,700, and ordered defendant to pay plaintiff $1,000,000 in exemplary damages. Defendants appealed. The Court of Appeals, Sam Griffith, J., 236 S.W.3d 825, affirmed in part, and reversed and rendered in part. Plaintiffs petitioned for review which was granted.

**Holdings:** The Supreme Court, Green, J., held that:

[1] contractual consideration received by fiduciary were recoverable in equity;

[2] testimony was properly admitted under collateral agreement exception to parol evidence rule;

[3] lost profit damage award of $300,000 was not supported by substantial evidence; and

[4] former employee's company was not jointly liable as a conspirator.

Affirmed in part and reversed in part.

West Headnotes (25)

**[1]**    **Fraud**
🔑 Elements of compensation

**Principal and Agent**
🔑 Nature of agent's obligation

Where willful actions which are breaches of fiduciary duty also amount to fraudulent inducement, contractual consideration received by fiduciary is recoverable in equity, regardless of whether actual damages are proven, subject to certain limits; agency principles, that forfeiture of compensation discourages agent from taking personal advantage of his position of trust in every situation, no matter the circumstances, whether principal may be injured or not, and that forfeiture removes any incentive for agent to stray based on possibility that principal will be unharmed, apply where fiduciary takes advantage of his position of trust to induce principal to enter into contract. Restatement (Second) of Agency § 469.

1 Cases that cite this headnote

**[2]**    **Fraud**
🔑 Elements of compensation

Courts may fashion equitable remedies such as profit disgorgement and fee forfeiture to remedy a breach of fiduciary duty; for instance, courts may disgorge all ill-gotten profits from a fiduciary when a fiduciary agent usurps an opportunity properly belonging to a principal, or competes with a principal.

12 Cases that cite this headnote

**[3]**    **Fraud**
🔑 Fiduciary or confidential relations

Even if a fiduciary does not obtain a benefit from a third party by violating his duty, he may be required to forfeit the right to compensation for his work.

4 Cases that cite this headnote

**[4]** **Fraud**

🔑 Elements of compensation

Although forfeiture of contractual consideration may have a punitive effect like forfeiture of compensation, it may nevertheless be necessary to protect fiduciary relationships; fiduciary who breaches his duty should not be insulated from forfeiture if the party whom he fraudulently induced into contract is ignorant about the fraud, or fails to suffer harm, and innocent party should not be put into a difficult choice regarding termination of the contract upon discovering the breach of duty.

3 Cases that cite this headnote

**[5]** **Equity**

🔑 Grounds of jurisdiction in general

Where equitable remedies exist, remedy of forfeiture must fit the circumstances presented.

5 Cases that cite this headnote

**[6]** **Principal and Agent**

🔑 Nature of agent's obligation

Factors which are relevant to whether plaintiff is entitled to equitable forfeiture include gravity and timing of the breach of duty, level of intent or fault, whether principal received any benefit from fiduciary despite breach, centrality of the breach to the scope of fiduciary relationship, any threatened or actual harm to the principal, and adequacy of other remedies, including any punitive damages award; above all, the remedy must fit the circumstances and work to serve the ultimate goal of protecting relationships of trust. Restatement (Third) of the Law Governing Lawyers § 49; Restatement (Second) of Trusts § 243 comment.

1 Cases that cite this headnote

**[7]** **Evidence**

🔑 Distinct consideration

Testimony of former employee of company conceding that lease agreement was consideration for buyout agreement as a whole was properly admitted under collateral agreement exception to parol evidence rule; if the parties agreed that lease obligation was to be additional consideration for buyout, then such an agreement was consistent collateral agreement. Restatement (First) of Contracts § 240 comment.

Cases that cite this headnote

**[8]** **Evidence**

🔑 Contracts in General

**Evidence**

🔑 Prior and Contemporaneous Collateral Agreements

General rule for an unambiguous contract is that evidence of prior or contemporaneous agreements is inadmissible as parol evidence; an exception exists for consistent collateral agreements.

3 Cases that cite this headnote

**[9]** **Evidence**

🔑 Prior and Contemporaneous Collateral Agreements

Parol evidence rule does not preclude enforcement of prior or contemporaneous agreements which are collateral to an integrated agreement and which are not inconsistent with and do not vary or contradict the express or implied terms or obligations thereof.

3 Cases that cite this headnote

**[10]** **Evidence**

🔑 Prior and Contemporaneous Collateral Agreements

Collateral agreement between parties concerning the relationship of several distinct obligations between them falls within exception to parol evidence for collateral agreements.

2 Cases that cite this headnote

**[11]** **Conspiracy**

 Damages

**Damages**

 Particular cases

**Fraud**

 Amount awarded

Lost profit damages award of $300,000 was not supported by substantial evidence in action by former employer and its shareholder against former employee for fraud, breach of contract, breach of fiduciary duty, and conspiracy, although shareholder's uncontradicted testimony indicated that company's net profit margin from account which former employee caused company to lose was 25-30%, company averaged $19,833 in monthly revenue from account, and method of comparing revenue from before and after loss of account was legally adequate; owner presented evidence of estimated lost revenue over the 33–month period of $595,337, 30% of which was $178,601.

1 Cases that cite this headnote

**[12]** **Damages**

 Loss of profits

Recovery for lost profits does not require that the loss be susceptible of exact calculation, but injured party must do more than show that they suffered some lost profits; amount of the loss must be shown by competent evidence with reasonable certainty.

20 Cases that cite this headnote

**[13]** **Damages**

 Loss of profits

What is reasonably certain evidence of lost profits is a fact-intensive determination; as a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained.

23 Cases that cite this headnote

**[14]** **Damages**

 Loss of profits

Although supporting documentation for lost profits may affect the weight of the evidence, it is not necessary to produce in court the documents supporting the opinions or estimates.

8 Cases that cite this headnote

**[15]** **Damages**

 Loss of profits

Contrasting revenue from a time period immediately before the period at issue is an established method of proving revenue for a lost profit damages calculation.

3 Cases that cite this headnote

**[16]** **Damages**

 Loss of Profits

Discrepancy between two reasonably certain lost profit amounts does not defeat recovery of such damages.

3 Cases that cite this headnote

**[17]** **Conspiracy**

 Damages

**Damages**

 Loss of profits and expenses incurred

**Fraud**

 Measure in General

Former employee did not meet his burden to provide at least some evidence that former employer's otherwise complete lost profit damages calculation was actually inadequate because of a necessary credit or additional expense, in former employer's action against him for fraud, breach of contract, breach of fiduciary duty, and conspiracy in connection with buyout agreement, although customer gave former employer ultimatum to chose between it and another customer because of former employee; nothing indicated that former employer could not work with both customers, thus, profits from former employer's work with one customer were not required to be offset against lost profits caused by ultimatum.

1 Cases that cite this headnote

**[18]  Damages**
 🔑 Loss of profits and expenses incurred

 **Damages**
 🔑 Necessity of proof as to damages in general

Plaintiff bears the burden of providing evidence supporting a single complete calculation of lost profits, which may often require certain credits and expenses.

3 Cases that cite this headnote

**[19]  Damages**
 🔑 Loss of profits

Defendant properly bears the burden of providing at least some evidence suggesting that an otherwise complete lost profits calculation is in fact missing relevant credit; were this not so, every facially adequate calculation of lost profits would be susceptible to an unsubstantiated challenge that something is missing.

8 Cases that cite this headnote

**[20]  Damages**
 🔑 Loss of profits and expenses incurred

For purposes of calculating lost profit damages, it is not necessarily the case that a company will incur increased expense or overhead, especially where a corporation was already profitable at the time damages began, and evidence supports an inference that it could have performed profitable services using only its existing resources.

1 Cases that cite this headnote

**[21]  Labor and Employment**
 🔑 Weight and sufficiency

Former employee's testimony that his involvement with one customer could harm employer's relationship with its customer, and that a severance of former employer's relationship with its customer would negatively affect former employer's revenues, was legally sufficient to establish a straight-forward link

between former employee's breach of fiduciary duty and the loss of profits to former employer.

Cases that cite this headnote

**[22]  Conspiracy**
 🔑 Damages

Company formed by former employee and his wife was not jointly liable as a conspirator for punitive damages and forfeiture of contractual consideration for former employee's fraud, breach of contract, or breach of fiduciary duty; there was no evidence that any of the damages awarded by the trial court occurred as the proximate result of any involvement by company, and no meeting of the minds between former employee and company could have occurred involving the actions causing former employer lost profits because company did not exist when employee committed breach, having been formed approximately six-months after employee's departure.

Cases that cite this headnote

**[23]  Conspiracy**
 🔑 Nature and Elements in General

 **Conspiracy**
 🔑 Object

Actionable civil conspiracy requires specific intent to agree to accomplish an unlawful purpose or a lawful purpose by unlawful means.

2 Cases that cite this headnote

**[24]  Conspiracy**
 🔑 Object

One of the elements of conspiracy is a meeting of the minds on the object or course of action; another is actual damages as the proximate result of the conspiracy.

3 Cases that cite this headnote

**[25]  Equity**
 🔑 Grounds of jurisdiction in general

Equitable remedies to protect relationships of trust encompasses the ability to fashion such remedies against those who would conspire to abuse such relationships but, the remedy of forfeiture must fit the circumstances presented.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*870** Sarah B. Duncan, Elissa Gail Underwood, Mike A. Hatchell, Susan A. Kidwell, Locke Lord Bissell & Liddell, LLP, Austin, TX, Deborah J. Race, Ireland Carroll & Kelley, P.C., Roger W. Anderson, Gillen & Anderson, Tyler, TX, for Petitioners.

Gregory D. Smith, S. Justin Lindley, Ramey & Flock, P.C., Tyler, TX, Sheral Kniffin Maloy, El Paso, TX, for Respondents.

**Opinion**

Justice GREEN delivered the opinion of the Court.

The principal question in this case is whether consideration received for the sale of a business interest is subject to equitable forfeiture as a remedy for breach of fiduciary duty. We hold that when a partner in a business breached his fiduciary duty by fraudulently inducing another partner to buy out his interest, the consideration received by the breaching party for his interest in the business is subject to forfeiture as a remedy for the breach, in addition to other damages that result from the tortious conduct. Here, the trial court ordered equitable forfeiture, but the court of appeals reversed, concluding that forfeiture was not an available remedy. We reverse the court of appeals' judgment in part and remand the case to that court for further proceedings consistent with this opinion.

## I. Facts

Larry G. Snodgrass and J. Mark Swinnea owned equal interests in two business entities, ERI Consulting Engineers, Inc., and Malmeba Company, Ltd., which they operated together for approximately ten years. ERI is a small consulting company that manages asbestos abatement projects for contractors. It leased office space from Malmeba, a partnership that owned the building.

Snodgrass and ERI purchased Swinnea's interest in ERI in 2001. ERI paid Swinnea $497,500 to redeem Swinnea's ERI stock, and Snodgrass transferred his half-interest in Malmeba to Swinnea. ERI agreed to employ Swinnea for six years, and Swinnea agreed not to compete with ERI. At the same time, ERI agreed to continue leasing from Malmeba for six **\*871** years. [1]

Unknown to Snodgrass, the wives of Swinnea and Chris Power, an ERI employee, had created a new company called Air Quality Associates a month before Swinnea and Snodgrass executed the buyout agreement. Air Quality Associates was created to perform mold abatement, but later engaged in asbestos abatement as a contractor even though neither wife had experience in the asbestos abatement field. Swinnea did not disclose the existence of Air Quality Associates to Snodgrass during the ERI buyout negotiations. In fact, because Swinnea believed Snodgrass would "run [ERI] into the ground," Swinnea told Power to "[b]e patient because we can buy this company back 50 cents on the dollar." The trial court found that "Swinnea's placement of his wife, Dawn Swinnea, and Tracy Power as principals of Air Quality Associates, Inc. was deceptive, a sham and constituted fraud."

After the buyout, Swinnea's revenue production as an ERI employee dropped 30%–50%. Snodgrass testified that although Swinnea's supervisory responsibilities were to cease under their agreement, Swinnea's revenue production was to remain the same, if not increase. Soon thereafter, Snodgrass learned about Swinnea's relationship with Air Quality Associates from one of ERI's asbestos contractors, Merico, with which Air Quality Associates was competing. Because of the personal relationship between the individuals involved with ERI and Air Quality Associates, Merico told Snodgrass that Merico would no longer work with ERI if ERI were to accept bids from Air Quality Associates on asbestos abatement projects. ERI had been accepting bids from Air Quality Associates without Snodgrass knowing of Swinnea's or Power's relationship with Air Quality Associates.

Power and his wife later bought out the Swinneas' interest in Air Quality Associates. ERI subsequently worked with Air Quality Associates, while its work with Merico declined. Meanwhile, Swinnea and his wife formed a new company, Brady Environmental. The Swinneas told Snodgrass that Brady Environmental was going to clean homes and air ducts. However, Brady Environmental began performing

asbestos abatement using the Resilient Floor Covering Institute method. Evidence suggests that ERI's clients' use of this method impacted ERI's business because RFCI does not require a consultant like ERI. Although he was employed by ERI, Swinnea encouraged ERI's clients to use RFCI instead, contrary to ERI's interest and policy. After the relationship between Swinnea and ERI deteriorated, Snodgrass ultimately fired Swinnea, releasing him from his non-compete obligations. Swinnea obtained a license to perform asbestos consulting work the next day and began working for Brady Environmental as a consultant. Snodgrass moved ERI out of Malmeba's building and pursued this lawsuit with ERI against Swinnea, Malmeba, and Brady Environmental.

After a bench trial, the trial court found for Snodgrass and ERI on their claims for statutory fraud in a real estate and stock transaction, common law fraud, breach of the non-compete clause in the contract, as well as for breach of fiduciary duty. It rendered judgment awarding ERI and Snodgrass combined damages of $1,020,700, and $1 million in exemplary **\*872** damages. The non-exemplary damages awarded by the trial court consisted of both equitable forfeiture and actual damages: forfeiture of $437,500, a portion of the $497,500 paid to Swinnea by ERI; forfeiture of $150,000, the value of Snodgrass's one-half interest in Malmeba transferred to Swinnea; forfeiture of $133,200, constituting the sum of the lease payments from ERI to Malmeba after the buyout; and $300,000 as ERI's lost profits from its business relationship with Merico. The trial court found that a civil conspiracy existed between Swinnea and Brady Environmental, and held Brady Environmental jointly and severally liable with Swinnea for the damages.

The court of appeals reversed and rendered judgment in favor of Swinnea because it found the evidence "legally insufficient to support the damage awards." 236 S.W.3d 825, 832 (Tex.App.-Tyler 2007). In particular, the court of appeals found that ERI failed to prove any actual damages. *Id.* at 841. It found that the equitable remedy of forfeiture was unavailable because there was no fee paid to Swinnea to be forfeited. *Id.* It concluded further that ERI failed to prove that Swinnea obtained any ill-gotten gains subject to disgorgement. *Id.* It determined that the lease payments were not recoverable because the evidence that the lease payments were intended as consideration for the buyout was "incompetent parol evidence." *Id.* at 835. Finally, the court of appeals concluded that there was no basis for joint liability as to Brady Environmental because there was no evidence of

a conspiracy between Swinnea and Brady Environmental. *Id.* at 841–42.

Swinnea does not dispute his liability for fraud, breach of contract, or breach of fiduciary duty. Rather, he disputes the damages the trial court awarded. He asserts that the forfeiture award is unsupported by law. He also asserts that the lost profits award is unsupported by legally sufficient evidence. Brady Environmental primarily disputes whether it can be jointly liable for any of the particular damages awarded by the trial court regardless of whether it later conspired in certain wrongful acts.

## II. Equitable Forfeiture

**[1]** The primary question we must address is whether forfeiture of contractual consideration is available as a remedy against Swinnea. We have previously upheld equitable remedies for breach of fiduciary duty. *E.g., Burrow v. Arce,* 997 S.W.2d 229, 237–45 (Tex.1999) (upholding remedy of forfeiture upon attorney's breach of fiduciary duty). In *Kinzbach Tool Co. v. Corbett–Wallace Corp.,* we stated the principle behind such remedies:

> It is beside the point for [Defendant] to say that [Plaintiff] suffered no damages because it received full value for what it has paid and agreed to pay.... It would be a dangerous precedent for us to say that unless some affirmative loss can be shown, the person who has violated his fiduciary relationship with another may hold on to any secret gain or benefit he may have thereby acquired. It is the law that in such instances if the fiduciary "takes any gift, gratuity, or benefit in violation of his duty, or acquires any interest adverse to his principal, without a full disclosure, it is a betrayal of his trust and a breach of confidence, and he must account to his principal for all he has received."

138 Tex. 565, 160 S.W.2d 509, 514 (1942) (quoting *United States v. Carter,* 217 U.S. 286, 306, 30 S.Ct. 515, 54 L.Ed. 769 (1910)). We later reiterated that a fiduciary may be punished for breaching his duty: "The main purpose of forfeiture is not to compensate an injured principal.... Rather, **\*873** the central purpose ... is to protect relationships of trust by discouraging agents' disloyalty." *Burrow,* 997 S.W.2d at 238.

**[2]** **[3]** Accordingly, courts may fashion equitable remedies such as profit disgorgement and fee forfeiture to remedy a breach of fiduciary duty. For instance, courts may disgorge all ill-gotten profits from a fiduciary when a

fiduciary agent usurps an opportunity properly belonging to a principal, or competes with a principal. *See, e.g., Johnson v. Brewer & Pritchard, P.C.,* 73 S.W.3d 193, 200 (Tex.2002) (stating the rule that courts may disgorge any profit where "an agent diverted an opportunity from the principal or engaged in competition with the principal, [and] the agent or an entity controlled by the agent profited or benefitted in some way"). Similarly, even if a fiduciary does not obtain a benefit from a third party by violating his duty, a fiduciary may be required to forfeit the right to compensation for the fiduciary's work. *See, e.g., Burrow,* 997 S.W.2d at 237 ("[A] person who renders service to another in a relationship of trust may be denied compensation for his service if he breaches that trust."). The difficulty comes in categorizing the damages awarded in this case. Here, the damages awarded by the trial court were not ill-gotten profits from an outside opportunity or external competition, or compensation for work done by the fiduciary. Rather, the trial court returned a significant part of the contractual consideration paid by ERI and Snodgrass to Swinnea as part of the buyout agreement. The situation arises because here the contracting party, Swinnea, was a fiduciary, such that we must consider whether under the circumstances an equitable remedy may cross the line from actual damages for breach of contract or fraud (redressing specific harm) to further, equitable return of contractual consideration.

The trial court found Swinnea liable for fraudulent inducement as to the buyout agreement, and Swinnea does not challenge this liability. The trial court also found that Swinnea owed fiduciary duties both to ERI and to Snodgrass. It follows that Swinnea's actions in fraudulently inducing the buyout agreement contracts were willful breaches of his fiduciary duty. We hold that where willful actions constituting breach of fiduciary duty also amount to fraudulent inducement, the contractual consideration received by the fiduciary is recoverable in equity regardless of whether actual damages are proven, subject to certain limiting principles set out below.

The situation in this case is akin in many respects to the fee forfeiture scenario between a principal and agent, which we discussed at length in *Burrow,* 997 S.W.2d at 237–45. In that case, former clients sued their attorneys alleging breach of fiduciary duty arising from settlement negotiations in a previous lawsuit. *Id.* at 232–33. We held that "a client need not prove actual damages in order to obtain forfeiture of an attorney's fee for the attorney's breach of fiduciary duty to the client." *Id.* at 240. We repeated that "the central purpose of the remedy is to protect relationships of trust from an agent's disloyalty or other misconduct." *Id.* That policy applies equally to the relationship of trust at issue here and the duties Swinnea owed to ERI and Snodgrass. We cited section 469 of the *Restatement (Second) of Agency,* which states that if "conduct [that is a breach of his duty of loyalty] constitutes a wilful and deliberate breach of his contract of service, he is not entitled to compensation even for properly performed services for which no compensation is apportioned." *Id.* at 237. We also stated:

> [T]he possibility of forfeiture of compensation discourages an agent from taking **\*874** personal advantage of his position of trust in every situation no matter the circumstances, whether the principal may be injured or not. The remedy of forfeiture removes any incentive for an agent to stray from his duty of loyalty based on the possibility that the principal will be unharmed or may have difficulty proving the existence or amount of damages.

*Id.* at 238. The same principles apply to circumstances where a fiduciary takes advantage of his position of trust to induce a principal to enter into a contract. The remedy of forfeiture is necessary to prevent such abuses of trust, regardless of proof of actual damages.

 **[4]**    Although forfeiture of contractual consideration may "have a punitive effect" like forfeiture of compensation, *id.* at 240, it may nevertheless be necessary to protect fiduciary relationships. As we said in the attorney-client context:

> An attorney who has clearly and seriously breached his fiduciary duty to his client should not be insulated from fee forfeiture by his client's ignorance of the matter. Nor should an attorney who has deliberately engaged in professional misconduct be allowed to put his client to the choice of terminating the relationship and risking that the outcome of the litigation may be adversely affected, or continuing the relationship despite the misconduct.

*Id.* at 244. The same reasoning applies here: a fiduciary who breaches his duty should not be insulated from forfeiture

if the party whom he fraudulently induced into contract is ignorant about the fraud, or fails to suffer harm. Likewise, the innocent party should not be put into a difficult choice regarding termination of the contract upon discovering the breach of duty.

 [5]   [6]   Where equitable remedies exist, however, "the remedy of forfeiture must fit the circumstances presented." *Id.* at 241. In *Burrow,* we listed several factors for consideration when fashioning a particular equitable forfeiture remedy in the context of attorney-client relationships:

> "[T]he gravity and timing of the violation, its wilfulness, its effect on the value of the lawyer's work for the client, any other threatened or actual harm to the client, and the adequacy of other remedies." These factors are to be considered in determining whether a violation is clear and serious, whether forfeiture of any fee should be required, and if so, what amount. The list is not exclusive. The several factors embrace broad considerations which must be weighed together and not mechanically applied. For example, the "wilfulness" factor requires consideration of the attorney's culpability generally; it does not simply limit forfeiture to situations in which the attorney's breach of duty was intentional. The adequacy-of-other-remedies factor does not preclude forfeiture when a client can be fully compensated by damages. Even though the main purpose of the remedy is not to compensate the client, if other remedies do not afford the client full compensation for his damages, forfeiture may be considered for that purpose.

*Id.* at 243–44 (quoting RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 49 (Proposed Final Draft No. 1, 1996)). We also cited comment c to section 243 of the *Restatement (Second) of Trusts:*

> It is within the discretion of the court whether the trustee who has committed a breach of trust shall receive full compensation or whether his compensation shall be reduced or denied. In the exercise of the court's discretion the following factors are considered: (1) whether **\*875** the trustee acted in good faith or not; (2) whether the breach of trust was intentional or negligent or without fault; (3) whether the breach of trust related to the management of the

whole trust or related only to a part of the trust property; (4) whether or not the breach of trust occasioned any loss and whether if there has been a loss it has been made good by the trustee; (5) whether the trustee's services were of value to the trust.

*Id.* at 243. Several of these factors are also relevant in this context. The gravity and timing of the breach of duty, the level of intent or fault, whether the principal received any benefit from the fiduciary despite the breach, the centrality of the breach to the scope of the fiduciary relationship, and any threatened or actual harm to the principal are relevant. Likewise, the adequacy of other remedies—including any punitive damages award—is also relevant. Above all, the remedy must fit the circumstances and work to serve the ultimate goal of protecting relationships of trust.

There is no indication the trial court followed these principles in fashioning its award. Accordingly, we direct the court of appeals to remand the case to the trial court for consideration of these factors upon resolution of the issues remaining for the court of appeals. [2]

### III. Evidence of Contractual Consideration

 [7]   We next consider whether the trial court properly admitted undisputed testimony offered to show that the lease agreement was intended to be consideration for the buyout agreement, and thus subject to potential forfeiture under our analysis above. The court of appeals concluded that such testimony was "incompetent parol evidence." 236 S.W.3d at 835. We disagree.

 [8]   [9]   [10]   The general rule for an unambiguous contract is that evidence of prior or contemporaneous agreements is inadmissible as parol evidence. *David J. Sacks, P.C. v. Haden,* 266 S.W.3d 447, 450 (Tex.2008) (per curiam). However, an exception exists for consistent collateral agreements. As we stated over half a century ago in *Hubacek v. Ennis State Bank,* the parol evidence rule "does not preclude enforcement of prior or contemporaneous agreements which are collateral to an integrated agreement and which are not inconsistent with and do not vary or contradict the express or implied terms or obligations thereof." 159 Tex. 166, 317 S.W.2d 30, 32 (1958); *accord Haden,* 266 S.W.3d at 451 ("Under the exception,

parol evidence can be used to demonstrate a prior or contemporaneous agreement that is both collateral to and consistent with a binding agreement, and that does not vary or contradict the agreement's express or implied terms or obligations."). A collateral agreement between parties concerning the relationship of several distinct obligations between them falls within the exception. *See, e.g., Hubacek,* 317 S.W.2d at 34 ("A and B in an integrated contract respectively promise to sell and to buy Blackacre for $3,000.00. A contemporaneous oral agreement between them that the price shall be paid partly by discharge of a judgment which B has against A is operative." (quoting with approval RESTATEMENT (FIRST) OF CONTRACTS section 240 cmt. d (1939))). Here, if the parties agreed that the lease obligation was to be additional **\*876** consideration for the buyout, then such an agreement was a consistent collateral agreement. Nothing in such an agreement would contradict the written contracts. *See id.* at 32 ("If ... the parol evidence rule precludes enforcement of the oral agreement, it is because the agreement varies or contradicts the terms or obligations of the [written contracts]."). Accordingly, Swinnea's testimony conceding this fact was properly admitted under this long-standing exception to the parol evidence rule. The fact that the lease agreement was consideration for the buyout agreement as a whole is thus established by legally sufficient evidence.

Therefore, as contractual consideration, the lease payments from ERI to Malmeba are subject to forfeiture for Swinnea's breach of fiduciary duty. The trial court should consider whether to include them in fashioning an appropriate equitable forfeiture.

### IV. Lost Profit Damages

 **[11]**    We turn next to the question of actual damages. Here, where the only actual damages that the trial court awarded were lost profit damages, the issue is whether ERI provided legally sufficient evidence of those lost profits. [3]

 **[12]**    **[13]**    **[14]**    The rule concerning adequate evidence of lost profit damages is well established:

> Recovery for lost profits does not require that the loss be susceptible of exact calculation. However, the injured party must do more than show that they suffered some lost profits. The amount of the

loss must be shown by competent evidence with reasonable certainty. What constitutes reasonably certain evidence of lost profits is a fact intensive determination. As a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained. Although supporting documentation may affect the weight of the evidence, it is not necessary to produce in court the documents supporting the opinions or estimates.

*Holt Atherton Indus., Inc. v. Heine,* 835 S.W.2d 80, 84 (Tex.1992) (citations omitted).

The trial court awarded $300,000 in lost profits "constituting the loss of income from [ERI's and Snodgrass's] business relationship with Merico." Our legal sufficiency analysis thus reviews whether competent evidence establishes this amount with reasonable certainty. *See id.*

 **[15]**    Snodgrass testified that based on information from his in-house accountant, ERI's net profit margin on revenue from Merico was approximately 25%–30%. [4] As a long-time co-owner and then sole owner of ERI—a small, profitable company—Snodgrass was competent to testify as to ERI's estimated profit margin on the Merico account. *Cf. Bowen v. Robinson,* 227 S.W.3d 86, 97 (Tex.App.-Houston [1st Dist.] 2006, pet. denied) ("Competent evidence of lost profits relating to property can be proved by the testimony of an expert or the owner of the property."). Swinnea directs us to no evidence contradicting **\*877** this testimony concerning ERI's profit margin. [5] ERI also introduced evidence—including dozens of detailed invoices—indicating that from January 2000 through August 2001 (20 months), ERI averaged $19,833.10 in revenue per month from Merico. Later, from September 2001 through May 2004 (33 months), average revenue dropped to $1,792.59 per month. [6] Contrasting revenue from a time period immediately before the period at issue is an established method of proving revenue for a lost profit damages calculation. *See Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.,* 877 S.W.2d 276, 279 (Tex.1994) ("It is permissible to show the amount of business done by the plaintiff in a corresponding period of time not too remote, and the business during the time for which recovery is sought." (quoting *Sw. Battery*

*Corp. v. Owen,* 131 Tex. 423, 115 S.W.2d 1097, 1098–99 (1938))). Thus, ERI's method for proving its lost profits in a reasonably certain amount—establishing its lost revenue with comparative evidence from a recent time period, and establishing its profit margin on that revenue by competent testimony of its owner—was legally adequate under *Holt Atherton.*

However, ERI's method does not support a calculation yielding the amount of damages awarded by the trial court. Even assuming a 30% profit margin on the work from Merico, Snodgrass's maximum profit margin estimate, the damages award would be only $178,601.05 for the 33–month period at issue when ERI's profits from Merico declined.[7] ERI's evidence thus fails to meet the minimum requirements for legal sufficiency that we set out in *Holt Atherton* regarding reasonable certainty as to the amount awarded by the trial court—here, $300,000. Up to this point, the court of appeals reached the same conclusions that we have. *See* 236 S.W.3d at 838–39 (reciting the same evidence and reaching the same conclusion regarding whether such evidence is legally sufficient to prove $300,000 of lost profit damages with reasonable certainty).

 [16]    Still, while the evidence does not prove $300,000 in lost profits, ERI's evidence is legally sufficient evidence to prove a lesser, ascertainable amount of lost profits with reasonable certainty. In this situation, such a discrepancy between two reasonably certain amounts will not defeat recovery by ERI. *See Sw. Battery,* 115 S.W.2d at 1099 ("[U]ncertainty as to the fact of legal damages is fatal to recovery, but uncertainty as to the amount will not defeat recovery."); *Tex. Instruments,* 877 S.W.2d at 279 (explaining that *Southwest Battery* and subsequent cases required reasonable certainty as to the amount of lost profit damages); *cf.*   **\*878** *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.,* 299 S.W.3d 106, 109 (Tex.2009) (remanding to the court of appeals where there was some evidence of damages, but not enough to support the full amount awarded by the trial court). ERI proved lost profit damages; its entitlement to recover them survives the trial court's error in awarding too much. Accordingly, the appropriate remedy is to remand the case to the court of appeals to consider the possibility for remittitur on lost profit damages. *See* TEX.R.APP. P. 46.3, 46.5 (providing procedures for remittitur by courts of appeals).

 [17]    Swinnea argues that ERI's lost profits calculation is inadequate because it fails to apply certain credits or deduct certain expenses. First, Swinnea asserts that because ERI's

lost profits were on the Merico account, which were in turn lost because of Swinnea's involvement with Air Quality Associates, we must offset any amount that ERI gained by doing business with Air Quality Associates. That is, where the two accounts were mutually exclusive, loss from one must be offset by gain from the other. This argument is unpersuasive in part because the exclusivity arose out of Merico's ultimatum to ERI about Air Quality Associates—"us or them"—not because it was otherwise impossible for ERI to pursue both business relationships simultaneously. The evidence shows that Merico came to give ERI its ultimatum because of Swinnea. Merico did not object to ERI's work with Air Quality Associates—a competitor of Merico's in asbestos abatement—until it discovered that Swinnea and Power were involved with Air Quality Associates. Nothing suggests that ERI could not have profited from working both with Air Quality Associates (apart from Swinnea) and Merico.[8] Accordingly, because nothing indicates that ERI could not work with both companies, any profits from ERI's work with Air Quality Associates need not be offset against the lost profits from Merico caused by Swinnea's position with Air Quality Associates.

 [18]    [19]    Even assuming that Swinnea is correct that profits from Air Quality Associates must be credited against the lost profits figure, he can point to no evidence to support his assertion that ERI profited from work with Air Quality Associates as a substitute for Merico. The plaintiff bears the burden of providing evidence supporting a single complete calculation of lost profits, which may often require certain credits and expenses. *See Holt Atherton,* 835 S.W.2d at 85 ("Recovery of lost profits must be predicated on one complete calculation."). However, the defendant properly bears the burden of providing at least some evidence suggesting that an otherwise complete lost profits calculation is in fact missing relevant credits. *Cf. Brown v. Am. Transfer & Storage Co.,* 601 S.W.2d 931, 936 (Tex.1980) ("The right of offset is an affirmative defense. The burden of pleading offset and of proving facts necessary to support it are on the party making the assertion."). Were this not so, every facially adequate calculation of lost profits would be susceptible to an unsubstantiated challenge that something is missing. That subtle distinction is crucial here because Swinnea directs us to nothing in the record proving that ERI profited— in any amount—from working with Air Quality Associates as a substitute for Merico in   **\*879** asbestos abatement; and we can find none.[9] Rather, he simply asserts that ERI does not dispute that it developed a mutually successful relationship with Air Quality Associates. The only evidence

in the record indicates that ERI continued to show an overall profit despite the decline in revenue from Merico, and that ERI worked with Air Quality Associates. No evidence shows whether any *profits* from working with Air Quality Associates contributed to ERI's overall profits, as a substitute for Merico or otherwise. [10]

[20] Swinnea also contests that overhead costs and other unspecified expenses were not included in ERI's evidence or calculation. However, it is not necessarily the case that a company will incur increased expense or overhead, especially where—as evidence here suggests—a corporation was already profitable at the time damages began, and evidence supports an inference that it could have performed profitable services using only its existing resources. *See Tex. Instruments,* 877 S.W.2d at 279 ("[P]re-existing profit, together with other facts and circumstances, may indicate with reasonable certainty the amount of profits lost." (quoting *Sw. Battery,* 115 S.W.2d at 1099)). This is not a manufacturing scenario, where production costs necessarily exist. Rather, ERI was a consulting company, which wrote plans and specifications, solicited bids for projects, and completed surveys. Evidence suggests that ERI would have been able to perform all of this service work using its existing employees. Power, for instance, testified that he "put in whatever hours it takes to get jobs done." Swinnea himself had begun contributing much less work to ERI, despite having been one of its most productive workers before. Had Swinnea continued to contribute at his prior level, that productivity would only have helped ERI complete additional projects. Furthermore, after Snodgrass fired Swinnea, ERI began to work with Merico again, while still working with Air Quality Associates, without expansion to ERI's staff. Accordingly, Swinnea has not met his burden to provide at least some evidence that ERI's otherwise complete lost profit damages calculation was actually inadequate because of a necessary credit or additional expense.

[21] Swinnea also challenges causation as to ERI's lost profit damages. However, evidence showed that at the end of October 2001, upon concluding a series of conversations about Swinnea's involvement with Air Quality Associates, Merico specifically indicated that it would no longer be working with ERI because of Swinnea's involvement. [11] Swinnea himself testified **\*880** that his involvement with Air Quality Associates could harm the Merico relationship, and that a severance of ERI's relationship with Merico would negatively affect ERI's revenues. This evidence is legally sufficient to establish a straightforward link between Swinnea's breach of duty and the loss of profits to ERI.

In sum, legally sufficient evidence does not exist to prove the trial court's lost profit damages award under the minimum requirements of *Holt Atherton.* However, this insufficiency does not extend to reasonable certainty as to *any* amount. Rather, competent evidence exists to establish *some* reasonably certain amount of lost profits—just not the particular amount awarded by the trial court. Unlike a situation where no evidence establishes any amount of lost profit damages with reasonable certainty, the situation here requires a potential reduction, not a take—nothing judgment against the plaintiff. Therefore, we reverse the court of appeals' judgment that ERI recover no lost profit damages and remand the case to that court for further proceedings. Should the court of appeals fail to arrive at a disposition concerning remittitur, it may remand for a new trial on lost profit damages, as we might have if the evidence did not seem conducive to remittitur. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 51 (Tex.1998) ("[B]ecause there is no legally sufficient evidence to support the entire amount of damages, but there is some evidence of the correct measure of damages, we reverse the judgment of the court of appeals and remand the cause for a new trial.").

Two additional collateral issues remain: punitive damages and factual sufficiency. The trial court found clear and convincing evidence establishing that Swinnea willfully, maliciously, and intentionally caused injury to ERI and Snodgrass in committing fraud. Accordingly, exemplary damages may be recoverable. *See* TEX. CIV. PRAC. & REM.CODE § 41.003 (providing that exemplary damages are recoverable if clear and convincing evidence shows harm from fraud or malice). Thus, upon resolution of the actual damages (lost profits) question, it is now proper for the courts below to consider any remaining issues concerning the trial court's initial award of $1 million in punitive damages, which Swinnea has continued to contest.

As for factual sufficiency of the lost profits award, however, we observe that there may be a question of whether Swinnea adequately briefed the issue to the court of appeals. The Texas Rules of Appellate Procedure require adequate briefing. *See* TEX.R.APP. P. 38.1(i) ("The [Appellant's] brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record."); *accord Redmon v. Griffith,* 202 S.W.3d 225, 241 (Tex.App.-

Tyler 2006, pet. denied) ("In their brief, the [cross-appellants] have not presented much in the way of cogent argument, nor have they cited to any authority in support of their sole issue.... We hold that the [cross-appellants] have waived their sole issue by their failure to adequately brief it."); *Murchison v. State,* 93 S.W.3d 239, 254 (Tex.App.-Houston [14th Dist.] 2002, pet. ref'd) (holding that factual sufficiency point concerning criminal trial was waived because "appellants' argument, record citations, and authorities do not address" the point); *Smith v. Tilton,* 3 S.W.3d 77, 84 (Tex.App.-Dallas 1999, no pet.) ("Points of error asserted on appeal but not briefed are waived."). On remand, the court of appeals should consider whether Swinnea **\*881** adequately raised a factual sufficiency challenge.

### V. Liability for Conspiracy

 **[22]**     Having found that legally sufficient evidence established lost profit damages in some amount, and that Swinnea may also be liable for punitive damages as well as forfeiture of contractual consideration, we must next address whether Brady Environmental may be jointly liable for these damages as a conspirator.

 **[23]**     **[24]**     An actionable civil conspiracy requires specific intent to agree to accomplish an unlawful purpose or a lawful purpose by unlawful means. *Juhl v. Airington,* 936 S.W.2d 640, 644 (Tex.1996). One of the elements of conspiracy is a meeting of the minds on the object or course of action. *Massey v. Armco Steel Co.,* 652 S.W.2d 932, 934 (Tex.1983). Another element is actual damages as the proximate result of the conspiracy. *Id.*

In its live pleading at trial, ERI asserted that Brady Environmental conspired in Swinnea's ongoing fraudulent misrepresentations as well as Swinnea's ongoing breach of fiduciary duty, which among other things damaged existing ERI client relationships. The trial court found that Swinnea's wrongful conduct "continued after the buy-out, including but not limited to his formation of Brady Environmental, Inc." It also found that Brady Environmental "participated in and knowingly accepted the benefits of ... Swinnea's wrongful conduct," and that Brady Environmental "had actual awareness of the wrongful conduct."

Even assuming those findings are true, there is no evidence that any of the damages awarded by the trial court occurred as the proximate result of any involvement by Brady

Environmental. Moreover, no meeting of the minds between Swinnea and Brady Environmental could have occurred involving the actions causing ERI actual harm—lost profits—because Brady Environmental did not yet exist, having been formed approximately six months after Swinnea left Air Quality Associates. Accordingly, Brady Environmental cannot be jointly and severally liable for any lost profit damages discussed above, or any potential punitive damages that follow from them.

 **[25]**     Furthermore, while Brady Environmental may have participated in the abuse of trust in Swinnea's ongoing breaches of fiduciary duty and Swinnea's ongoing fraudulent misrepresentations, Brady Environmental had no part in inducing the buyout agreement. As discussed above, the forfeiture of contractual consideration is available as an equitable remedy against a fiduciary who fraudulently induces the contract, regardless of actual harm. Contractual consideration is subject to forfeiture because it was fraudulently bargained for by a fiduciary. Certainly the rule allowing such equitable remedies to protect relationships of trust encompasses the ability to fashion such remedies against those who would conspire to abuse such relationships. *See Kinzbach,* 160 S.W.2d at 514 ("It is settled as the law of this State that where a third party knowingly participates in the breach of duty of a fiduciary, such third party becomes a joint tortfeasor with the fiduciary and is liable as such."). Yet, "the remedy of forfeiture must fit the circumstances presented." *Burrow,* 997 S.W.2d at 241. The trial court's award included no equitable remedy tied to conduct in which Brady Environmental participated. Rather, the only equitable award—forfeiture of contractual consideration—arose from a transaction that occurred approximately a year before Brady Environmental existed. Under the circumstances of this particular case, we believe that even if Brady Environmental **\*882** conspired in later breaches of fiduciary duty or fraud, Brady Environmental is not subject to liability for any particular equitable forfeiture amount from the return of contractual consideration given in the specific transaction at issue. Accordingly, we affirm the court of appeals' judgment that ERI take nothing on its conspiracy claim against Brady Environmental.

### VI. Conclusion

We hold that when a fiduciary fraudulently induced a contract, such a breach of fiduciary duty may give rise to equitable forfeiture of contractual consideration. We

therefore reverse the portion of the court of appeals' judgment that ERI take nothing in equity. Because trial courts are required to consider certain factors when fashioning a forfeiture remedy, which we have set out, we direct the court of appeals to remand the case to the trial court, in turn, for review of its forfeiture award in light of these principles. Additionally, we conclude that the court of appeals erred in excluding evidence that certain lease payments were contractual consideration subject to forfeiture because testimony proving this fact was properly admitted under the consistent collateral agreement exception to the parol evidence rule.

We also hold that while legally sufficient evidence does not exist to prove the lost profits awarded by the trial court, legally sufficient evidence does exist to prove some reasonably certain amount of lost profits. We therefore also reverse the portion of the court of appeals' judgment that

ERI take nothing on its claims for lost profit damages and punitive damages and remand the case to the court of appeals to consider a remittitur, as well as any other remaining issues, before remanding the case to the trial court.

Finally, we affirm the portion of the court of appeals' judgment that ERI and Snodgrass take nothing on their civil conspiracy claims against Brady Environmental because the actual damages awarded by the trial court were not caused by Brady Environmental's wrongful conduct, and the equitable forfeiture awarded by the trial court arose from a transaction too remote from Brady Environmental's involvement to support liability in equity.

**Parallel Citations**

53 Tex. Sup. Ct. J. 683

Footnotes

1    The parties dispute whether the lease agreement was intended to be consideration for the buyout. None of the documents in the buyout agreement expressly addressed this, but Snodgrass testified that he and Swinnea had agreed to the lease as part of the comprehensive buyout.

2    As we discuss below, certain issues that remain as a result of our holdings in this case are properly before the court of appeals on remand, precluding us from remanding the case directly to the trial court.

3    We need not distinguish here between ERI's causes of action—common-law and statutory fraud, breach of contract, and breach of fiduciary duty—because ERI's lost profit damages are recoverable for any one of those claims. *See Waite Hill Servs., Inc. v. World Class Metal Works, Inc.,* 959 S.W.2d 182, 184–85 (Tex.1998) (per curiam) (observing that lost profits are recoverable both as tort and contract damages, subject to the rule precluding double recovery for a single injury).

4    Swinnea did not raise a hearsay objection at trial.

5    We note that Swinnea's counsel stated on cross-examination of Snodgrass that "if we looked at [ERI's] financials, we could pretty well figure [the profit margin on the Merico account] out." Indeed, Swinnea had the opportunity to attempt to negate Snodgrass's testimony on profit margin with conclusive contrary evidence, if such evidence existed. Yet, Swinnea directs us to no such evidence from which we could determine whether Snodgrass's estimate was mistaken.

6    ERI points us to testimony from another ERI employee that its revenue from Merico was $300,000–$400,000 per year, but the accounting statements introduced by ERI as a trial exhibit conclusively establish otherwise. *See City of Keller v. Wilson,* 168 S.W.3d 802, 820 (Tex.2005) ("[Fact-finders] are not free to believe testimony that is conclusively negated by undisputed facts.")

7    At trial, ERI put on evidence that its estimated lost revenue over the 33–month period was $595,336.83. Thirty percent of this figure is $178,601.05.

8    Swinnea elsewhere points out to us that Air Quality Associates was also doing profitable mold treatment work, while Merico focused on asbestos removal. This suggests that ERI might have had separate consulting opportunities with Air Quality Associates that were unavailable from Merico, meaning it could have consistently worked with both without overlap, as ERI also performed mold assessments. Indeed, ERI began to work with both Merico and Air Quality Associates some time after the period in question.

9    Swinnea asserts in his brief that where "ERI chose the relationship with AQA [instead of Merico, such] conduct of itself is evidence of ERI's belief that the AQA relationship was the more profitable one." At most, this suggests that ERI might have believed that the Air Quality Associates relationship *would be* the more profitable one, which says nothing about whether it was actually profitable. Swinnea also asserts in his brief that "the AQA relationship was demonstrably ... lucrative to ERI, as the corporate financial records proved." But Swinnea does not direct us to any such financial records in the record. Further, having reviewed hundreds of ERI's invoices (the majority of which were issued to Merico), as well as other financial records introduced as evidence, we could not find a single piece of evidence in the record proving any profit to ERI from Air Quality Associates.

10      Indeed, we are left to wonder further whether any such alleged profits were in turn for asbestos projects that Merico might have worked on rather than for mold projects.

11      We reiterate that Swinnea does not contest liability. The trial court entered specific findings of fact and conclusions of law concerning the impropriety of Swinnea's involvement with Air Quality Associates. Thus, Swinnea's liability extends to any damage caused by his involvement with Air Quality Associates.

395 S.W.2d 821
Supreme Court of Texas.

Raymond Remigio GARZA et al., Petitioners,
v.
Abelina ALVIAR et al., Respondents.

No. A-10749. | Nov. 3, 1965.
| Rehearing Denied Dec. 1, 1965.

Action by father of 11-year-old daughter against driver of automobile and owner for injuries sustained by daughter when she was struck by the automobile. The District Court, Jim Wells County, C. W. Laughlin, J., entered judgment against father and daughter, which was reversed by the Court of Civil Appeals, 387 S.W.2d 905, and defendants brought error. The Supreme Court, Walker, J., held that point alleging that court erred in overruling plaintiffs' motion to disregard jury's findings with respect to certain special issues presented many contentions if their generality was overlooked but did not raise any question as to factual sufficiency of evidence to support answer to special issue relating to contributory negligence, and judgment of trial court should not have been reversed on that ground.

Judgment of Court of Civil Appeals reversed, and that of trial court affirmed.

West Headnotes (14)

[1] **Appeal and Error**
 Sufficiency of Evidence as Question of Law or Fact

Statement in a point of error that there is no evidence of probative force to support a finding in question presents a question of law within jurisdiction of Supreme Court, as well as that of Court of Civil Appeals.

Cases that cite this headnote

[2] **Appeal and Error**
 Interrogatories and Special Verdicts

**Appeal and Error**
 Extent of Review

In deciding question of whether there is evidence of probative force to support a finding, reviewing court must consider only evidence and inferences tending to support the finding and disregard all evidence and inferences to the contrary.

877 Cases that cite this headnote

[3] **Appeal and Error**
 Evidence to Establish Cause of Action or Defense

If a "no evidence" point is sustained on appeal and proper procedural steps have been taken, finding under attack may be disregarded entirely and judgment is usually rendered for appealing party unless the interests of justice require another trial.

67 Cases that cite this headnote

[4] **Appeal and Error**
 Review of Questions of Fact

When contention is made at appellate level that evidence is factually insufficient to support a finding of fact, a question within peculiar and conclusive factual jurisdiction of Court of Civil Appeals is presented, and that court is required to consider all the evidence in deciding the question.

41 Cases that cite this headnote

[5] **Appeal and Error**
 Failure to Introduce Sufficient Evidence to Authorize Recovery or Establish Defense

If contention that evidence is factually insufficient to support the finding of fact is sustained on appeal, finding under attack may be set aside and a new trial ordered.

491 Cases that cite this headnote

[6] **Appeal and Error**
 Sufficiency of Evidence in Support

**Appeal and Error**
 Authority to Find Facts

Factual insufficiency of evidence does not authorize reviewing court to disregard the finding entirely or make a contrary finding in entering final judgment for one of the parties.

[58 Cases that cite this headnote](#)

**[7]** **Appeal and Error**
　🗝 Scope and Effect

Unless context shows that words were used in a different sense, references to insufficiency of evidence are usually construed to mean factual insufficiency.

[5 Cases that cite this headnote](#)

**[8]** **Appeal and Error**
　🗝 Scope and Effect

Reference to insufficiency of evidence in point urged by plaintiffs in Court of Civil Appeals was construed to mean factual insufficiency where court stated that it had considered all evidence in passing on the point, and also remanded cause for new trial, and said nothing to indicate that this was done in the interest of justice.

[139 Cases that cite this headnote](#)

**[9]** **Appeal and Error**
　🗝 Sufficiency of Evidence as Question of Law or Fact

Supreme Court has no jurisdiction to review a holding that evidence is factually insufficient to support the answer to a special issue, but it is authorized to determine whether jurisdiction of Court of Civil Appeals to decide that question has been properly invoked.

[8 Cases that cite this headnote](#)

**[10]** **Appeal and Error**
　🗝 Objections to Verdict, Findings, or Judgment

Paragraph of motion for new trial, complaining of trial court's error in overruling motion to disregard jury's findings with respect to certain special issues, was too general to require or

justify consideration of a point of error based thereon.

[9 Cases that cite this headnote](#)

**[11]** **Judgment**
　🗝 Where There Is No Evidence to Sustain Verdict
**Trial**
　🗝 Questions to Be Submitted

Trial court is authorized upon motion and notice to disregard any special issue jury finding that has no support in evidence, but court may not properly refuse to submit an issue or disregard jury's answer thereto merely because evidence is factually insufficient to support the same. Rules of Civil Procedure, rule 301.

[84 Cases that cite this headnote](#)

**[12]** **Appeal and Error**
　🗝 Scope and Effect

A contention that an issue should not have been submitted, or that a finding of the jury should be disregarded because of the insufficiency of the evidence, can mean only that there is no evidence to warrant submission of issue or support jury's finding.

[23 Cases that cite this headnote](#)

**[13]** **Appeal and Error**
　🗝 Scope and Effect

Point of error alleging that court erred in overruling plaintiffs' motion to disregard jury's findings with respect to certain special issues presented many contentions if their generality was overlooked but did not raise any question as to factual sufficiency of evidence to support the answer to special issue relating to contributory negligence, and judgment of trial court should not have been reversed on that ground.

[269 Cases that cite this headnote](#)

**[14]** **Appeal and Error**
　🗝 Necessity

Supreme Court will not consider questions not brought to it by application for writ of error.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*822** Lloyd, Lloyd & Dean, Alice, Keys, Russell, Keys & Watson, Corpus Christi, for petitioners.

Perkins, Floyd, Davis & Oden, Alice, for respondents.

**Opinion**

WALKER, Justice.

This is a personal injury action in which the trial court rendered judgment on the verdict for the defendants. The Court of Civil Appeals reversed such judgment and remanded the cause for a new trial, because it concluded that the evidence was factually insufficient to support the jury's finding of contributory negligence. 387 S.W.2d 905. In our opinion this question was not raised in the trial court or presented by the plaintiffs' brief in the Court of Civil Appeals.

Linda Alviar, a girl eleven years of age, was crossing Almond Street in Alice, Texas, when she was struck by an automobile owned by Remigio M. Garza and driven by his son, Raymond Garza. Suit was instituted by Linda's father, individually and as next friend for his daughter, against the Garzas to recover damages for her injuries. The jury found that Almond Street had been designated as one-way street for south bound traffic only, and that the accident was proximately caused by the negligence of Raymond Garza in driving north thereon. It also concluded that Raymond was driving at an excessive rate of speed, but refused to find that this was a proximate cause of the accident. All other primary negligence issues were answered favorably to the defendants.

**\*823** The jury acquitted Linda of any negligence in failing to keep a proper lookout for her own safety and in failing to yield the right of way to the automobile. It also determined that while she was negligent in failing to cross the street at a regular crosswalk, such negligence was not a proximate cause of the accident. In response to Special Issues Nos. 14, 15 and 16, the jury found: (14) that just before the accident Linda ran from immediately behind a soda water truck, and (15) that this was negligence and (16) a proximate cause of the accident. The judgment of the trial court rests upon these three findings.

Plaintiffs went to the Court of Civil Appeals with seven points of error. Points Nos. 1, 2, 3, 4 and 6 were stricken by the intermediate court upon motion of the defendants. Plaintiffs were then granted leave to amend their brief, but no amendment was filed. After further consideration, the Court of Civil Appeals concluded that Point No. 4 challenged the sufficiency of the evidence to support the finding in response to Special Issue No. 15 that Linda was negligent in running from immediately behind the truck just prior to the accident. According to its opinion, the Court of Civil Appeals found 'that the evidence is insufficient to support the jury's answer to issue number 15' and on the basis of that holding reversed the judgment of the district court and remanded the cause for a new trial.

**[1] [2] [3]** A statement in a point of error, or in the opinion of one of our intermediate appellate courts, that the evidence is 'insufficient' to support a finding by the trier of fact is often troublesome because of its ambiguity. It can mean that the evidence is legally insufficient, i.e., there is no evidence of probative force, to support the finding in question. When that contention is made, a question of law within our jurisdiction as well as that of the Courts of Civil Appeals is presented. In deciding that question, the appellate court must consider only the evidence and the inferences tending to support the finding and disregard all evidence and inferences to the contrary. If a 'no evidence' point is sustained and the proper procedural steps have been taken, the finding under attack may be disregarded entirely and judgment is usually rendered for the appellant unless the interests of justice require another trial.

**[4] [5] [6]** On the other hand, an assertion that the evidence is 'insufficient' to support a finding of fact can mean that the evidence is factually insufficient, i.e., the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the finding should be set aside and a new trial ordered. When that contention is made at the appellate level, a question within the peculiar and conclusive factual jurisdiction of the Courts of Civil Appeals is presented. The intermediate court is required to consider all of the evidence in deciding the question. If the contention is sustained, the finding under attack may be set aside and a new trial ordered. Factual insufficiency of the evidence does not, however, authorize the court to disregard the finding entirely or make a contrary finding in entering final judgment for one of the parties. See Calvert, 'No Evidence' and 'Insufficient Evidence' Points of Error, 38 Tex.Law Rev. 359; Garwood, The Question of Insufficient Evidence on Appeal, 30 Tex.Law Rev. 803; Gulf, C. & S. F. Ry. Co. v. Deen, 158 Tex. 466, 312 S.W.2d 933, 159 Tex.

238, 317 S.W.2d 913; In re King's Estate, 150 Tex. 662, 244 S.W.2d 660.

 **[7]**   **[8]**   **[9]**   Unless the context shows that the words were used in a different sense, references to the insufficiency of the evidence are usually construed to mean factual insufficiency. We are satisfied that this is the meaning attributed to plaintiff's Point No. 4 by the Court of Civil Appeals in the present case. The court stated that it had considered all of the evidence in passing on the point. It also remanded the cause for a new trial and said nothing to indicate that this was done in the interest of justice. In  **\*824**  their answer to the application for writ of error, plaintiffs tacitly recognize that the Court of Civil Appeals was exercising its factual jurisdiction, for they insist that the Supreme Court is without power to review the ruling of the intermediate court on the sufficiency of the evidence. It is true that we have no jurisdiction to review the holding that the evidence is factually insufficient to support the answer to Special Issue No. 15, but we are authorized to determine whether the jurisdiction of the Court of Civil Appeals to decide that question was properly invoked.

Point No. 4 urged by plaintiffs in the Court of Civil Appeals reads as follows:

> 'The error of the trial court in overruling and in not sustaining plaintiffs' motion to disregard the jury's findings with respect to certain special issues.'

This and four other points were grouped in their brief, and the statement thereunder contains a rather full resume of the evidence. In the course of the argument, plaintiffs took the position that Special Issues Nos. 14, 15 and 16 are evidentiary and should not have been submitted, and that the affirmative answers thereto will not support a judgment for the defendants. It was also pointed out that they had filed their motion to disregard the answers to these three issues because 'there was insufficient support in the evidence to warrant the submission of such issues to the jury.' This is the only reference in the brief to the sufficiency of the evidence to support the answer to Special Issue No. 15.

As the basis for Point No. 4, plaintiffs referred in their brief to Paragraph V of the amended motion for new trial, which reads as follows:

> 'The court erred in overruling Plaintiffs' motion to disregard the jury's findings

with respect to certain special issues, a copy of Plaintiffs' motion to disregard the jury's findings with respect to certain special issues being attached hereto and made a part hereof for all purposes.'

 **[10]**   **[11]**   An assignment in these terms is too general to require or justify consideration of a point of error based thereon. Wagner v. Foster, 161 Tex. 333, 341 S.W.2d 887. Even if that were not the case, the assignment of error as well as Point No. 4 and the argument thereunder are directed at the action of the trial court in overruling plaintiff's motion to disregard the jury's findings. Under the rpovisions of Rule 301, Texas Rules of Civil Procedure, the trial court is authorized, upon motion and notice, to 'disregard any Special Issue Jury Finding that has no support in the evidence.' The court may not, however, properly refuse to submit an issue or disregard the jury's answer thereto merely because the evidence is factually insufficient to support the same.

 **[12]**   **[13]**   A contention that an issue should not have been submitted, or that a finding of the jury should be disregarded, because of the insufficiency of the evidence is subject to only one construction. It can mean only that there is no evidence to warrant submission of the issue or support the jury's finding. See McDonald v. New York Central Mutual Fire Ins. Co., Tex.Sup., 380 S.W.2d 545. Many contentions are presented by the assignment and point of error quoted above if we overlook their generality and consider plaintiffs' motion to disregard, but they do not raise any question as to the factual sufficiency of the evidence to support the answer to Special Issue No. 15. The judgment of the trial court should not have been reversed on that ground.

 **[14]**   We have examined plaintiffs' other points of error in the Court of Civil Appeals. Several are not supported by proper assignments of error in the motion for new trial, and it was for this reason that the court sustained defendants' motion to strike. The remainder of such points, if sustained, would require that the judgment of the trial court be reversed and rendered or modified  **\*825**  and affirmed. These questions cannot be considered by us, because they have not been brought here by application for writ of error. See Calvert, Some Problems of Supreme Court Review, 21 Tex.Bar Jour. 75.

The judgment of the Court of Civil Appeals is reversed, and that of the trial court is affirmed.

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

902 S.W.2d 181
Court of Appeals of Texas,
Fort Worth.

William C. GOOCH, Appellant,

v.

AMERICAN SLING COMPANY, INC., Appellee.

No. 2–94–205–CV.    |    June 29, 1995.

Creditor sued to recover on corporate president's guaranty of corporate indebtedness. The County Court at Law No. 2, Tarrant County, Steve Wallace, J., entered judgment in favor of creditor, and president appealed on theory that no consideration existed to support his guaranty or, in alternative, he executed guaranty under duress. The Court of Appeals, Dauphinot, J., held that: (1) consideration existed sufficient to support president's guaranty given evidence of creditor's forbearance in enforcing its right to payment, and (2) president failed to satisfy burden of demonstrating affirmative defense of duress.

Affirmed.

West Headnotes (24)

**[1]** **Appeal and Error**
    Review of Evidence

On challenge to legal sufficiency of evidence by party having burden of proof at trial, appellate court addresses alleged error as "matter of law" point.

4 Cases that cite this headnote

**[2]** **Appeal and Error**
    Total Failure of Proof

On challenge to legal sufficiency of evidence by party not having burden of proof at trial, appellate court addresses alleged error as "no evidence" point.

14 Cases that cite this headnote

**[3]** **Appeal and Error**

    Findings of Court or Referee

**Appeal and Error**
    Character and Amount of Evidence in General

In determining "no evidence" point, Court of Appeals considers only evidence and inferences that tend to support challenged finding and disregards all evidence and inferences to the contrary; if there is more than scintilla of such evidence to support finding, then claim is sufficient as matter of law, and any challenges go merely to weight to be accorded the evidence.

Cases that cite this headnote

**[4]** **Appeal and Error**
    Total Failure of Proof

"No evidence" point of error may be sustained only when record discloses a complete absence of evidence of vital fact, when court is barred by rules of law or evidence from giving weight to the only evidence offered to prove vital fact, when evidence offered to prove vital fact is no more than mere scintilla of evidence, or when evidence establishes conclusively the opposite of vital fact.

1 Cases that cite this headnote

**[5]** **Appeal and Error**
    Total Failure of Proof

"No evidence" point of error must be rejected when proof supplies a reasonable basis on which reasonable minds may reach different conclusions about existence of vital fact.

Cases that cite this headnote

**[6]** **Appeal and Error**
    Findings of Court or Referee

**Appeal and Error**
    Extent of Review

**Appeal and Error**
    Against Weight of Evidence

When appellant attacks legal sufficiency of adverse answer to finding on which he had burden of proof at trial, appellant must overcome

two hurdles: first, record must be examined for evidence that supports finding while ignoring all evidence to contrary; and secondly, if there is no evidence to support fact finder's answer, the entire record must be examined to see if contrary proposition is established as matter of law.

6 Cases that cite this headnote

**[7]     Appeal and Error**
 Preponderance of Evidence

When party challenges factual sufficiency of evidence on point on which he had burden of proof at trial, party must show that finding is against great weight and preponderance of evidence.

15 Cases that cite this headnote

**[8]     Appeal and Error**
Burden of Showing Error

When party challenges factual sufficiency of evidence on point on which he did not have burden of proof at trial, party must show only that evidence is insufficient to support adverse finding.

34 Cases that cite this headnote

**[9]     Appeal and Error**
Sufficiency of Evidence in Support

Assertion that evidence is "insufficient" to support fact finding means that evidence which supports finding is so weak, or evidence to the contrary is so overwhelming, that answer should be set aside and a new trial ordered.

6 Cases that cite this headnote

**[10]    Appeal and Error**
Extent of Review

**Appeal and Error**
Form and Requisites

On challenge to factual sufficiency of evidence to support finding, Court of Appeals must consider all of the evidence in case and, if it reverses, detail that evidence in its opinion.

1 Cases that cite this headnote

**[11]    Appeal and Error**
Extent of Review

In reviewing point of error asserting that finding is against great weight and preponderance of evidence, Court of Appeals must consider and weigh all of the evidence, both the evidence that tends to prove existence of vital fact as well as evidence that tends to disprove its existence.

1 Cases that cite this headnote

**[12]    Appeal and Error**
Manifest Weight

If finding is so contrary to great weight and preponderance of evidence as to be manifestly unjust, "factual sufficiency" point should be sustained, regardless of whether there is some evidence to support it.

8 Cases that cite this headnote

**[13]    Guaranty**
Forbearance

Consideration existed to support guarantee signed by corporate president, in which president agreed to be personally liable for corporation's preexisting debt, given evidence of creditor's forbearance in enforcing its right to payment and agreement to continue doing business with corporation.

3 Cases that cite this headnote

**[14]    Appeal and Error**
Same Effect as Verdict

Findings of fact entered in case tried to court are of same force and dignity as jury's answers to jury questions, and are reviewable on appeal by same standards that are applied in reviewing legal or factual sufficiency of evidence supporting jury's answer to jury question.

Cases that cite this headnote

**[15] Guaranty**

👉 Nature of Obligation

"Guaranty" is contract in which one party agrees to be responsible for performance of another party, even if first party does not have direct control.

2 Cases that cite this headnote

**[16] Contracts**

👉 Presumptions and Burden of Proof

Written contract carries with it a presumption that consideration was given for contract's execution.

5 Cases that cite this headnote

**[17] Guaranty**

👉 Presumptions and Burden of Proof

Burden of proof was on guarantor to show that there was no consideration for his written guaranty of corporate indebtedness.

Cases that cite this headnote

**[18] Guaranty**

👉 Consideration of Principal Contract in General

If guaranty is entered into independently of transaction that caused underlying obligation, then guaranty must be supported by consideration independent of obligation.

3 Cases that cite this headnote

**[19] Guaranty**

👉 Consideration

Consideration for guaranty agreement usually consists either of suffering of detriment by creditor or of benefit conferred on primary debtor.

3 Cases that cite this headnote

**[20] Guaranty**

👉 Forbearance

Postponement of enforcement of underlying debt may be sufficient consideration to support guaranty.

2 Cases that cite this headnote

**[21] Guaranty**

👉 Sufficiency

Agreement to continue doing business with primary debtor confers benefit on primary debtor, and may be consideration sufficient to support guaranty.

3 Cases that cite this headnote

**[22] Guaranty**

👉 Weight and Sufficiency

President failed to establish that he signed guaranty of corporate indebtedness as a result of supplier's duress, given conflicting evidence presented as to whether supplier had required execution of guaranty as prerequisite to its release of goods ordered by corporation.

Cases that cite this headnote

**[23] Contracts**

👉 Duress

**Contracts**

👉 Presumptions and Burden of Proof

Duress is affirmative defense to liability on contract, which must be pled and proven by party claiming defense. Vernon's Ann.Texas Rules Civ.Proc., Rule 94.

1 Cases that cite this headnote

**[24] Appeal and Error**

👉 Province of Trial Court

**Appeal and Error**

👉 Province of Trial Court

Fact finder determines credibility of witnesses and weight to be given their testimony, and absent clear abuse of discretion, its findings of fact will not be disturbed on appeal.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*183** Richard E. McGary, Robert F. Jones, Jr., Arlington, for appellant.

Donald T. Smith, Philip H. Trew, Law Office of Donald T. Smith, P.C., Fort Worth, for appellee.

Before LIVINGSTON, DAUPHINOT and BRIGHAM, JJ.

## OPINION

DAUPHINOT, Justice.

American Sling Co., Inc., Appellee, initially brought suit on a debt owed by William C. Gooch, Appellant. In a bench trial, the court found for Appellee and ordered Appellant to pay $4,282.42 for the debt and $3,754.74 in attorney fees. In seven points of error, Appellant complains that the trial court erred by finding that a guaranty agreement signed by Appellant was supported by consideration, that Appellant signed the guaranty voluntarily, and that Appellee was entitled to attorney fees. We affirm.

Appellant was President of Car Stackers, International, Inc. ("Car Stackers"). Car Stackers maintained a business relationship with Appellee, but had failed or delayed making payments to Appellee for goods sold over a period of time. In July 1993, Appellant signed a guaranty agreement that made him personally liable for the debt owed by Car Stackers. The guaranty stated that payment of the debt was due on or before August 1, 1993. When neither Car Stackers nor Appellant paid the debt by August 1, Appellee sent a demand letter to Appellant. Appellant sent a letter reaffirming his intent to pay, but the payment was never made. Appellee sued both Car Stackers and Appellant. The trial court found for Appellee.

## STANDARDS OF REVIEW

All of Appellant's points of error address the sufficiency of the evidence at trial, and the related conclusions of law. The points of error allege that the evidence was established as a matter of law, that there was no evidence to support the findings of the trial court, that the trial court's findings were against the great weight and preponderance of the evidence, and that there was factually insufficient evidence to support

findings of the trial court. All of these points of error were raised without addressing the appropriate burden of proof on the issues at the trial level. Because two of Appellant's points of error appear to confuse the appropriate standard of appellate review as applied to Appellant's burden of proof in the trial court, we shall, therefore, review the proper handling of sufficiency points of error.

## LEGAL SUFFICIENCY POINTS

**[1]** **[2]** Legal sufficiency points are addressed as either "no evidence" or "matter of law" points. If the complaining party has the burden of proof at trial, then the error is to be addressed as a "matter of law" point. If the complaining party does not have the burden of proof, then the error is to be **\*184** addressed as a "no evidence" point. *Croucher v. Croucher,* 660 S.W.2d 55 (Tex.1983); *Raw Hide Oil & Gas, Inc. v. Maxus Exploration Co.,* 766 S.W.2d 264, 275 (Tex.App.— Amarillo 1988, writ denied).

**[3]** In determining a "no evidence" point, we are to consider only the evidence and inferences that tend to support the finding and disregard all evidence and inferences to the contrary. *T.O. Stanley Boot Co., Inc. v. Bank of El Paso,* 847 S.W.2d 218, 221 (Tex.1992); *Orozco v. Sander,* 824 S.W.2d 555, 556 (Tex.1992); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661–62 (1951). If there is more than a scintilla of such evidence to support the finding, the claim is sufficient as a matter of law, and any challenges go merely to the weight to be accorded the evidence. *Browning–Ferris, Inc. v. Reyna,* 865 S.W.2d 925, 928 (Tex.1993).

**[4]** **[5]** A "no evidence" point of error may only be sustained when the record discloses one of the following: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla of evidence; or (4) the evidence establishes conclusively the opposite of a vital fact. *Juliette Fowler Homes, Inc. v. Welch Assoc., Inc.,* 793 S.W.2d 660, 666 n. 9 (Tex.1990); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 TEX.L.REV. 361 (1960). There is some evidence when the proof supplies a reasonable basis on which reasonable minds may reach different conclusions about the existence of the vital fact. *Orozco,* 824 S.W.2d at 556.

**[6]** If an appellant is attacking the legal sufficiency of an adverse answer to a finding on which he had the burden of proof, the Texas Supreme Court has stated that the appellant must, as a matter of law, overcome two hurdles. *Victoria Bank & Trust Co. v. Brady,* 811 S.W.2d 931, 940 (Tex.1991). First, the record must be examined for evidence that supports the finding, while ignoring all evidence to the contrary. Second, if there is no evidence to support the fact finder's answer, then the entire record must be examined to see if the contrary proposition is established as a matter of law. *Id.; Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex.1989).

### FACTUAL SUFFICIENCY POINTS

**[7]** **[8]** Like legal sufficiency, factual sufficiency points depend on who has the burden of proof. If the party attacking the adverse finding had the burden of proof, then he must show that the finding was against the "great weight and preponderance" of the evidence. If the party attacking the adverse finding did not have the burden of proof, then he must show that the evidence was insufficient to support the adverse finding. *Croucher,* 660 S.W.2d at 58; *Raw Hide,* 766 S.W.2d at 275.

**[9]** **[10]** An assertion that the evidence is "insufficient" to support a fact finding means that the evidence supporting the finding is so weak or that the evidence to the contrary is so overwhelming that the answer should be set aside and a new trial ordered. *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965). We are required to consider all of the evidence in the case in making this determination and, if reversing, to detail that evidence in the opinion. *Jaffe Aircraft Corp. v. Carr,* 867 S.W.2d 27, 29 (Tex.1993).

**[11]** **[12]** In reviewing a point of error asserting that an answer is "against the great weight and preponderance" of the evidence, we must consider and weigh all of the evidence, both the evidence that tends to prove the existence of a vital fact as well as evidence that tends to disprove its existence. *Ames v. Ames,* 776 S.W.2d 154, 158–59 (Tex.1989), *cert. denied,* 494 U.S. 1080, 110 S.Ct. 1809, 108 L.Ed.2d 939 (1990); *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). So considering the evidence, if a finding is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust, the point should be sustained, regardless of whether there is some evidence to support it. *Watson v. Prewitt,* 159 Tex. 305, 320 S.W.2d 815, 816 (1959); *In re King's Estate,* 244 S.W.2d at 661.

### *185 HOLDING

**[13]** Appellant's first and second points of errors complain of the findings of fact made by the trial court. Appellant's third point of error complains that the trial court erred in concluding that the guaranty was supported by consideration. Specifically, Appellant argues that the evidence established, as a matter of law, that there was no consideration given for the guaranty. Appellant argues, in the alternative, that the failure to find that there was no consideration given for the guaranty was against the great weight and preponderance of the evidence. Appellant also alleges that the there was no evidence and insufficient evidence to support the findings of the trial court.

**[14]** Findings of fact entered in a case tried to the court are of the same force and dignity as a jury's answers to jury questions. *Anderson v. City of Seven Points,* 806 S.W.2d 791, 794 (Tex.1991). The trial court's findings of fact are reviewable for legal and factual sufficiency of the evidence to support them by the same standards that are applied in reviewing the legal or factual sufficiency of the evidence supporting a jury's answer to a jury question. *Arena v. Arena,* 822 S.W.2d 645, 650 (Tex.App.—Fort Worth 1991, no writ); *Raposa v. Johnson,* 693 S.W.2d 43, 45 (Tex.App.—Fort Worth 1985, writ ref'd n.r.e.).

**[15]** **[16]** **[17]** A guaranty agreement is a contract in which one party agrees to be responsible for the performance of another party even if he does not have direct control. A written contract presumes that there was consideration given for its execution. *See Wright v. Robert & St. John Motor Co.,* 122 Tex. 278, 282, 58 S.W.2d 67, 69 (1933); *Hargis v. Radio Corp. of America, Electronic Components,* 539 S.W.2d 230, 232 (Tex.Civ.App.—Austin 1976, no writ). The burden of proof was on Appellant to show that there was a failure of consideration. *Maykus v. Texas Bank & Trust Co.,* 550 S.W.2d 396, 398 (Tex.Civ.App.—Dallas 1977, no writ). Because Appellant had the burden of proof, it was not appropriate for him to allege that there was no evidence and insufficient evidence to support the fact finding. Accordingly, we overrule point of error two and will address points of error one and three.

**[18]** **[19]** Appellant and Appellee entered into the guaranty agreement independently of the transaction that resulted in the debt owed to Appellee. If a guaranty is entered into

independently of the transaction that caused the obligation, then the guaranty must be supported by consideration independent of the obligation. *Fourticq v. Fireman's Fund Ins. Co.,* 679 S.W.2d 562, 564 (Tex.App.—Dallas 1984, no writ). Consideration for a guaranty agreement usually consists of either the suffering of a detriment by the creditor or a benefit conferred on the primary debtor. *Id.*

Both Appellant's and Appellee's arguments rely on the trial testimony of James Fletcher, president of American Sling. Appellee argues that Fletcher's testimony that the intent of the guaranty agreement was to extend the due date of the past due invoices until August 1, 1993, demonstrates that Appellee intended to postpone enforcement of the debt. Appellee also contends that Fletcher's testimony that the guaranty would allow Appellant to continue doing business with Appellee on a cash on delivery basis conferred a benefit on Appellant.

Appellant counters that Fletcher's testimony that Appellee waived no right to enforce the past due debt against Car Stackers demonstrates that Appellee did not intend for there to be a postponement of enforcement on the past due invoices. Appellant also argues that no benefit was conferred because Appellant and Appellee did not do any business after the guaranty was signed.

 **[20]** **[21]** Postponement of enforcement of a debt has been held to be sufficient consideration. *Swofford v. Tri–State Chemicals, Inc.,* 764 S.W.2d 24, 26 (Tex.App.—El Paso 1989, writ denied). Furthermore, an agreement to continue doing business with a party confers a benefit on that party. *See Hargis,* 539 S.W.2d at 232. We find that there was evidence to support the finding of the trial court that the guaranty agreement was supported by consideration. We further find that the evidence was not contrary to the great weight and preponderance of the evidence. **\*186** Appellant's points of error one and three are overruled.

 **[22]** Appellant's points of error four through six allege that the trial court erred in finding that Appellant did not sign the guaranty agreement under duress. Appellant contends that he only signed the guaranty after Appellee told Nova Lift, a company doing business with Appellant, that Appellee would not turn over a shipment of materials prepaid by Nova Lift unless Appellant paid the past due invoices or signed a personal guaranty.

 **[23]** Duress is an affirmative defense that must be pled and proved by the one claiming the defense. TEX.R.CIV.P. 94.

Thus, the burden of proof was on Appellant to show that he was under duress when he signed the guaranty agreement. Because Appellant had the burden of proving that he signed the guaranty under duress, it was inappropriate for him to allege that the there was no evidence or that there was factually insufficient evidence. Thus, we will only address points of error four and six. Point of error five is overruled.

Duress can be shown by proving the following:

> [1] there is a threat to do some act which the party threatening has no legal right to do. [2] Such threat must be of such character as to destroy the free agency of the party to whom it is directed. It must overcome his will and cause him to do that which he would not otherwise do, and which he was not legally bound to do. [3] The restraint caused by such threat must be imminent. [4] It must be such that the person to whom it is directed has no present means of protection. [5] Where a demand made is wrongful or unlawful, and it is necessary for the party making such demand to resort to the courts to enforce same, there is no duress, for the one upon whom demand is made has adequate means of protection, and there is no imminent restraint. [6] But where the party making such demand has, or is supposed to have, the power to injure the business or property interests of the one upon whom such demand is made, without resort to the courts to enforce the demand, and threatens to do an act which would cause such injury, and which he has no right to do, and thereby induces a compliance with his demand, [7] against the will of such party through fear of injury to his business or property interests, such threats amount to duress, [8] if it appears that the party making such demand and threat ought not in good conscience to retain the benefit received by reason thereof.

*Dale v. Simon,* 267 S.W. 467, 470 (Tex.Comm'n App.1924, judgm't adopted) (citations omitted).

Appellant contends that he was forced to sign the guaranty so that Nova Lift could get their shipment. Appellant did testify that he talked to Fletcher about signing a guaranty prior to the actual signing. However, Appellant maintained that he never agreed to sign the guaranty. Appellant testified that Charles Shields, a manager for American Sling, told him that he had been instructed by Fletcher not to turn over the shipment to Nova Lift unless Appellant signed the guaranty. Appellant also testified that when he signed the guaranty, he told Shields, "You've got me over a barrel and I'm signing under protest."

Andy Cauthen, CEO of Nova Lift, stated in an affidavit that Nova Lift had placed an order with Appellee and had agreed to pay for the order in advance. Cauthen stated that when they attempted to pick up the order, they were told that the order would not be released until Appellant either paid the past due invoices or personally guaranteed payment on the invoices. Cauthen stated that Gooch signed the personal guaranty, under protest, after Nova Lift "appealed" to him to "accommodate American Sling's demands."

However, Fletcher testified that Appellant agreed to sign the guaranty a week before he actually signed it. Furthermore, Appellant went to American Sling to sign the agreement. Fletcher testified that it was arranged for Appellant to sign the agreement on the day in question because it was assumed that Appellant would be coming to the office to pick up the Nova Lift order. Fletcher testified that after the August 1st **\*187** due date, he sent Appellant a demand letter. Appellant responded by sending a letter reaffirming his intention to pay the debt.

Charles Shields testified that he never told Appellant or Nova Lift that Nova Lift would not receive the order unless Appellant signed the guaranty. Shields also testified that

Fletcher did not leave directions to withhold the Nova Lift order. Shields testified that Appellant did say something like, "I guess I'm over a barrel," but that he had no idea what Appellant was talking about. Shields denied that he heard Appellant say anything else.

Appellant also testified that his signature was evidence of his disagreement with having to sign the guaranty. Appellant testified that he was known as William C. Gooch and signed all documents, "William C. Gooch." However, Appellant points out that he signed the guaranty agreement, "Bill Gooch," thus demonstrating that he was signing it under protest. However, the record shows that throughout trial, Appellant was constantly referred to as "Bill." In fact, his own attorney referred to him as "Bill Gooch."

The issue of duress actually boils down to the credibility of the witnesses. Witnesses for Appellant testified that Appellee refused to turn over the Nova Lift order unless Appellant signed the guaranty. Witnesses for Appellee testified that there was never any mention of withholding the Nova Lift order.

 **[24]**     The fact finder determines the credibility of the witnesses and the weight to be given the testimony of each. *McGalliard v. Kuhlmann,* 722 S.W.2d 694, 697 (Tex.1986). Absent a clear abuse of discretion, the findings of facts will not be disturbed. We hold that Appellant failed to prove duress as a matter of law. We further hold that the trial court's finding was not against the great weight and preponderance of the evidence. Appellant's fourth and sixth points of error are overruled.

Appellant's seventh point of error, regarding attorney fees, is premised upon sustaining any of Appellant's first six points of error. Because we have overruled those points of error, point of error seven is also overruled.

The judgment of the trial court is affirmed.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

112 S.W.3d 715
Court of Appeals of Texas,
Houston (14th Dist.).

Kerry GUTHERY, Appellant,
v.
Earnest B. TAYLOR, in his Official Capacity
as Chief of Police of the Sugar Land Police
Department, and the City of Sugar Land, Appellees.

No. 14–02–00743–CV. | July 17, 2003.

Police officer, who received disciplinary suspension based on investigation stemming from citizen's complaint, filed petition for writ of mandamus to compel police chief and city to withdraw disciplinary action taken against him and to restore his back pay and benefits. The 268th District Court, Fort Bend County, Brady G. Elliott, J., granted summary judgment motion of city and police chief, and denied police officer's motion for summary judgment. Police officer appealed. The Court of Appeals, John S. Anderson, J., held that notice of proposed disciplinary action provided by police chief to police officer did not comply with requirements of statutes governing complaints against law enforcement officers, and thus, chief had duty to refrain from taking disciplinary action against officer.

Reversed and rendered.

West Headnotes (15)

**[1]** **Municipal Corporations**
 Charges

Notice of proposed disciplinary action provided by police chief to police officer did not comply with requirements of statutes governing complaints against law enforcement officers, and thus, chief had duty to refrain from taking disciplinary action against officer; officer was only provided with chief's notice charging officer with violations, officer was not presented with affidavit from citizen making complaint or anything signed by her, and there was nothing to indicate officer was presented with affidavits from any other witnesses or presented with

internal affairs report. V.T.C.A., Government Code §§ 614.022, 614.023.

4 Cases that cite this headnote

**[2]** **Appeal and Error**
 Cases Triable in Appellate Court

Generally, matters of statutory construction are legal questions, subject to de novo review.

2 Cases that cite this headnote

**[3]** **Mandamus**
 Conduct of hearing or trial
**Mandamus**
 Right of review

An original proceeding for a writ of mandamus initiated in the trial court is a civil action subject to trial and appeal on substantive law issues and rules of procedure as any other civil suit.

1 Cases that cite this headnote

**[4]** **Mandamus**
 Ministerial acts in general

A writ of mandamus will issue to compel a public official to perform a ministerial act; an act is ministerial when the law clearly delineates the duty to be performed by the official with sufficient certainty that nothing is left to the exercise of discretion.

2 Cases that cite this headnote

**[5]** **Mandamus**
 Matters of discretion

A writ of mandamus will not issue to compel a public official to perform an act which involves an exercise of discretion.

Cases that cite this headnote

**[6]** **Mandamus**
 Matters of discretion

There is one exception to rule that a writ of mandamus will not issue to compel a public official to perform an act which involves an

exercise of discretion: a writ of mandamus may issue in a proper case to correct a clear abuse of discretion by a public official.

3 Cases that cite this headnote

**[7] Mandamus**
  Ministerial acts in general

When a statute delineates an act an official is to perform with sufficient certainty so nothing is left to the exercise of discretion, the case involves only performance of a ministerial act, and is subject to mandamus.

1 Cases that cite this headnote

**[8] Appeal and Error**
  Review Dependent on Mode of Trial in Lower Court

An appellate court looks to procedure used to resolve issue at trial to determine standard of review on appeal.

11 Cases that cite this headnote

**[9] Statutes**
  Intent

A court's objective in construing a statute is to determine and give effect to legislature's intent.

2 Cases that cite this headnote

**[10] Statutes**
  Plain language; plain, ordinary, common, or literal meaning

In construing a statute, an appellate court presumes legislature intended plain meaning of words it used.

Cases that cite this headnote

**[11] Statutes**
  Language and intent, will, purpose, or policy
**Statutes**
  Extrinsic Aids to Construction

If possible, an appellate court must ascertain legislature's intent from language of a statute and not resort to extraneous matters for an intent not stated in the statute.

2 Cases that cite this headnote

**[12] Statutes**
  Purpose
**Statutes**
  Statute as a Whole; Relation of Parts to Whole and to One Another
**Statutes**
  Construction in View of Effects, Consequences, or Results

When interpreting a statute, an appellate court considers the entire act, its nature and object, and the consequence that would follow from each construction.

Cases that cite this headnote

**[13] Statutes**
  Purpose

An appellate court must reject any statutory interpretation that defeats the legislative purpose.

Cases that cite this headnote

**[14] Statutes**
  Similarity or difference
**Statutes**
  Other Statutes
**Statutes**
  Similar or Related Statutes

When construing a statutory word or phrase, a court may take into consideration the meaning of the same or similar language used elsewhere in the act or in another act of similar nature.

9 Cases that cite this headnote

**[15] Statutes**
  Other Statutes

When the same or a similar term is used in the same connection in different statutes, the term



will be given the same meaning in one as in the other, unless there is something to indicate that a different meaning was intended.

9 Cases that cite this headnote

**Attorneys and Law Firms**

**\*717** Gregory B. Cagle, League City, for appellants.

Meredith Rene Riede, Sugar Land, for appellees.

Panel consists of Justices JOHN S. ANDERSON, SEYMORE, and GUZMAN.

**OPINION**

JOHN S. ANDERSON, Justice.

This police disciplinary case requires the court to construe Texas Government Code sections 614.022 and 614.023, which apply only to those police officers who are not covered by a civil service statute. TEX. GOV'T CODE ANN. § 614.021(3) (Vernon 1994). Section 614.022 provides: "To be considered by the head of a ... police department, the complaint must be: (1) in writing; and (2) signed by the person making the complaint." TEX. GOV'T CODE ANN. § 614.022 (Vernon 1994). Section 614.023 provides:

(a) A copy of a signed complaint against a law enforcement officer, fire fighter, or police officer shall be given to the officer or employee within a reasonable time after the complaint is filed.

(b) Disciplinary action may not be taken against the officer or employee unless a copy of the signed complaint is given to the officer or employee.

TEX. GOV'T CODE ANN. § 614.023 (Vernon 1994).

The case arises because appellant, Kerry Guthery, received a disciplinary suspension based on an investigation stemming from a citizen's complaint. Guthery subsequently filed suit in the trial court, seeking a declaratory judgment delineating his rights under sections 614.022 and 614.023. Guthery also sought injunctive relief, or, alternatively, a writ of mandamus to compel Sugar Land Police Chief Earnest B. Taylor, in his capacity of Chief of Police, and the City of Sugar Land,

appellees, to withdraw the disciplinary action taken against him and to restore his back pay and benefits.

The parties filed cross-motions for summary judgment, urging competing interpretations of the statutes at issue. The trial court granted appellees' motion and denied Guthery's motion, ordering that he take nothing.

We reverse the summary judgment in favor of appellees and render judgment in favor of Guthery (1) declaring appellees' actions violated sections 614.022 and 614.023, and (2) ordering appellees to withdraw the disciplinary action and restore Guthery's back pay and benefits.

**\*718 FACTUAL AND PROCEDURAL BACKGROUND** [1]

On January 29, 2000, Guthery, a police officer, decided to disperse a party at 55 Ashbury Park. He knocked on the front door with his flashlight, damaging the door. On February 2, 2000, Mrs. Scraper, a citizen, telephoned the Sugar Land Police Department ("SLPD"), complaining an officer had damaged her door on January 29, 2000.

SLPD determined Guthery was the only officer at Scraper's house that night. After reviewing the incident report, Guthery's supervisor made notes on the report and returned it to Guthery to obtain more information about how the damage might have occurred. [2] Guthery responded to the questions that day in an e-mail. [3] After receiving Guthery's answers, the SLPD's Professional Standards Division investigated the incident to determine whether any state laws or city policies had been violated. The investigation included meeting with Mrs. Scraper at her residence and photographing the damage. Additionally, Guthery supplied a written statement of the incident and was asked to provide a copy of the audio tape from that night. Guthery, however, was unable to provide an audio tape from that night because he failed to record this particular event.

The SLPD Professional Standards Division investigated the complaint as possible violations of state criminal law and city policies. During the investigation, there were multiple allegations against Guthery. The investigators ultimately concluded Guthery caused damage to Scraper's front door when he struck it several times with his flashlight, denting the wood surface and causing a panel of glass to break. The

investigators also determined that Guthery failed to activate his tape recorder during the incident.

Police Chief Taylor reviewed the investigation report, and Guthery received a "Notice of Proposed Disciplinary Action" ("Notice") on April 7, 2000. Chief Taylor's proposal to suspend Guthery for three days was included in the Notice, and Taylor requested Guthery to appear at a meeting on April 13, 2000, in order to respond. [4] **\*719** The Notice was signed by Chief Taylor. After meeting with Guthery on April 13, 2000, Chief Taylor approved the suspension. Guthery appealed the disciplinary action to the City's Employees Board of Appeals, and after a hearing, the board reduced the suspension to one day.

Guthery then filed a petition for writ of mandamus, asking the trial court to direct Chief Taylor to withdraw the disciplinary action because it was imposed in violation of Texas Government Code section 614.023(b), and to award Guthery full back pay and benefits lost as a result of the disciplinary action. Additionally, Guthery sought to recover all attorney's fees incurred. Guthery subsequently amended his original petition and added the City of Sugar Land as a defendant. Further, he sought relief under the Uniform Declaratory Judgments Act, asking the court to declare the acts of the defendants to be in violation of the Texas Government Code. [5]

Guthery and appellees filed cross-motions for summary judgment, setting forth competing constructions of Texas Government Code sections 614.022 and 614.023. Guthery argued appellees' actions violated section 614.022 because there was no written and signed complaint from Mrs. Scraper, the owner of the residence where the damage occurred. Guthery also argued appellees could not rely on the Notice because it included the discipline to be imposed, was delivered after conclusion of the investigation and was not signed by Scraper. Guthery noted, "at the conclusion of the investigation would not be 'within a reasonable time after the complaint is filed' as required by [section 614.023(a) ]."

Appellees' motion for summary judgment was based on the following: (1) compliance with sections 614.022 and 614.023 is not mandatory; and, in the alternative, (2) the procedures taken by appellees did comply with these sections. Appellees urged the court to find that Mrs. Scraper's signature was not statutorily required on the complaint, and that Chief Taylor's signature was sufficient because he was the officer who charged Guthery and proposed disciplinary action. Appellees

also argued the Notice given to Guthery at the completion of the investigation and before any disciplinary actions were taken was proper.

Following a hearing, the trial court granted appellees' motion and denied Guthery's motion. The trial court ordered Guthery take nothing on his claims and causes of action against appellees.

## ISSUES PRESENTED

**[1]** Guthery raises two issues on appeal. In issue one, he argues, "A copy of the signed complaint was not given to [Guthery] within a reasonable time after it was filed and before disciplinary action was taken and the determination of 'reasonable' is for the fact finder." In issue two, he argues, Chief Taylor "considered a complaint against a police officer ... which was not in writing and signed by the complainant as required by [Texas Government Code section 614.022]." As part of issue two, Guthery reiterates his argument that Chief Taylor did not provide him with a copy of the signed complaint within a reasonable time.

In response to issue one, appellees argue that determination of "reasonable time" is a question of law. In response to issue two, they argue the "complaint" that must be signed in the present case was the "Notice of Proposed Disciplinary Action," not Scraper's complaint. They also argue the complaint was given to Guthery "within **\*720** a reasonable time" because it was given to him before Chief Taylor took disciplinary action against Guthery.

Thus, the controlling issue is one of statutory construction: under the facts of this case, does the Notice suffice as the "complaint" which must be signed and in writing, and given to the officer "within a reasonable time," under Texas Government Code sections 614.022 and 614.023? Only if we determine the Notice suffices as the "complaint" must we decide whether the Notice was given to Guthery "within a reasonable time." Accordingly, after setting forth the standard of review, we begin by addressing Guthery's issue two.

## STANDARD OF REVIEW AND
## NATURE OF JUDGMENT SOUGHT

**[2]** The parties do not dispute the relevant facts. Therefore, this is a proper case for summary judgment. *City of Garland*

*v. Dallas Morning News,* 22 S.W.3d 351, 356 (Tex.2000). When, as here, parties file cross-motions for summary judgment, each party bears the burden of establishing it is entitled to judgment as a matter of law. *Id.* When the trial court grants one party's motion for summary judgment and denies the other, we review both motions; and, if we find the trial court erred, we will reverse and render the judgment the trial court should have rendered. *Id.; Bradley v. State ex rel. White,* 990 S.W.2d 245, 247 (Tex.1999). Generally, matters of statutory construction are legal questions, subject to de novo review. *See State Dep't of Highways & Pub. Transp. v. Gonzalez,* 82 S.W.3d 322, 327 (Tex.2002).

 **[3]  [4]  [5]  [6]  [7]**   An original proceeding for a writ of mandamus initiated in the trial court is a civil action subject to trial and appeal on substantive law issues and rules of procedure as any other civil suit. *Anderson v. City of Seven Points,* 806 S.W.2d 791, 792 n. 1 (Tex.1991). A writ of mandamus will issue to compel a public official to perform a ministerial act. *Id.* at 793. An act is ministerial when the law clearly delineates the duty to be performed by the official with sufficient certainty that nothing is left to the exercise of discretion. *Id.* A writ of mandamus will not issue to compel a public official to perform an act which involves an exercise of discretion. *Id.* There is one exception: a writ of mandamus may issue in a proper case to correct a clear abuse of discretion by a public official. *Id.* When a statute delineates the act an official is to perform with sufficient certainty so nothing is left to the exercise of discretion, the case involves only performance of a ministerial act, and is subject to mandamus. *See id.*

 **[8]**   Under the Uniform Declaratory Judgments Act, a person whose rights are affected by a statute may have a court determine any question of construction arising under the statute and may obtain a declaration of his rights under the same. *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 37.002, .004 (Vernon 1997). We review declaratory judgments under the same standards as other judgments and decrees. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 37.010 (Vernon 1997); *City of Galveston v. Giles,* 902 S.W.2d 167, 170 (Tex.App.-Houston [1st Dist.] 1995, no writ). We look to the procedure used to resolve the issue at trial to determine the standard of review on appeal. *Giles,* 902 S.W.2d at 170. Here, because the trial court resolved the case on competing motions for summary judgment in the face of undisputed facts, we review the propriety of the trial court's denial of the declaratory judgment under the same standards we apply to the summary judgment. *See* **\*721**

*Unauthorized Practice of Law Comm. v. Jansen,* 816 S.W.2d 813, 814 (Tex.App.-Houston [14th Dist.] 1991, writ denied) (case submitted on agreed stipulation of facts and motion for summary judgment).

### DISCUSSION

Texas Government Code section 614.022 provides, "To be considered by the head of a ... police department, the complaint must be: (1) in writing; and (2) signed by the person making the complaint." TEX. GOV'T CODE ANN. § 614.022 (Vernon 1994). It is undisputed that Chief Taylor is the head of the SLPD. It is undisputed that the investigation of Guthery arose from an incident brought to the attention of the Sugar Land Police when a citizen called to report damage to her door. It is also undisputed that the citizen never provided SLPD or Chief Taylor with a written and signed complaint. Finally, it is undisputed that Chief Taylor signed the "Notice of Proposed Discipline," which Guthery received on April 7, 2000, six days before he met with Chief Taylor. We must therefore decide whether, as appellees argue, the Notice suffices as the written and signed complaint required by section 614.022.

 **[9]  [10]  [11]  [12]  [13]**   A court's objective in construing a statute is to determine and give effect to the legislature's intent. *Tex–Air Helicopters, Inc. v. Galveston County Appraisal Review Bd.,* 76 S.W.3d 575, 581 (Tex.App.-Houston [14th Dist.] 2002, pet. denied). We presume the legislature intended the plain meaning of the words it used. *Id.* If possible, we must ascertain the legislature's intent from the language of the statute and not resort to extraneous matters for an intent not stated in the statute. *Id.* When interpreting a statute, we consider the entire act, its nature and object, and the consequence that would follow from each construction. *Id.* We must reject any statutory interpretation that defeats the legislative purpose. *Id.* In interpreting the provisions of the Government Code in question, we may look to the Code Construction Act for assistance. *See* TEX. GOV'T CODE ANN. § 1.002 (Vernon 1988) (stating Code Construction Act applies to construction of each provision of the Code, except as otherwise provided); TEX. GOV'T CODE ANN. § 311.002 (Vernon 1998) (stating chapter applies to each code enacted by 60th or subsequent legislature as part of state's continuing statutory revision program).

In interpreting the statute, we may consider the title or caption. *See* TEX. GOV'T CODE ANN. § 311.023(7) (Vernon 1998); *Southwestern Bell Tel. Co. v. Houston Indep. Sch. Dist.,* 397 S.W.2d 419, 421–22 (Tex.1965). Section 614.022 is captioned: "Complaint to be in Writing and Signed by Complainant." TEX. GOV'T CODE ANN. § 614.022 (Vernon 1994). [6] Neither complaint nor complainant is defined in sections 614.022 and 614.023.

**[14]** **[15]** Nevertheless, "[w]ords and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly." TEX. GOV'T CODE ANN. § 311.011(b) (Vernon 1998); *see Deltenre v. State,* 808 S.W.2d 97, 101 (Tex.Crim.App.1991) (concluding the term "peace officer" has acquired technical meaning by legislative definition). Moreover, when construing a statutory word or phrase, a court may take into consideration the meaning of the same or similar language used elsewhere in the act or in another act of similar nature. *L & M-Surco Mfg., Inc. v. Winn Tile Co.,* 580 S.W.2d 920, 926 (Tex.Civ.App.-Tyler 1979, writ dism'd). When the same or a similar term is used in **\*722** the same connection in different statutes, the term will be given the same meaning in one as in the other, unless there is something to indicate that a different meaning was intended. *Id.* [7]

"Complainant" is defined in Local Government Code Section 143.123, as "a person claiming to be the victim of misconduct by a fire fighter or police officer." TEX. LOC. GOV'T CODE ANN.. § 143.123(a)(1) (Vernon 1999). [8] Section 143.123(f) also provides in relevant part:

*An investigator may not conduct an interrogation of a fire fighter or police officer based on a complaint by a complainant who is not a peace officer unless the complainant verifies the complaint in writing before a public officer who is authorized by law to take statements under oath.* In an investigation authorized under this subsection, an investigator may interrogate a fire fighter or police officer about events or conduct reported by a witness who is not a complainant without disclosing the name of the witness. Not later than the 48th hour before the hour on which an investigator begins to interrogate a fire fighter or police officer regarding an allegation based on a complaint, affidavit, or statement, the investigator shall give the fire fighter or police officer a copy of the affidavit, complaint, or statement. An interrogation may be based on a complaint from an anonymous complainant if the departmental employee receiving the anonymous complaint certifies in writing, under oath, that the complaint was anonymous. This subsection does not apply to an on-the-scene investigation that occurs immediately after an incident being investigated if the limitations of this subsection would unreasonably hinder the essential purpose of the investigation or interrogation. If the limitation would hinder the investigation or interrogation, the fire fighter or police officer under investigation must be furnished, as soon as practicable, a written statement of the nature of the investigation, the name of each complaining party, and the complaint, affidavit, or statement.

TEX. LOC. GOV'T CODE ANN.. § 143.123(f) (Vernon 1999) (emphasis added). [9]

Thus, like Government Code section 614.022, Local Government Code section 143.123(f) contains a requirement that the complaint be in writing. A signature is implicitly required because the complaint must be verified. The two sections appear to be of similar nature.

**\*723** Section 143.123 is part of the Fire Fighter and Police Officer Civil Service Act ("CSA"). *See Klinger v. City of San Angelo,* 902 S.W.2d 669, 671 (Tex.App.-Austin 1995, writ denied). The purpose of the CSA is to "to secure efficient fire and police departments composed of capable personnel who are free from political influence and who have permanent employment tenure as public servants." TEX. LOC. GOV'T CODE ANN.. § 143.001(a) (Vernon 1999); *Klinger,* 902 S.W.2d at 671. The purpose underlying Local Government Code section 142.123 is not inconsistent with the apparent purpose of Government Code section 614.022.

Finally, the legislative history of section 614.022 suggests the similar nature of the two sections. Section 614.022 was created in 1969, and originated as Senate Bill 148. *See* Act of May 16, 1969, 61st Leg., R.S., ch. 407, § 1, 1969 Tex. Gen. Laws 1333. As originally drafted, Senate Bill 148 was intended to amend Texas Revised Civil Statutes Article 1269m, the Firemen's and Policemen's Civil Service Act, *i.e.,* the precursor of present Local Government Code section 142.123. *See* HOUSE COMM. ON URBAN AFFAIRS, BILL ANALYSIS, Tex. S.B. 148, 61st Leg., R.S. (1969); *see also* original bill draft in BILL FILE, Tex. S.B. 148, 61st Leg., R.S. (1969). [10] The Senate Committee on Jurisprudence, however, reported the bill adversely and substituted its own version, which did not contain any reference to Article 1269m or the Firemen's and Policemen's Civil Service Act. *See* "Committee Substitute for Senate Bill 148" in BILL FILE, Tex. S.B. 148. The Committee Substitute version was

passed and ultimately became Texas Revised Civil Statute Article 6252–20, which was subsequently codified in Texas Government Code sections 614.021–614.023. *See* Act of May 4, 1993, 73rd Leg., R.S., ch. 268, § 1, secs. 614.021–.023, 1993 Tex. Gen. Laws 583, 678–79.

Given what appears to be the similar nature of sections 141.123 and 614.022, and considering the definition of "complainant" in section 141.123(a)(1) as the "victim of misconduct," we construe the "complaint" that must be signed and in writing to be the victim's complaint, in this case Mrs. Scraper's. Thus, the "Notice of Proposed Disciplinary Action" provided by Chief Taylor to Guthery does not suffice as the "complaint" which must be signed and in writing, and given to the officer "within a reasonable time," as required by Texas Government Code sections 614.022 and 614.023. [11]

In support of their position the Notice fulfilled the requirements of sections 614.022 and 614.023., appellees direct our attention to *Fudge v. Haggar,* 621 S.W.2d 196 (Tex.Civ.App.-Texarkana 1981, writ ref'd n.r.e.). In *Fudge,* the appellate court concluded a letter of complaint provided to a police officer at the conclusion of an internal affairs investigation satisfied the requirements of former Texas Revised Civil Statute 6252–20 even though the investigation was prompted by a call from outside the police department. *Id.* at 198.

*Fudge,* however, is distinguishable. In *Fudge,* a member of the Dallas County Sheriff's Department called a Dallas Police Department internal affairs investigator to complain that Fudge, a patrolman with the Dallas Police Department, had engaged in improper conduct in obtaining the release of a prisoner. *Id.* at 197. James, the **\*724** internal affairs investigator, took affidavits from two pretrial release employees and made a special written report to the chief of police concerning the improper conduct. *Id.* James also wrote an official letter of complaint, presented it to Fudge, and showed Fudge the affidavits. *Id.* Fudge then complied with an instruction to prepare a written response to the complaint. *Id.* Subsequently, the chief of police discharged Fudge for the conduct that was the subject of the letter of complaint. *Id.*

The appellate court reasoned:

> In this case we deal with an internally generated complaint. Even though the initial information received by the police department was

external, coming from the Dallas County Sheriff's Office, the entire investigation began within the police department. Officer James testified that on October 19, 1979, he gave Fudge his letter of complaint and affidavits concerning all three incidents. He directed Fudge to respond to the specific acts of misconduct and Fudge did so on that day. The appellees argue that Fudge was aware of, understood, and replied to each of the charges of misconduct for which he was discharged and that the complaint against him was valid. We agree. The complaint was in writing, signed by the person making the complaint, and presented to the affected officer, Robert Fudge, prior to the taking of disciplinary action. It was in compliance with Tex.Rev.Civ. Stat. Ann. art. 6252–20....

*Id.* at 198.

Thus, the *Fudge* court addressed a situation in which an internal investigation produced a complaint supported by signed affidavits, and the court held such a complaint complied with the precursor statute to sections 614.022 and 614.023. In the present case, however, we only have Chief Taylor's Notice to Guthery, charging Guthery with the violations. Guthery was not presented with an affidavit from Mrs. Scraper or anything signed by her. There is nothing to indicate Guthery was presented with affidavits from any other witnesses or presented with the internal affairs report. On the facts before us, we conclude the procedure in the present case was not in compliance with Texas Government Code sections 614.022 and 614.023. We now turn to the appropriate remedy.

Section 614.023(b) provides that "[d]isciplinary action *may not* be taken against the officer ... unless a copy of the signed complaint is given to the officer or employee." TEX. GOV'T CODE ANN. § 614.023(b) (Vernon 1994) (emphasis added). " 'May not' imposes a prohibition and is synonymous with 'shall not.' " TEX. GOV'T CODE ANN. § 311.016(5) (Vernon 1998). Under the undisputed facts of this case, we hold Chief Taylor had a clear duty to refrain from taking disciplinary action against Guthery when the only "complaint" offered to satisfy sections 614.022 and 614.023 was the Chief's "Notice of Proposed Disciplinary Action."

We sustain Guthery's issue two. Because we sustain Guthery's issue two, it is not necessary to address issue one, by which he argues he did not receive the "complaint" within a reasonable time.

We reverse the summary judgment in favor of appellees and render judgment in favor of Guthery (1) declaring appellees' actions violated Texas Government Code sections 614.022 and 614.023, and (2) ordering appellees withdraw the disciplinary action and restore Guthery's back pay and benefits.

## CONCLUSION

Footnotes

1  We derive the factual background not only from the summary judgment proof presented, but also from the pleadings. We recognize facts asserted in the pleadings are not competent summary judgment evidence. *See Laidlaw Waste Sys., Inc. v. City of Wilmer, 904 S.W.2d 656, 661 (Tex.1995)*. Nevertheless, both parties concede the facts are undisputed and refer to factual assertions alleged in the pleadings.

2  The note read as follows: "Homeowner claims her front door was damaged. Kids claim Officer Guthery beat on the front door, but they wouldn't answer. Inference is being made that the Officer damaged the door. Lt. Lund wants the following answered." Lund wanted to know how Guthery knew the defendant's cup contained beer, why Guthery was at the residence, how the defendant was identified, and what happened when Guthery went to the front door. When Officer Webster presented the report to Guthery, Guthery was told there was no complaint, but the questions needed to be answered for clarification purposes.

3  Prior to answering the questions, Guthery asserted his *Garrity* rights against compelled self-incrimination. *See Garrity v. New Jersey, 385 U.S. 493, 500, 87 S.Ct. 616, 620, 17 L.Ed.2d 562 (1967)* (holding Fourteenth Amendment protection against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office and prohibition extends to all, regardless of whether they are policemen or members of body politic).

4  The suspension was to run from April 27, 2000, through April 29, 2000. The rules Guthery was accused of violating were "SLPD Rule # 1 Conduct Unbecoming to a Police Employee" and "Chapter 30, Directive 2—Recording Devices." Guthery was to be suspended for causing damage to Mrs. Scraper's front door and for failing to tape record the incident on January 29, 2000.

5  *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 37.001–.011 (Vernon 1997 & Supp.2003).

6  This caption was added when the statute was codified in the Government Code. *See* Act of May 4, 1993, 73rd Leg., R.S., ch. 268, § 1, sec. 614.022, 1993 Tex. Gen. Laws 583, 679.

7  The court continued, "This rule applies with particular force where the meaning of a word as used in one act is clear or has been judicially determined, and the same word is subsequently used in another act pertaining to the same subject." *L & M-Surco Mfg., Inc. v. Winn Tile Co., 580 S.W.2d 920, 926 (Tex.Civ.App.-Tyler 1979, writ dism'd)*. As discussed below, we find the definition of "complainant" in a subsequently enacted statute. Nevertheless, given the relationship between the two statutes, we apply the rule stated in *L & M-Surco.*

8  Texas Local Government Code section 143.312(b)(1) also contains the identical definition of "complainant." TEX. LOC. GOV'T CODE ANN. . § 143.312(b)(1) (Vernon 1999). The subchapter of which the section is a part applies to municipalities with populations of 460,000 or more that operate under a city manager form of government. TEX. LOC. GOV'T CODE ANN. . § 143.301 (Vernon 1999).

9  Texas Local Government Code section 143.312(g) contains a similar provision prohibiting interrogation "based on a complaint by a complainant who is not a fire fighter or a police officer unless the complainant verifies the complaint in writing before a public officer who is authorized by law to take statements under oath." TEX. LOC. GOV'T CODE ANN. . § 143.312(g) (Vernon 1999).

10  The Bill File is available from the Texas State Library and Archives Commission.

11  We also note that adopting appellees' interpretation would result in an officer's being disciplined based on another officer's hearsay characterization of a citizen's complaint, as opposed to the actual content of the complaint itself.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

TX B. An., H.B. 639, 3/8/2005

Texas Bill Analysis, 2005 Regular Session, House Bill 639

March 8, 2005
Texas House Research Organization
79th Legislature, 2005 Regular Session

HB 639

Bailey

SUBJECT: Requiring investigation before disciplining a peace officer or fire fighter

COMMITTEE: Urban Affairs -- favorable, without amendment

VOTE: 6 ayes -- Talton, Wong, A. Allen, Bailey, Blake, Rodriguez

0 nays

1 absent -- Menendez

WITNESSES: For -- Ronald DeLord, Combined Law Enforcement Associations of Texas; Russell Travis, Williamson County Sheriff's Association

Against -- None

On -- James Jones, Houston Police Department

BACKGROUND: Government Code, chap. 614, subchap. B states that when a complaint is filed against a police officer or fire fighter, the police officer or fire fighter in question must receive a written copy of the complaint signed by the complainant before disciplinary action may be taken against him. The subchapter applies to state law enforcement officers and local police officers and fire fighters who are at-will employees not covered by a civil service statute.

DIGEST: HB 639 would require that after the filing of a complaint, a state or local law enforcement agency or local fire department would have to conduct an investigation and sufficient evidence would have to be introduced to prove the alleged misconduct before disciplinary action could be taken. The bill also would expand subchapter B to cover not just fire fighters and *police* officers, but fire fighters and *peace* officers. Further, the subchapter would apply to all state and local peace officers and fire fighters.

The bill would take effect September 1, 2005, and would apply only to a complaint filed on or after this date.

SUPPORTERS SAY: HB 639 would close a loophole that allows peace officers and fire fighters to be disciplined -- even fired -- as the result of a complaint without any investigation. HB 639 would do nothing more than ensure that peace officers and fire fighters receive an investigation after a complaint so they are not at risk of being disciplined over a baseless accusation. The bill would not affect the ability to suspend an officer pending an investigation and would continue to allow departments to remove potentially dangerous officers from the streets. Neither would the bill affect a department's ability to give an informal verbal reprimand to an officer, thereby preserving an effective way to handle complaints.

The bill's silence on the matter of what constitutes sufficient evidence to prove an allegation of misconduct would leave the discretion to decide what is sufficient in the hands of state and local departments, where it lies already. Therefore, state and local agencies would lose no authority by the requirement of a sufficient evidence standard.

Current law allows politically powerful people to have an officer fired simply by filing a complaint. Therefore, the only people who might be deterred by this bill from filing a complaint are those who intend to file baseless complaints for their own personal benefit. Those who file legitimate claims, which are the majority of complainants, would not be hindered by this bill.

A planned floor amendment would clarify the bill by limiting to indefinite suspension or termination from employment the disciplinary actions that could not occur before investigation of a complaint. There would have be "evidence" to prove the complaint, rather than "sufficient evidence." Also, as amended the bill would not supersede existing meet-and-confer or collective bargaining agreements covering peace officers or fire fighters that already include provisions for investigating complaints involving potential disciplinary action.

OPPONENTS SAY: This bill is vague on two major points. Because it does not specify what would constitute disciplinary action, it might not be possible under the bill to suspend an officer without pay pending an investigation. This could allow potentially dangerous officers to remain on the streets. Nor is it clear whether disciplinary action could include verbally reprimanding an officer. For less serious matters, it can be more convenient and cost effective simply to reprimand the officer verbally rather than launch an investigation, and the bill might preclude this measure.

Neither does the bill define the standard of sufficient evidence. Because of this ambiguity, it is unclear whether a mere preponderance of the evidence would be sufficient to support the veracity of the complaint or whether the evidence would have to prove the truth of the allegation by the stricter standard of "beyond a reasonable doubt." This ambiguity could create confusion in departments in deciding when an officer could be disciplined.

Additionally, the bill could deter citizens from filing legitimate complaints. People already are more hesitant about filing complaints against police officers than they are against most other government employees because people often fear that their complaints will not seriously be considered. By raising the standard under which an officer may be disciplined following a complaint, people may be even more reluctant to file complaints than is already the case.

Finally, this bill could conflict with the many collective bargaining agreements already in place in several cities across the state.

NOTES: Rep. Bailey plans to offer a floor amendment that would limit to indefinite suspension or termination from employment the disciplinary actions that could not occur before investigation of a complaint. Before any indefinite suspension or termination could occur based on a complaint, the complaint would have to be investigated and there would have to be "evidence," rather than "sufficient evidence" as in the original bill, to prove any allegation of misconduct. As amended, the bill would not supersede existing meet-and-confer or collective bargaining agreements covering peace officers or fire fighters that already include provisions for investigating complaints involving potential disciplinary action. Also, the amendment would add detention officers and county jailers to those covered by the bill.

TX B. An., H.B. 639, 3/8/2005

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

**WestlawNext** © 2015 Thomson Reuters. No claim to original U.S. Government Works. 2

47 S.W.3d 486
Supreme Court of Texas.

HELENA CHEMICAL COMPANY and
Hyperformer Seed Company, Petitioners,
v.
Kenneth WILKINS and Tom Wilkins individually,
and d/b/a Chapotal Farms and Porciones 99
Properties, Geen Wilkins and Mark Wilkins,
individually and d/b/a Tabasco, and Wilkins
Family Limited Partnership, Respondents.

No. 00–0418. | Argued Feb. 7,
2001. | Decided April 26, 2001.

Farmers filed action against seed seller, alleging violation of Deceptive Trade Practices Act (DTPA), breach of warranties, and fraud. The 229th Judicial District Court, Starr County, John A. Pope, III, J., entered judgment on jury verdict awarding damages to farmers. Both sides appealed. The Court of Appeals, 18 S.W.3d 744, affirmed. Seller filed petition for review. The Supreme Court, Baker, J., held that: (1) as matter of first impression, farmers' delay in submitting claims against seed seller to arbitration, as was required by Seed Arbitration Act, did not deprive trial court of jurisdiction to hear farmers' lawsuit; (2) farmers' witness was sufficiently qualified to testify as expert as to suitability of grain sorghum seed for dry land farming and its susceptibility to charcoal rot disease; (3) expert's testimony on suitability of seed for dry land farming was sufficiently reliable to be admissible; (4) evidence supported conclusion that seller's misrepresentations about seed's characteristics, quality, and grade amounted to more than mere puffing; and (5) evidence was sufficient for jury to calculate, with reasonable certainty, award of lost profit damages.

Affirmed.

Abbott, J., filed a dissenting opinion, in which Hecht and Owen, JJ., joined.

West Headnotes (41)

**[1]** **Statutes**

👈 Language and intent, will, purpose, or policy

**Statutes**

👈 Construction as written

Court must construe statutes as written and, if possible, ascertain legislative intent from the statute's language.

34 Cases that cite this headnote

**[2]** **Statutes**

👈 Construction based on multiple factors

Even when a statute is not ambiguous on its face, a court can consider other factors to determine the Legislature's intent, including the object sought to be obtained, the circumstances of the statute's enactment, the legislative history, the common law or former statutory provisions, including laws on the same or similar subjects, the consequences of a particular construction, administrative construction of the statute, and the title, preamble, and emergency provision. V.T.C.A., Government Code § 311.023.

69 Cases that cite this headnote

**[3]** **Statutes**

👈 Statute as a Whole; Relation of Parts to Whole and to One Another

Court must always consider the statute as a whole rather than its isolated provisions.

42 Cases that cite this headnote

**[4]** **Statutes**

👈 Construing together; harmony

Court should not give one provision of a statute a meaning out of harmony or inconsistent with other provisions, although it might be susceptible to such a construction standing alone.

38 Cases that cite this headnote

**[5]** **Statutes**

👈 Mandatory or directory statutes

Word "must" in a statute is given a mandatory meaning when followed by a noncompliance penalty. V.T.C.A., Government Code § 311.016(2, 3).

9 Cases that cite this headnote

**[6]** **Statutes**

☛ Mandatory or directory statutes

To determine whether the Legislature intended a provision to be mandatory or directory, a court considers the plain meaning of the words used, as well as the entire act, its nature and object, and the consequences that would follow from each construction.

32 Cases that cite this headnote

**[7]** **Statutes**

☛ Mandatory or directory statutes

Even if a statutory requirement is mandatory, this does not mean that compliance is necessarily jurisdictional.

8 Cases that cite this headnote

**[8]** **Statutes**

☛ Mandatory or directory statutes

When a statute is silent about the consequences of noncompliance, the court looks to the statute's purpose to determine the proper consequences.

19 Cases that cite this headnote

**[9]** **Alternative Dispute Resolution**

☛ Applicant's default, delay, or laches

Farmers' delay in submitting claims against seed seller to arbitration, as was required by Seed Arbitration Act, until trial court granted seller's motion to compel arbitration, did not deprive trial court of jurisdiction to hear farmers' lawsuit, even though delay prompted arbitration board to refuse to arbitrate matter due to inability to investigate crops in field conditions, in light of Act's specific authorization for trial court to take such delay into account, court's ability to fashion remedy, and lack of provision dictating dismissal for noncompliance with timing requirement. V.T.C.A., Agriculture Code § 64.004.

4 Cases that cite this headnote

**[10]** **Alternative Dispute Resolution**

☛ As ousting jurisdiction of or precluding resort to courts

Arbitration scheme established under the Seed Arbitration Act was created to provide an alternate forum for farmers to initially submit claims, not as a mechanism to preclude farmers' suits altogether. V.T.C.A., Agriculture Code § 64.001 et seq.

2 Cases that cite this headnote

**[11]** **Statutes**

☛ Mandatory or directory statutes

To determine whether a statute's timing provision is mandatory, a court first looks to whether the statute contains a noncompliance penalty; if a provision requires that an act be performed within a certain time without any words restraining the act's performance after that time, the timing provision is usually directory.

21 Cases that cite this headnote

**[12]** **Statutes**

☛ Other Jurisdictions

When a state statute is modeled after another jurisdiction's, that jurisdiction's interpretation before the Legislature enacts the state statute may be given weight.

Cases that cite this headnote

**[13]** **Statutes**

☛ Other Jurisdictions

When the Legislature looks to another jurisdiction's statute, but modifies rather than adopts some of its provisions, it does so purposefully.

4 Cases that cite this headnote

**[14]** **Alternative Dispute Resolution**

☞ Constitutional and statutory provisions and rules of court

Seed arbitration laws are established to protect the farmer. V.T.C.A., Agriculture Code § 64.001 et seq.

Cases that cite this headnote

**[15]** **Alternative Dispute Resolution**
☞ Applicant's default, delay, or laches

While submission to arbitration under the Seed Arbitration Act is mandatory if not waived by the seed seller, the Act's timing requirement is not. V.T.C.A., Agriculture Code § 64.004.

Cases that cite this headnote

**[16]** **Evidence**
☞ Matters involving scientific or other special knowledge in general

**Evidence**
☞ Necessity of qualification

**Evidence**
☞ Necessity and sufficiency

Two-part test governs whether expert testimony is admissible: (1) the expert must be qualified, and (2) the testimony must be relevant and be based on a reliable foundation. Rules of Evid., Rule 702.

44 Cases that cite this headnote

**[17]** **Evidence**
☞ Determination of question of competency

Trial court makes the initial determination about whether an expert is qualified and the proffered testimony is relevant and based on a reliable foundation. Rules of Evid., Rule 702.

55 Cases that cite this headnote

**[18]** **Appeal and Error**
☞ Competency of witness

**Evidence**
☞ Determination of question of competency

Trial court has broad discretion to determine admissibility of expert testimony, and the

Supreme Court will reverse only if there is an abuse of that discretion.

32 Cases that cite this headnote

**[19]** **Evidence**
☞ Knowledge, experience, and skill in general

In deciding if an expert is qualified, trial courts must ensure that those who purport to be experts truly have expertise concerning the actual subject about which they are offering an opinion. Rules of Evid., Rule 702.

14 Cases that cite this headnote

**[20]** **Evidence**
☞ Necessity and sufficiency

If an expert relies upon unreliable foundational data, any opinion drawn from that data is likewise unreliable. Rules of Evid., Rule 702.

7 Cases that cite this headnote

**[21]** **Evidence**
☞ Necessity and sufficiency

Expert's testimony is unreliable even when the underlying data is sound if the expert's methodology is flawed. Rules of Evid., Rule 702.

7 Cases that cite this headnote

**[22]** **Evidence**
☞ Physical facts

Witness was sufficiently qualified to testify as expert as to suitability of grain sorghum seed for dry land farming and its susceptibility to charcoal rot disease, even though he was not plant pathologist, where witness, a plant scientist with a doctorate in plant physiology, used his experience in conducting crop-variety testing to formulate conclusion on basis of research, study of independent tests, and observations regarding seed's suitability for dry land farming. Rules of Evid., Rule 702.

2 Cases that cite this headnote

**[23] Evidence**

 Sources of Data

**Evidence**

Experiments and results thereof

Expert's testimony on suitability of grain sorghum seed for dry land farming was sufficiently reliable to be admissible in farmers' action against seed seller, where expert had 20 years experience as a plant scientist and conducting and interpreting crop trials and his conclusion flowed from his observation of seed tests and other factors including weather and weed-control reports, disease publications, other testing, and comparisons with crops on adjacent farms.

13 Cases that cite this headnote

**[24] Antitrust and Trade Regulation**

Representations, assertions, and descriptions in general

Actionable representations under the Deceptive Trade Practices Act (DTPA) may be oral or written. V.T.C.A., Bus. & C. § 17.41 et seq.

9 Cases that cite this headnote

**[25] Antitrust and Trade Regulation**

Representations, assertions, and descriptions in general

Party need not prove intent to make a misrepresentation under the Deceptive Trade Practices Act (DTPA); making the false representation is itself actionable. V.T.C.A., Bus. & C. § 17.46(b)(5, 7).

8 Cases that cite this headnote

**[26] Antitrust and Trade Regulation**

Reliance; causation; injury, loss, or damage

**Antitrust and Trade Regulation**

Omissions and other failures to act in general; disclosure

To recover under the Deceptive Trade Practices Act (DTPA), the plaintiff must show that the defendant's actions were the "producing cause" of actual damages, which requires some evidence that the defendant's act or omission was a cause in fact of the plaintiff's injury. V.T.C.A., Bus. & C. § 17.50(a).

9 Cases that cite this headnote

**[27] Antitrust and Trade Regulation**

Reliance; causation; injury, loss, or damage

In presenting some evidence that the defendant's act or omission was a cause in fact of the plaintiff's injury, under the Deceptive Trade Practices Act (DTPA), it is not necessary to show that the harm was foreseeable. V.T.C.A., Bus. & C. § 17.50(a).

5 Cases that cite this headnote

**[28] Appeal and Error**

Verdict

In conducting a no-evidence review, the Supreme Court must view the evidence in a light that tends to support the finding of the disputed fact and disregard all evidence and inferences to the contrary.

3 Cases that cite this headnote

**[29] Appeal and Error**

Sufficiency of Evidence in Support

If more than a scintilla of evidence exists, the evidence is legally sufficient to support the finding of the disputed fact.

3 Cases that cite this headnote

**[30] Antitrust and Trade Regulation**

Weight and sufficiency

Evidence of specific representations about grain sorghum seed's characteristics and specific representations about how farmers' crop in particular would perform supported conclusion that seller's misrepresentations about seed's characteristics, quality, and grade amounted to more than mere puffing, under the Deceptive Trade Practices Act (DTPA). V.T.C.A., Bus. & C. § 17.46(b)(5, 7).

10 Cases that cite this headnote

**[31]    Antitrust and Trade Regulation**
        Weight and sufficiency
    **Sales**
        Breach of warranty

Evidence that farmers' neighbor had no adverse effect from rotating from cotton to grain and that seed seller recommended alleged over-planting by farmers, together with evidence about grain sorghum seed's unsuitability for dryland farming, was sufficient to rebut possibility of causes of farmers' low yields other than seller's seed, which thus supported farmers' Deceptive Trade Practices Act (DTPA) and breach of warranty claims against seed seller. V.T.C.A., Bus. & C. § 17.46(b)(5, 7).

1 Cases that cite this headnote

**[32]    Damages**
        Loss of profits

Recovery for lost profits does not require that the loss be susceptible to exact calculation; however, the injured party must do more than show that it suffered some lost profits.

13 Cases that cite this headnote

**[33]    Damages**
        Loss of profits

Amount of lost profits must be shown by competent evidence with reasonable certainty.

10 Cases that cite this headnote

**[34]    Damages**
        Loss of profits

Establishing amount of lost profits is a fact-intensive determination.

1 Cases that cite this headnote

**[35]    Damages**
        Loss of profits

At a minimum, opinions or lost-profit estimates must be based on objective facts, figures, or data from which the lost-profits amount may be ascertained.

19 Cases that cite this headnote

**[36]    Damages**
        Growing crops, grass, shrubbery, or trees

General rule for assessing damages for crop loss is the market value of the lost part of the crop, as measured at maturity, less the cost of harvesting and marketing the lost part.

1 Cases that cite this headnote

**[37]    Damages**
        Extent of damage in general
    **Damages**
        Value of property

Law does not demand perfect proof of damages for crop loss but liberally permits estimates of crop value and probable yield, as well as cultivating and marketing expenses.

Cases that cite this headnote

**[38]    Antitrust and Trade Regulation**
        Profits

While "limitation of liability and remedies" clauses printed on seed seller's invoices, delivery tickets, and seed labels were effective to limit farmers' recovery for breach of warranty, clauses did not preclude farmer' lost-profit recovery for nonwarranty representations or unconscionability under the Deceptive Trade Practices Act (DTPA). V.T.C.A., Bus. & C. § 17.41 et seq.

3 Cases that cite this headnote

**[39]    Antitrust and Trade Regulation**
        Profits

Evidence was sufficient for jury to calculate, with reasonable certainty, award of damages to farmers for lost profits resulting from seed seller's deceptive act or unconscionable action,

under Deceptive Trade Practices Act (DTPA), concerning suitability of seed sold to farmers; farmer's testimony allowed jury to consider yield attributable to other seed, recalculate lease payments, and regard elevator costs as either reflected in yield or refundable so as to be not part of net cost calculation. V.T.C.A., Bus. & C. § 17.41 et seq.

2 Cases that cite this headnote

[40]     **Damages**
Loss of Profits

Lack of a profit history does not, by itself, preclude a new business from recovering lost future profits.

2 Cases that cite this headnote

[41]     **Damages**
Loss of profits

Showing lost profit damages with reasonable certainty can be accomplished with a profit history *or* some other objective data, such as future contracts.

22 Cases that cite this headnote

**Attorneys and Law Firms**

**\*490** Charles C. Murray, Lisa Powell, Atlas & Hall, McAllen, for Petitioners.

John B. Skaggs, Skaggs & Garza, Michele Nicole Gonzales, McAllen, for Respondents.

**Opinion**

Justice BAKER delivered the opinion of the Court, in which Chief Justice PHILLIPS, Justice ENOCH, Justice HANKINSON, Justice O'NEILL, and Justice JEFFERSON joined.

This is a case of first impression involving **\*491** the Texas Seed Arbitration Act. [1] The Act requires that certain defective-seed claims be submitted to arbitration as a prerequisite to maintaining a legal action against the labeler. We must decide whether the timeliness requirement for submitting claims to arbitration is jurisdictional under the Act. We conclude that it is not, and that the evidence was legally sufficient to support the jury's verdict on liability, causation, and damages. Accordingly, we affirm the court of appeals' judgment.

**I. BACKGROUND**

The Wilkinses began farming in 1989 and first planted grain in 1992. Most of their land is nonirrigated dryland. They purchased a Cherokee-variety grain sorghum seed from Helena Chemical Company in 1992, 1993, and 1994. The Wilkinses claim that when they purchased this seed, they relied on Helena's advertising that it had "excellent dryland yield potential." Helena also represented that the seed had a "good field tolerance" to charcoal rot, a condition that causes the grain's stem to weaken and "fall down," reducing yield.

The 1992 crop had a good yield, but the 1993 crop yield was much lower. The Wilkinses claim that Helena's agent blamed this low yield on the seeds being planted too close together and that the agent recommended planting Cherokee seed on the entire tract with increased spacing between seeds. The Wilkinses followed this advice in 1994 with no increase in yield. Helena claims that insufficient rainfall and soil moisture depletion brought about by the Wilkinses' planting cotton on part of the property in 1993 caused the reduced yield.

In February 1995, the Wilkinses sued Helena alleging Deceptive Trade Practices—Consumer Protection Act (DTPA) violations, breach of express and implied warranties, and fraud. In March, Helena filed a plea in abatement and motion to compel nonbinding arbitration under the Act. In April, the trial court granted Helena's motion and abated the proceedings. Fifteen months later, the Wilkinses submitted their claims to the Texas Plant and Seed Board for arbitration. The Board declined to arbitrate because the crops were no longer in "field condition" and thus the Board could not inspect the crops.

The trial court lifted the abatement and the case proceeded to trial. The jury found for the Wilkinses on all claims except fraud. It did not find that Helena had acted knowingly. It awarded the Wilkinses $360,000 in damages. The trial court also awarded prejudgment interest from the date the Board declined to arbitrate. Helena and the Wilkinses appealed.

The court of appeals held that Helena had effectively disclaimed any warranties. 18 S.W.3d at 758. But it affirmed the judgment on the DTPA claims, holding that the Board's refusal to arbitrate the Wilkinses' claims did not jurisdictionally bar their suit. 18 S.W.3d at 751–52. It also held that the evidence was legally and factually sufficient to support the jury's verdict on causation, liability, and damages. 18 S.W.3d at 754–59. Finally, in response to the Wilkinses' cross-appeal, the court held that the trial court properly calculated prejudgment interest. 18 S.W.3d at 760. Only Helena petitioned this Court for review.

## II. TEXAS SEED ARBITRATION ACT

Helena argues that the trial court did not have jurisdiction over the Wilkinses' **\*492** claims because the Act requires that all defective-seed claims first be timely submitted to nonbinding arbitration so the Board may effectively inspect the plants under field conditions. Thus, Helena argues, the Wilkinses' delay in submitting their claims for arbitration—which caused the Board to refuse to arbitrate—jurisdictionally barred the claims.

In response, the Wilkinses argue that submitting their claims to arbitration is all the Act requires. They posit that Helena's interpretation would render other statutory provisions meaningless and note that the Act does not authorize dismissal as a remedy under its arbitration procedures. Thus, the Wilkinses argue, the court of appeals correctly held that once they submitted their claims to arbitration under the Act, the trial court had jurisdiction to hear the claims regardless of whether arbitration actually occurred.

### A. APPLICABLE LAW

#### 1. Texas Seed Arbitration Act

The Legislature enacted the Act in 1989 to "provide[ ] for an unbiased third party investigation by the State Seed and Plant Board of the Texas Department of Agriculture of complaints concerning seed performance." HOUSE COMM. ON AGRICULTURE AND LIVESTOCK, BILL ANALYSIS, Tex. S.B. 64, 71st Leg., R.S. (1989). Pertinent to this appeal, the Act provides:

#### § 64.002. Requirement of Arbitration

(a) When a purchaser of seed designed for planting claims to have been damaged by the failure of the seed to produce or perform as represented by warranty or by the label required to be attached to the seed under this subtitle or as a result of negligence, the purchaser *must submit* the claim to arbitration as provided by this chapter *as a prerequisite* to the exercise of the purchaser's right to maintain a legal action against the labeler....

TEX. AGRIC. CODE § 64.002(a) (emphasis added).

#### § 64.004. Effect of Arbitration

In any litigation *involving a complaint that has been the subject of arbitration* under this chapter, any party may introduce the report of arbitration as evidence of the facts found in the report, and the court may give such weight to the arbitration board's findings of fact, conclusions of law, and recommendations as to damages and costs as the court determines advisable. The court *may also take into account any findings of the board of arbitration* with respect to the failure of any party to cooperate in the arbitration proceedings, *including any finding as to the effect of delay in filing the arbitration claim* or the arbitration board's ability to determine the facts of the case.

TEX. AGRIC. CODE § 64.004 (emphasis added).

#### § 64.005. Arbitration Board

(b) As a board of arbitration, the State Seed and Plant Board *shall conduct arbitration* as provided by this chapter....

TEX. AGRIC. CODE § 64.005(b) (emphasis added).

#### § 64.006. Arbitration Procedures

(a) A purchaser *may begin arbitration* by filing with the commissioner a sworn complaint and a filing fee, as provided by department rule.... Except in the case of seed that has not been planted, *the complaint must be filed within the time necessary to permit effective inspection of the plants under field conditions.*

....

**\*493** (c) The commissioner shall refer the complaint and the answer to the arbitration board for investigation, findings, and recommendations.

(d) On referral of the complaint for investigation, the arbitration board shall make a prompt and full investigation

of the matters complained of and report its findings and recommendations to the commissioner not later than the 60th day after the date of the referral, or before a later date determined by the parties.

(e) The report of the arbitration board shall include findings of fact, conclusions of law, and recommendations as to costs, if any....

....

(h) The arbitration board shall consider any field inspection or other data submitted by either party in its report and recommendation.

TEX. AGRIC. CODE § 64.006 (emphasis added).

### 2. Statutory Construction

 **[1]** **[2]** We must construe statutes as written and, if possible, ascertain legislative intent from the statute's language. *Morrison v. Chan,* 699 S.W.2d 205, 208 (Tex.1985). Even when a statute is not ambiguous on its face, we can consider other factors to determine the Legislature's intent, including: the object sought to be obtained; the circumstances of the statute's enactment; the legislative history; the common law or former statutory provisions, including laws on the same or similar subjects; the consequences of a particular construction; administrative construction of the statute; and the title, preamble, and emergency provision. TEX. GOV'T CODE § 311.023; *Ken Petroleum Corp. v. Questor Drilling Corp.,* 24 S.W.3d 344, 350 (Tex.2000).

 **[3]** **[4]** Additionally, we must always consider the statute as a whole rather than its isolated provisions. *Morrison,* 699 S.W.2d at 208. We should not give one provision a meaning out of harmony or inconsistent with other provisions, although it might be susceptible to such a construction standing alone. *Barr v. Bernhard,* 562 S.W.2d 844, 849 (Tex.1978). We must presume that the Legislature intends an entire statute to be effective and that a just and reasonable result is intended. TEX. GOV'T CODE § 311.021(2), (3).

 **[5]** When used in a statute, the term "must" creates or recognizes a condition precedent. TEX. GOV'T CODE § 311.016(3). While Texas courts have not interpreted "must" as often as "shall," both terms are generally recognized as mandatory, creating a duty or obligation. *See* TEX. GOV'T

CODE § 311.016(2), (3); *Wright v. Ector County Indep. Sch. Dist.,* 867 S.W.2d 863, 868 (Tex.App.—El Paso 1993, no writ)* ("The ordinary meaning of 'shall' or 'must' is of a mandatory effect."); *Inwood N. Homeowners' Ass'n, Inc. v. Meier,* 625 S.W.2d 742, 743 (Tex.Civ.App.—Houston [1st Dist.] 1981, no writ) (same); *Mitchell v. Hancock,* 196 S.W. 694, 700 (Tex.Civ.App.—Fort Worth 1917, no writ) (same). The word " 'must' is given a mandatory meaning when followed by a noncompliance penalty." *Harris County Appraisal Dist. v. Consolidated Capital Props. IV,* 795 S.W.2d 39, 41 (Tex.App.—Amarillo 1990, writ denied). However, we have held language that appears to impose a mandatory duty to be only directory when this interpretation is most consistent with the Legislature's intent. *E.g., Barshop v. Medina County Underground Water Conservation Dist.,* 925 S.W.2d 618, 629 (Tex.1996); *Lewis v. Jacksonville Bldg. & Loan Ass'n,* 540 S.W.2d 307, 310 (Tex.1976); ***494** Thomas v. Groebl,* 147 Tex. 70, 212 S.W.2d 625, 630–31 (1948).

 **[6]** **[7]** **[8]** To determine whether the Legislature intended a provision to be mandatory or directory, we consider the plain meaning of the words used, as well as the entire act, its nature and object, and the consequences that would follow from each construction. *Albertson's, Inc. v. Sinclair,* 984 S.W.2d 958, 961 (Tex.1999); *Chisholm v. Bewley Mills,* 155 Tex. 400, 287 S.W.2d 943, 945 (1956). Even if a statutory requirement is mandatory, this does not mean that compliance is necessarily jurisdictional. *Sinclair,* 984 S.W.2d at 961; *Hines v. Hash,* 843 S.W.2d 464, 467 (Tex.1992); *Schepps v. Presbyterian Hosp. of Dallas,* 652 S.W.2d 934, 938 (Tex.1983). When a statute is silent about the consequences of noncompliance, we look to the statute's purpose to determine the proper consequences. *Sinclair,* 984 S.W.2d at 961; *Schepps,* 652 S.W.2d at 937–38; *Chisholm,* 287 S.W.2d at 945.

### B. ANALYSIS

 **[9]** The parties agree that if the Wilkinses had not submitted their claims to arbitration after the trial court abated the proceedings, any claims subject to the Act would be jurisdictionally barred. *See* TEX. AGRIC. CODE § 64.002(a) ( "[T]he purchaser must submit the claim to arbitration ... as a prerequisite to the exercise of the purchaser's right to maintain a legal action against the labeler."); *see also Hines,* 843 S.W.2d at 469 (holding failure to perform mandatory but nonjurisdictional act while suit is abated for that purpose

results in dismissal). However, because the Wilkinses did submit their claims to the Board, the only issue is whether their delay in doing so, and the Board's subsequent refusal to arbitrate, deprived the trial court of jurisdiction.

Helena argues that section 64.006(a)'s requirement that a complaint be "filed within the time necessary to permit effective inspection of the plants under field conditions" is mandatory and jurisdictional. The Wilkinses acknowledge this statutory timing requirement, but argue that submission is the mandatory act and that timeliness is merely a factor the trial court may consider. We agree with the Wilkinses' interpretation.

Section 64.006(a) states that a purchaser's complaint "must" be filed within the time necessary to permit effective inspection under field conditions. The word " '[m]ust' creates or recognizes a condition precedent." TEX. GOV'T CODE § 311.016(3). The Legislature has instructed us to apply this definition unless its context "necessarily requires a different construction." TEX. GOV'T CODE § 311.016.

The problem with Helena's position that delay in submitting a claim to arbitration creates a jurisdictional bar is that we cannot read section 64.006(a) in a vacuum. Read in context, Helena's interpretation renders other provisions meaningless. In fact, section 64.004 expressly contemplates that a claim may be arbitrated and continue on to trial even when a delay in submission to arbitration prevents the Board from thoroughly investigating the claim. It provides:

> In any litigation involving a *complaint that has been the subject of arbitration under this chapter* ... [t]he court may also take into account any findings of the board of arbitration with respect to the failure of any party to cooperate ... *including any finding as to the effect of delay in filing the arbitration claim or the arbitration board's ability to determine the facts of the case.*

TEX. AGRIC. CODE § 64.004 (emphasis added). Accepting Helena's argument that section 64.006(a)'s timing requirement is **\*495** jurisdictional renders section 64.004 meaningless because in any case "involving a complaint that has been the subject of arbitration under this chapter," there could not be a "finding as to the effect of delay in filing ... or the arbitration board's ability to determine the facts of the case."

**[10]** Actually, the Act's language and purpose demonstrate that the Legislature simply did not contemplate the situation presented here—a submission to arbitration where the Board then refuses to arbitrate. Rather, the Legislature created this arbitration scheme to provide an alternate forum for farmers to initially submit claims, not as a mechanism to preclude farmers' suits altogether. *See* HOUSE COMM. ON AGRICULTURE AND LIVESTOCK, BILL ANALYSIS, Tex. S.B. 64, 71st Leg., R.S. (1989) (explaining that one reason this Act was passed was that "farmers are often reluctant to litigate" seed disputes).

In addition to the overall statutory objective, we have historically looked to two factors to determine if the Legislature intended a provision to be jurisdictional: (1) the presence or absence of specific consequences for noncompliance, *Sinclair,* 984 S.W.2d at 961–62, and (2) the consequences that result from each possible interpretation. *Barshop,* 925 S.W.2d at 629. Applying these factors supports our interpretation that delay in submitting claims is not jurisdictional.

**[11]** To determine whether a timing provision is mandatory, we first look to whether the statute contains a noncompliance penalty. If a provision requires that an act be performed within a certain time without any words restraining the act's performance after that time, the timing provision is usually directory. *Lewis,* 540 S.W.2d at 310; *Markowsky v. Newman,* 134 Tex. 440, 136 S.W.2d 808, 812 (1940). Here, the Act states that a purchaser's complaint must be filed "within the time necessary to permit effective inspection of the plants under field conditions." TEX. AGRIC. CODE § 64.006(a). However, the Act has no corresponding provision dictating dismissal for noncompliance. *State v. $435,000,* 842 S.W.2d 642, 644 (Tex.1992) ("If the Legislature had intended dismissal to be the consequence of a failure to hear a forfeiture case within the prescribed period, it could easily have said so."); *see also Sinclair,* 984 S.W.2d at 962 ("[T]hat section 410.253 does not dictate the consequence of noncompliance is significant when considering the entire statute."). To the contrary, the Act expressly provides nonjurisdictional consequences by allowing the Board to make findings about any delay and allowing the trial court to consider these findings. *See* TEX. AGRIC. CODE § 64.004. Thus, we conclude the Act's silence about dismissal, coupled with its provision for other consequences, weighs in favor of a nonjurisdictional interpretation.

When deciding whether the Legislature intended a particular provision to be jurisdictional, we must also consider the consequences that result from each possible construction. *Chisholm,* 287 S.W.2d at 945–46. Under Helena's interpretation, a delay in submitting a claim to arbitration precludes any consideration of the claim—by the Board or a trial court. Because the Board's arbitration is nonbinding and the trial court is not required to consider the Board's findings, we conclude that Helena's jurisdictional interpretation of section 64.006's timing requirement leads to an absurd result. *See Barshop,* 925 S.W.2d at 629.

Helena urges that our adopting a nonjurisdictional interpretation allows purchasers to bypass the Act and thwart its underlying purpose of providing for an unbiased, independent Board investigation. *See* HOUSE COMM. ON AGRICULTURE **\*496** AND LIVESTOCK, BILL ANALYSIS, Tex. S.B. 64, 71st Leg., R.S. (1989). We disagree.

The Act permits the Board to independently investigate and assess the purchaser's claims. TEX. AGRIC. CODE § 64.006(d). But, while the Act *requires* the Board to consider any field inspection or other data either party submits, nowhere does it require the Board itself to conduct a field inspection; nor does it expressly mention the Board conducting such an inspection. *See* TEX. AGRIC. CODE § 64.006(f)-(h). Instead, by the Act's express terms, the Board can carry out its investigation in a number of ways that do not necessarily require it to conduct its own field inspection. For example, the Act authorizes the Board to delegate all or any part of its investigation to its members. TEX. AGRIC. CODE § 64.006(g). And the Board may grow representative samples, conduct hearings, and examine the parties. TEX. AGRIC. CODE § 64.006(f). In fact, here both parties' experts conducted field inspections that they could have submitted to the Board to aid it in fulfilling its duties. *See* TEX. AGRIC. CODE § 64.006(h) ("The arbitration board *shall* consider any field inspection or other data submitted by either party.") (emphasis added). Thus, because the Board can conduct an investigation despite a delay in submission to arbitration, concluding that section 64.006(a)'s timing requirement is nonjurisdictional does not thwart the Act's purpose of providing for a Board investigation. *See Hines,* 843 S.W.2d at 469 (holding statute's purpose could be furthered without jurisdictional interpretation of mandatory timing requirement).

Further, our interpretation does not render a delay in submitting a claim to arbitration without consequence. Indeed, if a purchaser does not submit a claim in time for the Board or the seller to conduct an effective field inspection, it does so at its own peril. The Board may make findings adverse to the purchaser on this basis. TEX. AGRIC. CODE § 64.004. If the purchaser then sues, the Board's findings and recommendations are admissible, and the Act expressly authorizes the court to both "give such weight to the arbitration board's findings of fact, conclusions of law, and recommendations as to damages and costs as the court determines advisable" and "take into account any findings ... with respect to the failure of any party to cooperate in the arbitration proceedings, including any finding as to the effect of delay in filing the arbitration claim." TEX. AGRIC. CODE § 64.004. We conclude that these consequences—not the complete deprivation of any right to have the claims heard in any forum—are the consequences the Legislature contemplated under the Act.

The dissent disagrees with this conclusion, asserting that the Act absolutely forecloses a purchaser's action if the purchaser does not comply with section 64.006(a)'s timing requirement. 47 S.W.3d at 507. The dissent notes section 64.006's language that the complaint "must" be filed within the time necessary to permit effective crop inspection. 47 S.W.3d at 507. It then reconciles this language with section 64.004 by interpreting section 64.004 to permit Board findings about a purchaser's delay only while the crops are still in the ground. 47 S.W.3d at 507. It explains that "[a] purchaser could certainly delay filing an arbitration complaint for many months yet still file while the seeds are under field conditions." 47 S.W.3d at 508. Thus, it reasons, submitting a claim while the seeds are in the ground, but after a hot summer season, could "affect the Board's investigation." 47 S.W.3d at 511.

However, while purporting to apply a plain-language analysis to **\*497** section 64.006(a), the dissent glosses over the section's actual language and ignores the maxim that we must presume that every word in a statute is included purposefully. *See Cameron v. Terrell & Garrett, Inc.,* 618 S.W.2d 535, 540 (Tex.1981). First, the dissent's interpretation assumes the Board itself must conduct the field inspection referenced in section 64.006(a). The Act's text does not support this assumption. Instead, the Act provides that a complaint must be filed in time to "permit effective inspection of the plants under field conditions," TEX. AGRIC. CODE § 64.006(a), thus permitting the parties to inspect under field conditions and provide their reports to the Board. TEX. AGRIC. CODE

§ 64.006(h). Second, the dissent's interpretation presumes that any claim submitted while crops are still in the ground will satisfy section 64.006(a)'s language. 47 S.W.3d at 511. However, section 64.006 does not only require that a claim be submitted while the crops are available for inspection "under field conditions." Rather, it states a claim must be filed in time to permit an "*effective* inspection of the plants under field conditions." TEX. AGRIC. CODE § 64.006(a) (emphasis added). We must presume the word "effective" has meaning. *See Cameron,* 618 S.W.2d at 540. Thus, under the dissent's interpretation of 64.006(a), any claim brought while the crops are in the ground *but after* an *effective* inspection could be accomplished would *already be barred* under 64.006(a)—rendering section 64.004's provision for the Board to make findings about delay in submitting the claim meaningless.

The dissent also urges us to adopt the Florida Supreme Court's interpretation of a prior version of its Seed Act because our statute's legislative history indicates that our statute was modeled in part after Florida's. *See Ferry–Morse Seed Co. v. Hitchcock,* 426 So.2d 958, 961 (Fla.1983) (holding Florida Seed Act's arbitration submission timing requirement jurisdictional). There is only one reference to Florida in our Act's bill analysis. The background section notes that "[f]or many years the state of Florida has used a method of arbitration with an unbiased third party investigation and opinion" and that "[t]he American Seed Trade Association has recommended to each of its member states that they work to pass measures similar to Florida's." HOUSE COMM. ON AGRICULTURE AND LIVESTOCK, BILL ANALYSIS, Tex. S.B. 64, 71st Leg., R.S. (1989).

**[12]** **[13]** We recognize that when a Texas statute is modeled after another jurisdiction's, that jurisdiction's interpretation before the Legislature enacts our statute may be given weight. *City of Garland v. Dallas Morning News,* 22 S.W.3d 351, 360 (Tex.2000). However, when the Legislature looks to another jurisdiction's statute, but modifies rather than adopts some of its provisions, it does so purposefully. *See Sharifi v. Young Bros., Inc.,* 835 S.W.2d 221, 223 (Tex.App.—Waco 1992, writ denied).

When the Legislature enacted the Texas Act, the Florida Seed Act provided that a purchaser must submit its claim to arbitration "within such time as to permit inspection of the crops, plants, or trees by the seed investigation and conciliation council or its representatives *and* by the dealer from whom the deed was purchased." FLA. STAT. ANN.. § 578.026(1)(a) (emphasis added). In *Ferry–Morse Seed Co.,*

the case upon which the dissent relies, the Florida Supreme Court interpreted a prior version's timing requirement to be jurisdictional. 426 So.2d at 961. This prior version required a claim be filed "within ten days after the defect or violation becomes apparent." *See Ferry–Morse Seed Co.,* 426 So.2d at 960. There are two important differences between the Texas **\*498** and Florida Acts. First, the Florida Act's current version specifies that the Board and the seed seller must *both* be able to conduct an independent field inspection. The Texas Act has no such language. Second, and more significant, neither version of Florida's Act provides for the Board to make findings about the effect of the purchaser's delay in submitting a claim to arbitration as section 64.004 of the Texas Act does. Thus, while we might be inclined to adopt Florida's interpretation that timely submitting to arbitration is jurisdictional if its statute were identical to ours, we are not bound to interpret one similar provision of our Act in a way that conflicts with other provisions that differ from Florida's statute.

Finally, while we base our interpretation on the Act's language and the Legislature's intent, we note that one other court has had occasion to interpret its Seed Act's similar arbitration provisions. Illinois' Seed Act provides:

> A purchaser of seed *cannot maintain a civil action against the seller* for failure of the seed to produce or perform (i) as represented by a label attached to the seed or furnished under the Illinois Seed Law, (ii) as represented by warranty, or (iii) because of negligence, *unless the buyer has first submitted the claim to arbitration.*
>
> ....
>
> Except in case of seed that has not been planted, *the claim shall be filed within a time that will permit effective inspection of the plants under field conditions* and in no case later than 90 days after completion of harvest.

701 ILL. COMP. STAT.. 25/10, 25/20 (emphasis added). In *Presley v. P & S Grain Co.,* the Illinois court of appeals held this timing requirement to be directory rather than mandatory. 289 Ill.App.3d 453, 225 Ill.Dec. 398, 683 N.E.2d 901, 910 (1997). It reasoned, as we have here, that the statute's failure to provide for dismissal as a consequence for noncompliance with its arbitration provisions weighs in favor of a directory interpretation. *Presley,* 225 Ill.Dec. 398, 683 N.E.2d at 909. Likewise, it concluded that interpreting the nonbinding arbitration procedures as jurisdictional would

lead to an absurd result. *Presley,* 225 Ill.Dec. 398, 683 N.E.2d at 909.

 **[14]**  **[15]**  We agree with the Florida Supreme Court's observation that seed arbitration laws are "established to protect the farmer." *Ferry–Morse Seed Co.,* 426 So.2d at 961. Thus, when, as here, we are faced with two competing interpretations, we must choose the one most harmonious with the Act's objectives and other provisions. Accordingly, we conclude that while submission to arbitration under the Act is mandatory if not waived by the seller, the Act's timing requirement is not. *See Hines,* 843 S.W.2d at 469; *$435,000,* 842 S.W.2d at 644. Because the Wilkinses submitted their claims to arbitration and thus complied with the Act's mandatory requirements, the trial court correctly concluded that it had jurisdiction over their claims.

### III. EXPERT TESTIMONY

Helena argues that the trial court abused its discretion by admitting the Wilkinses' expert's testimony. The expert, Dr. Pleunneke, testified that in his opinion, Cherokee seed is not appropriate for dryland farming and thus did not perform as represented. Helena contends that Pleunneke lacked the required qualifications and that his testimony lacked the "indicia of reliability" required for admission. The court of appeals held the trial court did not abuse its discretion by admitting Pleunneke's testimony. 18 S.W.3d at 754. We agree with the court of appeals.

### *499 A. APPLICABLE LAW

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of opinion or otherwise. TEX.R. EVID. 702. Otherwise admissible opinion testimony is not objectionable because it embraces an ultimate issue of fact. TEX.R. EVID. 704.

 **[16]**  **[17]**  **[18]**  A two-part test governs whether expert testimony is admissible: (1) the expert must be qualified; and (2) the testimony must be relevant and be based on a reliable foundation. *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 556 (Tex.1995). The trial court makes the initial determination about whether the expert and the proffered

testimony meet these requirements. *Robinson,* 923 S.W.2d at 556. The trial court has broad discretion to determine admissibility, and we will reverse only if there is an abuse of that discretion. *Robinson,* 923 S.W.2d at 558.

 **[19]**  **[20]**  **[21]**  In deciding if an expert is qualified, trial courts "must ensure that those who purport to be experts truly have expertise concerning the actual subject about which they are offering an opinion." *Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 719 (Tex.1998) (quoting *Broders v. Heise,* 924 S.W.2d 148, 152 (Tex.1996)). To gauge reliability, we have explained:

> *Daubert* and Rule 702 demand that the district court evaluate the methods, analysis, and principles relied upon in reaching the opinion. The court should ensure that the opinion comports with applicable professional standards outside the courtroom and that it will have a reliable basis in the knowledge and experience of the discipline.

*Gammill,* 972 S.W.2d at 725–26 (quotations omitted). In *Robinson,* we identified six nonexclusive factors to determine whether an expert's testimony is reliable and thus admissible. *Robinson,* 923 S.W.2d at 557. But in *Gammill* we recognized that the *Robinson* factors may not apply to certain testimony. *Gammill,* 972 S.W.2d at 726. In those instances, there still must be some basis for the opinion offered to show its reliability, and, ultimately, the trial court must determine how to assess reliability. *Gammill,* 972 S.W.2d at 726. If an expert relies upon unreliable foundational data, any opinion drawn from that data is likewise unreliable. *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 714 (Tex.1997). Further, an expert's testimony is unreliable even when the underlying data is sound if the expert's methodology is flawed. *Havner,* 953 S.W.2d at 714.

### B. ANALYSIS

### 1. Qualifications

 **[22]**  Pleunneke testified that he grew up on a ranch. He earned a bachelor's degree in wildlife management from Texas A & M University. He then worked in a bank's trust department managing farm and ranch lands in Texas and Louisiana. During this time he worked with many different types of crops, including grain sorghum. He then returned to school and finished a doctorate in plant physiology. Afterwards, he worked with crops for Mississippi State

University's Agronomy and Biochemistry Department. At this job, he conducted crop-variety testing, predominantly on soybean crops, and he was "quite familiar with setting up tests and so forth and see[ing] which varieties are best." For the past twenty years he has worked in Texas as a plant scientist and consultant. He characterized some of his functions **\*500** as "work[ing] on different problems related to plant science, science pertaining to the physiology of plants, malnutrition, the way the environment affects them and so forth." In fact, the Wilkinses initially hired him, not as a litigation expert, but as a consultant to help them identify the source of their crop problems.

Helena notes that Pleunneke is not a plant pathologist and argues that his testimony does not establish he is an expert about charcoal rot. However, this argument incorrectly frames the issue. The Wilkinses allege Helena misrepresented Cherokee seed's fitness for use in a nonirrigated environment. Accordingly, the factual issue is not solely whether Cherokee is susceptible to charcoal rot. Also at issue is whether Cherokee is particularly suited for dryland farming as Helena represented.

The causation evidence in this case included: seed performance trial results, the Wilkinses' farm's current and past performance, the current and past performance of the Wilkinses' neighbor's farm, and weather and soil statistics. In response to this evidence, Helena contended that environmental factors, not Cherokee seed's drought intolerance, led to the Wilkinses' poor crop. Thus, to determine whether Pleunneke is a qualified expert, the question is whether Pleunneke has scientific, technical, or other specialized knowledge that would assist the jury to understand this evidence and determine if Cherokee seed is suitable for dryland farming as represented. *See* TEX.R. EVID. 702.

We conclude that Pleunneke's knowledge would aid the jury in understanding the evidence. Several grain performance trial results were entered into evidence. Pleunneke has experience conducting crop trials, and, presumably, experience interpreting and comparing those results. Also, as a plant-science consultant, he works on "different problems related to plant science, science pertaining to the physiology of plants, malnutrition, the way the environment affects them and so forth." Because Helena contends environmental factors caused the Wilkinses' crop failure rather than Cherokee seed's drought intolerance, Pleunneke's experience identifying environmental factors

affecting crops could have been helpful to the jury. Accordingly, we conclude that the court of appeals correctly held that the trial court's finding Pleunneke qualified was not an abuse of discretion.

### 2. Reliability

[23]    Helena also contends that Pleunneke's testimony is unreliable because he is not qualified to testify about charcoal rot and because he does not state the basis and the methodology behind his opinion. Again, Helena fails to recognize that the issue here is whether Cherokee seed is suitable for dryland farming as Helena represented. And it ignores the numerous bases underlying Pleunneke's opinion and his qualifications.

Pleunneke testified that, in forming his opinions, he relied on a number of things: a physical inspection of the Wilkinses' Cherokee crop; photographs and videotape of the Wilkinses' field; samples of the Wilkinses' soil and plants; samples of the Wilkinses' neighbors' soil and plants; lab analysis results from his field samples; South Texas rainfall statistics during the relevant period; Texas A & M grain-sorghum trials; Texas A & M grain-sorghum literature; publications by Dr. Fredrickson, a Texas A & M plant pathologist who is a grain-sorghum expert; Helena's soil and plant samples and analyses; and Helena's marketing literature. Helena does not argue that this foundational data underlying Pleunneke's opinion testimony is unreliable.

 **\*501**  Moreover, Pleunneke has twenty years experience as a plant scientist and conducting and interpreting crop trials. While testifying, Pleunneke explained the results of several grain trials, why he found those to be significant, and how they supported his opinions. He also explained the other factors that contributed to his opinion, and why they were significant to his conclusions. These other factors included weather and weed-control reports, disease publications, testing, and comparison with crops adjacent to the Wilkinses' farm. Thus, Pleunneke's experience, coupled with his thorough testimony about the methodology he employed, demonstrate that the opinions he drew from the underlying data are reliable. *See Gammill,* 972 S.W.2d at 726. Thus, we conclude that the court of appeals correctly held that the trial court did not abuse its discretion by admitting Pleunneke's testimony.

## IV. DTPA CLAIMS

Helena argues that the Wilkinses' failure to timely submit their claims to arbitration under the Act also precludes the trial court from considering their DTPA claims. In the alternative, it argues that there is no evidence to support the jury's DTPA liability and causation findings. Specifically, Helena argues that any representations it made amounted to nonactionable puffing.

### A. RELATIONSHIP BETWEEN THE DTPA AND THE TEXAS SEED ARBITRATION ACT

Helena argues that if the Act governs any part of a suit, then all the purchaser's claims must be arbitrated, regardless of the theory of recovery. The dissent agrees, concluding that all the Wilkinses' theories are "factually intertwined," and thus that their DTPA claims cannot provide an alternative basis for the trial court's judgment. Because we conclude that the Wilkinses complied with the Act and hold that their delay in submitting their claims to arbitration did not bar their suit, determining whether the DTPA claims are within the Act's purview is not necessary here.

### B. EVIDENCE TO SUPPORT DTPA JURY QUESTIONS

The trial court submitted two DTPA questions to the jury. The first question asked, in the disjunctive, whether Helena had violated three DTPA laundry-list provisions: sections 17.46(b)(5) (misrepresentations about a product's characteristics), 17.46(b)(7) (misrepresentations about a product's standard, quality, or grade), or 17.46(b)(23) (failure to disclose information with intent to induce another to enter transaction). *See* TEX. BUS. & COM.CODE § 17.46. The second question asked only whether Helena violated section 17.50(a)(3) (unconscionable action or course of action). *See* TEX. BUS. & COM.CODE § 17.50. The jury answered both questions "yes."

Helena argues that there is no evidence to support the jury's answers. Specifically, it argues that any representations made to the Wilkinses amounted to nonactionable puffing and that there is no causation evidence. The court of appeals held there was some evidence to support the jury's answers to both

questions. 18 S.W.3d at 755–57. We agree with the court of appeals.

### 1. Applicable Law

 **[24]** **[25]** The DTPA prohibits "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce." TEX. BUS. & COM.CODE § 17.46(a). Section 17.46(b) is a laundry list of specifically prohibited acts. Sections 17.46(b)(5) and 17.46(b)(7) prohibit "false, misleading, or deceptive acts or practices includ[ing] ... representing that goods and services have **\*502** ... characteristics, ingredients, uses, [or] benefits ... which they do not have" and "representing that goods or services are of a particular standard, quality, or grade ... if they are of another." Section 17.46(b)(23) prohibits "the failure to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed." Section 17.50 provides the remedy for violations of the laundry-list provisions of 17.46(b) and for "any unconscionable action or course of action by any person." Actionable representations may be oral or written. *Hedley Feedlot, Inc. v. Weatherly Trust,* 855 S.W.2d 826, 838 (Tex.App.—Amarillo 1993, writ denied). A party need not prove intent to make a misrepresentation under sections 17.46(b)(5) or 17.46(b)(7)—making the false representation is itself actionable. *Smith v. Baldwin,* 611 S.W.2d 611, 616–17 (Tex.1980).

 **[26]** **[27]** To recover under the DTPA, the plaintiff must also show that the defendant's actions were the "producing cause" of actual damages. *See* TEX. BUS. & COM.CODE § 17.50(a). This showing requires some evidence that the defendant's act or omission was a cause in fact of the plaintiff's injury. *Doe v. Boys Clubs of Greater Dallas, Inc.,* 907 S.W.2d 472, 481 (Tex.1995). Under this standard, it is not necessary to show that the harm was foreseeable. *Boys Clubs of Greater Dallas, Inc.,* 907 S.W.2d at 481.

The DTPA does not mention "puffing" as a defense. However, this Court has recognized that "mere puffing" statements are not actionable under sections 17.46(b)(5) or 17.46(b)(7). *Pennington v. Singleton,* 606 S.W.2d 682, 687 (Tex.1980). Neither this Court nor any court of appeals has extended the puffing defense to violations of

sections 17.46(b)(23) (failure to disclose) or 17.50(a)(3) (unconscionable conduct).

 **[28]**   **[29]**   In conducting a no-evidence review, we must view the evidence in a light that tends to support the finding of the disputed fact and disregard all evidence and inferences to the contrary. *Weirich v. Weirich,* 833 S.W.2d 942, 945 (Tex.1992). If more than a scintilla of evidence exists, the evidence is legally sufficient to support the finding. *Browning–Ferris, Inc. v. Reyna,* 865 S.W.2d 925, 928 (Tex.1993).

### 2. Analysis

The Wilkinses offered the following evidence to support their DTPA claims:

(1) Kenny Wilkins' testimony that he read Helena's seed brochure (PX–25) before purchasing Cherokee seed and that he would not have planted Cherokee in 1993 and 1994 had the brochure not represented Cherokee was a good dryland variety.

(2) The PX–25 brochure's description of Cherokee seed as "one of the most durable, top yielding hybrids" with an "outstanding disease tolerance package."

(3) The PX–25 brochure's "grain sorghum lineup" chart stating that Cherokee seed has "good" head exertion, "very good" standability, "excellent" yield potential in drylands, and that it is "FD [field] tolerant" to charcoal rot.

(4) Helena's written representation that its sorghum hybrids "constitute our best research and development efforts," that Cherokee seed has "excellent weatherability," that Cherokee seed is "the tough performer," and that it has "the stamina and  **\*503**  hardiness to withstand the harsh conditions from the Texas coastal bend across the lower south to the Carolinas."

(5) Testimony that the Wilkinses did not expect a "FD tolerant" plant would be affected by charcoal rot and that they understood "tolerant" to mean that "if there was an acceptable level of something out in the field it would be tolerant to it."

(6) The American Seed Association's (of which Helena is a member) definition of "tolerant" as "the ability of plants to endure a specified pest or an adverse environmental

condition, performing and producing in spite of the disorder."

(7) A Helena agent's testimony that "tolerance to charcoal rot is known to occur in grain sorghum. In this case the plant may develop a disease but may escape the full development of symptoms and produce some level of harvestable yield which it could not otherwise do in the absence of the tolerance phenomenon."

(8) The Wilkinses' testimony that they relied upon the Helena agent's oral representations.

(9) Testimony indicating that it is reasonable and customary for farmers to rely on oral representations and advice from seed companies' representatives and that, in fact, the neighboring farm's owner also relies on advice from his seed company representative.

(10) Another Helena agent's representations that Cherokee seed was a "good dry land variety and that it would hold up well under the dry land conditions," and his recommendation that the Wilkinses plant Cherokee seed.

(11) A Helena representative's statement that the Wilkinses had planted "too thick" and that if they would plant Cherokee on the whole lot, but with greater spacing, "the plant[s] will go ahead and perform."

Helena argues that its "alleged misleading statements are not statements of 'fact,' but constitute, if anything, nonactionable opinion or puffing." It relies extensively on *Autohaus, Inc. v. Aguilar,* where the court of appeals held that an automobile salesman's stating that Mercedes is the best-engineered automobile in the world and "jok[ing]" that the car would "probably" only need to be brought in for oil changes every 7,500 miles was nonactionable puffing. 794 S.W.2d 459, 464 (Tex.App.—Dallas 1990), *writ denied per curiam,* 800 S.W.2d 853 (Tex.1991). The court noted that these two sentences were "the extent of the evidence presented to show the misrepresentation by the salesman." *Aguilar,* 794 S.W.2d at 464. It also noted that the terms "probably" and "joked" demonstrated the generality of the statements. *Aguilar,* 794 S.W.2d at 464.

 **[30]**   Here, the Wilkinses' evidence reflects specific representations about Cherokee seed's characteristics and specific representations about how the Wilkinses' crop in particular would perform. We conclude some of the representations in this case are much more specific than

those in *Aguilar* and are more analogous to representations held actionable in other cases. *See, e.g., Pennington,* 606 S.W.2d at 687 (holding representations that used boat and motor were in "excellent condition," "perfect condition," and "just like new" were actionable misrepresentations about characteristics and benefits); *Hedley Feedlot, Inc.,* 855 S.W.2d at 831, 838–39 (holding cattle seller's representations to a buyer about "the type of cattle, weight, projected cost of feeding, the length of **\*504** time on feed, and the projected gain of the cattle" were actionable under the DTPA); *Gold Kist, Inc. v. Massey,* 609 S.W.2d 645, 646–47 (Tex.App.—Fort Worth 1980, no writ) (holding representations about seed-germination rate were actionable under the DTPA). Thus, viewing the evidence in a light most favorable to the jury's findings, we conclude that there is some evidence of misrepresentations about Cherokee seed's characteristics, quality, and grade amounting to more than mere puffing.

 [31]    Helena also argues that there is no evidence that its actions were the producing cause of the Wilkinses' injuries because the Wilkinses did not exclude other possible causes for the crop failure. Specifically, Helena contends that the Wilkinses depleted their soil by planting cotton the prior year.

The Wilkinses presented evidence about Cherokee's unsuitability for dryland farming. This evidence included their crop's performance, their neighbor's crop performance, several seed performance trial results, and South Texas rainfall statistics. The Wilkinses' expert, Dr. Pleunneke, testified that Cherokee seed does not produce a good yield in a nonirrigated environment.

The Wilkinses also presented evidence excluding other causes. The court of appeals summarized this evidence:

> Wilkins explained that the cotton-grain rotation is required by the local crop-management office; his neighbor rotated cotton and grain on certain portions of his acreage without adverse effects; and the alleged "over planting" occurred because the Wilkins[es] followed the recommendations of Helena in planting their 1993 crop.

18 S.W.3d at 756. Thus, we conclude the Wilkinses presented some evidence of producing cause.

In sum, there is some evidence to support a finding that Helena violated sections 17.46(b)(5) and 17.46(b)(7). This

finding is sufficient to support the jury's verdict. Thus, the court of appeals correctly held that there is some evidence of DTPA violations and that Helena's puffing defense did not defeat liability under the DTPA.

## V. DAMAGES

Finally, Helena argues that there is no evidence to support the jury's $360,000 damages award. The court of appeals held there was evidence to support this amount. 18 S.W.3d at 759. We agree with the court of appeals.

## A. APPLICABLE LAW

 [32]    [33]    [34]    [35]    Recovery for lost profits does not require that the loss be susceptible to exact calculation. *Texas Instruments, Inc. v. Teletron Energy Mgmt., Inc.,* 877 S.W.2d 276, 279 (Tex.1994). However, the injured party must do more than show that it suffered some lost profits. *Teletron Energy Mgmt., Inc.,* 877 S.W.2d at 279. The loss amount must be shown by competent evidence with reasonable certainty. *Szczepanik v. First S. Trust Co.,* 883 S.W.2d 648, 649 (Tex.1994); *Holt Atherton Indus., Inc. v. Heine,* 835 S.W.2d 80, 84 (Tex.1992). This is a fact-intensive determination. *Heine,* 835 S.W.2d at 84. At a minimum, opinions or lost-profit estimates must be based on objective facts, figures, or data from which the lost-profits amount may be ascertained. *Szczepanik,* 883 S.W.2d at 649; *Heine,* 835 S.W.2d at 84.

 [36]    [37]    Texas' general rule for assessing damages for crop loss is the market value of the lost part of the crop, as measured at maturity, less the cost of harvesting and marketing the lost part. *International Harvester Co. v. Kesey,* 507 S.W.2d 195, 197 (Tex.1974). The law does not demand perfect proof of damages for crop **\*505** loss but liberally permits estimates of crop value and probable yield, as well as cultivating and marketing expenses. *International Harvester Co.,* 507 S.W.2d at 197.

## B. ANALYSIS

 [38]    Helena argues that the Wilkinses' damages should have been limited to the Cherokee seed's purchase price. Helena relies upon the "limitation of liability and remedies" clause printed on its invoices, delivery tickets, and seed label. The DTPA provides that "[a]ny waiver by a consumer of the

provisions of this subchapter is contrary to public policy and is unenforceable and void." TEX. BUS. & COM.CODE § 17.42(a). We have held that a clause limiting recovery for breach of warranty is effective, even when brought under the DTPA, because the DTPA did not create warranty claims. *Southwestern Bell Tel. Co. v. FDP Corp.,* 811 S.W.2d 572, 576–77 (Tex.1991). However, the same does not hold true for other DTPA claims. *FDP Corp.,* 811 S.W.2d at 576–77. Thus, Helena's liability-limitation clauses cannot preclude the Wilkinses' lost-profit recovery for nonwarranty representations or unconscionability.

 [39]   Alternatively, Helena argues that there is no evidence to support the jury's damage award because prior losses cannot establish lost profits and because the Wilkinses did not prove their damages with reasonable certainty. Specifically, Helena argues that deducting government subsides and disaster relief from the Wilkinses' income results in a history of losses rather than profits.

The Wilkinses first planted grain in 1992 and brought this suit to recover for crop damages sustained in 1993 and 1994. Thus, they only had one year to establish a profit history.

 [40]   [41]   We have held that past profits, coupled with other facts and circumstances, *may* establish a lost-profits amount with reasonable certainty. *See Teletron Energy Mgmt., Inc.,* 877 S.W.2d at 279. However, lack of a profit history does not, by itself, preclude a new business from recovering lost future profits. *See, e.g., Orchid Software, Inc. v. Prentice–Hall, Inc.,* 804 S.W.2d 208, 211 (Tex.App.—Austin 1991, writ denied). Rather, our focus is on whether damages can be shown with reasonable certainty. *E.g., Szczepanik,* 883 S.W.2d at 649. This can be accomplished with a profit history *or* some other objective data, such as future contracts, from which lost profits can be calculated with reasonable certainty. *See, e.g., Szczepanik,* 883 S.W.2d at 649; *Allied Bank W. Loop v. C.B.D. & Assocs., Inc.,* 728 S.W.2d 49, 54–55 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.).

To establish their lost profits with reasonable certainty, the Wilkinses had to show: (1) the lost crop's market value, and (2) the harvesting and marketing expenses they would have incurred on that lost part. *International Harvester Co.,* 507 S.W.2d at 197. To calculate their lost crop's market value, the Wilkinses relied upon the United States Agriculture Stabilization and Conservation Service's farm-yield data. Each year the USASC measurement service gathers crop yield information from sorghum growers. The Wilkinses took

the average sorghum yield per acre and subtracted their actual per acre yield, as evidenced by sales receipts. Then they multiplied this resulting deficit by the number of acres planted and multiplied this figure by the market price. The result was $129,170.95 for 1993 and $361,684.63 for 1994. They submitted the $490,855.58 total to the jury as their estimated damages.

 **\*506**  To reach an estimated lost-profits figure, the cost of harvesting and marketing the lost crop must be deducted from the $490,855.58 value of the lost crop. These costs include additional lease payments, grain-elevator costs, and transportation charges. *See International Harvester Co.,* 507 S.W.2d at 197. Harvesting and marketing expenses can be liberally estimated. *International Harvester Co.,* 507 S.W.2d at 197.

Here, the Wilkinses' neighbor testified about average transportation costs to move grain between his farm and the grain elevator in McCook, Texas, where both the neighbor and the Wilkinses sent their crops. Kenneth Wilkins testified about how the grain-elevator company calculates drying charges and provided the jury with the Wilkinses' 1993 and 1994 grain-elevator receipts. The Wilkinses' leases containing the percentage of profits that the Wilkinses' were required to pay their landlord were entered into evidence. Finally, there was some evidence presented to the jury about the seed's actual price and some evidence that Helena may have "written off" a part of the price. With this evidence, the jury assessed the Wilkinses' net lost profits at $360,000. We agree with the court of appeals that the jury's damages award was within the range of evidence the Wilkinses presented and that this award is supported with evidence establishing damages with reasonable certainty. 18 S.W.3d at 759. Thus, we hold that there is some evidence to support the jury's damage award.

## VI. CONCLUSION

We conclude that the Wilkinses' delay in submitting their claims to arbitration did not jurisdictionally bar their suit. We also conclude that the trial court did not abuse its discretion in admitting the Wilkinses' expert's testimony. Finally, we conclude that there is some evidence to support the jury's liability, causation, and damages findings. Accordingly, we affirm the court of appeals' judgment.

Justice ABBOTT, joined by Justice HECHT and Justice OWEN, dissenting.

Although he knew about both the alleged problem with the seed and the Act's requirement that seed complaints be submitted to arbitration, Wilkins delayed submitting his complaint to arbitration until years after he first discovered the problem. Because of this delay, it was too late for the State Seed and Plant Board to conduct a meaningful investigation, and the Board appropriately concluded that the complaint did not qualify for arbitration. Despite the Act's plain requirement that seed complaints be timely submitted to arbitration as a prerequisite to maintaining a legal action, the Court sidesteps this requirement and permits Wilkins to maintain his suit. In doing so, the Court encourages all seed buyers who wish to circumvent the Act's arbitration requirement to simply delay submitting the complaint to arbitration until it is too late for the Board to investigate. Because the Court ignores the Act's plain language and undermines the Act's purpose by permitting seed purchasers to completely circumvent the Act's arbitration requirement, I dissent.

## I

The Act's purpose is to "provide[ ] for an unbiased third party investigation by the State Seed and Plant Board of the Texas Department of Agriculture of complaints concerning seed performance." HOUSE COMM. ON AGRIC. AND LIVESTOCK, BILL ANALYSIS, Tex. S.B. 64, 71st Leg., R.S. (1989). To achieve this purpose, the Act requires that a seed purchaser who "claims to have been damaged by the failure of the **\*507** seed to produce or perform as represented by warranty or by the label required to be attached to the seed ... or as a result of negligence ... must submit the claim to arbitration" before the Board "*as a prerequisite to the exercise of the purchaser's right to maintain a legal action.*" TEX. AGRIC. CODE § 64.002 (emphasis added).

In order for the Board to be able to conduct a meaningful investigation, the Act expressly provides that the arbitration complaint must be submitted "within the time necessary to permit effective inspection of the plants under field conditions." *Id.* § 64.006(a). The question the Court must answer today is: When the seed purchaser does not file the arbitration complaint within the time necessary to permit effective inspection of the plants under field conditions (even though he is aware of the problem during that time and conducts his own inspection), and the Board concludes that

the complaint does not qualify for arbitration because of the delay, is the purchaser's legal action based on the seller's alleged misrepresentations barred? Simple rules of statutory construction require that this question be answered yes.

First, the Act provides both that the seed purchaser "*must submit the claim to arbitration as provided by [Chapter 64]*" and that "the complaint *must* be filed within the time necessary to permit effective inspection of the plants under field conditions." *Id.* §§ 64.002, 64.006(a) (emphasis added). According to the Code Construction Act, "must" creates or recognizes a condition precedent. TEX. GOV'T CODE § 311.016(3). A condition precedent is "an event that must happen or be performed before a right can accrue to enforce an obligation." *Centex Corp. v. Dalton,* 840 S.W.2d 952, 956 (Tex.1992). Thus, before a seed purchaser may maintain his suit, he must submit his claim to arbitration *and* he must do so within the time necessary to permit effective inspection of the plants under field conditions—it is not enough to "submit" the claim when no inspection is possible. Because the Board "shall conduct arbitration as provided by [Chapter 64]," *id.* § 64.005(b), if the seed purchaser fails to timely submit the claim as directed by Chapter 64, the Board cannot arbitrate and the sole purpose of the Act is thwarted.

Second, the Legislature expressly indicated that the Act was based on a similar Florida statute. The bill analysis recognizes that "[f]or many years the state of Florida has used a method of arbitration with an unbiased third party investigation and opinion" and the "American Seed Trade Association has recommended to each of its member states that they work to pass measures similar to Florida's." *See* HOUSE COMM. ON AGRIC. AND LIVESTOCK, BILL ANALYSIS, Tex. S.B. 64, 71st Leg., R.S. (1989). At the time the Texas Seed Arbitration Act was enacted, the Florida statute provided that:

> [w]hen any farmer is damaged by the failure of ... seed to produce or perform as represented by the label ..., *as a prerequisite to his right to maintain a legal action* against the dealer from whom such seed was purchased, such farmer shall make a sworn complaint.... The *complaint shall be filed with the department,* and a copy of the complaint shall be served on the dealer by certified mail, *within such time as to permit inspection of the crops, plants, or trees* by the seed investigation and conciliation council

or its representatives and by the dealer from whom the seed was purchased.

FLA. STAT. ANN.. § 578.26(1)(a) (1989) (emphasis added).

The Florida and Texas statutes are substantially similar—both provide that the **\*508** seed purchaser or farmer must file a complaint or submit the claim to arbitration "as a prerequisite to [the purchaser's] right to maintain a legal action" against the dealer or labeler. Both statutes require the complaint to be filed in a timely manner so that it can be appropriately investigated and the crops can be inspected.

"[I]t is a generally accepted rule of statutory construction that when the Legislature adopts a 'foreign' statute it also adopts the construction of that statute by the foreign jurisdiction occurring prior to the Texas enactment." *State v. Moreno,* 807 S.W.2d 327, 332 n. 5 (Tex.Crim.App.1991); *see also City of Garland v. Dallas Morning News,* 22 S.W.3d 351, 360 (Tex.2000); *Tex. Dep't of Pub. Safety v. Gilbreath,* 842 S.W.2d 408, 412 (Tex.App.—Austin 1992, no writ). The Florida Supreme Court construed Florida's seed act in 1983 in *Ferry–Morse Seed Co. v. Hitchcock,* 426 So.2d 958 (Fla.1983). [1] Just as in this case, the farmer in *Hitchcock* waited over two years after discovering the problem to bring suit alleging breach of warranty and negligence, and made no attempt to comply with the statutory requirements. The Florida Supreme Court held that the farmer's claims were inextricably bound to the statute's labeling requirements, and that by failing to comply with the statutory requirements, the farmer was barred from bringing suit for damages. *Id.* at 961.

The Texas Legislature enacted Chapter 64 in 1989, well after the Florida Supreme Court issued its decision construing Florida's seed act. Accordingly, we should presume that the Legislature intended to adopt Florida's construction of its statute, so long as the Florida and Texas statutes are substantially similar and our statute does not reflect a contrary intent. *See Sharifi v. Young Bros.,* 835 S.W.2d 221, 223 (Tex.App.—Waco 1992, writ denied). As noted, the acts are substantially similar, and neither the Texas statute itself nor the available legislative history indicates a contrary intent.

The only notable difference between the Texas and Florida statutes is the provision in section 64.004 that:

[t]he court may ... take into account any findings of the board of arbitration with respect to the failure of any party to cooperate in the arbitration

proceedings, including any finding as to the effect of delay in filing the arbitration claim or the arbitration board's ability to determine the facts of the case.

TEX. AGRIC. CODE § 64.004. Both the Court and Wilkins contend that Wilkins's delay in filing his arbitration complaint does not bar his suit because the statute specifically addresses this problem by allowing the trial court to take such delays into account. However, because that interpretation allows Wilkins to completely circumvent Chapter 64's arbitration requirement, it simply cannot be an accurate application of section 64.004.

To the contrary, section 64.004 deals with the situation in which the complaint *is* filed within the time necessary to permit effective inspection under field conditions, but the seed purchaser's delay in filing nevertheless affects the investigation. A purchaser could certainly delay filing an arbitration complaint for many months yet still file while the seeds are under field conditions. For example, if the problem became apparent early in the season but **\*509** the farmer delayed submitting the claim to arbitration until after the heat of the summer, the delay could affect the Board's investigation. Section 64.004 allows the trial court to consider such a delay; it does not allow the court to completely ignore the statute's timeliness requirements. Moreover, section 64.004, by its terms, applies only to a complaint "that has been the subject of arbitration under [Chapter 64]." Because Wilkins's complaint was not arbitrated—and could not have been under the terms of the statute—section 64.004 does not apply.

Construed in this manner, section 64.004 is consistent with the Act's purpose and with the conclusion that a purchaser's failure to file an arbitration complaint within the time necessary to permit inspection during field conditions is a bar to suit. But the Court would rather rely on this one provision to gut the purpose of the Act. Rather than interpreting this single sentence in a manner entirely inconsistent with the Act's purpose of allowing an independent third-party investigation, we should interpret it consistently with the Act as a whole. *See Tex. Workers' Comp. Ins. Fund v. Del Indus., Inc.,* 35 S.W.3d 591, 593 (Tex.2000) (stating that we do not construe statutory language in isolation but in the context of the entire statutory scheme). And, when two constructions are possible, we should choose the one most consistent with the Act's purpose over the construction completely at odds with it.

The Court's construction of the Act renders meaningless section 64.006(a)'s requirement that the arbitration complaint be submitted within the time necessary to permit effective inspection of the plants under field conditions. Relying on the fact that the Act does not expressly state that *the Board* must conduct the field inspection, the Court reasons that "the Act provides that a complaint must be filed in time to 'permit an effective inspection of the plants under field conditions,' thus permitting the parties to inspect under field conditions and provide their reports to the Board." 47 S.W.3d at 507 (citations omitted). But this reasoning makes no sense. The timing requirement must have been intended to allow *someone* to conduct a field inspection. According to the Court, that someone is simply "the parties." But surely the Act's timeliness requirement was not included to allow the farmer to conduct a field inspection, since the farmer has access to his fields and can conduct an inspection at any time. Accordingly, the requirement must have been intended to permit the Board or the seed seller to conduct an inspection. Since the Act's purpose is to allow a third party investigation and the Board employs its own field inspectors, the only conclusion is that the Legislature intended to permit the Board to conduct an inspection. But under the Court's interpretation, there would be no problem even if *no one* conducted a field inspection and the farmer waited until well after the crops had been harvested to file the arbitration complaint so that no field inspection could be performed. Or, the farmer could conduct a field inspection but then wait until after field conditions to file the arbitration complaint so that the *only* field inspection the Board could consider would be the farmer's.

The Court's construction reads section 64.006(a)'s timeliness requirement right out of the Act. To be consistent with both the Act's language and its purpose, I would hold that Wilkins's failure to submit his claim to arbitration within the requisite time period bars him from maintaining a legal action against Helena.

## II

Wilkins argues that, regardless of whether the Act bars certain claims that **\*510** have not been arbitrated, the jury's verdict can be sustained on the basis of the DTPA unconscionability and misrepresentation causes of action, which he contends are not subject to the Act's arbitration requirement. Wilkins obtained favorable jury findings on his claims for breach of warranty, DTPA unconscionability, and DTPA oral misrepresentations. Wilkins argues that, even

if the breach of warranty claim is barred by his failure to arbitrate, the Act does not bar his DTPA unconscionability and misrepresentation claims because the statute requires only claims based on the label, warranty, or negligence to be submitted to arbitration, and his DTPA claims are not based on the label, warranty, or negligence.

If Wilkins is correct, plaintiffs could easily circumvent the Act simply by recharacterizing their claims as DTPA claims. This would render the Act wholly ineffective and would undermine the legislative intent. *Cf. Sorokolit v. Rhodes,* 889 S.W.2d 239, 242 (Tex.1994) ("Claims that a physician or health care provider was negligent may not be recast as DTPA actions to avoid the standards set forth in the Medical Liability and Insurance Improvement Act."). The Act's language is broad—it applies whenever a seed purchaser claims to have been damaged "by the failure of the seed to produce or perform as represented by warranty or by the label required to be attached ... or as a result of negligence." TEX. AGRIC. CODE § 64.002(a). The Business and Commerce Code—the same code in which the DTPA is found—defines warranties to include "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain" and "[a]ny description of the goods which is made part of the basis of the bargain." TEX. BUS. & COM.CODE § 2.313(a)(1),(2). Wilkins's claims for DTPA misrepresentation and unconscionability fall within the scope of this definition.

In the jury charge, the DTPA misrepresentation claim defined "false, misleading, or deceptive act or practice" as "representing that Cherokee seed had or would have characteristics that it did not have" or "representing that Cherokee seed was of a particular quality if it was of another." These representations fall within the definition of warranty, and, although couched as a DTPA misrepresentation claim, the underlying nature of the complaint is that the seeds did not produce or perform as represented. *See Sorokolit,* 889 S.W.2d at 242 (holding that the underlying nature of the claim, not its label, determines whether section 12.01(a) of the Medical Liability and Insurance Improvement Act prevents suit for violation of the DTPA). Wilkins's DTPA unconscionability claims are also predicated on Helena's representations concerning the Cherokee seed. The evidence supporting Wilkins's DTPA misrepresentation and unconscionability claims is the same evidence supporting his breach of warranty claims. Because all of Wilkins's claims are so significantly factually intertwined, they should be arbitrated together. *Cf. Jack B. Anglin Co. v. Tipps,* 842 S.W.2d 266, 271 (Tex.1992)

(requiring arbitration of factually intertwined contract and misrepresentation claims in contractual arbitration context). Accordingly, Wilkins's DTPA claims are included within the Act's arbitration requirement.

## III

Wilkins argued in the trial court that construing the Act to bar his legal action would violate the Open Courts provision of the Texas Constitution. *See* TEX. CONST. art. I, § 13. We should, if possible, interpret statutes in a manner that avoids constitutional infirmities. *Owens Corning v. Carter,* 997 S.W.2d 560, 577 (Tex.1999). **\*511** The Attorney General has concluded, and I agree, that Chapter 64's arbitration requirements do not on their face violate the Open Courts provision of the Texas Constitution. Op. Tex. Att'y Gen. No. DM–3 (1991). As noted in that decision, Chapter 64 does not purport to abolish the right of seed performance disputants to obtain redress in court. *Id.* The arbitration is non-binding, and seed purchasers are free to pursue their claims in court after the arbitration. Moreover, Chapter 64's arbitration requirements are certainly not unreasonable or arbitrary when balanced against the purpose and basis of the statute. *Id.; see Carter,* 997 S.W.2d at 573; *Sax v. Votteler,* 648 S.W.2d 661, 666 (Tex.1983).

The Attorney General did caution, however, that the Act could raise Open Courts questions as applied to some cases. Op. Tex. Att'y Gen. No. DM–3 (1991). In particular, the Attorney General pointed out that the Open Courts provision could limit the application of section 64.006(a)'s requirement that the arbitration complaint be filed in time to permit inspection of the plants under field conditions. *Id.* I agree

that this requirement might arguably violate the Open Courts provision as applied to cases in which the Act's complaint-filing time period has expired before the seed purchaser has a reasonable opportunity to discover the problem. But where, as here, the seed purchaser discovers the problem while the seeds are under field conditions (and conducts his own independent investigation of the crops in the field), is aware of the arbitration requirement, and has ample opportunity to file his complaint in a timely manner but simply fails to do so, the Open Courts provision is satisfied.

\* \* \* \* \*

Wilkins knew of the potential problem with the Cherokee seed within plenty of time to file a complaint with the Board during the requisite time period. Although he allowed some experts to investigate his crops under field conditions, he failed to file a complaint with the Board to allow the neutral third-party investigation required by the Act. Because Wilkins failed to submit his complaint within the requisite time period, the Board properly concluded that the complaint did not qualify for arbitration under the Act's plain language. And because arbitration is a prerequisite to Wilkins's right to maintain a legal action for his claims that he has been damaged by the failure of the seed to produce or perform as represented, Wilkins's claims are barred. The Court nevertheless decides that they are not. Because that decision contradicts the Act's plain language and undermines its purpose, I dissent.

**Parallel Citations**

44 Tex. Sup. Ct. J. 675

Footnotes

1  Unless otherwise indicated, all references to "the Act" are to the Texas Seed Arbitration Act. *See* TEX. AGRIC. CODE § 64.001–.007.

1  Florida's 1977 Act, which was at issue in *Ferry–Morse,* was similar to its 1989 version except that it required the farmer to file a sworn complaint with the department of agriculture within 10 days after the problem became apparent. FLA. STAT. ANN.. § 578.26(1) (1977).

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2001 WL 548906
Only the Westlaw citation is currently available.
United States District Court,
N.D. Texas, Dallas Division.

Kevin HINDS, Plaintiff,

v.

Gary SLAGEL, et al., Defendants.

No. CIV.A. 3:00–CV–2372–D.  |  May 18, 2001.

**MEMORANDUM OPINION AND ORDER**

FITZWATER, District J.

**\*1**  Plaintiff Kevin Hinds ("Hinds") sues defendants Gary Slagel, Mayor of the City of Richardson ("City"), Bill Keffler, City Manager of the City, Kenneth Yarbrough, the City Chief of Police, and Raymond Noah ("Judge Noah"), the City Municipal Judge, in their official and individual capacities, arising from his November 1, 1998 warrantless arrest by City police officers for a class C misdemeanor, the towing and impoundment of his vehicle, which was located on his private property, and court proceedings conducted by Judge Noah following his arrest. On March 19, 2001 defendants filed a motion to dismiss under Fed.R.Civ.P. 12(b)(6). On March 28, 2001 defendants filed an amended motion to dismiss. Hinds has responded to both motions. [1] The court grants the motion in part, denies it in part, and orders Hinds to file a Rule 7(a) reply no later than 30 days after this memorandum opinion and order is filed.

**I**

Hinds brings this *pro se* action under 42 U.S.C. § 1983, seeking relief on the ground that he was subjected to an unreasonable search and seizure, in violation of his federal constitutional rights. [2] He contends he was unlawfully arrested without a warrant or probable cause and jailed for a non-jailable class C misdemeanor offense rather than being taken directly before a magistrate, and that his car was illegally seized and impounded. Hinds also complains that Judge Noah violated his rights while arraigning him on the misdemeanor charges against him and in requiring that he post a bond to secure his release before he was afforded a trial or found guilty of the charges.

In their amended motion, defendants contend that Hinds' official capacity claims are redundant because he has also sued the City. They also assert that the individual defendants are entitled to official immunity [3] and qualified immunity, that Judge Noah is entitled to absolute judicial immunity, and that the City is entitled to sovereign immunity.

**II**

**A**

The court agrees that Hinds' official capacity claims are redundant of his action against the City. A suit against a government official in his official capacity is only another way of pleading an action against an entity of which the official is an agent. *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690 n. 55 (1978). If the government entity receives notice and an opportunity to respond, an official-capacity suit is treated as a suit against the entity. *Ky. v. Graham,* 473 U.S. 159, 166 (1985). A suit against a municipal official in his official capacity is not a suit against him personally, because the real party in interest is the entity. *Id.* There is no longer any need to bring official-capacity actions. Accordingly, Hinds' official capacity claims are dismissed.

**B**

Defendants also contend the individual defendants are entitled to qualified immunity. The court declines at the Rule 12(b)(6) stage to dismiss Hinds' complaint on this basis without first requiring a Rule 7(a) reply and then affording defendants a chance to move to dismiss or for summary judgment once they have reviewed the reply.

**\*2**  Hinds is not required to anticipate the defense of qualified immunity and provide greater specificity in his complaint. *Todd v. Hawk,* 72 F.3d 443, 446 (5th Cir.1995) (per curiam) (citing *Schultea v. Wood,* 47 F.3d 1427, 1433–34 (5th Cir.1995) (en banc)). Instead, a two-step procedure applies. The plaintiff must initially "file a short and plain statement of his claim pursuant to Rule 8(a)(2)." *Id.* This pleading is then "followed by a more particularized reply pursuant to Rule 7." *Id.* Where, as here, the public official "pleads the affirmative defense of qualified immunity in his answer, the district court may, on the official's motion or on

its own, require the plaintiff to reply to that defense in detail." *Schultea,* 47 F.3d at 1433. "[T]he reply must be tailored to the assertion of qualified immunity and fairly engage its allegations." *Id.* "Heightened pleading requires allegations of fact focusing specifically on the conduct of the individual who caused the plaintiff['s] injury." *Reyes v. Sazan,* 168 F.3d 158, 161 (5th Cir.1999).

Accordingly, the court declines to dismiss Hinds' actions against the individual defendants at this juncture based on qualified immunity. He must file a Rule 7(a) reply no later than 30 days after this memorandum opinion and order is filed.

### C

Defendants next maintain that Judge Noah is entitled to judicial immunity under federal and state law. Hinds responds that Judge Noah admits to imposing a bail requirement on individuals arrested for non-jailable offenses and incarcerating them if they cannot meet the bail requirement. Citing *Pulliam v. Allen,* 466 U.S. 522 (1984), he contends that Judge Noah does not enjoy immunity from injunctive or declaratory relief for such action and for an award of attorney's fees, even if he concededly is immune from an award of damages. The court agrees with Hinds that, to the extent he seeks injunctive or declaratory relief against Judge Noah under § 1983, his suit may proceed. *See Pulliam,* 466 U.S. at 541 (holding that judicial immunity is not a bar to § 1983 action seeking prospective injunctive or declaratory relief). Otherwise, his action against Judge Noah is dismissed.

Hinds cannot recover attorney's fees under § 1988—the statutory corollary to § 1983—because he does not allege that he is an attorney. *See Schinzing v. City of Burleson,* Civil Action No. 3:95–CV–1595–D, slip op. at 4 n. 4 (N.D.Tex. May 22, 1996) (Fitzwater, J.) (holding that *pro se* litigant who was not attorney could not recover attorney's fees under § 1988, the attorney's fee statute that applies to § 1983 actions) (citing *Cofield v. Atlanta,* 648 F.2d 986, 988 (5th Cir. Unit B June 1981) (holding that "section 1988 is not to compensate a worthy advocate but to enable and encourage a wronged person to retain a lawyer")). He cannot recover any relief under Texas law because Judge Noah is entitled to absolute judicial immunity. *See, e.g., Spencer v. City of Seagoville,* 700 S.W.2d 953, 957–58 (Tex.App.1985, no writ) (on rehearing).

**\*3** The action against Judge Noah is therefore dismissed except to the extent that Hinds sues him under § 1983 for prospective injunctive or declaratory relief.

### D

The City moves to dismiss on the ground that it is entitled to sovereign immunity. The predicate for this assertion is not sovereign immunity in its usual sense, but is instead the contention that Hinds has failed to plead a municipal custom or policy. What the City is actually arguing is that it cannot be held liable on the basis of *respondeat superior,* which is a well established legal doctrine. *See Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691 (1978); *Reimer v. Smith,* 663 F.2d 1316, 1323 (5th Cir. Dec. 1981). Hinds responds that the City should not be dismissed "unless and until it provides proof that the actions taken by its officers w[ere] not a direct result of its own rules, regulations, ordinances, policy and custom." P. Resp. at 5.

Hinds must establish that a "deprivation of rights protected by the Constitution or federal law" was inflicted pursuant to an official municipal policy. *See Campbell v. City of San Antonio,* 43 F.3d 973, 977 (5th Cir.1995). He is obligated to establish that a municipal policy or custom actually inflicted the constitutional injury that he alleges. *Monell,* 436 U.S. at 694. The burden to prove policy, custom, or practice is on the plaintiff. The defendant municipality need not disprove it. *See, e.g., Bennett v. City of Slidell,* 728 F.2d 762, 767 (5th Cir.1984) (en banc). Hinds must also show that "there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton, Ohio v. Harris,* 489 U.S. 378, 385 (1989).

Hinds' assertions against the City seem to rest primarily on the concept of *respondeat superior. See* 1st Am. Compl. at ¶¶ 25–26. Although he also appears to attempt to assert that the persons in question acted according to municipal policy, custom, or practice, *see id.* at ¶¶ 13, 17, 19, 22, and 26, he does not allege a direct causal link between a municipal policy or custom and the alleged constitutional deprivation. Nevertheless, in the context of a Rule 12(b)(6) motion, "[t]he court may dismiss a claim [only] when it is clear that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Jones v. Greninger,* 188 F.3d 322, 324 (5th Cir.1999) (per curiam) (citing *Fee v. Herndon,* 900 F.2d 804, 807 (5th Cir.1990)). "In analyzing the complaint, [the court] will accept all well-pleaded facts as

true, viewing them in the light most favorable to the plaintiff. *Id.* (citing *Doe v. Hillsboro Indep. Sch. Dist.,* 81 F.3d 1395, 1401 (5th Cir.1996)). "The issue is not whether the plaintiff will ultimately prevail, but whether he is entitled to offer evidence to support his claim." *Id.* (citing *Doe,* 81 F .3d at 1401). "Thus, the court should not dismiss the claim unless the plaintiff would not be entitled to relief under any set of facts or any possible theory that he could prove consistent with the allegations in the complaint." *Id.* (citing *Vander Zee v. Reno,* 73 F.3d 1365, 1368 (5th Cir.1996)). Under the highly deferential standard of *Conley v. Gibson,* 355 U.S. 41, 45–46 (1957), and viewing the allegations of Hinds' amended complaint in the light most favorable to him for purposes of deciding the motion to dismiss, *see, e.g., Royal Bank of*

*Canada v. FDIC,* 733 F.Supp. 1091, 1094 (N.D.Tex.1990) (Fitzwater, J.), the court is unable to say that he can prove no set of facts, consistent with the allegations, that would entitle him to relief against the City. The court therefore denies the amended motion to dismiss in this respect.

**\*4** The court grants in part and denies in part defendants' March 28, 2001 amended motion to dismiss and orders Hinds to file a Rule 7(a) reply no later than 30 days after this memorandum opinion and order is filed. The court denies defendants' March 19, 2001 motion to dismiss as moot.

SO ORDERED.

Footnotes

1    In view of the filing of the amended motion to dismiss, defendants' March 19, 2001 motion to dismiss is denied as moot.

2    He also appears to assert a pendent claim asserting a violation of the Texas Constitution. *See* 1st Am. Compl. ¶ 12.

3    They also assert that the individual defendants are entitled to official immunity. This argument is based on their being sued in their official capacities. *See* Am. Mot. at 3, ¶ 5. Considering the court's dismissal of these official capacity claims, *see infra* § II(A), the court need not address this ground of their motion.

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

19 S.W.3d 249
Supreme Court of Texas.

In re Jane DOE.

No. 00–0140. | Feb. 25, 2000.

Pregnant minor filed application for a court order authorizing her to consent to abortion without notifying her parents. The trial court denied application, finding that minor was not sufficiently well informed to make decision without notifying her parents. Minor appealed. The Court of Appeals affirmed. Granting minor's petition for review, the Supreme Court, Phillips, C.J., held, as matters of first impression, that: (1) Family Code did not prohibit Supreme Court from releasing opinion to public; (2) review of denial of order was subject to legal and factual sufficiency standards; (3) requirements to be mature and sufficiently well informed would be met if minor was capable of reasoned decision making and decision was not based on impulse; and (4) trial court must consider totality of circumstances in making decisions as to whether minor was mature and sufficiently well informed.

Reversed and remanded to the trial court.

Enoch, J., concurred in part and filed a separate opinion, in which Baker, Hankinson, and O'Neill JJ., joined.

Owen, J., concurred in part and filed a separate opinion, in which Phillips, C.J., joined in part.

Hecht, J., filed a dissenting opinion, in which Abbott, J., joined.

West Headnotes (12)

[1] **Courts**
 Opinions

Family Code's requirement of confidentiality in appeals from denial of order authorizing minor to consent to abortion without notifying her parents did not prohibit Supreme Court from releasing opinions to public. V.T.C.A., Family Code §§ 33.003(k, l), 33.004(c, f).

Cases that cite this headnote

[2] **Abortion and Birth Control**
 Proceedings

Determination of whether minor is mature and sufficiently well informed, as required to be entitled to court order authorizing her to consent to abortion without notifying her parents, is a question of fact. V.T.C.A., Family Code § 33.003(i).

2 Cases that cite this headnote

[3] **Abortion and Birth Control**
 Proceedings

Determination of whether minor is mature and sufficiently well informed, as required to be entitled to court order authorizing her to consent to abortion without notifying her parents, is subject to legal and factual review standard. V.T.C.A., Family Code §§ 33.003(i), 33.004(i).

40 Cases that cite this headnote

[4] **Abortion and Birth Control**
 Proceedings

When a minor meets the statutory threshold for court order authorizing her to consent to abortion without notifying her parents, the trial court must grant the application. V.T.C.A., Family Code § 33.003(i).

Cases that cite this headnote

[5] **Statutes**
 Plain Language; Plain, Ordinary, or Common Meaning

Supreme Court's focus in construing statutes is to determine the Legislature's intent, which it discerns primarily from the plain meaning of the words chosen.

1 Cases that cite this headnote

[6] **Abortion and Birth Control**
 Capacity and maturity

Minor is mature and sufficiently well informed to make the decision to have an abortion without notification to either of her parents when

the evidence demonstrates that the minor is capable of reasoned decision making and that her decision is not the product of impulse, but is based upon careful consideration of the various options available to her and the benefits, risks, and consequences of those options. V.T.C.A., Family Code § 33.003(i).

1 Cases that cite this headnote

**[7]** **Abortion and Birth Control**
Capacity and maturity

Trial court should take into account the totality of circumstances a minor presents in determining whether she is mature and sufficiently well informed, so as to be entitled to court order authorizing her to consent to abortion without notifying her parents. V.T.C.A., Family Code § 33.003(i).

Cases that cite this headnote

**[8]** **Abortion and Birth Control**
Approval by court; bypass in general

For minor to establish that she is sufficiently well informed, as required to be entitled to order authorizing her to consent to abortion without notifying her parents, the minor must make, at a minimum, three showings: (1) she must show that she has obtained information from a health-care provider about the health risks associated with an abortion and that she understands those risks; (2) she must show that she understands the alternatives to abortion and their implications; and (3) she must show that she is also aware of the emotional and psychological aspects of undergoing an abortion. V.T.C.A., Family Code § 33.003(i).

2 Cases that cite this headnote

**[9]** **Abortion and Birth Control**
Approval by court; bypass in general

While a minor must demonstrate a knowledge and appreciation of the various considerations involved in her decision to show she is sufficiently well informed, as required to be entitled to order authorizing her to consent

to abortion without notifying her parents, she should not be required to obtain information or other services from any particular provider or to meet with or review materials that advocacy or religious groups provide; inquiry is whether she has obtained information on the relevant considerations from reliable sources of her choosing that enable her to make a thoughtful and informed decision. V.T.C.A., Family Code § 33.003(i).

2 Cases that cite this headnote

**[10]** **Abortion and Birth Control**
Capacity and maturity
**Abortion and Birth Control**
Proceedings

Determination of maturity under statute governing orders authorizing minor to consent to abortion without notifying her parents necessarily involves more trial court discretion than determination of whether minor is sufficiently well informed; however, if a court determines that a minor has not demonstrated that she is mature enough to make a decision to undergo an abortion, then the court should make specific findings concerning its determination so that there can be meaningful review on appeal. V.T.C.A., Family Code § 33.003(i).

12 Cases that cite this headnote

**[11]** **Abortion and Birth Control**
Proceedings

When determining minor's maturity under statute governing orders authorizing minor to consent to abortion without notifying her parents, if a court concludes that a minor is not credible in some respect that directly relates to its determination of maturity, the court should make specific findings in that regard. V.T.C.A., Family Code § 33.003(i).

Cases that cite this headnote

**[12]** **Abortion and Birth Control**
Capacity and maturity

In making a determination of maturity under statute authorizing minor to consent to abortion without notifying her parents, minor's age, educational background, and grades in school, while indicative of some level of maturity, are not conclusive on the issue of maturity, nor is participation in extra-curricular activities; also, minor's socio-economic status should not bear on the decision. V.T.C.A., Family Code § 33.003(i).

1 Cases that cite this headnote

We conclude that in this case, the minor has not met the statutory standard. Because this Court has not previously provided guidance to trial and appellate courts about what a minor must show under section 33.003 of the Texas Family Code to demonstrate that she is mature and sufficiently well informed, we remand this case to the trial court in the interest of justice. In so doing, we direct that upon remand, the proceedings in the trial court must be concluded as if Doe's application had been filed the day after our opinion issues. *See* TEX. FAM.CODE § 33.003(h). In the event that the minor requires additional time after issuance of this opinion to prepare for a hearing, she may, of course, request an extension of time. *See id.*

**\*250  OPINION**

Chief Justice PHILLIPS delivered the opinion of the Court as to Parts I–VI and a concurring opinion as to Part VII, all of which Justice GONZALES joins. Justice ENOCH, Justice BAKER, Justice HANKINSON, and Justice O'NEILL join in Parts I, II, and IV–VI of the Court's opinion and in the judgment. Justice OWEN joins in Parts I, II, and III of the Court's opinion and in the judgment. Justice HECHT and Justice ABBOTT join in Parts II and III of the Court's opinion.

This is a confidential appeal from a court of appeals' decision affirming a trial court's **\*251**  denial of a minor's application for a court order authorizing her to consent to an abortion without notifying her parents. Our Court is called upon to determine what the Legislature intended in Texas's parental notification statute when it wrote that a court "shall enter an order" that a minor is "authorize[d] ... to consent to the performance of [an] abortion" if she demonstrates "by a preponderance of the evidence [that she] is mature and sufficiently well informed to make the decision to have an abortion performed without notification to either of her parents...." TEX. FAM.CODE § 33.003(i). We are not called upon to decide the constitutionality or wisdom of abortion. Arguments for or against abortion do not advance the issue of statutory construction presented by this case. Instead, our sole function in this case is to interpret and apply the statute enacted by our Legislature.

The trial court in this case concluded that although the minor "shows signs of being mature, she has not demonstrated that she is sufficiently well informed about the medical procedures and the emotional impact of the procedure." The court of appeals affirmed, and the minor has appealed to this Court.

**I**

Jane Doe is a pregnant, unmarried minor. Her eighteenth birthday will occur within a few months. She lives at home with her parents, and she has not been emancipated. Pursuant to Family Code section 33.003, she sought an order from the trial court allowing her to consent to an abortion without having to notify either of her parents. *See* TEX. FAM.CODE § 33.003.

Jane Doe was represented by counsel of her choice, and as the Family Code requires, the trial court appointed a guardian ad litem. *See id.* § 33.003(e). At the conclusion of a hearing, the trial court denied Jane Doe's application and issued written findings and conclusions in accordance with Texas Family Code section 33.003(h). Jane Doe appealed to the court of appeals, which affirmed the trial court's judgment without an opinion. She now appeals to this Court. *See id.* § 33.004(f). She contends that she has conclusively established that she is mature and is sufficiently well informed to make a decision about terminating her pregnancy without notifying her parents. She also has presented a limited argument that the trial court erred in failing to conclude that notification would not be in her best interest. *See id.* § 33.003((i). Because she did not present this latter issue to the court of appeals, we will not consider it.

Before we turn to the merits of the issues before us, however, there are two significant procedural matters that we must resolve. The first is whether the Family Code prohibits us from releasing our opinions to the public in these types of matters. The second is what standard of appellate review applies in cases arising under sections 33.003 and 33.004 of the Family Code.

## II

 **[1]**  Family Code sections 33.003 and 33.004 contain many provisions designed to ensure the minor's anonymity and the confidentiality of the judicial bypass proceeding. **\*252** Among these are provisions that, in effect, direct the trial court and the court of appeals not to publicly disseminate their rulings. *See* TEX. FAM.CODE §§ 33.003(k),(*l* ); 33.004(c).

Family Code section 33.003 directs that a minor's application to the trial court, all other documents pertaining to the proceedings, and the trial court's ruling are confidential and privileged. *See* TEX. FAM.CODE §§ 33.003(k), (*l* ). The statute is explicit about those who may receive notice of the trial court's ruling:

> (*l* ) An order of the court issued under this section is confidential and privileged and is not subject to disclosure under Chapter 552, Government Code, or discovery, subpoena, or other legal process. The order may not be released to any person but the pregnant minor, the pregnant minor's guardian ad litem, the pregnant minor's attorney, another person designated to receive the order by the minor, or a governmental agency or attorney in a criminal or administrative action seeking to assert or protect the interest of the minor.

TEX. FAM.CODE § 33.003(*l* ).

Similarly, Family Code section 33.004(c) prohibits the court of appeals from publishing its ruling:

> (c) A ruling of the court of appeals issued under this section is confidential and privileged and is not subject to disclosure under Chapter 552, Government Code, or discovery, subpoena, or other legal process. The ruling may not be released to any person but the pregnant minor, the pregnant minor's guardian ad litem, the pregnant minor's attorney, another person designated to receive the ruling

> by the minor, or a governmental agency or attorney in a criminal or administrative action seeking to assert or protect the interest of the minor.

TEX. FAM.CODE § 33.004(c).

The Code's judicial bypass provisions concerning appeals in this Court do not, however, contain directives regarding dissemination of opinions or rulings. The Family Code requires only that a "confidential appeal" shall be available to any pregnant minor to whom a court of appeals denies consent:

> (f) An expedited confidential appeal shall be available to any pregnant minor to whom a court of appeals denies an order authorizing the minor to consent to the performance of an abortion without notification to either of her parents or a managing conservator or guardian.

TEX. FAM.CODE § 33.004(f). The requirement of a "confidential appeal" is not an impediment to publishing our opinions. We can do so without disclosing the identity of the minor, the court of appeals, or the trial court.

As the head of the third branch of government with regard to civil matters, this Court has an obligation to provide guidance to lower courts through its published opinions. There would be no means of insuring consistency, uniformity, and predictability of the law if the court of last resort could not commit its analyses, reasoning, and decisions to writing in opinions and disseminate those opinions to the public. Without some explication from this Court of the meaning of "mature and sufficiently well informed," different courts around the state at both the trial and appellate level would surely arrive at very different constructions of what the statute requires. This result would undermine the rule of law that undergirds our whole system of justice.

By publicly announcing our construction of this statute, the Legislature and the public will know the meaning that we have ascribed to it, and can order their behavior accordingly. In particular, the people, through their elected representatives, will have full opportunity to change the law, if they so desire, in light of the way the judiciary is interpreting and applying it.

We note that we are not called upon to express an opinion about the constitutionality of the provisions of the Family Code **\*253** that prohibit the lower courts from making their rulings publicly available. Those questions must be decided another day.

### III

The second important procedural issue involves the standard of review that appellate courts are to apply in reviewing trial court rulings. Because section 33.004 is silent on this issue, we look to the standards of review we apply to other trial court decisions.

**[2]** First, we must determine whether the "mature and sufficiently well informed" requirement is a question of fact or of law. Section 33.003 provides that the trial judge should determine these questions by "a preponderance of the evidence." TEX. FAM.CODE § 33.003(i). This requirement implies that the trial judge is to weigh the evidence and determine the credibility of the minor or any other witnesses. These are typical fact-finding functions, performed by a trial court only after hearing the minor's live testimony and viewing her demeanor.

**[3]** Next, we determine whether the trial court's factual findings on these issues are subject to an abuse of discretion review standard or a legal and factual sufficiency review standard. The abuse of discretion standard applies when a trial court has discretion either to grant or deny relief based on its factual determinations. *See Bocquet v. Herring,* 972 S.W.2d 19, 20–21 (Tex.1998). This standard is especially appropriate when the trial court must weigh competing policy considerations and balance interests in determining whether to grant relief. *See General Tire, Inc. v. Kepple,* 970 S.W.2d 520, 526 (Tex.1998). Thus, the abuse of discretion standard is typically applied to procedural or other trial management determinations. *See, e.g., National Med. Enters., Inc. v. Godbey,* 924 S.W.2d 123, 128 (Tex.1996)(attorney disqualification); *City of Brownsville v. Alvarado,* 897 S.W.2d 750, 753–54 (Tex.1995)(admission of evidence); *Chrysler Corp. v. Blackmon,* 841 S.W.2d 844, 852 (Tex.1992)(discovery sanctions).

By contrast, in this case the trial court has no discretion over the order. The statute provides that if the court finds that the minor is "mature and sufficiently well informed," it "*shall* enter an order authorizing the minor

to consent to the performance of the abortion without notification to either of her parents...." TEX. FAM.CODE § 33.004(i)(emphasis added). Furthermore, in determining whether a minor is "mature and sufficiently well informed," the trial court is not to weigh policy considerations; it simply makes a factual determination. When the trial court acts primarily as a factfinder, appellate courts normally review its determinations under the legal and factual sufficiency standards. *See Bocquet,* 972 S.W.2d at 21; *Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex.1994). We therefore apply that standard of review to this appeal. [1]

Unlike the courts of appeals, our Court may only engage in legal sufficiency review. *See* TEX. CONST. art. V, § 6. In reviewing legal sufficiency, however, we may set forth factors and principles for lower courts to follow in determining and reviewing whether a minor is "mature and sufficiently well informed" to make this decision without parental notification. *See Bocquet,* 972 S.W.2d at 21 (reasonableness and necessity of attorney's fees); *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 30–31 (Tex.1994)(gross negligence).

### \*254 IV

We turn next to the standard of proof the Legislature intended to require in the parental notification statute. The Texas parental notification statute was enacted against a backdrop of over two decades of decisions from the United States Supreme Court. One of the seminal opinions regarding minors and abortion is *Bellotti v. Baird,* 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) (*Bellotti II* ). In *Bellotti* a state had enacted a statute that required parental consent before a physician could perform an abortion on a minor, with certain limited exceptions. A plurality of the Court reiterated in *Bellotti II* what a majority of the Court had previously held in *Planned Parenthood of Central Missouri v. Danforth,* 428 U.S. 52, 74, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976): " '[T]he State may not impose a blanket provision ... requiring the consent of a parent ... as a condition for abortion of an unmarried minor,' " and that it would be "inappropriate 'to give a third party an absolute, and possibly arbitrary, veto over the decision of the physician and his patient to terminate the patient's pregnancy, regardless of the reason for withholding the consent.' " *Bellotti II,* 443 U.S. at 643, 99 S.Ct. 3035 (plurality opinion) (quoting *Danforth,* 428 U.S. at 74, 96 S.Ct. 2831). The *Bellotti II* plurality further concluded that parental consent statutes would not pass constitutional muster unless

the state provided an alternative procedure in which a minor could receive authorization for an abortion. *Id.* (plurality opinion).

Thus, the plurality concluded that a minor must be permitted an opportunity to show "either: (1) that she is mature enough and well enough informed to make her abortion decision, in consultation with her physician, independently of her parents' wishes; or (2) that even if she is not able to make this decision independently, the desired abortion would be in her best interests." *Id.* at 643–44, 99 S.Ct. 3035 (plurality opinion). With regard to the determination of maturity, "the peculiar nature of the abortion decision requires the opportunity for case-by-case evaluations of the maturity of pregnant minors." *Id.* at 643 n. 23, 99 S.Ct. 3035 (plurality opinion). The *Bellotti II* plurality also concluded that a parental bypass proceeding must maintain the anonymity of the minor and must be completed with "sufficient expedition to provide an effective opportunity for an abortion to be obtained." *Id.* at 644, 99 S.Ct. 3035 (plurality opinion). A majority of the United States Supreme Court has subsequently approved the *Bellotti II* parental bypass requirements. *See City of Akron v. Akron Center for Reproductive Health, Inc.,* 462 U.S. 416, 439–442, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983) (*Akron I* ) (holding parental consent statute unconstitutional in light of *Bellotti II* ); *Ohio v. Akron Center for Reproductive Health,* 497 U.S. 502, 511–13, 110 S.Ct. 2972, 111 L.Ed.2d 405 (1990) (*Akron II* ) (declining to decide whether parental bypass was constitutionally required in a notification rather than a consent statute, but applying *Bellotti II* requirements). Our Legislature was obviously aware of this jurisprudence when it drafted the statute before us.

## V

Against this backdrop our Legislature, like the legislatures of a number of other states, has chosen to require only parental *notification,* not parental *consent.* And like the other states that require only parental notification, our Legislature did not specify the particular information a minor must have before she can be considered "sufficiently well informed" to make the decision independently. [2]

**\*255** **[4]** The parental notification statute forbids a physician from performing an abortion on a pregnant, unemancipated minor without giving notice to the minor's parents at least 48 hours before the procedure. *See* TEX. FAM.CODE § 33.002(a). But the act allows a pregnant minor

who wants to have an abortion without notifying one of her parents to "file an application for a court order authorizing the minor to consent to the performance of an abortion without notification to either of her parents...." TEX. FAM.CODE § 33.003(a). When a minor files such an application, the court "shall determine by a preponderance of the evidence" whether:

1. The minor is "mature and sufficiently well informed to make the decision to have an abortion performed without notification to either of her parents;" or

2. Notification would not be in the best interest of the minor; or

3. Notification may lead to physical, sexual, or emotional abuse of the minor.

TEX. FAM.CODE § 33.003(i). If the court makes any of these determinations, the court "*shall* enter an order authorizing the minor to consent to the performance of the abortion without notification to either of her parents...." *Id.* Because the Legislature used the imperative word "shall," we conclude that when a minor meets the statutory threshold, the trial court must grant the application. *See* TEX. GOV'T CODE § 311.016(2).

**[5]** Our focus in construing this statute is to determine the Legislature's intent; this we discern primarily from the plain meaning of the words chosen. *See, e.g., Surgitek, Bristol–Myers Corp. v. Abel,* 997 S.W.2d 598, 602 (Tex.1999); *Fitzgerald v. Advanced Spine Fixation Sys., Inc.,* 996 S.W.2d 864, 865 (Tex.1999); *Liberty Mutual Ins. Co. v. Garrison Contractors, Inc.,* 966 S.W.2d 482, 484 (Tex.1998). In section 33.003(i), the Legislature has succinctly stated that the minor must be "mature and sufficiently well informed to make the decision to have an abortion performed without notification to either of her parents...." TEX. FAM.CODE § 33.003(i). The brevity of the requirement does not, however, mean that it is insubstantial. The Legislature undoubtedly intended the bypass procedure to be a meaningful one. In requiring that a minor demonstrate that she is mature and sufficiently well informed, the Legislature took into account the gravity and potential consequences of the irreversible decision to terminate a pregnancy, and sought to assure that the minor's decision was thoughtful and informed.

**[6]** Thus, we conclude that a minor is "mature and sufficiently well informed to make the decision to have an abortion without notification to either of her parents"

when the evidence demonstrates that the minor is capable of reasoned decision-making and that her decision is not the product of impulse, but is based upon careful consideration of the various options available to her and the benefits, risks, and consequences of those options. *See In re Anonymous,* 711 So.2d 475, 477 (Ala.Civ.App.1998); *In re Petition of Anonymous 1,* 251 Neb. 424, 558 N.W.2d 784, 788 (1997); *In re Petition of Anonymous 2,* 253 Neb. 485, 570 N.W.2d 836, 838–39 (1997); *In re Jane Doe,* 126 N.C.App. 401, 485 S.E.2d 354, 356 (1997). The decisions of a number of other state courts construing similar statutes, which were available to the Legislature at the time they enacted section 33.003(i), inform our interpretation. *See Ex Parte Anonymous,* 618 So.2d 722, 725 (Ala.1993); *In re Petition of Jane Doe for Waiver of Notice,* 19 Kan.App.2d 204, 866 P.2d 1069, 1074– 75 (1994); **\*256** *In re Mary Moe,* 18 Mass.App.Ct. 727, 469 N.E.2d 1312, 1315 (1984); *Cf. In re Anonymous,* 674 So.2d 1317, 1318 (Ala.Civ.App.1995)*; In re Anonymous,* 655 So.2d 1052, 1054 (Ala.Civ.App.1995).

Obviously, whether a minor is mature and sufficiently well informed is a highly individualized decision that must take into account the diverse background and circumstances of each applicant for waiver of parental notification. An examination of decisions from other states' courts reveals consistent themes. All of the decisions wrestle with "mature" and "informed," two concepts that overlap to some extent, but which are also distinct. States make a distinction between the information, and the minor's ability to understand that information and deal with it responsibly.

The states that have written on this issue, including Alabama, Kansas, Massachusetts, Nebraska, North Carolina, and Ohio require that the minor has been informed as to the alternatives to abortion, to the nature of the abortion procedure and its risks, and the physical, emotional, and social consequences of either abortion or bringing the pregnancy to term. The Alabama Court of Civil Appeals has suggested that the information about the risks and options should be targeted to an individual's specific circumstances. *See In re Anonymous,* 650 So.2d 923, 925 (Ala.Civ.App.1994). But the courts are also careful to ensure that the minor understands that information, and has assimilated it in a mature way. To this end, they have inquired into how a minor might respond to certain contingencies, particularly assessing whether the minor will seek counseling in the event of physical or emotional complications. Many courts have assessed the minor's school performance and activities, as well as the minor's future and present life plans. A few courts have explicitly assessed the minor's character and judgment directly. Most of the decisions have also considered the minor's job experience and experience handling finances, particularly assessing whether the minor is aware of the financial obligations inherent in raising a child. Almost all courts conduct the maturity inquiry, either explicitly or implicitly, against the background circumstances of the minor's experience. These include the minor's relationship with her parents, whether she has social and emotional support, particularly from the male who would be a father, and other relevant life experiences.

## VI

**[7]** **[8]** We conclude that a trial court should take into account the totality of circumstances the minor presents in determining whether she is mature and sufficiently well informed. In order to establish that she is sufficiently well informed, the minor must make, at a minimum, three showings.

First, she must show that she has obtained information from a health-care provider about the health risks associated with an abortion and that she understands those risks. That would include an understanding of the risks associated with the particular stage of the minor's pregnancy.

Second, she must show that she understands the alternatives to abortion and their implications. As with any medical procedure, part of making an informed decision is knowing the available alternatives. A minor should be able to demonstrate that she has given thoughtful consideration to her alternatives, including adoption and keeping the child. She should also understand that the law requires the father to assist in the financial support of the child. *See* TEX. FAM.CODE § 154.001; *see also* TEX. CONST. art. XVI, § 28 (garnishment of wages for court-ordered child support payments). She should not be required to justify why she prefers abortion above other options, only that she is fully apprised of her options.

Third, she must show that she is also aware of the emotional and psychological aspects of undergoing an abortion, which can be significant if not severe for some women. She must also show that she has **\*257** considered how this decision might affect her family relations. Although the minor need not obtain this information from licensed, professional counselors, she must show that she has received information

about these risks from reliable and informed sources, so that she is aware of and has considered these aspects of the abortion procedure.

 **[9]**   While a minor must demonstrate a knowledge and appreciation of the various considerations involved in her decision, she should not be required to obtain information or other services from any particular provider. Nor should she be required to meet with or review materials that advocacy or religious groups provide. The inquiry is whether she has obtained information on the relevant considerations from reliable sources of her choosing that enable her to make a thoughtful and informed decision.

 **[10]**   **[11]**   A determination of maturity necessarily involves more trial court discretion. However, if a court determines that a minor has not demonstrated that she is mature enough to make a decision to undergo an abortion, then the court should make specific findings concerning its determination so that there can be meaningful review on appeal. Similarly, if a court concludes that a minor is not credible in some respect that directly relates to its determination of maturity, the court should make specific findings in that regard as well.

 **[12]**   A minor who can show that she is sufficiently well informed may also establish in the process that she is mature. In making a determination of maturity, there are, however, some criteria that should not be relied upon as conclusively showing *immaturity.* The United States Supreme Court has said that one of those is the fact, standing alone, that the pregnant female is a minor. That Court has also admonished that states and courts "may not make a blanket determination that *all* minors ... are too immature to make this decision or that an abortion never may be in the minor's best interests without parental approval." *Akron I,* 462 U.S. at 440, 103 S.Ct. 2481. A child's age, educational background or grades in school, while indicative of some level of maturity, are not conclusive on the issue of maturity. Nor is participation in extra-curricular activities. It should also go without saying that a minor's socio-economic status should not bear on the decision.

## VII

As discussed earlier in this opinion, the standard of review is legal sufficiency. Thus, unless Jane Doe has shown as a matter of law that she is mature and sufficiently well informed, we would ordinarily affirm the judgment of the court of appeals.

After reviewing this record, we conclude that she has not established as a matter of law that she is sufficiently well informed to make the decision to have an abortion performed without notifying her parents. But because this is a matter of first impression, in the interests of justice, we remand to the trial court for further hearing and consideration. [3]

## CONCLUSION

For the reasons we have discussed, we reverse the judgment of the court of appeals and remand this case to the trial court for further hearing and consideration. We have already indicated the time stricture within which further proceedings in the trial court must be concluded. Importantly, the court should schedule its proceedings with the additional consideration that it must maintain the minor's confidentiality. Section 33.003 allows the trial court to give proceedings of this type "precedence over other pending matters to the extent necessary to assure that the **\*258** court reaches a decision promptly." TEX. FAM.CODE § 33.003(h).

Justice ENOCH filed a concurring opinion, in which Justice BAKER, Justice HANKINSON, and Justice O'NEILL join.

Justice OWEN filed a concurring opinion, in which Chief Justice PHILLIPS joined as to Parts I and III.

Justice HECHT filed a dissenting opinion, in which Justice ABBOTT joins.

Justice ENOCH, joined by Justice BAKER, Justice HANKINSON, and Justice O'NEILL, concurring.

I join parts I, II, IV, V, and VI of the Court's opinion, and I join the Court's judgment remanding this appeal in the interests of justice. I disagree with parts III and VII for two reasons. One, I believe the standard of review on appeal in a proceeding under the parental notification act should be abuse of discretion, not factual or legal sufficiency. And two, I emphasize that in a proceeding under the parental notification act, our disposition today, remand, is inappropriate except in extraordinary circumstances. Because today we are construing the parental notification act for the first time, and because I agree it is in the interests of justice to give Jane Doe an opportunity to meet the statutory standard as the Court has construed it, I conclude this case presents exceptional circumstances warranting a remand.

I join the Court's construction of the statutory phrase "mature and sufficiently well-informed to make the decision to have an abortion performed without notification to either of her parents." [1] But I do not agree that the standard of review for appellate review of a trial court's decision that a minor is not mature or sufficiently well informed is factual and legal sufficiency. Because of the nature of the unusual proceedings contemplated under sections 33.003 and 33.004 of the Family Code, I would conclude that the appropriate standard of review is abuse of discretion.

Unlike virtually any other judicial proceeding I am aware of, this proceeding is not only "non-adversarial," but notice to the very persons (besides the minor) likely to have the most interest in the outcome of the hearing—the parents who stand not to be notified of their minor child's decision—is prohibited. And the secrecy of the proceeding assures that the hearing will be entirely one-sided.

Because of the nature of this proceeding, then, all the evidence in the record will be undisputed. But the standard the Legislature chose for trial courts to apply in determining whether a minor is "mature and sufficiently well informed"— preponderance of the evidence—is typically associated with weighing conflicting evidence after an adversarial proceeding. Thus, we have an anomalous situation—the Legislature directs that the minor must demonstrate by a preponderance of the evidence (which generally means more likely than not) that she is mature and sufficiently well-informed, yet because the minor is the only party presenting evidence on these elements, there is no other evidence against which to weigh it to see if it is more likely than not.

A preponderance standard for trial court hearings cannot establish the standard of review on appeal, precisely because of the unique, unopposed nature of the proceedings. Since the hearing in the trial court is not adversarial and no weighing of disputed evidence can occur, there is no basis for appellate courts to defer to the trial courts' fact-finding function, as we would in any other ordinary appeal. In other words, unless the evidence in the record raises a question about the minor's credibility, the trial court is not free to simply disregard the undisputed facts provided by the minor. Whether those undisputed facts demonstrate that the minor is "mature and sufficiently well informed to make **\*259** the decision to have an abortion" is a legal question. And as we have said before, trial courts have no discretion in determining what the law is or in applying the law to the facts. [2]

Thus, in these unique, non-adversarial, parental notification proceedings, I would hold that Texas appellate courts must review a trial court's decision under an abuse of discretion standard. That is, did the trial court correctly apply the law to the undisputed facts in the record?

Moreover, again because of the unusual nature of the proceedings, I believe this Court should review the trial court's decision, rather than the court of appeals' ruling, for abuse of discretion because a case under the parental notification statute reaches us only when the court of appeals has affirmed the trial court's denial of a minor's application for waiver of parental notice. Thus, the focus in this Court should remain on whether the trial court misapplied the law to the undisputed facts. [3]

An abuse of discretion standard would not diminish the trial court's role under the statute. It remains the trial court's role to determine the witness's credibility, as the trial court hears the minor's testimony in person and is in the best position to assess the minor's credibility. But the trial court's discretion to make credibility determinations should not be unfettered. The trial court cannot simply disregard the minor's uncontested testimony. To decide otherwise—that a trial court is free to disregard the undisputed evidence despite no question of veracity—would put the trial court's legal decision beyond review. Consequently, whether the trial court can disregard the undisputed evidence should depend on whether the record before the court raises a significant, legitimate question about the minor's veracity.

As mentioned, the parental notification statute prohibits not only general notice of the proceeding, but specific notice to the very people who likely would have the greatest interest in the minor's application—her parents. [4] It appears to me, therefore, that the Legislature intended for these proceedings to be unopposed in all circumstances. That means that the Legislature did not intend for the trial courts to assume the role of an opposing party and reject the undisputed evidence in the absence of a reasonable, factual basis to question the minor's credibility. Under similar circumstances, other courts have also concluded that the trial court may not simply choose to discredit the evidence offered by the minor unless it is "improbable or unreasonable or is shown to be untrustworthy." [5] In the case before us, for example, if the record revealed that, despite her testimony that she had conducted Internet research, Doe did not have access to a computer, the record itself would raise a significant,

legitimate question about her veracity. (Of course, no such questions appear in this record.)

Furthermore, I note that throughout the Family Code a trial court makes decisions bearing on the best interests of a child. And appellate courts review those decisions under an abuse of discretion standard. [6] This fact strengthens my conviction that an abuse of discretion standard should apply here. In this case, the best interests of the child is the subject of two of the three inquiries that the statute sets forth. The same level of review should apply to the trial court's decisions regardless of the provision under review. But the Court would apply a different level of review to the trial court's decision relating **\*260** to maturity and adequacy of information. This cannot but lead to confusion and inconsistency.

Nonetheless, having concluded that the standard of review should be abuse of discretion, I cannot say that the trial court in this case demonstrably acted "without regard to guiding legal principles." [7] The primary reason for this is that we have not before had the opportunity to provide guiding legal principles. That this trial court may not have properly comprehended what the Legislature meant by the phrase "mature and sufficiently well informed" does not equate to an abuse of discretion in this instance, where no published appellate decision existed to guide the trial court. Thus, this case presents just such an exceptional circumstance and a remand in the interest of justice is warranted. [8]

But now that this Court has announced the guiding legal principles, trial courts are not free to disregard those principles and substitute their own for determining whether a minor demonstrates that she is mature and sufficiently well informed to make this most difficult of decisions. And while the possibility exists that other exceptional circumstances in some future situation might also warrant a remand, I emphasize that such a result is contemplated neither by the statute [9] nor by our rules. [10] The time-sensitive nature of the proceedings and the constitutional implications of the specter of protracted hearings and appeals counsel very strongly against remand as an appellate disposition. And our rules expressly preclude a court of appeals from remanding. [11]

But here, where the minor has presented a record that demonstrates a high level of maturity, and where neither the minor nor the trial court had the benefit of guidance from this (or any other appellate decision) on the meaning of the phrase "mature and sufficiently well informed," I believe that it is in the best interest of justice to allow the minor the opportunity to meet the test the Court elaborates today for waiver under the act of notification to her parents to consent to the procedure. Thus, I join the Court's judgment.

Justice OWEN, joined by Chief Justice PHILLIPS as to Parts I and III, concurring.

I join in the Court's judgment reversing the court of appeals and remanding this matter to the trial court for further proceedings, but I cannot join the opinion of the Court in parts IV–VII. The Court refuses to give full effect to the statutory mandate that before a minor can obtain authorization to proceed with an abortion without notifying one of her parents, she must be "mature and sufficiently well informed to make the decision." TEX. FAM.CODE § 33.003(i). The Court's interpretation of "sufficiently well informed" falls short of what the Legislature had in mind. Most minors will, with the assistance of counsel, be able to meet the requirements set by the Court, which are minimal. The plain language of the Family Code and its historical backdrop require a more substantive showing.

# I

The history of how and why the bypass procedure in section 33.003 of the Family Code came to be sheds light on how it should be construed. Over twenty years ago, the United States Supreme Court **\*261** handed down two landmark decisions dealing with minors and abortion. *See Planned Parenthood of Central Mo. v. Danforth,* 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976); *Bellotti v. Baird,* 428 U.S. 132, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976) (*Bellotti I* ) (issued the same day as *Danforth* ). In *Danforth,* the Supreme Court held for the first time that a parent does not have an absolute "veto" over the decision of a minor to terminate her pregnancy:

> [T]he State may not impose a blanket provision ... requiring the consent of a parent ... as a condition for abortion of an unmarried minor.... [T]he State does not have the constitutional authority to give a third party an absolute, and possibly arbitrary, veto over the decision of the physician and his patient to terminate the patient's pregnancy, regardless of the reason for withholding consent.

*Danforth,* 428 U.S. at 74, 96 S.Ct. 2831. The Court further concluded that "[a]ny independent interest the parent may have in the termination of the minor daughter's pregnancy is no more weighty than the right of privacy of the competent minor mature enough to have become pregnant." *Id.* at 75, 96 S.Ct. 2831.

In so holding, the Supreme Court said that it did not mean to suggest that "every minor, regardless of age or maturity, may give effective consent for termination of her pregnancy." *Id.* at 75, 96 S.Ct. 2831. Consistent with that statement, the Court registered its concern that there are "unquestionably greater risks of inability to give an informed consent" for a minor. *See Bellotti I,* 428 U.S. at 147, 96 S.Ct. 2857. The Court suggested that a statute requiring parental consent before a minor could obtain an abortion might be constitutional if there were also a provision that allowed the minor to go to court to obtain consent. *Id.*

In *Bellotti II,* a plurality of the Supreme Court adopted what the Court had previously suggested in *Bellotti I* by holding that parental consent statutes would not pass constitutional muster unless the State provided an alternative procedure in which a minor could receive authorization for an abortion. *See Bellotti v. Baird,* 443 U.S. 622, 646–47, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) (plurality opinion) (*Bellotti II* ). The *Bellotti II* plurality concluded that a minor must be permitted an opportunity to show "either: (1) that she is mature enough and well enough informed to make her abortion decision, in consultation with her physician, independently of her parents' wishes; or (2) that even if she is not able to make this decision independently, the desired abortion would be in her best interests." *Id.* at 643–44, 99 S.Ct. 3035. With regard to the determination of maturity, *Bellotti II* stated that "the peculiar nature of the abortion decision requires the opportunity for case-by-case evaluations of the maturity of pregnant minors." *Id.* at 643 n. 23, 99 S.Ct. 3035. The *Bellotti II* plurality also concluded that a parental bypass proceeding must maintain the anonymity of the minor and must be completed with "sufficient expedition to provide an effective opportunity for an abortion to be obtained." *Id.* at 644, 99 S.Ct. 3035.

A majority of the United States Supreme Court has subsequently approved the *Bellotti II* parental bypass requirements. *See City of Akron v. Akron Ctr. for Reprod. Health, Inc.,* 462 U.S. 416, 439–42, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983) (*Akron I* ) (holding parental consent statute unconstitutional in light of *Bellotti II* ); *Ohio v. Akron Ctr. for Reprod. Health,* 497 U.S. 502, 510–13, 110 S.Ct.

2972, 111 L.Ed.2d 405 (1990) (*Akron II* ) (declining to decide whether parental bypass was constitutionally required in a notification rather than a consent statute, but applying *Bellotti II* requirements).

A question specifically left open in United States Supreme Court decisions is whether the parental bypass procedure set forth above is constitutionally mandated when a statute requires only that a parent be notified that the minor is about to undergo an abortion as opposed to a statute **\*262** that requires parental consent. *See, e.g., Lambert v. Wicklund,* 520 U.S. 292, 295, 117 S.Ct. 1169, 137 L.Ed.2d 464 (1997) (per curiam); *Akron II,* 497 U.S. at 510, 110 S.Ct. 2972. Nevertheless, there is reasoning in *Bellotti II* that would suggest that the United States Supreme Court might hold that bypass procedures are necessary in notification statutes. The statute under consideration in *Bellotti II* required that a parent be notified when a minor brought judicial proceedings to obtain consent. *See* 443 U.S. at 646, 99 S.Ct. 3035. The Supreme Court struck down this provision, observing " 'there are parents who would obstruct, and perhaps altogether prevent, the minor's right to go to court.' " *Id.* at 647, 99 S.Ct. 3035 (quoting the district court). The Court continued, stating that every minor must have the opportunity to go to court without first notifying a parent:

> [M]any parents hold strong views on the subject of abortion, and young pregnant minors, especially those living at home, are particularly vulnerable to their parents' efforts to obstruct both an abortion and their access to court. It would be unrealistic, therefore, to assume that the mere existence of a legal right to seek relief in superior court provides an effective avenue of relief for some of those who need it the most.

\* \* \*

> *[E]very minor must have the opportunity—if she so desires —to go directly to a court without first consulting or notifying her parents.* If she satisfies the court that she is mature and well enough informed to make intelligently the abortion decision on her own, the court must authorize her to act without parental consultation or consent.
> *Id.* (plurality opinion) (emphasis added).

Undoubtedly cognizant of these holdings and admonitions of the United States Supreme Court, the Texas Legislature enacted amendments to the Family Code that require parental notification before a minor may obtain an abortion, but

the Legislature also included a bypass provision. *See* TEX. FAM.CODE §§ 33.002, 33.003. The bypass procedures substantially track those set forth in *Bellotti II. See id.* § 33.003. A minor may apply to a court for an order authorizing her to consent to an abortion without notification of a parent or guardian. *See id.* The trial court may not authorize a minor to consent to an abortion unless it determines by a preponderance of the evidence

> whether the minor is mature and sufficiently well informed to make the decision to have an abortion performed without notification to either of her parents or a managing conservator or guardian, whether notification would not be in the best interest of the minor, or whether notification may lead to physical, sexual, or emotional abuse of the minor.

*Id.* § 33.003(i).

## II

The bypass procedure in section 33.003 does not mean, however, that the Legislature intended for a minor to proceed with an abortion based on a minimal showing. The Legislature has required that the minor be mature and sufficiently well informed to make the decision. In determining what the Legislature meant by those terms, it again must be borne in mind that decisions of the United States Supreme Court have dominated abortion law. There is a substantial body of law from that Court regarding what a state may and may not require to demonstrate a woman's informed consent to an abortion. That law should guide interpretation of section 33.003.

Given the context in which section 33.003 of the Family Code was enacted, I can only conclude that the Legislature intended to require minors to be informed about the decision to have an abortion to the full extent that the law, as interpreted by the United States Supreme Court, will allow. Accordingly, I turn to what the United States Supreme Court has said regarding **\*263** informed consent and what states may require.

## III

The United States Supreme Court has made it clear that when a woman is making a decision about abortion, particularly when she is a minor, a state can require consideration of factors in addition to the physical risks of the procedure. Those include recognition that there are profound philosophic arguments surrounding abortion, consideration of the impact that the procedure will have on the fetus, an understanding that there may be an emotional and psychological impact following an abortion and later in life, and consideration of how the decision to obtain an abortion may impact present and future familial relationships.

With regard to the philosophic aspects of the abortion decision, a majority of the Court observed in *Akron II* that:

> A free and enlightened society may decide that each of its members should attain a clearer, more tolerant understanding of the profound philosophic choices confronted by a woman who is considering whether to seek an abortion. Her decision will embrace her own destiny and personal dignity, and the origins of the other human life that lie within the embryo.

*Akron II,* 497 U.S. at 520, 110 S.Ct. 2972.

Other members of the Supreme Court again acknowledged the philosophic and social aspects of the abortion decision in *Planned Parenthood v. Casey,* 505 U.S. 833, 872, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (plurality opinion). They further acknowledged that when an adult woman is considering whether to have an abortion, a state may take steps to ensure that the decision is thoughtful and informed:

> Though the woman has a right to choose to terminate or continue her pregnancy before viability, it does not at all follow that the State is prohibited from taking steps to ensure that this choice is thoughtful and informed. Even in the earliest stages of pregnancy, *the State may enact rules and regulations designed to encourage her to know that there are philosophic and social arguments of great weight that can be brought to bear in favor of continuing the pregnancy to full term* and that there are procedures and institutions to allow adoption of unwanted children as well as a certain degree of state assistance if the mother chooses to raise the child herself. " '[T]he Constitution does not forbid a State or city, pursuant to democratic processes, from expressing a preference for normal childbirth.' " It

follows that *States are free to enact laws to provide a reasonable framework for a woman to make a decision that has such profound and lasting meaning.* This, too, we find consistent with *Roe* 's central premises, and indeed the inevitable consequence of our holding that the State has an interest in protecting the life of the unborn.

*Id.* at 872–73, 112 S.Ct. 2791 (citation omitted) (emphasis added).

In *Casey,* the Chief Justice, joined by three other Justices, agreed with the plurality that the informed consent provisions at issue did not unduly burden the abortion decision. *See id.* at 969, 112 S.Ct. 2791 (Rehnquist, C.J., concurring in the judgment in part and dissenting in part). In the Chief Justice's separate opinion, the concurring Justices observed that a state "has an interest in preserving unborn life," and that it may take steps to ensure "that a woman's decision to abort is a well-considered one, and reasonably furthers the State's legitimate interest in maternal health and in the unborn life of the fetus." *Id.* The Chief Justice's opinion further concluded that a 24–hour waiting period designed to give a woman time to reflect on her decision " 'is surely a small cost to impose to ensure that the woman's decision is well considered in light of its certain and irreparable consequences on fetal life, and the possible effects on her own.' " **\*264** *Id.* at 969–70, 112 S.Ct. 2791 (quoting *Akron I,* 462 U.S. at 474, 103 S.Ct. 2481 (O'Connor, J., dissenting)).

Initially, the Supreme Court had struck down as unconstitutional statutes that were fairly specific in their requirements for informed consent to an abortion. *See Thornburgh v. American College of Obstetricians and Gynecologists,* 476 U.S. 747, 759–65, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986); *Akron I,* 462 U.S. at 442–45, 103 S.Ct. 2481. However, in *Casey,* a majority of the Justices overruled *Thornburgh* and *Akron I,* at least in part. *See Casey,* 505 U.S. at 881–87, 112 S.Ct. 2791 (plurality opinion); *id.* at 966–69, 112 S.Ct. 2791 (Rehnquist, C.J., concurring in the judgment in part and dissenting in part). Although the constitutional limits on what a state may require for informed consent are not entirely clear after the Supreme Court's decision in *Casey,* it is clear that a state may require a "thoughtful and informed" decision that encourages a woman to consider that there are "philosophic and social arguments of great weight that can be brought to bear." *Casey,* 505 U.S. at 872, 112 S.Ct. 2791 (plurality opinion); *see also Akron II,* 497 U.S. at 520, 110 S.Ct. 2972. With regard to the emotional and psychological consequences of an abortion for a minor, a majority of the Supreme Court in *Akron II* said: " 'The medical, emotional,

and psychological consequences of an abortion are serious and can be lasting; this is particularly so when the patient is immature.' " *Akron II,* 497 U.S. at 519, 110 S.Ct. 2972 (quoting *H.L. v. Matheson,* 450 U.S. 398, 411, 101 S.Ct. 1164, 67 L.Ed.2d 388 (1981)).

**IV**

Today, this Court refuses to acknowledge the foregoing body of law or the likelihood that our Legislature relied on it when it said that a minor must be "sufficiently well informed to make the decision to have an abortion." The Court chooses to ignore that the Legislature intended section 33.003 to encompass factors other than physical risk to the pregnant minor and alternatives to abortion. The Legislature did not intend for the "mature and sufficiently well informed requirement" of section 33.003 to have as limited a focus as the Court ascribes to it. I would hold that a minor must demonstrate more.

The Court properly requires a minor to consult a health-care provider about the general risks of an abortion. But that is insufficient. There may be risks that are heightened for or unique to an individual. A minor cannot make a sufficiently well-informed decision about an abortion if she does not know the risks to *her* of that procedure. In this regard, the Family Code expressly allows a pregnant, unmarried minor to consent to medical treatment by a physician, short of an abortion itself. *See* TEX. FAM.CODE § 32.003(a)(4).

The Court recognizes that just as there are physical risks associated with an abortion, there are emotional and psychological consequences, which can be significant for some women. But the Court's treatment of this aspect of the abortion decision—one of *the* most important considerations —is superficial. I would require a minor to demonstrate that she has sought and obtained meaningful counseling from a qualified source about the emotional and psychological impact she may experience now and later in her life as a result of having an abortion. She should be able to demonstrate to a court that she understands that some women have experienced severe remorse and regret. She should also indicate to the court that she is aware of and has considered that there are philosophic, social, moral, and religious arguments that can be brought to bear when considering abortion. *See generally Casey,* 505 U.S. at 872, 112 S.Ct. 2791 (plurality opinion). A court cannot, of course, require a minor to adopt or adhere to any particular philosophy or to profess any religious beliefs. But requiring a minor to exhibit an awareness that there

are issues, including religious ones, surrounding the abortion decision is not prohibited by the **\*265** Establishment Clause. *Cf. Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) (holding that a statute must have a secular legislative purpose, that its principal or primary effect must be one that neither advances nor inhibits religion, and that it must not foster an excessive government entanglement with religion). The State's statutorily expressed interest in section 33.003 is to ensure a well-informed decision, which includes a mature understanding of all issues surrounding the decision to have an abortion.

An informed appreciation of the emotional and psychological aspects of terminating a pregnancy includes an understanding of the impact the procedure will have on the fetus. As Justices O'Connor, Kennedy, and Souter observed in *Casey,* failure to obtain a full understanding of this aspect of the procedure can lead to "devastating psychological consequences" afterwards:

> Nor can it be doubted that most women considering a abortion would deem the impact on the fetus relevant, if not dispositive, to the decision. In attempting to ensure that a woman apprehend the full consequences of her decision, the State furthers the legitimate purpose of reducing the risk that a woman may elect an abortion, only to discover later, with devastating psychological consequences, that her decision was not fully informed.

*Casey,* 505 U.S. at 882, 112 S.Ct. 2791.

In this same vein, these Justices explained, "[I]n order for there to be informed consent to a kidney transplant operation the recipient must be supplied with information about risks to the donor as well as risks to himself or herself." *Id.* at 883, 112 S.Ct. 2791. No less should be required for an abortion.

The Court today gives a nod to the fact that a decision to have an abortion may impact relationships with family members. I would require a minor to demonstrate that she has thoughtfully considered the potential impact on her relationships with her parents and other family members if they learn now or sometime in the future that she has had an abortion. She should also exhibit some consideration of how this decision may impact her future relationships, such as those she may have with a husband or future children. A

minor should also have considered the impact that continuing her pregnancy would or might have on these relationships.

While a minor must demonstrate a knowledge and appreciation of the various considerations involved in her decision, I agree with the Court that she should not be required to obtain counseling or other services from a particular provider. The internet should not, however, suffice. Nor should advice from laypersons who are not specifically trained and experienced in counseling pregnant minors suffice. The "State's interest is in ensuring that the woman's consent is informed and unpressured; the critical factor is whether she obtains the necessary information and counseling from a qualified person, not the identity of the person from whom she obtains it." *Akron II,* 497 U.S. at 518, 110 S.Ct. 2972. I note, however, that a majority of the Supreme Court has observed that " '[i]t seems unlikely that [a minor] will obtain adequate counsel and support from the attending physician at an abortion clinic, where abortions for pregnant minors frequently take place.' " *H.L. v. Matheson,* 450 U.S. 398, 410, 101 S.Ct. 1164, 67 L.Ed.2d 388 (1981) (quoting *Planned Parenthood v. Danforth,* 428 U.S. 52, 91, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976) (concurring opinion)). By the same token, it seems unlikely that a minor would obtain all the information necessary for a well-informed decision about proceeding with an abortion, such as medical information, solely from a religious organization or an advocacy group.

### V

I agree with the Court that Jane Doe has not established as a matter of law that **\*266** she is sufficiently well informed to make the decision to have an abortion performed without notification of one of her parents. With regard to the emotional and psychological consequences of an abortion, Jane Doe testified that she understood that there "is some emotional factor that can distress you and there is a slight risk of infection, not much." When asked if she anticipated seeking additional counseling if she were authorized by the Court to consent to an abortion, she said, "I haven't thought about it, but I think I do not need further counseling. I feel that my decision, and [sic] once it is followed through, would be fine. I am aware of it." She also testified that she had talked with an adult relative who had an abortion as a minor. That relative told Jane Doe that she has not regretted her decision. Jane Doe had also talked to two of her friends who had become pregnant as minors and were raising their respective children. One was of college age and told Jane Doe that "she

really wishes that she hasn't [sic] had her child." This friend is currently unable to attend college or to support herself and her child, and she intends to move back in with her parents. Jane Doe's other friend is fifteen and has married the father of her child. Jane Doe perceives that they are having "a very hard life," and her friend told her that "they wish they could take it back." Jane Doe also talked to a friend who has had an abortion. That friend told her that her own decision to have an abortion was "a good thing" and that she does not regret it.

The fact that Jane Doe has sought advice from friends and family indicates that she is seeking information as a mature person would do. Minors in Jane Doe's position should not be discouraged from asking for counsel and support from people who know and care about them. But talking to friends and family and obtaining anecdotal information is not equivalent to receiving in-depth counseling and information from sources qualified by training and experience. She expressed no appreciation that many women experience emotional and psychological problems as a consequence of their decision or why that is so.

With regard to alternatives to abortion, Jane Doe exhibited only the most superficial consideration. Finally, she did not demonstrate that she has considered the impact a decision to have an abortion might have on her relationships with her parents or others or her future relationships.

Because Jane Doe's proof was deficient, the trial court did not err in denying her application. I agree with the Court, however, that because no court has ever construed section 33.003, this matter should be remanded in the interest of justice.

Accordingly, I join only in parts I, II, and III of the Court's opinion, and I join the judgment.

Justice HECHT, joined by Justice ABBOTT, dissenting.
The Court today deals a heavy blow to parents' fundamental, constitutional rights to raise their children, rights the Legislature had absolutely every intention of protecting by passing the Parental Notification Act in 1999. [1] Described by one of its sponsors, Senator Florence Shapiro, as a "parental rights bill", the Act was plainly meant to encourage minors to seek their parents' advice and counsel in making what the United States Supreme Court has sympathetically called the "grave and indelible" [2] decision whether to have an abortion. The Act permits a judge to authorize a minor to

make the decision herself if she is "mature and sufficiently well informed". But, explains the Court, all that really means is that a minor must know something of the health risks of the abortion procedure (which is not too hard, *267 since for most women the physical risks are easily assessed), the alternatives to abortion (although she need not explain her choice among them), and, from "reliable and informed sources", [3] whatever that means, the emotional and psychological aspects of having an abortion. To think that a minor should choose abortion based merely on such antiseptic considerations trivializes the decision. As the Court reads the statute, no one need counsel a minor, as her parents should if they were told of her situation, that the family, social, moral, and religious aspects of her decision may radically affect her life, her family, and her future. Of such things—the really important part of the calculus of the abortion decision —a minor can be largely unappreciative and still be, in the Court's view, well informed. She need not have the benefit of differing viewpoints; she may obtain all her information from abortion proponents. "Well informed", for the Court, means only that a minor has thought about what she knows, not that she knows what to think about.

The Court does not base its statutory interpretation of "mature" and "well informed" on the ordinary meanings of those words, or on the purposes the Legislature intended them to achieve, or on the United States Supreme Court cases from which they were undoubtedly drawn, but on its own predilections. Other states' laws cited by the Court vary widely, some specifying the information a woman must be given, others prescribing only a general standard, and none shedding more than a faint light on the proper construction of Texas' statute. The result of today's decision is that it is not much harder now for a minor to obtain an abortion without telling her parents than it was before the Parental Notification Act was passed. Mostly, the Legislature has wasted a lot of time and energy. Before the statute a minor needed a willing clinic; now she just needs a lawyer, whose fees will be paid by the State.

The essential intent of the Parental Notification Act, as I read it, is that if the State is going to cut off a parent's right to advise a minor about her pregnancy, and to authorize the minor to choose abortion without the benefit of parental involvement, then the State must ensure that the minor has had the same kind of assistance in making her decision that a parent should provide. The last thing the State should want to hear is a minor's belated cry: "Why didn't someone tell me?" It is

precisely that kind of assistance that the Legislature intended to ensure but the Court ignores.

Because I believe the Court's construction of the Act conflicts with its language, purposes, and sources, I dissent.

# I

Jane Doe will be eighteen years old in a few months. She is a high school senior with a high-"B" or low-"A" grade average, is involved in some extracurricular activities, and has a part-time job. She has never been married and lives at home with both her parents. She has a boy friend, a recent high school graduate, who is attending college. Doe and her boy friend have been, in her words, "sexually active", and Doe thinks her mother is aware of that fact, although they do not discuss it. Doe is not sure whether her father is aware that she has had sex.

Doe has used birth control pills for years, but about ten weeks ago she discovered she was pregnant. About a month ago she went to a Planned Parenthood office where she received some information about abortion and, in her words, "partial counseling". A week later she applied to the trial court for authorization to have an abortion without notifying her parents.

At the hearing, Doe was asked what kind of information she had obtained and how she had made her decision. Her entire testimony on this subject is as follows:

**\*268** Q And what kind of information did you look at to evaluate your options?

A I got information on abortion and that procedure and what goes on with it and process of adoption and what it would actually be to have the child and I looked them over and I decided the abortion would be the best for me personally.

Q Briefly describe for the Court, I mean briefly, your understanding of what the abortion procedure entails.

A Okay. Well, I know I would have to get up and go to Planned Parenthood early and take a slight sedative, so be less painful, and they would flush it out and suck out, remove it, and I would have to go out—to go back in a month to a checkup, make sure there is no infection, no hemorrhaging, and that's pretty much how they remove it.

Q Did the information that you examined include information about medical risks associated with abortion?

A Well, there is a slim chance of death, a very, very rare. It is a pretty safe procedure, safer than actually having a child. There is some emotional factor that can distress you and there is a slight risk of infection, not much. It is a pretty safe procedure.

Q Did you also attempt to find any information on alternatives to abortion?

A Yes, I looked at other information such as adoption and actually having the child.

Q And what information did you look at, what information did you evaluate in deciding to get an abortion as opposed to pursuing one of those other options?

A Well, I just thought about my options and what would be best for me and actually the child and abortion in the long run I see as being most positive and best one there is.

Q Could you explain to the Court why you made that decision?

A Well, for me I feel if I were to have the child, my parents, they would be slightly upset to actually know that I became pregnant and they are very against abortion. So, first of all, they wouldn't even give me that chance to have an abortion. And I am planning after I graduate this year to go off [from home] to college. And I would like to pursue my own career. And I feel if I had the child I couldn't do any of that now and be a major setback. And I don't favor the adoption. I know it could be done, but if I were to go nine months having this child, I would feel to keep it. But that is—I already decided that would be, would be holding me back from my future, what I want to become. So, I decided abortion would be overall the best solution.

Doe has not consulted a physician. She testified that she had talked with a close relative who had had an abortion when she was 17. Doe's entire account of the conversation was that "she told me how she felt about it and what went on." Doe's guardian told the trial court that Doe's conversations with her relative "were pretty limited in terms of having the real advice". Doe also testified that she had spoken with three friends. One, a high school graduate, had a child and could not go to college but had to move in with her parents. Another, age 15, was, in Doe's words, "trying to go to school and have

her baby, you know," and her parents had forced her to marry. In Doe's words: "[T]hey both have a very hard life right now and they say they wish they could take it back." A third had had an abortion and felt strongly that it was, according to Doe, "a good thing that she had it done so she can look into the future and say she's glad she had this done". Doe did not talk with anyone else about her decision. No one she spoke with expressed any reservations about her having an abortion or about abortion in general.

Doe's guardian asked her to get counseling at a crisis pregnancy center, and she **\*269** made an appointment to do so, but she was unable to locate the office. She testified that she "did further research over the internet, different sites, different places, for how they feel about it, you know, what their procedures were about. So, I looked up on my own." Doe did not give further specifics about her internet research. Doe has not spoken with a member of the clergy. Asked whether she thought she needed any further counseling on the abortion procedure or alternatives to it, she said: "I haven't thought about it, but I do not think I need further counseling. I feel that my decision, and once it is followed through, would be fine. I am aware of it."

Asked why she did not want to involve her parents in her decision, Doe testified as follows:

> Q Could you briefly describe for the Court, you have talked a little bit, but maybe a little bit more information, as to why it is you don't believe you can tell your parents about your decision to have an abortion?
>
> A Okay. Both of my parents are active members at our church.... And they strongly believe that it's not a wise thing to do. It is something they do not believe in. They much rather me have a child. And they wouldn't even give me the opportunity to have this done. They have it set in their mind what would go on. It is something they strongly disapprove of.

* * *

> Q You say that your parents, you seem pretty sure that they would not be in favor of abortion. Have you ... had some general discussion with them about how they would feel if someone in their family got an abortion, or what is your basis for that?

> A Well, when my [relative] had her abortion ... my mom felt very strongly since then that it is something that she doesn't believe in, something that she doesn't want anyone else in the family to have done. She feels that the child would be a part of her and she would not give me that option. She's told me before that is not a thing that she does believe in. She doesn't want her daughter to go through that. It would be wrong. So, she just strongly disagrees with it.

* * *

> Q And can you tell me if there is any reason that you wouldn't want to have your mother there when you wake up [from the sedative after the abortion procedure]?

> A She wouldn't let me do it. I know for a fact she wouldn't. She is very against this and she would be disappointed in me. She wouldn't be there to support me with it. I know she wouldn't go along with it. She wouldn't be there in the first place. She totally detests the fact of people that actually do that.

Having heard this evidence, and after argument by the guardian and by Doe's attorney, the trial court made the following findings:

> 5. The applicant has not shown by a preponderance of the evidence that: Applicant is mature and sufficiently well informed to make the decision to have an abortion without notification to either of her parents, her managing conservator, or guardian.

> 6. The court finds that although applicant shows sign of being mature, she has not demonstrated that she is sufficiently well informed about the medical procedures and the emotional impact of the procedure.

> 7. The applicant has not shown by a preponderance of the evidence that: Notifying either of the applicant's parents, managing conservator or guardian would not be in her best interest.

## II

Texas' Parental Notification Act was enacted in the context of a developing body **\*270** of federal constitutional law that attempts to determine the extent of a woman's right to choose abortion and the kinds of limitations that can be placed on it.

Understanding this context is necessary to construe and apply the Texas statute.

A woman's right to choose abortion that the United States Supreme Court has recognized is not absolute. [4] The Supreme Court explained in *Planned Parenthood v. Casey:*

> At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life....
>
>> These considerations begin our analysis of the woman's interest in terminating her pregnancy but cannot end it, for this reason: though the abortion decision may originate within the zone of conscience and belief, it is more than a philosophic exercise. Abortion is a unique act. It is an act fraught with consequences for others: for the woman who must live with the implications of her decision; for the persons who perform and assist in the procedure; for the spouse, family, and society which must confront the knowledge that these procedures exist, procedures some deem nothing short of an act of violence against innocent human life; and, depending on one's beliefs, for the life or potential life that is aborted. [5]

When the woman is a minor, her right is subject to two important limitations: the State's interest in protecting the welfare of all its citizens and the life of the unborn, [6] and the interest of parents and families in living their lives free from undue state interference. [7] I examine each of these limitations in turn.

### A

The State has a legitimate interest in protecting its citizens' welfare, and it may constitutionally favor normal childbirth and encourage a woman to make that choice. In *Casey,* the Supreme Court explained:

> Though the woman has a right to choose to terminate or continue her pregnancy before viability, it does not at all follow that the State is prohibited from taking steps to ensure that this choice is thoughtful and informed. Even in the earliest stages of pregnancy, the State may enact rules and regulations designed to encourage her to know that there are philosophic and social arguments of great weight that can be brought to bear in favor of continuing the pregnancy to full term and that there are procedures and

institutions to allow adoption of unwanted children as well as a certain degree of state assistance if the mother chooses to raise the child herself. " '[T]he Constitution does not forbid a State or city, pursuant to democratic processes, from expressing a preference for normal childbirth.' " It follows that States are free to enact laws to provide a reasonable framework for a woman to make a decision that has such profound and lasting meaning.

\* \* \*

> What is at stake is the woman's right to make the ultimate decision, not a right to be insulated from all others in doing so. Regulations which do no more than create a structural mechanism by which the State, or the parent or guardian of a minor, may express profound respect for the life of the unborn are permitted, if they are not a substantial obstacle to the woman's exercise of the right to choose.

**\*271** \* \* \*

> It cannot be questioned that psychological well-being is a facet of health. Nor can it be doubted that most women considering an abortion would deem the impact on the fetus relevant, if not dispositive, to the decision. In attempting to ensure that a woman apprehend the full consequences of her decision, the State furthers the legitimate purpose of reducing the risk that a woman may elect an abortion, only to discover later, with devastating psychological consequences, that her decision was not fully informed. If the information the State requires to be made available to the woman is truthful and not misleading, the requirement may be permissible.

\* \* \*

> [W]e permit a State to further its legitimate goal of protecting the life of the unborn by enacting legislation aimed at ensuring a decision that is mature and informed, even when in so doing the State expresses a preference for childbirth over abortion. In short, requiring that the woman be informed of the availability of information relating to fetal development and the assistance available should she decide to carry the pregnancy to full term is a reasonable measure to ensure an informed choice, one which might cause the woman to choose childbirth over abortion. [8]

To sum up, the Supreme Court stated: "[t]he woman's liberty [to choose abortion] is not so unlimited ... that from the outset the State cannot show its concern for the life of the unborn...." [9] "Only where state regulation imposes an undue burden on a woman's ability to make this decision does the power of the State reach into the heart of the liberty protected by the Due Process Clause." [10]

The State's interest is particularly acute when the woman is a minor. The Supreme Court

> has held that the States validly may limit the freedom of children to choose for themselves in the making of important, affirmative choices with potentially serious consequences. These rulings have been grounded in the recognition that, during the formative years of childhood and adolescence, minors often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them. [11]

Among those choices, the Supreme Court has insisted, is abortion:

> The State has a strong and legitimate interest in the welfare of its young citizens, whose immaturity, inexperience, and lack of judgment may sometimes impair their ability to exercise their rights wisely. That interest, which justifies state-imposed requirements that a minor obtain his or her parent's consent before undergoing an operation, marrying, or entering military service, extends also to the minor's decision to terminate her pregnancy. [12]

### B

A minor's right to choose to have an abortion can be restricted not only by the State's interest in her welfare but by the interest of her parents and the interest of the family unit. [13] These interests are subject to constitutional protection. The Supreme Court has stated:

> [T]he demonstration of commitment to the child through the assumption of personal, financial, or custodial responsibility **\*272** may give the natural parent a stake in the relationship with the child rising to the level of a liberty interest.

> \* \* \*

> [T]he family has a privacy interest in the upbringing and education of children and the intimacies of the marital relationship which is protected by the Constitution against undue state interference. [14]

This Court has also recognized the constitutional rights of parents in the relationship with their children. [15]

Specifically with respect to parental involvement in a minor's decision whether to have an abortion, the Supreme Court has explained:

> [T]he guiding role of parents in the upbringing of their children justifies limitations on the freedoms of minors.... "The child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." "The duty to prepare the child for 'additional obligations' ... must be read to include the inculcation of moral standards, religious beliefs, and elements of good citizenship." This affirmative process of teaching, guiding, and inspiring by precept and example is essential to the growth of young people into mature, socially responsible citizens.

> We have believed in this country that this process, in large part, is beyond the competence of impersonal political institutions. Indeed, affirmative sponsorship of particular ethical, religious, or political beliefs is something we expect the State *not* to attempt in a society constitutionally committed to the ideal of individual liberty and freedom of choice. Thus, "[i]t is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include *preparation for obligations the state can neither supply nor hinder.*"

* * *

[T]he parental role implies a substantial measure of authority over one's children. Indeed, "constitutional interpretation has consistently recognized that the parents' claim to authority in their own household to direct the rearing of their children is basic in the structure of our society."

Properly understood, then, the tradition of parental authority is not inconsistent with our tradition of individual liberty; rather, the former is one of the basic presuppositions of the latter. Legal restrictions on minors, especially those supportive of the parental role, may be important to the child's chances for the full growth and maturity that make eventual participation in a free society meaningful and rewarding. Under the Constitution, the State can "properly conclude that parents and others, teachers for example, who have [the] primary responsibility for children's well-being are entitled to the support of laws designed to aid discharge of that responsibility."

* * *

[P]arental notice and consent are qualifications that typically may be imposed by the State on a minor's right to make important decisions. As immature minors often lack the ability to make fully informed choices that take account of both immediate and long-range consequences, a State reasonably may determine that parental consultation often is desirable and in the best interest of the minor. It may further determine, as a general proposition, that such consultation **\*273** is particularly desirable with respect to the abortion decision—one that for some people raises profound moral and religious concerns. [16]

The Supreme Court has held that a parent cannot have an absolute and arbitrary veto over a child's choice of an abortion. [17] But by the same token, a parent's right to be involved in a child's decisions cannot be abrogated without sufficient reason.

### III

In the context of this developing federal constitutional law, Texas' Parental Notification Act was passed, as

its abundant history repeatedly emphasizes, to encourage parental participation in a minor's decision to have an abortion, to discourage abortion generally, and to discourage teen pregnancy with the warning that an abortion without parental involvement would not be readily available. The Act prohibits a physician, with certain exceptions, from performing an abortion on an unemancipated minor without giving a parent, managing conservator, or guardian at least 48 hours' actual notice. [18] One exception to this prohibition is that a court may grant a minor's application to consent to an abortion without the prescribed notice if the court determines, by a preponderance of the evidence, that either (1) "the minor is mature and sufficiently well informed to make the decision to have an abortion performed without notification to either of her parents or a managing conservator or guardian," (2) "notification would not be in the best interest of the minor," or (3) "notification may lead to physical, sexual, or emotional abuse of the minor." [19] As I have already noted, petitioner bases her application on the first two of these grounds. I consider each ground separately.

### A

The Legislature has not defined the phrase "mature and sufficiently well informed" in section 33.033(i). Accordingly, we are obliged to give the words their ordinary meaning, [20] a requirement acknowledged by the Court and then wholly ignored.

According to the *Oxford English Dictionary,* the word "mature", used in describing a person, means "having the powers of body and mind fully developed." With reference to thought and deliberation, the word means "duly prolonged and careful." And as applied to "plans, conclusions, etc.," the word means "formed after adequate deliberation." The *Oxford English Dictionary* defines the word "well-informed" as: "Well equipped with information; fully furnished with knowledge, whether of a special subject or of things in general; having a well-stored mind." Thus defined, the statutory phrase, "mature and sufficiently well informed", refers to the basis for a decision—full information and knowledge of the subject—as well as the manner in which it is made—as by a person of ample years and experience.

A decision cannot be well informed if the person making it does not have a full knowledge of the relevant considerations. In the present context, this does not mean that a minor

must know all there is to know about abortion as a medical procedure or the alternatives to it and the factors involved in a choice. Some of the relevant factors are not hard to assess, such as the health risks of the procedure to the woman. But many of the relevant factors involve more unknowns: the consequences to the fetus, the risks of psychological and emotional problems, the woman's ability to mother the child if it is born, **\*274** the availability of alternatives including adoption, the availability of financial assistance if the child is carried to term, the impact of the decision on the woman's present and future family, and the "philosophic and social" [21] —including religious—concerns that favor continuing the pregnancy to term. Mastery of these issues is not necessary for a person to be well-informed, but an appreciation of them is. A minor worried about the financial burdens of parenthood, for example, should know what support is available to her; that information could affect her decision. While people disagree about the more subjective factors, a minor should nevertheless have some awareness of the issues in the disagreement in making her decision. As the United States Supreme Court has observed, the State has a legitimate purpose in "reducing the risk that a woman may elect an abortion, only to discover later, with devastating psychological consequences, that her decision was not fully informed." [22]

The abortion decision does not turn merely, or mostly, on simple facts, such as that in most instances abortion is a very safe medical procedure. The risks in a particular case may be greater and may determine the decision, but that is not true in most situations. Far more important are concerns about the family, social, psychological, emotional, moral, and religious implications of the abortion decision. Ordinarily, some of these issues are none of the State's business. A person's religious views, for example, are entirely a private and individual matter. But minors who have not yet thought seriously about such matters should be aware that their views may someday change. It is critical that a minor appreciate that decisions made today can have consequences decades into the future. The essential approach taken by the Legislature in the Parental Notification Act is that if a minor is to be allowed to choose abortion without the guidance parents should give a child in such circumstances, then she must have an appreciation of that guidance from somewhere else. Because there is deep disagreement over the subjective elements of a choice of abortion, a minor should be aware of and appreciate the differing views. She is free to credit some and discount others, of course, but she ought not to make a decision without knowing what others believe to be at stake. As the United

States Supreme Court has observed, "It seems unlikely that [a woman] will obtain adequate counsel and support from the attending physician at an abortion clinic, where abortions for pregnant minors frequently take place." [23] The landscape is not revealed in any single setting.

Whether a minor is well informed is more of an objective determination than whether she is mature. As noted above, the latter quality is an ability to act as an experienced adult would. The United States Supreme Court has observed that "the fact that a minor may be very much an adult in some respects does not mean that his or her need and opportunity for growth under parental guidance and discipline have ended." [24] The Court fails to take this obvious fact into account. Maturity is not so much a matter of what a person knows as it is of how she thinks and acts. A trial judge who can watch a minor's demeanor and hear the inflections in her voice is in a far better position to determine her maturity than an appellate judge confined to the typed transcript of her testimony.

From the meanings of the words themselves and the purposes of the Parental **\*275** Notification Act, informed by the United States Supreme Court's reference to the same ideas in numerous opinions, I conclude that by "mature and sufficiently well informed" the Legislature means a minor who has obtained for herself the kind of complete and balanced information relevant to her decision and evaluate it as a person who no longer needed parental guidance on so grave a matter. For reasons that I am about to explain, the Court reads the statutory standard to mean something far less.

### B

Although petitioner in this case has not focused her arguments on appeal on the alternative ground on which she based her application—that notifying her parents of her intent to have an abortion would not be in her best interest—I address that ground briefly.

In essence, petitioner does not want to notify her parents because she fears they will not approve. This concern, standing alone, should not justify excluding her parents from her decision, as the trial court found. For one thing, petitioner may have judged wrongly. But assuming her fears are well founded, petitioner must choose between parental disapproval and the burden of knowing that she has kept something very important from them. The latter does not simply trump the former. A minor's concealment from her

parents of so profound a decision, like the decision itself, may have lifelong, and unforeseen, consequences. The trial judge must ensure that the minor appreciates those consequences and must attempt to determine whether it would not be in a minor's interest to attempt to involve her parents in her decision despite their disappointment and disapproval.

### IV

The Court's opinion minimizes what a minor must prove to show that she is "mature and sufficiently well informed" to choose abortion without involving her parents. This is not immediately apparent from all its language. For instance, at one point the Court states that a minor must demonstrate that her decision "is based upon careful consideration of the various options available to her and the benefits, risks, and consequences of those options." [25] But this broad statement is belied by the specific requirements set out in Part V. There are only three, and while they are what the Court would require "at a minimum", [26] they are nevertheless sufficient as a matter of law for a minor to obtain judicial authorization for an abortion.

This point is crucial: as the Court reads the statute, once a minor has proved what she must by a preponderance of the evidence, then she is *entitled as a matter of law* to an abortion without parental notification. The trial court has no discretion in the matter. Thus, if a minor offers evidence to satisfy the Court's three requirements, her application *must be granted.* This standard is, of course, foreign to the language, intent, and purposes of the Act.

The Court's first requirement is that a minor must obtain information about the health risks of the procedure. While such information is certainly essential to the minor's decision, it will not be significant in most instances. Abortion is, for the most part, a physically safe procedure. There are instances when this is not true, and a minor should be advised of the risks *to her,* but in most instances it will not be difficult for a minor to meet this requirement.

The Court's second requirement is that a minor should "have an understanding of the alternatives to abortion and their implications" and have given them "thoughtful consideration", although she need not "justify why she prefers abortion above **\*276** other options". [27] In the Court's view, this requirement can be satisfied by a simple declaration by the

minor that she has thought long and hard about her decision. But in fact, a minor is not well informed merely because she knows that she can carry her pregnancy to term and then either keep the child or offer it for adoption. She should have an appreciation of what her options entail.

The Court's third requirement is that a minor should have received information "from reliable and informed sources" concerning the "emotional and psychological aspects of undergoing an abortion". [28] Just who such sources might be the Court does not say, but nothing prohibits them from all being promoters of abortion. A minor is not well informed simply because she has heard one side of a matter.

The Court acts as if these three requirements are significant, but they plainly are not. Any competent attorney representing a minor in a case like this can easily script testimony that will meet all three requirements. All a minor need tell the trial court is: that she has consulted with a clinician who told her that abortion presented insignificant physical risks to her, that some people regret having an abortion but not very often, and that she could always have the child and keep it or put it up for adoption; and that she carefully considered all the clinician said. Once the minor has covered these bases, she is *entitled* to an order authorizing her to consent to an abortion. A trial court that is convinced that a minor is not entitled to an abortion without parental notification must therefore base the decision on the minor's overall credibility and evidence of her immaturity that cannot be fully reflected in the appellate record.

The Court refuses even to acknowledge that a minor's decision can profoundly affect her future and present family relationships. In the Court's mind, the most significant issues involved in the abortion decision do not even exist. According to the Court, a minor is well informed if she knows a little about a few things which may matter and nothing about the very profound consequences of her decision.

The Court completely ignores the fundamental, constitutional rights of petitioner's parents which must, as the United States Supreme Court has stated, [29] be balanced against petitioner's right to choose an abortion. The Legislature's express intent in passing the Parental Notification Act was to protect parents' rights to provide children guidance in making difficult decisions. In essence, the Court holds that minors can get by without the help.

## V

I have set out above in complete detail petitioner's testimony, omitting only those facts that tend to identify her. It is fair to say that she based her decision to have an abortion on what she called "partial counseling" one Saturday at a Planned Parenthood clinic; the unsurprising encouragement of her 19–year–old boy friend, who is the father of the child and now wants no part of the responsibility; a brief conversation with a relative who had an abortion when she was petitioner's age; conversations with three teenage friends, one of whom was glad she had had an abortion, and two of whom, one age 15, said they wished they had; and unspecified information obtained on the internet. I agree with the Court that this does not prove as a matter of law that petitioner is mature and sufficiently well informed to have an abortion without telling her parents.

Incredibly, the Court never hints at the specific deficiency in petitioner's proof. In this "matter of first impression" the Court hides any reasoning it has. Why has petitioner's proof failed? What was missing? **\*277** How much more, or how little, was required? Ordinarily, the Court would answer these questions, would apply its construction of the statute to the facts of the case and explain the consequences. But the JUSTICES in the majority cannot agree on enough issues, even after days of compromise among themselves, to come up with a single ecumenical justification for their result. The Court says that it writes to give the lower courts guidance, and then in Part VII of its opinion, on the issue dispositive of the case, offers no explanation. None, except "Sorry, you lose, try again." To undertake an opinion in this case and then give no explanation for the result is a blatant abnegation of the Court's responsibility to the lower courts and the petitioner, and an affront to the Legislature.

I would hold that the trial court's decision to deny petitioner's application was based on some evidence, and I would deny her appeal. I do not agree that she should simply have a second try, especially since she will have no trouble improving her case. While the court's decision should be given res judicata effect, it would not bar petitioner from reapplying if her circumstances changed materially.

## VI

I agree with the conclusion in Part II of the Court's opinion that this Court must publicly explain its decisions, even in cases like this one in which there is a special need for confidentiality. [30] Neither our duty to the rule of law, nor our constitutional role in the government, nor our obligations to the people whose government it is, permit this Court to rule in secret. It may well be that the lower courts' rulings in cases like this cannot be secret either, but petitioner has not raised the issue, and no one else can raise it in this case, since no one besides her attorney and guardian will have known before today that the case was before us. So the issue must be left for another day. [31]

I also agree with the conclusion in Part III of the Court's opinion that the trial court's decision in this case should be affirmed on appeal if it finds sufficient support in the evidence. [32] Because our jurisdiction to review evidentiary sufficiency is limited, we must affirm the trial court's decision if there is any evidence to support it. We can reverse only if petitioner demonstrates that she has proven her right to an abortion without parental involvement as a matter of law, which I agree she has not done, for the reasons I have explained and the Court has not.

\* \* \* \* \*

The people of Texas, like the American people, are deeply divided over abortion. That division will almost certainly affect the present and future life of every minor who has an abortion. If the Legislature's mandate that a minor be well informed before choosing abortion without involving her parents does not mean that she be given the same guidance a child should have from her parents, then it offers her little protection. If the Legislature's mandate means that parents can be deprived of their fundamental right to guide their child's decisions when she has no more appreciation of her circumstances than the Court requires, then the statute is almost meaningless. I would not deny the Parental Notification Act its intended purposes. I dissent.

Footnotes

1      Justice Enoch's concurrence argues that the proper standard of review is abuse of discretion. Much of his argument is based on the premise that the facts will be undisputed. Although the hearing is unopposed, the testimony presented by the minor may be

inconsistent, either on direct or after the trial court has posed questions. Therefore, rather than simply applying the law to undisputed facts, the trial court must weigh all the evidence before it, including demeanor and credibility, to determine if the minor, by a preponderance of the evidence, has demonstrated that she is mature and sufficiently well informed.

*See* ARK.CODE ANN. § 20–16–804(1)(A)(Michie 1999); COLO.REV.STAT. ANN . § 12–37.5–107(2)(a)(1999); FLA. STAT. §§ 390.01115(3)(a) & (4)(c)(1999); GA.CODE ANN. § 15–11–114(c)(1999); 750 ILL. COMP. STAT.. 70/25–25(d) (West 1999); KAN. STAT. ANN.. §§ 65–6705(a) & (d) (1998); MD.CODE ANN., HEALTH §§ 20–103(a) & (c) (1991); MINN.STAT. § 144.343(6) (1998); MONT.CODE ANN. §§ 50–20–212(4) & (5) (1999); NEB.REV.STAT. § 71–6903(1) (1999); NEV.REV.STAT. § 442.255(2) (1997); N.J. STAT. ANN.. § 9:17A–1.7(d) (West 1999); OHIO REV.CODE ANN. §§ 2151.85(A)(4) & (C)(1) (Banks–Baldwin 1999); S.D. CODIFIED LAWS §§ 34–23A–7(3) & 34–23A–7.1 (Michie 1999); VA.CODE ANN. § 16.1–241(V) (Michie 1999); W. VA.CODE § 16–2F–4(f) (1999); WYO. STAT. ANN. § 35–6–118(b)(v)(B) (Michie 1999).

Although Texas Parental Notification Rule 3.3(b) does not allow a court of appeals to remand, the rules are silent regarding this Court. Consequently, we are not prohibited from remanding.

TEX. FAM.CODE § 33.003(i).

*Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992).

*See, e.g., Johnson v. Fourth Court of Appeals,* 700 S.W.2d 916, 918 (Tex.1985).

*See* TEX. FAM.CODE § 33.003(k).

*In the Matter of the Petition of Jane Doe,* 19 Kan.App.2d 204, 866 P.2d 1069, 1074 (1994).

*See* Gillespie v. Gillespie, 644 S.W.2d 449, 451 (Tex.1982); *Green v. Remling,* 608 S.W.2d 905, 908 (Tex.1980).

*Bocquet v. Herring,* 972 S.W.2d 19, 21 (Tex.1998).

*See* TEX.R.APP. P. 60.3.

*See* TEX. FAM.CODE § 33.004(b).

*See* TEX. PARENTAL NOTIFICATION RULES & FORMS 3.3(b).

*See id.* ("The court of appeals ... must issue a judgment affirming or reversing the trial court's order denying the application. If the court of appeals reverses the trial court order, it must also state in its judgment that the application is granted.").

TEX. FAM.CODE §§ 33.001–.011. All statutory references are to the Family Code unless otherwise noted.

*Bellotti v. Baird,* 443 U.S. 622, 642, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) (*Bellotti II* ).

*Ante* at 256–57.

*Planned Parenthood v. Casey,* 505 U.S. 833, 869, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (plurality opinion).

*Id.* at 851–852, 112 S.Ct. 2791.

*Id.* at 872–873, 112 S.Ct. 2791.

*Hodgson v. Minnesota,* 497 U.S. 417, 444, 110 S.Ct. 2926, 111 L.Ed.2d 344 (1990) (plurality opinion).

*Casey,* 505 U.S. at 872–883, 112 S.Ct. 2791 (citations omitted).

*Id.* at 869, 112 S.Ct. 2791.

*Id.* at 874, 112 S.Ct. 2791.

*Bellotti v. Baird,* 443 U.S. 622, 635, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) (*Bellotti II* ).

*Hodgson,* 497 U.S. at 444–445, 110 S.Ct. 2926 (plurality opinion) (citations omitted).

*Id.* at 444, 110 S.Ct. 2926.

*Id.* at 446, 110 S.Ct. 2926.

*E.g., Patterson v. Planned Parenthood,* 971 S.W.2d 439, 447 (Tex.1998) (Gonzalez, J., concurring); *In the Interest of J.W.T.,* 872 S.W.2d 189, 194–195 (Tex.1994); *Wiley v. Spratlan,* 543 S.W.2d 349, 352 (Tex.1976).

*Bellotti II,* 443 U.S. at 637–640, 99 S.Ct. 3035 (emphasis in original, citations omitted).

*Planned Parenthood v. Danforth,* 428 U.S. 52, 74, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976).

TEX. FAM.CODE § 33.002.

*Id.* § 33.003(i).

TEX. GOV'T CODE § 312.002(a); *Owens Corning v. Carter,* 997 S.W.2d 560, 577 (Tex.1999).

*Planned Parenthood v. Casey,* 505 U.S. 833, 872, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (plurality opinion).

*Id.* at 882, 112 S.Ct. 2791.

*H.L. v. Matheson,* 450 U.S. 398, 410, 101 S.Ct. 1164, 67 L.Ed.2d 388 (1981).

*Bellotti v. Baird,* 443 U.S. 622, 644 n. 23, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) (*Bellotti II* ) (plurality opinion).

*Ante* at 255.

26     *Ante* at 256.

27     *Ante* at 256.

28     *Ante* at 256.

29     *Hodgson v. Minnesota,* 497 U.S. 417, 444, 110 S.Ct. 2926, 111 L.Ed.2d 344 (1990) (plurality opinion).

30     *Ante* at 251–52.

31     *See also* TEX. PARENTAL NOTIFICATION RULES & FORMS, Explanatory Stmt. ("such issues should not be resolved outside an adversarial proceeding with full briefing and argument").

32     *Ante* at 253.

**End of Document**          © 2015 Thomson Reuters. No claim to original U.S. Government Works.

226 S.W.3d 400
Supreme Court of Texas.

In re SOUTHWESTERN BELL
TELEPHONE COMPANY, L.P., Relator.

No. 05–0511.  |  Argued March
22, 2006.  |  Decided June 1, 2007.

**Synopsis**
**Background:** Competitive local exchange carriers (CLECs) brought action alleging that incumbent local exchange carrier (ILEC) overcharged CLECs at rates in excess of rates set in arbitrations and thus violated antitrust laws and Deceptive Trade Practices Act (DTPA) and engaged in unjust enrichment and fraud. The trial court denied ILEC's motion to refer case based on primary jurisdiction of Public Utility Commission (PUC). ILEC petitioned for writ of mandamus. The Corpus Christi Court of Appeals denied writ. ILEC filed another mandamus petition.

**Holdings:** The Supreme Court, Johnson, J., held that:

[1] PUC had primary jurisdiction, and

[2] ILEC did not waive right to mandamus relief.

Writ conditionally granted.

West Headnotes (7)

**[1]    Mandamus**
    Remedy by Appeal or Writ of Error
**Mandamus**
    Matters of discretion
In order to obtain mandamus relief, a relator must show that the trial court clearly abused its discretion and that the relator has no adequate remedy by appeal.

41 Cases that cite this headnote

**[2]    Appeal and Error**

**    Abuse of discretion**
A trial court abuses its discretion if it fails to analyze or apply the law correctly.

30 Cases that cite this headnote

**[3]    Mandamus**
    Modification or vacation of judgment or order
An adequate remedy by appeal did not exist for trial court's refusal to defer to primary jurisdiction of Public Utility Commission (PUC) concerning interconnection agreements between competitive local exchange carriers (CLECs) and incumbent local exchange carrier (ILEC), and writ of mandamus was thus available; allowing the trial to proceed would interfere with the important legislatively mandated function and purpose of the PUC.

2 Cases that cite this headnote

**[4]    Telecommunications**
    Primary jurisdiction;  administrative or judicial jurisdiction
Public Utility Commission (PUC) had primary jurisdiction over interpretation, validity, and enforceability of interconnection agreements between competitive local exchange carriers (CLECs) and incumbent local exchange carrier (ILEC), and, thus, trial court should have deferred to PUC in CLECs' suit alleging violation of antitrust laws, deceptive trade practices, unjust enrichment, and fraud in connection with rates; even though PUC could not grant all relief requested, it was authorized to make initial determinations regarding validity and meaning of the agreements, and arbitration proceedings did not address validity and enforceability of different rates agreed upon by the parties.

2 Cases that cite this headnote

**[5]    Administrative Law and Procedure**
    Primary jurisdiction

Primary jurisdiction allocates power between courts and agencies when both have authority to make initial determinations in a dispute.

2 Cases that cite this headnote

**[6]**    **Administrative Law and Procedure**
     Primary jurisdiction

Under the doctrine of "primary jurisdiction," trial courts should defer to appropriate administrative agencies when (1) the agency is staffed with experts trained in handling complex problems within the agency's purview, and (2) great benefit is derived from the agency's uniform interpretation of laws within its purview and the agency's rules and regulations when courts and juries might reach differing results under similar fact situations.

6 Cases that cite this headnote

**[7]**    **Mandamus**
     Time to Sue, Limitations, and Laches
**Mandamus**
     Scope of inquiry and powers of court

Incumbent local exchange carrier (ILEC) did not waive right to mandamus relief to correct refusal to refer suit by competitive local exchange carriers (CLECs) to Public Utility Commission (PUC) under its primary jurisdiction; ILEC raised the issue in federal court and raised it less than a month after remand to state court, and ILEC filed petition less than a month after trial court denied motion to defer to PUC.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*401**  James A. Baker, Weston C. Loegering, Stanford Purser, Hughes & Luce, LLP, Kara Lea Altenbaumer–Price, Dallas, Robert Patrick Rodriguez, Eduardo R. Rodriguez, Rodriguez, Colvin, Chaney & Saenz, L.L.P., Brownsville, Cynthia F. Malone, SBC Texas Legal Department, Pamela St. John, Southwestern Bell Telephone, San Antonio, Mike A. Hatchell, Locke Liddell & Sapp, LLP, Austin, Geoffrey M. Klineberg, Kellogg Huber Hansen Todd & Evans, PLLC,

Scott H. Angstreich, Kellog, Huber, Hansen, Todd, Evans & Figel, PLLC, Washington, DC, for Relator.

Timothy J. Herman, Sean E. Breen, Herman, Howry & Breen, L.L.P., Mark Foster, Foster & Hunter, Christopher Malish, Foster Malish Blair & Cowan, Austin, Gilberto Hinojosa, Magallanes Hinojosa & Mancias, Brownsville, for Real Parties in Interest.

John R. Hulme, Natural Resources Division, Austin, for Amicus Curiae.

**Opinion**

Justice JOHNSON delivered the opinion of the Court.

The issue in this case is whether the Public Utility Commission has primary jurisdiction to resolve threshold questions about the meaning and effect of certain telephone interconnection agreements between Southwestern Bell Telephone Company and the plaintiff local exchange telephone service carriers. We conclude that it does, and conditionally grant mandamus relief.

### I. Background

In 1996, Congress opened local telephone service to competition by enacting the Federal Telecommunications Act (FTA). Telecommunications Act of 1996, Pub.L. No. 104–104, 110 Stat. 56. Telephone companies that provide local calling services are referred to as local exchange carriers or LECs. Certain LECs such as relator Southwestern Bell Telephone Company historically held a monopoly in providing the services and are referred to as incumbent LECs or ILECs. *Sw. Bell Tel. Co. v. Pub. Util. Comm'n,* 208 F.3d 475, 477 (5th Cir.2000). Historically, the ILECs owned extensive telecommunication networks. *AT & T Corp. v. Iowa Utils. Bd.,* 525 U.S. 366, 371, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999) (noting that ILECs "owned, among other things, the local loops (wires connecting telephones to switches), the switches (equipment directing calls to their destinations), and the  **\*402**  transport trunks (wires carrying calls between switches) that constitute a local exchange network"). LECs such as plaintiffs in the trial court, who are real parties in interest here, compete with ILECs and are called competitive local exchange carriers (CLECs). The FTA requires each ILEC to share its network with competitors. *Sw. Bell Tel. Co.,* 208 F.3d at 477. The FTA allows a CLEC to access an ILEC's network in three ways: by purchasing local telephone services

at wholesale rates for resale to end users; by leasing elements of the incumbent's network on an unbundled basis; and by interconnecting its own facilities with the ILEC's network. *AT & T Corp.,* 525 U.S. at 371, 119 S.Ct. 721.

Under the FTA, interconnection agreements must be approved by the Public Utility Commission (PUC). *See* 47 U.S.C. § 252(e) (2001). CLECs may, but need not, separately negotiate contracts with the ILEC. If a CLEC chooses not to separately negotiate a contract, the FTA also allows it to adopt (1) an existing agreement that any other CLEC has entered into with the ILEC, or (2) a standard-form "T2A" agreement developed by Southwestern Bell and other CLECs. If parties cannot reach an agreement when negotiating the terms of an interconnection agreement, then either party can ask the PUC to arbitrate the unresolved issues. *See* 47 U.S.C. §§ 252(b), (c).

Each of the CLEC plaintiffs in this case contracted with Southwestern Bell by adopting either the T2A agreement or an existing previously negotiated agreement. The interconnection agreements entered into by the parties provided that Southwestern Bell would charge the plaintiff CLECs between $5.00 and $25.00 for certain services.

After the plaintiffs and Southwestern Bell entered into their interconnection agreements, the PUC conducted two arbitrations to set rates for other CLECs' interconnection agreements when those CLECs were unable to agree on negotiated prices with Southwestern Bell. Those proceedings are referred to as the "Mega–Arb" and "AccuTel"[1] arbitrations. In the Mega–Arb and AccuTel proceedings the PUC set rates for certain services to be supplied by Southwestern Bell at prices between $2.56 and $5.00. The plaintiffs in this case had contracted to pay between $5.00 and $25.00 for the same services.

Following the PUC's decisions in the Mega–Arb and AccuTel proceedings, the plaintiffs brought suit, asserting that Southwestern Bell had been overcharging them because the rates in their contracts were substantially higher than the rates set in the Mega–Arb and AccuTel arbitration proceedings. The causes of action asserted by plaintiffs include (1) Deceptive Trade Practices Act (DTPA)[2] violations, (2) unjust enrichment/money had and received, (3) violations of Texas anti-trust laws, and (4) fraud.

Southwestern Bell removed the suit to federal court, but the federal court remanded the case. The plaintiffs and

Southwestern Bell both moved for summary judgment in state court. In the alternative, Southwestern Bell also sought referral to the PUC on the basis that the PUC had primary jurisdiction to decide threshold issues regarding the interconnection agreements. The motions were denied. Southwestern Bell then sought, but was denied, mandamus relief from the Thirteenth Court of Appeals. Southwestern **\*403** Bell now requests this Court to issue a writ of mandamus directing the trial court to (1) refer the issues regarding the interconnection agreements to the PUC and (2) abate the case while the PUC reviews the issues referred. The PUC has filed an amicus brief in support of Southwestern Bell's position.

## II. Mandamus Standards

[1] [2] [3] In order to obtain mandamus relief a relator must show that the trial court clearly abused its discretion and that the relator has no adequate remedy by appeal. *In re Prudential Ins. Co. of Am.,* 148 S.W.3d 124, 135–36 (Tex.2004). A trial court abuses its discretion if it fails to analyze or apply the law correctly. *In re Kuntz,* 124 S.W.3d 179, 181 (Tex.2003). An adequate remedy by appeal does not exist under circumstances such as those presented by this matter if trial is erroneously permitted to go forward because allowing the trial to proceed would interfere with the important legislatively mandated function and purpose of the PUC. *In re Entergy Corp.,* 142 S.W.3d 316, 321 (Tex.2004); *see also State v. Sewell,* 487 S.W.2d 716, 719 (Tex.1972) (noting the importance of administrative agencies and concluding that the judicial system should avoid improper restraints on administrative proceedings).

## III. Analysis—Primary Jurisdiction

[4] Southwestern Bell argues that referral to the PUC and abatement of the suit is required because the PUC has primary jurisdiction over questions regarding interpretation and enforceability of the parties' interconnection agreements. We agree.[3]

[5] [6] Primary jurisdiction "allocate[s] power between courts and agencies when both have authority to make initial determinations in a dispute." *Subaru of Am. v. David McDavid Nissan, Inc.,* 84 S.W.3d 212, 221 (Tex.2002). Trial courts should defer to appropriate administrative agencies when (1) the agency is staffed with experts trained in handling

complex problems within the agency's purview, and (2) great benefit is derived from the agency's uniform interpretation of laws within its purview and the agency's rules and regulations when courts and juries might reach differing results under similar fact situations. *Id.* Both requirements are met in this case.

The PUC is staffed with experts who routinely consider the validity and enforceability of interconnection agreements. In addition to approving the interconnection agreements in the first instance, the PUC also retains authority to interpret and enforce the interconnection agreements when disputes arise about their meaning or effect. *Sw. Bell Tel. Co. v. Pub. Util. Comm'n,* 208 F.3d 475, 479–80 (5th Cir.2000) ("[T]he [FTA's] grant to the state commissions of plenary authority to approve or disapprove these interconnection agreements necessarily carries with it the authority to interpret and enforce the provisions of agreements that state commissions have approved."). State commissions have been said to act as "deputized federal regulators" under the FTA and have developed expertise in enforcing and interpreting the requirements of the FTA. *MCI Telecomms. Corp. v. Illinois Bell Tel. Co.,* 222 F.3d 323, 344 (7th Cir.2000).

In addition to the PUC's having expertise in interpreting interconnection agreements, **\*404** its uniform interpretation of the agreements provides great benefit. Conflicting jury verdicts and rulings by different courts in regard to same or similar situations and fact patterns could result in disparate treatment of the CLECs and ILEC. Disparate treatment of companies and lack of uniform decisions regarding contractual obligations could inhibit competition, compromise the PUC's ability to perform its regulatory duties under the FTA, and frustrate Congress's goal of providing opportunity for competition in the local-calling market. *See* H.R. REP. NO. 104–458, at 113 (1996), *reprinted in* 1996 U.S.C.C.A.N. 124 (noting that Congress enacted the FTA to promote competition in all telecommunications markets, including the local service market). Furthermore, many CLECs have identical interconnection agreements because the FTA allows each CLEC to adopt an agreement that another CLEC has entered into with the ILEC. *See* 47 U.S.C. § 252(I) (2001). Given Congress's intent to promote competition and standardize the interconnection agreements, there is considerable benefit in obtaining uniform interpretation of those agreements. *See Subaru of Am.,* 84 S.W.3d at 221.

Plaintiff CLECs assert that the PUC lacks primary jurisdiction in this case because it lacks the power to adjudicate the plaintiffs' tort, DTPA, and antitrust claims. We disagree. Although the PUC cannot grant all the relief that the plaintiffs request, the PUC is authorized to make initial determinations regarding the validity of the interconnection agreements and their interpretation. We have held that "when the primary jurisdiction doctrine requires a trial court to defer to an agency to make an initial determination, the court should abate the lawsuit and suspend finally adjudicating the claim until the agency has an opportunity to act on the matter." *Butnaru v. Ford Motor Co.,* 84 S.W.3d 198, 208 (Tex.2002). Once the PUC has made its determinations regarding the interconnection agreements, then the trial court may proceed with its adjudicative function.

Plaintiffs further assert that referring the case to the PUC will provide no benefit because the previous arbitration proceedings resolved the question of what rates Southwestern Bell is authorized to charge. Again, we disagree. The arbitration decisions set rates for the future in situations where other CLECs and the ILEC could not agree between themselves what those rates should be. The proceedings did not address the validity and enforceability of different rates between parties who agreed upon those different rates.

We therefore conclude that the PUC has primary jurisdiction over questions regarding the validity and enforceability of the interconnection agreements.

### IV. Analysis—Waiver

[7] Plaintiff CLECs contend that mandamus relief is not warranted in this case because Southwestern Bell (1) waited too long to seek a hearing on primary jurisdiction, and (2) waited too long before pursuing mandamus relief after the trial court refused to abate the case. Plaintiffs rely primarily on *Rivercenter Assocs. v. Rivera,* 858 S.W.2d 366, 367 (Tex.1993). In *Rivercenter,* we held that "[a]lthough mandamus is not an equitable remedy, its issuance is largely controlled by equitable principles," and one such principle is that " '[e]quity aids the diligent and not those who slumber on their rights.' " *Id.* (quoting *Callahan v. Giles,* 137 Tex. 571, 155 S.W.2d 793, 795 (1941)). In that case, Rivercenter sought mandamus relief to quash a jury trial demand because the parties had contractually agreed to waive a jury. We held that relief was not appropriate when **\*405** Rivercenter was sent notice on the day the jury demand was filed, yet for no

apparent reason delayed filing its motion to quash for over four months.

We disagree for two reasons. First, the record in this case does not reflect unexplained delay in asserting the primary jurisdiction issue. Southwestern Bell raised the issue in federal court, then raised it again in the state trial court on April 25, 2003—less than a month after the federal court remanded the case.

Second, the CLECs do not contend that Southwestern Bell substantially invoked the litigation process to the CLECs' prejudice. *In re Vesta Ins. Group, Inc.,* 192 S.W.3d 759, 763 (Tex.2006). And, delay alone does not generally establish waiver. *Id.* Southwestern Bell filed, on September 13, 2004, its separate motion for summary judgment, or in the alternative, motion to defer to the PUC based on primary jurisdiction. [4] The trial court heard argument on the motion on December 2, 2004 and orally denied it at that time. The trial court entered a written order on April 18, 2005. Southwestern Bell filed its petition for writ of mandamus in the court of appeals less than one month later. These facts do not present a situation in which Southwestern Bell failed to timely assert the issue of primary jurisdiction or is barred by prejudicial delay from asserting that the PUC has primary jurisdiction. *See id.* To the contrary, Southwestern Bell raised the issue

of primary jurisdiction promptly, sought a hearing within the timeframe set by the scheduling order, and sought mandamus relief soon after its motion was denied.

### V. Conclusion

We hold that the trial court abused its discretion in refusing to abate the case to allow the PUC to exercise its primary jurisdiction. We further hold that (1) permitting trial to go forward before the PUC completes its exercise of primary jurisdiction would interfere with the important legislatively mandated function and purpose of the PUC in the construct established by the FTA, and (2) there is no adequate remedy by appeal if trial proceeds before the PUC completes exercise of its primary jurisdiction.

Accordingly, we conditionally grant mandamus relief. The trial court is directed to abate the case and proceed in accordance with this opinion. We are confident that the trial court will comply; the writ will issue only if it fails to do so.

### Parallel Citations

50 Tex. Sup. Ct. J. 823, 41 Communications Reg. (P&F) 779

Footnotes

1    AccuTel was originally a plaintiff in the underlying proceeding in this case. The trial court severed AccuTel's claim.
2    Tex. Bus. & Com.Code §§ 17.41–63.
3    Southwestern Bell also argues that abatement and referral to the PUC is warranted because the PUC has exclusive jurisdiction over threshold issues. Because Southwestern Bell seeks only abatement and not dismissal of the case, we decide the case based on primary jurisdiction and do not reach the question of exclusive jurisdiction.
4    The mandamus record does not contain the trial court's scheduling order. However, Southwestern Bell asserts, and the CLECs do not dispute, that Southwestern Bell filed its motion in accordance with the trial court's scheduling order.

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

105 S.Ct. 3099
Supreme Court of the United States

KENTUCKY, dba Bureau of State Police, Petitioner

v.

James E. GRAHAM et al.

No. 84–849. | Argued April 16, 1985. | Decided June 28, 1985.

A § 1983 suit was brought against the Commissioner of the Kentucky State Police "individually and as Commissioner" seeking damages for alleged deprivation of federal constitutional rights in warrantless raid and arrest by the state police. The Commonwealth, which was sued only for fees should the plaintiff eventually prevail, was dismissed on Eleventh Amendment grounds. Following settlement, the plaintiff moved for costs and attorney fees. The United States District Court for the Western District of Kentucky awarded costs and fees against the Commonwealth. The Court of Appeals for the Sixth Circuit, in an unpublished opinion, 742 F.2d 1455, affirmed. Certiorari was granted. The Supreme Court, Justice Marshall, held that: (1) liability on the merits and responsibilities for fees go hand in hand and, hence, where a defendant has not been prevailed against, § 1988 does not authorize a fee award against that defendant; (2) a suit against a government official in his/her personal capacity cannot lead to imposition of fee liability on the governmental entity; and (3) instant suit was necessarily litigated as a personal-capacity action, thereby precluding fee award against the Commonwealth, notwithstanding that the Commissioner was sued in both his "individual" and "official" capacities.

Judgment of Court of Appeals reversed.

West Headnotes (24)

**[1]** **Civil Rights**
 Results of litigation; prevailing parties

If a plaintiff prevails in a suit covered by civil rights attorney fee statute [42 U.S.C.A. § 1988], fees should be awarded as costs unless special circumstances would render such an award unjust.

28 Cases that cite this headnote

**[2]** **Civil Rights**
 Parties entitled or liable; immunity
**Civil Rights**
 Results of litigation; prevailing parties

Liability on the merits and responsibility for fees go hand in hand and, thus, where a defendant in a suit covered by civil rights attorney fee statute [42 U.S.C.A. § 1988] has not been prevailed against, either because of legal immunity or on the merits, the act does not authorize a fee award against that defendant.

65 Cases that cite this headnote

**[3]** **Federal Civil Procedure**
 Prevailing party
**Federal Civil Procedure**
 Bad faith, vexatiousness, etc

Prevailing defendants generally are entitled to costs, but are entitled to fees only when the suit was vexatious, frivolous or brought to harass or embarrass the defendant. Fed.Rules Civ.Proc.Rule 54(d), 28 U.S.C.A.

6 Cases that cite this headnote

**[4]** **Civil Rights**
 Liability of Public Officials

Personal-capacity civil rights suits seek to impose personal liability on a government official for actions he takes under color of state law; in contrast, official-capacity suits generally represent only another way of pleading an action against the entity of which the officer is an agent. 42 U.S.C.A. § 1983.

3270 Cases that cite this headnote

**[5]** **Civil Rights**
 Parties

As long as the governmental entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity and it is not

a suit against the official personally, for the real party in interest is the entity. 42 U.S.C.A. § 1983.

2360 Cases that cite this headnote

**[6]**  **Civil Rights**
  Liability of Public Officials

While an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself. 42 U.S.C.A. § 1983.

1792 Cases that cite this headnote

**[7]**  **Federal Civil Procedure**
  Officer's death or separation from office

Should a government official die pending resolution of a personal-capacity action, the plaintiff would have to pursue his action against the decedent's estate; in an official-capacity action in federal court, death or replacement of the named official will result in automatic substitution of the official's successor. Fed.Rules Civ.Proc.Rule 25(d)(1), 28 U.S.C.A.; F.R.A.P.Rule 43(c)(1), 28 U.S.C.A.; U.S.Sup.Ct.Rule 40, subd. 3, 28 U.S.C.A.

59 Cases that cite this headnote

**[8]**  **Civil Rights**
  Liability of Public Officials

On the merits, to establish personal liability of a public official in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right, but more is required in an official-capacity action, for the governmental entity is liable under § 1983 only when the entity itself is a "moving force" behind the deprivation. 42 U.S.C.A. § 1983.

1229 Cases that cite this headnote

**[9]**  **Civil Rights**
  Governmental Ordinance, Policy, Practice, or Custom

In an official-capacity suit under § 1983, the governmental entity's "policy or custom" must have played a part in the violation of federal law. 42 U.S.C.A. § 1983.

840 Cases that cite this headnote

**[10]**  **Civil Rights**
  Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general

An official in a personal-capacity § 1983 action may, depending on his position, be able to assert personal immunity defenses to liability, such as objectively reasonable reliance on existing law. 42 U.S.C.A. § 1983.

186 Cases that cite this headnote

**[11]**  **Civil Rights**
  Government Agencies and Officers

In an official capacity action, the personal immunity defenses available to a public official sued in his personal capacity in a § 1983 suit are unavailable and the only immunities that can be claimed are forms of sovereign immunity that the entity, qua entity, may possess, such as the Eleventh Amendment. 42 U.S.C.A. § 1983; U.S.C.A. Const.Amend. 11.

1120 Cases that cite this headnote

**[12]**  **Civil Rights**
  Government liability

Punitive damages are not available under § 1983 from a municipality, but are available in a suit against an official personally. 42 U.S.C.A. § 1983.

112 Cases that cite this headnote

**[13]**  **Civil Rights**
  Parties

There is no longer a need to bring official-capacity actions against local government officials, because under *Monell*, local government officials can be sued directly under § 1983 for damages and injunctive or declaratory relief. 42 U.S.C.A. § 1983.

563 Cases that cite this headnote

**[14]     Federal Courts**
          Abrogation by Congress

**Federal Courts**
          Suits for injunctive or other prospective or
equitable relief;  Ex parte Young doctrine

**Federal Courts**
          Agencies, officers, and public employees

Unless a state has waived its Eleventh
Amendment immunity [U.S.C.A. Const.Amend.
11] or Congress has overridden it, a state cannot
be sued directly in its own name, regardless of
the relief sought; thus, implementation of state
policy or custom may be reached in federal
court only because official-capacity actions for
prospective relief are not treated as actions
against the state.

702 Cases that cite this headnote

**[15]     Civil Rights**
          Parties entitled or liable;  immunity

A suit against a government official in his or
her personal capacity cannot lead to imposition
of fee liability on the government under civil
rights attorney fee statute; victory in a personal-
capacity action is a victory against the individual
defendant, rather than against the entity that
employs him and unless a distinct cause of action
is asserted against the entity itself, the entity is
not even a party to a personal-capacity lawsuit
and has no opportunity to present the defense;
disapproving *Glover v. Alabama Department of
Corrections*, 753 F.2d 1569. 42 U.S.C.A. § 1983.

1457 Cases that cite this headnote

**[16]     Federal Civil Procedure**
          Persons liable

That a plaintiff has prevailed against
one party does not entitle him to fees
from another party, let alone from a
nonparty. Fed.Rules Civ.Proc.Rule 25(d)(1), 28
U.S.C.A.; F.R.A.P.Rule 43(c)(1), 28 U.S.C.A.;
U.S.Sup.Ct.Rule 40, subd. 3, 28 U.S.C.A.

7 Cases that cite this headnote

**[17]     Civil Rights**
          Parties entitled or liable;  immunity

Permitting a § 1988 fee award against a
governmental entity in an action against a
government official in his/her personal capacity
would be inconsistent with the *Monell* rule that a
municipality cannot be made liable under § 1983
on a respondeat superior basis. 42 U.S.C.A. §§
1983, 1988.

455 Cases that cite this headnote

**[18]     Civil Rights**
          Proceedings, grounds, and objections in
general

Just as Congress rejected making § 1983 a
"mutual insurance" scheme, Congress sought to
avoid making § 1988 a "relief fund for lawyers."
42 U.S.C.A. §§ 1983, 1988.

2 Cases that cite this headnote

**[19]     Civil Rights**
          Results of litigation;  prevailing parties

Section 1988 does not create attorney fee liability
where merits liability is nonexistent. 42 U.S.C.A.
§ 1988.

9 Cases that cite this headnote

**[20]     Civil Rights**
          Parties entitled or liable;  immunity

Section 1983 damages action brought against
Commissioner of Kentucky State Police to
recover for alleged violation of federal
constitutional rights in warrantless raid and arrest
by state police was necessarily litigated as a
personal-capacity action and it was error to
award § 1988 fees against the Commonwealth,
notwithstanding that complaint expressly named
the Commissioner in both his "individual" and
"official" capacities and that the Commonwealth
was named as a defendant for limited purposes of
fee award; given Eleventh Amendment doctrine
and fact that the Commonwealth had not

waived Eleventh Amendment immunity, there could be no doubt that the damages action did not seek to impose monetary liability on the Commonwealth and absent liability on the merits fees could not be awarded against the Commonwealth. 42 U.S.C.A. §§ 1983, 1988; U.S.C.A. Const.Amend. 11.

1007 Cases that cite this headnote

[21]    **Federal Courts**
        👉 Agencies, officers, and public employees

Eleventh Amendment bar remains in effect when state officials are sued for damages in their official capacity. U.S.C.A. Const.Amend. 11.

2147 Cases that cite this headnote

[22]    **Federal Courts**
        👉 Suits for injunctive or other prospective or equitable relief; Ex parte Young doctrine
        **Federal Courts**
        👉 Agencies, officers, and public employees

In an injunctive or declaratory action grounded on federal law the state's Eleventh Amendment immunity [U.S.C.A. Const.Amend. 11] can be overcome by naming state officials as defendants.

272 Cases that cite this headnote

[23]    **Federal Courts**
        👉 Suits for injunctive or other prospective or equitable relief; Ex parte Young doctrine

Monetary relief that is "ancillary" to injunctive relief is not barred by the Eleventh Amendment. U.S.C.A. Const.Amend. 11.

83 Cases that cite this headnote

[24]    **Civil Rights**
        👉 Liability of Public Officials
        **Civil Rights**
        👉 Parties entitled or liable; immunity

Only in an official-capacity action is a plaintiff who prevails entitled to look for relief, both

on the merits and for fees, to the governmental entity employing the offending official.

346 Cases that cite this headnote

**3101    *159  *Syllabus*[*]

Respondents were arrested following the warrantless raid of a house in Kentucky by local and state police officers who were seeking a murder suspect. Claiming a deprivation of federal rights allegedly resulting from the police's use of excessive force and other constitutional violations accompanying the raid, respondents filed suit in Federal District Court under, *inter alia,* 42 U.S.C. § 1983, seeking money damages. Among the named defendants were the Commissioner of the Kentucky State Police, "individually and as Commissioner," and the Commonwealth of Kentucky, which was sued only for attorney's fees should respondents eventually prevail. The District Court, relying on the Eleventh Amendment, dismissed the Commonwealth as a party. On the second day of trial, the case was settled in favor of respondents, who then moved that the Commonwealth pay their costs and attorney's fees pursuant to 42 U.S.C. § 1988, which provides that in any action to enforce § 1983, the court may allow "the prevailing party ... a reasonable attorney's fee as part of the costs." The District Court granted the motion, and the Court of Appeals affirmed.

*Held:* Section 1988 does not allow attorney's fees to be recovered from a governmental entity when a plaintiff sues governmental employees only in their personal capacities and prevails; accordingly, since this case was necessarily litigated as a **3102 personal-capacity and not as an official-capacity action, it was error to award fees against the Commonwealth. Pp. 3104–3108.

(a) While § 1988 does not define the parties who must bear the costs, the logical place to look for recovery of fees is to the losing party. Liability on the merits and responsibility for fees go hand in hand. Where a defendant has not been prevailed against, either because of legal immunity or on the merits, § 1988 does not authorize a fee award against that defendant. Pp. 3104–3105.

(b) Personal-capacity suits seek to impose personal liability upon a government officer for actions he takes under color of state law, whereas official-capacity suits against an officer

are generally treated as suits against the governmental entity of which the officer is an agent. With this distinction in mind, it is clear that a suit against a government officer **\*160** in his or her personal capacity cannot lead to imposition of fee liability upon the governmental entity. Pp. 3105–3107.

(c) To hold that fees can be recovered from a governmental entity following victory in a personal-capacity action against government officials would be inconsistent with the rule that the entity cannot be made liable on the merits under § 1983 on a *respondeat superior* basis. Nothing in § 1988's history suggests that fee liability was intended to be imposed on that basis. Section 1988 simply does not create fee liability where merits liability is nonexistent. P. 3107.

(d) Although the State Police Commissioner was named as a defendant in both his "individual" and "official" capacities and the Commonwealth was named as a defendant for the limited purpose of a fee award, there can be no doubt, given Eleventh Amendment doctrine, that the action did not seek to impose monetary liability on the Commonwealth. Absent waiver by a State or valid congressional override, the Eleventh Amendment bars a damages action against a State in federal court, a bar that remains in effect when state officials are sued for damages in their official capacity. Accordingly, an official-capacity damages action could not have been maintained against the Commissioner in federal court. Respondents cannot seek damages from the Commonwealth simply by suing Commonwealth officials in their official capacity, nor did respondents' action on the merits become a suit against the Commonwealth by simply naming it as a defendant on the limited issue of fee liability. Pp. 3107–3108.

(e) *Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522, did not alter the basic philosophy of § 1988 that fees and merits liability run together, nor did it hold or suggest that fees are available from a governmental entity simply because a government official has been prevailed against in his or her personal capacity. P. ——.

742 F.2d 1455, (CA 6 1984), reversed.

## Attorneys and Law Firms

*George M. Geoghegan, Jr.,* Assistant Attorney General of Kentucky, argued the cause for petitioner. With him on the brief were *David L. Armstrong,* Attorney General, and *Cathy Cravens Snell.*

*Jack M. Lowery, Jr.,* argued the cause for respondents. With him on the brief was *Hollis L. Searcy.\**

\* *Joyce Holmes Benjamin, H. Bartow Farr III, Paul M. Smith,* and *Joseph N. Onek* filed a brief for the National League of Cities et al. as *amici curiae* urging reversal.

## Opinion

 **\*161** Justice MARSHALL delivered the opinion of the Court.

The question presented is whether 42 U.S.C. § 1988 allows attorney's fees to be recovered from a governmental entity when a plaintiff sues governmental employees only in their personal capacities and prevails.

### I

On November 7, 1979, a Kentucky state trooper was murdered. Suspicion quickly focused on Clyde Graham, whose step-mother's car was found near the site of the slaying and whose driver's license and billfold were discovered in nearby bushes. That evening, 30 to 40 city, county, and state police officers converged on the house of Graham's father in Elizabethtown, Kentucky. Without a warrant, the police entered the home twice and eventually **\*\*3103** arrested all the occupants, who are the six respondents here. Graham was not among them.[1] According to respondents, they were severely beaten, terrorized, illegally searched, and falsely arrested. Kenneth Brandenburgh, the Commissioner of the State Police and the highest ranking law enforcement officer in Kentucky, allegedly was directly involved in carrying out at least one of the raids. An investigation by the Kentucky Attorney General's office later concluded that the police had used excessive force and that a "complete breakdown" in police discipline had created an "uncontrolled" situation. App. to Brief for Respondents 21–22.

Alleging a deprivation of a number of federal rights, respondents filed suit in Federal District Court.[2] Their complaint **\*162** sought only money damages and named as defendants various local and state law enforcement officers, the city of Elizabethtown, and Hardin County, Kentucky. Also made defendants were Commissioner Brandenburgh, "individually and as Commissioner of the Bureau of State Police," and the Commonwealth of Kentucky. The Commonwealth was sued, not for damages on the merits,

but only for attorney's fees should the plaintiffs eventually prevail. [3] Shortly after the complaint was filed, the District Court, relying on the Eleventh Amendment, dismissed the Commonwealth as a party. Based on its Attorney General's report, the Commonwealth refused to defend any of the individual defendants, including Commissioner Brandenburgh, or to pay their litigation expenses.

On the second day of trial, the case was settled for $60,000. [4] The settlement agreement, embodied in a court order dismissing the case, barred respondents from seeking attorney's fees from any of the individual defendants but specifically preserved respondents' right to seek fees and court costs from the Commonwealth. Respondents then moved, pursuant to 42 U.S.C. § 1988, that the Commonwealth pay their costs and attorney's fees. At a hearing on this motion, the Commonwealth argued that the fee request had to be **\*163** denied as a matter of law, both because the Commonwealth had been dismissed as a party and because the Eleventh Amendment, in any event, barred such an award. Rejecting these arguments, the District Court ordered the Commonwealth to pay $58,521 in fees and more than $6,000 in costs and expenses. [5] In a short *per curiam* opinion relying solely on this Court's decision in *Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978), the Court of Appeals for the Sixth Circuit affirmed. *Graham v. Wilson,* 742 F.2d 1455 (1984).

We granted certiorari to address the proposition, rejected by at least two Courts **\*\*3104** of Appeals, [6] that fees can be recovered from a governmental entity when a plaintiff prevails in a suit against government employees in their personal capacities. 469 U.S. 1156, 105 S.Ct. 900, 83 L.Ed.2d 916 (1985). We now reverse.

## II

 [1] [2] [3] This case requires us to unravel once again the distinctions between personal- and official-capacity suits, see *Brandon v. Holt,* 469 U.S. 464, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985), this time in the context of fee awards under 42 U.S.C. § 1988. The relevant portion of § 1988, enacted as the Civil Rights Attorney's Fees Awards Act of 1976, 90 Stat. 2641, provides:

> "In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title, title

IX of Public Law 92–318, or title VI of the Civil Rights Act of 1964, the court, in its discretion, may allow *the prevailing party,* other than the United States, a reasonable attorney's fee as part of the costs" (emphasis added).

 **\*164** If a plaintiff prevails in a suit covered by § 1988, fees should be awarded as costs "unless special circumstances would render such an award unjust." S.Rep. No. 94–1011, p. 4 (1976), U.S.Code Cong. & Admin.News 1976, pp. 5908, 5911; see *Supreme Court of Virginia v. Consumers Union of United States, Inc.,* 446 U.S. 719, 737, 100 S.Ct. 1967, 1977, 64 L.Ed.2d 641 (1980). Section 1988 does not in so many words define the parties who must bear these costs. Nonetheless, it is clear that the logical place to look for recovery of fees is to the losing party—the party legally responsible for relief on the merits. That is the party who must pay the costs of the litigation, see generally Fed.Rule Civ.Proc. 54(d), [7] and it is clearly the party who should also bear fee liability under § 1988.

We recognized as much in *Supreme Court of Virginia, supra.* There a three-judge District Court had found the Virginia Supreme Court and its chief justice in his official capacity liable for promulgating, and refusing to amend, a State Bar Code that violated the First Amendment. The District Court also awarded fees against these defendants pursuant to § 1988. We held that absolute legislative immunity shielded these defendants for acts taken in their legislative capacity. We then vacated the fee award, stating that we found nothing "in the legislative history of the Act to suggest that Congress intended to permit an award of attorney's fees to be premised on acts for which defendants would enjoy absolute legislative immunity." 446 U.S., at 738, 100 S.Ct., at 1978. [8] **\*165** Thus, liability on the merits and responsibility for fees go hand in hand; where a defendant has not been prevailed against, either because of legal immunity or on the merits, § 1988 does not authorize a fee award against that defendant. [9] Cf. **\*\*3105** *Pulliam v. Allen,* 466 U.S. 522, 543–544, 104 S.Ct. 1970, 1981–1982, 80 L.Ed.2d 565 (1984) (state judge liable for injunctive and declaratory relief under § 1983 also liable for fees under § 1988).

### A

Proper application of this principle in damages actions against public officials requires careful adherence to the distinction between personal- and official-capacity action

suits. [10] Because this distinction apparently continues to confuse lawyers and confound lower courts, we attempt to define it more clearly through concrete examples of the practical and doctrinal differences between personal and official capacity actions.

 **[4]**  **[5]**  **[6]**  **[7]**  Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law. See, *e.g., Scheuer v. Rhodes,* 416 U.S. 232, 237–238, 94 S.Ct. 1683, 1686–1687, 40 L.Ed.2d 90 (1974). Official-capacity suits, in contrast, "generally represent only another way of pleading an action against an entity of which an officer is an agent." **\*166** *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 690, n. 55, 98 S.Ct. 2018, 2035, n. 55, 56 L.Ed.2d 611 1978). As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. *Brandon, supra,* 469 U.S., at 471–472, 105 S.Ct., at 878. It is *not* a suit against the official personally, for the real party in interest is the entity. Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself. [11]

 **[8]**  **[9]**  **[10]**  **[11]**  **[12]**  **[13]**  **[14]**  On the merits, to establish *personal* liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right. See, *e.g., Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). More is required in an official-capacity action, however, for a governmental entity is liable under § 1983 only when the entity itself is a " 'moving force' " behind the deprivation, *Polk County v. Dodson,* 454 U.S. 312, 326, 102 S.Ct. 445, 454, 70 L.Ed.2d 509 (1981) (quoting *Monell, supra,* 436 U.S., at 694, 98 S.Ct., at 2037); thus, in an official-capacity suit the entity's "policy or custom" must have played a part in the violation of federal law. *Monell, supra; Oklahoma City v. Tuttle,* 471 U.S. 808, 817–818, 105 S.Ct. 2427, 2433, 85 L.Ed.2d 791 (1985); *id.,* at 827–828, 105 S.Ct., at 2437, 2438 (BRENNAN, J., concurring in judgment). [12] When it comes to defenses to liability, an official in a personal-capacity action may, depending on his position, be able to assert personal immunity defenses, such **\*167** as objectively reasonable reliance on existing law. See *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) (absolute immunity); *Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967) (same); **\*\*3106** *Harlow*

*v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (qualified immunity); *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975) (same). In an official-capacity action, these defenses are unavailable. *Owen v. City of Independence,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980); see also *Brandon v. Holt,* 469 U.S. 464, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985). [13] The only immunities that can be claimed in an official-capacity action are forms of sovereign immunity that the entity, *qua* entity, may possess, such as the Eleventh Amendment. While not exhaustive, this list illustrates the basic distinction between personal- and official-capacity actions. [14]

 **[15]**  **[16]**  With this distinction in mind, it is clear that a suit against a government official in his or her personal capacity cannot lead to imposition of fee liability upon the governmental entity. A victory in a personal-capacity action is a victory against the individual defendant, rather than against the **\*168** entity that employs him. Indeed, unless a distinct cause of action is asserted against the entity itself, the entity is not even a party to a personal-capacity lawsuit and has no opportunity to present a defense. That a plaintiff has prevailed against one party does not entitle him to fees from another party, let alone from a nonparty. Cf. *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Yet that would be the result were we to hold that fees can be recovered from a governmental entity following victory in a personal-capacity action against government officials.

**B**

 **[17]**  **[18]**  **[19]**  Such a result also would be inconsistent with the statement in *Monell, supra,* that a municipality cannot be made liable under 42 U.S.C. § 1983 on a *respondeat superior* basis. Nothing in the history of § 1988, a statute designed to make effective the remedies created in § 1983 and similar statutes, suggests that fee liability, unlike merits liability, *was* intended to be imposed on a *respondeat superior* basis. On the contrary, just as Congress rejected making § 1983 a "mutual insurance" scheme, 436 U.S., at 694, 98 S.Ct., at 2037, Congress sought to avoid making § 1988 a " 'relief fund for lawyers.' " *Hensley, supra,* at 446, 103 S.Ct., at 1946 (opinion of BRENNAN, J.) (quoting 122 Cong.Rec. 33314 (1976) (remarks of Sen. Kennedy)). Section 1988 does not guarantee that lawyers will recover fees anytime their clients sue a government official in his personal capacity, with the governmental entity as ultimate insurer. Instead, fee liability

runs with merits liability; if federal law does not make the government substantively liable on a *respondeat superior* basis, the government similarly is not liable for fees on that basis under § 1988. Section 1988 simply does not create fee liability where merits liability is non-existent.

**\*\*3107** **III**

[20] [21] [22] [23] We conclude that this case was necessarily litigated as a personal-capacity action and that the Court of Appeals therefore erred in awarding fees against the Commonwealth of **\*169** Kentucky.[15] In asserting the contrary, respondents point out that the complaint expressly named Commissioner Brandenburgh in both his "individual" and "official" capacities and that the Commonwealth of Kentucky was named as a defendant for the limited purposes of a fee award. Nonetheless, given Eleventh Amendment doctrine, there can be no doubt that this damages action did not seek to impose monetary liability on the Commonwealth.[16]

The Court has held that, absent waiver by the State or valid congressional override, the Eleventh Amendment bars a damages action against a State in federal court.[17] See, *e.g., Ford Motor Co. v. Department of Treasury of Indiana,* 323 U.S. 459, 464, 65 S.Ct. 347, 350, 89 L.Ed. 389 (1945). This bar remains in effect when State officials are sued for damages in their official capacity. *Cory v. White,* 457 U.S. 85, 90, 102 S.Ct. 2325, 2328, 72 L.Ed.2d 694 (1982); *Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1974). That is so because, as discussed above, "a judgment against a public servant 'in his official capacity' imposes liability on the entity that he represents...." *Brandon, supra,* 469 U.S., at 471, 105 S.Ct., at 878.[18]

**\*170** Given this understanding of the law, an official-capacity action for damages could not have been maintained against Commissioner Brandenburgh in federal court.[19] Although respondents fail to acknowledge this point, they freely concede that money damages were never sought from the Commonwealth and could not have been awarded against it;[20] respondents cannot reach this same end simply by suing State officials in their official capacity. Nor did respondents' action on the merits become a suit against Kentucky when the Commonwealth was named a defendant on the limited issue of fee liability. There is no cause of action against a defendant for fees absent that defendant's liability for relief on

the merits. See *supra,* at ——. Naming the Commonwealth for fees did not create, out of whole cloth, the cause of action on the merits necessary to support this fee request. Thus, no claim for merits relief capable of being asserted in federal court was asserted against the Commonwealth of Kentucky. In the absence of such a claim, the fee award against the Commonwealth must be reversed.

**\*\*3108** **IV**

Despite the Court of Appeals' contrary view, the result we reach today is fully consistent with *Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978). *Hutto* holds only that, when a State in a § 1983 action has been prevailed against for relief on the merits, either because the State was a proper party defendant or because state officials properly were sued in their official capacity, fees may also be available from the State under § 1988. *Hutto* does not alter the basic philosophy of **\*171** § 1988, namely, that fee and merits liability run together. As a result, *Hutto* neither holds nor suggests that fees are available from a governmental entity simply because a government official has been prevailed against in his or her personal capacity.

Respondents vigorously protest that this holding will "effectively destro[y]" § 1988 in cases such as this one. Brief for Respondents 19. This fear is overstated. Fees are unavailable only where a governmental entity cannot be held liable on the merits; today we simply apply the fee-shifting provisions of § 1988 against a pre-existing background of substantive liability rules.

**V**

[24] Only in an official-capacity action is a plaintiff who prevails entitled to look for relief, both on the merits and for fees, to the governmental entity. Because the Court's Eleventh Amendment decisions required this case to be litigated as a personal-capacity action, the award of fees against the Commonwealth of Kentucky must be reversed.

*It is so ordered.*

**Parallel Citations**

105 S.Ct. 3099, 87 L.Ed.2d 114, 53 USLW 4966

Footnotes

\*     The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

1     Clyde Graham was killed by a Kentucky state trooper a month later at a motel in Illinois.

2     Respondents asserted causes of action under 42 U.S.C. §§ 1983, 1985, 1986, and 1988, as well as the Fourth, Fifth, Sixth, Eleventh, and Fourteenth Amendments. Complaint ¶ 13. Because the case was settled, there has been no need below to separate out or distinguish any of these purported causes of action. Before this Court, the parties briefed and argued the case as if it had been brought simply as a § 1983 action and we, accordingly, analyze it the same way. Our discussion throughout is therefore not meant to express any view on suits brought under any provision of federal law other than § 1983.

3     The complaint states:

        "Pursuant to the provisions of 42 U.S.C. Sec. 1988, the Commonwealth of Kentucky, d/b/a Bureau of State Police is liable for the payment of reasonable attorney fees incurred in this action." Complaint ¶ 4(D).

        According to respondents, "[p]aragraph 4(D) ... states the sole basis for including the Commonwealth as a named party." Brief for Respondents 14.

4     Five thousand dollars came from the city and $10,000 from the County. The remaining $45,000 was to be paid by Commissioner Brandenburgh, both personally and as agent for the "Kentucky State Police Legal Fund." The latter was not a named defendant but presumably represented the interests of the individual officers sued.

5     Petitioner did not appeal from the award of costs and expenses, and we therefore have no occasion to consider the appropriateness of these portions of the award.

6     *Berry v. McLemore,* 670 F.2d 30 (CA5 1982) (municipal officials); *Morrison v. Fox,* 660 F.2d 87 (CA3 1981) (same). At least one Court of Appeals appears to have reached the same result as that of the lower court in this case. See *Glover v. Alabama Department of Corrections,* 753 F.2d 1569 (CA11 1985).

7     See 6 J. Moore, W. Taggart, & J. Wicker, Moore's Federal Practice § 54.70[1], p. 1301 (1985) ("Costs" are awarded "against the losing party and as an incident of the judgment"); 10 C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2666, p. 173 (1983) ( " 'Costs' refers to those charges that one party has incurred and is permitted to have reimbursed by his opponent as part of the judgment in the action").

8     We did hold that the court and its chief justice in his official capacity could be enjoined from *enforcing* the State Bar Code and suggested that fees could be recovered from these defendants in their enforcement roles. Because the fee award had clearly been made against the defendants in their legislative roles, however, the award had to be vacated and the case remanded for further proceedings. That fees could be awarded against the Virginia Supreme Court and its chief justice pursuant to an injunction against enforcement of the Code further illustrates that fee liability is tied to liability on the merits.

9     The rules are somewhat different with respect to prevailing defendants. Prevailing defendants generally are entitled to costs, see Fed.Rule Civ.Proc. 54(d), but are entitled to fees only where the suit was vexatious, frivolous, or brought to harass or embarrass the defendant. See *Hensley v. Eckerhart,* 461 U.S. 424, 429, n. 2, 103 S.Ct. 1933, 1937, n. 2, 76 L.Ed.2d 40 (1983).

        We express no view as to the nature or degree of success necessary to make a plaintiff a prevailing party. See *Maher v. Gagne,* 448 U.S. 122, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980).

10     Personal-capacity actions are sometimes referred to as individual-capacity actions.

11     Should the official die pending final resolution of a personal-capacity action, the plaintiff would have to pursue his action against the decedent's estate. In an official-capacity action in federal court, death or replacement of the named official will result in automatic substitution of the official's successor in office. See Fed.Rule Civ.Proc. 25(d)(1); Fed.Rule App.Proc. 43(c)(1); this Court's Rule 40.3.

12     See *Monell,* 436 U.S., at 694, 98 S.Ct., at 2037 ("[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983").

13     In addition, punitive damages are not available under § 1983 from a municipality, *Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), but are available in a suit against an official personally, see *Smith v. Wade,* 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983).

14     There is no longer a need to bring official-capacity actions against local government officials, for under *Monell, supra,* local government units can be sued directly for damages and injunctive or declaratory relief. See, *e.g., Memphis Police Dept. v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) (decided with *Tennessee v. Garner* ) (damages action against municipality). Unless a State has waived its Eleventh Amendment immunity or Congress has overridden it, however, a State cannot be sued directly in its own name regardless of the relief sought. *Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978) (*per curiam* ).

Thus, implementation of state policy or custom may be reached in federal court only because official-capacity actions for prospective relief are not treated as actions against the State. See *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

In many cases, the complaint will not clearly specify whether officials are sued personally, in their official capacity, or both. "The course of proceedings" in such cases typically will indicate the nature of the liability sought to be imposed. *Brandon v. Holt,* 469 U.S. 464, 469, 105 S.Ct. 873, 877, 83 L.Ed.2d 878 (1985).

The city and county were sued directly as entities, but that aspect of the case is not before us.

See also n. 3, *supra.*

The Court has held that § 1983 was not intended to abrogate a State's Eleventh Amendment immunity. *Quern v. Jordan,* 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979); *Edelman v. Jordan,* 415 U.S. 651 (1974). Because this action comes to us as if it arose solely under § 1983, see n. 2, *supra,* we cannot conclude that federal law authorized an official-capacity action for damages against Commissioner Brandenburgh to be brought in federal court.

As to legislative waiver of immunity, petitioners assert that the Commonwealth of Kentucky has not waived its Eleventh Amendment immunity. This contention is not disputed, and we therefore accept it for purposes of this case.

In an injunctive or declaratory action grounded on federal law, the State's immunity *can* be overcome by naming state officials as defendants. See *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984); see also *Ex parte Young, supra.* Monetary relief that is "ancillary" to injunctive relief also is not barred by the Eleventh Amendment. *Edelman v. Jordan, supra,* 415 U.S., at 667–668, 94 S.Ct., at 1357–1358.

No argument has been made that the Commonwealth waived its Eleventh Amendment immunity by failing specifically to seek dismissal of that portion of the damages action that named Commissioner Brandenburgh in his official capacity. Nor is the Commonwealth alleged to have done so by allowing him to enter the settlement agreement; the Commonwealth did not even have notice of the settlement negotiations.

Brief for Respondents 17; Tr. of Oral Arg. 18.

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

106 S.W.3d 724
Supreme Court of Texas.

MARATHON CORPORATION d/b/
a Honda–Suzuki North, Petitioner,

v.

John PITZNER, a mentally incompetent
person, by and through his next friend and
guardian, Steven Pitzner, Respondent.

No. 01–0870.  |  May 22, 2003.
|  Rehearing Denied July 3, 2003.

Air conditioning repairman sued commercial tenant for injuries allegedly sustained in fall from roof of building. Pursuant to jury verdict, the 370th District Court, Hidalgo County, Fernando G. Mancias, J., entered judgment for repairman. Tenant appealed. The Corpus Christi Court of Appeals affirmed, 55 S.W.3d 114. On petition for review, the Supreme Court held that evidence was legally insufficient to support findings that, because of building's undisputed noncompliance with certain provisions of city's building and mechanical codes, repairman sustained electrical shock as he attempted to start unit, reeled backwards, tripped over gas line, and fell off roof.

Judgment of Court of Appeals reversed; take-nothing judgment rendered.

West Headnotes (9)

[1]     **Negligence**
          Necessity of causation
        **Negligence**
          Foreseeability
        Components of proximate cause are cause in fact and foreseeability.

        14 Cases that cite this headnote

[2]     **Negligence**
          "But-for" causation;  act without which event would not have occurred
        **Negligence**
          Substantial factor

Test for cause in fact, or "but for causation," is whether the act or omission was a substantial factor in causing the injury without which the harm would not have occurred.

40 Cases that cite this headnote

[3]     **Negligence**
          In general;  degrees of proof
        **Negligence**
          Direct or circumstantial evidence
        A finding of cause in fact, as component of proximate cause, may be based on either direct or circumstantial evidence, but cannot be supported by mere conjecture, guess, or speculation.

        26 Cases that cite this headnote

[4]     **Appeal and Error**
          Total failure of proof
        Appellate court will sustain a no evidence point of error when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact.

        57 Cases that cite this headnote

[5]     **Evidence**
          Sufficiency to support verdict or finding
        Anything more than a scintilla of evidence is legally sufficient to support the trial court's finding.

        11 Cases that cite this headnote

[6]     **Evidence**
          Sufficiency to support verdict or finding
        Some suspicion linked to other suspicion produces only more suspicion, which is not the same as some evidence.

        9 Cases that cite this headnote

**[7]** **Electricity**
&#128273; Weight and sufficiency of evidence

**Evidence**
&#128273; Cause and effect

Evidence was legally insufficient, in premises liability action against commercial tenant by air conditioning repairman to recover for injuries allegedly sustained in fall from roof, to support a finding that, because of building's undisputed noncompliance with certain provisions of city's building and mechanical codes, repairman sustained electrical shock as he attempted to start unit, reeled backwards and tripped over gas line, and then fell off roof; expert opinions to that effect were based on speculation piled on speculation.

7 Cases that cite this headnote

**[8]** **Evidence**
&#128273; Speculation, guess, or conjecture

Expert opinions must be supported by facts in evidence, not conjecture.

23 Cases that cite this headnote

**[9]** **Evidence**
&#128273; Circumstantial evidence

In cases with only slight circumstantial evidence, something else must be found in the record to corroborate the probability of the fact's existence or non-existence.

10 Cases that cite this headnote

**Attorneys and Law Firms**

**\*725** Clay E. Coalson, Meredith Donnell & Abernethy, P.C., Gregory T. Perkes, The Perkes Law Firm, P.C., Corpus Christi, Rodney W. Sipes, Law Offices of Rodney W. Sipes, Edinburg, Philip S. Gordon, Gordon Law Firm, Houston, for Petitioner.

Juan A. Magallanes, Gilberto Hinojosa and Richard Otto Burst, Magallanes & Hinojosa, P.C., Brownsville, for Respondent.

**Opinion**

PER CURIAM.

John Pitzner, an air conditioning repairman, sued Marathon Corporation d/b/a Honda–Suzuki North to recover damages for injuries he alleges he sustained when he fell from the roof of the building Marathon **\*726** occupied as a tenant. The trial court rendered judgment on a jury verdict in Pitzner's favor, and the court of appeals affirmed. [1] Because Pitzner failed to produce legally sufficient evidence that the alleged premises defects proximately caused his injuries, we reverse the court of appeals' judgment and render judgment that Pitzner take nothing on his claims against Marathon.

Marathon owned a Honda and Suzuki motorcycle dealership and leased the building from which Pitzner fell. Pitzner worked as an air conditioning repairman for a company owned by Robert S. Hull. Hull's company had serviced the two air conditioning units on the roof of Marathon's premises for many years before Pitzner's fall. Pitzner himself had been the primary repairman to work on the units for about two and a half years and had been on the roof of Marathon's premises at least twenty-five and perhaps as many as fifty times before sustaining his devastating injuries.

Pitzner's fall occurred on a summer day when the temperature was about ninety-nine degrees. The roof was flat and made of asphalt. Pitzner had begun work late in the afternoon. At about 6:30 p.m., Marathon's employees closed the dealership and left. They knew that Pitzner was on the roof but did not tell him that they were leaving. Pitzner was well-acquainted with the employees from previous service calls, and in the past when he needed access to the inside of the building, he would tell someone at Marathon. He had not told them that day that he needed to go inside the building or that they should stay late, as they had sometimes done.

About two hours after Marathon's employees closed the dealership and left, Pitzner was found semi-conscious in the parking lot with severe head injuries. It is undisputed that he had used a ladder to access the roof of the building, which was about twelve feet, ten inches high, but the ladder was missing when Pitzner was found. There was no other access to the roof, from either inside or outside the building. A screwdriver with a burnt tip was found near Pitzner in the parking lot, but there were no burns on Pitzner or other indications of contact with electricity. He suffered injuries to both the front and back of his head and to his lumbar spine.

The occurrence was initially reported as an assault, with the treating emergency room physician and a paramedic noting in their respective reports that Pitzner suffered from numerous blows to the head with a blunt object or appeared to have been beaten up. The investigating police officer disagreed, however, and surmised that Pitzner had fallen from the building. Because of the severity and extent of his injuries, Pitzner does not recall what happened.

Pitzner's guardian and next friend brought suit on his behalf against a number of defendants, including Marathon. Although Pitzner was a resident of Dallas County, and his injuries occurred there, suit was filed in Hidalgo County. Marathon filed a motion to transfer, which was overruled. By the time of trial, all other defendants had settled, and Marathon was the only remaining defendant.

At trial Marathon posited that Pitzner may have become dizzy or faint from working on the asphalt roof in the heat without any water. Photos and other evidence showed that Pitzner did not have any water with him on the roof. Marathon also suggested at trial that Pitzner had been the victim of foul play. Pitzner's witnesses disagreed and opined that Marathon **\*727** or the condition of its premises was responsible. An expert witness testified that, in his opinion, based on the injuries to Pitzner's skull and spine, Pitzner was traveling backwards when he left the roof, and his upper body struck the ground first. He also said that, in his opinion, Pitzner received an electrical shock or "a sensation that surprised him," and that he reeled backwards, tripped over a gas line on the roof, and fell from the building.

At trial the jury was instructed that "negligence" with regard to Marathon meant:

(1) That at the time of the occurrence in question there was a dangerous condition on the premises which presented an unreasonable risk of harm to John Pitzner; and,

(2) That prior to the occurrence in question, Marathon Corporation d/b/a Honda–Suzuki North knew or should have known by the exercise of ordinary care about said condition; and

(3) That Marathon Corporation d/b/a Honda–Suzuki North, did not exercise reasonable care to reduce or eliminate the risk.

The jury found Marathon one hundred percent liable for Pitzner's injuries, and the trial court rendered a judgment for $7,731,152.59 in actual damages, including pre-judgment and post-judgment interest. The court of appeals affirmed that judgment.

In this Court, Marathon raises a number of issues, including whether: (1) it owed a duty to Pitzner; (2) it exercised control over Pitzner's work when its employees closed the dealership and left Pitzner on the roof; (3) it had actual or constructive knowledge of premises defects; and (4) any premises defects proximately caused Pitzner's injuries. Marathon also asserts that various determinations regarding its motions to transfer and for a new trial were erroneous. We address only the proximate cause issue.

**[1]** **[2]** **[3]** The components of proximate cause are cause in fact and foreseeability.[2] The test for cause in fact, or "but for causation," is whether the act or omission was a substantial factor in causing the injury "without which the harm would not have occurred."[3] A finding of cause in fact may be based on either direct or circumstantial evidence,[4] but cannot be supported by mere conjecture, guess, or speculation.[5]

**[4]** **[5]** **[6]** Marathon contends that there is legally insufficient evidence to support the finding that Pitzner's injuries were caused by premises defects. We will sustain a no evidence point of error when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact.[6] Anything more than a scintilla of evidence is legally sufficient to support the trial court's finding, but as we have frequently said, **\*728** " 'some suspicion linked to other suspicion produces only more suspicion, which is not the same as some evidence.' "[7] We have also said that an inference stacked only on other inferences is not legally sufficient evidence.[8]

In reviewing the evidence in the light most favorable to the findings in favor of Pitzner, it is undisputed that the premises did not comply with Dallas City building and mechanical codes in certain respects. Pitzner points to two of these violations as the cause of his fall. First, air conditioning units were required to have a thirty-inch work space in front of

their access panels. The access panels of the two units on Marathon's premises faced one another and were ten to twelve inches apart, so that the space was eighteen to twenty inches shy of the code requirements. The spacing from electrical components inside the access panel was also less than the thirty-six inches required by the Dallas Electrical Code.

 **[7]**    Second, the air conditioning units did not have a power disconnect on the roof so that all electrical power to the units could be shut off by someone working on the roof. The power disconnect to the units themselves was located downstairs, inside the building, and the main power to the building was located on the ground outside of the building. One of the experts at trial theorized that the lack of a power disconnect and the lack of thirty inches of space between the units caused Pitzner to come into contact with a high-voltage line. The central question in this appeal is whether there is any evidence that Pitzner came into contact with a high-voltage rather than a low-voltage electrical wire or any electrical wire at all.

There was unchallenged testimony from Hull, who completed the repairs after Pitzner's fall, that Pitzner had almost finished repairing a freon leak. All experts agreed that, typically, a repairman would start an air conditioning unit after repairing a freon leak to fully recharge the unit. Pitzner's expert witness said that it was common for repairmen to start an air conditioning unit by connecting two low-voltage lines and that it was also common for repairmen to carry around a screwdriver with a burnt tip so that a new screwdriver would not be ruined each time one was used to short a circuit. He also testified that connecting and shorting two low-voltage lines would not work at premises like Marathon's if the air conditioning unit had been turned off downstairs. In that event, the expert said that a repairman would reach inside the access panel to push the contactor (a black bar), which would bypass the control circuit and start the unit. Although it was common for repairmen to do this, the expert said, it could result in an electrical shock or flash. However, there was no evidence of whether the power to the units had been turned off inside the building while Pitzner was working on them.

Another expert for Pitzner testified that in his opinion, the lack of space between **\*729** the units caused Pitzner to reach into the access panel at an angle that made it more likely that he would come into contact with a high-voltage wire, and that after Pitzner was shocked, he reeled backwards, tripped over a gas pipeline that was on the roof, and fell backwards off the roof. The units were ten feet from the edge of the roof. A gas pipeline ran the length of the roof. It was about two inches in

diameter and about five inches above the surface of the roof, and it was about six or seven feet from the units and three or four feet from the edge of the roof.

 **[8]**    Expert opinions must be supported by facts in evidence, not conjecture.[9] The experts' opinions that Pitzner sustained an electrical shock and fell off the roof because of premises defects pile speculation on speculation and inference on inference. To reach their conclusions, Pitzner's experts postulate that:

1) the power to the air conditioning units had been shut off inside the building so that it was not possible to start the recharged unit by connecting low-voltage wires,

2) therefore, Pitzner must have attempted to reach into the access panel to push the contactor,

3) and therefore, he must have come into contact with a high-voltage wire,

4) which then shocked him, causing him to step back and stumble over a gas pipeline,

5) which then caused him to fall off of the roof,

6) all of which would not have happened if there had been an electrical disconnect on the unit or ten to twelve more inches of space between the two air conditioning units.

But because there is no proof that the units had been shut off inside the building, it is only speculation that Pitzner reached into the access panel, came into contact with a high-voltage wire, was shocked, stumbled back, and fell off of the building.

 **[9]**    On this record, the circumstances "could give rise to any number of inferences, none more probable than another."[10] The absence of the ladder at the scene indicates that someone else was present on the premises at some point. The injuries to both the front and back of Pitzner's head are consistent with a fall but also with an assault and battery. The screwdriver's burnt tip could have been burned during a previous job and routinely carried by Pitzner to use on low-voltage wires, or the screwdriver might have been burned on Marathon's roof if it came into contact with a high-voltage wire inside the air conditioning unit. The factfinder could only speculate as to (1) whether Pitzner actually fell from the roof, (2) whether he actually came into contact with a high-voltage wire on Marathon's roof, and (3) whether and how the lack of a

power disconnect on the roof or the lack of additional space between the air conditioning units was a substantial factor in causing Pitzner's injuries. As this Court has said, "in cases with only slight circumstantial evidence, something else must be found in the record to corroborate the probability of the fact's existence or non-existence." [11] That "something else" is absent in this case. There is no evidence that the condition of Marathon's premises proximately caused Pitzner's injuries.

Accordingly, without hearing oral argument, **\*730** [12] we reverse the judgment of the court of appeals and render judgment that Pitzner take nothing on his claim against Marathon.

**Parallel Citations**

46 Tex. Sup. Ct. J. 689

Footnotes

1   55 S.W.3d 114.

2   *Doe v. Boys Clubs of Greater Dallas, Inc.,* 907 S.W.2d 472, 477 (Tex.1995).

3   *Id.*

4   *Havner v. E–Z Mart Stores, Inc.,* 825 S.W.2d 456, 459 (Tex.1992).

5   *Boys Clubs,* 907 S.W.2d at 477.

6   *Uniroyal Goodrich Tire Co. v. Martinez,* 977 S.W.2d 328, 334 (Tex.1996) (citing *Juliette Fowler Homes, Inc. v. Welch Assocs., Inc.,* 793 S.W.2d 660, 666 n. 9 (Tex.1990) (citing Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 TEX. L.REV. 361, 362–63 (1960))).

7   *Johnson v. Brewer & Pritchard, P.C.,* 73 S.W.3d 193, 210 (Tex.2002) (quoting *Browning–Ferris, Inc. v. Reyna,* 865 S.W.2d 925, 927 & n. 3 (Tex.1993) (citing *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983) ("When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence."))).

8   *See generally Lozano v. Lozano,* 52 S.W.3d 141, 148 (Tex.2001); *Hammerly Oaks, Inc. v. Edwards,* 958 S.W.2d 387, 392 (Tex.1997); *Cont'l Coffee Prods., Inc. v. Cazarez,* 937 S.W.2d 444, 450 (Tex.1996); *Litton Indus. Prods., Inc. v. Gammage,* 668 S.W.2d 319, 324 (Tex.1984).

9   *See generally Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 499–500 (Tex.1995).

10  *Hammerly Oaks,* 958 S.W.2d at 392.

11  *Lozano,* 52 S.W.3d at 148.

12  TEX.R.APP. P. 59.1.

**End of Document**                                   © 2015 Thomson Reuters. No claim to original U.S. Government Works.

971 S.W.2d 402
Supreme Court of Texas.

MARITIME OVERSEAS
CORPORATION, Petitioner,
v.
Richard ELLIS, Respondent.

NO. 94–1057.   |   Argued Nov.
5, 1997.   |   Decided April 16, 1998.
|   Rehearing Overruled July 3, 1998.

Steward's assistant sued shipowner under Jones Act and under general maritime law, alleging that he was suffering from delayed neurotoxic effects caused by exposure to toxic chemical pesticide. The 165th District Court, Harris County, Kenneth Harrison, J., entered judgment on jury verdict awarding steward actual, punitive, and exemplary damages, and prejudgment interest, for total of approximately $12.6 million. Shipowner appealed. On motion for rehearing, en banc, the Houston Court of Appeals, 14th District, 886 S.W.2d 780, affirmed in part and reversed and rendered in part. Application for writ of error was filed. The Supreme Court, Baker, J., held that: (1) Court of Appeals followed appropriate standards of review by analyzing shipowner's challenge to causation under "featherweight" burden of negligence and causation under Jones Act and by reviewing amount of damages awarded under traditional factual sufficiency review under Texas law, and (2) shipowner did not preserve for appellate review its claim that testimony presented by steward's experts was not scientifically reliable and therefore presented no evidence of causation.

Affirmed.

Gonzalez, J., filed a concurring opinion in which Abbott, J., joined in part.

Hecht, J., filed a dissenting opinion in which Phillips, C.J., joined.

West Headnotes (21)

**[1]      Admiralty**
         Effect of State Laws
      **Admiralty**

         Remedies and procedure
When state court hears admiralty case, that court occupies essentially same position occupied by federal court sitting in diversity, and state court thus must apply substantive federal maritime law but follow state procedure.

13 Cases that cite this headnote

**[2]      Labor and Employment**
         Weight and sufficiency of evidence
Under Federal Employers' Liability Act (FELA), causation burden is not common law proximate cause standard but rather is "featherweight burden" of whether proof justifies with reason the conclusion that employer negligence played any part, even slightest, in producing injury for which claimant seeks damages. Federal Employers' Liability Act, § 1 et seq., 45 U.S.C.A. § 51 et seq.

19 Cases that cite this headnote

**[3]      Seamen**
         Personal Injuries
Jones Act expressly incorporates Federal Employers' Liability Act (FELA) and case law developing that statute, and thus, causation standard under Jones Act is same as that under FELA. Jones Act, 46 App.U.S.C.A. § 688; Federal Employers' Liability Act, § 1 et seq., 45 U.S.C.A. § 51 et seq.

3 Cases that cite this headnote

**[4]      Appeal and Error**
         Questions of fraud or negligence
Federal Employers' Liability Act's (FELA) standard of appellate review applies in Jones Act cases. Jones Act, 46 App.U.S.C.A. § 688; Federal Employers' Liability Act, § 1 et seq., 45 U.S.C.A. § 51 et seq.

2 Cases that cite this headnote

**[5]      Appeal and Error**
         Questions of fraud or negligence

Purpose of Jones Act standard of appellate review is to vest jury with complete discretion on factual issues about liability. Jones Act, 46 App.U.S.C.A. § 688.

3 Cases that cite this headnote

**[6]** **Appeal and Error**

    Sufficiency of Evidence in Support

Appellate court's review in Jones Act case is complete once court determines that some evidence about which reasonable minds could differ supports verdict; appellate court may not conduct traditional factual sufficiency review of jury's liability finding under Texas "weight and preponderance" standard. Jones Act, 46 App.U.S.C.A. § 688.

40 Cases that cite this headnote

**[7]** **Appeal and Error**

    Personal injuries

**Appeal and Error**

    Reducing amount of recovery

State appellate courts have power to review excessiveness of damages and to order remittitur in Federal Employers' Liability Act (FELA) actions and, by implication, in Jones Act cases as well. Jones Act, 46 App.U.S.C.A. § 688; Federal Employers' Liability Act, § 1 et seq., 45 U.S.C.A. § 51 et seq.

2 Cases that cite this headnote

**[8]** **Appeal and Error**

    Extent of Review

In reviewing excessiveness of damages and whether to order remittitur in Jones Act cases, appellate court must make its own detailed appraisal of evidence bearing on damages. Jones Act, 46 App.U.S.C.A. § 688.

Cases that cite this headnote

**[9]** **Appeal and Error**

    Excessive verdict

Standard of review for excessive damages complaint is factual sufficiency of evidence, and court of appeals should employ same test for determining excessive damages as for any factual sufficiency question.

59 Cases that cite this headnote

**[10]** **Appeal and Error**

    Extent of Review

When considering factual sufficiency challenge to jury's verdict, courts of appeals must consider and weigh all of the evidence, not just that evidence which supports verdict.

191 Cases that cite this headnote

**[11]** **Appeal and Error**

    Clear or palpable weight or preponderance

Court of appeals can set aside verdict only if it is so contrary to overwhelming weight of evidence that verdict is clearly wrong and unjust.

202 Cases that cite this headnote

**[12]** **Appeal and Error**

    Credibility of Witnesses

**Appeal and Error**

    Conclusiveness in General

Court of appeals is not fact finder and accordingly may not pass upon witnesses' credibility or substitute its judgment for that of jury, even if evidence would clearly support different result.

279 Cases that cite this headnote

**[13]** **Appeal and Error**

    Form and requisites

If court of appeals determines that evidence supports jury's verdict, it is not required to detail all evidence supporting judgment when it affirms trial court's judgment for actual damages.

7 Cases that cite this headnote

**[14]** **Appeal and Error**

 Form and requisites

When reversing trial court's judgment for factual insufficiency, court of appeals must detail all evidence relevant to issue and clearly state why jury's finding is factually insufficient or so against great weight and preponderance of evidence that it is manifestly unjust.

53 Cases that cite this headnote

**[15]    Appeal and Error**

 Form and requisites

When reversing trial court's judgment for factual insufficiency, court of appeals must explain how contrary evidence greatly outweighs evidence supporting verdict.

14 Cases that cite this headnote

**[16]    Appeal and Error**

 Measure and amount of damages

Question of whether damages are excessive and that remittitur is appropriate is factual determination made final in court of appeals, and thus, Supreme Court lacks jurisdiction to review such findings. Vernon's Ann.Texas Const. Art. 5, § 6; V.T.C.A., Government Code, § 22.225(a).

8 Cases that cite this headnote

**[17]    Appeal and Error**

 Questions of fraud or negligence

**Appeal and Error**

 Personal injuries

Court of appeals followed appropriate standards of review in analyzing shipowner's challenges to steward's recovery under Jones Act by analyzing shipowner's challenge to causation under "featherweight" burden of negligence and causation under Jones Act and by reviewing amount of damages awarded to steward under traditional factual sufficiency review under Texas law. Jones Act, 46 App.U.S.C.A. § 688.

9 Cases that cite this headnote

**[18]    Appeal and Error**

 Necessity of timely objection

To preserve complaint that scientific evidence is unreliable and thus, constitutes no evidence, party must object to evidence before trial or when evidence is offered; without requiring timely objection to reliability of scientific evidence, offering party is not given opportunity to cure any defect that may exist, and will be subject to trial and appeal by ambush.

71 Cases that cite this headnote

**[19]    Appeal and Error**

 Opinion evidence and hypothetical questions

Reviewing courts may not exclude expert scientific evidence after trial to render judgment against offering party because that party relied on fact that evidence was admitted.

11 Cases that cite this headnote

**[20]    Appeal and Error**

 Necessity of timely objection

Shipowner did not preserve for appellate review its claim that testimony presented by steward's experts in Jones Act case was not scientifically reliable and therefore presented no evidence to prove that shipowner's negligence concerning pesticide caused delayed neurotoxicity and steward's long term health conditions, where shipowner did not make any objection to scientific reliability of experts before or at trial until after jury verdict. Jones Act, 46 App.U.S.C.A. § 688.

66 Cases that cite this headnote

**[21]    Appeal and Error**

 Objections to evidence and witnesses

When reliability of scientific evidence is contested, attempts at persuasion on weight of evidence before jury and reiterated on appeal cannot amount to preservation of error about reliability of evidence; to allow otherwise would impermissibly permit party to strip away trial court's role as gatekeeper in the first instance when a party wishes to contest reliability of

scientific evidence, would deprive proffering party of opportunity to cure any defects in its evidence, and could require appellate courts to make decisions about reliability without fully developed record.

28 Cases that cite this headnote

**Attorneys and Law Firms**

**\*404** Linda Broocks, Thomas B. Greene, III, Houston, Joe R. Greenhill, Austin, Marc A. Antonetti, Jane Nenninger Bland, Houston, Margaret Niver McGann, Salt Lake City, UT, Sally Mann Romano, Houston, for Petitioner.

John M. O'Quinn, Gary M. Riebschlager, Eugene A. Cook, Kendall C. Montgomery, Mareen McPherson Spector, Joe H. Reynolds, Gael Plauché, Christian A. Steed, Houston, for Respondent.

**Opinion**

BAKER, Justice, delivered the opinion of the Court, in which ENOCH, SPECTOR, ABBOTT and HANKINSON, Justices, join.

This case involves Richard Ellis's Jones Act claims for injuries he sustained aboard a vessel owned by Maritime Overseas Corporation. The trial court rendered judgment on the jury's verdict for Ellis for actual and exemplary damages and awarded prejudgment interest. The court of appeals affirmed the actual damages award, but reversed the awards of exemplary damages and prejudgment interest.

Maritime asserts that the court of appeals used an improper standard to review the factual sufficiency of Ellis's damages evidence. Maritime also contends that the court of appeals should have applied a *Daubert–Robinson–Havner* review to determine whether any well-founded scientific methodology supported some of the actual damages award. [1] We conclude, under the facts of this case, that the court of appeals properly disposed of Maritime's claims. Accordingly, we affirm the court of appeals' judgment.

### I. BACKGROUND

### A. FACTS

Ellis served as a steward's assistant in the housekeeping and galley department aboard the *S/T Overseas Alaska,* a 700–foot oil tanker owned by Maritime. In late August 1982, while the ship was at sea, the chief steward attempted to control a roach problem by spraying Diazinon, an industrial strength pesticide, in small, enclosed, unventilated areas, including the pantry, a storeroom and other nearby areas. The chief steward did not dilute the Diazinon properly. On the morning after the spraying, crew members noticed a strong insecticide odor. The captain ordered several crew members, including Ellis, to clean up the excess Diazinon. Ellis participated in the cleanup for about five hours without wearing inhalation protective gear or special equipment to protect his skin from contact with the insecticide. He was exposed to Diazinon levels up to 200 times over what is considered safe for human exposure.

After the cleanup, Ellis complained of a headache, eye irritation, and a runny nose. The ship reached New Orleans two days later, and Ellis was sent to the New Orleans General Hospital Emergency Room. At the hospital, emergency room personnel found Ellis had myosis with pupil constriction, muscle twitching, and muscle weakness along with other symptoms. Ellis's blood tests revealed that he had depressed levels of acetylcholinesterase, an essential enzyme. The **\*405** insecticide Diazinon is an organophosphate, which is toxic to humans in varying degrees. The emergency room doctor testified at trial that on a scale of one to ten, with one representing normal health and ten representing death, Ellis suffered organophosphate exposure of a level of six to seven. The examining physician concluded that Ellis suffered from Diazinon exposure and gave Ellis medication for eye problems. The examining physician did not hospitalize Ellis, but she recommended follow-up care. About a month later, Ellis saw another doctor for continuing problems with his eyes.

Months after his exposure to Diazinon, Ellis began to complain of memory defects, irritability, gastrointestinal problems, anxiousness, fatigue, indigestion, nausea, muscle pain and stiffness, leg cramps, dizziness, insomnia, high blood pressure, and black-out spells. At trial, Ellis's experts testified that his Diazinon exposure had caused him to suffer from "delayed neurotoxicity" or "neuropathy." Ellis's experts also testified that his condition is irreversible.

## B. PROCEDURAL HISTORY

About ten months after his exposure to Diazinon, Ellis sued Maritime for gross negligence under the Jones Act and unseaworthiness under general maritime law. Based on the jury's verdict, the trial court rendered judgment for Ellis for $8,576,000 in actual damages, $1,000,000 in punitive damages, $1,000,000 in exemplary damages for failure to pay maintenance and cure, and $1,871,728 in prejudgment interest. The damages totaled about $12.6 million. Maritime filed post-verdict motions for judgment notwithstanding the verdict and new trial or, in the alternative, for remittitur. Maritime alleged that the actual and exemplary damages were excessive because the evidence was factually insufficient to support the damage awards. The trial court overruled all of Maritime's motions.

In the court of appeals, Maritime only complained about the trial court's denial of its motion for new trial and motion for remittitur; it did not challenge the trial court's denial of its motion for judgment notwithstanding the verdict. The case was first argued before a three-judge panel of the court of appeals. The panel majority held that the evidence was factually insufficient to support the damages award. There was a dissent without an opinion. Later, the court of appeals granted Ellis's motion for en banc rehearing. Following argument, the en banc court affirmed the actual damages award, but reversed the trial court's judgment for exemplary damages and prejudgment interest. 886 S.W.2d 780.

This Court granted Maritime's application for writ of error on two issues. First, Maritime contends that the court of appeals erred by not using the proper standard to review the factual sufficiency of Ellis's actual damages evidence. Maritime argues that the court of appeals should have applied a traditional factual sufficiency review to the damages award instead of a featherweight causation standard because the trial court submitted the damages question to the jury based upon a preponderance of the evidence burden of proof. Second, Maritime contends, within the framework of its factual sufficiency review argument, that the court of appeals should have examined whether any well-founded scientific methodology supported the jury's actual damages award.

At oral argument in this Court, Maritime stated that it was not making a no evidence complaint. Rather, Maritime asserted that its only complaint is that the court of appeals did not properly conduct a factual sufficiency review. However,

under its factual sufficiency argument, Maritime argues that there is *no evidence* of long term injury from delayed neurotoxicity. In essence, Maritime would have this Court conduct a no evidence review of the evidence about delayed neurotoxicity within the Court's review of whether the court of appeals properly reviewed the factual sufficiency of the evidence. We decline to do so.

## II. COURT OF APPEALS'
## FACTUAL SUFFICIENCY REVIEW

### A. THE JONES ACT 46 U.S.C. § 688

 [1]    The Jones Act provides a cause of action for maritime workers injured by an employer's negligence. Federal law provides **\*406** that a party asserting an admiralty action may bring the action in state court. *See* 28 U.S.C. § 1333(1). When a state court hears an admiralty case, that court occupies essentially the same position occupied by a federal court sitting in diversity: the state court must apply substantive federal maritime law but follow state procedure. *See Texaco Ref. & Mkt. Inc. v. Estate of Dau Van Tran,* 808 S.W.2d 61, 64 (Tex.1991); *see also General Chem. Corp. v. De La Lastra,* 852 S.W.2d 916, 920 (Tex.1993).

 [2]    [3]    Under the Federal Employers' Liability Act (FELA), a related statute, the causation burden is not the common law proximate cause standard. Rather, the causation burden is "whether the proof justifies with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury for which the claimant seeks damages." *Rogers v. Missouri Pac. R.R.,* 352 U.S. 500, 506–07, 77 S.Ct. 443, 448–49, 1 L.Ed.2d 493 (1957); *Landry v. Oceanic Contractors Inc.,* 731 F.2d 299, 302 (5 th Cir.1984). This burden has been termed "featherweight." *See Johnson v. Offshore Exp., Inc.,* 845 F.2d 1347, 1352 (5 th Cir.1988); *Smith v. Trans–World Drilling Co.,* 772 F.2d 157, 162 (5 th Cir.1985); *see also Sentilles v. Inter–Caribbean Shipping Corp.,* 361 U.S. 107, 80 S.Ct. 173, 4 L.Ed.2d 142 (1959). The Jones Act expressly incorporates FELA and the case law developing that statute. *See Ferguson v. Moore–McCormack Lines, Inc.,* 352 U.S. 521, 77 S.Ct. 457, 1 L.Ed.2d 511 (1957). Thus, the causation standard under the Jones Act is the same as that under FELA. *See American Dredging Co. v. Miller,* 510 U.S. 443, 456, 114 S.Ct. 981, 989–90, 127 L.Ed.2d 285 (1994); *see also Brown & Root, Inc. v. Wade,* 510 S.W.2d 408, 410 (Tex.Civ.App.—Houston [14 th Dist.] 1974, writ ref'd n.r.e.).

## B. STANDARDS OF REVIEW

### 1. Jones Act Liability

 [4]    [5]    [6]    Texas courts have long recognized that in addition to the burden of proof being less stringent, the standard of appellate review in a Jones Act case is also less stringent than under the common law. *See Texas & Pac. Ry. v. Roberts,* 481 S.W.2d 798, 800 (Tex.1972); *Brown & Root, Inc.,* 510 S.W.2d at 410. As with the law on causation, FELA's standard of appellate review applies in Jones Act cases. *See Ferguson,* 352 U.S. at 523, 77 S.Ct. at 458. Thus, the purpose of the Jones Act standard of review is to vest the jury with complete discretion on factual issues about liability. *See Rogers,* 352 U.S. at 506–07, 77 S.Ct. at 448–49. Once the appellate court determines that some evidence about which reasonable minds could differ supports the verdict, the appellate court's review is complete. *See Roberts,* 481 S.W.2d at 800 (citing *Lavender v. Kurn,* 327 U.S. 645, 66 S.Ct. 740, 90 L.Ed. 916 (1946)). Essentially, a Texas court of appeals may not conduct a traditional factual sufficiency review of a jury's liability finding under the Texas "weight and preponderance" standard. *See Roberts,* 481 S.W.2d at 801; *see also Brown & Root, Inc.,* 510 S.W.2d at 410. Rather, courts of appeals must apply the less stringent federal standard of review.

### 2. Excessive Damages and Remittiturs

 [7]    [8]    Texas courts of appeal have the power to review excessiveness of damages and to order remittitur in FELA actions and, by implication, in Jones Act cases as well. *See Sweet v. Port Terminal R.R.,* 653 S.W.2d 291, 294–95 (Tex.1983); *c.f. Nobles v. Southern Pac. Transp. Co.,* 731 S.W.2d 697, 699 (Tex. App—Houston [14 th Dist.] 1987, writ ref'd n.r.e.); s*ee also Nairn v. National R.R. Passenger Corp.,* 837 F.2d 565, 566 (2d Cir.1988). The appellate court must make its own "detailed appraisal of the evidence bearing on damages." *Nairn,* 837 F.2d at 567, (quoting *Grunenthal v. Long Island R.R.,* 393 U.S. 156, 159, 89 S.Ct. 331, 333, 21 L.Ed.2d 309 (1968)).

 [9]    [10]    [11]    [12]    The standard of review for an excessive damages complaint is factual sufficiency of the evidence. *See Rose v. Doctors Hosp.,* 801 S.W.2d 841,

847–48 (Tex.1990); *Pope v. Moore,* 711 S.W.2d 622, 624 (Tex.1986). The court of appeals should employ the same test for determining excessive damages as for any factual sufficiency question. *See Pope,* 711 S.W.2d at 624. When considering a factual sufficiency challenge to a **\*407** jury's verdict, courts of appeals must consider and weigh all of the evidence, not just that evidence which supports the verdict. *See Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex.1996); *Lofton v. Texas Brine Corp.,* 720 S.W.2d 804, 805 (Tex.1986). A court of appeals can set aside the verdict only if it is so contrary to the overwhelming weight of the evidence that the verdict is clearly wrong and unjust. *See Ortiz,* 917 S.W.2d at 772; *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). The court of appeals is not a fact finder. Accordingly, the court of appeals may not pass upon the witnesses' credibility or substitute its judgment for that of the jury, even if the evidence would clearly support a different result. *See Pool v. Ford Motor Co.,* 715 S.W.2d 629, 634 (Tex.1986).

 [13]    [14]    [15]    If the court of appeals determines that the evidence supports the jury's verdict, it is not required to detail all the evidence supporting the judgment when it affirms the trial court's judgment for actual damages. *See Ellis County State Bank v. Keever,* 888 S.W.2d 790, 794 (Tex.1994). On the other hand, when reversing a trial court's judgment for factual insufficiency, the court of appeals must detail all the evidence relevant to the issue and clearly state why the jury's finding is factually insufficient or so against the great weight and preponderance of the evidence that it is manifestly unjust. *See Keever,* 888 S.W.2d at 794; *Pool,* 715 S.W.2d at 635. The court of appeals must explain how the contrary evidence greatly outweighs the evidence supporting the verdict. See *Keever,* 888 S.W.2d at 794; *Pool,* 715 S.W.2d at 635.

 [16]    Because the question of whether damages are excessive and that a remittitur is appropriate is a factual determination made final in the court of appeals, this Court lacks jurisdiction to review such findings. TEX. CONST. art. V, § 6; TEX. GOV'T CODE, § 22.225(a); *Akin v. Dahl,* 661 S.W.2d 917, 921 (Tex.1983); *Sweet,* 653 S.W.2d at 295.

## C. ANALYSIS

Maritime concedes that the Jones Act imposes a reduced burden in proving a defendant's *liability,* but asserts the Act does not relieve a plaintiff of the burden of proving *damages* by a preponderance of the evidence. Initially, Maritime contends that by submitting the damages question based upon

a preponderance of the evidence, Ellis waived any argument that a featherweight standard applies to the court of appeals' review of damages. *See De La Lastra,* 852 S.W.2d at 916. Maritime further argues that both federal and Texas appellate courts have reviewed damage awards for factual sufficiency and excessiveness using traditional standards of review in Jones Act cases. *See Nairn,* 837 F.2d at 566; *Sweet,* 653 S.W.2d at 294–95. Maritime asserts that the court of appeals used the wrong standard when it reviewed the actual damages award in this case. We disagree. As explained below, the court of appeals properly analyzed this case in the context of Maritime's point of error and argument in that court.

The record shows that during trial, Ellis offered the testimony of five expert medical doctors, four of whom had examined and treated Ellis. Maritime did not challenge the testimony of any of the five experts at trial. All five expert witnesses testified that Ellis's severe and lengthy exposure to Diazinon caused his prolonged neural damages. They expressed their opinions on bases ranging from reasonable medical probability to without a doubt. In essence, all five experts testified that Ellis's prolonged exposure to excessive levels of Diazinon due to Maritime's negligence caused the long-term effects of delayed neurotoxicity. Maritime presented three medical doctor experts, only one of whom had treated Ellis. These three experts testified that Ellis's injuries were not a delayed effect of his Diazinon exposure.

The jury answered "yes" to the question of whether Maritime's negligence played any part, even the slightest, in producing injury or illness to Ellis. The jury then found, based on a preponderance of the evidence, that $8,576,000 in actual damages would fairly and reasonably compensate Ellis for the injuries or illnesses resulting from the occurrence in question. The trial court rendered judgment for Ellis on the jury's verdict for the actual damages together with exemplary and punitive damages and prejudgment interest.

**\*408** In the court of appeals, Maritime contended the trial court erred in denying its motion for new trial because factually insufficient evidence supported the jury's finding that Ellis suffered $8,576,000 in actual damages, and because the amount was excessive. However, as the court of appeals recognized, Maritime's argument to that court was not about the amount of actual damages the jury awarded, but about causation. The court of appeals observed:

> Appellant concedes that appellee suffered short-term effects from the exposure to Diazinon and in effect,

that overexposure to Diazinon is toxic to humans and can cause damage to the nervous system on some temporary basis. Thus, appellant does not contest damages for the medical treatment appellee received in New Orleans in 1982 or for the loss of two days of work. Appellant does contest damages awarded for appellee's claim of delayed and permanent neurotoxic damage on the ground that appellee's expert testimony was speculative and not based on reasonable medical probability. Essentially, appellant's attack is directed at the issue of *causation* as to the delayed and permanent damage found by the jury based on the circumstantial and expert evidence before them.

886 S.W.2d at 783 (emphasis added). Because Maritime contended there was factually insufficient evidence to support the damages award, the court of appeals considered all the evidence both in favor of and contrary to the judgment.

**[17]** The court of appeals detailed the material testimony of all eight experts—five for Ellis and three for Maritime. After doing so, the court of appeals first concluded that the evidence more than satisfied the Jones Act standard for causation. 886 S.W.2d at 791. The court of appeals stated that sufficient evidence justified the jury's finding that Maritime's admitted negligence in exposing Ellis to extreme levels of a dangerous pesticide did play a part in producing the injury for which the damages were sought and awarded. 886 S.W.2d at 791. In addition to concluding that the evidence satisfied the "featherweight" burden of negligence and causation in Jones Act cases, the court of appeals also concluded that the evidence was sufficient under the higher standard of proof for causation under Texas common law. The court of appeals followed applicable law when it analyzed Maritime's challenge to causation instead of damages and when it reviewed the amount of the damages award under traditional factual sufficiency review. *See Rogers,* 352 U.S. at 506–07, 77 S.Ct. at 448–49; *Nairn,* 837 F.2d at 566; *Landry,* 731 F.2d at 302; *Sweet,* 653 S.W.2d at 294–95. Accordingly, we conclude that the court of appeals followed the appropriate standard of review in analyzing Maritime's claims. Again, this Court has no jurisdiction to decide whether the court of appeals reached the correct result—that is whether the actual

damages award was excessive. *See Akin,* 661 S.W.2d at 921. We reject Maritime's first argument.

## III. COURT OF APPEALS' REVIEW OF SCIENTIFIC EVIDENCE

Maritime's second contention is that the court of appeals erred because it did not examine whether any well-founded scientific evidence supports the actual damages award. Maritime argues that the federal standard articulated in *Daubert* and the state standard articulated in *Robinson* and *Havner* are the proper standards for reviewing the sufficiency of Ellis's damages evidence. Significantly, Maritime does not complain about the trial court's admission of any of the scientific evidence from any of Ellis's five experts. Rather, Maritime's position is that if the court of appeals applied a proper scientific methodology test to Ellis's experts' testimony, the testimony would be legally insufficient to show that the long term conditions Ellis claims he suffers were caused by delayed neurotoxicity. Thus, Maritime concludes, by way of its complaints about the court of appeals' factual sufficiency review, that there is *no evidence* of *some* of Ellis's actual damages. Maritime's argument is flawed.

### A. DAUBERT-ROBINSOn-HAVNER

In *Daubert,* the Supreme Court considered "the standard for admitting expert scientific testimony in a federal *trial.*" **\*409** *Daubert,* 509 U.S. at 579, 113 S.Ct. 2786, (emphasis added). *Daubert's* focus is on the trial court's discretion, when faced with an objection to scientific evidence, to admit or exclude such evidence before or during the trial. The Supreme Court added that when the trial court concludes that the disputed scientific evidence is insufficient to go to the jury, the trial court may grant a summary judgment or a directed verdict. *Daubert,* 509 U.S. at 595, 113 S.Ct. 2786. However, *Daubert* does not support the proposition that a reviewing court can in effect exclude expert testimony that was not objected to based on its scientific reliability before trial or when it was offered at trial and then render judgment against the offering party.

Similarly, in *Robinson,* we granted DuPont's application for writ of error to decide "the appropriate standard *for the admission* of scientific expert testimony." *See Robinson,* 923 S.W.2d at 554 (emphasis added). Like the Supreme Court in *Daubert,* we recognized the special nature of scientific expert testimony. *See Robinson,* 923 S.W.2d at 554–58. We

then explained the trial court's role as a "gatekeeper," and recognized that "[t]he trial court is responsible for making the preliminary determination of whether the proffered testimony meets the standards [for scientific reliability]." *Robinson,* 923 S.W.2d at 556. Like *Daubert, Robinson's* focus is on a trial court's discretion in admitting or excluding scientific evidence after a party lodges an objection to the reliability of its opponent's scientific expert testimony before trial or when the evidence is offered. *See Robinson,* 923 S.W.2d at 557.

Under *Havner,* a party may complain on appeal that scientific evidence is unreliable and thus, no evidence to support a judgment. *See Havner,* 953 S.W.2d 706. *Havner* recognizes that a no evidence complaint may be sustained when the record shows one of the following: (a) a complete absence of a vital fact; (b) the reviewing court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more that a mere scintilla; or (d) the evidence establishes conclusively the opposite of the vital fact. *See Havner,* 953 S.W.2d at 711 (citing Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 TEX. L.REV. 361, 362–63 (1960)). Here, like in *Havner,* Maritime contends that because Ellis's scientific evidence "is not reliable, it is not evidence," and the court of appeals and this Court are "barred by rules of law or of evidence from giving weight" to Ellis's experts' testimony. *See Havner,* 953 S.W.2d at 711, 713.

### B. ERROR PRESERVATION

[18]     To preserve a complaint that scientific evidence is unreliable and thus, no evidence, a party must object to the evidence before trial or when the evidence is offered. *See Robinson,* 923 S.W.2d at 557; *see also Havner,* 953 S.W.2d at 713 ("If the expert's scientific testimony is not reliable, it is not evidence."). Without requiring a timely objection to the reliability of the scientific evidence, the offering party is not given an opportunity to cure any defect that may exist, and will be subject to trial and appeal by ambush. *See Marbled Murrelet v. Babbitt,* 83 F.3d 1060, 1066–67 (9 th Cir.1996), *cert. denied,* 519 U.S. 1108, 117 S.Ct. 942, 136 L.Ed.2d 831 (1997); *Sumitomo Bank v. Product Promotions, Inc.,* 717 F.2d 215, 218 (5th Cir.1983).

[19]     Reviewing courts may not exclude expert scientific evidence after trial to render a judgment against the offering party because that party relied on the fact that the evidence

was admitted. *Babbitt,* 83 F.3d at 1067. To hold otherwise is simply "unfair." *Babbitt,* 83 F.3d at 1067. As the *Babbitt* court explained:

> [P]ermitting [a party] to challenge on appeal the reliability of [the opposing party's] scientific evidence under *Daubert,* in the guise of an insufficiency-of-the-evidence argument, would give [appellant] an unfair advantage. [Appellant] would be 'free to gamble on a favorable judgment before the trial court, knowing that [it could] seek reversal on appeal [despite its] failure to [object at trial].'

*Babbitt,* 83 F.3d at 1067 (citations omitted). Thus, to prevent trial or appeal by ambush, we hold that the complaining party must **\*410** object to the reliability of scientific evidence before trial or when the evidence is offered.

## C. ANALYSIS

In this case, Maritime did not object to the reliability of Ellis's scientific evidence until after the jury verdict. Maritime nevertheless argues that the court of appeals should have applied the *Daubert–Robinson–Havner* [2] rationale as part of its factual sufficiency review. These cases do not support Maritime's argument because: (1) each involve admissibility or no evidence considerations, and (2) in each case the defendants timely objected to the scientific evidence.

*Daubert* and *Havner* involve the anti-nausea drug, Bendectin. In these two cases, plaintiffs asserted that Bendectin caused birth defects. *See Daubert,* 509 U.S. at 591, 113 S.Ct. 2786; *Havner,* 953 S.W.2d at 708. *Robinson* involved a fungicide known as Benlate that DuPont manufactured. The Robinsons contended that the Benlate they used was contaminated and damaged their pecan crop. *See Robinson,* 923 S.W.2d at 551. In all three cases, causation was hotly contested, as it is in this case, on delayed effects. In all three cases, the manufacturer objected before trial or when the evidence was offered that the plaintiffs' scientific expert testimony on causation was inadmissible because it was neither relevant nor based upon a reliable foundation. *Daubert,* 509 U.S. at 591, 113 S.Ct. 2786; *Robinson,* 923 S.W.2d at 552; *Havner,* 953 S.W.2d at 708–09. Thus, the manufacturers in all three cases properly preserved their claims that the expert testimony was inadmissible and was no evidence of causation because it was not relevant and not based on well-founded scientific methodology.

In *Daubert,* Merrell Dow moved for summary judgment. The trial court granted summary judgment on the grounds that the Dauberts did not establish that the principle on which their experts based their opinions was generally accepted by the relevant scientific community. *See Daubert v. Merrell Dow Pharms., Inc.,* 727 F.Supp. 570, 572 (S.D.Cal.1989). On appeal, the United States Supreme Court held that the criteria is whether the scientific evidence is relevant and reliable and thus admissible. The Court remanded *Daubert* to the circuit court to determine whether the expert testimony rested on a reliable foundation and was relevant. *See Daubert,* 509 U.S. at 597, 113 S.Ct. 2786. On remand, the Ninth Circuit held that the testimony about Bendectin's effect was inadmissible under Federal Rule of Evidence 702.

In *Robinson,* the trial court granted DuPont's pretrial motion and excluded the Robinsons' expert testimony on the ground that it was neither relevant nor based upon a reliable foundation. *See Robinson,* 923 S.W.2d at 552. At trial, the Robinsons again attempted to introduce their expert's testimony but the trial court abided by its earlier ruling and excluded that testimony. The Robinsons then offered a bill of exception on their expert's testimony. At the close of evidence, the trial court granted DuPont's motion for directed verdict. The Robinsons appealed on the grounds that the trial court abused its discretion by excluding their expert's testimony. This Court followed *Daubert* and held that a party must show, in addition to showing an expert witness is qualified, that the expert's testimony is relevant and reliable. *See Robinson,* 923 S.W.2d at 556. Accordingly, although *Robinson* involves the exclusion of expert testimony, DuPont timely objected to the expert testimony before trial and when the evidence was offered. Unlike Maritime, DuPont did not wait until after the verdict to challenge the reliability of its opponent's expert testimony.

In *Havner,* Merrell Dow objected to the Havners' scientific evidence "at several junctures" during the litigation. *See Havner,* 953 S.W.2d at 708. Merrell Dow moved for summary judgment contending there was no scientifically reliable evidence that Bendectin caused limb reduction birth defects or that **\*411** Bendectin caused the plaintiff's birth defect. *Cf. General Elec. Co. v. Joiner,* 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) (affirming summary judgment when plaintiff's expert evidence did not show link between polychlorinated biphenyls (PCBs) and cancer). The trial court held a hearing at which the scientific reliability of the Havner's summary judgment evidence was extensively aired. The trial court then denied Merrell Dow's motion for

summary judgment. Before trial, Merrell Dow filed a motion in limine again questioning the scientific reliability of the Havner's expert testimony. The trial court denied Merrell Dow's motion in limine. During trial, Merrell Dow objected to the admission of the Havners' scientific evidence. Merrell Dow also unsuccessfully moved for directed verdict when the Havners closed their case, complaining about the Havners' scientific evidence. The trial court overruled Merrell Dow's objections and denied its motion for directed verdict. In *Havner,* while the issue was whether the scientific evidence was legally sufficient to be some evidence of causation, Merrell Dow timely challenged the experts' testimony at every opportunity in the trial court, and it properly preserved a no evidence claim. Indeed, this Court emphasized that the offering party should be allowed the opportunity to "pass[ ] muster" under a trial court *Robinson* objection—"to present the best evidence available"—before an appellate court considers whether legally sufficient evidence supports a judgment. *Havner,* 953 S.W.2d at 720.

[20]   Here, Maritime did not object to the scientific reliability of a single one of Ellis's five expert witnesses until after the jury verdict. Before trial, Maritime did not ask for a *Daubert/Robinson*-type hearing. *Cf. Havner,* 953 S.W.2d at 708–09. During trial, the record reflects that Maritime made nine objections while Ellis's five experts testified. Five objections complained about nonresponsiveness, three complained about leading questions, and one complained that the witness was testifying from a document not in evidence. Simply put, Maritime did not make *any* objection to the reliability of Ellis's experts before trial or when Ellis offered the evidence. Maritime cannot complain for the first time after the verdict that the testimony from Ellis's five experts does not support the judgment. To allow otherwise would deny Ellis's scientific experts the opportunity to "pass [ ] muster" in the first instance and usurp the trial court's discretion as "gatekeeper." *See Havner,* 953 S.W.2d at 720; *Robinson,* 923 S.W.2d at 554.

Rules and procedures about error preservation promote certainty and fairness. Such rules also frame and develop the legal issues for appeal, giving notice to both the litigants and to appellate courts about what issues remain. Appellate courts must base their decisions on the record as made and brought forward, not on a record that should have been made or could have been made. *See Babbitt,* 83 F.3d at 1067. For this Court to decide now that Ellis's scientific evidence is unreliable under *Daubert* or *Robinson* would base appellate review on a record that was not made.

### IV. RESPONSE TO THE DISSENT

We do not disagree with the dissent that "Maritime Overseas' position has always been ... that no reliable scientific evidence shows that Diazinon can cause long-term neurotoxicity." 971 S.W.2d at 415. However, at trial, rather than make objections to the trial court, Maritime chose to present this argument to the jury by challenging the reliability of Ellis's scientific evidence via vigorous cross-examination, presenting contrary evidence, and through opening statement and closing argument. Thus, unlike *Havner,* the "question of scientific reliability was [not] raised repeatedly" before the trial court. *Havner,* 953 S.W.2d at 709.

[21]   Nevertheless, the dissent would hold that Maritime's decision to argue the weight of both parties' experts' testimony to the jury was sufficient to preserve a complaint about reliability for appeal. When the reliability of scientific evidence is contested, attempts at persuasion before the jury and reiterated on appeal cannot amount to preservation of error for appeal. To allow otherwise would impermissibly permit a party to strip away the trial court's role as gatekeeper in the first instance when a party wishes to contest the reliability of scientific evidence. *See*   **\*412** *Robinson,* 923 S.W.2d at 553, 556, 558 (placing a "heightened responsibility" on trial judges "to ensure that expert testimony show some indicia of reliability" by holding them "responsible for making the preliminary determination of whether the proffered testimony meets the standards [for scientific reliability]"); *see also Daubert,* 509 U.S. at 589, 113 S.Ct. 2786 (explaining that "the trial judge must ensure that any and all scientific testimony or evidence admitted is ... reliable"). As Justice Gonzalez rightly points out in his concurring opinion, "[i]t is impossible for a [trial] court to exercise its gatekeeper function after the evidence has been admitted and the jury discharged." 971 S.W.2d at 412.

Under the dissent's approach, the trial court would be converted at a party's whim from a gatekeeper to "an idle spectator rendered powerless to ensure the integrity of courtroom evidence." *Robinson,* 923 S.W.2d at 554 (quoting DuPont's argument). We decline to take away the trial court's gatekeeping function. To do otherwise would usurp the orderly and efficient disposition of appeals, deprive the proffering party of an opportunity to cure any defects in its evidence that the objecting party might pose, and in some cases, place appellate courts in the undesirable position of

making decisions about evidentiary reliability absent a fully developed record.

The dissent also goes to great lengths to set forth cases that it claims stand for the proposition that "a party may complain after verdict and on appeal that evidence admitted without objection is neither legally nor factually sufficient to support the verdict." 971 S.W.2d at 417. But the dissent's reliance on these cases is misplaced for those cases involve no evidence challenges where, on the face of the record, the evidence lacked probative value. *See* Calvert, *supra,* at 362–63. In contrast, by its own admission, Maritime is not making a no evidence complaint.

Maritime could have and should have objected to Ellis's evidence at trial in a timely fashion for appellate consideration. We have properly decided the case on the issues preserved at trial and raised on appeal, as our rules and precedent require.

### V. CONCLUSION

We conclude that the court of appeals used the proper standard to review the factual sufficiency of Ellis's actual damages evidence. We also conclude that because Maritime did not preserve error about Ellis's scientific expert testimony in the trial court, the court of appeals did not err in conducting its factual sufficiency review. We overrule Maritime's other points of error. Accordingly, we affirm the court of appeals' judgment.

GONZALEZ, Justice, filed a concurring opinion, joined by ABBOTT, Justice, with respect to Part III only.

HECHT, Justice, joined by PHILLIPS, Chief Justice, filed a dissenting opinion.

OWEN, Justice, not sitting.

GONZALEZ, Justice, joined by ABBOTT, Justice, with respect to Part III, concurring.
I concur with the Court's judgment. The Court correctly resolves the main issues: (1) approving the court of appeals' standard for reviewing the factual insufficiency of the evidence of a Jones Act cause of action, and (2) rejecting Maritime Overseas Company's untimely attempt to challenge the reliability of scientific evidence. *See E.I. du Pont de*

*Nemours & Co. v. Robinson,* 923 S.W.2d 549 (Tex.1995) (making trial courts the "gatekeepers" of scientific evidence). I do not entirely agree with the Court's analysis of the *Robinson* issue. However, I ultimately reach the same conclusion that Maritime did not timely raise the issue. I think it is imperative to ventilate any *Robinson* issues as early as possible, preferably as a pretrial matter. To further that policy, we should give trial courts wide discretion to reject late *Robinson* objections, and hold that the trial court did not abuse its discretion in this case.

### I

In *Robinson,* we made trial courts the gatekeepers of scientific evidence, charging them with the duty to screen out the speculative and unreliable. *See id.* at 556–57. It is impossible for a court to exercise its gatekeeper function after the evidence has been **\*413** admitted and the jury discharged. Until now, however, we have not discussed in depth the procedure to preserve a *Robinson* objection. Preservation was not an issue in *Robinson,* wherein we upheld the trial court's exclusion of expert testimony after a pretrial hearing on its reliability. During trial the proponent of the evidence asked the court to reconsider its pretrial ruling, and made a bill of exceptions when it did not. *See id.* at 552.

We sustained a no-evidence point without discussing error preservation in *Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 499 (Tex.1995). The facts recited in the opinion do not reveal what steps Burroughs took to preserve error, other than its objection to the evidence when it was offered. We also sustained a no-evidence *Robinson* complaint in *Merrell Dow Pharm., Inc. v. Havner,* 953 S.W.2d 706 (Tex.1997). Preservation of error was beyond question in that case because Merrell Dow repeatedly challenged certain scientific evidence, raising the issue in a motion for summary judgment, motions in limine, extensive pretrial hearings on the motions, objections during the expert's testimony, a motion for a directed verdict at the close of the Havners' evidence, and multiple post-trial motions. *Id.* at 708–09; *Merrell Dow Pharm., Inc. v. Havner,* 907 S.W.2d 535, 539 (Tex.App.—Corpus Christi 1994).

The Court resolves the question in this case by characterizing Maritime's *Robinson* argument as a no-evidence complaint, and then holding that Maritime failed to preserve a legal insufficiency point. The dissenting opinion also treats Maritime's arguments as legal insufficiency points. I think

their respective analyses are wrong for two reasons. First, Maritime's arguments here are not true no-evidence points. As the Court observes, Maritime expressly disavows any legal insufficiency complaint, and instead claims only to challenge the court of appeals' standard of review when it evaluated factual insufficiency. Maritime's prayer for relief seeks only a new trial. I would take Maritime's arguments at face value and not try to read a no-evidence point into them.

Maritime argues instead that the evidence of causation is factually insufficient because the record is utterly devoid of reliable scientific evidence of causation. Such an argument would be a legitimate factual insufficiency argument if made to a court of appeals. A court of appeals reviewing factual insufficiency considers all of the evidence to see if "the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the finding should be set aside and a new trial ordered." *Garza v. Alviar,* 395 S.W.2d 821, 821 (Tex.1965). If there is no evidence to support the verdict, then certainly the court of appeals could conclude that the evidence is too weak to support the verdict. If the appellant's only viable point is factual insufficiency, the court of appeals should remand for a new trial. *See Wright Way Spraying Serv. v. Butler,* 690 S.W.2d 897, 898 (Tex.1985).

However, an argument proper in the court of appeals may not be appropriate in our Court because of our limited jurisdiction over factual insufficiency. Our jurisdiction over factual insufficiency is limited to whether the court of appeals applied the proper standard of review. *See In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661–62 (1951). Maritime asserts that it only wants us to exercise our limited jurisdiction over standards of review, but its arguments come perilously close to asking us to substitute our opinion for that of the court of appeals. I question whether our jurisdiction would allow us to consider the merits of Maritime's argument. *See Havner v. E–Z Mart Stores, Inc.,* 846 S.W.2d 286, 286 (Tex.1993)* (Gonzalez, J., concurring on denial of application for writ of error) (cautioning that this Court must not second-guess the court of appeals' review of factual insufficiency); *Lofton v. Texas Brine Corp.,* 777 S.W.2d 384, 388 (Tex.1989)* (Hecht, J., dissenting) (criticizing the Court for circumventing constitutional limitations over factual insufficiency through pretextual legal issues). *Compare with Jaffe Aircraft Corp. v. Carr,* 867 S.W.2d 27, 29–30 (Tex.1993)* (Gonzalez, J., concurring) (noting rare circumstance that allowed this Court to exercise jurisdiction over a court of appeals' factual insufficiency review). In any event, since Maritime only

brings a factual insufficiency point, it is not **\*414** necessary to decide if Maritime preserved a no-evidence complaint.

## II

Moreover, whether we categorize Maritime's arguments as factual insufficiency or legal insufficiency does not resolve the case for me. I do not think the usual rules for preserving either factual or legal insufficiency complaints adequately address the concerns unique to *Robinson* issues.

Ordinarily, both legal and factual insufficiency points may be preserved by post-judgment motions. *See Cecil v. Smith,* 804 S.W.2d 509 (Tex.1991). A court simply looks at the record to determine the existence and weight of evidence to prove a given point. Appellate courts and trial courts make such a review without additional information from outside the record. However, the no-evidence analysis we describe in *Havner* is qualitatively different from the ordinary evidentiary review:

> [W]e emphasize that courts must make a determination of reliability from all the evidence. Courts should allow a party, plaintiff or defendant, to present the best available evidence, assuming it passes muster under *Robinson,* and only then should a court determine from a totality of the evidence, considering all factors affecting the reliability of particular studies, whether there is legally sufficient evidence to support a judgment.

*Merrell Dow Pharm., Inc. v. Havner,* 953 S.W.2d at 720.

It should be apparent that appellate courts constitutionally cannot conduct such a hearing in the first instance. However, I do not think that allowing parties to raise *Robinson* objections for the first time post verdict, or even during trial, is fair to the litigants or judicially efficient.

A court should not be required to interrupt trial to conduct a *Robinson* hearing which could have been held pretrial. As *Merrell Dow v. Havner* illustrates, the trial court's role as gatekeeper requires it to decide complex issues in fields outside its primary expertise. Some courts have tried innovative approaches, such as selecting neutral experts in the

field to serve as masters, a step I encourage when the issues are especially complex. *See Justice Breyer Calls for Experts to Aid Courts in Complex Cases,* N.Y. Times, Feb. 17, 1998, at A17. Such innovation is not possible if the trial court is not given advance warning.

I recognize that there may be instances of good cause for not making a *Robinson* objection pretrial, in which case the trial court should entertain the objection. Also, some opinion testimony may be so untenable on its face that no *Robinson* hearing is necessary. For example, our Court recognized long before *Robinson* that courts are not bound by testimony at odds with indisputable physical facts and common knowledge because it has no probative value. *Humble Oil & Refining Co. v. Martin,* 148 Tex. 175, 222 S.W.2d 995, 1001–02 (1949) (holding that court could disregard petitioner's "incredible" testimony that she had secured her automobile by engaging the reverse gear before it rolled downhill striking pedestrians). Such situations will be comparatively rare, however. Our discovery rules require the proponent of expert testimony to identify the witnesses and the substance of their opinions in response to appropriate discovery. Thus in the ordinary case, it should be very apparent at the discovery stage that a party will proffer scientific testimony. The opponent of such testimony should bring its objections to the trial court's attention so that the trial court may resolve them without interfering with the eventual trial.

### III

As a final note, I encourage trial courts to aggressively exercise their role as gatekeepers of scientific evidence. There are many steps a court could take to try cases efficiently and fairly, with fidelity to sound scientific methodology. For example, a court could:

1) require parties to notify opponents and the court sufficiently in advance of the trial of plans to either offer scientific evidence or challenge an opponent's evidence;

2) conduct a preliminary hearing on admissibility in advance of plans to offer the evidence;

**\*415** 3) in complex litigation, appoint a panel of specially trained scientists or a special master to hear evidence and report on complicated scientific and statistical matters. The report would be filed with the clerk's office. If the parties request it, the court should conduct a hearing on the report and allow the parties to cross examine the court experts (the expert's fees would be taxed as court costs);

4) render expert testimony inadmissible or rule objections waived unless the parties fully comply with the notice requirements set out above.

In sum, because a *Robinson* objection profoundly impacts the trial of a case, an opponent to proffered scientific evidence should raise the issue of reliability early in the litigation or risk losing the objection. I agree with the Court that an opponent to scientific evidence must object to it when offered, at the very latest. However, I would go further and hold that if a party knows pretrial about the existence of *Robinson* issues but fails to ask for a pretrial hearing, any objection about the admission or exclusion of such evidence raised for the first time during trial is waived.

HECHT, Justice, joined by PHILLIPS, Chief Justice, dissenting.

Maritime Overseas Corporation seeks a new trial because, while Richard Ellis was undeniably injured by his exposure to diazinon, the scientific evidence does not support the conclusion that he suffers from permanent neurotoxicity, and thus the $8,576,000 awarded him in damages is excessive. The Court holds that it could not order a new trial even if it agreed with Maritime Overseas' contention, completely ignoring its decision to grant a new trial in indistinguishable circumstances just one year ago in *Texarkana Memorial Hospital, Inc. v. Murdock,* 946 S.W.2d 836 (Tex.1997). The Court also holds that Maritime Overseas failed to preserve its complaint for appeal because it did not object to Ellis's evidence at trial, even though Maritime Overseas' position has always been—in its opening statement, its extensive examination of the expert witnesses, its closing argument, its motion for new trial, and on appeal—that no reliable scientific evidence shows that diazinon can cause long-term neurotoxicity. As Ellis's attorney told the jury in his opening statement, Maritime Overseas' "position is that this chemical just cannot cause an injury to a worker's nervous system." Maritime Overseas' position has never been in doubt.

Not one case the Court cites so much as hints that a party in Maritime Overseas' circumstances has failed to preserve error, and one of those cases, *Sumitomo Bank v. Product Promotions, Inc.,* 717 F.2d 215, 218 (5th Cir.1983), actually suggests that Maritime Overseas has preserved its position. The Court refuses to acknowledge, much less reconcile, its own numerous precedents that require reversal of a judgment

based on non-probative evidence, even though the evidence was admitted without objection. The Court appears to think that if it ignores these cases they will somehow go away. The Court steadfastly evades the one and only issue over which these parties have fought since the day this litigation began —whether there is reliable evidence that Ellis suffers from neurotoxicity. I would decide this issue; therefore I dissent.

# I

It is undisputed that Ellis suffered some injury from his exposure to diazinon and should recover some damages, but it is equally undisputed that if he did not suffer long-term neurotoxicity, his damages are nowhere near $8,576,000. The court of appeals, in determining the factual sufficiency of the evidence, considered expert testimony that Ellis not only was injured but that he suffers from neurotoxicity. Maritime Overseas argues that evidence offered in support of Ellis's long-term injury claims is unreliable and therefore no evidence at all. Thus, Maritime Overseas contends that the court of appeals erred in considering such testimony in its factual sufficiency review. The Court correctly summarizes Maritime Overseas' argument: "In essence, Maritime would have this Court conduct a no evidence review of the evidence about delayed neurotoxicity within the Court's review of whether the court of **\*416** appeals properly reviewed the factual sufficiency of the evidence." *Ante* at 412. Then the Court says: "We decline to do so." *Id.*

But the Court did not "decline to do so" last year in *Texarkana Memorial Hospital, Inc. v. Murdock,* 946 S.W.2d 836 (Tex.1997). Murdock sued the Texarkana Memorial Hospital for negligence in delivering her daughter. The child was born with severe congenital defects and died about a year later. Murdock claimed that she was entitled to damages equal to all of the child's medical expenses, but the Hospital argued that Murdock could recover only for those expenses caused by its negligence, excluding expenses for treatment necessitated by the child's congenital defects. The district court awarded Murdock the total expenses, and the court of appeals affirmed, holding that legally and factually sufficient evidence supported the conclusion that all the medical expenses were caused by the Hospital's negligence. *Texarkana Memorial Hosp., Inc. v. Murdock,* 903 S.W.2d 868, 877–880 (Tex.App.—Texarkana 1995), *rev'd,* 946 S.W.2d 836 (Tex.1997). In this Court, the Hospital argued that there was "no evidence of a direct causal link between the amount of medical expenses awarded and any

injuries caused by [the Hospital's] negligence." *Murdock,* 946 S.W.2d at 837. We agreed and reversed the award, explaining:

> [W]hile [there] is some evidence of damage caused by [the Hospital's] negligence, a plaintiff may recover only for those injuries caused by the event made the basis of suit. *Morgan v. Compugraphic Corp.,* 675 S.W.2d 729, 732 (Tex.1984). The case before us is analogous to other cases where a suit for medical expenses involved another injury or pre-existing condition.... We ... hold that a plaintiff should recover only for medical expenses specifically shown to result from treatment made necessary by the negligent acts or omissions of the defendant, where such a differentiation is possible.

*Id.* at 839–840 (citation omitted). Although the Hospital couched its complaint in no-evidence terms, for which the remedy is ordinarily rendition of judgment, we concluded that "[b]ecause Murdock ... presented legally sufficient evidence that some of the medical expenses resulted from [the Hospital's negligence], [she] should be afforded an opportunity to develop this evidence further." *Id.* at 841. Thus, we remanded the case for a new trial. In support of this conclusion we cited *Stewart Title Guaranty Co. v. Sterling,* 822 S.W.2d 1, 10–12 (Tex.1991), in which we remanded a case for a new trial on attorney fees because the evidence supported an award of some fees for some claims, even though fees could not be awarded on all claims.

The present case is indistinguishable from *Murdock.* There, as here, the argument was that while some evidence showed some damages, no evidence supported all the damages awarded. Although the Hospital complained of the legal sufficiency of the evidence, it in effect challenged the court of appeals' factual sufficiency review for considering non-probative evidence, and we treated the complaint as being directed to that review, remanding for a new trial rather than rendering judgment for the Hospital. Maritime Overseas' application for writ of error states: "There is no evidence that diazinon causes delayed neurotoxicity and thus insufficient evidence that Ellis suffered $8,576,000 in actual damages." The arguments in the two cases, while phrased differently, are indistinguishable in import and effect. The arguments and the relief sought are the same in both.

Why isn't *Murdock* controlling or at least instructive? The Court refuses to answer, refuses even to cite *Murdock.* The argument that there is some significance in the Hospital's no-evidence challenge and Maritime Overseas' insufficient-evidence challenge is too weak even for the Court to employ. If anything, Maritime Overseas' contention that the evidence of damages is insufficient because there is no evidence of some damages awarded is more straightforward than the Hospital's contention that there was no evidence of the damages awarded because there was some evidence of only lesser damages. But in fact, both arguments come out at the same place, in substance—some but not all of the damages are supported by the evidence—and in result—a new trial excluding the unsupported claims. **\*417** Maritime Overseas' first point of error in this Court asserts: "The court of appeals erred in failing to examine whether any well-founded scientific methodology supports the award of ... actual damages." Even if Maritime Overseas could be faulted for misphrasing its point of error, that mistake cannot dictate the result in the case.

> A point of error "is sufficient if it directs the attention of the appellate court to the error about which complaint is made." Courts are to construe rules on briefing liberally. An appellate court should consider the parties' arguments supporting each point of error and not merely the wording of the points.

*Anderson v. Gilbert,* 897 S.W.2d 783, 784 (Tex.1995) (per curiam) (citations omitted). Maritime Overseas' argument in its application for writ of error is crystal clear:

> In this case, Ellis offered *no* epidemiological study, *no* peer-reviewed theory, *nor any* evidence of general scientific acceptance to support the conclusion of his experts that his exposure to diazinon caused delayed neurotoxicity. The premise upon which his experts' conclusion was based—that because some organophosphates can cause delayed neurotoxicity, diazinon therefore must cause delayed neurotoxicity —is false logic, as pointed out by Justice Robertson's concurring and dissenting opinion, because

> *some* organophosphates *do not* cause delayed neurotoxicity.

To make the matter even clearer, Maritime Overseas summarizes its position thusly: "There is no evidence that diazinon causes delayed neurotoxicity and thus insufficient evidence that Ellis suffered $8,576,000 in actual damages." The result in *Murdock* was correct, and the same analysis should be applied in this case. A party must have a means of contesting the amount of damages when there is evidence for some claims but not all of them. Following *Murdock,* Maritime Overseas is entitled to a new trial if its evidentiary complaint has been preserved and has merit. The Court holds that Maritime Overseas' complaint was not preserved and does not reach the merits.

## II

As early as 1912, and as recently as last year, this Court has held that a party may complain after verdict and on appeal that evidence admitted without objection is neither legally nor factually sufficient to support the verdict. The Court ignores a solid line of cases establishing this principle with respect to all kinds of evidence, including scientific testimony. There is no authority for the Court's holding that "[t]o preserve a complaint that scientific evidence is unreliable and thus, no evidence, a party must object to the evidence before trial or when the evidence is offered." *Ante* at 409. The notion that a party must as a matter of course object to evidence *before* trial is a complete stranger to our procedure. Despite this lack of authority, it seems clear that parties should be required to contest the reliability of scientific testimony in some way prior to the verdict in most instances. However, Maritime Overseas did so in this case.

### A

As a rule, a contention that evidence is insufficient to support a judgment need not be raised before the verdict. Rule 279, TEX.R. CIV. P., states: "A claim that the evidence was legally or factually insufficient to warrant the submission of any question may be made for the first time after verdict, regardless of whether the submission of such question was requested by the complainant." Prior to the verdict, a party may, but is not required to, raise the complete absence of evidence on a point. This differs from federal procedure, which requires that a motion for judgment as a matter of law

be made before the case is submitted to the jury "to assure the responding party an opportunity to cure any deficiency in that party's proof that may have been overlooked until called to the party's attention". FED.R.CIV.P. 50(a)(2) advisory committee's note. Texas procedure does not afford parties the same protection. Thus, for example, a defendant sued for reasonable and necessary expenses can wait until after the verdict to point out that the plaintiff never offered evidence that the expenses claimed were reasonable. *See McCreless Properties, Ltd. v. F.W. Woolworth* **\*418** *Co.,* 533 S.W.2d 863, 868 (Tex.Civ.App.—San Antonio 1976, writ ref'd n.r.e.); *Holt v. Purviance,* 347 S.W.2d 321, 324–325 (Tex.Civ.App. —Dallas 1961, writ ref'd n.r.e.). A defendant sued for attorney fees may wait until after the verdict to assert that no evidence of the required presentment of the claim was offered. *See Jim Howe Homes, Inc. v. Rogers,* 818 S.W.2d 901, 905 (Tex.App. —Austin 1991, no writ). A pre-verdict objection to the factual insufficiency of the evidence cannot preclude submission to the jury of pleaded claims, *Brown v. Goldstein,* 685 S.W.2d 640, 641 (Tex.1985), and thus has essentially no effect.

Even if evidence is admitted without objection, it may be insufficient to support a judgment. This Court held eighty-six years ago that "incompetent testimony can never form the basis of a finding of facts in an appellate court, notwithstanding its presence in the record without objection." *Henry v. Phillips,* 105 Tex. 459, 151 S.W. 533, 538 (Tex.1912). In that case, testimony admitted without objection was held to be no evidence on appeal because it was hearsay. *Id.* at 537. The Court repeatedly treated hearsay as no evidence even if it was not objected to, until Rule 802 of the Texas Rules of Civil Evidence was adopted in 1983. *Zobel v. Slim,* 576 S.W.2d 362, 369 (Tex.1978); *Cooper Petroleum Co. v. LaGloria Oil & Gas Co.,* 436 S.W.2d 889, 891 (Tex.1969); *Aetna Ins. Co. v. Klein,* 160 Tex. 61, 325 S.W.2d 376, 379 (1959); *City of Mission v. Popplewell,* 156 Tex. 269, 294 S.W.2d 712, 717 (1956); *Texas Co. v. Lee,* 138 Tex. 167, 157 S.W.2d 628, 631 (1941). But the principle in *Henry* has been applied to evidence other than hearsay.

In *Casualty Underwriters v. Rhone,* 134 Tex. 50, 132 S.W.2d 97 (1939), Rhone sought compensation for injuries sustained while working on a construction site. The dispute centered on whether at the time of his injuries he was employed by the general contractor, Beaumont Development Corporation, or a subcontractor, McDaniel. The jury found that Rhone was employed by the general contractor, but the court of civil appeals reversed, holding as a matter of law that Rhone was employed by the subcontractor. We affirmed the court of civil appeals, holding that testimony by Rhone and McDaniel contrary to its conclusion, though not objected to, was no evidence.

> The only testimony in the record which would in the least tend to support the conclusion that Rhone was working for the Beaumont Development Corporation was given by Rhone and McDaniel, each of whom testified that, at the time of the injury, Rhone was working for it. Those statements did not amount to any evidence at all. They were but bare conclusions and therefore incompetent, and the fact that they were admitted without objection adds nothing to their probative force.

*Id.* at 99.
The Court followed *Rhone* in *Dallas Railway & Terminal Company v. Gossett,* 156 Tex. 252, 294 S.W.2d 377 (1956). In that case, a bus passenger, Gossett, recovered damages for injuries she sustained when the bus struck a car. The bus company, Dallas Railway, impleaded the driver of the car, Sample, contending that her negligence in driving the wrong way on a one-way street caused the accident. The jury failed to find Sample negligent. On appeal, Dallas Railway argued that the evidence established Sample's negligence because it was undisputed that she was driving the wrong way on a one-way street. The bus driver, Gossett, Sample, and an accident investigator all testified that they believed traffic on the street was one-way, but no evidence was offered showing that traffic was legally restricted. The Court held that the witnesses' testimony did not establish that the street was one-way, explaining: "It is well settled that the naked and unsupported opinion or conclusion of a witness does not constitute evidence of probative force and will not support a jury finding even when admitted without objection." *Id.* at 380–381.

Two cases cited by *Gossett* with approval apply the same principle in other settings. In one, *Webb v. Reynolds,* 207 S.W. 914 (Tex. Comm'n App.1919, judgm't adopted), the court held that a plaintiff's testimony that he owned a promissory note was no evidence to support his claim because the statement "was a bare conclusion or opinion of the witness without any basis of fact". *Id.* at 916. Plaintiff's **\*419** own pleadings asserted that the note was owned by an estate.

*Id.* The court added: "The fact that [the testimony] was not objected to could add nothing to its probative force." *Id.* In the other, *Perren v. Baker Hotel,* 228 S.W.2d 311 (Tex.Civ.App.—Waco 1950, no writ), the court held that a wife's testimony that her husband had agreed to rent hotel rooms "was nothing more than a bare conclusion on the part of the witness concerning a question of law and such testimony had no probative force, even though it had been admitted without any objection." *Id.* at 317.

In *Robertson Tank Lines, Inc. v. Van Cleave,* 468 S.W.2d 354 (Tex.1971), this Court held that a plaintiff's testimony that he was acting in the course and scope of his employment at the time he was injured was no evidence to support a finding to that effect. Even though the testimony was admitted without objection, it was attacked in cross-examination. The Court stated:

> This court has approved the holding that testimony of an employee (driver) that he was acting within the course of his employment at the time of an accident is not admissible. If such testimony is admitted, with or without objection, it has been held to be incompetent and without probative force. It will not support a verdict or a finding of fact by a court.

*Id.* at 360 (citations omitted).

In *Schaefer v. Texas Employers' Insurance Association,* 612 S.W.2d 199 (Tex.1980), Schaefer claimed compensation benefits, alleging that he suffered from an occupational disease, atypical tuberculosis. The carrier disputed that Schaefer contracted his disease at work. His treating physician, Dr. Anderson, testified "that in his opinion, based on reasonable medical probability, Schaefer's disease resulted from his employment." *Id.* at 202. The defendant attacked Dr. Anderson's opinion on cross-examination but did not object to its admission. The jury found for Schaefer, but the court of civil appeals reversed and rendered judgment for the carrier. This Court affirmed, refusing to take Dr. Anderson's opinion at face value and looking instead to the basis for it. The Court explained:

> The basis for [Dr. Anderson's] opinion is that persons engaged in "dirty" occupations, such as farmers, tend to have a greater exposure to the

bacteria; that Schaefer frequently worked in soil contaminated by bird droppings; that Schaefer suffers from one of the serotypes of m. intracellularis; and, therefore, he has an occupational disease. Notwithstanding Dr. Anderson's opinion, there is a crucial deficiency in the proof of causation. The evidence fails to establish that any bacteria was present in the soil where Schaefer worked.

*Id.* at 203. After quoting extensively from Dr. Anderson's testimony, the Court continued that his opinion was no evidence of the cause of Schaefer's disease because it lacked any real basis:

> Dr. Anderson assumes that Schaefer is infected with an avian serotype m. intracellularis pathogenic to fowl. He further assumes that this serotype was present in bird droppings where Schaefer worked. It is admitted that the particular strain of m. intracellularis from which Bobby Schaefer suffers has not been identified. It is also admitted that the manner in which the disease was transmitted to Schaefer is unknown. It is further admitted that there is no evidence that the bacteria is present in the soil where Schaefer worked, or even in Nueces County.

> We have reviewed the substance of Dr. Anderson's testimony in its entirety and we find that it does no more than suggest a possibility as to how or when Schaefer was exposed to or contracted the disease. We hold that his opinion is not based upon reasonable medical probability but relies on mere possibility, speculation, and surmise. We hold there is no evidence that the disease suffered by Bobby Schaefer is an occupational disease "arising out of and in the course of employment." The fact that proof of causation is difficult does not provide a plaintiff with an excuse to avoid introducing some evidence of causation. To ignore the substance of Dr. Anderson's testimony and accept his opinion as "some" evidence simply because he used the magic words "reasonable probability" effectively **\*420** removes this Court's jurisdiction over any case requiring expert opinion testimony. Under such view, so long as an expert states the words "reasonable probability," in giving his opinion, there would be some evidence. The question would then be solely one of sufficiency of the evidence over which this Court has no jurisdiction.

*Id.* at 204–205 (citations omitted).

We reaffirmed *Schaefer* in *Burroughs Wellcome Company v. Crye,* 907 S.W.2d 497 (Tex.1995). In that case plaintiff Crye's treating physician, Dr. Blesius, testified without objection that Polysporin sprayed on Crye's foot caused frostbite. The jury found for Crye, and the court of appeals affirmed, concluding that the evidence was factually and legally sufficient to support the verdict. *Burroughs Wellcome Co. v. Crye,* 912 S.W.2d 251, 259 (Tex.App.—El Paso 1994), *rev'd,* 907 S.W.2d 497 (Tex.1995). We reversed, despite the admission of Dr. Blesius' testimony without objection, because his opinion had no factual basis. We stated:

> We hold that Dr. Blesius' testimony constitutes no evidence that Polysporin spray caused Crye to sustain a frostbite injury. When an expert's opinion is based on assumed facts that vary materially from the actual, undisputed facts, the opinion is without probative value and cannot support a verdict or judgment. *See Schaefer v. Texas Employers' Ins. Ass'n,* 612 S.W.2d 199, 202–05 (Tex.1980) (reviewing substance of medical expert's testimony and holding that this testimony constitutes no evidence of causation, as it is based on assumptions, possibility, speculation, and surmise).

*,Id.* at 499–500 (citation omitted).

Just last year in *Merrell Dow Pharmaceuticals, Inc. v. Havner,* 953 S.W.2d 706 (Tex.1997), we reiterated that "an expert's bare opinion will not suffice" to provide evidence of causation of an injury; "[t]he substance of the testimony must be considered." *Id.* at 711. Merrell Dow asserted in the trial court that scientific evidence of any causal connection between the use of Bendectin and birth defects was unreliable, and it "objected to the admission of some, but not all, of this evidence." *Id.* at 709. We held that the expert testimony, even that admitted without objection, was no evidence to support a judgment for Havner because the testimony showed that there was no basis for the experts' opinions. We said: "When the expert 'br [ings] to court little more than his credentials and a subjective opinion,' this is not evidence that would support a judgment." *Id.* at 712 (citation omitted). We added:

Justice Gonzalez, in writing for the Court, gave rather colorful examples of unreliable scientific evidence in *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 558 (Tex.1995), when he said that even an expert with a degree should not be able to testify that the world is flat, that the moon is made of green cheese, or that the Earth is the center of the solar system. If for some reason such testimony were admitted in a trial without objection, would a reviewing court be obliged to accept it as some evidence? The answer is no. In concluding that this testimony is scientifically unreliable and therefore no evidence, however, a court necessarily looks beyond what the expert said. Reliability is determined by looking at numerous factors including those set forth in *Robinson* and [*Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) ]. The testimony of an expert is generally *opinion* testimony. Whether it rises to the level of *evidence* is determined under our rules of evidence, including Rule 702, which requires courts to determine if the opinion testimony will assist the jury in deciding a fact issue. While Rule 702 deals with the admissibility of evidence, it offers substantive guidelines in determining if the expert testimony is some evidence of probative value.

*Id.* (emphasis in original).

Within the past few months we denied the application for writ of error in *Williams v. Gaines,* 943 S.W.2d 185 (Tex.App.—Amarillo 1997, writ denied). In that case, Gaines sued Williams for removing her as president of a corporation in which he was sole shareholder and terminating her employment with the corporation. The jury found that Williams **\*421** breached his agreement with Gaines and that her damages included $92,500 as the value of the stock

as of a specific date that Williams promised Gaines but did not convey. The court of appeals reversed the judgment for Gaines and remanded the case for a new trial, holding that there was no evidence to support the jury's damages finding. Gaines and an expert witness had testified without objection to the value of the stock based solely on data after the date at issue. The court concluded: "Because the data relied upon by Ms. Gaines to support the jury's award is based on subsequent data, there was no probative evidence of the fair market value of one-half of the [corporation's] stock on [the specified date]". *Id.* at 193. The court explained: "Opinion evidence based on conjecture or speculation lacks probative value. Incompetent evidence, even if not objected to at trial, may not be considered as probative in determining the legal and factual sufficiency of the evidence." *Id.* (citation omitted).

To summarize, bare conclusions and assertions unsupported by facts of record, expert opinions based on facts merely assumed and not proved, or facts different from those proved, and scientific testimony without any reliable basis, even if admitted without objection, are no evidence to support a finding of fact. An expert's opinion that disease was contracted through working conditions, or that a spray caused frostbite, or that a medication caused birth defects, even if admitted without objection, is not probative evidence if the testimony shows that the opinion lacks any substantial basis. This is not to say that the deficiency in the evidence need not be pointed out in any way before the verdict, but only that it can be done by cross-examination and means other than objections.

### B

The Court holds: "To preserve a complaint that scientific evidence is unreliable and thus, no evidence, a party must object to the evidence before trial or when the evidence is offered." *Ante* at 409. Whatever the Court means by objecting to evidence before trial, the four cases the Court cites as authority do not support this holding. The first case, *Robinson,* does not consider the issue. In that case, the subject evidence was objected to and excluded by the trial court. Whether any objection was necessary was never addressed by this Court. In the second case, *Havner,* we stated quite plainly that objection was made to the admission of "some, but not all" of the evidence at issue. "[T]he question of scientific reliability was raised repeatedly", but not consistently by objection. *Havner,* 953 S.W.2d at 709.

The other two cases, *Marbled Murrelet v. Babbitt,* 83 F.3d 1060 (9th Cir.1996), *cert. denied,* 519 U.S. 1108, 117 S.Ct. 942, 136 L.Ed.2d 831 (1997), and *Sumitomo Bank v. Product Promotions, Inc.,* 717 F.2d 215 (5th Cir.1983), the Court cites for the proposition that "[w]ithout requiring a timely objection to the reliability of the scientific evidence, the offering party is not given an opportunity to cure any defect that may exist, and will be subject to trial and appeal by ambush." *Ante* at 409. There are two flaws in the Court's reliance on these cases. First, as noted earlier, Texas procedure allows the sufficiency of the evidence to be challenged for the first time after verdict, whereas federal procedure does not. Thus, Texas procedure allows for some ambush that federal procedure precludes. Second, *Sumitomo Bank* holds only that in determining whether there is no evidence to support a finding such that judgment should be rendered notwithstanding the verdict, evidence ruled admissible cannot be excluded from consideration. *See also Schudel v. General Elec. Co.,* 120 F.3d 991, 995 (9th Cir.1997) ("when deciding a motion for JNOV, a trial court may not ignore evidence erroneously admitted at trial, [because] excluding evidence after the verdict is unfair to a party who may have relied on the determination that the evidence was admissible."). While this reasoning applies in deciding whether to render judgment notwithstanding the verdict, it does not apply in deciding whether to grant a new trial. As the court explained in *Sumitomo Bank:*

> The trial judge erred in retroactively striking the summary exhibits and then gauging the jury's performance on the fictive basis that the summary evidence was not before it. *Although acceptable in the context of a motion for new trial, see* **\*422** *Montgomery Ward & Co. v. Duncan,* 311 U.S. 243, 61 S.Ct. 189, 85 L.Ed. 147 (1940), this methodology is not appropriate in connection with a motion for judgment n.o.v.

717 F.2d at 218 (emphasis added). As the court noted, the Supreme Court explained the difference between motions for judgment n.o.v. and motions for new trial in *Montgomery Ward:*

> Each motion, as the rule recognizes, has its own office. The motion for judgment cannot be granted unless,

as matter of law, the opponent of the movant failed to make a case and, therefore, a verdict in movant's favor should have been directed. The motion for a new trial may invoke the discretion of the court in so far as it is bottomed on the claim that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving; *and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence* or instructions to the jury.

311 U.S. at 251, 61 S.Ct. 189 (emphasis added). Maritime Overseas contends here that it is entitled to a new trial, not that judgment should be rendered in its favor. Thus, the Court's reasoning, and the cases it cites, are inapposite. Our rules of procedure do not require a party to assert before the verdict that the evidence is insufficient to support a verdict. The factual sufficiency of the evidence may always be attacked post-verdict, even if no objection was made to its admissibility. Indeed, as the Supreme Court observed, one consideration in deciding whether to grant a new trial is whether there were substantial errors in the admission or rejection of evidence. As already demonstrated, our own precedents permit evidence to be rejected post-verdict as non-probative in at least some instances, even if it was admitted without objection.

**C**

The Court holds that the reliability of scientific evidence must be objected to before trial or when the evidence is offered. How one objects to evidence before trial is not entirely clear. The Court mentions Merrell Dow's motion for summary judgment and motion in limine in *Havner,* suggesting that these are ways in which scientific evidence can be challenged. As already noted, the Court states that "Merrell Dow objected to the admission of the Havners' scientific evidence", *ante* at 411, but this is only partly true. Merrell Dow only objected to some of the Havners' evidence. Had Merrell Dow been foreclosed from attacking the reliability of evidence to which it did not object, there would have been evidence to support the verdict. Thus, the

Court's holding that no evidence supported the verdict was despite the absence of objections.

The Court states that *Havner* "emphasized that the offering party should be allowed the opportunity to 'pass[ ] muster' under a trial court *Robinson* challenge—'to present the best evidence available'—before an appellate court considers whether legally sufficient evidence supports a judgment." *Ante* at 411. What *Havner* actually said was:

> In sum, we emphasize that courts must make a determination of reliability from all the evidence. Courts should allow a party, plaintiff or defendant, to present the best available evidence, assuming it passes muster under *Robinson,* and only then should a court determine from a totality of the evidence, considering all factors affecting the reliability of particular studies, whether there is legally sufficient evidence to support a judgment.

953 S.W.2d at 720. The point was, as we said, that the reliability of scientific evidence must be determined from a review of all the evidence, not simply the evidence of one party or the other. Only by alchemy can this passage be turned into a requirement that evidence be objected to before its reliability can be determined.

The Court does not explain the holding in *Schaefer* and other cases cited above, where evidence was held to be non-probative even though it had been admitted without objection. Instead, the Court refers vaguely to a pretrial "*Daubert/Robinson*-type hearing." *Ante* at 411. The Court does not explain what kind of hearing this is, how it is invoked, **\*423** when it is to be conducted relative to the commencement of trial, and whether it is required.

Our precedents seem to teach that parties should not be permitted to attack evidence for the first time after the verdict unless it is plainly without probative value—such as an opinion based on the moon's being made of green cheese, or a mere assertion that a person is another's employee, or that a person was injured in the course of work, or that a person made an agreement. In most situations, however, if the probative value of evidence is to be in question, then ordinarily the issue must be raised before the verdict. This prevents the ambush that concerns the Court and puts both

parties and the trial court on notice of the contentions in the case. But it hardly makes sense to require a specific objection to each line of scientific opinion testimony when a party's stated, clear position is that the opinion is baseless. In *Schaefer,* for example, the carrier's position was plain from its cross-examination of the claimant's physician: his opinion that the claimant contracted atypical tuberculosis at work had no basis in fact. Likewise, in *Havner,* there could be no mistake that Merrell Dow's position throughout, as in all the other Bendectin cases previously tried, was that there was no reliable evidence that Bendectin caused birth defects.

In the case before us, there was never any doubt about Maritime Overseas' position. In his opening statement, Ellis's attorney told the jury:

> The attorney representing the company told you yesterday that— well, their position is that this chemical just cannot cause an injury to a worker's nervous system. That's just not true. In fact, you'll hear evidence from the witnesses that it can cause an injury if it is—if the exposure is sufficiently great and if the exposure is on the order of what this man was exposed to.

Maritime Overseas' counsel responded in his opening statement:

> [W]e think the medical evidence will show that the effects of diazinon are not long-term but, indeed, are confined within a specific period of time. Certainly no more than months.

> And the evidence will show, and we'll bring in a toxicologist and a neuropsychologist who will testify that there is no relationship between the current situation exhibited by Mr. Ellis in the exposure to diazinon on the ship in 1982.

The dispute over this issue pervaded the examination and cross-examination of the eight expert witnesses. The focus of all the testimony was not on Ellis's initial poisoning from his exposure to diazinon, but whether he suffered any long-term injury. The possibility that diazinon causes neurotoxicity was thoroughly explored, and Maritime Overseas established that no studies or other evidence exist to support the opinions of

Ellis's experts that he suffered from neurotoxicity caused by exposure to diazinon.

In summation, Ellis's counsel again addressed the issue:

> I acknowledge that the difficulty I have labored under is that you cannot show clearly a damage to the central nervous system. Nobody can, but that doesn't mean you don't have a right to be treated fairly when you have it.

Maritime Overseas' counsel stressed in summation:

> There wasn't a single article out of all the articles that we all went over bit by bit, line by line. Not a single one ever says that diazinon causes these sort of effects [*i.e.,* neurotoxicity]. Not one.

> * * *

> There's an article and it's Defendant's Exhibit No. 3. I want you to look on page 149 of that article, in particular. It's an article written by Al Johnson together with Dr. Lassetor and two other people. And one of the conclusions of that article is that pesticides—some pesticides have neurotoxic effects, yes. It doesn't mention diazinon.... And the reason is because all organophosphates are different. Some are nerve gas, some kill people, some are insecticide. There's not a single article anywhere that says diazinon causes these effects.

> **\*424** * * *

> We have never taken the position that Mr. Ellis did not have acute symptoms due to exposure of the diazinon. Where the case differs and where we differ from the plaintiff is whether Mr. Ellis's current complaints are a result of the exposure to diazinon. Does he have long-term, delayed neurotoxicity as a result to the exposure to the diazinon. *That's the key issue in this case. All these other issues that you have to answer, especially the ones relating to damages, to medical expenses, to loss of wages, it all falls from that decision that you have to make.*

> * * *

> We have had article after article referred to, that have all been discussed, organophosphate poisoning and the

effects of organophosphate poisoning. We've tried to show—and I've been accused of nitpicking for doing it—that each article relied on ... doesn't support a determination that exposure to diazinon does cause long-term delayed neurotoxicity, period. It didn't support it. And what the plaintiff has tried to do is say the literature talks about organophosphate exposure, diazinon is an organophosphate, therefore this has got to be it....

(Emphasis added.)

The Court states that to determine now whether Maritime Overseas' scientific evidence was unreliable "would base appellate review on a record that was not made." *Ante* at 411. That simply is not true. Maritime Overseas did not ambush Ellis on the substance of the expert testimony. The record shows that it was, in counsel's words, "the key issue" in the case. The parties purported to present all available evidence on the issue whether diazinon could cause neurotoxicity. This is not a case where a party could have offered more or different scientific evidence had it known that its opponent objected to the evidence as unreliable. Maritime Overseas reasserted its contentions in its motion for new trial and on appeal. There can be no question that Maritime Overseas challenged the reliability of Ellis's scientific evidence.

### D

The Court does not attempt to argue that Ellis's evidence had any probative value. It holds that even if the evidence had no probative value, it must be considered some evidence to support the judgment on appeal if it was not objected to. This holding is squarely contrary to *Schaefer, Crye, Havner,* and the other cases I have cited. The Court has two responses.

First, the Court says that to allow an argument that scientific evidence admitted without objection was nevertheless unreliable and non-probative would "take away the trial court's gatekeeping function" and thus would:

> usurp the orderly and efficient disposition of appeals, deprive the proffering party of an opportunity to cure any defects in its evidence that the objecting party might pose, and in some cases, place appellate courts in the undesirable position of making decisions about evidentiary reliability absent a fully developed record.

*Ante* at 412. Of course, none of these evil effects is present in this case. Ellis not only understood Maritime Overseas' position and had every opportunity to cure the defects in his evidence, he and Maritime Overseas purported to offer all the evidence in existence on whether diazinon can cause neurotoxicity. There can be no question in this case that the record was fully developed. To say that a review of the sufficiency of evidence admitted without objection deprives the trial court of its gatekeeping function is to say that *Schaefer, Crye,* and *Havner* were wrongly decided. In *Schaefer,* for example, a physician testified, just as in the present case, that the plaintiff's injury was caused by a particular agent. Defendant did not object to this testimony. Still, this Court held that the evidence had no probative value because there was nothing in the record to indicate that the injury could have occurred as the witness testified. The witness's mere opinion was not enough to support a judgment. The same situation is present in this case, except that here the parties clearly made every **\*425** effort to produce all available evidence, whereas that is not at all clear in *Schaefer.* Second, the Court says that the cases I have cited—it refers to none of them by name—are distinguishable because "those cases involve no evidence challenges where, on the face of the record, the evidence lacked probative value.... In contrast, by its own admission, Maritime is not making a no evidence complaint." *Ante* at 412. I have already explained that Maritime Overseas' complaint is really that there is no evidence of some damages, and that the Court's effort to categorize Maritime Overseas' position more rigidly is unfair to the arguments made in its briefs. But assume that all the cases I have cited involved no-evidence challenges and that this case does not. What possible difference can that make to the Court? Why is the necessity of objection to the evidence less important when the appellate complaint is no evidence? As the Court's own authority, *Sumitomo Bank,* points out, the necessity of objection is more important when the complaint is that there is no evidence to support a judgment and therefore judgment should be rendered in the complainant's favor. When the request is only for a new trial, a reassessment of evidence admitted without objection is "acceptable". *Sumitomo Bank,* 717 F.2d at 218. Moreover, the trial court's gatekeeping function which the Court argues must be preserved is "take[n] away", *ante* at 412, just as effectively in a no-evidence appeal.

The Court's attempts to distinguish *Havner, Crye, Schaefer,* and the long line of cases that precedes them are flawed.

**E**

The use of scientific evidence at trial poses unique problems. Sometimes, as in *Havner,* the entire body of evidence is unreliable from a scientific viewpoint. At other times, as in *Crye* and *Schaefer,* the evidence is unreliable because it is based on assumptions that cannot be demonstrated. In still other cases, like this one, the evidence is unreliable only as it pertains to a part of the claims. For the most part, I agree with the Court that the issue of the reliability of scientific evidence should be raised in the trial court. The exception is when the evidence is plainly lacking in probative value—the moon is made of green cheese. But it is not at all clear what procedures should be used to raise reliability challenges. The Court refers to motions in limine, although as a general rule rulings on such motions do not preserve error. The Court also refers to summary judgments, although this procedure may not work well when testimony is important to illuminate the issue. The Court insists that there be an objection, but *Havner* shows the difficulty of objecting to an entire case. Moreover, once the issue has been identified, why should further objection be necessary?

For over two years, the Supreme Court Advisory Committee, which advises the Court on all rules of procedure, and the State Bar of Texas Committee on the Administration of Rules of Evidence, which monitors the operation of the Rules of Evidence, have tried to fashion rules governing the timing and manner of objections to scientific evidence. The seventy-plus members of these highly respected committees have broad experience and expertise in procedural and evidentiary matters. Last fall the Advisory Committee, after considering the work of the State Bar Committee, concluded that the problem of how and when to object to scientific evidence is complex and involves many difficult considerations. The Advisory Committee recommended to this Court that any rules await a development of the issues in appellate opinions carefully analyzing the various concerns. That counsel seemed sound at the time, but today's confusing opinion makes the alternative of a rules solution far more appealing.

In simply mandating an objection before or during trial, the Court appears oblivious to the considerations its advisory committees believed to be complex and difficult. The Court's analysis is really confined to a single thought: parties should not be "ambushed". That relatively innocuous proposition simply cannot support the addition to our procedural

jurisprudence of a vague and universal duty to object to scientific evidence before or during trial.

**\*426 III**

Maritime Overseas' challenge to Ellis's scientific evidence is valid. Although Ellis's experts testified that Ellis's exposure to diazinon caused neurotoxicity, there was no basis for their opinions in any scientific literature or experimentation. The experts reviewed all the literature regarding neurotoxicity from exposure to pesticides in general and organophosphates in particular; none was omitted. Nowhere in the literature is there any demonstration that diazinon causes neurotoxicity.

Ellis's position is that diazinon is an organophosphate, some organophosphates cause neurotoxicity (although some do not), and therefore diazinon causes neurotoxicity. The logical fallacy in this syllogism is apparent. The record establishes that no scientific evidence exists for concluding that diazinon is among the organophosphates that causes neurotoxicity or among those that do not. There is simply no way to tell.

In *Havner,* plaintiffs offered extensive epidemiological evidence showing a relationship between Bendectin and birth defects, but the relationship was never shown to be statistically significant. We held that that was no evidence to support a finding that Bendectin causes birth defects. The evidence in the present case is even weaker than the evidence in *Havner.* Here there is no evidence at all, other than Ellis's experts' bare opinions, showing a relationship between diazinon exposure and neurotoxicity. Moreover, all physical medical evidence—electroencephalograms, peripheral nerve tests, an MRI, and a CAT scan—have shown Ellis to be in normal health, aside from problems relating to obesity, high blood pressure, smoking, and alcohol dependency. Under our precedents, the experts' unsupported opinions cannot provide a basis for a judgment against Maritime Overseas.

\* \* \* \* \*

Because there is no basis for Ellis's experts' opinions that his exposure to diazinon caused him to suffer from neurotoxicity, those opinions were not probative evidence and should not have been considered by the court of appeals in assessing the factual sufficiency of the evidence of causation of Ellis's damages. Accordingly, I would reverse the court of appeals'

judgment and remand the case to that court to redetermine the factual sufficiency of the evidence.

**Parallel Citations**

41 Tex. Sup. Ct. J. 683

Footnotes

1    *See Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *E.I. duPont de Nemours v. Robinson,* 923 S.W.2d 549 (Tex.1995); *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706 (Tex.1997).

2    Maritime also cites *Brock v. Merrell Dow Pharms., Inc.,* 874 F.2d 307 (5 th Cir.), *modified,* 884 F.2d 166 (1989), to support its argument that Ellis's experts' testimony was not proper scientific evidence. However, like *Daubert, Robinson* and *Havner,* in *Brock,* Merrell Dow challenged the scientific evidence before the jury verdict. Here, Maritime did not challenge Ellis's scientific evidence until after the jury verdict.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

964 S.W.2d 922
Supreme Court of Texas.

Charles MAYHEW, Sr., Charles Mayhew, Jr., The Estate of Audrey Mayhew, and Sunnyvale Properties, Ltd., Petitioners,
v.
The TOWN OF SUNNYVALE, Respondent.

No. 95–0771. | Argued Oct. 24, 1996. | Decided March 13, 1998. | Rehearing Overruled May 8, 1998.

Landowners filed action challenging town's denial of their application for planned development. The 192nd District Court, Dallas County, Merrill Hartman, J., granted town's motion for summary judgment. Landowners appealed. The Court of Appeals, Whitham, J., 774 S.W.2d 284, affirmed in part, reversed in part and remanded. After trial on the merits, the District Court, Dallas County, Merrill Hartman, J., found for landowners. Town appealed. The Court of Appeals, 905 S.W.2d 234, reversed. Application for writ of error was granted. The Supreme Court, Abbott, J., held that: (1) landowners' claims were ripe despite their failure to request variance or file another planned development application before filing suit; (2) town's denial of planned development application substantially advanced legitimate governmental interests in protecting community from ill effects of urbanization and did not totally destroy all value of property, and thus did not constitute regulatory taking; and (3) town did not violate landowners' substantive or procedural due process rights, nor their equal protection rights, by denying planned development application.

Reversed and rendered.

West Headnotes (31)

[1]     **Appeal and Error**
         Determination of questions of jurisdiction in general

         **Appeal and Error**
         Cases Triable in Appellate Court

         Ripeness is element of subject matter jurisdiction and thus is legal question, is subject to de novo review, and can be raised by court sua sponte.

676 Cases that cite this headnote

[2]     **Constitutional Law**
         Advisory Opinions

         Under separation of powers doctrine, courts are without jurisdiction to issue advisory opinions because such is function of executive department, not judiciary. Vernon's Ann.Texas Const. Art. 2, § 1.

12 Cases that cite this headnote

[3]     **Eminent Domain**
         Conditions precedent to action; ripeness

         Landowners' failure to request variance or file another planned development application before filing suit did not preclude ripeness of their regulatory takings claims based on town's denial of initial planned development application, under circumstances indicating that landowners had negotiated with town for over a year, spent $500,000 in expenditures on application, and finally made compromise proposal for smaller development with minimum number of units landowners believed necessary to make economically viable use of land, and in light of town's clear position that it would not approve development at that size so as to render futile any request for variance or reapplication.

31 Cases that cite this headnote

[4]     **Constitutional Law**
         Questions of law or fact

         **Eminent Domain**
         Questions for jury

         **Zoning and Planning**
         Questions for jury

         Although determining whether property regulation is unconstitutional requires consideration of a number of factual issues, ultimate question of whether zoning ordinance constitutes compensable taking or violates due process or equal protection is question of law, not question of fact. U.S.C.A. Const.Amends. 5, 14.

151 Cases that cite this headnote

**[5]** **Zoning and Planning**

🔑 Decisions of boards or officers in general

Zoning decisions are vested in discretion of municipal authorities, and courts should not assume role of super zoning board.

Cases that cite this headnote

**[6]** **Eminent Domain**

🔑 Zoning and Permits

Application of general zoning law to particular property constitutes regulatory taking if ordinance does not substantially advance legitimate state interests or it denies owner all economically viable use of his or her land. U.S.C.A. Const.Amends. 5, 14.

11 Cases that cite this headnote

**[7]** **Eminent Domain**

🔑 What Constitutes a Taking; Police and Other Powers Distinguished

Property regulation must substantially advance a legitimate governmental interest to pass constitutional muster, which thus requires examination of effect of regulation and legitimate state interest it is supposed to advance, although requirement is not equivalent to rational basis standard applied to due process and equal protection claims. U.S.C.A. Const.Amends. 5, 14.

3 Cases that cite this headnote

**[8]** **Eminent Domain**

🔑 Particular cases

**Zoning and Planning**

🔑 Architectural and structural designs; area and lot considerations

**Zoning and Planning**

🔑 Other particular considerations

Town's denial of landowners' planned development application substantially advanced legitimate governmental interests in protecting

community from ill effects of urbanization, for purposes of regulatory takings claim; town was uniquely rural and suburban, with undivided two-lane roads, clusters of trees, lakes and ponds, and houses on large lots, which would be changed drastically by large planned development with at least three residences per acre that would more than quadruple population of town. U.S.C.A. Const.Amends. 5, 14.

8 Cases that cite this headnote

**[9]** **Eminent Domain**

🔑 What Constitutes a Taking; Police and Other Powers Distinguished

**Eminent Domain**

🔑 Zoning, Planning, or Land Use; Building Codes

Compensable regulatory taking can occur when governmental agencies impose restrictions that either deny landowners all economically viable use of their property, or unreasonably interfere with landowners' rights to use and enjoy their property. U.S.C.A. Const.Amends. 5, 14.

38 Cases that cite this headnote

**[10]** **Eminent Domain**

🔑 What Constitutes a Taking; Police and Other Powers Distinguished

**Eminent Domain**

🔑 Zoning, Planning, or Land Use; Building Codes

Governmental restriction denies landowner all economically viable use of property or totally destroys value of property, and thus constitutes compensable regulatory taking, if restriction renders property valueless. U.S.C.A. Const.Amends. 5, 14.

19 Cases that cite this headnote

**[11]** **Eminent Domain**

🔑 Zoning, Planning, or Land Use; Building Codes

Determining whether all economically viable use of property has been denied by government restriction, so as to create

compensable regulatory taking, entails relatively simple analysis of whether value remains in property after governmental action. U.S.C.A. Const.Amends. 5, 14.

14 Cases that cite this headnote

**[12]    Eminent Domain**

👉 What Constitutes a Taking;  Police and Other Powers Distinguished

Determining whether government has unreasonably interfered with landowner's right to use and enjoy property, for purposes of regulatory takings claim, requires consideration of economic impact of regulation and extent to which regulation interferes with distinct investment-backed expectations. U.S.C.A. Const.Amends. 5, 14.

26 Cases that cite this headnote

**[13]    Eminent Domain**

👉 What Constitutes a Taking;  Police and Other Powers Distinguished

Economic impact of regulation, for purposes of regulatory takings claim, compares value that has been taken from property by regulation with value that remains in property, and loss of anticipated gains or potential future profits is not usually considered. U.S.C.A. Const.Amends. 5, 14.

3 Cases that cite this headnote

**[14]    Eminent Domain**

👉 Zoning and Permits

Existing and permitted uses of property constitute primary expectation of landowner that is affected by regulation, for purposes of regulatory taking claim, and landowner's knowledge of existing zoning is to be considered in determining whether regulation interferes with owner's investment-backed expectations. U.S.C.A. Const.Amends. 5, 14.

12 Cases that cite this headnote

**[15]    Eminent Domain**

👉 Particular cases

**Zoning and Planning**

👉 Maps, Plats, and Plans;  Subdivisions

Town's denial of landowners' planned development application did not totally destroy all value of property so as to constitute unconstitutional regulatory taking, in light of $2.4 million value for property even after denial of planned development. U.S.C.A. Const.Amends. 5, 14.

9 Cases that cite this headnote

**[16]    Eminent Domain**

👉 Particular cases

**Zoning and Planning**

👉 Architectural and structural designs;  area and lot considerations

Landowners had no reasonable investment-backed expectation to build 3,600 residential units on their property, and thus, town did not unreasonably interfere with their right to use and enjoy their property, so as to constitute compensable regulatory taking, by denying owners' application for planned development of that size which would have at least three homes per acre and would quadruple town's population; owners originally purchased property for ranching and used it for that purpose for nearly 40 years, owners' subsequent purchases of additional land occurred after town had restricted development density for 12 years. U.S.C.A. Const.Amends. 5, 14.

29 Cases that cite this headnote

**[17]    Eminent Domain**

👉 What Constitutes a Taking;  Police and Other Powers Distinguished

Historical uses of property are critically important when determining reasonable investment-backed expectation of landowner for purposes of regulatory taking claim. U.S.C.A. Const.Amends. 5, 14.

3 Cases that cite this headnote

**[18]    Eminent Domain**

☞ Zoning and Permits

Existing zoning of property at time it was acquired is to be considered in determining whether zoning regulation interferes with investment-backed expectations for purposes of regulatory taking claim. U.S.C.A. Const.Amends. 5, 14.

3 Cases that cite this headnote

**[19]** **Constitutional Law**
☞ Proceedings and review

Court should not set aside zoning determination for substantive due process violation unless action has no foundation in reason and is a mere arbitrary or irrational exercise of power having no substantial relation to public health, public morals, public safety, or public welfare in its proper sense. U.S.C.A. Const.Amends. 5, 14.

2 Cases that cite this headnote

**[20]** **Constitutional Law**
☞ Zoning and Land Use

Generally applicable zoning ordinance will survive substantive due process challenge if it is designed to accomplish objective within government's police power and if rational relationship exists between ordinance and its purpose. U.S.C.A. Const.Amends. 5, 14.

5 Cases that cite this headnote

**[21]** **Constitutional Law**
☞ Zoning and Land Use

If it is at least fairly debatable that zoning decision was rationally related to legitimate government interests, decision must be upheld against substantive due process challenge; ordinance will violate substantive due process only if it is clearly arbitrary and unreasonable. U.S.C.A. Const.Amends. 5, 14.

6 Cases that cite this headnote

**[22]** **Constitutional Law**
☞ Particular issues and applications

**Zoning and Planning**
☞ Other particular considerations

Town did not act irrationally or arbitrarily in denying landowners' planned development application, and thus did not violate their substantive due process rights, in light of town's legitimate governmental interests regarding urbanization effects of development, and fact that denial of development application was clearly rationally related to those interests. U.S.C.A. Const.Amends. 5, 14.

6 Cases that cite this headnote

**[23]** **Constitutional Law**
☞ Zoning and Land Use

As-applied equal protection challenge to zoning decision requires that government treat claimant different from other similarly-situated landowners without any reasonable basis. U.S.C.A. Const.Amends. 5, 14.

5 Cases that cite this headnote

**[24]** **Constitutional Law**
☞ Zoning and Land Use

Zoning ordinance generally must only be rationally related to legitimate state interest to survive equal protection challenge, unless ordinance discriminates against suspect class. U.S.C.A. Const.Amends. 5, 14.

2 Cases that cite this headnote

**[25]** **Constitutional Law**
☞ Economic or social regulation in general
**Constitutional Law**
☞ Zoning and Land Use

Economic regulations, including zoning decisions, have traditionally been afforded only rational relation scrutiny under equal protection clause. U.S.C.A. Const.Amends. 5, 14.

Cases that cite this headnote

**[26]** **Constitutional Law**
☞ Selective enforcement

**Zoning and Planning**

👉 Other particular considerations

Landowners seeking approval of planned 1200–acre residential development application were not similarly situated to landowners seeking to build on small parcels for purposes of landowners' equal protection claim. U.S.C.A. Const.Amends. 5, 14.

2 Cases that cite this headnote

[27] **Constitutional Law**

👉 Zoning and Land Use

**Zoning and Planning**

👉 Other particular considerations

Town did not act irrationally or arbitrarily in denying landowners' planned development application, and thus did not violate their equal protection rights, in light of town's legitimate governmental interests regarding urbanization effects of development, and fact that denial of development application was clearly rationally related to those interests. U.S.C.A. Const.Amends. 5, 14.

2 Cases that cite this headnote

[28] **Constitutional Law**

👉 Notice and Hearing

If individual is deprived of property right, government must afford appropriate and meaningful opportunity to be heard to comport with procedural due process. U.S.C.A. Const.Amends. 5, 14.

4 Cases that cite this headnote

[29] **Constitutional Law**

👉 Proceedings

Plaintiff alleging procedural due process takings claim must establish that he or she was deprived of notice and opportunity to be heard with respect to decision affecting his or her property rights. U.S.C.A. Const.Amends. 5, 14.

4 Cases that cite this headnote

[30] **Zoning and Planning**

👉 Legislative, administrative, judicial, or quasi-judicial power

Zoning is legislative act, and, in making legislative zoning determination, city or town is entitled to consider all facts and circumstances which may affect property, community, and welfare of its citizens.

1 Cases that cite this headnote

[31] **Constitutional Law**

👉 Proceedings and review

**Zoning and Planning**

👉 Notice

**Zoning and Planning**

👉 Hearings in general

Town satisfied requirements of procedural due process concerning zoning decision by providing landowners with notice and opportunity to be heard before town denied their planned development application. U.S.C.A. Const.Amends. 5, 14.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*925** Don Black, P. Michael Jung, Dallas, Charles L. Siemon, Marcella Larsen, Boca Raton, FL, for Petitioners.

LaDawn H. Conway, Cole B. Ramey, Terry D. Morgan, Robert H. Freilich, Kansas City, MO, W. Alan Wright, Dallas, for Respondent.

**Opinion**

ABBOTT, Justice, delivered the opinion for a unanimous Court.

We are confronted with two primary questions in this regulatory takings case. First, we must determine the extent to which the Mayhews' claims are ripe for our consideration. Second, we must decide whether the denial of the Mayhews' planned development proposal violated their constitutional rights. While we conclude that the Mayhews' claims are ripe, we hold that the Town did not violate their constitutional

rights. We reverse the court of appeals' judgment dismissing the Mayhews' claims, and we render judgment that the Mayhews take nothing.

**I**

The Town of Sunnyvale, a Texas general law municipal corporation with a population of approximately 2,000 people, is located approximately twelve miles east of the central business district of Dallas. The Town contains approximately 10,941 acres of land, but approximately 8,190 acres are currently vacant. The Town's first zoning ordinance, adopted in 1965, allowed residential development at a density of 3.6 units per acre. In 1973, in response to septic tank failures, the Town modified its zoning ordinance and enacted a one-acre minimum lot size requirement. However, when sanitary sewer facilities were later made available to the Town, the Town did not repeal its one-acre minimum lot requirement.

The Mayhew family owns approximately 1196 acres of land in Sunnyvale. From 1941 to 1965, the Mayhews acquired 850 acres of their property at a cost of $372,000.00. The Mayhews used this property for ranching for a number of years. In 1985 and 1986, the Mayhews purchased an additional 346 acres in the Town for development purposes. The Mayhews' property comprises 26% of the land available for residential development in the Town.

In 1985, the Mayhews began meeting with various Town officials seeking permission to proceed with a planned development with a density in excess of the then allowable one-dwelling-unit-per-acre residential zoning. **\*926** The Mayhews told the Town a planned development would not be feasible under one-unit-per-acre zoning. In 1986, after meeting with the Mayhews, the Town adopted a comprehensive plan providing for a projected population of 25,000 by the year 2006, and 30,000 to 35,000 persons by the year 2016. The Town also amended article XV of its zoning ordinances to allow, upon council approval, planned developments with densities in excess of one dwelling-unit per acre.

In July 1986, after spending over $500,000 conducting studies and preparing evaluative reports, the Mayhews submitted their planned development proposal to the Town. If the proposal was approved, the Mayhews planned to sell their property to the Trammel Crow Company for development. Because Trammel Crow would only develop the property

if it could build a minimum of 3,600 units, the Mayhews requested approval to build between 3,650 and 5,025 units on their land, a density of over three units per acre.

The Town employed a professional planning and engineering firm to initially review the proposal. This firm, after finding that the proposal satisfied each of the requirements of the Town's zoning ordinance, recommended approval of the proposal. The proposal was then forwarded to the Town's planning and zoning commission.

While the commission was reviewing the Mayhews' application, the Town council passed a moratorium on planned developments, which was in effect until the Spring of 1987. Despite the moratorium, the commission continued to consider the Mayhews' application. After four months of consideration, the commission recommended denial of the Mayhews' application on November 20, 1986. In support of its recommendation, the commission noted that the development would severely impact the ability of the Town to provide adequate municipal services. The commission also reasoned that the Town had a very unique character and lifestyle that differed from the proliferation of multi-family and single-family homes on small lots in adjoining municipalities. According to the commission, a less dense use of the property was preferable.

The Town council appointed a negotiating committee of two Town councilmen, the Town mayor, and the Town attorney. The Mayhews met with the committee and both sides tentatively agreed to a compromise development of 3,600 units. Subsequently, on January 13, 1987, the Town council met to vote on the proposal. During the council meeting, Charles Mayhew, Jr. told the council that anything less than approval for 3,600 units would be considered an outright denial. Despite the prior compromise, the Town council voted to deny the Mayhews' development proposal by a four-to-one vote. A subsequent meeting to reconsider the planned development request was canceled by the Town.

In March 1987, the Mayhews sued the Town and the four individual council members who voted against their proposal, alleging that the refusal to approve the planned development violated their state and federal constitutional rights to procedural due process, substantive due process, and equal protection. The Mayhews further alleged that the Town's decision was a taking of their property without payment of just or adequate compensation. The Mayhews also brought various statutory claims.

The Town and the individual council members moved for summary judgment, which the district court granted. On appeal, the court of appeals affirmed the summary judgment in favor of the individual council members, and also affirmed the summary judgment in favor of the Town on the Mayhews' statutory claims. However, the appellate court reversed the summary judgment on the Mayhews' constitutional claims against the Town, concluding that material fact questions existed regarding whether the Town violated the Mayhews' state and federal constitutional rights. *Mayhew v. Town of Sunnyvale,* 774 S.W.2d 284, 286 (Tex.App.—Dallas 1989, writ denied), *cert. denied,* 498 U.S. 1087, 111 S.Ct. 963, 112 L.Ed.2d 1049 (1991).

Upon remand, the district court held a bench trial. The court heard testimony from thirty-five witnesses, most of whom were experts. At the conclusion of the trial, the district court made numerous findings of fact **\*927** and conclusions of law, including findings that:

> 26. The Mayhew Ranch Planned Development was well-planned and satisfied all of the requirements contained in Article XV and the Zoning Ordinance of the Town of Sunnyvale.

> 36. Adequate steps were taken in the design of the Mayhew Ranch Planned Development to protect the public health, safety, welfare, and morals of the Town of Sunnyvale and its citizens.

> 40. Growth and development in the Town of Sunnyvale cannot possibly reach the population projection in the Comprehensive Plan of the Town of Sunnyvale under the Town's one-acre zoning.

> 78. The Planning and Zoning Commission's recommendations to the Town Council of November 20, 1986 had no basis in fact and were not rational.

> 82. The Town of Sunnyvale's one-acre zoning does not bear any factual relationship to valid planning principles or objectives.

> 87. The existing development in the Town of Sunnyvale is suburban and urban and any "rural" atmosphere that exists is the result of the existence of undeveloped private property.

> 99. In denying the application for planned development approval for the Mayhew Ranch Planned Development,

the Town of Sunnyvale has refused to allow economically viable development on [the Mayhews'] property with the intention to prevent all development ... and thereby impose a servitude for the benefit of the public.

> 101. In denying the application for planned development approval ..., and in enacting numerous moratoria on applications for consideration of planned development approval, the Town of Sunnyvale has acted pursuant to an official policy not to allow development with a density of greater than one dwelling unit per acre.

> 106. Prior to the Town Council's action to deny the application for [the] planned development ..., the [Mayhews'] property had a fair market value of at least $9,700,000.00.

> 107. The value of the [Mayhews'] property on January 13, 1987, with development approval ... and without the application of the one-acre zoning requirement, would have been greater than $15,000,000.00.

> 108. As a result of the Town Council's denial of the application for [the] planned development ..., and the continued application of the one-acre zoning, the fair market value of the [Mayhews'] property was reduced to $2,400,000.00.

> 115. The minimum residential density necessary for economic viability on [the Mayhews'] property is approximately 3,600 dwelling units or three dwelling units per acre.

> 117. Agriculture is not an economically viable use of [the Mayhews'] property.

> 118. No knowledgeable investor would purchase [the Mayhews'] property as it is currently zoned.

> 120. The Town Council's decision to deny the application for [the] planned development ... has the practical effect of depriving [the Mayhews] of the only economically viable use of their property.

> 121. The result of the Town Council's decision to deny the application for [the] planned development ... is to destroy the value of [the Mayhews'] property.

> 131. The actions of the Town of Sunnyvale reveal a pattern and practice which

demonstrates the intent of the Town of Sunnyvale to deny any application for developmental approval with a density greater than one dwelling unit per acre.

133. The Town of Sunnyvale has closed the door on future reapplication by [the Mayhews] at a realistic or economically viable density.

Based on its findings, the district court concluded that the case was ripe for adjudication and that the Mayhews should prevail on their procedural due process, substantive due process, and equal protection claims under the federal and state constitutions. The district court further concluded that the Town's decision to deny the application for the planned development was an unconstitutional taking under both the federal and state **\*928** constitutions. The court rendered judgment in favor of the Mayhews, awarding $5 million in damages, $2.3 million in prejudgment interest, approximately $1.2 million in attorney's fees, and costs.

The court of appeals reversed the district court's judgment and dismissed the Mayhews' claims against the Town, holding that none of the claims was ripe for review. *Town of Sunnyvale v. Mayhew,* 905 S.W.2d 234 (Tex.App.—Dallas 1994). In a supplemental opinion, the court of appeals addressed the merits of the Mayhews' claims in light of this Court's opinion in *Taub v. City of Deer Park,* 882 S.W.2d 824 (Tex.1994), *cert. denied,* 513 U.S. 1112, 115 S.Ct. 904, 130 L.Ed.2d 787 (1995). The court concluded that, even if the Mayhews' claims were ripe, the evidence was factually insufficient to support the trial court's findings. 905 S.W.2d at 259–68.

We granted the Mayhews' application for writ of error to consider whether their claims were ripe for review and whether judgment should be rendered on the Mayhews' state and federal constitutional claims.

## II

 **[1]**    Our initial inquiry is whether the Mayhews' claims are ripe for this Court's review. Ripeness is an element of subject matter jurisdiction. *State Bar of Texas v. Gomez,* 891 S.W.2d 243, 245 (Tex.1994); *City of Garland v. Louton,* 691 S.W.2d 603, 605 (Tex.1985). As such, ripeness is a legal question subject to de novo review that a court can raise sua sponte. *Texas Ass'n of Business v. Texas Air Control Bd.,* 852 S.W.2d 440, 444–45 (Tex.1993)(subject matter jurisdiction

cannot be waived and may be raised for the first time on appeal by the parties or by the court); *North Alamo Water Supply Corp. v. Texas Dep't of Health,* 839 S.W.2d 455, 457 (Tex.App.—Austin 1992, writ denied)(issue of court's jurisdiction presented a question of law). *See also Reahard v. Lee County,* 30 F.3d 1412, 1415 (11th Cir.1994)(ripeness is a jurisdictional issue subject to a de novo review), *cert. denied,* 514 U.S. 1064, 115 S.Ct. 1693, 131 L.Ed.2d 557 (1995); *Christensen v. Yolo County Bd. of Supervisors,* 995 F.2d 161, 163–64 (9th Cir.1993)(ripeness is a question of law subject to de novo review); *Herrington v. County of Sonoma,* 857 F.2d 567, 568 (9th Cir.1988)(same), *cert. denied,* 489 U.S. 1090, 109 S.Ct. 1557, 103 L.Ed.2d 860 (1989).

 **[2]**    The ripeness requirement emanates, in part, from the separation of powers provision set out in article II, section 1 of the Texas Constitution. Under the separation of powers doctrine, courts are without jurisdiction to issue advisory opinions because such is the function of the executive department, not the judiciary. *Texas Ass'n of Business,* 852 S.W.2d at 444; s*ee also Public Util. Comm'n v. Houston Lighting & Power Co.,* 748 S.W.2d 439 (Tex.1987)("A court has no jurisdiction to render an advisory opinion on a controversy that is not yet ripe."); *City of Garland,* 691 S.W.2d at 605 (same); *Coalson v. City Council of Victoria,* 610 S.W.2d 744, 747 (Tex.1980)(Texas Constitution precludes district courts from giving advisory opinions in prematurely filed actions).

The ripeness doctrine conserves judicial time and resources for real and current controversies, rather than abstract, hypothetical, or remote disputes. *See Browning–Ferris, Inc. v. Brazoria County,* 742 S.W.2d 43, 49 (Tex.App.—Austin 1987, no writ). In this regard, the state ripeness doctrine is similar to the federal ripeness doctrine in that it has both constitutional and prudential dimensions.

This Court has never addressed the ripeness of constitutional challenges to land use regulation. We are aware of only one published Texas decision, *City of El Paso v. Madero Dev.,* 803 S.W.2d 396, 400 (Tex.App.—El Paso 1991, writ denied), *cert. denied,* 502 U.S. 1073, 112 S.Ct. 970, 117 L.Ed.2d 135 (1992), in which the ripeness of regulatory takings and related constitutional claims was analyzed. In that case, the court of appeals relied heavily on federal law to hold that the landowner's claims were not ripe. We agree that we should look to the experience of the federal courts in determining the ripeness of constitutional challenges **\*929** to land-use regulations. [1] *Cf. Texas Ass'n of Business,* 852 S.W.2d at

444 ("Because standing is a constitutional prerequisite to maintaining a suit under both federal and Texas law, we look to the more extensive jurisprudential experience of the federal courts on this subject for any guidance it may yield.").

### A

The federal courts have recognized, as a prudential matter, an essential prerequisite to the ripeness of federal regulatory takings and related constitutional claims. *Suitum v. Tahoe Regional Planning Agency,* 520 U.S. 725, —— – —— & n. 7, 117 S.Ct. 1659, 1664–65 & n. 7, 137 L.Ed.2d 980 (1997). This "essential prerequisite" requires "a final and authoritative determination of the type and intensity of development legally permitted on the subject property. A court cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes." *MacDonald, Sommer & Frates v. Yolo County,* 477 U.S. 340, 348, 106 S.Ct. 2561, 2565–66, 91 L.Ed.2d 285 (1986) (citations omitted). In other words, the federal courts have reasoned that a court cannot determine whether a taking or other constitutional violation has occurred until the court can compare the uses prohibited by the regulation to any permissible uses that may be made of the affected property.

Accordingly, in order for a regulatory takings claim to be ripe, there must be a final decision regarding the application of the regulations to the property at issue. [2] *Suitum,* 520 U.S. at ——, 117 S.Ct. at 1665; *Williamson County Regional Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 186, 105 S.Ct. 3108, 3116, 87 L.Ed.2d 126 (1985). A "final decision" usually requires both a rejected development plan and the denial of a variance from the controlling regulations. *Hamilton Bank,* 473 U.S. at 187–88, 105 S.Ct. at 3117*; see also MacDonald,* 477 U.S. at 351–52 & n. 8, 106 S.Ct. at 2567–68 & n. 8 (case was not ripe when a single "intense" subdivision proposal was rejected because a "meaningful application" had not been made); *Hodel v. Virginia Surface Mining & Reclamation Ass'n,* 452 U.S. 264, 293–97, 101 S.Ct. 2352, 2369–71, 69 L.Ed.2d 1 (1981)(Court refused to consider takings claim based on general regulatory provision that had not been applied to specific properties and from which no administrative relief had been sought); *Agins v. Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980)("as-applied" constitutional challenge was not ripe because the property owners had not yet submitted a plan for the development of their property).

However, futile variance requests or re-applications are not required. *See Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1012 n. 3, 112 S.Ct. 2886, 2891 n. 3, 120 L.Ed.2d 798 (1992); *MacDonald,* 477 U.S. at 352 n. 8, 106 S.Ct. at 2567–68 n. 8; *Kawaoka v. City of Arroyo Grande,* 17 F.3d 1227, 1232 (9th Cir.), *cert. denied,* 513 U.S. 870, 115 S.Ct. 193, 130 L.Ed.2d 125 (1994); *Southern Pac. Transp. Co. v. City of Los Angeles,* 922 F.2d 498, 504 (9th Cir.1990), *cert. denied,* **\*930** 502 U.S. 943, 112 S.Ct. 382, 116 L.Ed.2d 333 (1991); *Greenbriar, Ltd. v. City of Alabaster,* 881 F.2d 1570, 1575 (11th Cir.1989); *Hoehne v. County of San Benito,* 870 F.2d 529, 534–35 (9th Cir.1989); *Herrington v. County of Sonoma,* 857 F.2d at 569–70; *Kinzli v. City of Santa Cruz,* 818 F.2d 1449, 1454–55 (9th Cir.), *modified on other grounds,* 830 F.2d 968 (9th Cir.1987), *cert. denied,* 484 U.S. 1043, 108 S.Ct. 775, 98 L.Ed.2d 861 (1988).

Moreover, the term "variance" is "not definitive or talismanic;" it encompasses "other types of permits or actions [that] are available and could provide similar relief." *Southern Pacific,* 922 F.2d at 503; *see also Executive 100, Inc. v. Martin County,* 922 F.2d 1536, 1541 (11th Cir.) (aggrieved landowner must "have sought variances or pursued alternative, less ambitious development plans"), *cert. denied,* 502 U.S. 810, 112 S.Ct. 55, 116 L.Ed.2d 32 (1991); *Landmark Land Co. of Oklahoma, Inc. v. Buchanan,* 874 F.2d 717, 721 (10th Cir.1989)(claim not ripe until initial permit application denied and some effort made to "compromise" with the city to allow some level of development). The variance requirement is therefore applied flexibly in order to serve its purpose of giving the governmental unit an opportunity to "grant different forms of relief or make policy decisions which might abate the alleged taking." *Southern Pacific,* 922 F.2d at 503.

The same "final decision" requirement applies to determine the ripeness of as-applied due process and equal protection challenges to a land-use decision. *See, e.g., Hamilton Bank,* 473 U.S. at 199–200, 105 S.Ct. at 3123–24 (concluding that due process claim under Fourteenth Amendment was not ripe because the requisite variance had not been sought to establish a "final decision," and utilizing the same rationale in analyzing the ripeness of the takings claim and the due process claim); *Taylor Inv., Ltd. v. Upper Darby Township,* 983 F.2d 1285, 1292–95 (3d Cir.1993)(final decision rule of *MacDonald* and *Hamilton Bank* applies to substantive due process, equal protection, and procedural due process claims), *cert. denied,* 510 U.S. 914, 114 S.Ct. 304, 126 L.Ed.2d 252 (1993); *Bigelow v. Michigan Dep't of Natural Resources,*

970 F.2d 154, 159–60 (6th Cir.1992)(procedural due process claim, which was related to plaintiff's takings claim, subject to the finality rule); *Eide v. Sarasota County,* 908 F.2d 716, 725 (11th Cir.1990)(finality requirement applies to substantive due process claim), *cert. denied,* 498 U.S. 1120, 111 S.Ct. 1073, 112 L.Ed.2d 1179 (1991); *Herrington,* 857 F.2d at 569 (final decision requirement applies to substantive due process and equal protection claims); *Norco Constr., Inc. v. King County,* 801 F.2d 1143, 1145 (9th Cir.1986)(final decision requirement applies to procedural due process and equal protection claims).

However, a final decision on the application of the zoning ordinance to the plaintiff's property is not required if the plaintiff brings a facial challenge to the ordinance. *See Pennell v. City of San Jose,* 485 U.S. 1, 9–14, 108 S.Ct. 849, 856–59, 99 L.Ed.2d 1 (1988); *Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 386, 47 S.Ct. 114, 117–18, 71 L.Ed. 303 (1926); *Nasierowski Bros. Inv. Co. v. City of Sterling Heights,* 949 F.2d 890, 894–95 (6th Cir.1991); *Smithfield Concerned Citizens for Fair Zoning v. Town of Smithfield,* 907 F.2d 239, 242–43 (1st Cir.1990); *Beacon Hill Farm Assocs. II v. Loudoun County Bd. of Supervisors,* 875 F.2d 1081, 1084–85 (4th Cir.1989).

**B**

The Mayhews alleged (1) just compensation takings claims, (2) "fails to substantially advance" takings claims, (3) substantive due process and due course claims, (4) equal protection claims, and (5) procedural due process and due course claims under the United States Constitution and Texas Constitution regarding the Town's denial of their planned development application for 3,600 units. The Mayhews also argue in their application for writ of error that their constitutional claims challenge the Town's continued application and enforcement of a blanket one-acre zoning designation on their property. We conclude, however, that this challenge is not independent from their claims stemming from the Town's denial of their planned development proposal. The record in this case clearly indicates that the Mayhews were only interested in the Town approving their development **\*931** request for 3,600 units. As Charles Mayhew, Jr. testified, anything less than 3,600 units, the Mayhews believed, was an outright denial of their application. The Mayhews' very theory at trial was that the only economically viable use of their property was to develop it in accordance with the development proposal

that the Town rejected. While the Town's general one-acre zoning requirement almost certainly contributed to the Town's rejection of the Mayhews' application, the one-acre zoning requirement itself did not cause a discrete injury separate from the harm the Mayhews suffered as a result of the denial of their planned development proposal because the Mayhews had no intention of pursuing a development with less than 3,600 units.

The Town maintains that the Mayhews' claims regarding the denial of their planned development application are not ripe because the Mayhews submitted only one planned development application and did not thereafter reapply for development or submit a "variance." The Mayhews counter that, under the circumstances of this case, their planned development application and amended request for 3,600 units were sufficient, and that any further applications would have been futile. We agree with the Mayhews.

**[3]** After the Town denied the Mayhews' planned development application for 3,600 units, the Mayhews did not thereafter request a variance. Moreover, the Mayhews did not file another planned development application. Instead, the Mayhews filed this suit. Normally, their failure to reapply or seek a variance would be fatal to the ripeness of their claims. *See MacDonald,* 477 U.S. at 351, 106 S.Ct. at 2567; *Hamilton Bank,* 473 U.S. at 188–91, 105 S.Ct. at 3117–19. However, under the unique circumstances of this case, we conclude that the Mayhews' constitutional challenges to the Town's denial of their planned development application for 3,600 units are ripe for this Court's review.

A planned development is not a typical request for a zoning change; the density, type, and location of particular uses in the development are left to the planning process and are determined through negotiations between the developer and the town. The evidence in this case establishes the extent to which the Mayhews worked with the Town in attempting to have their development approved. The Mayhews originally requested approval to build between 3,650 and 5,025 units on their land. They spent over a year in negotiations with the Town, and expended over $500,000 preparing and developing the application. The Mayhews presented the project to the Town planning staff, the Town planning and zoning committee, and the Town council. After receiving a negative response from the planning and zoning committee, the Mayhews met with Town council members, and, in an effort to compromise, agreed to alter their application. The

Mayhews then submitted a modified application to the Town council, which the council rejected.

The modified application that the Mayhews presented to the Town council requested 3,600 units, a reduction from their original request for approval. Such a compromise proposal can sometimes be sufficient to satisfy the variance requirement. *Executive 100, Inc.,* 922 F.2d at 1540 (aggrieved landowner must "have sought variances or pursued alternative, less ambitious development plans"); *Landmark Land Co.,* 874 F.2d at 721 (claim not ripe until initial permit application denied and some effort made to "compromise" with the city to allow some level of development).

Moreover, this modified application was not the most profitable use envisioned by the Mayhews, but rather the minimum number of units the Mayhews believed necessary to make an economically viable use of their land. In fact, the very theory espoused by the Mayhews at trial was that only improvements along the lines of their 3,600 unit proposed planned development would avert a regulatory taking. In other words, the Mayhews alleged that anything less than the Town allowing their planned development would deny the only economically viable use of their property.

The United States Supreme Court has indicated that such a claim may be ripe without the necessity of seeking a variance or filing a subsequent application. In *MacDonald,* after the county rejected the applicant's single **\*932** proposal to subdivide the property into 159 single-family and multi-family residential lots, the applicant immediately sued, alleging that the county had restricted the property to an open-space agricultural use, thereby appropriating the property. *MacDonald,* 477 U.S. at 342–44, 106 S.Ct. at 2562–64. Because the county's only action was its rejection of a single subdivision proposal, the Supreme Court held that the applicant's claim that the county had deprived it of all use of its property was not ripe. In such a situation, the Court reasoned that the applicant had not received the county's " 'final, definitive position regarding how it will apply the regulations at issue to the particular land in question.' " *Id.* at 351, 106 S.Ct. at 2567 (quoting *Hamilton Bank,* 473 U.S. at 191, 105 S.Ct. at 3118–19). But the Court noted that the applicant did not "contend that *only improvements along the lines of its 159–home subdivision plan would avert a regulatory taking.*" *Id.* at 352 n. 8, 106 S.Ct. at 2567–68 n. 8 (emphasis added). The Supreme Court accordingly implied that the result may have been different if the applicant's

complaint had been that the only way to avert a regulatory taking was for the county to approve the subdivision proposal.

Of course, that is exactly the Mayhews' complaint. The Mayhews allege that anything less than approval for 3,600 units on their property constitutes a regulatory taking. The ripeness doctrine does not require a property owner, such as the Mayhews, to seek permits for development that the property owner does not deem economically viable. *See Beure–Co. v. United States,* 16 Cl.Ct. 42, 51 n. 11 (1988). We accordingly conclude that, under the circumstances of this case, the Mayhews were not required to submit additional alternative proposals, after a year of negotiations and $500,000 in expenditures, to ripen this complaint.

Any other holding would require the Mayhews to expend their own time and resources pursuing, and the Town's time and resources considering, a development proposal that the Mayhews would never actually develop. Requiring such a wasteful expenditure of resources would violate the Supreme Court's admonition that a property owner is "not required to resort to piecemeal litigation or otherwise unfair procedures in order to obtain [a final] determination." *MacDonald,* 477 U.S. at 352 n. 7, 106 S.Ct. at 2567–68 n. 7. The Town clearly was not going to approve the Mayhews' development proposal for 3,600 units, making a subsequent application or variance request for 3,600 units a futile act. We therefore hold that the Mayhews' claims that the Town violated their constitutional rights by denying their planned development proposal for 3,600 units are ripe for this Court's review.

### III

The Mayhews brought five separate claims against the Town under the federal and state constitutions, alleging "fails to substantially advance" takings claims, "just compensation" takings claims, substantive due process and due course claims, equal protection claims, and procedural due process and due course claims. The Mayhews urged in their application for writ of error that Texas takings jurisprudence follows the federal standards. Accordingly, for purposes of this case, we assume, without deciding, that the state and federal guarantees in respect to land-use constitutional claims are coextensive, and we will analyze the Mayhews' claims under the more familiar federal standards. *Cf. Tilton v. Marshall,* 925 S.W.2d 672, 677 n. 6 (Tex.1996)(assuming without deciding that the state and federal free exercise guarantees were coextensive with respect to relator's claims

because relator did not demonstrate that the provisions should be applied differently).

 [4]    Before proceeding to analyze the Mayhews' five constitutional claims, we must consider the proper effect of the findings of fact made by the district court in this case. Although determining whether a property regulation is unconstitutional requires the consideration of a number of factual issues, the ultimate question of whether a zoning ordinance constitutes a compensable taking or violates due process or equal protection is a question of law, not a question of fact. *City of College Station v. Turtle Rock Corp.,* 680 S.W.2d 802, 804 (Tex.1984); *see also*   **\*933**  *Hunt v. City of San Antonio,* 462 S.W.2d 536, 539 (Tex.1971); *DuPuy v. City of Waco,* 396 S.W.2d 103, 110 (Tex.1965). In resolving this legal issue, we consider all of the surrounding circumstances. *City of College Station,* 680 S.W.2d at 804; *see also Hunt,* 462 S.W.2d at 539; *City of Bellaire v. Lamkin,* 159 Tex. 141, 317 S.W.2d 43, 45 (1958); *City of Waxahachie v. Watkins,* 154 Tex. 206, 275 S.W.2d 477, 481 (1955). While we depend on the district court to resolve disputed facts regarding the extent of the governmental intrusion on the property, *cf. Republican Party of Texas v. Dietz,* 940 S.W.2d 86, 91 (Tex.1997), the ultimate determination of whether the facts are sufficient to constitute a taking is a question of law. [3]

## A. REGULATORY TAKING CLAIM

The Just Compensation Clause of the Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation." This prohibition has been incorporated through the Fourteenth Amendment to apply to the individual states. *Williamson Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 175 n. 1, 105 S.Ct. 3108, 3110–11 n. 1, 87 L.Ed.2d 126 (1985); *Chicago, B. & Q.R. Co. v. Chicago,* 166 U.S. 226, 241, 17 S.Ct. 581, 586, 41 L.Ed. 979 (1897). Similarly, article I, section 17 of the Texas Constitution provides, in pertinent part, that no "person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made...."

Takings can be classified as either physical or regulatory takings. Physical takings occur when the government authorizes an unwarranted physical occupation of an individual's property. *See Yee v. City of Escondido,* 503 U.S. 519, 522, 112 S.Ct. 1522, 1526, 118 L.Ed.2d 153 (1992). The Mayhews do not claim that the Town has physically taken

their property. Rather, the Mayhews allege that the denial of their planned development constitutes a regulatory taking.

 [5]    [6]    Zoning decisions are vested in the discretion of municipal authorities; courts should not assume the role of a super zoning board. *Goss v. City of Little Rock,* 90 F.3d 306, 308 (8th Cir.1996); *Burns v. City of Des Peres,* 534 F.2d 103, 108 (8th Cir.), *cert. denied,* 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976). However, despite the discretion afforded to municipal authorities, zoning decisions must comply with constitutional limitations. As a general rule, the application of a general zoning law to a particular property constitutes a regulatory taking if the ordinance "does not substantially advance legitimate state interests" or it denies an owner all "economically viable use of his land." *Agins v. City of Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980). *See also Dolan v. City of Tigard,* 512 U.S. 374, 385, 114 S.Ct. 2309, 2316–17, 129 L.Ed.2d 304 (1994); *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1016, 112 S.Ct. 2886, 2893–94, 120 L.Ed.2d 798 (1992); *Nollan v. California Coastal Comm'n,* 483 U.S. 825, 834, 107 S.Ct. 3141, 3147, 97 L.Ed.2d 677 (1987); *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 485, 107 S.Ct. 1232, 1241–42, 94 L.Ed.2d 472 (1987).

The Mayhews allege, and the district court found, that the denial of the Mayhews' planned development did not substantially advance legitimate state interests and amounted to a taking because all economically viable use of their property was denied. We first analyze whether the Town's actions substantially advance legitimate governmental interests before determining whether the Town's actions denied the Mayhews all economically viable use of their property.

### 1. *Substantially Advance Legitimate Interests*

 [7]    A property regulation must "substantially advance" a legitimate governmental interest to pass constitutional muster. *See, e.g.,*   **\*934**  *Dolan,* 512 U.S. at 385, 114 S.Ct. at 2316–17*; Nollan,* 483 U.S. at 834, 107 S.Ct. at 3147.  *See also City of College Station,* 680 S.W.2d at 805 (property regulation must be "substantially related" to a legitimate goal); *Hunt,* 462 S.W.2d at 539 (same); *Watkins,* 275 S.W.2d at 481 (same); *Lombardo,* 73 S.W.2d at 485 (same). While it is clear that a zoning ordinance that does not substantially advance a legitimate state interest constitutes a taking, the standards for determining what constitutes a legitimate state

interest or what relation between a regulation and the state interest satisfies the "substantially advance" requirement in a regulatory takings case has not been clarified by the United States Supreme Court. *See, e.g., Nollan,* 483 U.S. at 834, 107 S.Ct. at 3147.

The Supreme Court has, however, indicated that "a broad range of governmental purposes and regulations" will satisfy these requirements. *Id.* at 834–35, 107 S.Ct. at 3147–48. Specifically, the Supreme Court has noted that the following state interests are legitimate state interests: protecting residents from the "ill effects of urbanization"; *Agins,* 447 U.S. at 261, 100 S.Ct. at 2141–42; enhancing the quality of life; *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 129, 98 S.Ct. 2646, 2661–62, 57 L.Ed.2d 631 (1978); and protecting a beach system for recreation, tourism, and public health; *Keystone,* 480 U.S. at 488, 107 S.Ct. at 1243–44; *Esposito v. South Carolina Coastal Council,* 939 F.2d 165, 169 (4th Cir.1991), *cert. denied,* 505 U.S. 1219, 112 S.Ct. 3027, 120 L.Ed.2d 898 (1992).

In *Agins,* the City of Tiburon adopted a zoning ordinance governing development of open space land that limited the plaintiffs to building between one and five single-family residences on the five acres of land which they had previously purchased for residential development. 447 U.S. at 257, 100 S.Ct. at 2139–40. The Court held that protecting the residents of Tiburon from the ill effects of urbanization by precluding the conversion of open-space land to urban uses was a legitimate government purpose. *Id.* at 261, 100 S.Ct. at 2141–42. *Cf. Penn Central Transp. Co.,* 438 U.S. at 129, 98 S.Ct. at 2661–62 (preservation of desirable aesthetic features); *Village of Belle Terre v. Boraas,* 416 U.S. 1, 9, 94 S.Ct. 1536, 1541, 39 L.Ed.2d 797 (1974); *Berman v. Parker,* 348 U.S. 26, 32–33, 75 S.Ct. 98, 102–03, 99 L.Ed. 27 (1954); *Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 394–95, 47 S.Ct. 114, 120–21, 71 L.Ed. 303 (1926); *see also Christensen v. Yolo County Bd. of Supervisors,* 995 F.2d 161, 165 (9th Cir.1993)(preservation of agricultural uses of land a legitimate state interest); *Smithfield Concerned Citizens for Fair Zoning v. Town of Smithfield,* 907 F.2d 239, 244–45 (1st Cir.1990)(controlling both the rate and character of community growth a legitimate government purpose); *Pompa Construction Corp. v. City of Saratoga Springs,* 706 F.2d 418, 422 (2d Cir.1983)(discouraging conversion of open-space land to urban uses a legitimate state interest). Such zoning ordinances benefit "the public by serving the city's interest in assuring careful and orderly development of residential

property with provision for open-space areas." *Agins,* 447 U.S. at 262, 100 S.Ct. at 2142.

The "substantial advancement" requirement examines the nexus between the effect of the ordinance and the legitimate state interest it is supposed to advance. *See Yee v. City of Escondido,* 503 U.S. 519, 530, 112 S.Ct. 1522, 1529–30, 118 L.Ed.2d 153 (1992); *see also generally Nollan,* 483 U.S. at 837, 107 S.Ct. at 3148–49; *Esposito,* 939 F.2d at 169. This requirement is not, however, equivalent to the "rational basis" standard applied to due process and equal protection claims. *Nollan,* 483 U.S. at 834 n. 3, 107 S.Ct. at 3147 n. 3. The standard requires that the ordinance "substantially advance" the legitimate state interest sought to be achieved rather than merely analyzing whether the government could rationally have decided that the measure achieved a legitimate objective. *Id.*

[8]    The Town's denial of the Mayhews' planned development application passes constitutional muster under this standard. In making this determination, we do not review the wisdom of the Town's decision. S*ee Smithfield Concerned Citizens,* 907 F.2d at 245. Rather, we are concerned only with whether the decision satisfies constitutional standards.

**\*935** The Mayhews allege that the real reason behind the denial of their development application was to have their property serve as "borrowed" open space for the residents of the Town who primarily live on less than one-acre lots. In support of this contention, the Mayhews presented evidence negating some of the reasons given by the planning and zoning commission for the denial of their development application. For instance, the Mayhews presented evidence establishing, and the district court found, that sanitary sewer facilities would not be a problem for the Mayhews' planned development because the local sewage plant was operating in full compliance with EPA guidelines and had enough capacity to serve the additional residences contemplated in the Mayhews' planned development.

But the Town's planning and zoning commission came forth with a number of separate reasons for the denial of the Mayhews' application, several of which substantially advance legitimate state interests. The Town denied the development application in part because of the impact the development would have on the overall character of the community and the unique character and lifestyle of the Town which is different from that of adjoining municipalities where there is a proliferation of multi-family and single-family homes

on small lots. Under the Supreme Court's decision in *Agins,* concern for such urbanization effects is clearly a legitimate state interest.

We also conclude that the denial of the Mayhews' development application substantially advances the Town's legitimate concern for protecting the community from the ill effects of urbanization. The Mayhews requested a planned development with 3,600 units in a Town with a population of only approximately 2,000 residents. Photographs in the record show that the Town is uniquely rural and suburban, with undivided two lane roads, clusters of trees, lakes and ponds, and houses on large lots. This community would change drastically if a large planned development with at least three residences per acre was built. The Mayhews' planned development would result in an estimated population increase of between 10,000 and 15,000 persons, more than quadrupling the population of the Town. Simply put, the Town has a substantial interest in preserving the rate and character of community growth, and its action in denying the Mayhews' planned development furthers those interests.

## 2. *Just Compensation Takings Claim*

 **[9]** Our conclusion that the Town's action substantially advances a legitimate state interest does not end the takings inquiry, however. A compensable regulatory taking can also occur when governmental agencies impose restrictions that either (1) deny landowners of all economically viable use of their property, or (2) unreasonably interfere with landowners' rights to use and enjoy their property. *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1015–19 & n. 8, 112 S.Ct. 2886, 2893–95 & n. 8, 120 L.Ed.2d 798 (1992); *see also Taub v. City of Deer Park,* 882 S.W.2d 824, 826 (Tex.1994), *cert. denied,* 513 U.S. 1112, 115 S.Ct. 904, 130 L.Ed.2d 787 (1995); *City of Austin v. Teague,* 570 S.W.2d 389, 393 (Tex.1978).

 **[10]** **[11]** A restriction denies the landowner all economically viable use of the property or totally destroys the value of the property if the restriction renders the property valueless. *See, e.g., Dolan v. City of Tigard,* 512 U.S. 374, 385, 114 S.Ct. 2309, 2316–17, 129 L.Ed.2d 304 (1994); *Lucas,* 505 U.S. at 1015–16, 1020, 112 S.Ct. at 2893–94; *Taub,* 882 S.W.2d at 826; *City of College Station v. Turtle Rock Corp.,* 680 S.W.2d 802, 806 (Tex.1984); *Teague,* 570 S.W.2d at 393. Determining whether all economically viable use of a property has been denied entails a relatively simple

analysis of whether value remains in the property after the governmental action.

 **[12]** **[13]** **[14]** In contrast, determining whether the government has unreasonably interfered with a landowner's right to use and enjoy property requires a consideration of two factors: the economic impact of the regulation and the extent to which the regulation interferes with distinct investment-backed expectations. *See Lucas,* 505 U.S. at 1019 n. 8, 112 S.Ct. at 2895 n. 8; *Penn Central,* 438 U.S. at 124, 98 S.Ct. at 2659. The first factor, the economic impact of the regulation, **\*936** merely compares the value that has been taken from the property with the value that remains in the property. *Keystone,* 480 U.S. at 497, 107 S.Ct. at 1248. The loss of anticipated gains or potential future profits is not usually considered in analyzing this factor. *Andrus v. Allard,* 444 U.S. 51, 66, 100 S.Ct. 318, 327, 62 L.Ed.2d 210 (1979); *see also Moore v. City of Costa Mesa,* 886 F.2d 260, 263 (9th Cir.1989), *cert. denied,* 496 U.S. 906, 110 S.Ct. 2588, 110 L.Ed.2d 269 (1990). The second factor is the investment-backed expectation of the landowner. The existing and permitted uses of the property constitute the "primary expectation" of the landowner that is affected by regulation. *Penn Central,* 438 U.S. at 136, 98 S.Ct. at 2665; *see also Lucas,* 505 U.S. at 1017 n. 7, 112 S.Ct. at 2894 n. 7 (owner's reasonable expectations shaped by uses permitted by state law); *Esposito v. South Carolina Coastal Council,* 939 F.2d 165, 170 (4th Cir.1991), *cert. denied,* 505 U.S. 1219, 112 S.Ct. 3027, 120 L.Ed.2d 898 (1992)("the courts have traditionally looked to the existing use of property as a basis for determining the extent of interference with the owner's 'primary expectation concerning the use of the parcel.' ") (quoting *Penn Central,* 438 U.S. at 136, 98 S.Ct. at 2665). Knowledge of existing zoning is to be considered in determining whether the regulation interferes with investment-backed expectations. *See Pompa Construction Corp. v. City of Saratoga Springs,* 706 F.2d 418, 424–25 (2d Cir.1983).

The Town urges that its rejection of the Mayhews' application did not unconstitutionally deprive them of their property. The Town first contends that the district court found that the Mayhews' property retained a value of at least $2.4 million following the denial of the planned development application; thus, according to the Town, the property's value was not totally destroyed. The Town next urges that the denial of the development request did not unreasonably interfere with the Mayhews' property rights because the Mayhews had no right to have their property "up-zoned" for a greater density

of development. In other words, the Town asserts that the Mayhews had no reasonable investment-backed expectation to lose. The Town also maintains that the Mayhews were not singled out unfairly through the denial of the planned development proposal. Instead, the Town claims that the zoning applied evenly to all property owners in the Town and the Town denied applications other than just the Mayhews' proposal. [4]

The Mayhews counter, however, that this is not the typical denial of an up-zoning application. The Mayhews point out that the district court found that the only economically viable use of this property was to construct 3,600 residential units. The district court also found that agriculture was not an economically viable use of the property. Finally, the district court found that, with one-acre zoning, it would take a minimum of 150 years before the Mayhews could completely develop their property. Accordingly, the district court found that no reasonable investor would purchase the Mayhews' property.

We first must consider the effect of these fact-findings relied on by the Mayhews. As discussed previously, the ultimate determination of whether the facts are sufficient to constitute a taking is a question of law, but we depend on the district court to resolve disputed facts regarding the extent of the governmental intrusion on the property. Under substantive law, a regulatory taking occurs when governmental regulations deprive the owner of all economically viable use of the property or totally destroy the property's value. *Dolan,* 512 U.S. at 385, 114 S.Ct. at 2316–17; *Lucas,* 505 U.S. at 1015–16, 112 S.Ct. at 2893; *Taub,* 882 S.W.2d at 826. Some courts have made an alternative pronouncement that a taking occurs when the government does not allow any use of the property that is sufficiently desirable to permit **\*937** the property owner to sell the property. *See, e.g., Del Monte Dunes at Monterey, Ltd. v. City of Monterey,* 95 F.3d 1422, 1433 (9th Cir.1996), *petition for cert. filed,* 66 U.S.L.W. 3509 (U.S. Jan. 26, 1998) (No. 97–1235); *Park Ave. Tower Assoc. v. City of New York,* 746 F.2d 135, 139 (2d Cir.1984), *cert. denied,* 470 U.S. 1087, 105 S.Ct. 1854, 85 L.Ed.2d 151 (1985). The district court's findings that there was no economically viable use of the property and that no reasonable investor would purchase the property purport to decide the ultimate legal issue of whether a taking has occurred. This, however, involves a question of law, and we therefore owe no deference to the trial court's "findings" in this regard. We will instead focus on the district court's underlying factual determinations regarding

the extent of the governmental intrusion and the diminution in the property's value in determining whether the Town has taken the Mayhews' property without just compensation.

[15] The relevant factual findings demonstrate that the Town has not totally destroyed all value of the property by denying the Mayhews' planned development proposal. In *Lucas,* the Supreme Court clarified that a taking occurs "when the owner of real property has been called upon to sacrifice *all* economically beneficial uses in the name of the common good, that is, to leave his property economically idle." *Lucas,* 505 U.S. at 1019, 112 S.Ct. at 2895 (emphasis in original). Because the trial court found that Lucas's property was rendered completely and wholly valueless by the regulations at issue, the Supreme Court concluded that a taking had occurred. *Id.* at 1019–20, 112 S.Ct. at 2895–96. In contrast, the district court in this case determined that, even after the denial of the Mayhews' planned development proposal, the property retained a value of $2.4 million. In such a situation, the governmental regulation has not entirely destroyed the property's value.

[16] Even if the governmental regulation has not entirely destroyed the property's value, a taking can occur if the regulation has a severe enough economic impact and the regulation interferes with distinct investment-backed expectations. *See Lucas,* 505 U.S. at 1019 n. 8, 112 S.Ct. at 2895 n. 8 (takings are to be measured by the "economic impact of the regulation on the claimant and ... the extent to which the regulation has interfered with distinct investment-backed expectations"); *Penn Central,* 438 U.S. at 124, 98 S.Ct. at 2659 (same); *see also Taub,* 882 S.W.2d at 826 (sufficiently severe economic impact can constitute a taking). The reasonable investment-backed expectation of the claimant is critical to this analysis because it distinguishes this concept from those situations in which the landowner's property has been totally destroyed. Because we conclude that the Mayhews had no reasonable investment-backed expectation to build 3,600 units on their property, we hold that the Town has not unreasonably interfered with their right to use and enjoy their property by denying their planned development proposal.

[17] When the Mayhews first began purchasing their property, the Town did not have a zoning ordinance in place. It is undisputed that the Mayhews originally purchased their property for ranching, not for development. They then used their property for ranching for nearly four decades. Historical uses of the property are critically important when

determining the reasonable investment-backed expectation of the landowner. *See Esposito,* 939 F.2d at 170 ("the courts have traditionally looked to the existing use of property as a basis for determining the extent of interference with the owner's 'primary expectation concerning the use of the parcel.' ")(quoting *Penn Central,* 438 U.S. at 136, 98 S.Ct. at 2665). After four decades of ranching their property in a Town with a population of no more than 2,000 people, the Mayhews did not have a reasonable investment-backed expectation that they could pursue an intensive development of 3,600 units that would more than quadruple the Town's population.

 **[18]**    The Mayhews' subsequent purchases of property in 1985 and 1986 were for purposes of development. However, at this time, the Town's zoning ordinances had restricted development to one unit per acre for the preceding twelve years. The existing zoning of the property at the time it was **\*938** acquired is to be considered in determining whether the regulation interferes with investment-backed expectations. *See Pompa Construction Corp.,* 706 F.2d at 424–25. We do not believe that the Mayhews had a reasonable investment-backed expectation to build 3,600 units on their 1,200 acres when the Town's zoning ordinances had for twelve years limited development to one unit per acre.

Accordingly, we render judgment against the Mayhews on their regulatory takings claims. The Town's denial of the planned development substantially advanced legitimate state interests and did not totally destroy the value of the Mayhews' property or unreasonably interfere with their rights to use and enjoy their property.

## B. SUBSTANTIVE DUE PROCESS

 **[19]**    A court should not set aside a zoning determination for a substantive due process violation unless the action "has no foundation in reason and is a mere arbitrary or irrational exercise of power having no substantial relation to the public health, the public morals, the public safety or the public welfare in its proper sense." *Nectow v. City of Cambridge,* 277 U.S. 183, 187–88, 48 S.Ct. 447, 448, 72 L.Ed. 842 (1928); *see also Pennell v. City of San Jose,* 485 U.S. 1, 11, 108 S.Ct. 849, 857, 99 L.Ed.2d 1 (1988); *Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 395, 47 S.Ct. 114, 121, 71 L.Ed. 303 (1926); *Smithfield Concerned Citizens for Fair Zoning v. Town of Smithfield,* 907 F.2d 239, 243–44 (1st Cir.1990); *Greenbriar, Ltd. v. City of Alabaster,* 881 F.2d 1570, 1577 (11th Cir.1989).

 **[20]**    **[21]**    A generally applicable zoning ordinance will survive a substantive due process challenge if it is designed to accomplish an objective within the government's police power and if a rational relationship exists between the ordinance and its purpose. *FM Properties Operating Co. v. City of Austin,* 93 F.3d 167, 174 (5th Cir.1996); *Christensen v. Yolo County Bd. of Supervisors,* 995 F.2d 161, 165 (9th Cir.1993); *Southern Pac. Transp. Co. v. City of Los Angeles,* 922 F.2d 498, 507 (9th Cir.1990), *cert. denied,* 502 U.S. 943, 112 S.Ct. 382, 116 L.Ed.2d 333 (1991); *Smithfield Concerned Citizens,* 907 F.2d at 243–44; *Stansberry v. Holmes,* 613 F.2d 1285, 1289 (5th Cir.), *cert. denied,* 449 U.S. 886, 101 S.Ct. 240, 66 L.Ed.2d 112 (1980). This deferential inquiry does not focus on the ultimate effectiveness of the ordinance, but on whether the enacting body could have rationally believed at the time of enactment that the ordinance would promote its objective. *Williamson v. Lee Optical of Oklahoma, Inc.,* 348 U.S. 483, 487–88, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955). If it is at least fairly debatable that the decision was rationally related to legitimate government interests, the decision must be upheld. *See Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 464, 101 S.Ct. 715, 723–24, 66 L.Ed.2d 659 (1981); *FM Properties,* 93 F.3d at 175. The ordinance will violate substantive due process only if it is *clearly* arbitrary and unreasonable. *See Esposito v. South Carolina Coastal Council,* 939 F.2d 165, 170 (4th Cir.1991), *cert. denied,* 505 U.S. 1219, 112 S.Ct. 3027, 120 L.Ed.2d 898 (1992).

In *Greenbriar,* 881 F.2d at 1577–80, the Eleventh Circuit was faced with a substantive due process challenge similar to the challenge made by the Mayhews in this case. The fact finder determined in that case, based on conflicting evidence on whether the proposal was in the best interest of the community, that the city council had acted arbitrarily and capriciously in refusing to rezone the subject property based on "political pressure" from constituents. The Eleventh Circuit held, however, that this evidence was not sufficient to establish that the city acted irrationally or arbitrarily in rejecting the application. *Id.* at 1580; *see also Sylvia Dev. Corp. v. Calvert County,* 48 F.3d 810, 827–29 (4th Cir.1995)(a landowner who speculatively purchases property based on the possibility of an upzoning does not demonstrate a substantive due process violation when the county refuses to grant upzoning).

 **[22]**    We likewise conclude that the Town did not act irrationally or arbitrarily in denying the Mayhews' planned development application. The Town's concerns regarding

the urbanization effects of the development are legitimate governmental interests, and **\*939** the denial of the development application is clearly rationally related to those interests.

## C. EQUAL PROTECTION

[23] [24] [25] An as-applied equal protection claim requires that the government treat the claimant different from other similarly-situated landowners without any reasonable basis. *Executive 100, Inc. v. Martin County,* 922 F.2d 1536, 1541 (11th Cir.), *cert. denied,* 502 U.S. 810, 112 S.Ct. 55, 116 L.Ed.2d 32 (1991). The ordinance generally must only be rationally related to a legitimate state interest to survive an equal protection challenge, unless the ordinance discriminates against a suspect class. *Christensen v. Yolo County Bd. of Supervisors,* 995 F.2d 161, 165 (9th Cir.1993); *Southern Pac. Transp. Co. v. City of Los Angeles,* 922 F.2d 498, 507 (9th Cir.1990), *cert. denied,* 502 U.S. 943, 112 S.Ct. 382, 116 L.Ed.2d 333 (1991). Economic regulations, including zoning decisions, have traditionally been afforded only rational relation scrutiny under the equal protection clause. *See City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 440, 105 S.Ct. 3249, 3254–55, 87 L.Ed.2d 313 (1985); *Clajon Production Corp. v. Petera,* 70 F.3d 1566, 1580 (10th Cir.1995); *see also City of New Orleans v. Dukes,* 427 U.S. 297, 303–04, 96 S.Ct. 2513, 2516–17, 49 L.Ed.2d 511 (1976)*; Barshop v. Medina Cty. Underground Water Conservation Dist.,* 925 S.W.2d 618, 631–32 (Tex.1996).

[26] The Mayhews claim that they are not being treated the same as other property owners in the Town that have higher density properties. However, they are not similarly situated. A landowner seeking a zoning change for a 1200 acre development is not similarly situated to a landowner seeking to build on a small parcel of land. There is no showing that the Mayhews have been treated differently from other property owners seeking a planned development on their property.

The Mayhews also allege that the zoning ordinance has a disproportionate impact on racial minorities, thus invoking a suspect class. At trial, however, the Mayhews stipulated that they abandoned any "allegation of racial animus as a motivation for the actions either in regard to the planned development or in regard to the existing zoning which applies to the subject property." That stipulation applies in this Court as well.

[27] Finally, the Mayhews claim that the Town's zoning ordinance was not rationally related to a legitimate government purpose. In analyzing this claim, we apply the same standards as to their substantive due process analysis. For the same reasons that we concluded that the Town's actions did not violate substantive due process, we conclude that the Town has not violated the Mayhews' equal protection rights.

## D. PROCEDURAL DUE PROCESS

[28] [29] If an individual is deprived of a property right, the government must afford an appropriate and meaningful opportunity to be heard to comport with procedural due process. *Cleveland Bd. of Education v. Loudermill,* 470 U.S. 532, 542, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985); *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 428, 102 S.Ct. 1148, 1153–54, 71 L.Ed.2d 265 (1982). Accordingly, a plaintiff alleging a procedural due process takings claim must establish that he was deprived of notice and an opportunity to be heard with respect to a decision affecting his property rights. *Cf. Anderson v. Douglas County,* 4 F.3d 574, 578 (8th Cir.1993), *cert. denied,* 510 U.S. 1113, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994); *Herrington v. County of Sonoma,* 834 F.2d 1488, 1501 (9th Cir.), *modified on other grounds,* 857 F.2d 567 (9th Cir.1988), *cert. denied,* 489 U.S. 1090, 109 S.Ct. 1557, 103 L.Ed.2d 860 (1989).

[30] [31] The Mayhews were given notice and an opportunity to be heard with respect to their development application. While the Mayhews complain that the procedure was unfair because the Town applied ad hoc unreviewable standards in making its determination and that the Town lacked the discretion to deny the application because it satisfied the applicable standards, this is not the proper inquiry. Zoning is a legislative act. *See, e.g., Thompson v. City of Palestine,* 510 S.W.2d 579, 581 (Tex.1974). In making a legislative zoning determination, a city or town is entitled to consider all the facts and **\*940** circumstances which may affect the property, the community, and the welfare of its citizens. *Cf. City of El Paso v. Donohue,* 163 Tex. 160, 352 S.W.2d 713, 716 (1962). To satisfy the requirements of procedural due process, then, the Town must only provide notice and an opportunity to be heard, which it did. We conclude that the Mayhews are not entitled to prevail on their procedural due process claims.

* * * *

We reverse the court of appeals' judgment dismissing the Mayhews' claims on ripeness grounds. Rather than dismissing their claims, we render a take-nothing judgment against the Mayhews because we hold that, as a matter of law, the Mayhews did not prevail on their just compensation takings claims, "substantially advances" takings claims, substantive due process and due course claims, equal protection claims, and procedural due process and due course claims under the federal and state constitutions.

**Parallel Citations**

41 Tex. Sup. Ct. J. 517

Footnotes

1    It is possible that we are compelled to reach this result, at least with respect to the Mayhews' federal claims. While state procedural law generally determines the manner in which a federal question is to be presented in state court, that is not the case if federal substantive law defines its own procedural matrix. *See* TRIBE, AMERICAN CONSTITUTIONAL LAW  3–24, at 166 (2d ed.1988). Because the United States Supreme Court has stated that the "final decision" prudential ripeness requirement "follows from the principle that only a regulation that 'goes too far' results in a taking under the Fifth Amendment," *Suitum v. Tahoe Regional Planning Agency,* 520 U.S. 725, ——, 117 S.Ct. 1659, 1665, 137 L.Ed.2d 980 (1997) (citations omitted), a persuasive argument could be made that the "final decision" aspect of ripeness is not independent of federal substantive law. *See also MacDonald, Sommer & Frates v. Yolo County,* 477 U.S. 340, 348, 106 S.Ct. 2561, 2565–66, 91 L.Ed.2d 285 (1986)(final decision is an "essential prerequisite" of a regulatory takings claim). In any event, we need not determine whether we are compelled by federal supremacy to rely on federal law because, in determining the ripeness of the Mayhews' regulatory takings claims in this case, we apply federal jurisprudence.

2    Moreover, before a regulatory takings claim can be maintained in federal court, a plaintiff must seek compensation through the procedures the state has provided for doing so. *Suitum,* 520 U.S. at ——, 117 S.Ct. at 1665; *Hamilton Bank,* 473 U.S. at 194–95, 105 S.Ct. at 3120–21. This requirement does not apply in this case.

3    The United States Supreme Court apparently also views the ultimate determinations in takings cases as a legal issue. *See United States v. Causby,* 328 U.S. 256, 259, 66 S.Ct. 1062, 1064–65, 90 L.Ed. 1206 (1946)(accepting Court of Claims' factual conclusion that the existence of government airplanes in the airspace immediately above the property destroyed its value while reserving for itself the legal conclusion of whether a compensable taking occurred under the Fifth Amendment).

4    As Justice Scalia has observed, "Traditional land-use regulation (short of that which totally destroys the economic value of property) does not violate [the Takings Clause] because there is a cause-and-effect relationship between the property use restricted by the regulation and the social evil that the regulation seeks to remedy. Since the owner's use of the property is (or, but for the regulation would be) the source of the social problem, it cannot be said that he has been singled out unfairly." *Pennell v. City of San Jose,* 485 U.S. 1, 20, 108 S.Ct. 849, 861–62, 99 L.Ed.2d 1 (1988)(Scalia, J., dissenting).

**End of Document**                                           © 2015 Thomson Reuters. No claim to original U.S. Government Works.

149 Tex. 147
Supreme Court of Texas.

McASHAN et al.

v.

CAVITT et al.

No. A-2552.  |  May 17, 1950.

Action by S. E. Cavitt and another for themselves and the American Fire and Casualty Company, subrogee, against Ernest McAshan and others to recover damages for the loss of an automobile stolen from defendants' parking lot. A judgment for the plaintiffs was affirmed by the El Paso Court of Civil Appeals for the Eighth Supreme Judicial District, 227 S.W.2d 340, Price, C. J., on appeal from the District Court for Bexar County, Quinn, J., and defendants brought error. The Supreme Court, Smedley, J., held that since one of the owners did not know of limitations expressed on a parking lot sign and claim check and was not informed that the lot would close at a certain time, the contract of bailment did not include those limitations, and the obligation of the parking lot operators to use ordinary care for protection of the automobile did not terminate at the closing hour.

Judgments of the Court of Civil Appeals and the District Court affirmed.

West Headnotes (7)

**[1]** **Automobiles**

    In General;  Nature of Relation

**Bailment**

    Bailments for Mutual Benefit

Where an owner left automobile in parking lot for parking and safe keeping, and paid or agreed to pay parking fee, and parking lot operators took possession of automobile and gave owner a claim check, relation of bailor and bailee for hire was created, and obligation was imposed upon parking lot operators to exercise ordinary care to protect automobile from theft.

1 Cases that cite this headnote

**[2]** **Automobiles**

    Limitation of Liability

**Bailment**

    Bailments for Mutual Benefit

Sign of parking lot operators showing closing hour would be strictly construed and would not be interpreted as effecting an exemption from exercise of ordinary care with respect to safety of property after that hour if any other meaning might reasonably be ascribed to language employed.

1 Cases that cite this headnote

**[3]** **Bailment**

    Bailments for Mutual Benefit

Generally, limitations of bailee's responsibility expressed on signs or printed on claim checks do not become parts of contracts of bailment, and do not bind bailor unless called to his attention.

4 Cases that cite this headnote

**[4]** **Automobiles**

    Limitation of Liability

**Bailment**

    Bailments for Mutual Benefit

Where an owner of automobile delivered to parking lot operator did not know of time limitations expressed on sign and on claim check and was not informed the lot would close at 6 p. m. and that operators would not be responsible for automobile if left after that time, contract of bailment did not include those limitations, and obligation of operators to use ordinary care for protection of the automobile did not terminate at closing time.

3 Cases that cite this headnote

**[5]** **Trial**

    Finding of Fact or Conclusion of Law

Where trial court found as a fact that theft of an automobile was result of negligence on part of bailees, in not adequately protecting it from theft, and court found as a conclusion of law that bailees were negligent in failing to provide adequate protection against theft and that

damage was proximately caused by failure to exercise ordinary care, Supreme Court would consider the conclusion as a finding of fact notwithstanding its designation.

10 Cases that cite this headnote

[6]     **Trial**
        🗝 Finding of Fact or Conclusion of Law

A trial court's conclusion that evidence establishes proximate cause as a matter of law necessarily includes a finding of proximate cause as a fact supported by the evidence.

5 Cases that cite this headnote

[7]     **Appeal and Error**
        🗝 Particular Findings Implied

In action by owners of automobile against parking lot operators for damages sustained as result of theft, trial court's conclusion that operators were negligent in failing to provide adequate protection against theft and that damage was proximately caused by such failure, together with a finding of fact that theft was result of negligence and fact that, in absence of express findings of fact, an inference of a finding of proximate cause would be indulged, supported judgment for owners insofar as causal relation between negligence and theft was concerned.

Cases that cite this headnote

**Attorneys and Law Firms**

 **\*148**  **\*\*1017** Randle Taylor, San Antonio, Warren & Groce (Walter Groce), Corpus Christi, for petitioners.

William E. Remy, San Antonio, for respondents.

**Opinion**

SMEDLEY, Justice.

Following trial without a jury, judgment was rendered by the district court in favor of respondents S. E. Cavitt and wife and their insurer against petitioners for $1750.00, being the value of an automobile belonging to Mr. and Mrs. Cavitt, which

was delivered by Mrs. Cavitt to respondents for parking in a parking lot operated by them in the City of San Antonio and was stolen from the lot after 6 o'clock P.M. The Court of Civil Appeals affirmed the trial court's judgment. 227 S.W.2d 340.

These are the facts found by the trial court and shown by **\*149** undisputed testimony: The parking lot is in the business district of the City of San Antonio. In part it is a small unfenced area abutting two streets. A small office is situated in that area. Patrons drive their automobiles into the area and receive claim checks for them. The automobiles are then driven by an employee of petitioners out of the small area and into a larger adjoining fenced lot. Mrs. Cavitt, who lived in another town, drove her automobile into the small area at about 10:30 o'clock A.M. and delivered it to those in charge of the parking lot for parking and safekeeping, leaving the ignition key in the automobile and either paying at that time the parking fee of twenty-five cents or agreeing to pay it on delivery of the car to her. When she left the car she was given a claim check on which was printed: 'We close at 6 P.M. Cars left later at owner's risk.' She put the check into her purse without reading it. The trial court found that her failure to read the check was a failure to exercise ordinary care. On the office of the parking lot is a sign which Mrs. Cavitt saw: 'Not responsible for merchandise left over 48 hours', and another sign which she did not see: 'A service charge of 50¢ will be collected from all persons locking their ignition or taking their keys with them.' Across the entrance to the small area and about fifteen feet above the ground is a sign in letters approximately ten inches high: 'Open at 8 A.M. Close at 6 P.M.' Mrs. Cavitt did not see that sign and it was not called to her attention. She did not know that the parking lot closed at 6 P.M. and no one told her that it did and she was not told that for an additional charge she could take the keys of her automobile with her. When she returned to the parking lot at 7 o'clock P.M. her automobile was not there and no watchman or other employee of petitioners was present. A witness who was in charge of the lot for petitioners testified that respondents' car was moved at 6 P.M. by one of petitioners' employees from the large enclosed lot to the small unfenced area or front lot, and was left near the office, in which there was a light, and near the sidewalk. The keys were left in the automobile. All of petitioners' employees left the parking lot at 6:30 P.M. Petitioners had no provision, rules or regulations for locking or otherwise protecting automobiles that might be left on the parking lot after 6 o'clock P.M., and no system whereby the keys of cars so left were taken to a central location so that owners of cars could call for them.

The trial court found that petitioners failed to exercise reasonable and ordinary care, or any degree of care, for the protection of respondents' car after 6:30 P.M., and that the car was stolen or taken from the parking lot by someone other than *150 the petitioners or the respondents, and that 'such theft was the result of negligence on the part of petitioners in not adequately protecting the same from theft.'

Petitioners' principal defense to the suit as presented by their application for writ of error is that they offered parking service to the public from 8 o'clock A.M. to 6 o'clock P.M. and not after 6 o'clock P.M., and that having thus limited their offer they are not liable for the loss of the automobile. The limitations of their offer upon which they rely are evidenced by the sign over the entrance to the parking lot stating that the lot closed at 6 P.M. and **1018 by the printed statement on the claim check which has been quoted above.

 [1]   When Mrs. Cavitt left the automobile in petitioners' parking lot for parking and safekeeping and paid or agreed to pay to petitioners the parking fee of twenty-five cents and petitioners took possession of the automobile and gave Mrs. Cavitt a claim check, the relation of bailor and bailee for hire was created, and the obligation was imposed upon the bailee to exercise ordinary care to protect the automobile from theft. Exporters' & Traders' Compress & Warehouse Co. v. Schulze, Tex.Com.App., 265 S.W. 133; Rhodes v. Turner, Tex.Civ.App., 171 S.W.2d 208; Rhodes v. McDonald, 141 Tex. 478, 172 S.W.2d 972; Ablon v. Hawker, Tex.Civ.App., 200 S.W.2d 265; Direct Navigation Co. v. Davidson, 32 Tex.Civ.App. 492, 74 S.W. 790; Sandler v. Commonwealth Station Co., 307 Mass. 470, 30 N.E.2d 389, 131 A.L.R. 1170; Vol. 7, Blashfield's Cyclopedia of Automobile Law and Practice, Perm.Ed., s 5022, pages 534-535; Williston on Contracts, (Rev.Ed.) Vol. 4, pp. 2921-2922, Sec. 1045, pp. 2960-2962, Sec. 1065a.

The case before us comes to this: Did the obligation of petitioners to exercise ordinary care for the protection of Mrs. Cavitt's automobile terminate at 6 o'clock P.M. of the day on which the automobile was delivered to them? The position taken by petitioners is that the foundation of bailment lies in contract, that the parties may substitute a special contract for one implied in law, and that in this case a special contract was made by petitioners' offer of parking service to the public from 8 o'clock A.M. to 6 o'clock P.M. and not after 6 o'clock P.M., and by Mrs. Cavitt's acceptance of their offer when she left her automobile with them. To sustain this position petitioners depend upon the sign showing the closing hour

and the statement printed on the claim check as being a part or parts of the contract between them and Mrs. Cavitt.

 *151   [2]   It may well be doubted that the sign of itself, even if it had been seen by Mrs. Cavitt, would have relieved petitioners of the obligation to exercise ordinary care for the protection of Mrs. Cavitt's automobile after 6 o'clock P.M. It gave notice merely that we 'Close at 6 P.M.' It did not clearly give notice that the automobile if left later would be at the owner's risk. It might be construed to mean that no automobiles would be accepted after 6 o'clock P.M. Such a sign will be strictly construed, and will not be interpreted as effecting an exemption from the exercise of ordinary care with respect to the safety of the property if any other meaning may reasonably be ascribed to the language employed. Langford v. Nevin, 117 Tex. 130, 133, 298 S.W. 536.

 [3]   But the sign was not seen by Mrs. Cavitt and it was not called to her attention. She did not read the identification check, and her attention was not directed to what was printed on it. The general rule, and especially that of the more recent decisions, is that limitations of the bailee's responsibility expressed on signs or printed on claim checks do not become parts of the contracts of bailment and do not bind the bailor unless they are called to his attention. Ablon v. Hawker, Tex.Civ.App., 200 S.W.2d 265; Union News Company v. Vinson, Tex.Civ.App., 227 S.W. 236; Sandler v. Commonwealth Station Co., 307 Mass. 470, 30 N.E.2d 389, 131 A.L.R. 1170 and Note pp. 1175, 1184-1202, 1205; Kravitz v. Parking Service Co., 240 Ala. 467, 199 So. 731; Agricultural Insurance Co. v. Constantine, 144 Ohio St. 275, 58 N.E.2d 658; Malone v. Santora, 135 Conn. 286, 64 A.2d 51; 8 C.J.S., Bailments, s 26, page 266; 6 Am.Jur. pp. 275-276, Sec. 179; Note 175 A.L.R. pp. 8, 123-128; 7 Blashfield's Cyclopedia of Automobile Law and Practice, Perm.Ed., s 5040, pages 560-562; 27 Georgetown Law Journal, pp. 162, 179.

Probably most of the decisions which apply the foregoing rule are in cases where attempt is made to avoid or limit responsibility for loss by fire or theft, but there are a number of them in which the sign or statement on the claim check has reference to closing time.

A Texas case, Ablon v. Hawker, Tex.Civ.App., 200 S.W.2d 265, 266, is very closely in point. There, in a garage with **1019 no means of closing it, where automobiles were accepted for storage, a sign was hung in plain view of the entrance: 'Garage closes at 7:30 P.M. Cars left after this

at owner's risk.' The plaintiff, at 4 or 4:30 P.M., drove his automobile to the entrance for storage and delivered it to an attendant, accepting and putting in his pocket without reading it a claim check, on which was printed: 'Safe **\*152** inside parking. \* \* \* Not responsible for damage by fire, theft, storm, accident, or articles left in car.' He did not observe the sign and neither asked for nor received any information as to the conditions of the bailment. The key was left in the automobile and no watchman or other employee was present in the garage after 7:45 P.M. There were no barriers or obstructions to prevent a stranger from entering the garage and removing the automobile. The automobile was stolen at about 9 o'clock P.M. The court, in opinions by two of the justices, with Chief Justice Bond dissenting, affirmed the trial court's judgment for the plaintiff, the owner of the automobile. It was held that the burden which rested upon the plaintiff to prove that the theft of the automobile was the result of the defendant's failure to exercise reasonable and ordinary care for its protection against theft was fully discharged by the facts in evidence and that neither the sign nor what was printed on the claim check relieved the defendant of his obligation to exercise reasonable care for the protection of the automobile and that his obligation did not terminate at 7:30 P.M., the closing time, because the plaintiff did not know that the garage closed at 7:30 P.M., not having seen the sign and not having read the claim check. The concurring opinion by Associate Justice Young, after referring to the words on the sign that the garage closed at 7:30 P.M., and that cars left thereafter would be at the owner's risk, contains the following: 'However, plaintiff did not know this, and within two hours the car was stolen. During such interval, under the circumstances, defendant owed plaintiff's property some measure of protection; and it became a question of fact determinable by court or jury of whether the safeguards extended by defendant during the entire period of bailment were commensurate with his continuing duty to exercise ordinary care.' 200 S.W.2d 265, 272.

The application for writ of error in Ablon v. Hawker was refused with the notation 'no reversible error'. It presented as the principal points of error first the contention that there was no evidence of negligence on the part of the defendant proximately causing the loss, and second the contention that by reason of the sign the contract of bailment terminated as a matter of law at the closing time, 7:30 P.M., and that the defendant having discharged all of his duties as bailee up to that time, was not liable for the loss. The writ of error would have been granted had the Court been of the opinion that either one of these points was well taken, and the refusal of the application for the writ with the notation quoted amounted

to the approval **\*153** of the decision of the Court of Civil Appeals of the two questions raised by these points.

In Sandler v. Commonwealth Station Co., 307 Mass. 470, 30 N.E.2d 389, 390, 131 A.L.R. 1170, the owner of an automobile delivered it to an attendant in a parking lot and received a claim check or 'stub' on which was printed: 'We are not responsible for the car \* \* \* while parked on our lot. \* \* \*. No attendant on duty after 6 p. m.' He did not read what was printed on the 'stub'. When he returned between 6 and 6:15 P.M. there was no attendant present, and he found that the automobile had been stolen. The court, in affirming the trial court's judgment for the plaintiff, the owner of the automobile, held that the limitation of liability appearing on the stub given to the plaintiff, which was not read by him, did not as a matter of law require the direction of a verdict for the operator of the parking lot, and expressed the opinion that a finding was warranted that a person in the position of the plaintiff might properly assume, from the requirement of a fee and the delivery of possession and control of the automobile to the owner of a public parking station, that **\*\*1020** the owner assumed responsibility for its care, and further that the plaintiff could reasonably assume that the stub was a receipt for his automobile, or a means of identifying him when he should return to get his automobile, rather than a contract freeing an apparent bailee from responsibility. See also General Exchange Insurance Corp. v. Service Parking Grounds, 254 Mich. 1, 235 N.W. 898, 899; Kravitz v. Parking Service Co., 240 Ala. 467, 199 So. 731; Starita v. Campbell, 72 R.I. 405, 52 A.2d 303; Lewis v. Ebersole, 244 Ala. 200, 12 So.2d 543; Malone v. Santora, 135 Conn. 286, 64 A.2d 51.

[4] Since Mrs. Cavitt did not know of the limitations expressed on the sign and on the claim check, and she was not informed that the parking lot would close at 6 P.M. and that the bailee would not be responsible for the automobile if left after that time, and in view of the authorities that have been discussed and cited above, it is our opinion that the contract of bailment did not include those limitations and that the obligation of petitioners to use ordinary care for the protection of the automobile did not terminate at 6 o'clock P.M.

It is true that the operator of a parking lot should be free to establish hours for opening and closing and that there should be a method by which he could be relieved of responsibility for automobiles after the closing hour. We do not undertake to suggest what the method should be except that information as **\*154** to the hour of closing and the time of the ending of responsibility for care of the automobile should be clearly and specifically brought to the attention of the bailor.

One of petitioners' points of error is that the trial court did not find as a fact that petitioners' negligence proximately caused the theft of the automobile. The trial court, on request and after the rendition of judgment, filed elaborate findings of fact and conclusions of law. One of the findings of fact is that the theft of the automobile was the result of negligence on the part of petitioners in not adequately protecting it from theft. Among six paragraphs under the title 'Conclusions of Law' which immediately follow the 'Findings of Fact' is this paragraph: 'The defendants were negligent in failing to provide adequate protection of such car against theft or loss and that the plaintiffs' damage was proximately caused by the failure to exercise reasonable and ordinary care for the protection of such car.'

 [5]   [6]   [7]   The substance of petitioners' argument under this point is that the evidence does not support a conclusion of law that the negligence was a proximate cause, but raises the question only as an issue of fact, and that because there is no finding of proximate cause as a fact among the fact findings, the trial court's judgment is erroneous. The record affirmatively shows a conclusion by the court that the negligence proximately caused the loss, and the court seems to have made the mistake of writing that conclusion under the title 'Conclusions of Law'. The designation is not controlling, and looking to all of the findings and conclusions we may consider this conclusion a finding of fact. Wells v. Yarbrough, 84 Tex. 660, 663, 19 S.W. 865; First National Bank of Fort Worth v. Blewett, Tex.Civ.App., 89 S.W.2d 487, 490. But even if the conclusion is regarded as one of law, it seems that a trial court's conclusion that the evidence establishes proximate cause as a matter of law would necessarily include a finding of proximate cause as a fact supported by the evidence. Be that as it may, we believe that the conclusion, together with the finding of fact that the theft was the result of petitioners' negligence, and the fact that in the absence of express findings of fact an inference of a finding of proximate cause would be indulged in support of the judgment,-these taken together are enough to support the judgment in so far as causal relation between the negligence and the theft are concerned.

 **\*155**  The judgments of the Court of Civil Appeals and the district court are affirmed.

**Parallel Citations**

229 S.W.2d 1016

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

180 S.W.3d 183
Court of Appeals of Texas,
Austin.

Appellants, William McMILLIN and Mary
Furse//Cross–Appellant, State Farm Lloyds,
v.
Appellee, STATE FARM LLOYDS//
Cross–Appellees, William McMillin and Mary Furse.

No. 03–04–00171–CV.  |  Aug. 26,
2005.  |  Rehearing Overruled Dec. 2, 2005.

**Synopsis**
**Background:** Insureds who moved out of house damaged by water and mold brought action against homeowners insurer to recover for breach of contract, deceptive acts or practices, violation of the prompt pay requirements of the Insurance Code, and bad faith. The 201st Judicial District Court, Travis County, Patrick O. Keel, J., entered summary judgment in favor of insureds on coverage for mold, refused to strike jurors for cause, entered judgment on jury verdict for damages of $1000, and refused to award attorney fees. Both parties appealed.

**Holdings:** The Court of Appeals, Bob Pemberton, J., held that:

[1] insureds failed to preserve all challenges to jurors;

[2] jurors did not have a disqualifying bias;

[3] refusal to give spoliation instruction was not abuse of discretion;

[4] evidence supported $1000 award for breach of contract;

[5] insureds were entitled to zero additional living expenses for loss of the use of their home;

[6] insurer's internal telephone logs on insureds' calls to report property damage were not a "notice of claim"; and

[7] insureds were entitled to attorney fees.

Affirmed in part, reversed and rendered in part, and remanded.

West Headnotes (68)

**[1]** **Appeal and Error**
 Qualifications and selection, impaneling and oath of jurors

**Appeal and Error**
 Rulings on motions

To preserve a complaint that trial court abused its discretion in refusing to strike a juror for cause, a party must not only obtain an adverse ruling on motion to strike, but also use a peremptory challenge against the veniremember involved, exhaust its remaining peremptory challenges, and notify the trial court that one or more specific objectionable veniremembers will remain on the jury list.

2 Cases that cite this headnote

**[2]** **Jury**
 Exception or denial

Any error in a trial court's denial of a challenge for cause may be cured by the aggrieved party's using a peremptory challenge to strike the veniremember in question.

Cases that cite this headnote

**[3]** **Appeal and Error**
 Overruling challenge

A trial court's error in denying challenge for cause is harmful only if it forces the aggrieved party to accept an objectionable juror, i.e., the party's use of a peremptory challenge to cure error leaves it without a sufficient number of peremptory challenges to strike a specific additional veniremember it finds objectionable.

Cases that cite this headnote

**[4]** **Appeal and Error**
 Overruling challenge

If a party, after expending a peremptory challenge on a veniremember unsuccessfully challenged for cause, has a sufficient number of peremptory challenges remaining to strike all other veniremembers found objectionable, it is harmed by any error in the trial court's denial of its challenge for cause.

Cases that cite this headnote

**[5]** **Appeal and Error**
👉 Qualifications and selection, impaneling and oath of jurors

A party aggrieved by denial of challenge for cause is required, before exercising its peremptory challenges, to alert the trial court that the court's ruling on challenges for cause was erroneous and harmful, thus affording the trial court the opportunity to consider the merits of that claim and to cure any error by such measures as granting additional peremptory strikes. Rules App.Proc., Rule 33.1.

Cases that cite this headnote

**[6]** **Appeal and Error**
👉 Overruling challenge

The refusal of the trial court to excuse an unqualified juror does not necessarily constitute harmful error; the harm occurs only if the party uses all peremptory challenges and is thus prevented from striking other objectionable jurors from the list because he has no additional peremptory challenges.

Cases that cite this headnote

**[7]** **Appeal and Error**
👉 Necessity of timely objection

**Jury**
👉 Exception or denial

It is incumbent upon the complaining party to inform the trial court at the time of alleged error in denying challenge for cause to prospective juror; once informed, the court is able to determine if the party was in fact forced to take objectionable jurors.

Cases that cite this headnote

**[8]** **Appeal and Error**
👉 Overruling challenge

**Jury**
👉 Exception or denial

A party cannot demonstrate harm arising from a trial court's denial of a challenge for cause unless (1) the party first attempts to cure the error by using a peremptory challenge against the veniremember involved and (2) its use of the peremptory challenge causes the party to be unable to strike other objectionable jurors.

Cases that cite this headnote

**[9]** **Appeal and Error**
👉 Qualifications and selection, impaneling and oath of jurors

Use of peremptory strikes against veniremembers not previously challenged for cause resulted in failure to preserve complaints about refusal to strike prospective jurors; the appellants needed to use their three remaining peremptory challenges on veniremembers they had challenged for cause in order to preserve error regarding the district court's denial of their cause challenges to those veniremembers, and their failure to do so waived error as to three of the six veniremembers they challenged on appeal.

1 Cases that cite this headnote

**[10]** **Appeal and Error**
👉 Qualifications and selection, impaneling and oath of jurors

Appellants preserved error regarding three veniremembers challenged for cause, even though they did not identify the specific veniremembers previously challenged for cause against whom they were intending to use peremptory strikes; since the appellants had fewer peremptory strikes than the total number of veniremembers they had challenged for cause, three veniremembers at issue on appeal would have remained on the jury list even if the

appellants had used their peremptory challenges exclusively against veniremembers challenged for cause, and the appellants notified the district court of an insufficient number of peremptory challenges to strike the veniremembers they found objectionable, listed all veniremembers at issue on appeal, and requested additional peremptory strikes.

1 Cases that cite this headnote

**[11]** **Appeal and Error**

&#x232b; Qualifications and selection, impaneling and oath of jurors

Appellants did not waive error by using peremptory strikes against veniremembers who followed prospective jurors challenged for cause and by not using the strikes against the prior veniremembers; no authority required the appellants to use their peremptory strikes against veniremembers challenged for cause in any particular order to preserve error.

Cases that cite this headnote

**[12]** **Jury**

&#x232b; Bias and Prejudice

"Prejudice" supporting disqualification of prospective juror means prejudgment and consequently embraces bias. V.T.C.A., Government Code § 62.105(4).

Cases that cite this headnote

**[13]** **Jury**

&#x232b; Bias and Prejudice

"Bias" supporting disqualification of prospective juror is an inclination toward one side of the issue rather than the other. V.T.C.A., Government Code § 62.105(4).

Cases that cite this headnote

**[14]** **Jury**

&#x232b; Bias and Prejudice

To cause disqualification, the juror's biased state of mind must lead to the natural inference that

the juror will not or did not act with impartiality. V.T.C.A., Government Code § 62.105(4).

Cases that cite this headnote

**[15]** **Jury**

&#x232b; Weight and effect of evidence

A veniremember's statement that the plaintiff starts off slightly behind is not alone grounds for reversing a trial court's refusal to disqualify that member; instead, the court may permit further questioning that clarifies the veniremember's position. V.T.C.A., Government Code § 62.105(4).

Cases that cite this headnote

**[16]** **Jury**

&#x232b; Bias and Prejudice

The relevant inquiry regarding bias of prospective jurors is not where jurors start, but where they are likely to end. V.T.C.A., Government Code § 62.105(4).

Cases that cite this headnote

**[17]** **Jury**

&#x232b; Bias and Prejudice

A prospective juror's initial leaning is not disqualifying bias if it represents skepticism, rather than an unshakeable conviction. V.T.C.A., Government Code § 62.105(4).

Cases that cite this headnote

**[18]** **Appeal and Error**

&#x232b; Selection and impaneling of jurors

The failure to strike jurors for cause is reviewed for an abuse of discretion.

Cases that cite this headnote

**[19]** **Appeal and Error**

&#x232b; Review of questions of pleading and practice

The Court of Appeals must consider the entire examination of a prospective juror on appeal from denial of challenge for cause.

Cases that cite this headnote

**[20]     Jury**
          Subject-Matter of Cause
     **Jury**
          Weight and effect of evidence

Jurors in insureds' suit against homeowners insurer to recover for mental anguish from delay in paying for loss of house as result of mold did not have a disqualifying bias by expressing concern about coverage for mold and an unwillingness to award $5 million; although the jurors said in various ways that the insureds started out behind because of the nature of their claims and the amount they claimed, they said when questioned further that they would listen to the evidence and apply the relevant standards of proof, they were thus rehabilitated, and their statements that the $5 million demand far exceeded the estimated $500,000 value of the house was a statement of fact, not evidence of bias. V.T.C.A., Government Code § 62.105(4).

1 Cases that cite this headnote

**[21]     Appeal and Error**
          Qualifications and selection, impaneling and oath of jurors

Appellants waived ground for appealing denial of challenge for cause, where they did not assert it to the trial court. Rules App.Proc., Rule 33.1(a).

Cases that cite this headnote

**[22]     Pretrial Procedure**
          Failure to Comply;  Sanctions
     **Trial**
          Failure of party to testify or to call witness or produce evidence

Refusal to give a spoliation instruction based on homeowners insurer's failure to produce for deposition principal author of mold guidelines was not abuse of discretion; the district court

had before it the history of the litigation and the progression of events specific to the discovery dispute, heard the explanations and complaints of the parties, and struck a balance by granting a monetary sanction but, finding that the evidence was eventually presented or at least offered, declining to award the full extent of sanctions and the instruction.

2 Cases that cite this headnote

**[23]     Pretrial Procedure**
          Failure to Comply;  Sanctions

Sanctions are appropriate for spoliation of evidence when there was a duty to preserve evidence, the alleged spoliator negligently or intentionally spoliated the evidence, and the spoliation prejudiced the nonspoliator's ability to present its case or defense.

2 Cases that cite this headnote

**[24]     Trial**
          Failure of party to testify or to call witness or produce evidence

A jury instruction regarding spoliation of evidence is proper when a party has deliberately destroyed evidence or has failed to either produce relevant evidence or explain its nonproduction.

1 Cases that cite this headnote

**[25]     Trial**
          Failure of party to testify or to call witness or produce evidence

A "spoliation instruction" tells the jury that, if a party has control over a piece of evidence and fails to retain or produce it, the jury should presume that the evidence would have been unfavorable to the party who controlled the evidence.

1 Cases that cite this headnote

**[26]     Appeal and Error**
          Depositions, affidavits, or discovery

A trial court's determinations whether to award a discovery sanction is reviewed under an abuse of discretion standard.

2 Cases that cite this headnote

**[27]** **Appeal and Error**

 Conduct of trial or hearing in general

The abuse of discretion standard applies to review of a trial court's decision to give or refuse a jury instruction.

2 Cases that cite this headnote

**[28]** **Appeal and Error**

 Total failure of proof

There is "no evidence" or legally insufficient evidence when (1) there is a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence conclusively establishes the opposite of the vital fact.

4 Cases that cite this headnote

**[29]** **Evidence**

 Sufficiency to support verdict or finding

More than a scintilla of evidence exists when the evidence supporting the finding, as a whole, rises to a level that would enable reasonable and fair-minded people to differ in their conclusions; however, if the evidence is so weak as to do no more than create a mere surmise or suspicion of its existence, its legal effect is that it is no evidence.

Cases that cite this headnote

**[30]** **Appeal and Error**

 Sufficiency of Evidence in Support

Parties attacking the legal sufficiency of an adverse finding on an issue on which they have the burden of proof must further demonstrate that the evidence conclusively established all vital facts in support of the issue.

3 Cases that cite this headnote

**[31]** **Appeal and Error**

 Sufficiency of Evidence in Support

On appeal attacking the legal sufficiency of an adverse finding on an issue on which appellant has the burden of proof, the Court of Appeals examines the record for evidence supporting the finding that reasonable jurors could believe, disregarding all contrary evidence that reasonable jurors could ignore.

Cases that cite this headnote

**[32]** **Appeal and Error**

 Rendering Final Judgment

If the proposition contrary to the verdict is established as a matter of law, the Court of Appeals must render judgment for that proposition.

1 Cases that cite this headnote

**[33]** **Damages**

 Weight and Sufficiency

If the evidence favoring a particular amount of damage award is not contradicted by any other witness or attendant circumstances, and the same is clear, direct, and positive, and free from contradiction, inaccuracies, and circumstances tending to cast suspicion thereon, it can be taken as true, even if the evidence comes from an interested witness, especially where the opposing party has the means and opportunity of disproving the testimony and fails to do so.

2 Cases that cite this headnote

**[34]** **Damages**

 Questions for Jury

If uncontradicted evidence favoring a particular amount of damage award is unreasonable, incredible, or questionable, it only raises a question of fact, and a judgment based on that evidence is not required.

Cases that cite this headnote

**[35]** **Appeal and Error**

🔑 Extent of Review

When reviewing a challenge to the factual sufficiency of the evidence, the Court of Appeals must consider, weigh, and examine all of the evidence in the record.

1 Cases that cite this headnote

**[36]** **Appeal and Error**

🔑 Sufficiency of Evidence in Support

If a party is attacking the factual sufficiency of an adverse finding on an issue to which the other party had the burden of proof, the attacking party must demonstrate that there is insufficient evidence to support the adverse finding.

4 Cases that cite this headnote

**[37]** **Appeal and Error**

🔑 Manifest weight of evidence

On review of factual sufficiency of the evidence, the Court of Appeals should set aside the verdict only if the evidence that supports the jury finding is so weak as to be clearly wrong and manifestly unjust, and the Court may not reverse merely because it concludes that the evidence preponderates toward a different answer.

2 Cases that cite this headnote

**[38]** **Insurance**

🔑 Weight and sufficiency

**Insurance**

🔑 Questions of law or fact

Evidence supported $1000 award for homeowners insurer's breach of contract in paying $346,875.62 on claim for total loss of home due to water and mold damage; rather than a binary choice or a series of binary choices, the evidence presented a range of possible awards, and the jury's choice of a round figure near the low end of the range did not invalidate the award.

3 Cases that cite this headnote

**[39]** **Damages**

🔑 Questions for Jury

Juries have broad discretion in assessing damages where the law provides no precise legal measure.

Cases that cite this headnote

**[40]** **Appeal and Error**

🔑 Amount of Recovery

A jury's findings on damages will not be disregarded merely because its reasoning in arriving at its figures may be unclear, so long as a rational basis for its calculation exists.

3 Cases that cite this headnote

**[41]** **Damages**

🔑 Weight and Sufficiency

Damages cannot be based on mere speculation and hypothesis.

1 Cases that cite this headnote

**[42]** **Appeal and Error**

🔑 Judgment or Order

Any error in granting summary judgment that homeowners insurance policy covered loss due to mold did not harm insurer, where sufficient evidence of unpaid, non-mold-related expenses supported the $1000 award.

Cases that cite this headnote

**[43]** **Appeal and Error**

🔑 Submission of case or question to jury

To complain of a damage award that improperly commingles valid and invalid theories of recovery, an appellant must object to the submission of a question to the jury that permits such commingling.

Cases that cite this headnote

**[44]** **Insurance**
🔑 Loss of use in general; related expenses

**Insurance**
🔑 Questions of law or fact

Evidence supported jury's finding that insureds were entitled to zero additional living expenses for loss of the use of their home and, thus, were not entitled to eight months of mortgage interest, taxes, and insurance after moving into newly-purchased house following total loss of insured premises; the homeowners insurance policy covered only reasonable and necessary expenses incurred during the reasonable time for the insureds to become settled, and the jury was entitled to determine that the reasonable time during which the policy provided such coverage was two days or less.

Cases that cite this headnote

**[45]** **Contracts**
🔑 Ambiguity in general

The construction of an unambiguous contract is a question of law for the court.

Cases that cite this headnote

**[46]** **Contracts**
🔑 Construction as a whole

**Contracts**
🔑 Extrinsic circumstances

**Contracts**
🔑 Ambiguity in general

Whether a contract is ambiguous is a question of law for the court to decide by examining the contract as a whole in light of the circumstances present when the contract was entered.

Cases that cite this headnote

**[47]** **Contracts**
🔑 Existence of ambiguity

A contract is unambiguous if it can be given a definite or certain legal meaning.

Cases that cite this headnote

**[48]** **Insurance**
🔑 Ambiguity in general

An ambiguity does not arise in an insurance policy simply because the parties advance conflicting interpretations of the policy, particularly if one conflicting interpretation is unreasonable.

Cases that cite this headnote

**[49]** **Insurance**
🔑 Ambiguity in general

If the insurance policy is subject to one or more reasonable interpretations, it is ambiguous.

Cases that cite this headnote

**[50]** **Contracts**
🔑 Construction as a whole

**Contracts**
🔑 Presumptions and burden of proof

Courts assume that the parties to a contract intended every clause to have some effect; courts cannot strike down any portion of a contract absent irreconcilable conflict.

Cases that cite this headnote

**[51]** **Customs and Usages**
🔑 Explanation of Contract

Although courts give to words in a contract their plain, common, or generally accepted meaning, they may resort to extrinsic sources to determine if a term has a generally understood meaning peculiar to the specialized industry.

Cases that cite this headnote

**[52]** **Insurance**
🔑 Ambiguity, Uncertainty or Conflict

**Insurance**
🔑 Exclusions, exceptions or limitations

When ambiguous insurance policy terms permit more than one interpretation, courts construe the policy against the insurer, especially when the policy terms exclude or limit coverage.

Cases that cite this headnote

**[53] Insurance**

 Weight and sufficiency

Conclusive evidence showed that homeowners insurer owed $990.13 for tarp to prevent further damage to home, even though adjuster testified that she mailed a check for that amount and even though the insureds retained another check for ten months before cashing it; evidence indicated that the insureds did not receive the check.

Cases that cite this headnote

**[54] Evidence**

 Mailing, and delivery of mail matter

Adjuster's testimony that she mailed check to insureds did not entitle insurer to presumption that insureds received the check, where no evidence indicated that the letter had the proper address or postage.

Cases that cite this headnote

**[55] Evidence**

 Conclusiveness and Effect

Undisputed evidence contrary to a verdict may be conclusive when a party admits it is true.

Cases that cite this headnote

**[56] Appeal and Error**

 Against Weight of Evidence

When evidence contrary to a verdict is conclusive, it cannot be disregarded on appeal.

Cases that cite this headnote

**[57] Insurance**

 Duty to settle or pay

Homeowners insurer's internal telephone logs on insureds' calls to report property damage were not a "notice of claim" under statute specifying claim-handling periods that began upon receipt of notice of claim; the statute defined "notice of claim" as a notification in writing to an insurer and by a claimant, and the wrote the logs. V.A.T.S. Insurance Code, art. 21.55, §§ 1(5), 2(a)(Repealed).

Cases that cite this headnote

**[58] Costs**

 Bad faith or meritless litigation

If a claimant makes an excessive presuit demand and will not take a lesser amount, the claimant is not entitled to attorney fees expended in litigation thereafter, but the doctrine does not bar recovery of attorney fees expended before the excessive demand.

2 Cases that cite this headnote

**[59] Costs**

 Objections to taxation or to items

Excessive demand is an affirmative defense to an award of attorney fees and must be pleaded or tried by consent.

1 Cases that cite this headnote

**[60] Insurance**

 Duty to settle or pay

**Insurance**

 Fraud or misrepresentation

**Insurance**

 Interest

Insureds under property insurance policy were not entitled to attorney fees under the Insurance Code, where they did not prevail on claims of false, misleading, deceptive, or unconscionable actions or practices and were not entitled to interest penalties for delay in payment. V.A.T.S. Insurance Code, arts. 21.21, 21.55 (Repealed).

Cases that cite this headnote

**[61] Insurance**

 Costs and Attorney Fees

Insureds were entitled to attorney fees for prevailing on their breach-of-contract claim against homeowners insurer; no evidence supported the jury's award of zero attorney fees

for preparation and trial of the case. V.T.C.A., Civil Practice & Remedies Code § 38.001(8).

1 Cases that cite this headnote

**[62]     Insurance**
    Costs and Attorney Fees

The fact that a plaintiff makes a claim on an insurance policy does not automatically bar recovery of attorney fees under statute permitting award in suit for breach of contract; instead, in a policyholder's successful suit for breach of contract against an insurer that is subject to other Insurance Code provisions, the insurer is liable for reasonable attorney fees incurred in pursuing the breach-of-contract action, unless the insurer is liable for attorney fees under another statutory scheme. V.T.C.A., Civil Practice & Remedies Code §§ 38.001(8), 38.006.

1 Cases that cite this headnote

**[63]     Costs**
    Evidence as to items

Under some circumstances, an award of zero attorney fees to the prevailing party is proper; a zero award is proper if the evidence (1) failed to prove (a) that any attorney services were provided, or (b) the value of the services provided; or (2) affirmatively showed that no attorney's services were needed or that any services provided were of no value. V.T.C.A., Civil Practice & Remedies Code § 38.001.

Cases that cite this headnote

**[64]     Costs**
    Duties and proceedings of taxing officer

A jury cannot simply refuse to award attorney fees if any were properly proven.

1 Cases that cite this headnote

**[65]     Costs**
    Evidence as to items

Uncontroverted testimony by an interested witness may establish a right to attorney fees as a matter of law.

Cases that cite this headnote

**[66]     Evidence**
    Testimony of interested persons

Testimony by an interested witness establishes a fact as a matter of law if: (1) the testimony could be readily contradicted if untrue; (2) it is clear, direct, and positive; and (3) there are no circumstances tending to discredit or impeach it.

1 Cases that cite this headnote

**[67]     Costs**
    Evidence as to items

Where trial counsel's testimony concerning attorney fees is clear, positive, direct, and uncontroverted, it is taken as true as a matter of law, especially when the opposing party had the means and opportunity to disprove the testimony and failed to do so.

4 Cases that cite this headnote

**[68]     Appeal and Error**
    As to damages and costs

Appellate courts will reverse a denial or minimization of attorney fees and render judgment for attorney fees in the amount proved, where trial counsel's testimony concerning attorney fees is clear, positive and direct, and uncontroverted.

6 Cases that cite this headnote

**Attorneys and Law Firms**

**\*190**  Blair Dancy, Michael S. Hull, Hull Henricks & MacRae LLP, Austin, TX, for Appellants.

Linda J. Burgess, Peter A. Nolan, Craig T. Enoch and Melissa Anne Prentice, Winstead Sechrest & Minick, P.C., Austin, TX, for Appellee.

Before Justices B.A. SMITH, PURYEAR and PEMBERTON.

*OPINION*

[BOB PEMBERTON](), Justice.

Both parties appeal from a judgment based on a jury verdict awarding William McMillin and Mary Furse ("McMillins" [1] ) **\*191** $1000 for the breach of an insurance contract by State Farm Lloyds ("State Farm"), but rejecting several other damage claims by the McMillins. The McMillins complain about the district court's failure to strike six jurors for cause. They also complain that they are entitled to recover additional damages and attorney's fees. State Farm challenges the $1000 award and the award of statutory interest penalties. We will affirm the judgment in part, reverse the judgment in part, render judgment in part, and remand part of the cause for further proceedings.

## BACKGROUND

The claims underlying this appeal arose while the McMillins were renovating their house. The McMillins had removed a portion of the roof and covered the opening with tarp. On October 6, 2000, a storm hit and the tarp failed to prevent water from entering the house. The McMillins filed a claim with their homeowners' insurance carrier, State Farm, and, within a few days, State Farm made a payment of $2508.35 for viewable damage. Later that same month, after additional inclement weather, the McMillins reported additional water damage, along with mold growth throughout the house. Unlike the case with the McMillins' initial claim, several months passed before State Farm paid the second claims. On March 1, 2001, a mold remediator sent a fax to State Farm opining that remediation was so expensive that it was no longer cost-effective; State Farm did not share that estimate with the McMillins. On August 7, 2001, a week after getting another estimate from the mold remediator, State Farm paid $344,367.27 to the McMillins on their claim of water damage resulting in mold; thus, State Farm paid $346,875.62 to compensate the McMillins for their covered losses, an amount that excludes the $1000 deductible. By August 2001, the McMillins had purchased another home and moved there, partly in order to enable their planned adoption of a child to move forward.

The McMillins sued State Farm, asserting causes of action including breach of the insurance agreement, false,

misleading or deceptive acts or practices and unconscionable acts in violation of the Deceptive Trade Practices Act ("DTPA"), *see* [Tex. Bus. & Com.Code Ann. §§ 17.45(5)]() (West 2002), [17.46(a)]() (West Supp.2004–05); unfair and deceptive acts or practices in violation of the insurance code, *see* [Tex. Ins.Code Ann. art. 21.21]() (West Supp.2004–05); violation of the "prompt pay" requirements of the insurance code, *see id.* [art. 21.55, § 2](); and breach of its common-law duty of good faith and fair dealing. The McMillins sought $5 million in damages, exemplary damages, attorney's fees, costs, and interest.

Both parties filed motions for partial summary judgment. State Farm moved for judgment that its policy expressly excluded coverage for remediation or repair of a home for damages caused by mold. The McMillins filed a cross-motion for partial summary judgment that the policy did not exclude coverage for remediation or repair of a home for damages caused by mold if that damage resulted from damages caused by water. The court granted the McMillins' motion and denied State Farm's motion.

The McMillins' claims were tried to a jury, which found that State Farm had failed to comply with its policy, but failed to find State Farm liable on any of the McMillins' other claims. The jury found that State Farm received all items, statements, and forms requested and required from the McMillins on July 31, 2001, which **\*192** served as the trigger date for the deadlines for State Farm's duty to investigate, resolve, and pay claims promptly. *See id.* As damages for breach of the policy, the jury awarded the McMillins $1000 representing the amount, less amounts actually paid, that should have been paid under Coverage A Dwelling coverage; the court awarded $76.44 in prejudgment interest on this claim. However, the jury found zero damages for additional amounts that should have been paid under the policy's loss of use coverage and for reasonable and necessary expenses incurred in attempting to prevent further damage to the house.

## DISCUSSION

Both parties appeal. In what they term their "Primary Issue," the McMillins urge that the district court abused its discretion in failing to strike six jurors for cause and that we should accordingly remand this case for a new trial. The McMillins also contend that the district court abused its discretion in failing to give a spoliation instruction as sanctions against State Farm for discovery abuse and spoilation of

evidence that they claim prevented them from attacking State Farm's interpretation of their homeowners' policy at trial. The McMillins also present legal and factual sufficiency challenges to (1) the jury's award of zero additional living expenses under the loss of use provision of the insurance contract; (2) the jury's award of zero expenses incurred by the McMillins to prevent further damage; (3) the jury's finding that State Farm had received all items, statements, and forms requested and required from the McMillins on July 31, 2001; and (4) the jury's award of zero attorney's fees under the McMillins' breach of contract and Article 21.55 theories.

State Farm brings four issues, three of which attack the underpinnings of the jury's $1000 award on the McMillins's breach of contract claim relating to Coverage A. It first challenges the legal sufficiency of the evidence supporting the jury's decision to award the amount of $1000. In its second issue, State Farm contends that the district court erred in granting the McMillins summary judgment that mold damage was not excluded under Coverage A, and in denying State Farm summary judgment that such damage was excluded. In its third issue, State Farm argues that because mold damage was excluded from Coverage A, its payments to the McMillins for water damage were adequate and, thus, there was no evidence that it breached the policy contract. In its fourth issue, State Farm urges that the district court erred by awarding statutory interest penalties under article 21.55 because the McMillins failed to offer evidence that they ever gave written notice, which State Farm contends was required by the statute.

### Challenges for cause

The McMillins complain that the trial court abused its discretion by overruling their challenges for cause of six veniremembers who were seated on the jury.[2] State Farm argues that the McMillins neither preserved their complaints nor showed that the court abused its discretion by refusing to strike these jurors for cause.

### *Preservation*

 [1]   [2]   [3]   [4]   [5]   [6]   [7]   To preserve a complaint that the court abused its discretion in refusing to strike a juror for cause, a party must not **\*193** only obtain an adverse ruling on their motion to strike, but must also "use a peremptory challenge against the veniremember involved," exhaust its remaining peremptory challenges, and notify the trial court that one or more specific objectionable veniremembers will remain on the jury list. *Cortez v. HCCI–*

*San Antonio, Inc.,* 159 S.W.3d 87, 90–91 (Tex.2005); *Hallett v. Houston Northwest Medical Ctr.,* 689 S.W.2d 888, 890 (Tex.1985). These requirements derive from harmless error principles. Any error in a trial court's denial of a challenge for cause may be cured by the aggrieved party's using a peremptory challenge to strike the veniremember in question. *See Cortez,* 159 S.W.3d at 90 ("When a challenge for cause is denied, that error can be corrected by striking the venireperson peremptorily."). For this reason, the trial court's error would be harmful to the aggrieved party only if it forced the party to accept an objectionable juror; *i.e.,* the party's use of a peremptory challenge to cure error leaves it without a sufficient number of peremptory challenges to strike a specific additional veniremember it finds objectionable. *See id.* at 90.[3] Consistent with general error preservation principles, *see* Tex.R.App. P. 33.1, the aggrieved party is required, before exercising its peremptory challenges, to alert the trial court that the court's ruling on challenges for cause was erroneous and harmful, thus affording the trial court the opportunity to consider the merits of that claim and to cure any error by such measures as granting additional peremptory strikes. *See Hallett,* 689 S.W.2d at 889–90;[4] *see also Texas Gen. Indem. Co. v. Moreno,* 638 S.W.2d 908, 912 (Tex.App.-Houston [1st Dist.] 1982, no writ) ("Prior to the time the peremptory challenges are made the complaining party has not been harmed by any unfavorable ruling. The harmful effect occurs only when an improper ruling forces the complaining party to accept undesirable jurors and no avenue of relief is available.") (cited with approval in *Hallett,* 689 S.W.2d at 889).

In this case, the McMillins made challenges for cause to several veniremembers that were overruled by the district court. Subsequently, before presenting their list of peremptory challenges to the district court, the McMillins' attorney reiterated some of these challenges while making the following statement on the record:

> Your Honor, because the Court refused to remove certain jurors for cause, the defendant will have no preemptory [sic] strikes left to challenge those objectionable panelists. And I will list them momentarily. To cure the error, the plaintiffs ask the Court to strike these following jurors for cause, or, in the alternative to grant plaintiffs additional preemptory [sic] strikes for

each, starting **\*194** with Juror No. 1,
5, 12, 14, 16, 29, 34, 36, 40, 41, 48, 50,
and 54. And in that order of preference.

After the district court denied the McMillins' re-urged challenges for cause and request for additional peremptory strikes, the McMillins exhausted their six peremptory strikes [5] on veniremember numbers 7, 15, 22, 31, 37, and 38. Three of these veniremembers—15, 22, and 37—were among those whom the McMillins had unsuccessfully challenged for cause; the other three were not. The jurors ultimately seated included seven panelists whom the McMillins had moved to strike for cause and whom they had identified in their statement as objectionable jurors whom the court's rulings would force them to accept: numbers 1, 5, 12, 14, 16, 29, and 34.

The McMillins contend on appeal that the district court abused its discretion in refusing to strike for cause veniremembers 1, 5, 12, 14, 16, and 29. State Farm maintains that the McMillins failed to preserve error regarding their challenges for cause to any of these veniremembers. We agree that the McMillins have waived error as to some of these veniremembers, but not all.

 **[8]**    **[9]**    Under *Cortez* and *Hallett,* a party cannot demonstrate harm arising from a trial court's denial of a challenge for cause unless (1) the party first attempts to cure the error by using a peremptory challenge "against the veniremember involved" *and* (2) its use of the peremptory challenge causes the party to be unable to strike other objectionable jurors. *Cortez,* 159 S.W.3d at 90–91; *Hallett,* 689 S.W.2d at 889–90. Here, the McMillins used three of their peremptory challenges to strike veniremembers they had previously challenged for cause, 15, 22, and 37; they do not, however, appeal the district court's rulings regarding these veniremembers. But, rather than using their remaining three peremptory challenges to strike other veniremembers they had challenged for cause (and thereby remedy any error in the court's rulings regarding those panelists), the McMillins opted instead to strike veniremembers they had not previously challenged for cause. We believe that *Cortez* and *Hallett* required the McMillins to use their three remaining peremptory challenges on veniremembers they had challenged for cause in order to preserve error regarding the district court's denial of their cause challenges to those veniremembers. Their failure to do so waived error as to three of the six veniremembers they challenge on appeal. [6]

 **[10]**    But the McMillins have preserved error regarding the remaining three veniremembers they challenge on appeal. The McMillins had fewer peremptory strikes than the total number of veniremembers they had challenged for cause and, thus, could not possibly have used peremptory challenges against every "veniremember involved" to cure error. *Cortez,* 159 S.W.3d at 91. In other words, **\*195** even if the McMillins had used their peremptory challenges exclusively against veniremembers they had challenged for cause, three of the veniremembers at issue in this appeal would have remained on the jury list. [7] Lacking peremptory challenges to use against those veniremembers, the McMillins notified the district court that "because the Court refused to remove certain jurors for cause," they would have an insufficient number of peremptory challenges to strike the veniremembers they found objectionable, listed all six of the veniremembers at issue on appeal, [8] and requested additional peremptory strikes.

State Farm contends that the McMillins waived error because they did not identify the specific veniremembers previously challenged for cause against whom they were intending to use peremptory strikes. Only by specifically identifying those veniremembers, State Farm insists, could the McMillins enable the district court to determine that they were, in fact, being forced to accept objectionable jurors. *See Hallett,* 689 S.W.2d at 890. We disagree. Under these circumstances, where the McMillins reminded the court that they had challenged thirteen veniremembers for cause and that the six peremptory challenges were insufficient to strike all of them, the McMillins adequately apprised the court that its denials of the challenges for cause were forcing the McMillins to accept objectionable jurors. [9]

 **[11]**    We also reject State Farm's argument that the McMillins waived error by using peremptory strikes against veniremembers 15, 22, and 37 rather than on earlier-reached jurors they had also challenged for cause, 1, 5, 12 and 14. We find no authority that would have required the McMillins to use their peremptory strikes against veniremembers challenged for cause in any particular order to preserve error.

The net effect of our holdings is that the McMillins must demonstrate that the district court abused its discretion in overruling their for-cause challenges to at least four veniremembers—one panelist more than the three for which error was waived—in order to show harm. [10] Conversely, we must affirm the district court's rulings if it did *not* abuse

its discretion in denying the McMillins' for-cause challenges regarding at least three veniremembers.

### Merits

[12] [13] [14] Veniremembers may be disqualified for cause from serving on a petit jury for several reasons. *See* Tex. Gov't Code Ann. § 62.105 (West 2005). They may be disqualified if they are directly or indirectly interested in the outcome of the suit. *See id.* § 62.105(2). They may also **\*196** be disqualified if they are prejudiced or biased for or against one of the parties. *See id.* § 62.105(4); *see Goode v. Shoukfeh,* 943 S.W.2d 441, 452–53 (Tex.1997). Prejudice "means prejudgment, and consequently embraces bias." *Compton v. Henrie,* 364 S.W.2d 179, 182 (Tex.1963). Bias is "an inclination toward one side of the issue rather than the other." *Goode,* 943 S.W.2d at 453. But to cause disqualification, the juror's biased state of mind must lead to the natural inference that the juror will not or did not act with impartiality. *Id.* (citing *Compton,* 364 S.W.2d at 182).

[15] [16] [17] In *Cortez,* the Texas Supreme Court emphasized that a veniremember who has made statements indicating possible bias may be rehabilitated. [11] *Cortez,* 159 S.W.3d at 91–92. A veniremember's statement that the plaintiff starts off "slightly behind" is not alone grounds for reversing a trial court's refusal to disqualify that member. *See Cortez,* 159 S.W.3d at 94; *Goode,* 943 S.W.2d at 452 n. 4, 453. Instead, the court may permit further questioning that clarifies the veniremember's position. *Cortez,* 159 S.W.3d at 93. As the supreme court explained, the relevant inquiry is "not where jurors *start* but where they are likely to *end.* An initial 'leaning' is not disqualifying if it represents skepticism rather than an unshakeable conviction." *Id.* at 94.

[18] [19] We review the failure to strike jurors for cause for an abuse of discretion. *Cortez,* 159 S.W.3d at 93. We find error only where there is an abuse of discretion, recognizing that trial judges are in a better position to evaluate the veniremembers' sincerity in their responses and capacity for fairness and impartiality. *Id.* (citing *Swap Shop v. Fortune,* 365 S.W.2d 151, 154 (Tex.1963)). We must consider the entire examination. *Cortez,* 159 S.W.3d at 93.

[20] Applying these standards, we conclude that the district court did not abuse its discretion with respect to at least three of the veniremembers challenged on appeal. [12] Veniremember No. 1, Linda Roberts, asserted that the crisis over mold in homes was "very much overstated" and she

expressed concern that the lawsuits had raised her home-insurance premiums and would prevent her from obtaining new home insurance. Of the latter, she said, "I think it could bias me." She also said, "[I]t would be very difficult for you to prove to me that a house that's worth $500,000, that they should get $5 million." She told the McMillins that they would be "starting behind" with her as a juror and that she was not the best juror for the McMillins' case. Roberts asserted, however, that she would listen to the facts and would award the McMillins $5 million if the evidence supported the award, including damages for mental anguish. She said that the fact that the case involved mold would not affect her ability to determine and award damages for the repair and replacement costs of the house.

No. 12, Jennifer Emmons initially agreed with the McMillins' characterization of her attitude toward their complaints that she "couldn't award [$5 million], no way, not ever, no how, under any circumstances." She also said that she **\*197** had a problem awarding mental anguish damages and punitive damages if the repair costs were covered. She agreed that the McMillins would have to bring more than fifty-one percent proof to convince her they were entitled to mental anguish damages and proof almost beyond all doubt to earn punitive damages. Under examination by State Farm, Emmons reiterated that awarding mental anguish damages was against her nature, but said that she would follow the judge's instructions and would apply the evidentiary standards for proof of mental anguish and punitive damages.

No. 29, Arthur Flores first said that he could not award the full amount of damages requested no matter what because "[t]hat's too much." He later said he could award the damages if proven.

Under the applicable legal standards as clarified by *Cortez,* and giving due deference to the district court's front-line assessment of credibility and demeanor, we find no abuse of discretion in the district court's refusal to strike these jurors for cause. Although some of these jurors said in various ways that the McMillins "started out behind" because of the nature of their claims and the amount they claimed, when questioned further they said that they would listen to the evidence and apply the relevant standards of proof; this is the type of rehabilitation approved by *Cortez. See* 159 S.W.3d at 93–94. The jurors' statements that the $5 million demand far exceeded the estimated $500,000 value of the house was a statement of fact, not evidence of bias.

**[21]** Because we have concluded that the district court did not abuse its discretion in overruling the McMillins' for-cause challenges to these three veniremembers, the McMillins could not, in light of our preservation holding, demonstrate harm from any error in the district court's rulings on their other three for-cause challenges. We thus express no opinion regarding whether the district court abused its discretion with respect to the McMillins' challenges to No. 14, Arnulfo Guajardo, and No. 16, Kevin Johnson, both of whom were State Farm policyholders, [13] or No. 5, Samuel Stone, Jr. [14] We overrule the McMillins' primary issue.

**Request for spoliation instruction**

**[22]** The McMillins next contend that the district court abused its discretion in failing to give a spoliation instruction based on State Farm's failure to produce a witness for deposition in Austin, as had been ordered by the district court. The McMillins encountered considerable frustration in their attempts to obtain discovery regarding State Farm's internal Operations Guidelines governing the carrier's handling of mold claims. Although the McMillins had requested the operations guidelines in discovery, State Farm did not produce the documents or acknowledge their existence until after the discovery period had closed. The McMillins sought relief from the district court, which ordered State Farm to produce for deposition a corporate representative most knowledgeable about the guidelines. [15] **\*198** State Farm responded by producing a manager, Jeff Grabill, who admitted during his deposition that he actually knew little about the mold guidelines. The McMillins again sought relief from the district court, which agreed that State Farm had violated the prior order by failing to produce the person most knowledgeable about the guidelines. Following consultation with the parties, the court ordered State Farm to produce in Austin for deposition Floyd Leffew, who was represented to be the guidelines' author. But State Farm subsequently refused to produce Leffew in Austin on the basis that he was soon retiring from State Farm and that, prior to that time, his wife was having surgery, requiring him to remain with her in Illinois. Leffew also claimed to have developed a sinus infection that precluded his traveling to Austin by either air or car. State Farm did, however, offer the McMillins the opportunity to depose Leffew by videoconference or in person at Leffew's Illinois home, and offered to pay the expenses of the McMillins' counsel. With trial looming in less than five days, the McMillins declined.

The McMillins again sought relief from the district court, requesting monetary sanctions of $1000 as reasonable and necessary attorney's fees, a spoliation instruction to the jury regarding State Farm's failure to produce Leffew, and exclusion of any evidence from State Farm seeking to explain its failure to produce Leffew. The proposed instruction stated:

> You are instructed that State Farm employee Floyd Leffew was a principal author of Policy Guideline O.G. 75–110 entitled *Mold Mildew and Other Fungi.* Mr. Floyd Leffew has testified in another case that he is the principal author for O.G. 75–110. He has also testified that he sits on a committee that reviews, modifies, and updates other policy guidelines that potentially govern water claims involving mold.

> The Defendant should have but failed to identify Mr. Leffew as a person with knowledge of facts relevant to this case.

> The Defendant was ordered by the Court to produce Mr. Leffew for a deposition in Austin. The Defendant refused to comply with the Court's Order.

> You may draw whatever inference you feel is reasonable from the Defendant's defiance of the Court's Order to produce Mr. Leffew in Austin for a deposition.

State Farm attempted to explain its failure to produce Leffew as ordered as an error by counsel who, at the previous hearing, had agreed to produce Leffew in Austin without first inquiring whether the witness was in fact available. Noting that it had ordered State Farm to produce Leffew in Austin, the district court awarded the McMillins the $1000 sanction they had requested. However, the court denied all other relief, stating that it believed the proposed instruction to be an improper comment on the evidence and that this ruling, as the McMillins acknowledge, mooted their request to exclude evidence.

**[23]** **[24]** **[25]** Sanctions are appropriate for spoliation of evidence when there was a duty to preserve evidence, the alleged spoliator negligently or intentionally spoliated the evidence, and the spoliation prejudiced the nonspoliator's ability to present its case or defense. *Offshore Pipelines, Inc. v. Schooley,* 984 S.W.2d 654, 666 (Tex.App.-Houston [1st Dist.] 1998, no pet.) (citing *Trevino v. Ortega,* 969 S.W.2d 950, 954–55 (Tex.1998) (Baker, J. concurring)). A jury **\*199** instruction regarding spoliation is proper when a party has deliberately destroyed evidence or has failed to either produce relevant evidence or explain its nonproduction.

*Wal–Mart v. Johnson,* 106 S.W.3d 718, 721–22 (Tex.2003). A spoliation instruction tells the jury that, if a party has control over a piece of evidence and fails to retain or produce it, the jury should presume that the evidence would have been unfavorable to the party who controlled the evidence. *Id.* at 720–21.

The McMillins complain that State Farm's failure to produce Leffew left them without meaningful discovery regarding the carrier's interpretation of its mold operational guidelines. For instance, the McMillins construed a guideline stating that status letters should be sent to the insured at regular intervals (usually every 30 days) as a mandatory requirement because it appeared in a section of the guidelines labeled as "requirements." At trial, State Farm's witness opined that, by contrast, frequent oral contact with the client could substitute for sending a regular form letter, although the guidelines did not expressly permit that substitution. The McMillins complain that State Farm's conduct deprived them of the opportunity to discover State Farm representatives who, in the McMillins' words, "might have" interpreted the operational guidelines in their favor. The McMillins urge that this evidence was highly relevant to whether State Farm engaged in an unconscionable, unfair, or deceptive act or practice. They insist that the district court's failure to give the instruction was harmful because, having been deprived of discovery on the issue, they could not otherwise rebut State Farm's evidence concerning its interpretation of the guidelines.

 **[26]**    **[27]**    "Discovery in civil cases is founded on the principle that justice is best served when litigants may obtain information not in their possession to prosecute and defend claims." Explanatory Statement Accompanying the 1999 Amendments to the Rules of Civil Procedure Governing Discovery, Order of Approval of the Revisions to the Texas Rules of Civil Procedure, Misc. Docket No. 98–9196, (Tex. Nov. 9, 1998).[16] Abuse of the discovery process through unwarranted delays and unresponsiveness accordingly subverts justice, and we condemn any such conduct. At the same time, however, we recognize that trial judges are in the best position to evaluate the often complex facts and equities of discovery disputes and determine whether discovery abuse has in fact occurred, the relative culpability and harm of such conduct, and the credibility of

a party's attempts to explain delays and unresponsiveness. We accordingly review a trial court's determinations whether to award discovery sanction under an abuse of discretion standard. *Reiff v. Roy,* 115 S.W.3d 700, 707 (Tex.App.-Dallas 2003, no pet.); *see also TransAmerican Natural Gas Corp. v. Powell,* 811 S.W.2d 913, 917 (Tex.1991). We also apply the abuse of discretion standard in reviewing a trial court's decision to give or refuse a jury instruction. *Wal–Mart Stores, Inc. v. Johnson,* 106 S.W.3d 718, 719 (Tex.2003); *Interstate Northborough P'ship v. State,* 66 S.W.3d 213, 224 (Tex.2001).

Giving due deference to the district court's firsthand assessment of these facts, we cannot say that it abused its discretion in refusing to give the instruction the McMillins requested. (We express no opinion as to whether the district court would have been within its discretion in imposing this or any other discovery sanctions, **\*200** had it done so.) The district court had before it the history of the litigation and the progression of events specific to the discovery dispute. It heard the explanations and complaints of the parties, and struck a balance by granting a monetary sanction but, finding that the evidence was eventually presented or at least offered, declining to award the full extent of sanctions and the instruction the McMillins requested. This is the essence of an exercise of discretion, and we find no abuse of that discretion.

### Breach of contract damages

The district court submitted an issue on the McMillins' breach of contract theory, "Did State Farm fail to comply with the terms of the policy between it and Plaintiffs....?" The jury responded, "Yes." Predicated upon its liability submission, the court also submitted the following damages issue, with the jury's responses so indicated:

> What sum of money, if paid now in cash, would fairly and reasonably compensate Plaintiffs for their damages, if any, that resulted from such failure to comply?

> \* \* \*

The amount that should have been paid minus the amount actually paid under Coverage

A Dwelling coverage under the Policy:                                           $    1,000

The amount that should have been paid minus the amount actually paid under Loss of

Use coverage under the Policy:                                     $      0

The amount that should have been paid minus the amount actually paid for reasonable and necessary expenses incurred in attempt-

ing to prevent further damage to the home:                          $      0

State Farm contends that no evidence supports the award of $1000 in damages under Coverage A. It also attacks the underpinnings of that award, asserting that the district court erred in granting summary judgment that Coverage A encompassed mold damage and that, accordingly, it did not breach the policy because the amount it paid for repairs for water damage fully discharged its Coverage A obligations as a matter of law.

The McMillins contend that the evidence was legally and factually insufficient to support the jury's failure to award damages for additional living expenses under Loss of Use coverage or expenses incurred in attempting to prevent further damage. They assert that the evidence conclusively established their entitlement to $34,800 for additional living expenses under the loss of use coverage and to $990 for expenses incurred in attempting to prevent further damage.

### Standard of review

[28]  [29]  There is "no evidence" or legally insufficient evidence when (a) there is a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence conclusively establishes the opposite of the vital fact. *City of Keller v. Wilson,* 168 S.W.3d 802, 810 (Tex., 2005) & *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997) (both citing Robert W. Calvert, "No Evidence" and "Insufficient Evidence" Points of Error, 38 Tex. L.Rev. 361, 362–63 (1960)). More than a scintilla of evidence exists when the evidence supporting the finding, as a whole, "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Havner,* 953 S.W.2d at 711; *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 25 (Tex.1994). If the evidence is so weak as to do no more than create a mere surmise or suspicion of its existence, its legal effect is that it is no evidence. *Haynes & Boone v. Bowser Bouldin, Ltd.,* 896 S.W.2d 179, 182 (Tex.1995).

**\*201** [30]  [31]  [32]  [33]  [34]  Parties attacking the legal sufficiency of an adverse finding on an issue on which they have the burden of proof must further demonstrate that the evidence conclusively established all vital facts in support of the issue. *Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 241 (Tex.2001). We examine the record for evidence supporting the finding that reasonable jurors could believe, disregarding all contrary evidence that reasonable jurors could ignore. *City of Keller,* 168 S.W.3d 802, 807. If the proposition contrary to the verdict is established as a matter of law, we must render judgment for that proposition. *Dow,* 46 S.W.3d at 241. If the evidence favoring a particular amount of damage award is not contradicted by any other witness or attendant circumstances, and the same is clear, direct and positive, and free from contradiction, inaccuracies, and circumstances tending to cast suspicion thereon, it can be taken as true —even if the evidence comes from an interested witness. *Ragsdale v. Progressive Voters League,* 801 S.W.2d 880, 882 (Tex.1990). This is especially true where the opposing party has the means and opportunity of disproving the testimony, if it is not true, and fails to do so. *Id.* An appellate court can render judgment based on such uncontradicted testimony. *Id.; see also Brown v. Bank of Galveston, N.A.,* 963 S.W.2d 511, 515 (Tex.1998). However, if the uncontradicted evidence is unreasonable, incredible, or questionable, it only raises a question of fact, and a judgment based on that evidence is not required. *See Ragsdale,* 801 S.W.2d at 882.

[35]  [36]  [37]  When reviewing a challenge to the factual sufficiency of the evidence, we must consider, weigh, and examine all of the evidence in the record. *Plas–Tex, Inc. v. U.S. Steel Corp.,* 772 S.W.2d 442, 445 (Tex.1989). If a party is attacking the factual sufficiency of an adverse finding on an issue to which the other party had the burden of proof, the attacking party must demonstrate that there is

insufficient evidence to support the adverse finding. *Westech Eng'g, Inc. v. Clearwater Constructors, Inc.,* 835 S.W.2d 190, 196 (Tex.App.-Austin 1992, no writ). We should set aside the verdict only if the evidence that supports the jury finding is so weak as to be clearly wrong and manifestly unjust. *See Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). We may not reverse merely because we conclude that the evidence preponderates toward a different answer. *See Herbert v. Herbert,* 754 S.W.2d 141, 144 (Tex.1988).

### Coverage A Dwelling coverage

State Farm attacks the jury's $1000 damage award for breach of its Coverage A obligations on two fronts. It argues that no evidence supports the $1000 award. State Farm also argues that the court erred by granting the McMillins' motion for summary judgment that the policy covered water damage that causes an ensuing loss by mold.

### Damage award

[38] State Farm contends that the McMillins produced no evidence of damages from sources other than mold in excess of the amount State Farm already paid. It contends that the only source of a $1000 figure in the record is Mr. McMillin's statement that he believed he was charged the $1000 deductible twice; State Farm contends that his statement is not evidence of a double-charge. The McMillins contend that ample evidence supports at least a $1000 award.

[39] [40] [41] Juries have broad discretion in assessing damages where the law provides no precise legal measure; a jury's findings will not be disregarded merely because its reasoning in arriving at its figures may be unclear so long as a rational basis for its **\*202** calculation exists. *Swank v. Sverdlin,* 121 S.W.3d 785, 799 (Tex.App.-Houston [1st Dist.] 2003, pet. denied); *First State Bank v. Keilman,* 851 S.W.2d 914, 930 (Tex.App.-Austin 1993, writ denied). However, damages cannot be based on mere speculation and hypothesis. *See Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.,* 960 S.W.2d 41, 49–50 (Tex.1998). This limitation is expressed through a variety of legal requirements governing proof of damages.

Jury awards must be supported by evidence of the value of the property damaged or that must be replaced. *Gulf States Utils. Co. v. Low,* 79 S.W.3d 561, 566 (Tex.2002). The jury in *Low* found that Gulf States wrongfully terminated the plaintiff's electric service and awarded, among other damages, $100 for spoiled food. *Id.* at 563. But, because

the plaintiff had presented no evidence of the cost of the spoiled food, the supreme court held that he was not entitled even to nominal damages. *Id.* at 566–67. In certain circumstances, evidence that supports a particular damage amount may be factually insufficient to support even a jury award that is smaller than the evidence would support. *Keilman,* 851 S.W.2d at 930. In *Keilman,* which concerned whether a bank charged unauthorized interest, the parties presented competing calculations; the bank contended that it had charged $169.92 in authorized interest, and the plaintiff contended that the bank had charged $7161.44 in unauthorized interest. *Id.* The jury found that the bank had charged $360 in unauthorized interest. Although the $360 award was within the range between the competing interest figures, the evidence was factually insufficient to support the award because there was inadequate support for a theory that would have resulted in a $360 figure. The evidence supported a choice of one figure or the other, not a verdict somewhere in the range between them. *Id.*

On the other hand, where there is proof to support a range of damage options, the mere fact that nothing in the record shows how the jury arrived at a specific amount is not fatal to the verdict. *Mayberry v. Texas Dep't of Agric.,* 948 S.W.2d 312, 317 (Tex.App.-Austin 1997, writ denied). In *Mayberry,* we concluded that some evidence supported a jury verdict for back pay because the theory of the case provided for a range of possible damage awards (rather than a binary choice between two amounts) depending on when the jury concluded the plaintiff should have been promoted, and because the verdict was within the narrow range defined by competing extremes posited by the parties. *See id.* (award of $1206 fell between $1028 and $1292).

The McMillins produced evidence of up to $242,382.95 in damages. Mr. McMillin testified that State Farm set the replacement value of the house at over $540,000, [17] and that the house was a total loss. The McMillins' public adjuster, Jim Beneke, estimated that repairs would cost $510,042.09; this total includes his estimate of $334,956.12 for building repairs and the mold remediators' estimate of $175,085.97. Beneke opined that there could be additional costs due to inflation and overruns.

But State Farm argues that there is no evidence to support the $1000 award because there is no rational basis for it. State Farm rejects Mr. McMillin's statement that he believed State Farm charged the $1000 deductible twice—unsupported **\*203** by any documentation—arguing that it is at best

speculation and no evidence that State Farm did so.[18] *See Keilman,* 851 S.W.2d at 930. Although the repair estimates provide a cumulative demand that could support a range of higher damage amounts, the McMillins point to no discrete item that supports a $1000 award. Nor do they point to any basis on which the jury might have relied in drastically reducing the McMillins' estimated total repair costs.

We conclude, however, that we cannot say that the record contains no evidence to support a $1000 award. This is not like *Keilman* in which the jury had to choose between competing theories on how interest should be calculated. *Id.* Nor is it like *Low,* in which the plaintiff presented no evidence of the cost of his spoiled food. *See* 79 S.W.3d at 566. The repair estimates provided were not based on a mathematical formula; indeed, Beneke testified that actual costs could vary. Rather than a binary choice or a series of binary choices, this evidence presented the jury with a range of possible awards. That they chose a round figure near the low end of the range does not invalidate the award. *See City of Houston v. Harris County Outdoor Advertising Ass'n,* 879 S.W.2d 322, 334 (Tex.App.-Houston [14th Dist.] 1994, writ denied); *see also Neiman-Marcus Group, Inc. v. Dworkin,* 919 F.2d 368, 374 (5th Cir.1990); *Insurance Co. of North Am. v. Cangelosi,* 217 S.W.2d 888, 890 (Tex.Civ.App.-Waco 1949, no writ). Legally sufficient evidence supports the jury's finding. We overrule State Farm's first issue.

### *Mold coverage*

[42] State Farm contends that the award for breach-of-contract damages was erroneous because the district court erred by granting summary judgment that the policy provides mold coverage either directly or through an ensuing-loss provision. State Farm argues that the court should have granted its competing motion for a summary judgment declaring that the policy did not cover mold. We need not explore the merits of this issue, however, because its resolution will not alter the judgment.

[43] Even if the summary judgment is erroneous, State Farm would have to show that the error was harmful in order to merit reversal of the judgment. *See* Tex.R.App. P. 44.1(a). Any error in granting the summary judgment was harmful only if the jury's $1000 award for Coverage A Dwelling coverage included mold-related expenses. *Cf. Crown Life Ins. Co. v. Casteel,* 22 S.W.3d 378, 388 (Tex.2000) (commingling valid and invalid theories is harmful even if evidence supports jury award solely on valid theory). But to complain of

a damage award that improperly commingles valid and invalid theories of recovery, an appellant must object to the submission of a question to the jury that permits such commingling. *See id.* at 387–88. We find no objection to the submission of this question or to its subsuming of questions concerning mold-related expenses and non-mold-related expenses into a single question. Thus, State Farm cannot complain on appeal of harm by asserting that the award included mold-related expenses unless there was no evidence to support a finding of $1000 in non-mold-related expenses.

The record contains evidence of at least $1000 in covered, non-mold-related expenses **\*204** remained unpaid. State Farm paid $346,875.62 on the McMillins' claim. One remediation contractor testified that at least $50,000–$60,000 of the amount State Farm paid was for mold containment; another contractor put that figure at $52,000. This provides some evidence that State Farm paid $296,875.62 to repair non-mold damage. Using Beneke's estimate that non-mold repairs would cost $334,956.12, there is some evidence that $38,080.50 in non-mold related damage claims (the non-mold portion of Beneke's estimate less the non-mold amounts paid by State Farm) remained unpaid;[19] that exceeds the $1000 award.

Because State Farm failed to object to the submission of the damage question on grounds that it subsumed both covered expenses and non-covered expenses, and because the record contains evidence of sufficient covered unpaid non-mold-related expenses, it cannot show harm from the grant of the McMillins' motion for summary judgment that the policy also covered mold expenses. Because State Farm cannot show harm from the summary judgment, we decline to address whether the summary judgment was erroneous because resolution of this issue is not necessary to our disposition of this appeal. *See* Tex.R.App. P. 47.1. Sufficient evidence of unpaid, non-mold-related expenses supports the $1000 award. We overrule State Farm's second issue.

### *Additional living expenses*

[44] The McMillins challenge the jury's finding that they were entitled to zero additional living expenses for their loss of the use of their home. The McMillins claim that they proved $34,800 in additional living expenses incurred in purchasing a second home on Woodmont Avenue; these expenses cover the period from the purchase in June 2001 until they became "settled" in February 2002. They request that the judgment be modified to include compensation for

eight months' worth of mortgage interest ($2750 per month), taxes ($1300 monthly), and insurance ($300 monthly).

State Farm defends the jury's findings, arguing that the policy does not cover costs associated with purchasing a new home and that the evidence supports a finding that this increase in the McMillins' living expenses was not necessary and reasonable. State Farm argues that, while expenses related to a rental property would be covered, mortgage, taxes, and insurance are not.

 [45]   [46]   [47]   [48]   [49]   The construction of an unambiguous contract is a question of law for the court. *Buys v. Buys,* 924 S.W.2d 369, 372 (Tex.1996). Whether a contract is ambiguous is a question of law for the court to decide by examining the contract as a whole in light of the circumstances present when the contract was entered. *Columbia Gas Transmission Corp. v. New Ulm Gas., Ltd.,* 940 S.W.2d 587, 589 (Tex.1996). A contract is unambiguous if it can be given a definite or certain legal meaning. *Id.; see also Lopez v. Munoz, Hockema & Reed, L.L.P.,* 22 S.W.3d 857, 861 (Tex.2000). An ambiguity does not arise simply because the parties advance conflicting interpretations of the policy, particularly if one of the conflicting interpretations is unreasonable. *Lopez,* 22 S.W.3d at 861; **\*205** *Columbia Gas,* 940 S.W.2d at 589. But if the insurance policy is subject to one or more reasonable interpretations, it is ambiguous. *National Union Fire Ins. Co. v. Hudson Energy Co.,* 811 S.W.2d 552, 555 (Tex.1991).

 [50]   [51]   [52]   The general rules of contract construction govern interpretation of an insurance policy. *Id.; Texas Farmers Ins. Co. v. Murphy,* 996 S.W.2d 873, 879 (Tex.1999). We assume the parties to a contract intended every clause to have some effect; we cannot strike down any portion of a contract absent irreconcilable conflict. *See Edlund v. Bounds,* 842 S.W.2d 719, 726 (Tex.App.-Dallas 1992, writ denied). Although we give words their plain, common, or generally accepted meaning, we may resort to extrinsic sources to determine if a term has a generally understood meaning peculiar to the specialized industry. *Mescalero Energy, Inc. v. Underwriters Indem. Gen. Agency, Inc.,* 56 S.W.3d 313, 320 (Tex.App.-Houston [1st Dist.] 2001, pet. denied). When ambiguous insurance policy terms permit more than one interpretation, we construe the policy against the insurer. *State Farm Fire & Cas. Co. v. Vaughan,* 968 S.W.2d 931, 933 (Tex.1998). This is so especially when the policy terms exclude or limit coverage. *National Union,* 811 S.W.2d at 555.

The McMillins' policy does not set out explicitly what additional living expenses it covers. The policy provides as follows:

> additional living expense, meaning any necessary and reasonable increase in living expense you incur so that your household can maintain its normal standard of living.... Payment will be for the reasonable time required to repair or replace the damaged property. If you permanently relocate, payment will be for the reasonable time required for your household to become settled.

The McMillins argue that the meaning of "become settled" is a question of contract interpretation for the court. They advocate using the definition "begin to feel comfortable or established in a new home," citing The New Oxford American Dictionary 1560 (2001).

Even accepting the McMillins' definition, the policy covers only reasonable and necessary expenses incurred during the reasonable time for the insured to become settled. Whether conduct is reasonable is ordinarily a question of fact. *Adam Dante Corp. v. Sharpe,* 483 S.W.2d 452, 456 (Tex.1972). The question of reasonableness is one peculiarly tailored to the province of the jury. *Tri–State Wholesale Assoc. Grocers, Inc. v. Barrera,* 917 S.W.2d 391, 397 (Tex.App.-El Paso 1996, writ dism'd by agr.); *see also Universe Life Ins. Co. v. Giles,* 950 S.W.2d 48, 55 (Tex.1997). Here, the coverage decision depends on the reasonableness of the insured's conduct in incurring expenses and becoming settled. Accordingly, we must examine the record for evidence supporting the jury's finding that the McMillins proved no reasonable additional living expenses.

The parties disagreed strongly over the length of the reasonable period to become settled. Although the McMillins hoped for several months to repair the Murray house, they abandoned that hope and bought the Woodmont house intending to permanently relocate there. But they contend that they did not become settled in the Woodmont house for eight months after purchasing it and moving in. They contend that, during this adjustment period, their mortgage interest, insurance, and taxes for those months were reasonable and necessary expenses above their normal living costs that were incurred because of their property loss. By contrast, State

Farm claim adjuster Lisa Webb testified that, generally, "settled" means **\*206** "moved in." Tom Veitch, an attorney with experience in the insurance field, testified that becoming settled under the policy takes about two days after moving in, during which time the policy would cover expenses such as restaurant expenses and utility connection fees; the McMillins do not seek to recover these type of expenses.

This record supports the jury's finding that the McMillins did not prove themselves entitled to recover their mortgage interest, insurance, and tax expenses as additional living expenses under the policy's loss-of-use provision. The jury was entitled to determine that the "reasonable time" during which the policy provided such coverage was two days or less. The record also supports a factual determination that the expenses associated with the purchase of the Woodmont house for permanent relocation were not increases in living expenses during those two days or less, but were expenses dedicated to the acquisition, protection, and retention of an asset for the long-term. The record legally and factually supports the zero damages finding on this issue.

### Expenses to prevent further damage

 [53]    The McMillins challenge the jury's finding that they were entitled to zero reasonable and necessary expenses incurred seeking to prevent further damage to the home. McMillin testified that he submitted a claim for $990.13 for covering the roof with a tarp, but had not received a check for that amount. State Farm claim adjuster Lisa Webb agreed that the McMillins had submitted a receipt for and were entitled to $990.13 for such expenses; she testified that she had issued a check for that amount and that the check had not been cashed. Webb also testified that the McMillins held onto their $344,367.27 repair check from when it was issued August 7, 2001 until they cashed it in June 2002. The court asked the jury for "[t]he amount that should have been paid *minus the amount actually paid* for reasonable and necessary expenses incurred in attempting to prevent further damage to the home." (Emphasis added.) The jury found that State Farm owed nothing.

 [54]    We conclude that no evidence supports the take-nothing finding. State Farm agreed that the homeowners incurred $990.13 for the tarp expenses and that the expenses were covered by the policy; thus, $990.13 is an "amount that should have been paid." The jury's zero finding is supported only if that amount is fully offset by "the amount actually paid." Accepting Webb's testimony that State Farm sent the check, there is still no evidence that the homeowners have

been "actually paid" $990.13 because there is no evidence that they received the check. State Farm would be entitled to a rebuttable presumption that the McMillins received the mailed check if it had introduced evidence that the letter was properly addressed, stamped, and mailed. *Southland Life Ins. v. Greenwade,* 138 Tex. 450, 159 S.W.2d 854, 857 (App.1942). Webb's testimony on the mailing issue was as follows:

Q. And did you put a check in the mail for $990.13?

A. Yes.

There is no evidence that the letter had the proper address or postage; therefore, State Farm is not entitled to any presumption that the McMillins received the check. Further, there is no evidence that the money owed has been transferred from State Farm to the homeowners. State Farm argues that the jury could infer from the homeowners' previous 10–month retention of the $344,367.27 check that the homeowners are similarly retaining the $990.13 check. But that requires piling an inference that the homeowners received the check upon an inference that they **\*207** chose not to cash it. "[A] vital fact may not be established by piling inference upon inference...." *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.,* 435 S.W.2d 854, 858 (Tex.1968) (cited by *Greenberg Traurig of New York, P.C. v. Moody,* 161 S.W.3d 56, 79 (Tex.App.-Houston [14th Dist.] 2004, no pet.)). This double inference is too tenuous to show payment of the amounts due in the absence of any evidence or presumption that the homeowners received the check. No evidence supports the jury's finding that State Farm did not, at time of trial, owe the homeowners for expenses incurred attempting to prevent further damage to the home.

 [55]    [56]    Instead, conclusive evidence shows that State Farm owes the homeowners $990.13 for such expenses. Undisputed evidence contrary to a verdict may be conclusive when a party admits it is true. *City of Keller,* 168 S.W.3d 802, 815 . State Farm admitted that it owed the McMillins $990.13, that it mailed them a check for that amount, and that the check was not cashed. The only evidence is that the McMillins did not receive the check. There is no evidence that any part of the $990.13 has been in any other way transferred from State Farm to the McMillins. "When evidence contrary to a verdict is conclusive, it cannot be disregarded." *Id.* at 817. The uncontroverted evidence established as a matter of law that State Farm's admitted debt of $990.13 for expenses incurred to prevent future damage remains unpaid. Accordingly, we will render judgment for the McMillins in that amount. *See*

*Ragsdale,* 801 S.W.2d at 882; *see also Brown,* 963 S.W.2d at 515.

### Interest penalties under Article 21.55

[57]    The parties present cross-issues relating to the assessment of an interest penalty of $425.59 on the $1000 damage award [20] under the insurance code's provisions intended to promote prompt payment of claims. Tex. Ins.Code Ann. art. 21.55 (West Supp.2004–05). State Farm argues that the McMillins' failure to make a claim in writing makes the interest penalty of article 21.55 unavailable to them. The McMillins argue that the evidence conclusively supports a different answer to the question concerning the date by which that State Farm received all necessary and documentation relating to its Coverage A claim (the $1000 award), thus triggering an earlier accrual of an interest penalty.

The claim-handling periods of article 21.55 are triggered by the insurance company's "receipt of notice of claim." *Id.* § 2(a). The code defines a "notice of claim" as "any notification in writing to an insurer, by a claimant, that reasonably apprises the insurer of the facts relating to the claim." *Id.* § 1(5). State Farm argues that the McMillins' telephonic report of their damages did not satisfy the statutory requirement for written notice. *See* **\*208** *Mid–Century Ins. Co. v. Barclay,* 880 S.W.2d 807, 810 n. 3 (Tex.App.-Austin 1994, writ denied). State Farm argues that, because the report therefore did not trigger State Farm's statutory obligation to resolve the complaint within the statutory periods, State Farm cannot be penalized for failing to do so.

The McMillins respond that such a construction unfairly diminishes the protections to insureds. They note that article 21.55 "shall be liberally construed to promote its underlying purpose which is to obtain prompt payment of claims made pursuant to policies of insurance." *Id.* § 8. They argue that their telephonic report satisfied the purpose of the statute by reasonably apprising State Farm of the basis of their claim, and that State Farm never told them that their oral report of their problems constituted a waiver of statutory protections. To the extent that a writing is required, they argue that State Farm's telephone logs memorializing their telephonic notice suffice.

This issue turns on the meaning of the terms in the "notice of claim" provision. The primary rule of statutory construction is to ascertain and give effect to the legislature's intent.

*See* Tex. Gov't Code Ann. §§ 311.011, 311.021, 311.023 & 312.005 (West 2005); *Kroger Co. v. Keng,* 23 S.W.3d 347, 349 (Tex.2000). We ascertain the legislature's intent in the plain and common meaning of the words used. Tex. Gov't Code Ann. § 311.011; *Keng,* 23 S.W.3d at 349. We must presume that every word of the legislation has meaning. *See Brooks v. Northglen Ass'n,* 141 S.W.3d 158, 169 (Tex.2004); *see also* Tex. Gov't Code Ann. § 311.021(2).

The McMillins' arguments require either ignoring the plain language and meaning of the statute or grafting meaning onto the statute. The statute requires compliance with its provisions to trigger the insurance penalties. *See generally* Tex. Ins.Code Ann. art. 21.55. It does not require the insurer to inform the insured of the necessity of a writing to trigger statutory penalties, nor does it contain a provision permitting actual notice to satisfy its provisions. Section 21.55 requires a notification in writing of a claim "to" an insurer that is "by" a claimant. *See id.* § 1(5). One of our sister courts has held that a claim form completed and signed by an insured together with her insurance agent can satisfy the notice requirement. *See Protective Life Ins. Co. v. Russell,* 119 S.W.3d 274, 288 (Tex.App.-Tyler 2003, pet. denied). In *Russell,* the claimant participated in the preparation of a written claim and signed it. By contrast, the McMillins do not claim they sent written notice to State Farm of their claim; instead, they rely on State Farm's printed telephone logs. Even reading the notice requirement broadly, we conclude that State Farm's internal telephone logs are not a notice of claim under the statute. Although State Farm's logs are in writing and memorialize a notification by the claimant, they are written by the insurer instead of being written by the claimant to the insurer as required, and they are not sent by the claimant to the insurer.

Because there is no evidence that the McMillins triggered the provisions of article 21.55 by providing notice in writing to State Farm of their claim, we sustain State Farm's third issue. Accordingly, the McMillins' complaint about the jury's finding of a date that fixed when the article 21.55 interest penalties began to accrue is moot because no penalties will accrue.

### Attorney's fees

Challenging the jury's award of zero attorney's fees, the McMillins contend that they are entitled to attorney's fees based on the judgment that State Farm breached its contract with the McMillins. *See* Tex. Civ. Prac. & Rem.Code Ann. § 38.001 (West 1997). They contend that the evidence **\*209** proved as a matter of law they were entitled to a reasonable

attorney's fees of $300,000 for the trial, $35,000 for this appeal, and $25,000 for any appeal to the supreme court.

State Farm defends the award of zero attorney's fees, contending that the McMillins are not entitled to attorney's fees for several legal, equitable, and factual reasons. State Farm contends that the McMillins made an excessive presuit demand, that they did not prevail as required to recover attorney's fees under the insurance code, that their insurance-related claims do not entitle them to fees under the civil practice and remedies code, and that their claim for $300,000 in attorney's fees based on a $1000 recovery is unreasonable.

 [58]    [59]    The McMillins' claims are not barred by their presuit demand for $950,000 in repairs and attorney's fees. If the claimant made an excessive presuit demand and would not take a lesser amount, the claimant is not entitled to attorney's fees expended in litigation thereafter; we note that the doctrine does not bar recovery of attorney's fees expended before the excessive demand. *Findlay v. Cave,* 611 S.W.2d 57, 58 (Tex.1981); *Lairsen v. Slutzky,* 80 S.W.3d 121, 131 (Tex.App.-Austin 2002, pet. denied). Excessive demand is an affirmative defense to an award of attorney's fees and must be pleaded or tried by consent. *Kurtz v. Kurtz,* 158 S.W.3d 12, 21 (Tex.App.-Houston [14th Dist.] 2004, pet. filed). State Farm notes that it was denied a jury question on the reasonableness of the presuit demand, but does not raise that as an issue on appeal. Instead, it points to the judgment as showing that the demand was unreasonable. But the size of the verdict does not prove that the McMillins would not have taken a lesser amount to settle the dispute, nor does it prove as a matter of law that the McMillins' demand was unreasonable. *See Findlay,* 611 S.W.2d at 58.

 [60]    State Farm correctly argues that the McMillins are not entitled to attorney's fees under the insurance code. They did not prevail at trial on their article 21.21 claims of false, misleading, deceptive or unconscionable actions or practices. *See* Tex. Ins.Code Ann. art. 21.21 (West Supp.2004–05). We have just determined that they are not entitled to recover interest penalties under article 21.55.

 [61]    [62]    But they did prevail in their breach-of-contract claim and are entitled to an award of reasonable attorney's fees established by the evidence. *See* Tex. Civ. Prac. & Rem.Code Ann. § 38.001(8); *Recognition Communications, Inc. v. American Auto. Ass'n, Inc.,* 154 S.W.3d 878, 891 (Tex.App.-Dallas 2005, pet. filed) ("*RCI* "); *World Help v. Leisure Lifestyles, Inc.,* 977 S.W.2d 662, 683 (Tex.App.-Fort Worth 1998, pet. denied). The fact that a plaintiff makes a claim on an insurance policy does not automatically bar recovery of attorney's fees under section 38.001; instead, "in a policyholder's successful suit for breach of contract against an insurer that is subject to the provisions listed in section 38.006, the insurer is liable for reasonable attorney's fees incurred in pursuing the breach-of-contract action under section 38.001 unless the insurer is liable for attorney's fees under another statutory scheme." *Grapevine Excavation, Inc. v. Maryland Lloyds,* 35 S.W.3d 1, 5 (Tex.2000). The McMillins are eligible to be awarded attorney's fees for prevailing on their breach-of-contract claim. *See* Tex. Civ. Prac. & Rem.Code Ann. § 38.001.

 [63]    Under some circumstances, an award of zero attorney's fees to the prevailing party is proper. A zero award is proper if the evidence (1) failed to prove **\*210** (a) that any attorney's services were provided, or (b) the value of the services provided; or (2) affirmatively showed that no attorney's services were needed or that any services provided were of no value. *RCI,* 154 S.W.3d at 891; *Cale's Clean Scene Carwash, Inc. v. Hubbard,* 76 S.W.3d 784, 787 n. 4 (Tex.App.-Houston [14th Dist.] 2002, no pet.).

 [64]    [65]    [66]    [67]    [68]    However, a jury cannot simply refuse to award attorney's fees if any were properly proven. *RCI,* 154 S.W.3d at 891; *Hubbard,* 76 S.W.3d at 787. Uncontroverted testimony by an interested witness may establish a right to attorney's fees as a matter of law. *RCI,* 154 S.W.3d at 891; *see Hubbard,* 76 S.W.3d at 787. Testimony by an interested witness establishes a fact as a matter of law if: (1) the testimony could be readily contradicted if untrue; (2) it is clear, direct, and positive; and (3) there are no circumstances tending to discredit or impeach it. *Lofton v. Texas Brine Corp.,* 777 S.W.2d 384, 386 (Tex.1989). Where trial counsel's testimony concerning attorney's fees is clear, positive and direct, and uncontroverted, it is taken as true as a matter of law, especially true when the opposing party had the means and opportunity to disprove the testimony and failed to do so. *See Ragsdale v. Progressive Voters League,* 801 S.W.2d 880, 882 (Tex.1990); *see also* Tex. Civ. Prac. & Rem.Code Ann. § 38.003 (West 1997) (rebuttable presumption that usual and customary attorney's fees are reasonable); *World Help,* 977 S.W.2d at 684. In such instances, appellate courts will reverse a denial or minimization of attorney's fees and render judgment for attorney's fees in the amount proved. *See Ragsdale,* 801 S.W.2d at 882 (on injunction and $1 damage case, reversing $150 award attorney's fees award and rendering $22,500 judgment for attorney's fees); *RCI,* 154

S.W.3d at 891 (on $10,000 damage award, reversing jury's zero damage award and rendering $75,764 award); *see also Hubbard,* 76 S.W.3d at 786–88 (on $31,846 damage award affirming trial court's award of $29,225 in attorney's fees notwithstanding jury's zero award).

There was competing evidence regarding the amount of fees that would be reasonable and necessary in pursuing the McMillins' suit. The McMillins introduced evidence from their attorney, Jack Maroney, about the attorney's fees and costs he considered reasonable and necessary. He discussed taking more than thirty depositions, attending more than twenty pretrial hearings, sending more than 350 pieces of correspondence, and reading many pieces of correspondence in return. He stated that they had billed $557,000 in fees and expended $50,000 in court costs. He estimated $35,000 would be expended in attorney's fees for this appeal and an additional $25,000 for proceedings at the supreme court. State Farm's expert witness, Mike McKetta, testified that this case could and reasonably should have been handled through trial for $150,000, though the fee could reasonably be as much as double that; he said that he would consider any amount over $300,000 to be "outside of any range of reasonableness." He testified that the greater the amount in controversy, the greater the expenditure might be reasonable; if a dispute were over $20,000, he would not usually find reasonable an expenditure of 5, 10, or 20 times more than that to recover that amount.

No evidence supports the jury's award of zero attorney's fees for preparation and trial of this case. The only evidence is that at least $150,000—and perhaps as much as $300,000—was reasonable and necessary for preparation and trial of the entire case. There was no dispute regarding the appellate fees. Because we find the evidence legally insufficient to support **\*211** the zero attorney's fees award, we need not consider the factual sufficiency of the evidence. *See Glover v. Tex. Gen. Indem. Co.,* 619 S.W.2d 400, 401 (Tex.1981); *Exxon Corp. v. Breezevale Ltd.,* 82 S.W.3d 429, 438 (Tex.App.-Dallas 2002, pet. denied). Thus, we will reverse the award of no attorney's fees.

But the record does not conclusively prove any particular amount that was a reasonable and necessary amount of attorney's fees. For example, the McMillins contend that the experts' testimony shows them entitled to $300,000 in

attorney's fees, but McKetta's testimony was that up to $300,000 *could be* reasonable; that is far from conclusive. Nor is the evidence clear that they are entitled to the full $150,000 that McKetta testified he believed was reasonable; although the McMillins prevailed on some causes of action, they did not prevail on every claim and did not show as a matter of law that the entire amount was reasonable and necessary to recover on the claims on which they did prevail. Therefore, we will not render judgment in their favor, but will remand the issue of attorney's fees on the Coverage A Dwelling coverage claim for further proceedings.

We will also remand for a determination of what attorney's fees are reasonable and necessary with respect to the damage-prevention expenses—a theory on which the jury did not award damages and on which it therefore did not consider awarding attorney's fees. *See Pelto Oil Corp. v. CSX Oil & Gas Corp.,* 804 S.W.2d 583, 588 (Tex.App.-Houston [1st Dist.] 1991, writ denied) (remanding only issue of attorney's fees after rendering judgment on appeal); *cf. Coffel v. Stryker Corp.,* 284 F.3d 625, 641 (5th Cir.2002) (reversing for consideration of additional attorney's fees based on additional recovery under revised judgment). We cannot render judgment for these attorney's fees because the evidence is not conclusive as to what part of the overall claim for attorney's fees is attributable to this claim or what fee is reasonable and necessary to prepare and try this claim. *See Ragsdale,* 801 S.W.2d at 882.

### CONCLUSION

We reverse the award of interest penalties under insurance code article 21.55 and render judgment that the McMillins take nothing by that claim. We reverse the judgment that the McMillins take nothing by their claim for expenses incurred to prevent further damage to the property, and render judgment that they take $990.13 on that claim. We reverse the award of zero attorney's fees and remand for consideration of what amount of attorney's fees, if any, the McMillins are entitled to for preparation and trial and appeal of the claims which entitle them to attorney's fees. We otherwise affirm the judgment.

Footnotes

1    In their briefing, Mr. McMillin and Ms. Furse refer to themselves collectively as the "McMillins," and we do the same.

The McMillins also complained in their initial brief about a seventh juror, veniremember 34, but subsequently waived this complaint in response to the supreme court's opinion in *Cortez v. HCCI–San Antonio, Inc.,* 159 S.W.3d 87, 90–91 (Tex.2005), discussed above.

Conversely, if the party, after expending a peremptory challenge on a veniremember it had unsuccessfully challenged for cause, had a sufficient number of peremptory challenges remaining to strike all other veniremembers it found objectionable, it would not have been harmed by any error in the trial court's denial of its challenge for cause.

As the supreme court explained in *Hallett:*

> The refusal of the trial court to excuse an unqualified juror does not necessarily constitute harmful error. The harm occurs only if the party uses all his peremptory challenges and is thus prevented from striking other objectionable jurors from the list because he has no additional peremptory challenges. It is at this point that any harmful error occurs, i.e., when the court is made aware that objectionable jurors will be chosen. Thus, it is incumbent upon the complaining party to inform the trial court at the time of the error. Once informed, the court is able to determine if the party was in fact forced to take objectionable jurors.
>
> *Id.* at 889–90.

*See* Tex.R. Civ. P. 233.

We recognize that this conclusion may present difficult choices for trial attorneys, who must elect between using a peremptory challenge to preserve error on a challenge for cause versus using it to strike another veniremember whom the attorney may find even more objectionable. However, we are bound to follow *Cortez.* We also note that trial attorneys frequently face such strategic trade-offs between error preservation and the more immediate goal of winning at trial. *See generally* Jack Ratliff, *et. al,* Texas Courts: Trial & Appeal 1–3 (9th ed.2003–04) (describing how "the advocate in a jury trial must cultivate a split personality," simultaneously pursuing the sometimes contradictory goals of obtaining a favorable verdict while protecting the record, and that "[s]o it is that the best advocates, who know how to preserve error, sometimes decide not to do it.").

The McMillins used three peremptory challenges on veniremembers 15, 22, and 37, who they had challenged for cause at trial but do not challenge on appeal. At that juncture, the McMillins had remaining only three peremptory challenges to use in curing any error regarding the six veniremembers they now challenge on appeal.

As *Cortez* indicates, "objectionable" jurors remaining after peremptory strikes are exhausted may include both those previously challenged for cause and those desired to be stricken for other reasons. *Id.* at 91 (explaining that party need not explain why it found each identified veniremember objectionable).

We also disagree with State Farm's depiction that the McMillins' counsel "merely listed the juror numbers of thirteen venire members they had already unsuccessfully challenged for cause, and then challenged them again."

On the record before us, we cannot correlate the McMillins' waivers of three challenges for cause to any three specific veniremembers.

In the wake of *Cortez,* 159 S.W.3d at 91–94, the McMillins have abandoned their original complaint that the trial court erred by accepting rehabilitation testimony.

To assess the court's exercise of discretion, we have reviewed statements made at jury selection. The following summaries come from both the general section of the voir dire examination during which questions were posed to and answered by the entire venire, and the colloquies with individual veniremembers that were conducted thereafter.

Johnson, moreover, had been offered legal services by State Farm in connection with a wreck involving his son.

Stone also said he thought he had State Farm insurance, but that policy would not affect his deliberations. The McMillins waived this ground by not asserting it to the trial court. *See* Tex.R.App. P. 33.1(a).

State Farm subsequently disputed whether the court's order compelled it to produce a representative *most* knowledgeable regarding the guidelines, contending that it was merely required to produce *a* representative with *some* knowledge of the guidelines. The district court rejected State Farm's interpretation of the order.

This explanatory note is available on the Texas Supreme Court's website at http:// www.supreme.courts.state.tx.us/rules/tdr/fr 111098.htm.

McMillin testified that State Farm valued the house at $540,750 for replacement purposes. He testified that, "even with the house in the state it was" after the discovery of mold, State Farm raised the value to $561,000.

When testifying about amounts he believed State Farm owed under the policy, McMillin testified that "although I know Mr. Nolan had done a figure on the—where the deductible, I still don't under—it still seems to me that he took a second deductible out of my —so I added in the $1000 deductible that they took out, the second deductible."

The fact that the remediation contractors' estimates of how much of State Farm's payments paid for mold-related costs were minimum estimates does not undercut this analysis; if the portion of State Farm's payments that went to mold-related costs was higher, then even more of the McMillins' non-mold-related claim remains unpaid. For example, if $100,000 of State Farm's payment went to mold-remediation costs, then only $248,875.62 of their non-mold claims were paid, leaving $88,080.50 unpaid.

We will not consider whether 21.55 penalties are available for the other damage awards.

Although we will render judgment that the McMillins are entitled to $990.13 for expenses incurred to prevent further damage, the date by which State Farm received all documents relating to the Coverage A claim is not relevant to the $990.13 recovery; the jury was not asked to find the date by which State Farm received all documents relating to their claim for damage-prevention expenses, and the McMillins do not complain about the absence of such a question or finding. The jury was asked about the date by which State Farm received all documents necessary to resolution of the loss-of-use claim, but found "no date." That is not challenged on appeal.

Our affirmance of the zero damages finding concerning additional living expenses also moots reconsideration of the zero interest award on that element of damages.

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

278 S.W.3d 90
Court of Appeals of Texas,
Dallas.

Jeffrey NELSON, Alfred P. Schoelen,
Jr., and Timothy Stecker, Appellants,
v.
CITY OF DALLAS and Chief
David Kunkle, Appellees.

No. 05–08–00335–CV.    |    Feb. 4, 2009.
|    Rehearing Overruled March 17, 2009.

**Synopsis**
**Background:** Two police officers brought action against
their employing city and its police chief, alleging they were
taking disciplinary action against them which arose from
investigations conducted in violation the Texas Government
Code that governed complaints against law enforcement
officers. The officers sought injunctive relief stopping
disciplinary proceeding and investigations, and declaratory
judgment construing statutory provisions, and mandamus
ordering chief to comply with law and to cease violation of
Government Code. The 44th Judicial District Court, Dallas
County, Carlos Cortez, J., granted plea to the jurisdiction and
abated the suit. Officers appealed.

**Holdings:** The Court of Appeals, Moseley, J., held that:

[1] city had primary jurisdiction over the discipline of its
police officers;

[2] exception to exhaustion of remedies requirement of
irreparable injury did not apply to police officers;

[3] exception to exhaustion of remedies requirement that
opposing parties violated and continued to violate due course
of law rights did not apply to police officers; and

[4] Government Code provisions were not statutory
prerequisites to jurisdiction or authority of city to discipline
its officers.

Affirmed.

West Headnotes (10)

**[1]** **Administrative Law and Procedure**
 Primary Jurisdiction

Doctrine of primary jurisdiction allocates power
between courts and agencies when both have
authority to make initial determinations in a
dispute; trial courts should defer to appropriate
administrative agencies when (1) the agency is
staffed with experts trained in handling complex
problems within the agency's purview, and
(2) great benefit is derived from the agency's
uniform interpretation of laws within its purview
and the agency's rules and regulations when
courts and juries might reach differing results
under similar fact situations.

Cases that cite this headnote

**[2]** **Administrative Law and Procedure**
 Primary Jurisdiction

Under the exclusive jurisdiction doctrine, the
legislature is considered to have granted an
administrative agency the sole authority to
make an initial determination in a dispute;
an agency has exclusive jurisdiction when
a pervasive regulatory scheme indicates the
legislature intended the regulatory process to be
the exclusive means of remedying the problem
to which the regulation is addressed, and thus,
whether an agency has exclusive jurisdiction
depends on statutory interpretation.

1 Cases that cite this headnote

**[3]** **Administrative Law and Procedure**
 Exhaustion of Administrative Remedies

If the administrative agency has either primary
jurisdiction or exclusive jurisdiction, the
trial court should await the exhaustion of
administrative remedies before proceeding, if at
all.

Cases that cite this headnote

**[4]** **Municipal Corporations**

🔑 Local Legislation

Home-rule cities have broad discretionary powers, provided that no ordinance shall contain any provision inconsistent with the Constitution of the state, or of the general laws enacted by the legislature; they possess the full power of self government and look to the legislature not for grants of power, but only for limitations on their power. Vernon's Ann.Texas Const. Art. 11, § 5.

1 Cases that cite this headnote

[5] **Municipal Corporations**
🔑 Review in General

City had primary jurisdiction over the discipline of its police officers under the city charter and ordinances, and officers who sued their employing city and its police chief, alleging they were taking disciplinary action against them which arose from one or more investigations conducted in violation of Texas Government Code that governed complaints against law enforcement officers, would be required to exhaust administrative remedies before going to court, a conclusion unaffected by the officers' other claims for declaratory, injunctive, and mandamus relief. V.T.C.A., Government Code §§ 614.022, 614.023.

Cases that cite this headnote

[6] **Municipal Corporations**
🔑 Review in General

Exception to exhaustion of remedies requirement, of irreparable injury if required to exhaust administrative remedies, did not apply to police officers who sued city and police chief, alleging that disciplinary action against them was in violation of Texas Government Code that governed complaints against law enforcement officers; injury claimed was damage to their reputations and loss of future income, which could be compensated by money damages, moreover, those damages would result from discipline, if any, imposed by city, and not from the administrative process itself. V.T.C.A., Government Code §§ 614.022, 614.023.

Cases that cite this headnote

[7] **Municipal Corporations**
🔑 Review in General

Exception to exhaustion of remedies requirement, that opposing parties had violated and continued to violate due course of law rights under state constitution, did not apply to police officers who sued city and police chief, alleging that disciplinary action against them was in violation of Texas Government Code that governed complaints against law enforcement officers; it was, in fact, the officers themselves who were attempting to avoid the very process due in circumstances, administrative review of employee discipline under city's charter and ordinances, followed by judicial review in court if necessary. Vernon's Ann.Texas Const. Art. 1, § 19; V.T.C.A., Government Code §§ 614.022, 614.023.

1 Cases that cite this headnote

[8] **Municipal Corporations**
🔑 Review in General

Police officers' allegations, in their suit against city and its police chief alleging disciplinary action against them was in violation of Texas Government Code that governed complaints against law enforcement officers, did not rise to the level of constitutional due course of law violations warranting an exception to the exhaustion of administrative remedies requirement. Vernon's Ann.Texas Const. Art. 1, § 19; V.T.C.A., Government Code §§ 614.022, 614.023.

Cases that cite this headnote

[9] **Municipal Corporations**
🔑 Review in General

Determination of whether city and police chief had or would violate Texas Government Code that governed complaints against police officers, by considering an anonymous letter, was not purely a question of law which was outside requirement of exhaustion of administrative

remedies, in officers' action for injunctive relief to stop disciplinary proceeding and a declaratory judgment construing Code; city and chief disputed officers' contention about letter, and argued their investigation was based on signed complaint detailing specific allegations against officers. V.T.C.A., Government Code §§ 614.022, 614.023.

Cases that cite this headnote

**[10]** **Municipal Corporations**
⚷ Charges

**Municipal Corporations**
⚷ Review in General

Texas Government Code provisions governing complaints against law enforcement officers were not statutory prerequisites to the jurisdiction or authority of the city to discipline its officers, although those sections applied to any complaint against a peace officer within scope of statute; alleged violation of provisions did not deprive city of jurisdiction or obviate need for exhaustion of administrative remedies, inasmuch as even if city erroneously applied sections, error could be addressed in administrative process and ultimately under judicial review provided by city charter. V.T.C.A., Government Code §§ 614.022, 614.023.

1 Cases that cite this headnote

**Attorneys and Law Firms**

 **\*92** David A. Schiller, John D. Exline, The Shiller Firm, Plano, for Appellants.

Barbara E. Rosenberg, City of Dallas Attorney's Office, for Appellees.

Before Justices MOSELEY, RICHTER, and FRANCIS.

**OPINION**

Opinion by Justice MOSELEY.

The dispositive issue in this appeal is whether the City of Dallas has primary jurisdiction or exclusive jurisdiction over the initial determination of disciplinary issues concerning its police officers. Because we conclude it does, we affirm the trial court's order granting the plea to the jurisdiction and abating the suit.

**I. BACKGROUND**

Appellants, Dallas police officers Jeffrey Nelson, Alfred P. Schoelen, Jr., and Timothy Stecker ("the officers"), sued the City of Dallas and its police chief, David Kunkle (collectively, "appellees"). The officers alleged appellees were in the process of taking disciplinary action against them and the impending disciplinary actions arose from one or more investigations that were conducted by the police department in violation of certain provisions in the Texas Government Code that govern complaints against law enforcement officers. [1] The officers did not seek monetary damages, but **\*93** rather a temporary restraining order, temporary injunction, and permanent injunction stopping the disciplinary proceeding and related investigations. [2] The officers also sought a declaratory judgment construing the statutory provisions they claim appellees violated, and a writ of mandamus ordering Kunkle "to comply with the law and to cease all activities in violation of the aforementioned Government Code provisions, including but not limited to: [the four items set forth in appellants' request for injunctive relief]."

Appellees filed a plea to the jurisdiction, seeking dismissal of the officers' claims. Among other things, appellees asserted the trial court lacked subject-matter jurisdiction over the officers' claims because they had not exhausted their administrative remedies, because their claims were not ripe for adjudication, and because there was no legislative waiver of appellees' immunity from suit. After a hearing, the trial court granted the plea to the jurisdiction and abated the case until the officers exhausted their administrative remedies.

The officers appealed. *See* TEX. CIV. PRAC. & REM.CODE § 51.014(8) (Vernon 2008). Appellees did not file a cross-appeal. In a single issue, the officers contend the trial court erred by granting appellees' plea to the jurisdiction and abating the case for the exhaustion of their administrative remedies. The officers argue neither the primary jurisdiction doctrine nor the exclusive jurisdiction doctrine apply here to support the trial court's order abating the case until

administrative remedies are exhausted. They also argue that if either doctrine applies here, nevertheless one of several exceptions to excuse them from exhausting their administrative remedies.

## II. APPLICABLE LAW

### A. Standard of Review

A plea to the jurisdiction is a dilatory plea that seeks dismissal of a case for lack of subject matter jurisdiction. *Bland Indep.* **\*94** *Sch. Dist. v. Blue,* 34 S.W.3d 547, 554 (Tex.2000). Whether a trial court has subject matter jurisdiction is a question of law to be reviewed de novo. *Tex. Natural Res. Conservation Comm'n v. IT–Davy,* 74 S.W.3d 849, 855 (Tex.2002); *Subaru of Am., Inc. v. David McDavid Nissan, Inc.,* 84 S.W.3d 212, 222 (Tex.2002) (issues of primary or exclusive jurisdiction). In performing this review, we do not look to the merits of the plaintiff's case, but consider only the pleadings and the evidence pertinent to the jurisdictional inquiry. *See Tex. Dep't of Parks & Wildlife v. Miranda,* 133 S.W.3d 217, 227 (Tex.2004); *County of Cameron v. Brown,* 80 S.W.3d 549, 555 (Tex.2002).

### B. Primary and Exclusive Jurisdiction

**[1]** The primary jurisdiction and exclusive jurisdiction doctrines both relate to administrative law; nevertheless, they are "distinctly different doctrines that have different consequences when applied." *Subaru of Am., Inc.,* 84 S.W.3d at 221. The doctrine of primary jurisdiction "allocate [s] power between courts and agencies when both have authority to make initial determinations in a dispute." *In re Sw. Bell Tel. Co., L.P.,* 226 S.W.3d 400, 403 (Tex.2007) (quoting *Subaru of Am., Inc.,* 84 S.W.3d at 221). Trial courts should defer to appropriate administrative agencies when (1) the agency is staffed with experts trained in handling complex problems within the agency's purview, and (2) great benefit is derived from the agency's uniform interpretation of laws within its purview and the agency's rules and regulations when courts and juries might reach differing results under similar fact situations. *Id.*

**[2]** While primary jurisdiction is prudential in nature, exclusive jurisdiction is jurisdictional. *See Subaru of Am., Inc.,* 84 S.W.3d at 221. Under the exclusive jurisdiction doctrine, the legislature is considered to have granted an administrative agency the sole authority to make an initial determination in a dispute. *See id.* An agency has

exclusive jurisdiction when a pervasive regulatory scheme indicates the legislature intended the regulatory process to be "the exclusive means of remedying the problem to which the regulation is addressed." *Id.* (citation omitted). Thus whether an agency has exclusive jurisdiction depends on statutory interpretation. *Id.; see e.g., Thomas v. Long,* 207 S.W.3d 334 (Tex.2006) (supreme court interprets statute governing creation and operation of sheriff's department civil service commission and concludes, despite absence of "exclusive jurisdiction" language, that commission has exclusive jurisdiction over relevant employment matters).

**[3]** If the administrative agency has either primary jurisdiction or exclusive jurisdiction, the trial court should await the exhaustion of administrative remedies before proceeding, if at all. *See Subaru of Am., Inc.,* 84 S.W.3d at 221 ("If the primary jurisdiction doctrine requires a trial court to defer to an agency to make an initial determination, the court should abate the lawsuit and suspend finally adjudicating the claim until the agency has an opportunity to act on the matter."); *id.* ("[I]f an agency has exclusive jurisdiction, a party must exhaust all administrative remedies before seeking judicial review of the agency's action.").

### C. The City's Administrative Process

**[4]** The City of Dallas is a home-rule municipal corporation. *Lowenberg, v. City of Dallas,* 261 S.W.3d 54, 58 (Tex.2008). Home-rule cities have broad discretionary powers, provided that no ordinance "shall contain any provision inconsistent with the Constitution of the State, or of the general laws enacted by the Legislature of this **\*95** State." TEX. CONST. art. XI, § 5. They possess the full power of self government and look to the legislature not for grants of power, but only for limitations on their power. *Dallas Merchant's and Concessionaire's Ass'n v. City of Dallas,* 852 S.W.2d 489, 489–90 (Tex.1993).

The City has not adopted the state civil service provisions, instead using its own civil service provisions adopted in its charter and ordinances. *See Cooper v. City of Dallas,* 229 S.W.3d 860, 863 (Tex.App.-Dallas 2007, pet. denied); *see also* TEX. LOCAL GOV'T CODE ANN. § 143.002 (Vernon Supp.2008); *see generally id.* §§ 143.001–.363 (Vernon 1999 & Supp.2008) (municipal civil service for firefighters and police officers). The City's charter authorizes the police chief to discipline officers, and provides an administrative procedure for contesting and appealing the police chief's discipline decisions. DALLAS, TEX., CHARTER ch. XII, § 4. After discipline has been imposed, the officer may appeal

to the city manager. *Id.* If the discipline is upheld by the city manager, the officer may appeal to the civil service trial board or an administrative law judge. DALLAS, TEX., CHARTER ch. XVI, § 12.1; DALLAS, TEX., CODE § 34–40. The charter and ordinances establish detailed procedures for the hearing before the trial board or administrative law judge. *See* DALLAS, TEX., CHARTER ch. XVI, §§ 12, 12.1; DALLAS, TEX., CODE § 34–40. Either party may appeal the decision of the trial board or administrative law judge to state district court. DALLAS, TEX., CHARTER ch. XVI, § 12(b); DALLAS, TEX., CODE § 34–40(f)(2)(A). "The appeal to the district court must be decided upon review of the record of the hearing." DALLAS, TEX., CODE § 34–40(f)(2)(B); *see also* DALLAS, TEX., CHARTER ch. XVI, § 12(b) ("the matter must be decided based upon the review of the record" of the hearing before the administrative law judge).

### III. ANALYSIS

#### A. Waiver

The officers argue appellees did not assert the primary jurisdiction doctrine in their plea to the jurisdiction and that appellees requested only dismissal of the suit, not abatement. Although a plea in abatement might be the more appropriate device to raise a primary jurisdiction argument, the plea clearly argued that the officers were required to exhaust their administrative remedies as "a prerequisite to subject-matter jurisdiction for this suit." Moreover, the order being appealed abated the case, which would be the result of a determination that the City had primary jurisdiction. The appellees did not file a cross-appeal complaining of the trial court's failure to dismiss the suit outright. Thus, it does not appear from this record that the officers were prejudiced by appellees' argument for greater relief—dismissal without prejudice—under the exclusive jurisdiction doctrine rather than for an abatement under the exhaustion requirement for primary jurisdiction

#### B. Primary Jurisdiction

The officers next argue that the City does not have primary jurisdiction because the legislature has not conferred authority on the City to interpret and apply government code sections 614.022 and 614.023. The officers also argue the elements for primary jurisdiction are not met because the City and the police chief are not experts in how to interpret and determine the scope and effect of state statutes, and because

there is no great benefit in allowing the City to interpret sections 614.022–.023.

However, the officers frame the scope of the City's administrative process too narrowly. The subject of the City's administrative **\*96** procedure is whether or not to discipline the officers—members of Dallas Police Department—for alleged misconduct. The issue before the trial court, and before us, is whether the City may make the initial determination of that dispute through its administrative procedures, before the parties are allowed to resort to the courts. Thus the scope of the administrative proceeding is broader than the interpretation of sections of the government code.

Here the City charter clearly gives the City—through its chief of police—the right to "discipline any of the officers ... for violations of city ordinances or federal or state law, or for failure to obey orders given by the proper authority, or the orders, rules, and regulations promulgated by the chief of police." DALLAS, TEX., CHARTER ch. XII § 4. That determination is subject to review by other personnel within the City, and is subject to review in district court based on the administrative record. *See* DALLAS, TEX., CHARTER ch. XVI, §§ 12, 12.1; DALLAS, TEX., CODE § 34–40.

Whether an officer's actions warrant discipline and, if so, the amount of such discipline, are complex problems within the purview of the City, and the City-through its chief of police and the other personnel involved in the City's administrative disciplinary procedure—is staffed with experts trained in handling those complex problems. *See In re Sw. Bell Tel. Co., L.P.,* 226 S.W.3d at 403. Moreover, if courts and juries made the initial determination of police disciplinary issues, they may reach differing results under similar fact situations. This would result in increased uncertainty and less uniformity in police disciplinary issues, undermining both the City's authority to operate and manage the department and the confidence of the public and the police officers that discipline issues will be handled in a uniform manner. Thus, there is a significant benefit derived from the City's uniform interpretation of the police department's rules and regulations. *See id.*

 [5]   We conclude the City has primary jurisdiction over the discipline of its police officers under the City charter and ordinances. This conclusion is unaffected by the officers' other claims for declaratory, injunctive, and mandamus relief. *See Thomas,* 207 S.W.3d at 342 (bringing suit as declaratory

judgment action did not change exclusive jurisdiction analysis where subject matter of action was "same subject matter over which the Legislature intended the Commission to exercise exclusive jurisdiction"). Similarly, an agency does not lack primary jurisdiction merely because it lacks power to adjudicate all claims a party may desire to raise. *See In re Sw. Bell Tel. Co., L.P.,* 226 S.W.3d at 404 ("Although the PUC cannot grant all the relief that the plaintiffs request, the PUC is authorized to make initial determinations regarding the validity of the interconnection agreements and their interpretation.... Once the PUC has made its determinations regarding the interconnection agreements, then the trial court may proceed with its adjudicative function.").

## C. Exceptions to Exhaustion Requirement

 **[6]**    Even if the City has primary jurisdiction, there are exceptions to the exhaustion requirement, and the officers claim that several apply. *See Dotson v. Grand Prairie Indep. Sch. Dist.,* 161 S.W.3d 289, 291–92 (Tex.App.-Dallas 2005, no pet.).[3] **\*97** We disagree, however. The officers claim they will suffer irreparable injury if required to exhaust their administrative remedies, but the injury they claim is damage to their reputations and loss of future income and benefits—all of which can be compensated for by money damages. Moreover, these possible damages would result from the discipline, if any, imposed by the City, not from the administrative process itself. *See Houston Fed'n of Teachers, Local 2415 v. Houston Indep. Sch. Dist.,* 730 S.W.2d 644, 646 (Tex.1987); *Dotson,* 161 S.W.3d at 292. Further, as noted above, that the agency may not be able to provide all relief requested does not excuse the exhaustion requirement. *See In re Sw. Bell Tel. Co., L.P.,* 226 S.W.3d at 404; *Dotson,* 161 S.W.3d at 292.

 **[7]**    **[8]**    The officers next claim appellees have violated and will continue to violate their due course of law rights under the Texas constitution. TEX. CONST. art. I, § 19.[4] However, it is the officers who are attempting to avoid the very process that is due in this circumstance—administrative review of employee discipline under the City's charter and ordinances, followed by judicial review in the courts if necessary. As this Court has recognized, "[d]ue process requires a public employer to provide its employee: (1) oral or written notice of the charges against him; (2) an explanation of the employer's evidence; (3) a fair opportunity for the employee to present his side of the story; and (4) a full evidentiary post-termination hearing conducted at a meaningful time." *Baca v. City of Dallas,* 796 S.W.2d 497, 499 (Tex.App.-Dallas 1990, no

writ) (citing *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985)). The officers' allegations that appellees have or will violate sections 614.022–.023 by disciplining them do not rise to the level of constitutional due course of law violations warranting an exception to the exhaustion requirement. *See Tex. Educ. Agency v. Cypress–Fairbanks Indep. Sch. Dist.,* 830 S.W.2d 88, 91 (Tex.1992) (discharged employees' assertion of federal due process rights and violations of Title 42 of the United States Code did not excuse exhaustion of administrative remedies under Texas Education Code).

 **[9]**    The officers also assert the determination of the whether appellees have or will violate sections 614.022–.023 is purely a question of law and the facts are undisputed. The officers contend Appellees violated sections 614.022–.023 when they considered an anonymous letter in connection with the disciplinary proceedings. Appellees dispute this contention and argue the disciplinary investigation was based on a signed complaint detailing the specific allegations **\*98** against the officers and that the complaint was given to them within a reasonable time. We conclude the officers' claims do not involve pure questions of law and undisputed facts.

The last two exceptions are argued together. The officers argue the City lacks jurisdiction over their claims and it is acting without authority. Initially, we reject any argument the City lacks jurisdiction or authority to discipline its police officers under the procedures set out in its charter and ordinances. The officers equate sections 614.022–.023 with statutory prerequisites to an agency's jurisdiction and authority to act, and argue the violation of those sections deprives the City of jurisdiction and authority to act. The supreme court has rejected the notion that failure to follow statutory provisions deprives a court of jurisdiction. *See Dubai Petroleum Co. v. Kazi,* 12 S.W.3d 71, 76–77 (Tex.2000) ("We therefore overrule *Mingus* [*v. Wadley,* 115 Tex. 551, 285 S.W. 1084 (1926)] to the extent that it characterized the plaintiff's failure to establish a statutory prerequisite as jurisdictional.").

 **[10]**    Further, we do not read sections 614.022–.023 as statutory prerequisites to the jurisdiction or authority of the City to discipline its officers. Certainly those sections apply to any complaint against a peace officer within the scope of the statute, *see* TEX. GOV'T CODE ANN. § 614.021. However they do not limit the City's jurisdiction or authority to act, and their alleged violation does not deprive the City of jurisdiction or authority or obviate the need for exhaustion of

administrative remedies. Even if the City erroneously applies the sections, that error can be addressed in the administrative process and ultimately in the courts under the judicial review provided by the City charter and ordinances.

We conclude none of the recognized exceptions to the exhaustion requirement apply in this case. We overrule the officers' sole issue.

Because the City has primary jurisdiction over the disputes at issue in this case and no exception to the exhaustion requirement applies, the trial court properly abated the case until the officers exhausted their administrative remedies. We need not decide if the exclusive jurisdiction doctrine also applies in this case because in either case, the trial court should defer to the City to make an initial determination regarding discipline of its officers. *See In re Sw. Bell Tel. Co., L.P.,* 226 S.W.3d at 403; *Subaru of Am., Inc.,* 84 S.W.3d at 221. We affirm the trial court's order.

## IV. CONCLUSION

Footnotes

1   The code provisions alleged are sections 614.021, 614.022, and 614.023 of the Texas Government Code. TEX. GOV'T CODE ANN. §§ 614.021–.023 (Vernon Supp.2008). Section 614.021 provides that the subchapter applies only to complaints against listed law enforcement officers and firefighters, including "a peace officer under Article 2.12, Code of Criminal Procedure, or other law who is appointed or employed by a political subdivision of this state." TEX. GOV'T CODE ANN. § 614.021.

   Sections 614.022 and 614.023 provide:

   § 614.022. Complaint to be in Writing and Signed by Complainant

   To be considered by the head of a state agency or by the head of a fire department or local law enforcement agency, the complaint must be:

   (1) in writing; and

   (2) signed by the person making the complaint.

   § 614.023. Copy of Complaint to be Given to Officer or Employee

   (a) A copy of a signed complaint against a law enforcement officer of this state or a fire fighter, detention officer, county jailer, or peace officer appointed or employed by a political subdivision of this state shall be given to the officer or employee within a reasonable time after the complaint is filed.

   (b) Disciplinary action may not be taken against the officer or employee unless a copy of the signed complaint is given to the officer or employee.

   (c) In addition to the requirement of Subsection (b), the officer or employee may not be indefinitely suspended or terminated from employment based on the subject matter of the complaint unless:

   (1) the complaint is investigated; and

   (2) there is evidence to prove the allegation of misconduct.

   TEX. GOV'T CODE ANN. § 614.022, .023.

2   Specifically, they sought to temporarily and permanently enjoin appellees from:

   1. Taking disciplinary against [the officers] and in particular conducting the disciplinary hearing set for December 18, 2007;

   2. Continuing any investigation or disciplinary action against [the officers];

   3. Conducting any further investigations on the same issues investigated in the unlawful investigation; and

   4. Opening any new investigations based on evidence gathered in the unlawful investigation or investigations.

   The officers also sought a writ of mandamus ordering Kunkle "to comply with the law and to cease all activities in violation of the aforementioned Government Code provisions, including but not limited to: [the four items set forth in appellants' request for injunctive relief]."

3   "Exhaustion of administrative remedies is not necessary if: (1) the aggrieved party will suffer irreparable harm and the administrative agency is unable to provide relief; (2) the claims are for a violation of a constitutional or federal statutory right; (3) the cause of action involves pure questions of law and the facts are not disputed; (4) the Commissioner of Education lacks jurisdiction over the claims; (5) the administrative agency acts without authority; or (6) the claims involve parties acting outside the scope of their employment with the school district." *Id.*

4   There is a authority that this exception applies only to alleged violations of the federal constitution and statutes. *See Jackson v. Houston Indep. Sch. Dist.,* 994 S.W.2d 396, 402 (Tex.App.-Houston [14th Dist.] 1999, no pet.); *Janik v. Lamar Consol. Indep. Sch. Dist.,* 961 S.W.2d 322, 323–24 (Tex.App.-Houston [1st Dist.] 1997, writ denied); *Hicks v. Lamar Consolidated Indep. Sch. Dist.,*

943 S.W.2d 540, 542 (Tex.App.-Eastland 1997, no writ). In an unpublished opinion, this Court concluded the better rule was set out in *Hicks* that this exception is merely a special case of the third exception for claims involving pure questions of law and undisputed facts. *See Dallas Cent. Appraisal Dist. v. Hamilton,* No. 05–99–01401–CV, 2000 WL 1048537 at *6, 2000 Tex.App.LEXIS 5069 at *16–*17 (Tex.App.-Dallas 2000, no pet.) (not designated for publication).

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

202 S.W.3d 250
Court of Appeals of Texas,
Corpus Christi–Edinburg.

PLAYBOY ENTERPRISES, INC., Appellant,
v.
EDITORIAL CABALLERO,
S.A. DE C.V., et al., Appellees.

No. 13–03–048–CV.  |  May 25, 2006.
|  Motion for En Banc Reconsideration  and
Motion for Rehearing Overruled Oct. 12, 2006.

**Synopsis**

**Background:** In action started by advertising service, publisher and distributor of Spanish edition of magazine asserted fraud, breach of contract, breach of fiduciary duty, business disparagement, and tortious interference claims against magazine owner. Owner cross-claimed for breach of contract and fraud. The 332nd District Court of Hidalgo County, Mario E. Ramirez, Jr., J., realigned publisher and distributor as plaintiffs, and entered a judgment on a jury verdict for publisher and distributor. Owner appealed.

**Holdings:** The Court of Appeals, Rodriguez, J., held that:

[1] publisher and distributor could not recover in fraud on alleged oral representations made by owner where such representations were directly contradicted by the parties' license agreement;

[2] owner had duty to disclose that magazine founder, who was also majority shareholder of owner, did not want a competing second-language edition distributed in the United States;

[3] evidence was sufficient to establish that publisher and distributor were unaware that magazine's founder was adamantly opposed to parties' license agreement;

[4] owner did not tortiously interfere with any contracts between publisher and distributor and third parties;

[5] owner did not owe a fiduciary duty to publisher and distributor;

[6] evidence was sufficient to establish that publisher and distributor suffered some damages as a result of owner's fraud, but amount awarded by the jury was not supported by the evidence; and

[7] judgment on fraud claim would be reversed and remanded for a new trial on both liability and damages.

Reversed and rendered in part, and reversed and remanded in part.

West Headnotes (35)

**[1]** **Fraud**
 Duty to Investigate
A party to an arm's length transaction must exercise ordinary care and reasonable diligence for the protection of his own interests, and a failure to do so is not excused by mere confidence in the honesty and integrity of the other party.

Cases that cite this headnote

**[2]** **Fraud**
Relations and means of knowledge of parties
Reliance upon an oral representation that is directly contradicted by the express, unambiguous terms of a written agreement between the parties is not justified as a matter of law.

3 Cases that cite this headnote

**[3]** **Fraud**
Relations and means of knowledge of parties
**Fraud**
Defenses
Publisher and distributor of Spanish edition of magazine could not recover for fraud based on magazine owner's alleged oral representations that owner would not enforce the parties' license agreement, that renewal of license agreement

was automatic, that publisher and distributor could import Spanish edition into the United States, that owner was not concerned with cannibalization, that it would not be a problem to distribute 150,000 copies of the Spanish edition per month and that parties would be partners, where alleged oral representations were directly contradicted by the express, unambiguous terms of the parties' license agreement, and license agreement contained a merger clause stating agreement represented the entire understanding of the parties.

3 Cases that cite this headnote

**[4]** **Contracts**
　🔑 Merger in Subsequent Contract

**Fraud**
　🔑 Defenses

Where a contract is negotiated at arms-length by sophisticated businessmen represented by counsel, a merger clause, stating the contract represents the entire understanding of the parties and it can not be waived or modified except by an express agreement in writing, is enforceable, and negates reliance on any alleged oral representations.

3 Cases that cite this headnote

**[5]** **Fraud**
　🔑 Reliance on Representations and Inducement to Act

Publisher and distributor of Spanish edition of magazine could not recover for fraud based on magazine owner's alleged approval of distributor's media kit setting out an expected monthly United States distribution of 225,000 copies, where parties' license agreement required formal written approval for United States distribution and stated that, if approval was granted, such distribution would not exceed 150,000 copies per issue, and owner's alleged approval of the media kit was not a formal written approval.

Cases that cite this headnote

**[6]** **Fraud**
　🔑 Duty to disclose facts

As a general rule, a failure to disclose information does not constitute fraud unless there is a duty to disclose the information.

1 Cases that cite this headnote

**[7]** **Fraud**
　🔑 Duty to disclose facts

A duty to disclose information can arise where there is a formal fiduciary relationship.

1 Cases that cite this headnote

**[8]** **Fraud**
　🔑 Duty to disclose facts

A duty to disclose information can arise where there is a confidential relationship between the parties.

1 Cases that cite this headnote

**[9]** **Fraud**
　🔑 Duty to disclose facts

The existence of a fiduciary or confidential relationship is but one of the bases for imposing a duty to disclose information, and a duty to speak may arise in an arms-length transaction in at least three other situations: (1) when one voluntarily discloses information, he has a duty to disclose the whole truth; (2) when one makes a representation, he has a duty to disclose new information when the new information makes the earlier representation misleading or untrue; and (3) when one makes a partial disclosure and conveys a false impression, he has the duty to speak.

7 Cases that cite this headnote

**[10]** **Fraud**
　🔑 Questions for Jury

Whether a duty to disclose information exists is a question of law.

1 Cases that cite this headnote

**[11]    Fraud**

🔑 Duty to disclose facts

Magazine owner had a duty to disclose to publisher and distributor of Spanish edition of magazine that magazine's founder, who was also majority shareholder of owner, did not want a second-language edition of the magazine competing with the English edition of the magazine in the United States, for purposes of fraudulent concealment claim asserted by publisher and distributor against owner, as owner did disclose to publisher and distributor general concerns it had about a Spanish edition cannibalizing sales of the English edition, but owner did not disclose material fact that agreement with publisher and distributor was quite contrary to what founder envisioned for a Spanish edition, and thus owner had not disclosed the whole truth, new information was not disclosed that made owner's earlier representations misleading, and owner's partial disclosures conveyed a false impression.

2 Cases that cite this headnote

**[12]    Fraud**

🔑 Weight and Sufficiency

Evidence was sufficient to establish, in trial of fraudulent concealment claim asserted by publisher and distributor of Spanish edition of magazine against owner of magazine, that publisher and distributor were unaware that magazine's founder, who was also majority shareholder of owner, was adamantly opposed to owner's license agreement with publisher and distributor; corporate representative of distributor testified he did not know of founder's opposition or that founder did not want a Spanish edition unless it was owned 100 percent by owner and was an exact translation of the English version.

Cases that cite this headnote

**[13]    Torts**

🔑 Contracts

A tortious interference cause of action is established if the plaintiff proves: (1) the existence of a contract subject to interference; (2) a willful and intentional act of interference; (3) the act was a proximate cause of the plaintiff's damages; and (4) actual damage or loss resulted.

2 Cases that cite this headnote

**[14]    Torts**

🔑 Contracts in general

Owner of magazine did not tortiously interfere with any contracts between publisher and distributor of Spanish edition of magazine and third parties, where publisher and distributor did not identify any specific contracts with third parties that were interfered with, and publisher resisted pressure by owner to terminate its contract with distributor.

2 Cases that cite this headnote

**[15]    Joint Adventures**

🔑 Other relations distinguished and contracts creating them

Publisher and distributor of Spanish edition of magazine could not recover against magazine's owner for breach of fiduciary duty based on a joint enterprise, as a joint enterprise between the parties did not exist; parties had entered into a license agreement, owner's compensation under the agreement was solely in the form of royalties, and thus the community of pecuniary interest in a common purpose that was necessary for a joint venture was lacking.

Cases that cite this headnote

**[16]    Joint Adventures**

🔑 Other relations distinguished and contracts creating them

A joint enterprise cannot exist as a matter of law between a licensee who has a pecuniary interest in profits and a licensor who has a pecuniary interest only in royalties, since the necessary community of pecuniary interest in a common purpose is lacking.

Cases that cite this headnote

**[17]    Fraud**
    Fiduciary or confidential relations

Publisher and distributor of Spanish edition of magazine could not recover against magazine's owner for breach of fiduciary duty based on a relationship of trust and confidence, as a relationship of trust and confidence between the parties did not exist; though representatives of publisher and distributor testified that they trusted owner and their business dealings were friendly, subjective trust did not transform arms-length dealings into fiduciary relationships, and license agreement between the parties expressly provided that the only relationship between owner and publisher and distributor was that of licensor-licensee.

1 Cases that cite this headnote

**[18]    Fraud**
    Fiduciary or confidential relations

Subjective trust does not transform arms-length dealings into a fiduciary relationship.

1 Cases that cite this headnote

**[19]    Partnership**
    Verification

Failure of owner of magazine to file a verified denial that a partnership existed between it and publisher and distributor of Spanish edition of magazine did not create a partnership by default, in breach of fiduciary duty and fraud action brought by publisher and distributor against owner, though publisher and owner asserted they were in a "joint venture, joint enterprise or partnership" with owner, as publisher and distributor had not pled a true partnership; pleadings of publisher and distributor acknowledged that owner was to receive royalties and not profits under parties' license agreement, a partnership required an agreement to share profits, and thus owner was not required to deny that a partnership

existed. Vernon's Ann.Texas Rules Civ.Proc., Rule 93(5).

Cases that cite this headnote

**[20]    Partnership**
    Community of Interest in Profits and Losses

A partnership requires an agreement to share profits.

Cases that cite this headnote

**[21]    Partnership**
    Verification

Where the pleadings as a whole reflect that a party, while using the term "partnership," is in fact asserting a different relationship, rule, requiring the opposing party to file a verified denial of the partnership allegation in order to avoid a partnership being created by default, does not apply. Vernon's Ann.Texas Rules Civ.Proc., Rule 93(5).

Cases that cite this headnote

**[22]    Libel and Slander**
    Nature and elements in general

The general elements of a claim for business disparagement are publication by the defendant of the disparaging words, falsity, malice, lack of privilege, and special damages.

Cases that cite this headnote

**[23]    Libel and Slander**
    Injury from slander

Representations in media kit allegedly approved by owner of magazine, regarding circulation numbers for Spanish edition of magazine in the United States, could not support claims by publisher and distributor of Spanish edition that they lost profits in Mexico as a result of owner's wrongful business disparagement, as media kit did not address business in Mexico.

Cases that cite this headnote

**[24] Appeal and Error**
⚷ Amount of recovery or extent of relief

Magazine owner preserved for appellate review, in fraud, breach of fiduciary duty, and breach of contract action brought by publisher and distributor of Spanish edition of magazine, issue of whether collective damages award was barred because jury did not determine publisher's and distributor's damages separately, where owner at charge conference objected to damage questions on ground that there was only one blank to put in total damages for both parties, and that damages should be separated out.

1 Cases that cite this headnote

**[25] Judgment**
⚷ Joint or several judgment

Trial court did not abuse its discretion, in fraud, breach of fiduciary duty, and breach of contract action brought against magazine owner by publisher and distributor of Spanish edition of magazine, by not charging publisher's and distributor's damages separately, where publisher and distributor asserted their claims and causes of action jointly rather than severally, and neither publisher nor distributor claimed damages in separate sums on their causes of action. Vernon's Ann.Texas Rules Civ.Proc., Rule 40.

1 Cases that cite this headnote

**[26] Damages**
⚷ Particular cases

**Fraud**
⚷ Amount awarded

Evidence was sufficient to establish, in fraud, breach of fiduciary duty and breach of contract action brought against magazine owner by publisher and distributor of Spanish edition of magazine, that publisher and distributor suffered some out-of-pocket damages as a result of owner's fraud, though not the $3,600,000 jury awarded; corporate representative for distributor testified that distributor brought in $4,000,000 in financing and did not count on having to use

it all up just to stay in business, representative testified that money was spent on launch parties, upgrading facilities, transportation, building a staff and other activities, and, relying on financial statements provided by corporate representative, expert for publisher and distributor testified as to publishing rights expense, distributor's expenses and investments, publisher's out-of-pocket expenses and profit and loss histories.

Cases that cite this headnote

**[27] Damages**
⚷ Particular cases

**Fraud**
⚷ Amount awarded

Evidence was sufficient to establish, in fraud, breach of fiduciary duty and breach of contract action brought against magazine owner by publisher and distributor of Spanish edition of magazine, that publisher and distributor suffered some damages for liabilities that were incurred as a result of owner's fraud that were not duplicative of damages awarded for out-of-pocket expenses, though not the $500,000 that jury awarded for liabilities incurred; publisher owed $110,000 to its editor-in-chief and such amount was not money borrowed and then spent, and records provided by publisher and distributor indicated that $125,000 went to distributor, of which $89,000 was invested in publisher.

Cases that cite this headnote

**[28] Fraud**
⚷ Difference between actual and represented value

**Fraud**
⚷ Difference between value and price paid

The two alternative measures of damages are benefit-of-the-bargain, or lost profits, and out-of-pocket measures; "benefit-of-the-bargain damages" are the difference between the value as represented and the value received, while "out-of-pocket damages" compensate a defrauded party for the difference between the value of that

with which he or she has parted and the value actually received.

Cases that cite this headnote

**[29]** **Fraud**
　　 Issues, proof, and variance
**Fraud**
　　 Elements of compensation

When properly pleaded and proved, consequential damages that are foreseeable and directly traceable to the fraud and result from it might be recoverable.

1 Cases that cite this headnote

**[30]** **Fraud**
　　 Elements of compensation

It is possible that, in the proper case, consequential damages from fraud could include foreseeable profits from other business opportunities lost as a result of the fraudulent misrepresentation.

1 Cases that cite this headnote

**[31]** **Fraud**
　　 Damage from fraud

Consequential damages in the form of foreseeable profits from other business opportunities lost as a result of the fraudulent misrepresentation by owner of magazine were properly pled, in action brought against magazine owner by publisher and distributor of Spanish edition of magazine, where publisher's and distributor's petition sought recovery for all damages they sustained as a result of fraud including loss of profits in other ventures, and prayed for any and all lost profits/lost business opportunity damages with respect to other business ventures and relationships.

Cases that cite this headnote

**[32]** **Appeal and Error**
　　 Reducing amount of recovery
**Appeal and Error**

　　 Failure to introduce sufficient evidence to authorize recovery or establish defense

Judgment entered on a jury verdict on fraud claim, asserted against magazine owner by publisher and distributor of Spanish edition of magazine, would be reversed and remanded for a new trial on liability and damages, as there was no probative evidence supporting the entire amount of damages awarded by the judgment, but there was legally sufficient evidence that publisher and distributor had suffered some damages as a result of owner's fraud, because owner contested the issue of damages Court of Appeals could not render judgment for a lesser dollar amount, and the interests of justice required a remand for another trial on liability and damages. Rules App.Proc., Rule 43.3(b).

4 Cases that cite this headnote

**[33]** **Interest**
　　 Effect on judgments

Amendments to statute lowering post-judgment interest rate did not apply retroactively to judgment on fraud claim asserted against magazine owner by publisher and distributor of Spanish edition of magazine, where judgment was not signed on or after the effective date of the amendments and did not become subject to appeal on or after the effective date of the amendments. V.T.C.A., Finance Code § 304.003.

Cases that cite this headnote

**[34]** **Appeal and Error**
　　 Taking papers and articles to jury room

Even if trial court erred, in fraud, breach of fiduciary duty, and breach of contract action brought against magazine owner by publisher and distributor of Spanish edition of magazine, by inadvertently failing to send to jury transcript of testimony of one of publisher's and distributor's principals from another case stating that lack of funding caused failure of Spanish edition of magazine, such error was not reversible error, where excerpts of the transcript were read to the jury during the trial, owner's

counsel read to jury statement blaming failure of Spanish edition on the lack of funding, and thus jury was aware that there was evidence that lack of funding, rather than owner's actions, caused Spanish edition to fail. Rules App.Proc., Rule 44.1(a).

1 Cases that cite this headnote

**[35]     Trial**
👉 Several pleas or issues

Trial court did not err by realigning publisher and distributor of Spanish edition of magazine as plaintiffs for purposes of final argument, in action started by advertising company in which publisher and distributor asserted fraud, breach of fiduciary duty and breach of contract action claims against magazine owner, as publisher, distributor, and owner were equally positioned as defendants/cross-plaintiffs, and in such a situation trial court was allowed by rule to prescribe the order of argument. Vernon's Ann.Texas Rules Civ.Proc., Rule 269(a).

Cases that cite this headnote

**Attorneys and Law Firms**

**\*255** Harry M. Reasoner, Penelope E. Nicholson, Spikes Kangerga, Vinson & Elkins, Houston, for appellant.

**\*256** Donald B. Edwards Craig S. Smith, Corpus Christi, for appellees.

Before Chief Justice VALDEZ and Justices HINOJOSA and RODRIGUEZ.

**OPINION**

Opinion by Justice RODRIGUEZ.

This commercial dispute arose between plaintiff Eduardo Gongora, [1] appellant Playboy Enterprises, Inc. (PEI), and appellees Editorial Caballero, S.A. de C.V. (EC) and Grupo Siete International, Inc. (GSI). EC and GSI cross-claimed against PEI for fraud, breach of contract, breach of fiduciary duty, business disparagement, tortious interference, and

interference with prospective business relations. PEI cross-claimed against EC and GSI alleging, among other things, breach of contract and fraud. Immediately before closing arguments and over PEI's objection, the trial court realigned EC and GSI as plaintiffs. The jury found for EC and GSI and against PEI on all claims, except interference with prospective business relations, and awarded $3,600,000 for out-of-pocket expenses, $500,000 for liabilities incurred, and $260,000 for lost profits. The jury declined to award punitive damages. With respect to PEI's claims, the jury found that both EC and GSI had committed fraud and various contractual breaches, but that their actions were excused. [2] The trial court rendered a final judgment for damages awarded by the jury in the amount of $4,360,000, plus the maximum allowable pre-judgment interest calculated from the date suit was filed and post-judgment interest at the maximum rate allowed by law.

PEI appeals from the judgment entered in favor of EC and GSI on their claims against PEI. By ten issues and sub-issues, PEI brings legal and factual sufficiency challenges related to the jury's liability and damage findings, and contends that the trial court erred in (1) realigning EC and GSI as plaintiffs, (2) failing to properly charge the jury on wrongful disparagement, and (3) refusing to send a requested exhibit to the jury room during deliberations. PEI asks this Court to reform the judgment, if affirmed, with respect to pre-judgment and post-judgment interest rates. By a single issue with sub-issues, PEI also appeals from the judgment entered against PEI on its breach of contract cross-claim because EC and GSI failed to make payments owed under the International Publishing License Agreement (the License Agreement) and under the Renegotiated Payment Plan. We reverse and render, in part, and remand, in part.

**I. BACKGROUND**

For many years, pursuant to predecessor agreements between EC and PEI, EC published and distributed a Spanish language version of *Playboy* magazine in **\*257** Mexico. [3] In October 1996, PEI and EC entered into the License Agreement at issue in this case. It provided that EC would continue to publish and distribute the magazine in Mexico. It also provided that EC, with PEI's prior written approval, could publish a Spanish language version of *Playboy* for distribution in the United States and could assign the United States distribution rights to, and only to, GSI. [4] The License Agreement was for a three-year term beginning January 1,

1997. The October 1997 issue was the first issue of the Spanish language edition of *Playboy* distributed in the United States pursuant to the License Agreement. PEI terminated the License Agreement in January 1998 for EC's non-payment of royalties and other payments owed. Before termination of the License Agreement, the parties had renegotiated payments and entered into a written Renegotiated Payment Plan.

## II. Fraud

By its second issue, PEI contends that EC and GSI cannot recover for fraud as a matter of law. Alternatively, it complains that the evidence is insufficient to support the finding.

The jury answered, "Yes," when asked, "Did [PEI] commit fraud against [EC] or [GSI], or both, proximately causing damages?" The jury was instructed, in part, as follows:

Fraud occurs when—

a. a party makes a material misrepresentation,

b. the misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion,

c. the misrepresentation is made with the intention that it should be acted on by the other party, and

d. the other party acted in reliance on the misrepresentation and thereby suffers injury.

### A. Oral Representations

 **[1]**  **[2]**  PEI contends that EC and GSI cannot, as a matter of law, recover for fraud based on PEI's alleged oral representations because the License Agreement specifically bars EC and GSI from relying on oral representations. The alleged oral representations at issue in this case include the following: (1) PEI would not enforce or terminate the License Agreement; (2) renewal was automatic; (3) EC and GSI could import the Spanish language edition into the United States; (4) PEI intended to ramp up circulation after the initial three-year term of the License Agreement and was not concerned with "cannibalization;" [5] (5) it was not going to be a problem to distribute or sell 150,000 copies per month; and (6) the parties would be partners.

In this regard, [however,] a party to an arm's length transaction must exercise ordinary care and reasonable diligence for the protection of his own interests, **\*258** and a failure to do so is not excused by mere confidence in the honesty and integrity of the other party. Therefore, reliance upon an oral representation that is directly contradicted by the express, unambiguous terms of a written agreement between the parties is not justified as a matter of law. *DRC Parts & Accessories, L.L.C. v. VM Motori, S.P.A.,* 112 S.W.3d 854, 858 (Tex.App.-Houston [14th Dist.] 2003, pet. denied) (en banc) (op. on reh'g).

 **[3]**  The License Agreement, in this case, specifically provided for the following:

1. Upon the occurrence of an event of default, the non-defaulting party may terminate the License by written notice to the party in default;

2. On the condition that Licensee shall be in full compliance with the material terms of this Agreement, including the timely payment of all amounts required under this Agreement, then Licensee shall have the option ... to request negotiations concerning an extension of the license;

3. Distribution and sale of the Foreign Edition in any country other than Mexico will be subject to Licensor's prior written approval, which may be withdrawn once given, on notice from Licensor;

4. If Licensor fails or declines to grant such consent or approval to Licensee, Licensor shall not be liable to give any reason therefor;

5. Licensor's approval of such distribution and sale in the United States, if at all, will not occur until at least six (6) months following the legal formation of the joint venture Grupo Siete International, Inc., and if such approval is granted, will not exceed one-hundred-fifty thousand (150,000) copies per issue; and

6. The rights and powers herein granted to Licensee are those of a licensee only and this Agreement shall not, and is not intended to, create any other relationship nor make, constitute or appoint Licensee an agent or employee of Licensor.

The alleged oral representations about which EC and GSI complain are directly contradicted by the express, unambiguous terms of the License Agreement, and EC and

GSI are not justified in relying upon them as a matter of law. *See id.* Thus, the fraud claim based on these oral representations is barred on this basis.

 **[4]**    The License Agreement also contains a merger clause that specifically sets out that "this Agreement represents the entire understanding of the parties. None of the terms of this Agreement can be waived or modified except by an express agreement in writing signed by the parties. There are no representations, promises, warranties, covenants or undertakings other than those contained in this Agreement." Where a contract is negotiated at arms-length by sophisticated businessmen represented by counsel, this type of "merger" clause, like the clause in *Schlumberger Tech. Corp. v. Swanson,* 959 S.W.2d 171, 180–81 (Tex.1997), is enforceable and negates reliance on any alleged oral representations, an essential element of fraud as set out in the charge above. *See id.* (providing that merger clauses could, in some cases, operate to negate the reliance element of fraudulent-inducement claims arising from the same contract containing the merger clause); *see also IKON Office Solutions, Inc. v. Eifert,* 125 S.W.3d 113, 126–28 (Tex.App.-Houston [14th Dist.] 2003, pet. denied) (providing that provisions that contract was "entire agreement" and requiring any modifications to be in writing barred fraudulent-inducement claim under *Schlumberger ).* Here, as in **\*259** *Schlumberger,* the alleged oral representations dealt with matters specific to PEI's rights under the License Agreement. Therefore, reliance by EC and GSI on the purported oral representations is negated as a matter of law on this basis.

### B. Media Kit

 **[5]**    PEI also asserts that EC and GSI cannot rely on the asserted approval of the "media kit" as a representation that EC and GSI could distribute 225,000 copies monthly in the United States. GSI prepared the media kit to promote the planned U.S. launch of the magazine. The kit set out expected monthly U.S. distribution at 225,000 copies, with expected sales of 125,000 copies. However, the License Agreement, which required formal, written approval for any U.S. distribution, provided that, if approval was granted, such distribution and sale in the United States would not exceed 150,000 copies per issue. The number set out in the media kit exceeded 150,000, and PEI approval, if any, of a media kit was not the formal written approval for U.S. distribution required by the License Agreement. Therefore, because the alleged approval of the media kit and representations set out

in the media kit dealt with matters specific to PEI's rights under the License Agreement, reliance by EC and GSI on these representations was also negated as a matter of law. *See Schlumberger,* 959 S.W.2d at 180–81; *DRC,* 112 S.W.3d at 858; *see also Airborne Freight Corp. v. C.R. Lee Enter.,* 847 S.W.2d 289, 297–98 (Tex.App.-El Paso 1992, writ denied).

### C. Fraudulent Concealment

The jury was also instructed, in part, as follows:

> Fraud may also occur when—
>
> a. a party conceals or fails to disclose a material fact within the knowledge of that party,
>
> b. a party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth,
>
> c. a party intends to induce the other party to take some action by concealing or failing to disclose the fact, and
>
> d. the other party suffers injury as a result of acting without knowledge of the undisclosed fact.

### 1. Duty

PEI contends that fraudulent concealment cannot be based on PEI's alleged failure to disclose the concerns of Hugh Hefner, founder of *Playboy,* chairman emeritus, editor-in-chief, and owner of approximately seventy percent of the stock, about distributing a second-language version of *Playboy* in the United States, because it owed no such duty. PEI asserts it had no duty to disclose these concerns because it had no special relationship of trust and confidence with EC and GSI in this arms-length commercial transaction.

 **[6]**    **[7]**    **[8]**    **[9]**    **[10]**    "As a general rule, a failure to disclose information does not constitute fraud unless there is a duty to disclose the information." *Bradford v. Vento,* 48 S.W.3d 749, 756 (Tex.2001) (quoting *Ins. Co. of N. Am. v. Morris,* 981 S.W.2d 667, 674 (Tex.1998)); *see Ralston Purina Co. v. McKendrick,* 850 S.W.2d 629, 633–36 (Tex.App.-San Antonio 1993, writ denied). Such a duty can arise where there is a formal fiduciary relationship. *See Morris,* 981 S.W.2d at 674 (providing that "[f]iduciary duties arise as a matter of law in certain

formal relationships, including attorney-client, partnership, and trustee relationships"). Such a duty can also arise where there is a confidential relationship **\*260** between the parties. *Id.* (providing that "confidential relationships may arise when the parties have dealt with each other in such a manner for a long period of time that one party is justified in expecting the other to act in its best interest"). However, the existence of a fiduciary or confidential relationship is but one of the bases for imposing a duty to disclose information. *See Formosa Plastics Corp. v. Presidio Engineers & Contractors, Inc.,* 941 S.W.2d 138, 146–47 (Tex.App.-Corpus Christi, 1995) (per curiam), *rev'd on other grounds,* 960 S.W.2d 41, 44 (Tex.1998). In addition to situations where there is a fiduciary or confidential relationship, as this Court set out in *Formosa Plastics,* a duty to speak may arise in an arms-length transaction in at least three other situations: (1) when one voluntarily discloses information, he has a duty to disclose the whole truth; (2) when one makes a representation, he has a duty to disclose new information when the new information makes the earlier representation misleading or untrue; and (3) when one makes a partial disclosure and conveys a false impression, he has the duty to speak. *Id.; Hoggett v. Brown,* 971 S.W.2d 472, 487 (Tex.App.-Houston [14th Dist.] 1997, pet. denied); *Ralston Purina,* 850 S.W.2d at 635–36. [6] "Whether such a duty exists is a question of law." *Bradford,* 48 S.W.3d at 755; *see Hoggett,* 971 S.W.2d at 487.

The evidence in this case establishes that as early as the fall of 1996, PEI, EC, and GSI knew of Hefner's concerns regarding the distribution of a Spanish language edition of *Playboy.* It is undisputed that before the License Agreement was signed in November 1996 and became effective in January 1997, PEI disclosed general information to EC and GSI regarding concerns it had about cannibalism and the publication of the Spanish language edition for distribution in the United States. For example, on October 17, 1996, Robert O'Donnell, a member of the board of directors, vice-president of the international publishing group, and business manager for PEI, wrote a memo to Henry Marks, a senior vice-president of the international publishing group and a member of the board of directors at PEI, which reads, in part, as follows:

> I just finished a coffee with [EC and GSI principals,] Javier [Sanchez Campuzano (Sanchez) ] and Paul [Siegel], and while feathers are still a bit ruffled, especially Javier's, they're going to sign the deal as written....

> I was very clear to both of them that while I anticipated few problems or issues re: the other Spanish markets, that we

should all prepare ourselves for the microscope, including, perhaps even "inputs" from Hef, for entering the USA.

Additionally, O'Donnell testified that PEI disclosed to EC and GSI that Hefner was upset and that cannibalization needed to be disproved. [7] Fernando Becerra Paramo, **\*261** GSI's editor-in-chief, also testified that he was aware of PEI's cannibalization concerns.

While there is evidence that PEI disclosed general concerns, the evidence also establishes that material facts regarding Hefner's position on cannibalization and his instructions regarding the publication of the Spanish language edition for distribution in the United States were not disclosed to EC and GSI. Early internal memos at PEI set out that what was being done was "quite contrary to how Hef envisioned this publication." In November 1996, after the License Agreement was signed, Christie Hefner, chairman of the board of directors, chief executive officer, and Hefner's daughter, wrote a memo to Marks and Bob Perkins setting out, in part, the following:

> My agreement to allow the export of the Mexican edition subject to creative and business parameters was not an agreement to allow quasi American and Mexican Spanish language editions. When Bob starts talking about U.S. drawings in the book, U.S. pictorials, U.S. interview subjects, we are now clearly crossing the line into a Spanish language edition of Playboy for the U.S. market competing with U.S. Playboy, which is not something that I approved and I think is directly contrary to concerns that Hef expressed when we were looking at this as a stand-alone deal.

In December 1996, Hefner wrote the following internal memo:

> With the acquisition of the Mexican Playboy by a U.S. firm, it is important to make clear that the editorial focus and distribution of this Spanish language version of the magazine remain essentially Mexican.

> As previously expressed, I don't want a second language version of Playboy competing with us here in the U.S.

Again, in February 1997, after the License Agreement became effective, Hefner wrote internal memos expressing his position and dissatisfaction with the project. On February 4, 1997, he sent the following Playboy interoffice memo to Marks:

There still seems to be real confusion on what is acceptable and not acceptable related to the distribution of a Spanish language edition (Mexican or other) in the United States.

I have no problem with a direct Spanish translation of the U.S. magazine if we own it and can count the circulation toward our own rate base. But I have already rejected the idea of a separate Spanish language edition of PLAYBOY in the U.S. as being too confusing. And I am even more opposed to allowing some outside company [to] own and distribute **\*262** a Spanish edition (Mexican or not) here in the U.S.

The direct competition of a Spanish edition in the U.S. with a circulation of 130,000 to 150,000, as suggested in your memo, would clearly hurt the newsstand circulation and advertising rate base of the U.S. magazine and that impact—whether it costs us 5,000 copies or 50,000—makes no sense at a time when we are fighting a reduction in newsstand outlets and sales.

On February 7, 1997, Hefner sent the following memo to Christie:

I think it is naive to assume that distributing 100,000 copies of a Mexican edition in the United States won't have some impact on the newsstand sales of the U.S. edition when our own single copy sales are often no more than 500,000.

With much of the celebrity pictorial and centerfold content the same in each issue, I'm concerned about the impact this will have on our rate base.

Even the loss of 5,000 or 10,000 copies a month will hurt us, but we'll never know, because there is really no way of monitoring the impact of this inappropriate competition.

I think this is a dumb decision done by people who do not understand the fuller implications of what they are doing.

This is being done despite my specific instructions to the contrary.

Throughout the year, memos continued to express the fact that "Hef is very concerned about the issue of cannibalization."

For example, by internal memo in July 1997, Dick Rosenzweig, chief financial officer and Hefner's right-hand man and contact with the operations of the company, wrote the following memo to Christie, which reads in part:

Hef had and continues to have major reservations about how this project will negatively impact the circulation and advertising of [PEI's] domestic edition with very little additional revenue from the importation of this edition to us. Others and I have had many conversations with Henry Marks and Bob O'Donnell about this move and have asked for a definitive memo for Hef to review prior to moving ahead. I never received this memo.

When distribution numbers of 50,000 to 100,000 copies were originally mentioned Hef was enraged. He has no problem with a few thousand of these copies brought into the country just as we do with other foreign editions on foreign newsstands....

I notice on our current Calendar of Events we have three launch parties slated beginning in late August in Miami, New York and Los Angeles. I find it difficult to believe we're going to this trouble to launch a few thousand magazines. Hef continues to be adamant on this point and has dropped it back squarely in our laps.

He indicated he does not have a problem with our doing a direct Spanish translation of the domestic edition (which I understand has no appeal to the Hispanic market in this country) or he would consider a custom Spanish language edition if it were our project.

On August 21, 1997, Christie wrote to Rosenzweig regarding the test entry of the Spanish language version of *Playboy* into the United States. In her memo, she stated the following, in part:

Hef is still having great difficulty on making the decision to move ahead with the Mexican edition distribution in the U.S. He is concerned that the domestic circulation base continues to decline, we continue to lose outlets and despite Larry's memo of August 20th he worries about the domestic circulation.

**\*263** He also worries about the quality of this magazine distributed in the U.S. and the amount of time it will take away from more important projects for some of our key people. Indeed, what it really gets down to for him are the economics—is it really worth doing? As he said, if this meant another two million dollars added to our bottom line

it's one thing, but to do this with all of his concerns for little profit is not worth the experiment.

Finally, at trial, John McDonald, PEI's corporate representative, testified that while there was no confusion about Hefner not wanting a second-language version of Playboy competing with Playboy in the United States, because Hefner was not involved in the day-to-day operations of the company, it was a matter of Christie getting him to listen to reason and of PEI to prove that he was wrong. Additionally, at trial, O'Donnell testified that early in the project when the major strategy change from a "front door" to a "side door" approach was first presented to Christie she said okay, but she had to check with Hefner because that was his backyard.

 **[11]**  Based on these facts, we conclude this evidence supports the imposition of a duty on PEI to disclose to EC and GSI material facts regarding Hefner's specific concerns about cannibalization and his instructions regarding the publication of the Spanish language edition for U.S. distribution. Without disclosing Hefner's position on these matters, the information relayed to EC and GSI regarding general concerns PEI had about cannibalism and the publication of the Spanish language edition for distribution in the United States was not the whole truth, was misleading, or conveyed a false impression. Thus, PEI's duty to disclose the material facts arose in at least one, if not all, of the following situations: when one voluntarily discloses information, he has a duty to disclose the whole truth; when one makes a representation, he has a duty to disclose new information when the new information makes the earlier representation misleading or untrue; and when one makes a partial disclosure and conveys a false impression, he has the duty to speak. *See Hoggett,* 971 S.W.2d at 487 (citing *Formosa Plastics,* 941 S.W.2d at 146–47).

### 2. Sufficiency of the Evidence

Having determined that PEI owed EC and GSI the asserted duty to disclose information, we look next at PEI's contention that the evidence is legally and factually insufficient to establish that EC and GSI were ignorant of the undisclosed facts, an element of fraudulent concealment set out in the jury charge. *See Romero v. KPH Consol., Inc.,* 166 S.W.3d 212, 221 (Tex.2005); *Wal–Mart Stores, Inc. v. Sturges,* 52 S.W.3d 711, 715 (Tex.2001)* (providing that an assessment of

the evidence "must be made in light of the jury charge that the district court gave without objection").

In reviewing the legal sufficiency of the evidence, we view the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson,* 168 S.W.3d 802, 807 (Tex.2005). In conducting a legal sufficiency review, we will sustain a legal sufficiency point if the record reveals the following: (a) the complete absence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence establishes conclusively the opposite of the vital fact. *Id.* at 810 (citing Robert W. Calvert, " **\*264**  No Evidence" & "Insufficient Evidence" Points of Error, 38 TEX. L.REV. 361, 362–63 (1960)). The fact finder is the sole judge of the credibility of the witnesses and the weight to give their testimony. *See id.* at 819.

When reviewing factual insufficiency complaints, this Court considers, weighs, and examines all evidence which supports or undermines the finding. *Golden Eagle Archery v. Jackson,* 116 S.W.3d 757, 761 (Tex.2003). The finding is set aside only if the evidence standing alone is too weak to support the finding or the finding is so against the overwhelming weight of the evidence as to be manifestly unjust and clearly wrong. *Id.*

 **[12]**  Jonathan Fink, GSI's corporate representative, testified that EC and GSI knew cannibalization was a concern to PEI, but only to the extent EC and GSI were "limited to selling 150,000 copies." He did not know there were concerns in December 1996 or that in 1997 Hefner was adamantly opposed to the activity in which PEI, EC, and GSI were involved. Fink testified that they were not told that Hefner did not want a second-language edition for fear it would cannibalize the U.S. *Playboy.* O'Donnell did not tell Fink of the substance of Hefner's February memos; he did not tell him that if there was any cannibalization it would kill the deal. Fink testified that before the expected Cinco de Mayo launch, Playboy's representatives were very upbeat and excited about the launch and were helpful in every way. Fink testified that, even with limited distribution in September, October, and November 1997, they were still being told "everyone, be calm, let's work together, we'll work this out, it's not a problem, we'll go forward, we'll do more in the future."

As set out above, the evidence, including the evidence supporting a conclusion of duty to disclose, reveals that PEI only generally informed EC and GSI of Hefner's concerns. While representing that cannibalism was an issue, the evidence establishes that PEI did not disclose to EC and GSI that Hefner was adamant about not allowing cannibalization of the U.S. edition and that he had instructed PEI executives not to publish the Spanish language edition of *Playboy* (Mexican or other) unless the Spanish language edition was owned one hundred percent by PEI and the Spanish language edition was an exact translation of the U.S. *Playboy.* The evidence provides more than a scintilla of evidence to establish that EC and GSI were ignorant of the undisclosed facts. *See City of Keller,* 168 S.W.3d at 810. Thus, reviewing the evidence in the light most favorable to the verdict and disregarding all contrary evidence that a reasonable jury could have disbelieved, we conclude the evidence is legally sufficient to support the jury's fraud finding. *See id.* at 807.

Moreover, considering, weighing, and examining all evidence which supports or undermines the finding, we conclude the evidence standing alone is not too weak to support the finding or the finding is not so against the overwhelming weight of the evidence as to be manifestly unjust and clearly wrong. *See Golden Eagle Archery,* 116 S.W.3d at 761. Thus, we conclude that there is factually sufficient evidence to support this element of fraudulent concealment.

Having concluded that PEI had a duty to disclose and that the evidence supports the jury's finding, EC and GSI can recover for fraud on this basis. PEI's second issue is overruled.

### III. Tortious Interference with Existing Contractual Relationships

 **[13]**    **[14]**    In issue three, PEI argues that there is no evidence that it interfered **\*265** with any contracts between EC and GSI and third parties. We agree. "A tortious interference cause of action is established if the plaintiff proves: (1) the existence of a contract subject to interference; (2) a willful and intentional act of interference; (3) the act was a proximate cause of the plaintiff's damages; and (4) actual damage or loss resulted." *Friendswood Dev. Co. v. McDade + Co.,* 926 S.W.2d 280, 282 (Tex.1996). In this case, we find no evidence, and EC and GSI refer us to none, that supports a finding that PEI interfered with contracts between EC and GSI and third parties. Although EC and GSI assert

that PEI's alleged approval of the distribution numbers in the media kit "interfered with [their] business relations with investors, advertiser, and others," they do not identify any such contracts, and we find no record of such contracts being presented at trial.

EC and GSI also assert that there is evidence to support this finding because PEI allegedly interfered with the contracts between EC and GSI. They rely on Sanchez's testimony that PEI's Henry Marks encouraged Sanchez and EC to end the relationship with GSI. Regardless of whether such testimony could otherwise constitute evidence of interference, Sanchez refused to end the relationship. Thus, no breach was induced and no damages caused.

There is no evidence offered in this case to prove that PEI interfered with any contracts between EC and GSI and third parties, or between EC and GSI. Thus, the evidence is legally insufficient to support the jury's finding of tortious interference. *See City of Keller,* 168 S.W.3d at 810. We sustain PEI's third issue.

### IV. Fiduciary Duty

By its fourth issue, PEI contends that EC and GSI cannot recover for breach of fiduciary duty based on a joint enterprise or on a relationship of trust and confidence. The License Agreement expressly provided that the only relationship between PEI and EC was that of licensor-licensee; no other relationship was created by the License Agreement. *Cf. Esquivel v. Murray Guard, Inc.,* 992 S.W.2d 536, 541 (Tex.App.-Houston [14th Dist.] 1999, pet. denied) (holding that the express terms of the contract precluded a finding of joint enterprise). Therefore, in this case, a joint enterprise or a confidential relationship must have been established outside of the License Agreement.

### A. Joint Enterprise

 **[15]**    **[16]**    The jury found that PEI engaged in a joint enterprise with EC, GSI, or both. The charge instructed the jury as follows:

> A joint enterprise exists if the persons concerned have: (1) an agreement, express or implied, among the members of the group; (2) a

common purpose to be carried out by the group; (3) a community of pecuniary interest in that purpose, among the members; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control.

There is no evidence, however, establishing that an agreement, express or implied, existed outside the License Agreement. Moreover, even assuming the License Agreement provided the basis for EC's and GSI's position, a joint enterprise cannot exist as a matter of law between a licensee who has a pecuniary interest in profits and a licensor who has a pecuniary interest only in royalties since the necessary community of pecuniary interest in a common purpose is lacking. *See St. Joseph Hosp. v. Wolff,* 94 S.W.3d 513, 527–28 (Tex.2002) ("Although the [franchisors] stand to benefit financially from the successful **\*266** downstream marketing of their goods or services, their interests in those activities are not held in 'community' with the [franchisees] because they are not shared 'without special or distinguishing characteristics.' "). [8] Here, PEI's compensation under the License Agreement was solely in the form of royalties, precluding any finding of joint enterprise. Thus, we conclude the evidence is legally and factually insufficient to establish a joint enterprise imposing a fiduciary duty on PEI.

### B. Relationship of Trust and Confidence

 [17]    [18]    The jury also found that a relationship of trust and confidence existed between PEI and EC or GSI or both. The jury was instructed as follows:

> A relationship of trust and confidence existed if [EC or GSI] justifiably placed trust and confidence in [PEI] to act in the best interests of [EC or GSI]. [EC's or GSI's] subjective trust and feelings alone do not justify transforming arm's-length dealings into a relationship of trust and confidence.

There is, however, no evidence of such a relationship. Sanchez testified that he "trusted" PEI and that their business dealings were always conducted "in the most friendly manner." Fink similarly testified that he trusted PEI and that "everyone was great friends." But subjective trust does not

transform arms-length dealings into a fiduciary relationship. *Schlumberger,* 959 S.W.2d at 177; *see Garrison Contractors, Inc. v. Liberty Mut. Ins. Co.,* 927 S.W.2d 296, 301 (Tex.App.-El Paso 1996), *aff'd,* 966 S.W.2d 482 (Tex.1998) (providing that allegations that the defendant had promised to "take care of," "look out for," and was "working for" the plaintiff were insufficient as a matter of law to establish a relationship of trust and confidence). The testimony in this case establishes that the parties had, at most, a friendly working relationship. The License Agreement did not create a relationship of trust and confidence, and there were no other circumstances creating any such special relationship between PEI and EC and/or GSI. *See Trans. Ins. Co. v. Faircloth,* 898 S.W.2d 269, 280 (Tex.1995) ("A fiduciary or confidential relationship may arise from circumstances of the particular case, but it must exist prior to, and apart from, the agreement made the basis of the suit."). Although Sanchez had an ongoing business relationship with PEI, this, also, is insufficient as a matter of law. *See Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.,* 823 S.W.2d 591, 595 (Tex.1992) ( "Neither is the fact that the relationship has been a cordial one, of long duration, evidence of a confidential relationship."). Accordingly, we conclude the evidence is legally and factually insufficient to establish that a relationship of trust and confidence existed between PEI and EC or GSI or both.

### C. Partnership

 [19]    [20]    [21]    EC and GSI also argue that they pleaded that they were in a partnership with PEI, that PEI did not file a verified denial, and that under Texas Rule of Civil Procedure 93(5) a partnership was created by default; thus, it created a fiduciary relationship. *See* TEX.R. CIV. P. 93(5). However, rule 93 does not apply here. From pleadings filed by EC and **\*267** GSI, it is clear they are asserting a special relationship of trust or confidence or a joint enterprise, not a true partnership, even though the language in the pleading asserts that they were in a "joint venture, joint enterprise, or partnership" with PEI. A partnership requires an agreement to share profits. *Schlumberger,* 959 S.W.2d at 176. However, their pleadings acknowledge that PEI was to receive "royalties arising from the business activities of Editorial and Grupo Siete," not profits. The License Agreement referenced in the pleadings also makes clear that PEI was entitled to royalties, not profits. Moreover, EC and GSI requested jury questions on special relationship and joint enterprise, not partnership. Where the pleadings as a whole reflect that a party—while using the term "partnership"—

is in fact asserting a different relationship not covered by the rule, that rule does not apply. *See Zarsky Lumber Co. v. Guiberteau,* 270 S.W.2d 630, 632 (Tex.Civ.App.-San Antonio 1954, writ ref'd n.r.e.) ("[I]n view of all the facts plead[ed] herein, [the allegation] is one of joint adventure and not of partnership, and allegations of joint adventure do not have to be denied under oath."); *see also Cantu v. Holiday Inns, Inc.,* 910 S.W.2d 113, 116–17 (Tex.App.-Corpus Christi 1995, writ denied) (providing that pursuant to the "of record" exception in rule 93, a matter established by evidence in the trial court record appears "of record," so no verified denial is needed). Because joint enterprise and special trust relationships are not covered by rule 93, this rule does not apply, and the argument fails.

Having determined that there is no evidence to establish that a joint enterprise or a relationship of trust and confidence existed between PEI and EC or GSI or both, we conclude EC and GSI cannot recover for breach of fiduciary duty based on such relationships. We sustain PEI's fourth issue.

## V. Wrongful Disparagement

 **[22]**    By its fifth issue, PEI contends that there is no evidence of wrongful disparagement. "The general elements of a claim for business disparagement are publication by the defendant of the disparaging words, falsity, malice, lack of privilege, and special damages." *Hurlbut v. Gulf Atl. Life Ins. Co.,* 749 S.W.2d 762, 766 (Tex.1987). The jury found for EC and GSI on this claim and awarded damages in the amount of $260,000 for lost profits in Mexico, $0 in the United States, and $0 in Latin America.

 **[23]**    To support this wrongful disparagement claim, EC and GSI rely on the information in the media kit prepared by GSI and allegedly approved by PEI. EC and GSI argue that, through the media kit, PEI published false statements to third parties; false statements that damaged their business. The media kit, however, contained only inflated circulation numbers for the United States, not Mexico circulation numbers. The media kit did not address business in Mexico, which is the only market for which the jury found lost profits. The media kit related only to distribution in the United States, and the jury found no lost U.S. profits. [9] Representations in the media kit cannot, therefore, support disparagement damages in the form of lost profits in Mexico. We conclude, therefore, that there is no evidence offered in this case to prove this vital fact, and the evidence is, thus, legally insufficient to

support the jury's finding of **\*268** wrongful disparagement. *See City of Keller,* 168 S.W.3d at 810. PEI's fifth issue is sustained.

## VI. Damages

The jury awarded EC and GSI $3,600,000 for out-of-pocket expenses, $500,000 for liabilities incurred, and $260,000 for lost profits in the Mexico market. The judgment ordered that EC and GSI should have and recover the sum of $4,360,000.

## A. Collective Damage Award

By its sixth issue, PEI first contends that the collective damages award is independently barred as a matter of law because the jury did not determine EC's damages and GSI's damages separately. [10] Construing this contention as a challenge to the jury charge, the standard of review is abuse of discretion which "occurs only when the trial court acts without reference to any guiding principle." *Tex. Dep't of Human Servs. v. E.B.,* 802 S.W.2d 647, 649 (Tex.1990).

## 1. Preservation of Issue

We first address the contention raised by EC and GSI that PEI did not preserve this issue for our review. "A party must make the trial court aware of the complaint, timely and plainly, and obtain a ruling." *In the Interest of B.L.D.,* 113 S.W.3d 340, 349 (Tex.2003) (citing *State Dep't of Highways & Pub. Transp. v. Payne,* 838 S.W.2d 235, 241 (Tex.1992)).

 **[24]**    At the charge conference, PEI objected "to those damage questions being submitted together. There is only one blank to put in total damages for both of those parties, and we would object to that as it should be separated out." The trial court overruled PEI's objection. PEI's complaint was that EC and GSI are separate parties and their damages should be determined separately. We conclude that, with its objection, PEI made the trial court aware of its complaint, timely and plainly, and obtained a ruling. *See id.* Thus, PEI preserved error for our review.

## 2. Separate or Collective Damages

[25]    To support its position that separate, not collective damages, if any, should have been awarded, PEI relies on *Minn. Mining and Mfg. Co. v. Nishika Ltd.,* 953 S.W.2d 733, 738–39 (Tex.1997), and *Mullen v. Roberts,* 423 S.W.2d 576, 578–79 (Tex.1968). However, *Nishika* and *Mullen* are distinguishable from the present case and do not support this contention.

In *Nishika,* the supreme court certified to the Minnesota Supreme Court the question of whether the *Nishika* plaintiffs could recover damages jointly as a single economic unit. *See Nishika,* 953 S.W.2d at 738. The Minnesota Supreme Court held that they could not under Minnesota law. *See id.* That court, however, left **\*269** open for the Texas courts the procedural question of whether altering the damages award or a new trial was appropriate. *See id.* Therefore, the issue in *Nishika* was not whether the plaintiffs could recover damages jointly but whether the court should render or remand the case for a determination of proper damages. See *id. Nishika* provides no support for PEI in this instance.

In *Mullen,* the Texas Supreme Court concluded "the judgment should not be for an aggregate sum but should segregate and award to each the damages or relief to which he is properly entitled." Using the *Mullen* court's analysis, however, we reach a different result in this case. *See Mullen,* 423 S.W.2d at 579. The joint damage award and judgment in favor of EC and GSI conform with the pleadings, thus distinguishing our facts from those in *Mullen* where the judgement did not conform with the pleadings. *Cf. id.* The cross-claim and third party petition filed by EC and GSI specifically set out that "it is brought by [EC] and [GSI], jointly, against [PEI] based upon [PEI's] unjustified, improper, illegal, intentional, fraudulent, and negligent conduct, causing huge financial losses and potential economic ruin to [EC] and [GSI]." No claim or cause of action was asserted severally. Neither EC nor GSI claimed damages in separate sums on the alleged causes of action. *Cf. id.* at 578. Additionally, Texas Rule of Civil Procedure 40 authorizes the joinder in one action of multiple plaintiffs asserting any right to relief jointly. *See* TEX.R. CIV. P. 40; *see also Mullen,* 423 S.W.2d at 578.

Accordingly, acting with reference to the above guiding principles, we cannot conclude the trial court abused its discretion in not charging the damages separately. *See E.B.,* 802 S.W.2d at 649.

## B. Out–of–Pocket Damages

[26]    PEI next contends there is no legally or factually sufficient evidence to support the jury's award of $3,600,000 for out-of-pocket expenses, described in the jury questions as "[t]he amount of money spent by [EC and GSI] in reliance on the promises made by [PEI]." PEI complains that while the jury awarded $3,600,000 to EC and GSI as out-of-pocket expenses, their economic expert, Gilberto de los Santos, testified that EC and GSI incurred out-of-pocket expenses in the aggregate amount of $2,703,971. Thus, PEI argues that this is no evidence to support the jury's higher verdict award of $3,600,000. It further asserts that the evidence to support even the $2,703,971 amount, including de los Santos's testimony and that offered by Fink, is legally and factually insufficient evidence because it is conclusory and based on flawed methodology and unreliable data, or refers to Group Seven's out-of-pocket expenses,[11] perhaps not even related to the *Playboy* project, not GSI's expenses. PEI also contends Fink's testimony cannot constitute evidence of out-of-pocket damages because he testified only about the amount allegedly invested by GSI, without regard to offsetting revenues that were generated.

However, EC and GSI did provide some evidence of out-of-pocket expenses through their expert who testified as to "publishing rights" expense, GSI's expenses and investments in the project, EC's out-of-pocket expenses, and profit and loss histories. He relied on financial statements provided to him by Fink,[12] conversations with Fink, and records entered into evidence. Fink **\*270** also testified that GSI brought in $4,000,000 in financing[13] and did not count on having to "use it all up just to stay in business to put out a Playboy magazine without enough copies to make any money." Without referring to supporting documentation, Fink testified that money was spent on launch parties, upgrading facilities, flying people back and forth, building a staff, and other business activities. He also testified that the company invested at least $2,500,000 in the business venture.

Based on the above, we conclude that there is legally sufficient evidence that EC and GSI suffered some out-of-pocket damages as a result of PEI's fraud, although there is no probative evidence supporting the entire amount of out-of-pocket damages awarded. *See City of Keller,* 168 S.W.3d at 810.

### C. Liabilities Incurred

In addition to the $3,600,000 awarded for out-of-pocket expenses, the jury awarded damages for liabilities incurred by EC or GSI in reliance on PEI's promises. PEI contends that the $500,000 award for liabilities incurred is duplicative of the out-of-pocket expenses award because it is included in the $3,600,000 award. Alternatively, PEI urges that the evidence is legally and factually insufficient to support this award for liabilities incurred.

[27]  De los Santos recognized that "out-of-pocket expenses" necessarily included amounts borrowed from third parties and then spent on the PEI project. Therefore, to the extent "liabilities incurred" included moneys borrowed from third parties and spent on the PEI project in this case, such award constitutes a double recovery and should be disregarded. *See Waite Hill Servs. v. World Class Metal Works,* 959 S.W.2d 182, 184–85 (Tex.1998) (per curiam). However, the evidence also shows that Paramo, GSI's editor-in-chief, was owed $111,000, a salary amount set out in a contract for his services. The $111,000 was not money borrowed and then spent on the PEI project. It was a liability incurred; a liability supported by the evidence. We conclude this amount would not constitute a double recovery. Moreover, PEI notes that the records provided by EC and GSI establish that, at most, $125,000 went to GSI (of which only $89,000 was invested in EC). Thus, we conclude there is legally sufficient evidence that EC and GSI suffered some damages for liabilities incurred as a result of PEI's fraud, although there is no probative evidence supporting the entire amount awarded for liabilities incurred. *See City of Keller,* 168 S.W.3d at 810.

### D. Lost Profits

#### 1. Direct Damages

[28]  PEI asserts that because lost profits and out-of-pocket expenses are remedies constituting alternative measures of damages, the jury's award of $260,000 for lost profits in the Mexico market cannot stand. The two alternative measures of damages are benefit-of-the-bargain (lost profits) and out-of-pocket measures. *See Fortune Prod. Co. v. Conoco, Inc.,* 52 S.W.3d 671, 681 (Tex.2000) (citing, *e.g., Formosa Plastics Corp. USA v. Presidio Eng'rs and Contractors, Inc.,* 960

S.W.2d 41, 49 (Tex.1998)). "Benefit-of-the-bargain damages are the difference between the value as represented and the value received." *Id.* "Out-of-pocket damages compensate a defrauded party for the difference between the value of that with which he or she has parted and the value actually received." *Id.* We have already concluded that there is legally sufficient **\*271** evidence to support an award for out-of-pocket expenses in this case. Therefore, to the extent the jury's award is for lost profits in the Mexico market, this award is an alternative measure of damages. [14]

#### 2. Consequential Damages

[29]  [30]  "When properly pleaded and proved, consequential damages that are foreseeable and directly traceable to the fraud and result from it might be recoverable." *Formosa Plastics,* 960 S.W.2d at 49 (citing *Arthur Andersen & Co. v. Perry Equip. Corp.,* 945 S.W.2d 812, 817 (Tex.1997)). "It is possible that, in the proper case, consequential damages could include foreseeable profits from other business opportunities lost as a result of the fraudulent misrepresentation." *Id.*

[31]  In their petition, EC and GSI sought "recovery against [PEI] for all damages they have sustained by their fraud and other wrongful conduct, that is their substantial business losses, lost profits, loss of credibility and profits in other ventures, and other related damages." EC and GSI prayed for actual damages, any and all out-of-pocket losses or expenditures, and any and all lost profits/lost business opportunity damages, both with respect to the publication at issue and with respect to other business ventures and relationships. Construing the pleadings liberally, we conclude consequential damages in the form of foreseeable profits from other business opportunities lost as a result of the fraudulent misrepresentation were properly pled. *See id.* Thus, this element of damages based on the fraud claim may have been recoverable in this case. PEI does not challenge the sufficiency of the evidence to support an award of consequential damages for lost profits, if any. Therefore, that issue is not before us.

### E. Disposition Regarding Damages

[32]  While there is no probative evidence supporting the entire amount of damages awarded by the judgment, there is legally sufficient evidence that EC and GSI suffered

some damages as a result of PEI's fraud. Because PEI contested the **\*272** issue of damages, we cannot render judgment for a lesser dollar amount. *See Formosa Plastics, 960 S.W.2d at 49.* Instead, we sustain issue six, reverse the trial court's judgment regarding the fraud claim, and remand for a new trial on liability and damages related to this claim. *See Fortune, 52 S.W.3d at 682 (Tex.2000)* (holding that where there is evidence of some fraud damages, but there is no evidence to support the full amount of damages found by the jury, remand for a new trial is the appropriate remedy); *Formosa Plastics, 960 S.W.2d at 51* (holding that appellate court can remand for new trial when no evidence supports damages awarded but there is evidence of some damages); *Texarkana Mem'l Hosp. v. Murdock, 946 S.W.2d 836, 841 (Tex.1997)* (holding because plaintiffs presented legally sufficient evidence that some of the damages resulted from the complained of conduct, they should be afforded an opportunity to develop this evidence further); *Rente Co. v. Truckers Express, Inc., 116 S.W.3d 326, 335 (Tex.App.-Houston [14th Dist.] 2003, no pet.)* (finding evidence legally insufficient to support award, but sufficient to show plaintiff suffered some damage, court reversed and remanded for a new trial on liability and damages); *but see Springs Window Fashions Division, Inc., v. The Blind Maker, Inc., 184 S.W.3d 840, 889 (Tex.App.-Austin 2006, pet. filed)* (holding legally and factually insufficient evidence to support award, but sufficient evidence to support some of the award and suggesting a remittitur *sua sponte* ). *See also* TEX.R.APP. P. 44.1(b) (appellate court may not order separate trial solely on unliquidated damages if liability is contested); *Johnston v. McKinney Am., Inc., 9 S.W.3d 271, 284 (Tex.App.-Houston [14th Dist.] 1999, pet. denied)* (stating appellate courts cannot remand as to damages only).

We decline to suggest a remittitur as urged, in the alternative, by PEI. Remittitur is not appropriate because we are remanding for a new trial on liability and damages regarding the fraud claim. *See* TEX.R.APP. P. 44.1(b); *see also Rente, 116 S.W.3d at 335.* Moreover, in the context of this case, we conclude that the interests of justice require a remand for another trial on the fraud claim and damages related to that claim. *See* TEX.R.APP. P. 43.3(b) (providing that appellate court may remand for another trial when interests of justice require); *Johnston, 9 S.W.3d at 284* (same).

## VII. Pre- and Post–Judgment Interest

**[33]** By its eleventh issue, PEI contends it is entitled to new judgment interest rates if any part of the judgment is affirmed. PEI argues that amended section 304.003 of the Texas Finance Code which lowers the post-judgment interest floor to five percent should apply to the judgment in this case. *See* TEX. FIN.CODE ANN. § 304.003(c) (Vernon Supp.2005) (providing for post-judgment interest rate of five percent a year if prime is less than five percent).

House Bill 4 and House Bill 2415, the bills that amended section 304.003, [15] set out that the revisions apply to a case in which "a final judgment is signed or is subject to appeal on or after the effective date" of the acts. *Bic Pen Corp. v. Carter, 171 S.W.3d 657, 677 (Tex.App.-Corpus Christi 2005, pet. filed)* (quoting Act of June 2, 2003, 78th Leg., R.S., H.B. 4, **\*273** § 6.04 (H.B. 4); Act of June 2, 2003, 78th Leg., R.S., ch. 676, § 2(a) (H.B. 2415)). "The provisions therefore apply if the judgment in this case was signed on or after the effective date of either act, or if the judgment became subject to appeal, that is, capable of being appealed, on or after the effective date of the act." *See id. at 677–78* (citing *SunBridge Healthcare Corp. v. Penny, 160 S.W.3d 230, 255 (Tex.App.-Texarkana 2005, no pet.)*; *see also City of Dallas v. Redbird Dev. Corp., 143 S.W.3d 375, 388–89 (Tex.App.-Dallas 2004, no pet.)*; *Columbia Med. Ctr. of Las Colinas v. Bush, 122 S.W.3d 835, 865 (Tex.App.-Fort Worth 2003, pet. denied)*).

The effective date of September 1, 2003, for House Bill 4 is not in dispute, and we have recently determined that House Bill 2415 also became effective on that date. *See id. at 678–79.* The judgment in this case was signed and also became capable of being appealed on October 24, 2002. *See id. at 678.* That date controls the application of section 304.003(c) in this matter. *See* TEX. FIN.CODE ANN. § 304.003(c) (Vernon Supp.2005). Therefore, because the judgment was not signed on or after the effective date of the acts and because it did not become subject to appeal on or after the effective dates of the acts, neither House Bill 4 nor House Bill 2415 applies to the judgment in this case. PEI is not entitled to new judgment interest rates. We overrule the eleventh issue.

## VIII. Exhibit 248A

In its seventh issue, PEI complains that the trial court erred when it inadvertently failed to provide exhibit 248A to the jury during deliberations. The exhibit was a sixteen-page transcript of direct testimony provided by Siegel in a separate California lawsuit. [16] In that case, Siegel testified

that lack of funding from Admiral Capital Corporation, an investor in Group Seven, GSI's parent corporation, caused the failure of the PEI project. Because Siegel's testimony directly contradicted allegations in the present lawsuit that PEI caused the project to fail, PEI contends the trial court erred in failing to send the requested exhibit to the jury room.

The trial court, however, did not refuse to provide the exhibit to the jury as required by rule 281. *See* TEX.R. CIV. P. 281 (providing that "[t]he jury may, and on request shall, take with them in their retirement ... any written evidence"); *see also First Employees Ins. Co. v. Skinner,* 646 S.W.2d 170, 172 (Tex.1983) (holding rule 281 "is mandatory and ... the trial court is required to send all exhibits admitted into evidence to the jury room during the deliberations" even in the absence of a requests by jurors or counsel). The bill of exception signed by the trial court set out that when the first and second questions came out from the jury asking for Siegel's testimony, the trial court met in chambers with all attorneys regarding the exhibit. Assuming that the jurors had all exhibits and after identifying the exhibit that contained the requested information as number 248A, the trial court informed the jurors that the material they were seeking was contained in exhibit 248A, an exhibit which had been admitted into evidence. There is no indication in the record that, after receiving that information, the jurors informed the trial court that the exhibit was not found. Based on these facts, we cannot conclude that the action of the trial court was error.

 **\*274** **[34]**    Moreover, even assuming the trial court erred in inadvertently failing to send exhibit 248A to the jury room upon request, we conclude from an examination of the entire record that reversible error is not shown. *See* TEX.R.APP. P. 44.1(a). During the trial, both counsel for EC and counsel for PEI had an opportunity and did, in fact, read excerpts from exhibit 248A, Siegel's California trial testimony, into the record. The jury heard the excerpts read at the time the exhibit was introduced into evidence. EC's counsel read testimony concerning how, after entering into an agreement with Admiral for funding, its president wanted a change of terms and conditions. This was not acceptable to Siegel who then asked for a release from the agreement so that he could pursue other financing which was at that time "surely needed." PEI's counsel also read excerpts that provided information regarding the success of Group Seven through 1997 and statements that the success would have been much greater had Admiral funded as agreed. From the excerpt read by PEI's counsel, Siegel testified that, because of the exclusivity of the agreement with Admiral, he lost other

opportunities to raise capital. The following exchange was also read to the jury:

Q: As a result of the failure of Admiral to make the additional investment in Group Seven, how has Group Seven been damaged?

A: The Playboy license was terminated because of lack of funding.

Thus, the jury was aware of Siegel's statements regarding Admiral's involvement in the matter.

In addition, when called to testify in this case, Fink, GSI's corporate representative, was asked questions about the California lawsuit and Admiral's agreement with Group Seven to provide investment monies for a variety of projects. Fink testified that the purpose of raising money from Admiral was to provide extra funding for the company ... because it was "starting to run short of its cash, based on the projections of ... its time line [to launch the magazine] starting to get stretched out." In further questioning of Fink, PEI counsel also read the following:

> As set forth in the accompanying declaration of Bob Byer[, GSI's director, secretary and treasurer,] based on Admiral's conduct, Group Seven has lost the licenses held with Playboy.... Admiral failed to fully fund its 2.1 million equity obligation causing Group Seven damages in excess of those sought by Admiral. Group Seven is now involved in litigation with ... Playboy ... as set forth in the Siegel declaration. The lack of admiral funding has prevented the ... publishing and distributing the company's ... Spanish language Playboy through the [GSI] subsidiary to the Hispanic marketplace in the United States and throughout Central and South America. The lack of funding has deleteriously impacted Group Seven's relationship.

Based on the above, the exhibit at issue was cumulative of other evidence the jury considered. Therefore, even if the exhibit had been excluded from the jury's deliberations at trial, a new trial would not be ordered. *See Interstate*

*Northborough P'ship v. State,* 66 S.W.3d 213, 227 (Tex.2001) (holding error in the admission or exclusion of evidence is harmless if cumulative). The error was not such as would probably cause the rendition of an improper judgment or prevent PEI from presenting its case to this Court. *See* TEX.R.APP. P. 44.1(a). PEI's seventh issue is overruled.

### IX. Realignment of EC and GSI as Plaintiffs

 **[35]**  By its eighth issue, PEI contends the trial court improperly realigned EC **\*275** and GSI as plaintiffs for purposes of final argument because Gongora was the primary plaintiff and because PEI, EC, and GSI were all equally positioned as defendants/cross-plaintiffs. Texas Rules of Civil Procedure 266 and 269(a) provide for a party's right to open and close argument. *See* TEX.R. CIV. P. 266, 269(a). Rule 266 begins with the following words: "Except as provided in Rule 269 the plaintiff shall have the right to open and conclude both in adducing his evidence and in the argument." *Id.* at rule 266. Rule 269(a) sets out, in effect, that the party having the burden of proof of the whole case or on all matters which are submitted by the charge shall be entitled to open and conclude the argument. *Id.* at rule 269(a). It also provides "where there are several parties having separate claims or defenses, the court shall prescribe the order of argument between them." *Id.* In this case, as noted by PEI above, Gongora was the primary plaintiff and PEI, EC, and GSI were all equally positioned as defendants/cross-plaintiffs; thus, there were several parties with separate claims or defenses. The trial court shall prescribe the order of argument in such a case. *See id.* Thus, the trial court did not err in allowing EC and GSI to open and close final argument.

PEI also asserts this alleged error is particularly egregious because, when the case was earlier removed to federal court, EC and GSI strenuously argued that they should not be realigned as plaintiffs for purposes of federal removal jurisdiction. It claims the trial court should have held that EC and GSI were estopped and otherwise should have been precluded from arguing that they should be realigned as plaintiffs after the case was remanded to state court. *See Gen. Agents Ins. Co. v. Home Ins. Co.,* 21 S.W.3d 419, 427 (Tex.App.-San Antonio 2000, pet. dism'd) (judicial estoppel

"precludes a party from asserting a position in a legal proceeding inconsistent with a position taken by that party in the same or a prior litigation"). Interestingly, our review of the record reveals that PEI, itself, argued that EC and GSI should be realigned as plaintiffs in that same earlier proceeding in an effort to remove the case to federal court. Thus, using this analysis, PEI, too, should be estopped from taking its present position on this issue. Under the facts of this case, we cannot conclude this argument supports PEI's position. We overrule this eighth issue.

### X. Breach of Contract and Excuse [17]

By its first issue, PEI contends that EC and GSI cannot recover for breach of the License Agreement. PEI also contends, by its ninth issue, that EC and GSI, as EC's assignee under the License Agreement, are liable for breach of contract as a matter of law and that there is no evidence that EC's failure to comply with the License Agreement was excused. However, because of our disposition of the fraud issue and the interrelated nature of the breach of contract and fraud claims, we will not address these contentions at this time. *See* TEX.R.APP. P. 43.3(b) ("When reversing a trial court's judgment, the court must render the judgment that the trial court should have rendered, except when ... the interests of justice require a remand for another trial."); *id.* at rule 47.1 (setting out that a written opinion must be as brief as practicable addressing every **\*276** issue raised and necessary to final disposition of the appeal).

### XI. Conclusion

Accordingly, we reverse the trial court's judgment, in part, and render judgment that EC and GSI take nothing on their tortious interference, fiduciary duty, and wrongful disparagement claims. We reverse the judgment of the trial court, in part, and remand the parties' fraud claims to the trial court for a new trial. In the interest of justice, we also remand the parties' contract claims to the trial court for a new trial. *See id* at rule 43.3(b).

Footnotes

Eduardo Gongora, who is in the business of selling and soliciting advertisements for products in different forms of media, sued PEI, EC, and GSI for failing to publish a Spanish language edition of *Playboy* in Mexico and to distribute it in the United States. Gongora lost on all of his claims in the trial court and is not a party to this appeal.

The trial court set out in its judgment that the following jury findings should be disregarded as immaterial findings or incomplete submissions: (1) EC failed to comply with the License Agreement; (2) EC and/or GSI failed to comply with the Renegotiated Payment Plan; (3) EC committed fraud against PEI; (4) GSI committed fraud against PEI; and (5) EC and/or GSI failed to comply with the terms of the asset purchase agreement and other contracts executed between them.

The Spanish language version of the magazine is titled *Playboy Un Estilo De Vida.*

Javier Sanchez Campuzano (Sanchez), EC's president and principal, signed the License Agreement on behalf of EC. GSI was EC's assignee of the U.S. distribution rights to the Spanish language version of *Playboy.* Paul Siegel was GSI's principal. It is undisputed that GSI assumed EC's obligations under the License Agreement and expressly agreed to be bound by the License Agreement's terms and conditions.

"Cannibalization" is described, in this case, as hurting the U.S. sales of PEI's English-language version by distributing a Spanish language edition in the United States and as head to head competition with the U.S. *Playboy.*

While the Texas Supreme Court has not yet adopted section 551 of the second restatement of torts that is the basis for a general duty to disclose facts in a commercial setting, it has acknowledged that several courts of appeals have held a general duty to disclose information may arise in an arm's length business transaction when a party makes a partial disclosure that, although true, conveys a false impression. *See Bradford v. Vento,* 48 S.W.3d 749, 755–56 (Tex.2001) (citing RESTATEMENT (SECOND) OF TORTS S S S S S S § 551 (1977); *Hoggett v. Brown,* 971 S.W.2d 472, 487 (Tex.App.-Houston [14th Dist.] 1997, pet. denied); *Ralston Purina Co. v. McKendrick,* 850 S.W.2d 629, 633–36 (Tex.App.-San Antonio 1993, writ denied)); *see also SmithKline Beecham v. Jane Doe,* 903 S.W.2d 347, 352 (Tex.1995).

During October 1996, O'Donnell faxed the following internal memo to Siegel and Sanchez. Among other things, O'Donnell wrote,

Hef's direction was that while Spanish language might be an OK idea, there can be only one U.S. Playboy. All we could do was to create an exact high quality translation of USPB. As this would have been in our minds the absolute worst approach to take, (image, cannibalization and relevance), I decided to look at the side door with the front door now barred.

I set up a meeting between the President of Sports Time, Paul Siegel, and our Mexican Publisher, Javier Campuzano, whose license was up for renewal at the end of this year, and who, with the economic crisis in Mexico, was having cash flow and payment problems and was trying to sell assets to raise money.

The basic purpose was to explore the concept of using cash that Sports Time could raise to invest in (1) upgrading the quality of the core Mexican Edition and support its recovery parallel with economic stabilization (2) creation of local market tailored versions of the edition for export to other Spanish speaking markets of South/Central America, (not large or yet strong enough for their own editions), and (3) do a U.S. Hispanic targeted version as soon as we could develop an acceptable positioning and pass the quality test.

EC and GSI argue that this case is distinguishable from *St. Joseph Hosp. v. Wolff,* 94 S.W.3d 513, 527–28 (Tex.2002), because PEI retained rights to approve the quality of the Spanish Language edition. Such approval rights, however, do not distinguish *Wolff. See id.* at 528 (explaining that "both parties to an agreement may have 'a common business interest,' 'a common pecuniary interest,' or both, despite lacking a community of pecuniary interest in the purpose").

EC and GSI do not complain on appeal of the failure of the jury to award any money for lost profits in the United States market.

"FOR GSI" was written beside the $500,000 liabilities award and "FOR EDITORIAL" beside the $260,000 lost profits award. However, "[a] jury's marginal notations generally may not be considered on appeal." *Wal–Mart Stores, Inc. v. Alexander,* 868 S.W.2d 322, 328 (Tex.1993); *see Thomas v. Oldham,* 895 S.W.2d 352, 359 (Tex.1995) (setting out that an appellate court "cannot consider the margin notations as separate damage awards for purposes of evidentiary review"); *First Nat'l Bank in Dallas v. Zimmerman,* 442 S.W.2d 674, 678 (Tex.1969) (providing that the jury's "handwritten notation was not the jury's verdict; it merely reflected the jury's mental processes in arriving at their verdict.... The jury's reasons for reaching a particular verdict are irrelevant, at least in the absence of some overt act of misconduct."). Therefore, as the parties do not argue differently, for purposes of our review, we will not consider the margin notations as separate damage awards.

Group Seven is GSI's parent company.

PEI also challenges the use of unaudited statements provided by Fink, statements PEI asserts had no bases in reality.

PEI asserts that Fink is referring not to GSI but to its parent company, Group Seven.

PEI asserts there is no evidence of lost profits in the Mexico market. PEI complains that the only lost profits testimony came from de los Santos, whose testimony PEI contends is "wholly speculative and out of touch with reality." In this case, however, the evidence includes a table showing EC's profits from 1989 until 1998. While net losses are shown in 1994 and from 1996 to 1998, net profits are shown from 1989 to 1993 and in 1995, with the greatest net profit of $2.5 million in 1990. De los Santos used information from

past development and existing conditions, economic indicators, and market and industry data to develop his opinions regarding lost profits. While the two-month baseline of actual production upon which he based his projected future revenues in Mexico is a relatively short period of time, it is a corresponding period of time upon which de los Santos could obtain data. Among other things, de los Santos utilized increases in monthly sales and increases in the target population of men, ages 20–59, to determine lost profits. From this data, lost profits may be ascertained with a reasonable degree of certainty and exactness.

It is unclear, however, how the jury determined lost profits in Mexico, apart from lost profits in the United States, Puerto Rico, Venezuela, and the Conosur Region. When de los Santos transformed his revenue projections into profit projections, he did not specifically calculate lost profits for Mexico. Rather, his projections referenced the aggregate lost profits for Mexico, the United States, Puerto Rico, Venezuela, and the Conosur Region. Although the evidence does not support the specific award of lost damages the jury made, we conclude there is legally sufficient evidence that EC and GSI suffered some damages for lost profits in Mexico that were incurred as a result of PEI's fraud. *See City of Keller v. Wilson,* 168 S.W.3d 802, 810 (Tex.2005).

15 "House Bills 4 and 2415 amended section 304.003(c) of the finance code, reducing the effective post-judgment interest rate from ten to five percent." *Bic Pen Corp. v. Carter,* 171 S.W.3d 657, 677 (Tex.App.-Corpus Christi 2005, pet. filed) (citing Act of June 2, 2003, 78th Leg., R.S., H.B. 4, § 6.04 (H.B. 4); Act of June 2, 2003, 78th Leg., R.S., ch. 676, § 2(a) (H.B. 2415)).

16 *See Admiral Capital Corp. v. Group Seven Communications, Inc., Paul Siegel, Robert Byer, and Jonathan Fink,* No. SACV 99–00198–DOC(EEx) (U.S. D. for the W. Div. C.D. of Cal., April 1, 1999).

17 Without additional briefing, PEI identifies in the "Issues Presented" section of its brief a tenth issue; that the evidence is legally and factually insufficient to support any of the jury's liability and damage findings challenged by PEI in its brief. We have already, however, discussed sufficiency issues that were adequately briefed. Therefore, we need not address PEI's tenth issue.

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

7 S.W.3d 109
Supreme Court of Texas.

Jerry J. QUICK, Kaira G. Quick, John M. Bryant,
Ruth E. Bryant, Joe Cox, Dolores Cox, Florence
Turck and Circle C Land Corp., Petitioners,
v.
CITY OF AUSTIN, Save Our Springs Legal
Defense Fund, Inc. and Al St. Louis, Respondents.

No. 96–1154.   |   Argued Nov. 3,
1997.   |   Decided May 8, 1998.   |
Opinion Granting Rehearing Sept. 30, 1999.

Owners of land within city's extraterritorial jurisdiction brought declaratory judgment action challenging water pollution control ordinance. The 22nd Judicial District Court, Hays County, John Forbis, J., entered judgment declaring ordinance to be null and void. City appealed. The Austin Court of Appeals reversed in part and modified in part, 930 S.W.2d 678. On writ of error, the Supreme Court, Abbott, J., held that: (1) review did not violate separation of powers doctrine; (2) ordinance was rationally related to city's interest in protecting water quality; (3) ordinance was not subject to statutory procedures for adopting zoning ordinances; (4) city was not required to obtain approval from the Natural Resource Conservation Commission before ordinance became effective; and (5) ordinance was proper subject of the initiative and referendum process under city charter. On rehearing, the Court further held (6) repealed statute locking in development regulations in existence at time of original permit application continued to apply to applications filed or approved before repeal.

Affirmed in part, reversed and modified in part.

Enoch, J., filed a concurring opinion on original submission.

Hankinson, J., filed dissenting opinion on rehearing, which Enoch, Baker, and O'Neill, JJ., joined.

West Headnotes (30)

**[1]** **Constitutional Law**
 Nature and scope in general

Legislative function cannot, under the separation of powers doctrine, be reviewed de novo by any other branch of government. Vernon's Ann.Texas Const. Art. 2, § 1.

Cases that cite this headnote

**[2]** **Constitutional Law**
 To Judiciary
**Environmental Law**
 Validity

Water Code provision that permitted persons located outside city limits, but affected by water pollution control ordinance, to bring suit challenging such ordinance as "invalid, arbitrary, unreasonable, inefficient, or ineffective," and permitted reviewing court to "overturn or modify" city's action, did not allow de novo review of legislative action, as would violate separation of powers doctrine. Vernon's Ann.Texas Const. Art. 2, § 1; V.T.C.A., Water Code § 26.177(d).

4 Cases that cite this headnote

**[3]** **Constitutional Law**
 Avoidance of constitutional questions

In analyzing the constitutionality of a statute, court should, if possible, interpret the statute in a manner that avoids constitutional infirmity.

10 Cases that cite this headnote

**[4]** **Statutes**
 Effect of Partial Invalidity;  Severability

If any provision of statute is held to be invalid, the invalidity does not affect other provisions that can properly be given effect in the absence of the invalid provisions.

5 Cases that cite this headnote

**[5]** **Constitutional Law**
 Policy
**Municipal Corporations**
 Conformity to constitutional and statutory provisions in general

Judiciary has no power to allow a jury to redecide the policy behind legislative issues by a preponderance of the evidence; instead, in reviewing an ordinance, the court is to consider all the circumstances and determine as a matter of law whether the legislation is invalidated by a relevant statute or constitutional provision. Vernon's Ann.Texas Const. Art. 2, § 1.

6 Cases that cite this headnote

**[6]    Administrative Law and Procedure**
        Scope of Review in General

Standard of review is more than just words; rather, it embodies principles regarding the amount of deference a reviewing tribunal accords the original tribunal's decision.

4 Cases that cite this headnote

**[7]    Administrative Law and Procedure**
        Trial De Novo

Key to determining whether statute authorizes a de novo review is the amount of deference the statute requires the reviewing tribunal to give to the original tribunal's decision.

27 Cases that cite this headnote

**[8]    Administrative Law and Procedure**
        Trial De Novo

When conducting a de novo review, the reviewing tribunal exercises its own judgment and redetermines each issue of fact and law.

89 Cases that cite this headnote

**[9]    Administrative Law and Procedure**
        Trial De Novo

In conducting de novo review, the reviewing tribunal accords the original tribunal's decision absolutely no deference.

38 Cases that cite this headnote

**[10]   Municipal Corporations**
        Presumptions and burden of proof

Party attacking municipal ordinance bears the extraordinary burden to establish that no conclusive or even controversial or issuable fact or condition existed that would authorize the passage of the ordinance.

3 Cases that cite this headnote

**[11]   Municipal Corporations**
        Public safety and welfare

Court reviewing municipal ordinance considers all the circumstances and determines, as a substantive matter, if reasonable minds could differ as to whether the ordinance has a substantial relationship to the protection of the general health, safety, or welfare of the public; if the evidence reveals a fact issue in this respect, the ordinance must be upheld.

6 Cases that cite this headnote

**[12]   Environmental Law**
        Validity

Water pollution control ordinance that restricted new development in watershed area, including areas within city's extraterritorial jurisdiction, was rationally related to city's governmental interest in protecting water quality, and was not invalid, arbitrary, unreasonable, inefficient, or ineffective, even insofar as it established strict runoff standards, provided only limited opportunity for variance, and severely affected some property values. V.T.C.A., Water Code § 26.177(d).

3 Cases that cite this headnote

**[13]   Eminent Domain**
        What Constitutes a Taking; Police and Other Powers Distinguished

Governmental regulation can restrict, or even take, property for public benefit, but if the regulation of property rights goes too far, compensation must be provided.

Cases that cite this headnote

**[14]   Environmental Law**

🔑 Effluent Limitations and Guidelines

Statutory procedures for adopting municipal rules governing plats and subdivisions of land, which required public hearing, did not apply to adoption of municipal water pollution control ordinance. V.T.C.A., Local Government Code §§ 212.002, 212.003.

2 Cases that cite this headnote

**[15]** **Zoning and Planning**
🔑 Procedural Requirements

Municipal water pollution control ordinance was not in effect a zoning ordinance that would be subject to statutory procedures for adopting municipal rules governing plats and subdivisions of land, though ordinance included impervious cover limitations that clearly had effect on land use. V.T.C.A., Local Government Code §§ 212.002, 212.003.

2 Cases that cite this headnote

**[16]** **Municipal Corporations**
🔑 Local legislation

Home rule city was not required to obtain approval from the Natural Resource Conservation Commission before its water control ordinance became effective; Water Code provision requiring that water pollution or abatement program be submitted to the Commission for "review and approval" did not, with unmistakable clarity, limit effectiveness of home rule city's program pending appeal. Vernon's Ann.Texas Const. Art. 11, § 5; V.T.C.A., Water Code § 26.177(a, c).

1 Cases that cite this headnote

**[17]** **Municipal Corporations**
🔑 Local legislation

Home-rule city is not dependent on the Legislature for a grant of authority; rather, the Legislature may provide limits on the power of home-rule cities, but only if the limitation appears with unmistakable clarity. Vernon's Ann.Texas Const. Art. 11, § 5.

7 Cases that cite this headnote

**[18]** **Municipal Corporations**
🔑 Matters subject to initiative

Water pollution control ordinance was proper subject of the initiative and referendum process under city charter, and was not impliedly withdrawn by charter provision requiring comprehensive plan to regulate development and planning commission to review development proposals.

2 Cases that cite this headnote

**[19]** **Municipal Corporations**
🔑 Initiative

City charter provisions are to be liberally construed in favor of the power of initiative and referendum.

3 Cases that cite this headnote

**[20]** **Municipal Corporations**
🔑 Initiative

While the initiative power may be either expressly or impliedly limited by the city charter, such a limitation will not be implied unless the provisions of the charter are clear and compelling.

2 Cases that cite this headnote

**[21]** **Appeal and Error**
🔑 Intervention

Any error in failing to grant citizens group's plea in intervention was harmless, in suit challenging city's water pollution control ordinance, where group sought to intervene because it believed city could not adequately protect its interest, but city prevailed on appeal in upholding ordinance against all the challenges. Rules App.Proc., Rule 61.1.

1 Cases that cite this headnote

**[22]** **Statutes**

&#128273; Repealing Statutes

Generally, when a statute is repealed without a savings clause limiting the effect of the repeal, the repeal of that statute is usually given immediate effect.

3 Cases that cite this headnote

**[23]  Statutes**
&#128273; Repealing Statutes

When a right or remedy is dependent on a statute, the unqualified repeal of that statute operates to deprive the party of all such rights that have not become vested or reduced to final judgment.

7 Cases that cite this headnote

**[24]  Appeal and Error**
&#128273; Effect of change in law
**Statutes**
&#128273; Pending Actions and Proceedings

Ordinarily all suits filed in reliance on statute must cease when the repeal of statute becomes effective, and if final relief has not been granted before the repeal goes into effect, final relief cannot be granted thereafter, even if the cause is pending on appeal; repeal of the statute deprives the court of subject matter jurisdiction.

9 Cases that cite this headnote

**[25]  Statutes**
&#128273; Saving clauses

Existence of the specific savings clause in repeal of legislation does not preclude application of the general savings provision of the Code Construction Act to the repeal. V.T.C.A., Government Code § 311.031(a, b).

1 Cases that cite this headnote

**[26]  Statutes**
&#128273; Saving clauses

General savings clause of Code Construction Act is presumed to apply to repeal of legislation unless a contrary legislative intent is shown

by clear expression or necessary implication. V.T.C.A., Government Code § 311.031(a, b).

29 Cases that cite this headnote

**[27]  Zoning and Planning**
&#128273; Constitutional and Statutory Provisions

Repeal of statute locking in development regulations in existence at time of original permit application was subject to general savings clause of Code Construction Act, though repeal included specific savings clause, where repeal did not expressly make general savings clause inapplicable, and specific savings clause was not redundant of and did not conflict with general clause. V.T.C.A., Government Code § 311.031(a, b); V.T.C.A., Government Code § 481.143 (Repealed).

1 Cases that cite this headnote

**[28]  Zoning and Planning**
&#128273; Retroactive operation

Subsequent applications were covered by statute locking in development regulations in existence at time of original permit application even if original application was filed before effective date of statute. V.T.C.A., Government Code § 481.143 (Repealed).

2 Cases that cite this headnote

**[29]  Statutes**
&#128273; Property
**Zoning and Planning**
&#128273; Retroactive operation

Statute locking in development regulations in existence at time of original permit application was not improperly given retroactive effect to extent it was determined to apply even when original application was filed before effective date of statute, with result that subsequent applications, filed after effective date, were governed by regulations in effect before effective date. V.T.C.A., Government Code § 481.143 (Repealed).

4 Cases that cite this headnote

**[30]** **Zoning and Planning**
   👉 Constitutional and Statutory Provisions

By application of general savings clause of Code Construction Act, repealed statute locking in development regulations in existence at time of original permit application precluded application of current water pollution control ordinance, restricting new development in watershed area, to permit applications first filed or approved before repeal, but not those first filed after repeal. V.T.C.A., Government Code § 311.031(a, b).

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*112** Roy Q. Minton, John L. Foster, Bob E. Shannon, Joseph R. Knight, Robert I. Howell, Scott K. Field, Joe R. Greenhill, Austin, for Petitioners.

William G. Bunch, Thomas H. Watkins, Andrew F. Martin, Elizabeth G. Bloch, James K. McClendon, Frank C. Cooksey, Pamela Stanton Baron, Austin, Michael A. Hatchell, Tyler, Dick DeGuerin, Houston, Teresa L. Todd, Marfa, for Respondents.

**Opinion**

Justice ABBOTT delivered the opinion of the Court.

We are confronted with a challenge to the City of Austin's Save Our Springs Ordinance, a water pollution control measure enacted in 1992. Petitioners, who own land within the City of Austin's extraterritorial jurisdiction, brought this action contesting the Ordinance. Petitioners claim that the Ordinance is arbitrary, unreasonable, and inefficient. Petitioners also assert that the Ordinance is void because it was enacted without a public hearing, it impermissibly regulates the number, use, and size of buildings in the City's extraterritorial jurisdiction, and it has not been approved by the Texas Natural Resource Conservation Commission. The trial court rendered judgment in favor of Petitioners, holding that the Ordinance was null and void. The court of appeals reversed in part and modified in part, rendering judgment that the Ordinance was valid. 930 S.W.2d 678. Although we do not agree with all of the court of appeals' analysis, we affirm its judgment upholding the Ordinance's validity.

**I**

Frustrated by their perception that the Austin City Council was failing to safeguard Barton Springs adequately, a group of Austin citizens interested in protecting the environment initiated the Save Our Springs Ordinance and placed it on the Austin municipal ballot for a local referendum election. In August 1992, the Austin citizens participating in the referendum election overwhelmingly approved the Ordinance. Two days after the voters approved the Ordinance, the Austin City Council enacted the Ordinance and incorporated it into the City Code.

The purpose of the Ordinance, according to its Declaration of Intent, is to insure water quality control in Barton Creek, Barton Springs, and the Barton Springs Edwards Aquifer. [1] The provisions of the **\*113** Ordinance apply to those areas within Austin and Austin's extraterritorial jurisdiction that contain watersheds contributing to Barton Springs. The Ordinance limits impervious or non-porous cover on land in the regulated areas to between 15% and 25% of the net site area. The Ordinance also requires that new developments be set back from streams and not contribute to an increase in the amount of pollution constituents commonly found in urban rainfall runoff water. Construction in the "critical water quality zone" of the Barton Creek watershed is prohibited by the Ordinance. The Ordinance provides for no waivers or exceptions unless necessary to avoid conflict with state and federal laws.

Petitioners Jerry J. Quick, Kaira G. Quick, John M. Bryant, Ruth E. Bryant, Joe Cox, Dolores Cox, Florence Turck, and Circle C Land Corporation all own land outside the city limits of Austin but within its extraterritorial jurisdiction. Because their land is within Austin's extraterritorial jurisdiction, any development of their property must comply with the Ordinance. The Petitioners sued the City in Hays County, seeking a declaratory judgment that the Ordinance was void because it was illegally enacted. Additionally, Petitioners challenged the Ordinance under section 26.177(d) of the Texas Water Code, which authorizes a party aggrieved by a water pollution control ordinance to appeal to district court to review whether the ordinance is invalid, arbitrary, unreasonable, inefficient, or ineffective.

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Save Our Springs Alliance, Inc., an incorporated association of individuals led by the citizen initiators of the Ordinance, moved to intervene in the suit. The Alliance urged that the City was incapable of adequately advocating the Alliance's interest due to previous hostilities over the Ordinance. *See, e.g., City Council of Austin v. Save Our Springs Coalition, 828 S.W.2d 340 (Tex.App.—Austin 1992, no writ)*(citizens sued City to force election on the Ordinance). The trial court, however, struck the plea in intervention, leaving the City to defend the Ordinance.

The Petitioners and the City proceeded to try the case to a jury. The jury answered "yes" to all the questions in the charge inquiring whether the Ordinance and its impervious cover limitations, its prohibition against increases in pollution constituents, and its failure to contain variances were an unreasonable, arbitrary, and inefficient attempt to control water quality. The jury also found that the Ordinance was not a proper subject for the initiative and referendum process and that the Ordinance regulated the number, use, and size of buildings in the City's extraterritorial jurisdiction (a violation of section 212.003 of the Texas Local Government Code).

Based on the jury's answers, the trial court rendered judgment for the Petitioners declaring the Ordinance null and void. The trial court's final judgment also contained conclusions of law, including that the Ordinance was ineffective because the Texas Natural Resource Conservation Commission had not approved it and that the Ordinance was void because it was enacted without a public hearing in violation of section 212.002 of the Local Government Code. The trial court further decreed that any permit required by Petitioner Circle C Land Corporation to develop its property would be subject only to the law in effect when the original application for preliminary subdivision approval was filed, which, in some cases, pre-dated the enactment of the Ordinance.

The court of appeals reversed and rendered in part and modified in part the trial court's judgment. 930 S.W.2d 678. The appellate court first determined that the trial court did not abuse its discretion in striking the Alliance's plea in intervention. 930 S.W.2d at 683. The court of appeals then concluded that the trial court erred in rendering judgment that the Ordinance **\*114** was unreasonable, arbitrary, and inefficient pursuant to section 26.177(d) of the Texas Water Code because section 26.177(d) was unconstitutional under article II, section 1 of the Texas Constitution, the separation of powers provision. *Id.* at 685. The court of appeals further held that the Ordinance was not illegally enacted because (1)

it did not require approval by the Texas Natural Resource Conservation Commission before it could become effective, (2) it was not subject to sections 212.002 and 212 .003 of the Local Government Code, and (3) it was a proper subject of the initiative and referendum process. *Id.* at 686–91. The appellate court accordingly reversed the trial court's judgment in part and rendered judgment that the Ordinance was a valid legislative act. The court of appeals also modified the trial court's judgment in part, holding that any permit required by Circle C would be considered only under the regulations and ordinances in effect when the original application for preliminary subdivision approval was filed, *as long as the permit application was filed after September 1, 1987. Id.* at 693–94.

Petitioners challenged the court of appeals' judgment by filing an application for writ of error with this Court. Petitioners allege that the court of appeals erred by holding (1) that section 26.177(d) of the Water Code is unconstitutional as a violation of separation of powers, (2) that the Ordinance is not subject to sections 212.002 and 212.003 of the Local Government Code, (3) that the Ordinance is effective without the City first obtaining the Texas Natural Resource Conservation Commission's approval, (4) that the Ordinance was a proper subject of the initiative and referendum process, and (5) that only Circle C's permit applications filed after September 1, 1987 would be considered on the basis of the regulations and ordinances in effect at that time. The Alliance also filed its own application for writ of error, contending that the court of appeals erred in upholding the trial court's striking of its plea in intervention.

### II

We first consider the constitutionality of section 26.177(d) of the Texas Water Code. Section 26.177(d) provides in pertinent part:

> Any person affected by any ... ordinance ... relating to water pollution control and abatement outside the corporate limits of such city adopted pursuant to this section or any other statutory authorization may appeal such action to the [Texas Natural Resource Conservation Commission] or district court.... The issue on appeal is whether the action or program

is invalid, arbitrary, unreasonable, inefficient, or ineffective in its attempt to control water quality. The commission or district court may overturn or modify the action of the city.

TEX. WATER CODE § 26.177(d).

The trial court submitted several questions to the jury inquiring whether various provisions of the Ordinance were "unreasonable," "arbitrary," or "inefficient." Based on the jury's affirmative answers to these questions, the court then rendered judgment that the Ordinance was invalid under section 26.177(d).

The court of appeals, however, concluded that section 26.177(d) violates the separation of powers doctrine of the Texas Constitution because it requires a de novo review of a legislative act. The court of appeals reasoned that the trial court conducted a de novo review of the statute as evidenced by the court's charge asking the jury to determine, by a preponderance of the evidence, whether the jury thought the Ordinance was unreasonable, arbitrary, or inefficient. The court of appeals further ruled that section 26.177(d) authorized such an unconstitutional de novo review by permitting the reviewing court to "modify" a legislative act and to determine whether a legislative act was "inefficient" or "ineffective."

**A**

 **[1]**    A legislative function cannot, under the separation of powers doctrine, be reviewed **\*115** de novo [2] by any other branch of government. Article II, section 1 of the Texas Constitution divides the functions of government as follows:

[T]hree distinct departments, each of which shall be confided to a separate body of magistracy, to wit: Those which are Legislative to one; those which are Executive to another, and those which are Judicial to another; and no person, or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others.
TEX. CONST. art. II, § 1. Consistent with this division of power, we have recognized that, when the Legislature delegates a legislative function to a municipality or an administrative agency, a de novo review by the judiciary of the delegated function violates the Constitution. *Chemical Bank & Trust Co. v. Falkner,* 369 S.W.2d 427, 432–33 (Tex.1963); *Davis v. City of Lubbock,* 160 Tex. 38, 326 S.W.2d 699, 712–14 (1959); *Southern Canal Co. v. State Bd. of Water Eng'rs,* 159 Tex. 227, 318 S.W.2d 619, 621–22 (1958).

 **[2]**    The Petitioners concede that, if section 26.177(d) in fact confers the power on the courts to review a legislative function de novo, the statute is unconstitutional as a violation of the separation of powers provision of our state constitution. Petitioners also concede that the Ordinance represents the exercise of a legislative function the Legislature has delegated to the City. Accordingly, the only issue we must determine is whether section 26.177(d) necessitates a de novo review by the judiciary. If it does, it is unconstitutional; if it does not, it is constitutional.

 **[3]**    **[4]**    In analyzing the constitutionality of a statute, we should, if possible, interpret the statute in a manner that avoids constitutional infirmity. *Barshop v. Medina County Underground Water Conservation Dist.,* 925 S.W.2d 618, 629 (Tex.1996). Moreover, if any provision of the statute is held to be invalid, the invalidity does not affect other provisions that can properly be given effect in the absence of the invalid provisions. *Rose v. Doctors Hosp.,* 801 S.W.2d 841, 844 (Tex.1990); *see also* TEX. GOV'T CODE § 311.032(c).

The Petitioners argue that, under these standards, section 26.177(d) does not unconstitutionally authorize de novo review of a legislative act. The Petitioners maintain that the Legislature did not expressly mandate de novo review, but rather used neutral terms consistent with the constitutionally appropriate standard for judicial review of legislative acts. Petitioners observe that section 26.177(d) employs terms such as "unreasonable" and "arbitrary," which are consistent with the standard of review traditionally employed in reviewing city ordinances. *See City of Brookside Village v. Comeau,* 633 S.W.2d 790, 792 (Tex.), *cert. denied,* 459 U.S. 1087, 103 S.Ct. 570, 74 L.Ed.2d 932 (1982)(city ordinance is presumed valid unless the ordinance is unreasonable and arbitrary); *Hunt v. City of San Antonio,* 462 S.W.2d 536, 539 (Tex.1971)(same). Petitioners also rely on this Court's holding in *Edgewood Indep. Sch. Dist. v. Kirby,* 777 S.W.2d 391, 394 (Tex.1989), that legislative acts can be reviewed for "efficiency." Petitioners alternatively urge that, even assuming that certain words in the statute impermissibly

connote a de novo review, this Court should excise those words and uphold the remaining portions of the statute.

The City responds that section 26.177(d)'s effect is to require a court to reweigh the City's legislative decisions regarding the reasonableness, effectiveness, and efficiency of the Ordinance, which is an unconstitutional judicial review of public policy determinations. The intrusiveness of section 26.177(d) is demonstrated, according to the City, by the fact that the jury was asked to decide in this case, by a **\*116** preponderance of the evidence, whether the Ordinance was "inefficient," "unreasonable," or "arbitrary." Section 26.177(d) is not, the City continues, similar to a permitted review of whether a legislative act is unreasonable or arbitrary. Moreover, the City argues that *Edgewood,* 777 S.W.2d at 394, does not apply because our decision in that case was premised on a unique state constitutional provision, article VII, section 1, which charged the Legislature with the duty to provide for "an efficient system of public free schools." Because there is no constitutional mandate that a water quality ordinance be "efficient," the City avers that *Edgewood* does not mean that courts may routinely review the efficiency of legislation. Finally, the City asserts that severing any offending terms in section 26.177(d) would contravene legislative intent and would render the statute devoid of meaning.

 **[5]**     The City correctly argues that the trial court erred in submitting a question for the jury to determine, based on a preponderance of the evidence, whether the Ordinance was arbitrary, unreasonable, or inefficient. The judiciary has no power to allow a jury to redecide the policy behind legislative issues by a preponderance of the evidence. *See Southern Canal,* 318 S.W.2d at 623–24. Instead, in reviewing an ordinance, the court is to consider all the circumstances and determine as a matter of law whether the legislation is invalidated by a relevant statute or constitutional provision. *Cf. Comeau,* 633 S.W.2d at 793. Nevertheless, the fact that the trial court in this case impermissibly submitted these questions to the jury does not mandate that the *statute* is unconstitutional. The submitted jury questions, being questions of law, are immaterial and will not be considered. *Spencer v. Eagle Star Ins. Co.,* 876 S.W.2d 154, 157 (Tex.1994)(court may disregard as immaterial a jury's finding on a question of law). We will instead rely on the provisions of the statute itself to determine its constitutionality.

 **[6]     [7]**     The court of appeals focused on certain words in the statute, such as "inefficient," "ineffective," and "modify," as

the basis for its conclusion that the statute unconstitutionally authorizes a de novo review for legislative acts. However, a standard of review is more than just words; rather, it embodies principles regarding the amount of deference a reviewing tribunal accords the original tribunal's decision. The key to determining whether section 26.177(d) authorizes a de novo review is therefore the amount of deference the statute requires the reviewing tribunal to give to the original tribunal's decision.

 **[8]     [9]**     When conducting a de novo review, the reviewing tribunal exercises its own judgment and redetermines each issue of fact and law. *Key Western Life Ins. Co. v. State Bd. of Ins.,* 163 Tex. 11, 350 S.W.2d 839, 846 (1961); *Lone Star Gas Co. v. State,* 137 Tex. 279, 153 S.W.2d 681, 692 (1941); *Ysleta Ind. Sch. Dist. v. Meno,* 933 S.W.2d 748, 751 n. 5 (Tex.App.—Austin 1996, writ denied). In such a review, the reviewing tribunal accords the original tribunal's decision absolutely no deference. *See, e.g., State v. Heal,* 917 S.W.2d 6, 9 (Tex.1996); *Ysleta,* 933 S.W.2d at 751 n. 5. Accordingly, then, the controlling issue is whether section 26.177(d) requires that the Ordinance be given practically no deference by the reviewing court.

We hold that section 26.177(d) does not mandate such a result. In reaching this conclusion, we abide by the maxim that courts should, if possible, interpret statutes in a manner that avoids constitutional infirmities. *Barshop,* 925 S.W.2d at 629. We note that section 26.177(d) utilizes two words, "unreasonable" and "arbitrary," that this Court has repeatedly stated connote the proper deferential standard of reviewing a city ordinance. *Comeau,* 633 S.W.2d at 792 (city ordinance is presumed to be valid unless the ordinance is unreasonable and arbitrary); *Thompson v. City of Palestine,* 510 S.W.2d 579, 581–82 (Tex.1974)(describing extraordinary burden **\*117** on party attacking ordinance to show that reasonable minds could not differ on whether the ordinance has a substantial relationship to the general welfare and that the city acted arbitrarily); *Hunt,* 462 S.W.2d at 539 (city ordinance is presumed to be valid unless the ordinance is unreasonable and arbitrary).

In the context of the deferential standard predicated by the words "unreasonable" and "arbitrary," we cannot agree with the court of appeals that the inclusion of "inefficient" and "ineffective" somehow requires a transformation of the standard of review from the proper deferential standard to a standard in which the City's decision is afforded no deference. In fact, on prior occasions, albeit under

different circumstances, this Court has interpreted the word "efficient" in a more deferential manner than would have been required under a de novo review. *See, e.g., Edgewood,* 777 S.W.2d at 398–99 (utilizing the term "efficient" in article VII, section 1 of the Texas Constitution to provide a standard to measure the constitutionality of the Texas system for financing public education in Texas, but recognizing that the Legislature, rather than the courts, had "the primary responsibility to decide how best to achieve an efficient system"); *Central Educ. Agency of State of Texas v. Upshur County Com'rs Court,* 731 S.W.2d 559, 561 (Tex.1987)(holding that Commissioner of Education's responsibility to "promote efficiency and improvement" did not mean that Commissioner could conduct a de novo review of county commissioners' detachment and annexation decisions). We accordingly perceive no constitutional impediment to judicial review of an ordinance to determine whether it is "inefficient" or "ineffective" under the appropriate deferential standard of review.

 [10]     [11]     The principles that underlie this deferential standard of review for municipal legislation are summarized in our decision in *Comeau,* 633 S.W.2d at 792–93. The party attacking the ordinance bears the "extraordinary burden" to establish " 'that no conclusive or even controversial or issuable fact or condition existed' " that would authorize the passage of the ordinance. *Id.* (quoting *Thompson,* 510 S.W.2d at 581). We consider all the circumstances and determine, as a substantive matter, if reasonable minds could differ as to whether the ordinance has a substantial relationship to the protection of the general health, safety, or welfare of the public. *Id.* at 793. If the evidence reveals a fact issue in this respect, the ordinance must be upheld. *Id.* Accordingly, we hold that, under this deferential standard of review, the Texas Constitution is not violated by the judiciary considering, according to the mandates of section 26.177(d) of the Water Code, whether a water control ordinance is invalid, arbitrary, unreasonable, inefficient, or ineffective in its attempt to control water quality.

We further do not believe that the provision in section 26.177(d) allowing the reviewing court to "modify" the city's action connotes an impermissible de novo review. Courts ordinarily cannot strike down an entire ordinance as invalid based on the invalidity of only a part of the ordinance, unless all the provisions of the ordinance are so dependent or connected that it cannot be presumed that one provision would have been passed without the others. *Rose v. Doctors*

*Hosp.,* 801 S.W.2d 841, 844 (Tex.1990). If a reviewing court were to determine that one portion of a water control ordinance was invalid, the court would therefore be required to "modify" the ordinance to delete the invalid portion if the remainder of the ordinance was complete in itself and capable of being executed in accordance with the apparent legislative intent. *See id.* The Legislature's use of the word "modify" thus does not render section 26.177(d) unconstitutional. We disagree with the court of appeals' holding that section 26.177(d) violates the separation of powers doctrine and is unconstitutional. Rather, we will interpret and apply section 26.177(d) consistent with the deferential **\*118** standard of review this Court articulated in *Comeau.*

**B**

 [12]     Petitioners urge that the Ordinance's invalidity under the *Comeau* standard is manifest. Petitioners rely upon evidence in the record that, before the passage of the Ordinance, the City already had the most stringent water quality standards in Texas. Moreover, a city engineer and the head of Austin's Environmental Services admitted during trial that no discernible trend of pollution existed in Barton Springs prior to the Ordinance's enactment. Accordingly, Petitioners maintain that the Ordinance was unnecessary and based on flawed data.

Petitioners also complain that it is impossible to comply with the Ordinance. The Ordinance requires that a development not increase annual pollution loadings of thirteen identified constituents. Petitioners contend that the rules implemented by the City of Austin to execute the Ordinance require runoff surface water from a development to have lower average concentrations of some of these constituents than was found in certain rain samples taken in Austin.[3] In fact, Petitioners point out that the Ordinance requires that runoff surface water have less average nitrogen than contained in some name-brand bottled drinking water.[4] Petitioners allege that the Ordinance's practical effect is therefore a preclusion of all development in the watershed areas.

Petitioners also attack the lack of variances in the Ordinance. For instance, even if a landowner could establish that no increase in pollution would result from constructing a greater percentage of impervious cover than allowed under the Ordinance, no variance is permitted.

Finally, Petitioners impugn the Ordinance's financial impact. The City's own expert economist concluded that the Ordinance would, over a fifteen-year period, decrease property values in the watershed areas in the range of $229 million to $379 million. The Petitioners introduced evidence at trial that some land lost ninety percent of its value because of the Ordinance.

The City presented evidence at trial that sharply contradicted the Petitioners' arguments. In response to the Petitioners' evidence regarding the effectiveness of the water control ordinances in place before the Save Our Springs Ordinance, the City provided testimony that the Ordinance was cheaper and easier to administer than earlier measures. Further, the evidence also established that eighty-six percent of all development applications received a variance under the water quality ordinance in effect immediately prior to the Save Our Springs Ordinance. This excessive grant of variances under the prior ordinance, according to the City, obviously undercut its effectiveness.

To rebut the Petitioners' claim that it is impossible to comply with the Ordinance because its rules require that runoff be purer than rain, the City elicited testimony from Stephen Stecher, the project director of the Barton Creek watershed study. He testified that soil and plants on the ground **\*119** typically capture much of the nitrogen and some other constituents in urban rainfall before the constituents reach a creek or tributary. Accordingly, even assuming that the Petitioners' evidence regarding the rainfall samples was reliable, *see* ante at n. 3, the City contends that compliance with the technical rules is still possible because runoff is naturally less contaminated with certain pollutants than rainfall. In further support of its argument that it is not impossible to comply with the Ordinance, the City presented testimony from two developers that it is not only possible, but actually profitable to develop land in the watershed areas in compliance with the Ordinance. These developers both testified that they were anticipating sizable profits from their developments complying with the strictures of the Ordinance.

Finally, the City offered evidence that the impervious cover limitations in the Ordinance reduce polluting runoff and are a nationally-recognized method of protecting water quality. According to the City, the provisions restricting the pollutant constituents are only a small percentage of the 138 pollutants that the City is required to monitor under federal law. The restrictions on impervious cover and pollutant constituents, the City therefore urges, are clearly related to its goal of protecting the watershed from pollution in order to preserve water quality.

In light of the conflicting evidence presented at trial regarding the Ordinance, we cannot conclude that the Petitioners met their "extraordinary burden" of establishing that reasonable minds could not differ regarding whether the Ordinance was invalid, arbitrary, unreasonable, inefficient, or ineffective in its attempt to control water quality. While Petitioners presented evidence tending to establish that prior water control ordinances were sufficient such that the Ordinance was not necessary, the City's evidence regarding the excessive grant of variances under the prior measure precludes a determination that reasonable minds could not differ on the need for the Ordinance.

The trial testimony conflicts regarding a landowner's ability to comply with the Ordinance. The Petitioners offered scientific testimony attempting to establish that it was virtually impossible to comply with the Ordinance, but this testimony was refuted by the City. Moreover, the City also presented the testimony of two developers that, not only did the City approve their developments under the Ordinance, they actually anticipate profitable returns on their investments. The conflict in this evidence demonstrates that reasonable minds could indeed differ on whether compliance with the Ordinance is possible.

While the Petitioners decry the lack of a variance procedure in the Ordinance, the Ordinance does actually provide a limited variance to keep the Ordinance from running afoul of federal and state laws. Moreover, the Petitioners' complaint regarding the lack of a variance procedure ignores the evidence that the excessive grant of variances under prior water control measures had undercut their effectiveness.

We perceive that the real crux of the Petitioners' complaint is that the Ordinance unreasonably reduces property values and requires excessive expenditures in order to comply with its provisions. The Petitioners established that the Ordinance will result in at least a $225 million decrease in property values in regulated areas, and that the Ordinance has caused some parcels of land to lose ninety percent of their value. The City has not refuted this evidence.

However, in this case, the fact that the Ordinance severely impacts some property values does not make it invalid, arbitrary, unreasonable, inefficient, or ineffective in its attempt to control water quality. While the Ordinance's

impervious cover limitations undoubtedly substantially affect the value of some property parcels, such limitations are a nationally-recognized method of preserving water quality. Further, **\*120** it is indisputable that limiting pollutants in runoff water will aid in preserving water quality. We therefore conclude that the Ordinance's provisions are rationally related to its goal of protecting water quality.

[13] Because we have concluded that the Ordinance is rationally related to the governmental interest in protecting water quality, the City has the right to significantly limit development in watershed areas in furtherance of this interest. *See Day–Brite Lighting, Inc. v. Missouri,* 342 U.S. 421, 424, 72 S.Ct. 405, 96 L.Ed. 469 (1952). A governmental regulation can restrict, or even take, property for such a public benefit; however, if the regulation of property rights goes too far, compensation must be provided. *See Barshop,* 925 S.W.2d at 628. To the extent that the City's limitations on development deny all economically viable use of property or unreasonably interfere with the right to use and enjoy property, affected property owners may have a remedy in takings law. *See Mayhew v. Town of Sunnyvale,* 964 S.W.2d 922, 935 (Tex.1998)(recognizing that a compensable taking can occur if a governmental regulation totally destroys a property's value or if the regulation has a severe enough economic impact and the regulation interferes with distinct investment-backed expectations). Such a challenge is not part of this lawsuit. Our holding today that the Ordinance is not invalid, arbitrary, unreasonable, inefficient, or ineffective in its attempt to control water quality accordingly has no impact on any potential claim that the Ordinance unconstitutionally interferes with a landowner's property rights.

### III

[14] The Petitioners next attack the court of appeals' conclusion that the Ordinance is not void under sections 212.002 and 212.003 of the Local Government Code. Local Government Code section 212.002 provides:

> After a public hearing on the matter, the governing body of a municipality may adopt rules governing plats and subdivisions of land within the municipality's jurisdiction to promote the health, safety, morals, or general welfare of the municipality and

the safe, orderly, and healthful development of the municipality.

TEX. LOC. GOV'T CODE § 212.002. Local Government Code section 212.003 provides in pertinent part:

> (a) The governing body of a municipality by ordinance may extend to the extraterritorial jurisdiction of the municipality the application of municipal ordinances adopted under Section 212.002 and other municipal ordinances relating to access to public roads. However, unless otherwise authorized by state law, in its extraterritorial jurisdiction a municipality shall not regulate:
>
> (1) the use of any building or property for business, industrial, residential, or other purposes;
>
> (2) the bulk, height, or number of buildings constructed on a particular tract of land;
>
> (3) the size of a building that can be constructed on a particular tract of land, including without limitation any restriction on the ratio of building floor space to the land square footage; or
>
> (4) the number of residential units that can be built per acre of land.

*Id.* § 212.003.

Petitioners argue that (1) sections 212.002 and 212.003 govern the Ordinance, (2) the Ordinance was enacted without a public hearing in violation of section 212.002, and (3) the Ordinance effectively violates the prohibitions in section 212.003 by regulating the use, bulk, height, number, or size of buildings. Petitioners accordingly advocate that the trial court correctly held that the Ordinance was void. The City responds that sections 212.002 **\*121** and 212.003 do not apply because these sections are zoning statutes and the Ordinance is a water pollution control measure. We agree with the City.

By their express terms, sections 212.002 and 212.003 apply to ordinances that "govern plats and subdivisions of land." Further, the statutes' legislative history indicates that they govern a city's zoning authority, not a city's authority to apply water quality requirements. For instance, House Bill 3187, which amended section 212.003, "prohibits the application of zoning regulations in ETJ areas." COMMITTEE ON URBAN AFFAIRS, BILL ANALYSIS, Tex. H.B. 3187, 71st Leg., R.S. (1989). In fact, the Legislature made it clear that

section 212.003 was not intended "to affect the ability of a municipality to apply water control requirements" in its extraterritorial jurisdiction. CONFERENCE COMMITTEE REPORT, Tex. H.B. No. 3187, 71st Leg., R.S. (1989). We therefore conclude that sections 212.002 and 212.003 apply only to zoning statutes, not water control measures such as the Ordinance.

 [15]     Petitioners nevertheless assert that the Ordinance is, in effect, a zoning ordinance, not a water control ordinance. Petitioners argue that the Ordinance's impervious cover limitations effectively constitute a regulation on the use, bulk, height, number, and size of buildings in the City's extraterritorial jurisdiction in violation of section 212.003. Petitioners contend that we should consider the actual effect of the Ordinance, not its stated purpose, in determining whether the Ordinance must comply with these statutes.

However, we disagree with Petitioners' assertion that the Ordinance effectively constitutes a zoning regulation. The Ordinance's stated goal is to protect and preserve a "clean and safe drinking water supply" and "to prevent further degradation of the water quality in Barton Creek, Barton Springs, and the Barton Springs Edwards Aquifer." While the Ordinance clearly has effects on land use through its imposition of impervious cover limitations, these cover limitations are typical features in ordinances protecting water quality. Indeed, as discussed previously, such cover limitations are a nationally-recognized method of preserving water quality, and therefore we conclude that the cover limitations further the Ordinance's stated goal. On balance, the Ordinance is not a zoning regulation seeking to shape urban development, but rather is a measure designed to protect water quality. We accordingly hold that the requirements of sections 212.002 and 212.003 are not applicable to the Ordinance, and the Ordinance cannot be invalidated by these statutes.

## IV

 [16]     Petitioners also complain that the court of appeals erred in holding that the Ordinance is effective without the City first obtaining approval from the Texas Natural Resource Conservation Commission. Section 26.177(a) of the Water Code allows municipalities with populations in excess of five thousand to establish water pollution control and abatement programs. Section 26 .177(c) provides in pertinent part:

> The water pollution and abatement program ... must be submitted to the [Texas Natural Resource Conservation] commission for review and approval. The commission may adopt rules providing the criteria for the establishment of those programs and the review and approval of those programs.

TEX. WATER CODE § 26.177(c).

Petitioners argue that the Legislature clearly contemplated by the phrase "review and approval" that the Texas Natural Resource Conservation Commission would actually approve a city's water pollution and abatement control program before the program could become effective. Otherwise, Petitioners maintain that a city ordinance would remain effective even if the Commission later expressly disapproved the ordinance. Additionally, Petitioners **\*122** rely on the statute's bill analysis, which stated that:

> Current law requires the preparation of pollution abatement plans by cities ... but does not require submittal, review and approval of the plans. There is currently no requirement for cities to notify anyone when a pollution abatement plan is established. Water pollution abatement plans, when properly prepared, can be beneficial in reducing water pollution. However, if a city fails to submit a plan, or submits an inadequate plan, there is no procedure for carrying out the intent of the law. This bill would provide for direct Texas Water Commission oversight of pollution abatement plans.

SENATE NATURAL RESOURCES COMM., BILL ANALYSIS, Tex. H.B. 1546, 71st Leg., R.S. (1989). Petitioners assert that the Commission cannot "provide oversight" of the pollution abatement plans if the plans can become effective before approval is obtained. Because the Ordinance undisputedly has not yet been approved by the Commission, Petitioners urge that it is not effective.

The City responds that its own charter prescribes when ordinances become effective. Any legislative limits on the City's authority to control the effective date of its ordinances cannot be implied, but must be set forth with unmistakable clarity. *Lower Colorado River Auth. v. City of San Marcos,* 523 S.W.2d 641, 643–45 (Tex.1975). According to the City, section 26.177(c) does not state with unmistakable clarity that a water pollution control ordinance is not effective until the Commission approves it. Moreover, the City maintains that the statute's legislative history supports its position. The City also points out that the Commission itself considers any ordinance submitted for review to be effective prior to Commission approval. Indeed, the Commission has filed an amicus curiae brief in this Court requesting that we affirm the court of appeals' holding on this issue.

 **[17]**    The City of Austin is a home-rule city deriving its power from article XI, section 5 of the Texas Constitution. A home-rule city is not dependent on the Legislature for a grant of authority. *Lower Colorado River Auth.,* 523 S.W.2d at 643. Rather, the Legislature may provide limits on the power of home-rule cities, but only if the limitation appears with "unmistakable clarity." *Id.* at 645; *City of Sweetwater v. Geron,* 380 S.W.2d 550, 552 (Tex.1964).

Under Austin's city charter, the Ordinance is effective. Accordingly, unless the Legislature limited the City's authority to set the Ordinance's effective date with unmistakable clarity in section 26.177(c), the Ordinance does not require Commission approval before it becomes effective. We conclude that the Legislature has not so limited the City's authority.

While section 26.177(c) states that a water pollution or abatement program must be submitted to the Commission for "review and approval," the statute is silent as to whether the program is effective pending approval. We find this silence significant because, in other Water Code sections, the Legislature has specifically stated that an act was not effective until the Commission approved it. For instance, section 11.121 of the Water Code provides that any project for "the storage, taking, or diversion of water" shall not begin "*without first obtaining a permit from the commission.* " TEX. WATER CODE § 11.121 (emphasis added). Similarly, section 26.032, which has since been repealed, stated that "*[b]efore* the order, resolution, or other rule *becomes effective,* the county shall submit it to the commission and obtain the commission's written approval." Act of May 26, 1985, 69th Leg., R.S., ch. 795, § 1.079(c), 1985 Tex. Gen.

Laws 2760 (emphasis added), *repealed by* Act of June 17, 1987, 70th Leg., R .S., ch. 406, § 2, 1987 Tex. Gen. Laws 1938. Thus, while the Legislature clearly was well-versed in drafting statutes that explicitly provided that a local act was not **\*123** effective until approved by the Commission, the Legislature chose not to include such an express provision in section 26.177(c). We presume that this omission has a purpose. *See Cameron v. Terrell & Garrett,* 618 S.W.2d 535, 540 (Tex.1981). The only purpose that we can ascribe for such an omission is that the Legislature did not intend that water pollution programs such as the Ordinance require Commission approval before becoming effective.

Section 26.177(c)'s legislative history also supports our holding. The author of the bill that added the review and approval provision stated that the provision was not intended to take away local control, but was designed to gather information and to assist cities in developing their programs. Debate on Tex. H.B. 1546 on the Floor of the House, 71st Leg., R.S., Floor Tape 72, Side 2 (May 2, 1989)(remarks of Representative Terral Smith). *See also* Hearing on Tex. H.B. No. 1546 before the House Resources Committee, 71st Leg., R.S., House Tape Excerpts, Tape 2–B (March 22, 1989)(Executive Director of the Commission testified that the Commission viewed the legislation as establishing an information-gathering process). Nothing in the bill analysis relied upon by the Petitioners compels a contrary conclusion.

Finally, we note that our holding is consistent with the Commission's interpretation of the statute. While not controlling, the contemporaneous construction of a statute by the administrative agency charged with its enforcement is entitled to great weight. *State v. Public Util. Comm'n,* 883 S.W.2d 190, 196 (Tex.1994); *Dodd v. Meno,* 870 S.W.2d 4, 7 (Tex.1994). According to the Commission's amicus brief, the Commission has refrained from acting on submitted water pollution control and abatement programs until it can analyze and adopt rules and standards to guide its consideration. Therefore, a holding that a water pollution control and abatement program requires pre-approval by the Commission would essentially render ineffective every municipality's program passed since 1989. This is a result that we cannot presume the Legislature intended by enacting section 26.177(c).

V

 **[18]**    Petitioners next urge that the Ordinance is invalid because it is not a proper subject of the initiative and referendum process under Austin's city charter. Article IV, section 1 of the City's charter contains the following provision regarding legislation by public initiative:

> The people of the city reserve the power of direct legislation by initiative, and in the exercise of such power may propose any ordinance, not in conflict with this Charter, the state constitution, or the state laws except an ordinance appropriating money or authorizing the levy of taxes.

Austin City Charter art. IV, § 1.

Petitioners assert that the Ordinance conflicts with article X of the City's charter. Article X mandates the implementation of a comprehensive plan to guide, regulate, and manage development to assure the most beneficial use of land, water, and other natural resources. Article X also establishes a planning commission which "shall" review and make recommendations on proposals to "adopt or amend land development regulations," including "zoning, subdivision, building and construction, environmental and other police power regulations controlling, regulating, or affecting the use or development of land." Austin City Charter art. X, § 4. Finally, the charter provides that the city council may adopt amendments to the comprehensive plan only after at least one public hearing. *Id.* § 5. Petitioners claim that these provisions of the charter remove water pollution regulations, such as the Ordinance, from the domain of citizen initiators. The City responds that such a withdrawal of the power of initiative must be clearly stated, and no such clear statement exists in this case.

 **\*124**    **[19]**    **[20]**    Charter provisions are to be liberally construed in favor of the power of initiative and referendum. *Glass v. Smith,* 150 Tex. 632, 244 S.W.2d 645, 649 (1951); *Taxpayers' Ass'n of Harris County v. City of Houston,* 129 Tex. 627, 105 S.W.2d 655, 657 (1937). While the initiative power may be either expressly or impliedly limited by the city charter, such a limitation will not be implied unless the provisions of the charter are clear and compelling. *Glass,* 244 S.W.2d at 649.

Petitioners make no contention that the Austin city charter expressly provides that a water control regulation, such as the Save Our Springs Ordinance, may not be adopted

by the people at an initiative election. Rather, Petitioners claim that, because the charter requires a comprehensive plan to regulate development and a planning commission to review development proposals, the subject matter of the Ordinance has been implicitly withdrawn from the people. However, such an implicit withdrawal must be "clear and compelling." The provisions of article X do not clearly compel the conclusion that the Ordinance cannot be passed through the initiative and referendum process. The planning commission's review and recommendation powers over development can reasonably coexist with the adoption of a water quality regulation through public initiative. Indeed, article X does not grant the planning commission the power to establish a water pollution and abatement program under section 26.177(d) of the Water Code. Accordingly, we hold that the SOS Ordinance was a proper subject of the initiative and referendum process.

## VI

Petitioners finally contend that the court of appeals erred by holding that only projects where the original permit applications were filed after September 1, 1987 were required to be considered on the basis of the City's regulations and ordinances in effect at that time. Circle C made applications for preliminary subdivision approval for five different sections of the Circle C development, four of which were filed in 1985 and the fifth of which was filed in 1992. In furtherance of its ongoing development from these permit applications, Circle C applied for site development permits after the enactment of the Ordinance.

The trial court concluded that, under former section 481.143 of the Government Code, the ordinances in effect when Circle C filed its original permit applications in 1985 and 1992 governed the City's consideration of Circle C's subsequent permit applications for the same development. The court of appeals, however, modified the trial court's judgment, holding that because section 481.143 became effective September 1, 1987, only initial permits filed between September 1, 1987 and the effective date of the Ordinance (August 10, 1992) were not subject to the strictures of the Ordinance. Circle C contends that the court of appeals erred in modifying the trial court's judgment.

Generally, the right to develop property is subject to intervening regulations or regulatory changes. *Connor v. City of University Park,* 142 S.W.2d 706, 709 (Tex.Civ.App.—

Dallas 1940, writ ref'd). In adopting sections 481.141–.143 of the Texas Government Code on September 1, 1987, the Texas Legislature significantly altered this rule by locking in for the life of a project the regulations in effect at the time of the application for the project's first permit. The version of section 481.143 in effect at the time of the dispute provided:

> The approval, disapproval, or conditional approval of an application for a permit shall be considered by each regulatory agency solely on the basis of any orders, regulations, ordinances, or other duly adopted requirements in effect at the time the original application for the permit is filed. If a series of permits is required for a project, the orders, regulations, ordinances, or other requirements in effect at the time the original **\*125** application for the first permit in that series is filed shall be the sole basis for consideration of all subsequent permits required for the completion of the project.

Act of June 16, 1987, 70th Leg., R.S., ch. 374, § 1, 1987 Tex. Gen. Laws 1838–39, *amended by* Act of May 24, 1995, 74th Leg., R.S., ch. 794, § 1, 1995 Tex. Gen. Laws 4147, *repealed by* Act of June 1, 1997, 75th Leg., R.S., ch. 1041, § 51(b), 1997 Tex. Gen. Laws 3966.

However, the Legislature repealed section 481.143 while this case was pending before this Court. Act of June 1, 1997, 75th Leg., R.S., ch. 1041, § 51(b), 1997 Tex. Gen. Laws 3966. Because of this repeal, we conclude that we cannot address Circle C's argument that the court of appeals erred in its modification of the trial court's judgment.

When a cause of action is based on a statute, the repeal of that statute without a savings clause for pending suits is usually given immediate effect. *Knight v. International Harvester Credit Corp.,* 627 S.W.2d 382, 384 (Tex.1982). Ordinarily, all suits filed in reliance on the statute must cease when the repeal becomes effective; if final relief has not been granted before the repeal goes into effect, final relief cannot be granted thereafter, even if the cause is pending on appeal. *Knight,* 627 S.W.2d at 384; *National Carloading Corp. v. Phoenix–El Paso Express, Inc.,* 142 Tex. 141, 176 S.W.2d 564, 568 (1943); *Dickson v. Navarro County Levee Improvement Dist. No. 3,* 135 Tex. 95, 139 S.W.2d 257, 259

(1940). The repeal of the statute in such instances deprives a court of subject matter jurisdiction over the cause. *See Knight,* 627 S.W.2d at 384; *Dickson,* 139 S.W.2d at 259.

The Legislature, in its repeal of section 481.143, did not include a savings clause providing that section 481.143 remained in effect for pending litigation. Accordingly, we must give its repeal immediate effect, and we cannot review Circle C's argument that the court of appeals erred in concluding that its original permit applications filed before September 1, 1987 were not covered by section 481.143.

We were confronted with a similar situation in *Dickson v. Navarro County Levee Improvement Dist. No. 3,* 135 Tex. 95, 139 S.W.2d 257 (1940). In *Dickson,* a bondholder instituted suit to collect delinquent taxes owed by the defendants to a levee improvement district under a statute allowing holders of bonds issued by such districts to commence suit if the district failed to do so within sixty days after the taxes became delinquent. The trial court rendered judgment in favor of the bondholder, and defendants appealed. While the case was pending in the court of appeals, the Legislature repealed the statute allowing bondholders to bring such actions. *Id.* at 259. The court of appeals nevertheless affirmed the trial court's judgment for the bondholder, but this Court vacated the appellate court's judgment and dismissed the cause. *Id* . at 260. We reasoned that the Legislature's repeal of the statute precluded the bondholder from maintaining the suit because the Legislature had not incorporated a savings clause in the repealing statute. *Id.* at 259.

We similarly cannot review Circle C's claim that the court of appeals erred by holding that section 481.143 did not apply to subsequent permit applications when the original permit application was filed before September 1, 1987. Because the Legislature did not include a savings provision in its repeal of section 481.143, we must give the repeal immediate effect since Circle C had not obtained "final relief" prior to the repeal.

However, no party challenged the court of appeals' holding that section 481.143 applied to Circle C's original permit applications filed after September 1, 1987. The court of appeals' holding on this issue therefore constituted "final relief" in Circle C's favor. When "final relief" has been granted before the repeal of a statute, the relief is not usually affected by the statute's **\*126** subsequent repeal, unless the Legislature has provided to the contrary. *Cf. Knight,* 627 S.W.2d at 384.

In sum, we dismiss Circle C's point of error challenging the court of appeals' modification to the trial court's judgment. However, that portion of the court of appeals' judgment holding that any permit Circle C required be considered on the basis of the ordinances in effect when the original application for preliminary subdivision approval was filed, as long as the original application was filed after September 1, 1987, remains intact as it was not challenged in this Court.

## VII

 [21]   As a final matter, we must consider Save Our Springs Alliance's argument that the trial court erred in striking its plea in intervention and the court of appeals erred in affirming the trial court's striking of its intervention. The Alliance, comprised of the citizen initiators of the Save Our Springs Ordinance, maintains that the City could not adequately defend the Ordinance in court because the City had consistently opposed the Ordinance and had vigorously defended the previous water control ordinances that had been in place. Further, the Alliance points out that the City had opposed the legality of the Ordinance in open court and attempted to preclude a vote on the Ordinance. *See City Council of Austin v. Save Our Springs Coalition,* 828 S.W.2d 340 (Tex.App.—Austin 1992, no writ)(citizens sued City to force election on the Ordinance). Under these circumstances, the Alliance urges that its intervention was essential to protect its interests. *See Guaranty Fed. Savings Bank v. Horseshoe Operating Co.,* 793 S.W.2d 652, 657 (Tex.1990)(trial court abuses its discretion in striking intervention when (1) the intervenor, in its own name, could have either brought, or defended and defeated the same action; (2) the intervention will not complicate the case by an excessive multiplication of the issues; and (3) the intervention is almost essential to effectively protect the intervenor's interest). The Alliance contends that the court of appeals erred in concluding that the City could adequately protect its interests. The Alliance further asserts that citizen initiative sponsors have an absolute right to intervene in litigation involving the initiated legislation.

However, we do not believe it is necessary to reach the merits of the Alliance's argument. Even assuming the trial court erred in striking the Alliance's intervention and the court of appeals erred by affirming the trial court's action, the error was harmless. Under the Texas Rules of Appellate Procedure, no judgment may be reversed on appeal unless

we conclude that the error complained of probably caused the rendition of an improper judgment.  TEX. R. APP. P. 61.1. The Alliance admits that the only remedy for the alleged improper striking of its intervention is a new trial. Because the City has prevailed in upholding the Ordinance against all the challenges raised by Petitioners, a new trial would do nothing to further the Alliance's interests. We accordingly conclude that any alleged error in striking the Alliance's intervention was harmless.

\* \* \* \* \* \*

For the foregoing reasons, we affirm the court of appeals' judgment holding that the Ordinance is a valid legislative act that need not be approved by the Texas Natural Resource Conservation Commission to become effective and enforceable. We dismiss Circle C's point of error regarding the court of appeals' modification of the trial court's judgment with regard to  section 481.143 of the Government Code because Circle C did not obtain final relief prior to the repeal of section 481.143.

Justice ENOCH filed a concurring opinion.

Justice ENOCH, concurring.
I join in the Court's opinion and in the judgment. I write separately only to mention one facet of this case that troubles me:  **\*127**  by conferring on Austin the authority to control land use outside its boundaries, the Legislature has partially disenfranchised a class of citizens. This disenfranchisement is at its most obvious in this case, in which the citizens of one community by their vote have placed land use restrictions on citizens of neighboring communities who had no vote. It is also a disenfranchisement that may very well violate the "one man, one vote" principle inherent in the right to participate in the political process and guaranteed by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. *See Holt Civic Club v. City of Tuscaloosa,* 439 U.S. 60, 68, 99 S.Ct. 383, 58 L.Ed.2d 292 (1978).

In *Holt,* the United States Supreme Court decided that the City of Tuscaloosa's extraterritorial jurisdiction, which extended police jurisdiction and sanitary regulations over several unincorporated areas, did not violate the voting rights of those areas' residents. *Id.* at 70, 99 S.Ct. at 389-90. The Court declined to invalidate the extraterritorial jurisdiction because of "the extraordinarily wide latitude that States have in creating various types of political subdivisions and

conferring authority upon them." *Id.* at 71, 99 S.Ct. at 390. But however wide the states' latitude is, it is not without boundaries, and two aspects of the *Holt* opinion indicate that this case might be distinguishable.

First, the jurisdictional extension in *Holt* provided substantial benefits to the residents in the form of municipal services such as police, fire, and health protection. *See id.* at 74, 99 S.Ct. at 392. Second, the Court stated that an extraterritorial-jurisdiction statute conferring broader powers than those at issue in *Holt* could run afoul of the "one man, one vote" principle. *See id.* at 72 n. 8, 99 S.Ct. at 391; *id.* at 79, 99 S.Ct. at 394-95 (Stevens, J., concurring) (noting the Court's "limited" holding and stating that extraterritorial jurisdiction "might sometimes operate to deny the franchise to individuals who share the interests of their voting neighbors").

In this case, by contrast, the Petitioners appear to bear most of the burdens and the City appears to enjoy most of the benefits. Perhaps the extraterritorial jurisdiction at issue here is onerous enough to violate the Petitioners' constitutional rights. However, though they hint at it, the Petitioners do not brief this issue, and the Court properly omits considering it. *See* TEX. R. APP. P. 38.1(h). On the other hand, I think that this is a serious question that should be kept in mind.

Justice ABBOTT delivered the opinion of the Court on Motion for Rehearing as to Section VI, in which Chief Justice PHILLIPS, Justice HECHT, Justice OWEN, and Justice GONZALES join.

We granted Petitioners' Motion for Rehearing. We now withdraw Part VI of our opinion and substitute the following.

## VI

Petitioners finally contend that the court of appeals erred by holding that only projects in which the original permit applications were filed after September 1, 1987 are required to be considered on the basis of the City's regulations and ordinances in effect at the time the original permit applications were filed. Circle C made applications for preliminary subdivision approval for five different sections of the Circle C development, four of which were filed in 1985 and the fifth of which was filed in 1992. In furtherance of its ongoing development from these permit applications, Circle C applied for site development permits after the enactment

of the Ordinance. These subsequent permit applications are at issue.

The trial court concluded that, under former section 481.143 of the Government Code, the ordinances in effect when Circle C filed its original permit applications in 1985 and 1992 governed the City's consideration of Circle C's subsequent permit applications for the same development. The court of appeals, however, modified **\*128** the trial court's judgment, holding that because section 481.143 became effective September 1, 1987, only projects in which the initial permits were filed between September 1, 1987 and the effective date of the Ordinance (August 10, 1992) were not subject to the strictures of the Ordinance. Petitioners contend that the court of appeals erred in modifying the trial court's judgment in this manner.

Generally, the right to develop property is subject to intervening regulations or regulatory changes. *See Connor v. City of University Park,* 142 S.W.2d 706, 709 (Tex.Civ.App. —Dallas 1940, writ ref'd). In adopting sections 481.141–.143 of the Texas Government Code on September 1, 1987, the Texas Legislature significantly altered this rule by requiring that each permit in a series required for a development project be subject to only the regulations in effect at the time of the application for the project's first permit, and not any intervening regulations. The stated purpose of the statute was to establish requirements relating to the processing and issuance of permits and approvals by governmental regulatory agencies in order to alleviate bureaucratic obstacles to economic development. *See* Act of May 30, 1987, 70th Leg., R.S., ch. 374, § 1, sec. 7.001(2), 1987 Tex. Gen. Laws 1823, 1838, *amended by* Act of May 24, 1997, 74th Leg., R.S., ch. 794, § 1, sec. 481.141(b), 1995 Tex. Gen. Laws 4147, 4147, *repealed by* Act of June 1, 75th Leg., R.S., ch. 1041, § 51(b), 1997 Tex. Gen. Laws 3943, 3966. The version of section 481.143 in effect at the time of the dispute provided:

> The approval, disapproval, or conditional approval of an application for a permit shall be considered by each regulatory agency solely on the basis of any orders, regulations, ordinances, or other duly adopted requirements in effect at the time the original application for the permit is filed. If a series of permits is required for a project, the orders, regulations, ordinances, or other requirements

in effect at the time the original application for the first permit in that series is filed shall be the sole basis for consideration of all subsequent permits required for the completion of the project.

Act of May 30, 1987, 70th Leg., R.S., ch. 374, § 1, sec. 7.003(a), 1987 Tex. Gen. Laws 1823, 1839, *amended by* Act of May 24, 1995, 74th Leg., R.S., ch. 794, § 1, sec. 481.143, 1995 Tex. Gen. Laws 4147, 4147, *repealed by* Act of June 1, 1997, 75th Leg., R.S., ch. 1041, § 51(b), 1997 Tex. Gen. Laws 3943, 3966.

 **[22]    [23]    [24]**    The Legislature repealed section 481.143 while this case was pending before this Court. *See* Act of June 1, 1997, 75th Leg., R . S., ch. 1041, § 51(b), 1997 Tex. Gen. Laws 3943, 3966. The general rule is that when a statute is repealed without a savings clause limiting the effect of the repeal, the repeal of that statute is usually given immediate effect. *See Knight v. International Harvester Credit Corp.,* 627 S.W.2d 382, 384 (Tex.1982). When a right or remedy is dependent on a statute, the unqualified repeal of that statute operates to deprive the party of all such rights that have not become vested or reduced to final judgment. Ordinarily, all suits filed in reliance on the statute must cease when the repeal becomes effective; if final relief has not been granted before the repeal goes into effect, final relief cannot be granted thereafter, even if the cause is pending on appeal. *See id.; National Carloading Corp. v. Phoenix–El Paso Express, Inc.,* 142 Tex. 141, 176 S.W.2d 564, 568 (1943); *Dickson v. Navarro County Levee Improvement Dist. No. 3,* 135 Tex. 95, 139 S.W.2d 257, 259 (1940). The repeal of the statute in such instances deprives a court of subject matter jurisdiction over the cause. *See Knight,* 627 S.W.2d at 384; *Dickson,* 139 S.W.2d at 259.

 **[25]**    This common-law rule of abatement may be modified by a specific savings clause in the repealing legislation or by a general savings statute limiting the effect of repeals. Most states, including Texas, **\*129**  have adopted some form of general savings statute. *See* Ruud, *The Savings Clause— Some Problems in Construction and Drafting,* 33 TEX. L. REV. 285, 296–97 (1955). Texas's general savings clause is codified in section 311.031 of the Government Code, which states:

> (a) Except as provided by Subsection (b), the reenactment, revision, amendment, or repeal of a statute does not affect:

(1) the prior operation of the statute or any prior action taken under it;

(2) any validation, cure, right, privilege, obligation, or liability previously acquired, accrued, accorded, or incurred under it;

(3) any violation of the statute or any penalty, forfeiture, or punishment incurred under the statute before its amendment or repeal; or

(4) any investigation, proceeding, or remedy concerning any privilege, obligation, liability, penalty, forfeiture, or punishment; and the investigation, proceeding, or remedy may be instituted, continued, or enforced, and the penalty, forfeiture, or punishment imposed, as if the statute had not been repealed or amended.

(b) If the penalty, forfeiture, or punishment for any offense is reduced by a reenactment, revision, or amendment of a statute, the penalty, forfeiture, or punishment, if not already imposed, shall be imposed according to the statute as amended.

TEX. GOV'T CODE § 311.031(a), (b).

Petitioners assert that the general savings provision of the Code Construction Act applies to the repeal of section 481.143. *See* TEX. GOV'T CODE § 311.002 (application of the Code Construction Act); *Knight,* 627 S.W.2d at 385. The City argues that the general savings clause does not apply because a much narrower specific savings clause is included in section 52 of the repealing legislation, which provides:

> The rules, policies, procedures, and decisions of the Texas Department of Commerce are continued in effect as rules, policies, procedures, and decisions of the Texas Department of Economic Development until superseded by a rule or other appropriate action of the Texas Department of Economic Development.

> The validity of a rule, form, or procedure adopted, contract or acquisition made, proceeding begun, obligation incurred, right accrued, or other action taken by or in connection with the authority of the Texas Department of Commerce before it is abolished under ... this section is not affected by this Act. To the extent those actions continue to have any effect on or after September 1, 1997, they are considered to be the actions of the Texas Department of Economic Development.

Act of June 1, 1997, 75th Leg., R.S., ch. 1041, §§ 52(g), 52(h), 1997 Tex. Gen. Laws 3943, 3967. The City argues that because the repealing legislation contains a specific savings clause, application of the general savings provision is preempted. *See Ex parte Mangrum,* 564 S.W.2d 751, 755 (Tex.Crim.App.1978) ("The general savings clause of the Code Construction Act, however, is inapplicable to the new Penal Code because a specific savings clause was provided by the Legislature."); *Scott v. State,* 916 S.W.2d 40, 41 (Tex.App.—Houston [1st Dist.] 1995, no pet.); *Wilson v. State,* 899 S.W.2d 36, 38 (Tex.App.—Amarillo 1995, pet. ref'd); *see also* TEX. GOV'T CODE § 311.026.

We conclude that section 52 contains a specific savings clause. But the existence of the specific savings clause does not preclude application of the general savings provision of the Code Construction Act to the repeal of section 481.143.

 **[26]** The Legislature's adoption of the general savings clause in the Code Construction Act indicates a general legislative policy that the repeal of any statute shall not affect the prior operation of that statute nor extinguish any liability incurred or **\*130** affect any right accrued or claim arising before the repeal takes effect. Given this general policy and the broad applicability of the Code Construction Act, we will presume that the general savings clause applies unless a contrary legislative intent is shown by clear expression or necessary implication. *See Great N. Ry. Co. v. United States,* 208 U.S. 452, 465, 28 S.Ct. 313, 52 L.Ed. 567 (1908) ("[T]he provisions of [the general savings clause] are to be treated as incorporated in and as a part of subsequent enactments, and therefore under the general principles of construction requiring, if possible, that effect be given to all parts of a law the section must be enforced unless either by express declaration or necessary implication, arising from the terms of the law, as a whole, it results that the legislative mind will be set at naught by giving effect to the provisions of [the general savings clause].") . Here, no contrary legislative intent is expressed or implied by section 52.

 **[27]** Section 52 does not expressly state that only the enumerated items are saved, nor does it expressly negate application of the general savings statute. *See State v. Fenter,* 89 Wash.2d 57, 569 P.2d 67, 70 (1977) (en banc) ("Although [the specific savings clause] exempts three categories from repeal and thus acts as a mini-savings statute, it does not expressly state that these three categories are the only three categories exempt from repeal. Therefore, we find no express legislative intent that the general savings

statute ... does not apply [to the repealed statute].") . Nor is application of the general savings clause negated by necessary implication. Although in many cases it could be argued that the Legislature's inclusion of a specific savings clause despite its awareness of the existence of the general savings clause renders the specific savings clause redundant, *see State v. Showers,* 34 Kan. 269, 8 P. 474, 477 (1885), that is not the case here. The specific savings clause in section 52 is not redundant of the general savings provision. The purpose of Senate Bill 932, which repealed section 481.143, was to "abolish[ ] the Texas Department of Commerce and transfer [ ] its powers and duties to the newly created Texas Department of Economic Development and to certain other economic development programs." Act of June 1, 1997, 75th Leg., ch. 1041, 1997 Tex. Gen. Laws 3943, 3943. Sections 52(g) and (h) ensured that proceedings begun, rights accrued, and other actions taken by or in connection with the authority of the Texas Department of Commerce before it was abolished were not affected by the Act, and, as of the September 1, 1997 effective date of the Act, would be continued in effect as the actions of the newly created Texas Department of Economic Development. This result may not have been achieved by the general savings clause. Thus, both the general and specific clauses were needed to effectuate legislative intent.

Additionally, in contrast to the cases that have held that a specific savings clause "trumps" application of the general savings clause, the specific savings clause in section 52 does not irreconcilably conflict with the general savings clause. *See* TEX. GOV'T CODE § 311.026(a) (providing that a special provision prevails over a general provision only if the conflict between the provisions is irreconcilable). Accordingly, we conclude that the general savings clause applies to the repeal of section 481.143. Applying the clause, the prior operation of section 481.143 is not affected by the repeal, and we may address Petitioners' point of error.

## A

 **[28]** The parties do not dispute whether section 481.143 applies to subsequent permit applications when the original permit application was filed after September 1, 1987, such as the one application for preliminary subdivision approval filed in 1992. The issue we must decide is whether the statute is applicable to Circle C's subsequent permit applications filed after September 1, 1987, when the original application **\*131** in the series was filed *before* September 1, 1987, such as

the four applications for preliminary subdivision approval filed in 1985. The City argues that, in order to apply the statute to original permit applications filed before September 1, 1987, the statute must be applied retroactively, and that the law disfavors such retroactive application. *See Houston Indep. Sch. Dist. v. Houston Chronicle,* 798 S.W.2d 580, 585 (Tex.App.—Houston [1st Dist.] 1990, writ denied); *see also* TEX. GOV'T CODE § 311.022 ("A statute is presumed to be prospective in its operation unless expressly made retroactive."). Because section 481.143 does not expressly or impliedly indicate that it has a retroactive effect, the City asserts that the court of appeals correctly concluded that the statute does not apply to original permit applications filed before September 1, 1987. 930 S.W.2d at 693. Petitioners respond that they are not requesting a retroactive application of section 481.143, but rather a prospective application of the law to Circle C's subsequent permits filed after September 1, 1987.

Our first task is to determine whether the Legislature has expressly prescribed the statute's proper reach. *See Landgraf v. USI Film Prods.,* 511 U.S. 244, 280, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). The statute provides that if a series of permits is required for a project, the ordinances in effect at the time the original application for the first permit is filed shall be the sole basis for consideration of all subsequent permits required for the completion of the project. Nowhere does the statute require that the original application for the first permit in the series be filed after September 1, 1987. But neither does the statute expressly state that it will apply to projects in progress before that date. Thus, the plain language of the statute does not expressly delineate its reach.

Petitioners contend that the statute applies to the treatment of any subsequent permit application filed after September 1, 1987, regardless of when the first permit was filed. This construction is consistent with the plain language of section 481.143, which states that "the ... ordinances ... in effect at the time the original application for the first permit in that series is filed [the ordinances in effect in 1985 in this case] shall be the sole basis for consideration of all subsequent permits required for completion of the project [the subsequent permits filed by Circle C in 1992]." [1] Moreover, this construction complies with the Legislature's mandate to construe statutes liberally to achieve their purposes. *See* TEX. GOV'T CODE § 312.006. If we were to apply the construction urged by the City and the dissent, the statute would at least partially fail of its intended purpose to "alleviat[e] bureaucratic obstacles" that "inhibit the economic development of the state." Obviously, "current administrative practices" can present bureaucratic obstacles to both ongoing and future projects. If the statute only applies to projects in **\*132** which initial permit applications are filed after the statute's effective date, the benefit of the statute would be denied to existing projects even though they too play a role in the State's economic development. Accordingly, we agree with Petitioners' construction of the statute.

[29] Our next step is to determine whether this construction renders the statute retroactive, thereby invoking the presumption against retroactivity. *See Landgraf,* 511 U.S. at 280, 114 S.Ct. 1483. As the Supreme Court observed in *Landgraf v. USI Film Products,* "[w]hile statutory retroactivity has long been disfavored, deciding when a statute operates 'retroactively' is not always a simple or mechanical task." *Id.* at 268, 114 S.Ct. 1483. The Court in *Landgraf* did not attempt to precisely define what constitutes a retroactive law, instead preferring a "functional" approach. The Court instructed:

> A statute does not operate "retrospectively" merely because it is applied in a case arising from conduct antedating the statute's enactment, or upsets expectations based in prior law. Rather, the court must ask whether the new provision attaches new legal consequences to events completed before its enactment. The conclusion that a particular rule operates "retroactively" comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event. Any test of retroactivity will leave room for disagreement in hard cases, and is unlikely to classify the enormous variety of legal changes with perfect philosophical clarity. However, retroactivity is a matter on which judges tend to have "sound ... instinct[s]," and familiar considerations of fair notice, reasonable reliance, and settled expectations offer sound guidance.

*Id.* at 269–70, 114 S.Ct. 1483 (citations and footnote omitted).

Applying these principles, we conclude that our construction does not operate retroactively. Contrary to the court of appeals' conclusion, section 481.143 does not affect any applications for permits filed before September 1, 1987. That would be retroactive. But applying section 481.143 to subsequent permit applications filed after September 1, 1987, when the original permit application was filed before September 1, 1987, is not a retroactive application of the law. The statute operates prospectively on new permits for existing projects. It affects only new permits to be issued in the future. It does not annul or affect prior permits, or require the City to issue a permit retroactively.

When Circle C filed its original permit applications in 1985, the City's ordinances in effect at that time governed the City's evaluation of those applications. Although subsequent applications in the series required for a project would normally be subject to any new ordinances and regulations in effect at the time of their filing, the Legislature provided that these subsequent applications, if filed after September 1, 1987, would be governed by only the ordinances and regulations in effect at the time the original permit application was filed. Thus, when Circle C filed subsequent permit applications after September 1, 1987, the City was required to apply only the ordinances in effect in 1985 to those applications. The statute is not retroactive merely because it requires the City to evaluate future permits based on past law.

The dissent argues that application to existing projects is retroactive because it reaches back in time and attaches new legal consequences to past acts. But the only new legal consequences it attaches to prior acts is in determining which "orders, regulations, ordinances, and other requirements" may be applied in the future to new permits. The Legislature could have passed a law comprehensively setting out criteria for new permits. Instead, section 481.143 adopts by reference to original **133** permits the appropriate orders, regulations, ordinances, and other requirements to apply to new permits —those in effect at the time the original application for the first permit in the series was filed. As the *Landgraf* opinion states, "a statute 'is not made retroactive merely because it draws upon antecedent facts for its operation.' " *Id.* at 270 n. 24, 114 S.Ct. 1483 (quoting *Cox v. Hart,* 260 U.S. 427, 435, 43 S.Ct. 154, 67 L.Ed. 332 (1922)); *accord Regions Hosp. v. Shalala,* 522 U.S. 448, 456, 118 S.Ct. 909, 139 L.Ed.2d 895 (1998); *General Dynamics Corp. v. Sharp,* 919 S.W.2d 861, 866 (Tex.App.—Austin 1996, writ denied); *American Home Assurance v. Texas Dep't of Ins.,* 907 S.W.2d 90, 94 (Tex.App.—Austin 1995, writ denied); *see also Walls v. First*

*State Bank of Miami,* 900 S.W.2d 117, 121 (Tex.App.—Amarillo 1995, writ denied) (discussing *Landgraf* ). Here, the statute merely draws upon an antecedent fact—the date of the first permit application—to determine what law will apply to subsequent permit applications.

Accordingly, we hold that the court of appeals erred in holding that only the subsequent permit applications from original permit applications filed after September 1, 1987 were governed by the ordinances in effect at the time of the original application.

### B

[30] That does not end our inquiry, however, for we must also consider the effect of the repeal on Circle C's rights. The general savings clause of the Code Construction Act saves both the prior operation of the statute and "any validation, cure, right, privilege, obligation, or liability previously acquired, accrued, accorded, or incurred under it." TEX. GOV'T CODE § 311.031(a)(2).

We begin by identifying Circle C's rights under section 481.143. As we have concluded, by its terms, section 481.143 gives Circle C the right to have the City consider an application for a permit "solely on the basis of any orders, regulations, ordinances, or other duly adopted requirements in effect at the time the original application for the permit is filed," which in this case would be the regulations and ordinances in effect in 1985 when the original applications for preliminary subdivision approval were filed and approved.

The general savings clause saves this right only if it was acquired, accrued, or accorded under section 481.143 before the September 1, 1997 effective date of the repeal.[2] *See Iowa Dep't of Transp. v. Iowa Dist. Ct. for Buchanan County,* 587 N.W.2d 774, 776 (Iowa 1998) ("[O]ne relying on [the general savings clause] must demonstrate that the privilege he seeks to save is one that he possessed, or that had vested, or that had been granted prior to the date the statute providing such a privilege was repealed."). This right would not accrue until Circle C filed an application for a permit; it is only when an application is filed that the right granted by section 481.143 is due and attaches to the review of the application. As each subsequent application for a permit is filed, Circle C's right accrues with respect to that application. With respect to applications filed after the repeal of section 481.143, Circle C's right would not have accrued before the effective date

of the repeal, and nothing is saved by the general savings clause. Thus, the City may not apply current regulations and ordinances to its evaluation of permit applications filed or approved during **\*134** the prior operation of section 481.143, but it may do so with respect to any applications filed after its repeal, subject, of course, to the effects, if any, of the statute as reenacted in 1999. *See* Act of April 29, 1999, 76th Leg., R.S., ch. 73, 1999 Tex. Gen. Laws 431 to be codified at TEX. LOC. GOV'T CODEE § 245.001 et. seq.).

In sum, we hold that the general savings clause applies to the repeal of section 481.143. Considering Petitioners' point of error, we conclude that, under the 1987 version of section 481.143, any subsequent permit applications filed or approved between September 1, 1987 and September 1, 1997 are governed by only the rules, regulations, and ordinances in effect in 1985 when the original applications for preliminary subdivision approval were filed. Because we hold that this is not a retroactive application of the statute, we reverse the court of appeals' judgment in that regard, and we modify the judgment accordingly.BAKER and Justice O'NEILL join.

Justice HANKINSON filed a dissenting opinion on rehearing as to Section VI, in which Justice ENOCH, Justice BAKER, and Justice O'NEILL join.

Justice HANKINSON, dissenting.
While I agree with the Court's resolution of the first issue we address on rehearing, I dissent from what I perceive to be its impermissible and unnecessary retroactive application of Texas Government Code § 481.143. For the reasons expressed by the court of appeals, 930 S.W.2d 678, 693, I would hold that for section 481.143 to apply to a particular series of permits, the first permit in the series must have been filed after the effective date of section 481.143.

> The presumption is very strong that a statute was not meant to act retrospectively, and it ought never to receive such a construction if it is susceptible of any other. It ought not to receive such a construction unless the words used are so clear, strong, and imperative that no other meaning can be annexed to them or unless the intention of the legislature cannot be otherwise satisfied.

*United States Fidelity & Guar. Co. v. United States ex rel. Struthers Wells Co.,* 209 U.S. 306, 314, 28 S.Ct. 537, 52 L.Ed. 804 (1908).

Texas has its own "well-entrenched legal hostility to retroactive laws." *Houston Indep. Sch. Dist. v. Houston Chronicle Publ'g Co.,* 798 S.W.2d 580, 585 (Tex.App.—Houston [1st Dist.] 1990, writ denied). "Texas law militates strongly against the retroactive application of laws," *id.,* and any doubts must be resolved against retroactive operation of a statute. *See Government Personnel Mut. Life Ins. Co. v. Wear,* 151 Tex. 454, 251 S.W.2d 525, 529 (1952). The Legislature has codified the presumption that statutes apply prospectively: "A statute is presumed to be prospective in its operation unless *expressly* made retroactive." Tex. Gov't Code § 311.022 (emphasis added).

The Court misconstrues the proper temporal reach of the statute before us. It seems reasonably clear to me that while section 481.143 is not retroactive on its face, the Court's application of it creates a retroactive effect that can easily be avoided. The Court creates this retroactive effect by applying a statute not effective until September 1, 1987, to permit applications originally filed in 1985. Section 481.143 has retroactive effect if applied in this manner—it reaches back before its effective date and attaches new legal consequences to past acts by changing what the law was before section 481.143 was enacted.

Before the Legislature enacted section 481.143, under well-established law cities could pass or amend ordinances in the proper exercise of their police power, and citizens were bound by those intervening ordinances even if they were passed while an application for a permit was pending. *See* **\*135** *Connor v. City of Univ. Park,* 142 S.W.2d 706, 709 (Tex.Civ.App.—Dallas 1940, writ ref'd). Thus, permit applications were subject to any intervening ordinances and amendments. Section 481.143 essentially eliminated any intervening ordinances and amendments passed by any city, including changes to fire, electrical, plumbing, and mechanical codes designed to further public safety. For example, if someone filed an application for a building permit in 1970, under the Court's reading of section 481.143, that person would only have to meet the safety standards of 1970 when applying in 1987 for the next permit in the series, and any ordinances passed in the intervening seventeen years would have no effect. In this manner, the Court's reading attaches new legal consequences to the 1985 permit applications and retroactively changes the law

governing those 1985 applications, which were filed before the Legislature enacted section 481.143 in 1987. This is not "merely draw[ing] upon an antecedent fact," as the Court proposes. And I must emphasize that the Court's reading is what creates the retroactive effect, not the language of the Legislature as expressed in the statute itself; the Court agrees that the statute "does not expressly delineate its reach." Precisely because section 481.143 contains no clear expression that it operates retroactively, and because the Code Construction Act mandates that statutes operate prospectively in the absence of such clear expression, we are bound to read the statute in a way that does not create a retroactive effect.

Moreover, the Legislature knows precisely how to make the statute retroactive—it did so by amending section 481.143 in 1995 so that the section then expressly applied to projects "in progress on or commenced after" September 1, 1987. Act of May 24, 1995, 74th Leg., R.S., ch. 794, § 1, 1995 Tex. Gen. Laws 4147. That amendment bolsters the conclusion that we should not apply the 1987 version, which was not expressly retroactive, to have a retroactive effect. Thus, the Court's reading of the 1987 statute has the effect of making the 1995 amendments mere surplusage. The 1995 amendments also included an exemption for adopting the kind of codes affecting public safety mentioned above, highlighting that the Legislature is the proper body to decide what the best policy is and how best to redress particular problems.

The practical danger of ignoring the Legislature's policy choice, as expressed in the Code Construction Act, and applying section 481.143 retroactively, is that we have no idea what rules, regulations, ordinances, or orders will be affected. Section 481.143 applies not just to the city of Austin, or to all cities in Texas, but to every "agency, bureau, department, division, or commission of the state or any department or other agency of a political subdivision that processes and issues permits." TEX. GOV'T CODE § 481.142(4). The statute applies not just to land development projects, but to every "endeavor over which a regulatory agency exerts its jurisdiction and for which a permit is required before initiation of the endeavor." TEX. GOV'T CODE § 481.142(3). The definition of permit is equally broad: " 'Permit' means a license, certificate, approval, registration, consent, permit, or other form of authorization required by law, rule, regulation, or ordinance...." Id. § 481.142(2). In striving to reach its result in this particular case, the Court ignores the fact that the implications of its decision are unknown. I would argue that is precisely why the Legislature has codified its decision that statutes

not be applied retroactively without the Legislature itself saying so, without it's having weighed the consequences after considering the potential effects of retroactivity and expressed its decision that those consequences are desirable. Courts simply are not empowered or endowed with the jurisdiction or the resources to make those kinds of open-ended policy decisions.

The Court struggles to find legislative intent on retroactivity where none is apparent and uses that phantom intent to **\*136** circumvent the express language of the Code Construction Act. Nothing in the language of the statute or its history supports the Court's assertion that the usual prospective reading would cause the statute to "at least partially fail of its intended purpose." Without some expression by the Legislature that it intended section 481.143 to apply to existing projects, how do we know whether it intended precisely the opposite, perhaps as part of a legislative compromise, or perhaps as a result of the Legislature's understanding that statutes operate prospectively in the absence of clear expression to the contrary. Moreover, how can we liberally construe a statute on a point on which the statute is admittedly silent, without any proof of legislative intent, and when the Code Construction Act unequivocally mandates the opposite of the Court's reading. Whether to apply a statute retroactively is, for very good reasons, a legislative policy choice:

> Because [prospectivity] accords with widely held intuitions about how statutes ordinarily operate, a presumption against retroactivity will generally coincide with legislative and public expectations. Requiring clear intent assures that Congress itself has affirmatively considered the potential unfairness of retroactive application and determined that it is an acceptable price to pay for the countervailing benefits. Such a requirement allocates to Congress responsibility for fundamental policy judgments concerning the proper temporal reach of statutes, and has the additional virtue of giving legislators a predictable background rule against which to legislate.

Landgraf v. USI Film Prods., 511 U.S. 244, 272–73, 114 S.Ct. 1483 (1994). Through the Code Construction Act,

the Legislature has clearly expressed its policy choice that its laws will not operate retroactively without its own deliberation and manifest expression of the value of retroactivity in the statute at issue. Ignoring the Code Construction Act, especially in the absence of any statutory language or legislative history to the contrary, is, in my view, tantamount to legislating.

The Court points out that "[n]owhere does [the 1987] statute require that the original application for the first permit be filed after September 1, 1987." In the face of that legislative silence, and in light of the statutory presumption against retroactive application, I conclude we must apply the statute prospectively. Applying section 481.143 prospectively, I would hold that because section 481.143 was not effective until 1987, it did not apply to Circle C's 1985 applications for preliminary subdivision approval. I would further hold that section 481.143 governs Circle C's one application filed after the effective date of section 481.143 and before the SOS ordinance became effective, but that any other applications in that series must have been filed before section 481.143 was repealed for section 481.143 to govern those applications. Any other reading flouts our longstanding principles disfavoring retroactive lawmaking. Accordingly, I dissent.

Footnotes

1    The Barton Springs Edwards Aquifer is that portion of an underground system of water-bearing formations in Central Texas that recharges Barton Springs. Barton Springs is a spring surfacing in Austin that is fed by and feeds Barton Creek. Barton Springs and Barton Creek provide a significant source of Austin's water supply. Barton Springs also contributes to a unique recreational attraction in Austin, Barton Springs Pool, a spring-fed outdoor swimming pool open throughout the year.

2    In a de novo review, the reviewing tribunal determines each issue of fact and law without according deference to the original tribunal's decision. *See Post* at 116.

3    As support for this contention, Petitioners rely on a water quality analysis of sixteen rainfall samples taken at three locations. The City, however, elicited testimony that the water quality analysis of the samples was unreliable because not enough rain was collected and several of the samples were contaminated.

4    Petitioners introduced into evidence a label from a bottle of Evian natural spring water showing a nitrate concentration exceeding the runoff requirements under the Ordinance's technical rules. Because the purpose of the Ordinance's rules is to ensure that no *increases* occur in the average annual loadings of constituents such as nitrogen, Petitioners' comparison to Evian merely establishes that natural runoff in the Barton Creek watershed has a lower concentration of nitrates than the spring waters producing Evian bottled water. Accordingly, this evidence is actually not probative of whether compliance with the technical requirements of the Ordinance is possible.

1    Chapter 481 was amended in 1995. *See* Act of May 24, 1995, 74th Leg., R.S., ch. 794, § 1, 1995 Tex. Gen. Laws 4147, *repealed by* Act of June 1, 1997, 75th Leg., R.S., ch. 1041, § 51(b), 1997 Tex. Gen. Laws 3943, 3966. The 1995 amendments provided that section 481.143 applied "to all projects in progress on or commenced after the effective date of this subchapter as originally enacted." Act of May 24, 1995, 74th Leg., R.S. ch. 794, § 1, sec. 481.143(b), 1995 Tex. Gen. Laws 4147, 4147 (repealed). Although the 1995 amendments were expressly made retroactive to September 1, 1987, Circle C concedes that the amendments do not apply to its claims. *See* Act of May 24, 1995, 74th Leg., R.S., ch. 794, § 3, 1995 Tex. Gen. Laws 4147, 4148 ("Nothing in this Act shall be construed to diminish or impair the rights or remedies of any person or entity under a final judgment rendered by, or in any pending litigation brought in, any court concerning an interpretation of the provisions of Subchapter I, Chapter 481, Government Code."). Subchapter I was reenacted in 1999 as Local Government Code, Subtitle C, Title 7, Chapter 245, but the reenacted version contains a similar provision and is thus also inapplicable to this litigation. *See* Act of April 29, 1999, 76th Leg., R.S., ch. 73, § 4, 1999 Tex. Gen. Laws ___, ___ (to be codified at TEX. LOC. GOV'T CODE E § ___). Moreover, given the Legislature's mandate, we do not consider the 1995 amendments in construing section 481.143 as enacted.

2    It is unclear whether the terms "accorded" and "acquired" relate to rights. Certainly, not all terms in the general savings clause relate to rights—for example, incur, which generally means "become liable or subject to" would not refer to a party's rights. In addition, if we apply the general definition of "accord," which is "grant" or "allow," then any right of action granted or allowed by a statute would be saved despite a repeal, regardless of whether it had accrued before repeal. This cannot have been the Legislature's intent in enacting the general savings clause, for repeals of statutory causes of action would have no effect. Accordingly, we will apply these terms, but in the more limited sense of affording the right when due, rather than when granted.

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

766 S.W.2d 264
Court of Appeals of Texas,
Amarillo.

RAW HIDE OIL & GAS, INC., Raw Hide Production
Company, Inc., & J.C. McCollough, Appellants,
v.
MAXUS EXPLORATION COMPANY.

No. 07–88–0011–CV.  |  Dec. 31,
1988.  |  Rehearing Denied Feb. 15, 1989.

An action was brought to determine title and ownership between the owner of gas rights and the owner of oil and casinghead gas rights under two separate mineral leases on a tract of land. The 69th District Court, Moore County, Bill Sheehan, J., found for the gas rights owner, and the oil and casinghead gas rights owner appealed. The Court of Appeals, Pirtle, J., held that: (1) attorney fees were properly awarded to gas rights owner; (2) jury instruction defining "oil" was proper under the circumstances; (3) refusal to submit requested special issues was proper; and (4) sufficient evidence supported jury finding that gas produced from wells during court ordered test was gas rights gas.

Affirmed.

West Headnotes (16)

**[1]** **Administrative Law and Procedure**
 Collateral Attack
**Mines and Minerals**
 Form of Remedy

Action to establish ownership and title to gas produced from formations under property and to recover damages for gas allegedly converted by competing mineral rights owner was one which involved title and ownership rights to property and thus was properly within jurisdiction of trial court, and did not constitute an impermissible collateral attack on any railroad commission classification of oil and gas wells.

Cases that cite this headnote

**[2]** **Costs**
 Declaratory Judgment

In an action under the declaratory judgments act in which the parties stipulated that reasonable and necessary attorney fees were $200,000 through trial, $37,500 for an appeal to the Court of Appeals and $17,500 for an application for writ of error to the Texas Supreme Court, but did not stipulate that any party was entitled to recovery of attorney's fees, an award of attorney fees was appropriate where the pleadings and evidence were sufficient to support both the declaratory judgment action and the judgment rendered. V.T.C.A., Civil Practice & Remedies Code §§ 37.001 et seq., 37.002(b).

3 Cases that cite this headnote

**[3]** **Mines and Minerals**
 Trial

In oil and gas rights case, definition of "oil" as "crude petroleum oil, that is liquid both in the reservoir and at the surface, that is native to the reservoir and that is producible under normal operating conditions" was appropriate in case in which the central issue was whether the gas rights owner or the oil and casinghead gas rights owner owned gas produced by well. V.T.C.A., Natural Resources Code § 86.002(10).

2 Cases that cite this headnote

**[4]** **Mines and Minerals**
 Pleading and Evidence

Party drilling and completing wells in a manner which created allocation and ownership problems bore the burden of proving percentages of gas rights gas and casinghead gas produced by well.

1 Cases that cite this headnote

**[5]** **Mines and Minerals**
 Trial

Jury special issue regarding allocation of percentages of gas rights gas and casinghead gas produced by wells was rendered inconsequential

by jury's answer to special issue finding that none of the formations produced oil and that all the wells were completed or perforated in or close to those formations and could have produced exclusively from those formations, thus making the gas produced from those wells gas rights gas, rather than casinghead rights gas.

Cases that cite this headnote

**[6]    Mines and Minerals**
　　👈 Trial

Refusal to submit special jury issue numbers requested by oil and casinghead gas rights owner, which requested a finding as to whether gas currently being produced by the gas rights owner was in a liquid state on a particular date and the percentage of gas being produced of the gas rights owner's current production, was proper in light of jury's findings that gas rights owner had not converted any oil after oil and casinghead gas rights owner obtained its rights.

Cases that cite this headnote

**[7]    Mines and Minerals**
　　👈 Trial

Oil and casinghead gas rights owner was not entitled to special jury instructions dealing with gas rights owner's alleged failure to case off, save or protect oil in casinghead gas the amount of oil affected, whether failure was malicious, and the appropriate amount of damages, absent evidence that gas rights owner ever encountered oil in any well so as to trigger gas rights owner's duty under lease agreement to use reasonable care and caution to case off oil or casinghead gas. Rules App.Proc., Rule 81(b)(1).

Cases that cite this headnote

**[8]    Appeal and Error**
　　👈 Exclusion of Evidence

**Appeal and Error**
　　👈 Admission or Exclusion of Evidence

Oil and casinghead gas rights owner which failed to make an offer of proof or bill of exception did not preserve trial court's alleged

error in refusing to permit them to present evidence concerning another lease for appellate review; even assuming that casinghead gas rights owner timely requested admission of evidence contained in offer of proof and bill of exceptions, court did not rule on offer and no objection was made to court's failure to rule prior to charge being read to jury. Rules Civ.Evid., Rule 103(a)(2), (b); Rules App.Proc., Rule 52(a, b), (c)(11).

3 Cases that cite this headnote

**[9]    Exceptions, Bill Of**
　　👈 Necessity for Certificate

Offer of proof and bill of exceptions not approved by trial court or opposing counsel, which was not a bystander's bill, did not qualify as a formal bill of exception and was inadequate to preserve appellate complaint. Rules Civ.Evid., Rule 103(a)(2), (b); Rules App.Proc., Rule 52(a, b), (c)(11).

5 Cases that cite this headnote

**[10]   Appeal and Error**
　　👈 Against Weight of Evidence

Factual sufficiency points of error concede conflicting evidence on an issue, yet maintain that the evidence against the jury's finding is so great as to make the finding erroneous.

39 Cases that cite this headnote

**[11]   Appeal and Error**
　　👈 Verdict, Findings, or Decision

Legal sufficiency points of error assert a complete lack of evidence on an issue, and are designated as "no evidence points" or "matter of law points," depending upon whether the complaining party had the burden of proof.

38 Cases that cite this headnote

**[12]   Appeal and Error**
　　👈 Review Dependent on Whether Questions Are of Law or of Fact

**Appeal and Error**

 Great or Overwhelming Weight or Preponderance

On evidence issue challenged by party which had burden of proof on issue, the appropriate standard of review was whether the jury's finding was inappropriate as a matter of law or whether such finding was against the great weight and preponderance of the evidence.

87 Cases that cite this headnote

**[13]** **Mines and Minerals**
 Pleading and Evidence

Jury finding that 100% of gas produced from wells during court-ordered test was gas rights gas, rather than casinghead gas, was not against the great weight and preponderance of the evidence.

3 Cases that cite this headnote

**[14]** **Mines and Minerals**
 Pleading and Evidence

Jury finding that no oil existed in geological formations underlying oil and casinghead gas rights owner's lease was supported by sufficient evidence; there was expert testimony that wells were not producing oil, that oil produced during court-ordered test was not oil production by any standards, that gas produced from wells was not casinghead gas, that well in question and nearby nine gas wells never produced any oil, and that oil production was unlikely under lease due to high structural elevation of geological formation and application.

1 Cases that cite this headnote

**[15]** **Mines and Minerals**
 Pleading and Evidence

Exclusion of oil and casinghead gas rights owner's exhibit consisting of an excerpt from an annual report complied by oil and gas division of railroad commission was not such a denial of casinghead gas rights owner's rights as to cause a rendition of an improper judgment; finding that oil could not be produced from

pertinent formation underlying mineral lease was supported by the record.

Cases that cite this headnote

**[16]** **Mines and Minerals**
 Title in General

The mere existence of oil within a geological formation does not mean that all wells producing from that formation are oil wells.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*266** J.R. Lovell, Cynthia A. Quetsch, Lovell & Lyle, Dumas, Parker McCollough, Georgetown, for appellants.

Frank Douglass, Tom W. Reavley, Ray Donley, Scott, Douglas & Luton, Harlow Sprouse, Underwood, Wilson, Berry, Stein & Johnson, Austin, for appellee.

Before REYNOLDS, C.J., and DODSON and PIRTLE, JJ.

**Opinion**

PIRTLE, Justice.

This action involves a title and ownership dispute between the gas rights owner and the oil and casinghead gas rights owner, under two separate mineral leases on a tract of land situated in Moore County, Texas. Throughout this opinion, gas belonging to the owner of the gas rights will be referred to as "gas rights gas," whereas gas belonging to the owner of the oil and casinghead gas rights will be referred to simply as "casinghead gas."

Diamond Shamrock Exploration Company, now known as Maxus Exploration Company (both generally referred to as Maxus), the gas rights owner, brought suit against Raw Hide Oil & Gas, Inc. (Raw Hide Oil) and J.C. McCollough (McCollough), the oil and casinghead gas rights owner, seeking damages for conversion of gas belonging to Maxus and declaratory relief to determine its ownership rights in future production from certain formations under that tract of land. Raw Hide Production Company, Inc. (Raw Hide Production) intervened in the suit, alleging that it owned an interest in the oil and casinghead gas rights. Raw Hide Oil, Raw Hide Production and McCollough (collectively referred

to as Raw Hide) counterclaimed, seeking a declaratory judgment that Maxus had converted oil and casinghead gas, alleging that Maxus had failed to case off, save and protect their oil and casinghead gas rights. A pretrial court order provided for supervised testing of the wells at issue. Proceeds from the sale of gas produced during the test period were deposited into the registry of the court pending determination of ownership.

Raw Hide appeals from an adverse judgment, rendered upon a jury verdict favorable to Maxus. The judgment provides, *inter alia,* that Maxus owns the exclusive right to complete and produce wells in certain formations, productive of gas rights gas only, and that certain Raw Hide wells were producing gas which belonged to Maxus. The judgment permanently enjoined Raw Hide from producing gas from certain formations under the lease and awarded Maxus damages and attorney's fees.

By eleven points of error, with corresponding numbers, Raw Hide contends that the trial court erred in (1) awarding attorney's fees to Maxus; (2) submitting an **\*267** improper definition of the term "oil" following special issue number seven; (3) placing the burden of proof in special issue number three on Raw Hide; (4) rendering judgment, claiming that there is no evidence to support the answer to special issue number three or, in the alternative, that said answer is against the great weight and preponderance of the evidence; (5) awarding the funds in the court's registry to Maxus; (6) refusing to submit Raw Hide's requested special issue numbers one and two, claiming that there was sufficient evidence to support their submission; (7) refusing to submit Raw Hide's requested special issue numbers three, four, five, and six, claiming that there was sufficient evidence to support their submission; (8) excluding evidence pertaining to the Powell "C" lease; (9) rendering judgment, claiming that there is no evidence to support the answer to special issue number seven or, in the alternative, that said answer is against the great weight and preponderance of the evidence; (10) excluding defense exhibit number seventy-two; and (11) declaring that certain formations under Section 237 are gas zones and not productive of oil. We affirm the judgment of the trial court for the reasons now to be stated.

### *Overview of the Facts*

A brief review of the facts is essential. In 1938, The Shamrock Oil and Gas Corporation (Shamrock) and W. Coffee entered

into a gas mining lease (the 1938 Coffee lease). This lease conveyed to Shamrock the exclusive right to prospect for, drill, and produce "gas" on Section 237, Block 3–T, T & NO Ry. Co. Survey, Moore County, Texas. The 1938 Coffee lease specifically excluded "all of the oil and casinghead gas (as casinghead gas is defined by existing law)." Paragraph 12 of the 1938 Coffee lease provides:

> 12. If at any time the holder and owner of the gas and gas rights granted under the terms of this lease shall, in the drilling on said premises for gas, encounter oil in any well to be drilled under the terms hereof, then the lessee herein shall use reasonable care and caution to case off any such oil and/or casinghead gas that may be encountered therein, and likewise if at any time hereafter during the existence of this lease the holder and owner of the oil and oil rights in and to said premises shall, in the drilling for and the production of oil and casinghead gas thereon, encounter gas in any well or wells being so drilled, then such person shall use reasonable care and caution to case off, save and protect any such gas so encountered, it being the intention hereof that the holder and owner of the gas and gas rights, and the holder and owner of the oil and casinghead gas and rights therein in and to said premises, shall each use reasonable care and caution in the production of such respective products as will save and protect the product of the other from waste.

By assignment, Maxus holds current title to the gas rights originally conveyed to Shamrock under the 1938 Coffee lease.

There are five geological formations, relevant to this dispute, located under the tract covered by the 1938 Coffee lease. From top to bottom, they are the Red Cave, Brown Dolomite, White Dolomite, Moore County Lime, and Arkosic Dolomite formations. [1]

In 1938, Shamrock drilled the Coffee H–1 well on the lease. This well was completed throughout the Brown Dolomite and

Moore County Lime formations. Since completed, the Coffee H–1 well has continuously produced gas, except during times when it was shutin or being reworked. The Coffee H–1 produced approximately 23.1 BCF (billion cubic feet) of gas and no oil from 1938 to June 1987, the latest reporting period prior to trial.

On May 25, 1981, Wayne Jones obtained an oil and casinghead gas lease from several parties covering all but 80 acres of section 237 (the Fate lease). Jones subsequently assigned the Fate lease to Flatiron Corporation. On November 25, 1983, Raw Hide Oil entered into a farmout agreement **\*268** with Flatiron in which Raw Hide Oil agreed to drill two wells, with the option of drilling ten additional wells, on the E/2 of Section 237, in exchange for an assignment of Flatiron's oil and casinghead gas rights on 20 acres surrounding each well drilled. Flatiron retained an overriding royalty and an optional participating working interest in the wells drilled. Raw Hide Oil subsequently became the owner of all oil and casinghead gas rights under the Fate lease, and on March 21, 1984, Raw Hide assigned an overriding royalty to McCollough.

Raw Hide Production drilled the Raw Hide Fate well Nos. 9, 10, 11, and 12 on the lease in June and July 1984. Richard Strickland, a petroleum engineer, reported that many of the perforations in these wells were completed in the Brown Dolomite and Moore County Lime formations, the same formations from which the Coffee H–1 well has produced gas since 1938.

In April 1985, after the instant lawsuit was commenced, Raw Hide Production completed the Raw Hide Fate well Nos. 3, 7, and 8. The Raw Hide Fate well No. 3 also has perforations within the same formation from which the Coffee H–1 well is producing. Strickland reported that the Raw Hide Fate well No. 8 has no perforations in the Moore County Lime, but has some perforations in the Arkosic Dolomite. The top perforations in the Arkosic Dolomite are only a few feet from the bottom of the Moore County Lime. There was evidence that the Fate well No. 8 was completed and fracture treated in a manner that would indicate a possibility that the well was capable of producing gas from the Moore County Lime as well as the Arkosic Dolomite. The Fate well No. 7 was drilled through the Moore County Lime and a few feet into the Arkosic Dolomite; however, it was filled with cement up to a point in the Red Cave formation.

In May 1985, Raw Hide Production completed the Raw Hide Fate well Nos. 4, 5, and 6. Although these wells were perforated only in the Arkosic Dolomite, the top perforations were only a few feet from the bottom of the Moore County Lime. Strickland stated that these wells were also fracture treated in a way that could result in gas being produced from the Moore County Lime.

On November 14, 1985, the parties entered into an agreed testing order. The order provided that Raw Hide would operate the wells during the testing period. Maxus was permitted to run logs, conduct bottom hole pressure and temperature surveys, and install temporary gas flow lines from the wells to transport the gas produced. Proceeds from the sale of gas produced during the test period were to be deposited into the registry of the court, pending distribution upon determination of the merits of the case.

The initial phase of agreed testing commenced on January 2, 1986, but was prematurely terminated by Raw Hide on January 28, 1986. The second five day preflow testing phase never started because Raw Hide shut in all of its wells. From January 3rd to the 24th, all ten Raw Hide Fate wells were in operation. On the 25th and 26th only four wells were producing. On the 27th and 28th, only two wells were producing. The average barrels of oil produced per well per day during the test period was 0.049, with an average daily value of $0.93. The wells produced an average of 225 MCF of gas per well per day, with an average daily value of $562.50. During the last nine days of the test, no oil was produced from any well. There were seven other days when no oil was produced from any of the Raw Hide Fate wells. Raw Hide disputed the test results by producing evidence that the gathering system, designed and installed by Maxus and used to collect the substances produced from the well during the test, prevented oil production from the wells.

In response to special issues, with corresponding numbers, the jury found that: (1) the Raw Hide Fate wells were capable of producing gas rights gas from the Red Cave, Brown Dolomite, White Dolomite, and Moore County Lime formations; (2) the Raw Hide Fate wells produced some gas rights gas; (3) the Raw Hide Fate wells had produced 100% gas rights gas and no **\*269** casinghead gas during the court-ordered test period; (4) Raw Hide vented 2,623.86 MCF of gas rights gas from its Fate wells prior to the court-ordered test; (5) the fair market value of the gas rights gas vented prior to the court-ordered test was $5,247.72; (6) Maxus had peaceable and adverse possession of the leasehold right to

produce natural gas from the Dolomite and Moore County Lime formations above 347 feet above sea level for at least the ten consecutive years prior to June 1, 1986; (7) no oil exists in the Red Cave, Brown Dolomite, White Dolomite and Moore County Lime formations under the Raw Hide Fate Lease; and (8) subsequent to June 1984, Maxus did not convert any oil or casinghead gas on the E/2 of Section 237, owned by Raw Hide Production or McCollough.

In accordance with the jury verdict, the trial court entered judgment and decreed that: (1) pursuant to the Uniform Declaratory Judgments Act, [2] Maxus owned the exclusive and sole right to complete wells in and produce gas from the Red Cave, Brown Dolomite, White Dolomite, and Moore County Lime formations under the lease, since these formations were gas zones and not productive of oil; (2) pursuant to the Uniform Declaratory Judgments Act, the gas produced by Raw Hide Production from the Fate lease was gas owned by Maxus and that all funds in the registry of the court pursuant to the court-ordered tests were the property of Maxus; (3) Raw Hide Oil and Raw Hide Production were permanently enjoined from producing gas from the Raw Hide Fate lease in the Red Cave, Brown Dolomite, White Dolomite, and Moore County Lime formations; (4) all funds in the registry of the court were to be distributed to Maxus; (5) Maxus shall recover from Raw Hide Production $5,247.72 in damages; (6) Raw Hide shall take nothing on its counterclaim against Maxus; (7) Maxus shall recover from Raw Hide Oil and Raw Hide Production jointly and severally, the sum of $196,875 in attorney's fees; (8) Maxus shall recover from Raw Hide, jointly and severally, the sum of $3,125 in attorney's fees; (9) Maxus shall recover an additional $37,500 from the parties taking an appeal to the court of appeals; (10) Maxus shall recover an additional $17,500 from the parties filing an application for writ of error to the Texas Supreme Court; and (11) Maxus shall recover costs and interest from the date of judgment as provided by statute.

### *Merits of the Appeal*

We will first discuss Raw Hide's eleventh point of error because that point presents a jurisdictional attack. Raw Hide contends that the trial court erred in declaring that the formations under the Fate lease were gas zones and not productive of oil, arguing the evidence does not support the trial court's finding and that the court was without jurisdiction to make that determination. In three subpoints, they contend that (1) there were no pleadings to support the declaratory

judgment, (2) there was no evidence that the formations were not productive of oil, and (3) the judgment was a collateral attack on the Railroad Commission's classification of the Raw Hide Fate wells, citing *Amarillo Oil Co. v. Energy–Agri Products, Inc.,* 731 S.W.2d 113 (Tex.App.—Amarillo 1987, writ granted). We disagree. [3]

 **[1]**    The first and second subpoints are discussed more fully under other points of error addressed hereinbelow. In considering the jurisdictional question presented by the third subpoint, we note that the pleadings and evidence show that Maxus' cause of action was one to establish the ownership of and title to gas produced from formations under the Fate lease, and to recover damages for the gas converted by Raw Hide. Consequently, this action is one which involves title and ownership rights to property, and it is properly within the trial court's jurisdiction. Furthermore, this action does not constitute an impermissible collateral attack on any Railroad Commission **\*270** classification. *Dorchester Gas Prod. Co. v. Harlow Corp.,* 743 S.W.2d 243, 251 (Tex.App.—Amarillo 1987, writ requested). Accordingly, we overrule the jurisdictional attack presented by the third subpoint of point of error number eleven. We also overrule the first and second subpoints, which are analogous to issues raised in points of error discussed hereinbelow.

By their first point of error, Raw Hide Oil and Raw Hide Production attack the trial court's award of attorney's fees to Maxus, contending that (1) under the substantive law of conversion, Maxus' action for conversion does not support an award of attorney's fees since there was no finding of malice or fraud; (2) the trial court's declaratory judgment on the conversion issue cannot support an award of attorney's fees; (3) the trial court did not award Maxus a declaratory judgment or a judgment based upon adverse possession; (4) the trial court did not award Maxus a declaratory judgment on adverse possession; and (5) the declaratory judgment rendered is not supported by the pleadings and cannot support an award of attorney's fees. We disagree and find that the pleadings and evidence support the judgment.

In its third amended original petition, Maxus sought a judgment under the Uniform Declaratory Judgments Act, Tex.Civ.Prac. & Rem.Code Ann. § 37.001 *et seq.* (Vernon 1986):

> [D]eclaring and determining that Raw Hide Production and Raw Hide Oil & Gas have failed to case off, save or

protect [Maxus'] gas as required under its Gas Lease and that gas or natural gas liquids that may be produced from the Raw Hide Fate wells belongs to [Maxus]. A genuine controversy has arisen between Plaintiff and said Defendants as to the ownership of the gas that has been and will be produced by the Raw Hide Fate wells.

Maxus also prayed for attorney's fees. The judgment declared that Maxus owned the sole and exclusive right to gas produced from four formations under the lease, that those formations were gas zones and not productive of oil, and that the gas produced by Raw Hide Production from these formations was gas rights gas belonging to Maxus.

It is axiomatic that the Uniform Declaratory Judgments Act should be liberally construed. *Guilliams v. Koonsman,* 279 S.W.2d 579, 583 (Tex.1955); Tex.Civ.Prac. & Rem.Code Ann. § 37.002(b) (Vernon 1986). Although no particular type of pleading is required, the general rules regarding petitions govern such actions. *Anderson v. McRae,* 495 S.W.2d 351, 358 (Tex.Civ.App.—Texarkana 1973, no writ). Where no special exceptions have been presented, as here, the pleading must be construed liberally in favor of the pleader. *Roark v. Allen,* 633 S.W.2d 804, 809 (Tex.1982). This general rule of construction is applicable to declaratory judgment actions. *Frost v. Sun Oil Co.,* 560 S.W.2d 467, 473 (Tex.Civ.App.— Houston [1st Dist.] 1977, no writ); *Anderson v. McRae,* 495 S.W.2d at 358.

The Uniform Declaratory Judgments Act provides that the court may award reasonable and necessary attorney's fees as are just and equitable. Tex.Civ.Prac. & Rem.Code Ann. § 37.009 (Vernon 1986). The phrase "just and equitable" has been given a broad construction under the statute. *First National Bank at Lubbock v. John E. Mitchell Co.,* 727 S.W.2d 360, 363 (Tex.App.—Amarillo 1987, no writ). Under the Uniform Declaratory Judgments Act, attorney's fees may be awarded to a party other than the prevailing party, or to a party defending a declaratory judgment action, even though that party sought no affirmative relief under the statute. *Sears Sav. & Profit Sharing Fund v. Stubbs,* 734 S.W.2d 76, 80 (Tex.App.—Austin 1987, no writ); *Ritchie v. City of Fort Worth,* 730 S.W.2d 448, 451 (Tex.App.—Fort Worth

1987, writ ref'd n.r.e.); *Tanglewood Homes Ass'n, Inc. v. Henke,* 728 S.W.2d 39, 45 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.); *First National Bank at Lubbock v. John E. Mitchell Co.,* 727 S.W.2d at 363; *District Judges of Collin County v. Commissioners Court of Collin County,* 677 S.W.2d 743, 746 (Tex.App.—Dallas 1984, writ ref'd n.r.e.). In a declaratory judgment **\*271** action, the award or denial of attorney's fees is within the sound discretion of the trial court, and the judgment will not be disturbed on appeal absent a clear abuse of discretion. *Oake v. Collin County,* 692 S.W.2d 454, 455 (Tex.1985).

**[2]** Here, Maxus and Raw Hide stipulated that reasonable and necessary attorney's fees were $200,000 through trial, $37,500 for an appeal to this Court, and $17,500 for an application for writ of error to the Texas Supreme Court. However, the parties did not stipulate that any party was entitled to recovery of attorney's fees. Raw Hide does not attack the award as being unjust or inequitable. Under this record, Maxus plead and proved that Raw Hide Production and Raw Hide Oil failed to case off, save and protect its gas, and that a controversy had arisen concerning ownership of the gas produced from the Raw Hide Fate wells. Maxus also plead for and produced evidence of attorney's fees. Hence, the pleadings and evidence are sufficient to support both the declaratory judgment action and the judgment rendered. As a result, the award of attorney's fees was appropriate. Finding no abuse of discretion in the award of attorney's fees, point of error number one is overruled.

**[3]** By their second point of error, Raw Hide contends that the trial court erred in submitting special issue number seven, arguing that the judge gave an improper definition of the term "oil." We disagree.

In this connection, the record shows the following instruction, jury answers, and definition of oil:

## SPECIAL ISSUE NO. 7

Do you find from a preponderance of the evidence that oil exists in any of the following formations under the Raw Hide Fate Lease?

Answer yes or no as to each formation:

| | |
|---|---|
| Red Cave Formation | No |
| Brown Dolomite | No |

| | |
|---|---|
| White Dolomite | No |
| Moore County Lime above 347 feet above sea level | No |
| Below 347 feet above sea level | No |

You are instructed that the word "oil" means crude petroleum oil, that is liquid both in the reservoir and at the surface, that is native to the reservoir and that is producible under normal operating conditions.

Raw Hide argues that the instruction was too restrictive because it required the jury to determine that oil was "producible under normal operating conditions." Raw Hide alternatively sought a statutory definition that oil is "crude petroleum oil, crude petroleum, and crude oil" or "crude petroleum oil". *See* Tex.Nat.Res.Code Ann. §§ 85.001(b) and 86.002(1) (Vernon 1978). They reason that the existence of *any* oil is the critical issue regardless of whether the oil is producible under normal operating conditions.

In *Dorchester Gas Prod. Co. v. Harlow Corp.,* 743 S.W.2d 243 (Tex.App.—Amarillo 1987, writ requested), the jury found that the two wells drilled under that lease in the Brown Dolomite formation were not productive of oil. In *Dorchester,* a similar jury instruction survived attack. *Id.* at 257. In effect, we have already concluded that a similar instruction was material.

A central issue in this case is which party owned the gas produced from the Raw Hide Fate wells, the gas rights owner, Maxus, or the oil and casinghead gas rights owner, Raw Hide. Casinghead gas is currently defined as any vapor or gas indigenous to an oil stratum and produced with oil. Tex.Nat.Res.Code Ann. § 86.002(10) (Vernon 1978). At the time the 1938 Coffee lease was executed, the term casinghead gas was defined as "any gas and/or vapor indigenous to an oil stratum and produced from such stratum with oil." Gas Waste Prohibited, Restricting Production of Wells and Prescribing Penalties For Violations, ch. 120, § 2(i), 1935 Tex.Gen.Laws 318, 319, amended and codified, Tex.Nat.Res.Code Ann. § 86.002(10) (Vernon 1978). The 1938 Coffee lease expressly incorporated this earlier definition of casinghead gas. Since the wells are not productive **\*272** of oil under normal operating conditions, the gas produced therefrom is not casinghead gas and is not owned by the oil and casinghead gas owner. Moreover, since there was evidence that some oil had been previously pumped into the well, and because there was evidence that both the weather during the test and the test equipment itself may have inhibited oil production, we find that the challenged portion of the instruction was relevant. Accordingly, point of error number two is overruled.

 [4]    In their third point of error, Raw Hide contends that the trial court erred in submitting special issue number three, arguing that this special issue erroneously placed the burden of proof on Raw Hide. We disagree.

Special issue number three provided and was answered as follows:

State the percentage of the gas produced by the Raw Hide Fate wells during the court-ordered test that was gas rights gas and the percentage that was casinghead gas.

In connection with Special Issue No. 3 and 4, you are instructed that Raw Hide has the burden of establishing by a preponderance of the evidence how much of the gas they produced was not gas rights gas. You are instructed that the total of the percentages you find for gas rights gas and for casinghead gas must equal 100%.

Answer with a percentage or "0".

Answer:

| | |
|---|---|
| Gas rights gas: | 100% |
| Casinghead gas: | 0% |
| Total: | 100% |

In *Dorchester Gas Prod. Co. v. Harlow Corp.,* 743 S.W.2d at 256, we held that the burden of proof is not exclusively determined by which party is the plaintiff, recognizing that a consideration in determining the burden is which party has peculiar knowledge of the facts to be proved. In *Dorchester,* it was undisputed that the casinghead gas rights owner had comingled gas rights gas from the Brown Dolomite formation with oil and casinghead gas from other formations, and that

the casinghead gas rights owner had peculiar knowledge concerning the production of gas from the formations.

Raw Hide argues that they were not in a position to have peculiar knowledge of the facts to be proved because both parties participated in the court-ordered test, agreed on the manner in which the test would be conducted, and monitored the test results. Raw Hide also argues that the gathering system was designed and installed by Maxus. Raw Hide reasons that since the comingling, if any, was a result of the gathering system, Maxus should bear the burden of proving the percentages of gas rights gas and casinghead gas.

Maxus argues that the burden is properly on Raw Hide because (1) Raw Hide was exclusively responsible for drilling and completing the wells in a manner that created the allocation problem, (2) Raw Hide was responsible for operating the wells during the test period, and (3) Maxus only gathered the gas and operated the lease compressor during the test. We agree that the party drilling and completing wells in a manner that creates the allocation and ownership problems should bear the burden of proof.

Without citation to authority, Maxus alternatively argues that special issue number three was rendered irrelevant by the answer to special issue number seven. An answer to a special issue can be disregarded only when there is no evidence to support the answer, or when it is rendered immaterial. A special issue is rendered immaterial when (1) although properly submitted, it becomes inconsequential by other findings; or (2) it should not have been submitted. *C. & R. Transport, Inc. v. Campbell,* 406 S.W.2d 191, 194 (Tex.1966); *J.R. Neatherlin Corp. v. Baughman,* 580 S.W.2d 129, 130 (Tex.Civ.App.—Houston [14th Dist.] 1979, writ ref'd n.r.e.); *Estate of Lee,* 564 S.W.2d 392, 394–95 (Tex.Civ.App.—Dallas 1978, writ ref'd n.r.e.).

 [5]    Here, the answer to special issue number three was rendered inconsequential by the answer to special issue number seven. **\*273**  Since the jury found that none of the formations were productive of oil and because all the Raw Hide Fate wells were completed or perforated in or close to those formations and could have produced exclusively from those formations, the gas produced therefrom was gas rights gas. Point of error number three is overruled.

Points of error numbers four and five present factual and legal sufficiency points which will be discussed in conjunction with point of error number nine below.

 **[6]**    By their sixth point of error, Raw Hide contends that the trial court erred in refusing their requested special issue numbers one and two, contending that there was sufficient evidence to support their submission. We disagree.

Without citation to authority, Raw Hide contends that vaporized oil belongs to the oil and casinghead gas rights owner, although produced as gas. Referring us to evidence that oil had vaporized since 1938 and is now in a gaseous state, Raw Hide contends that the refused issues were relevant to support its theory that Maxus had converted vaporized oil belonging to Raw Hide. Maxus claims that the requested issue is irrelevant, arguing that (1) its Coffee H–1 is not located on the Raw Hide Fate lease and resultantly, it could not have converted gas owned by Raw Hide; (2) since the Maxus well never produced oil, any vaporized oil would not have been casinghead gas; (3) since Raw Hide did not obtain any rights to oil and casinghead gas until 1984, the reservoir's condition in 1938 was irrelevant to oil converted from Raw Hide; and (4) Raw Hide's conversion theory was properly submitted and answered negatively through special issue numbers eight, nine, ten, and eleven.

Raw Hide requested the following special issues, denominated one and two by them, which were refused by the trial court.

Do you find from a preponderance of the evidence that any of the gas currently being produced by Maxus Exploration Company was in a liquid state on May 1, 1938?

Answer "we do" or "we do not"

Answer: _____

If you answered Special Issue No. ____ "we do", then answer the following Special Issue; otherwise do [not] answer the following Special Issue.

_____

Find from a preponderance of the evidence the amount of gas currently being produced by Maxus Exploration Company that was in a liquid state on May 1, 1938.

Answer by a percentage of the current production of Maxus Exploration Company.

Answer: _____

In special issue number eight, the jury found that Maxus had not converted any oil or casinghead gas since 1984 on the E/2 of Section 237. Based upon this finding, the jury was not required to answer special issue numbers nine, ten, and eleven, which were conditioned upon a finding that Maxus converted oil and casinghead gas. Special issue numbers nine, ten, and eleven inquired into the fair market value of the oil and casinghead gas converted by Maxus.

Because Maxus produced no oil from the Coffee H–1 well, there is no evidence that Maxus ever encountered oil or casinghead gas. Hence, under the express terms of its lease, Maxus could not have failed to properly case off, save or protect oil or casinghead gas. Moreover, the jury found that Maxus had not converted any oil since June 1984 in its answer to special issue eight. Notwithstanding the fact that we conclude that there is no legal basis for the proposition that vaporized oil is "oil" for purposes of determining ownership, the evidence of vaporized oil was before the jury when they answered issue number eight. The failure to submit Raw Hide's requested special issues could not have caused the rendition of an improper judgment because said special issues were irrelevant and rendered inconsequential by the answer to special issue number eight. Tex.R.App.Proc. 81(b)(1). Point of error number six is overruled.

 **\*274**  **[7]**   In Raw Hide's seventh point of error, they contend that the trial court erred in refusing their requested special issue numbers three, four, five, and six, claiming that the evidence was sufficient to warrant submission. Referring to evidence in the record that oil had vaporized and migrated into the Maxus well since 1938, Raw Hide reasons that an inference is raised that Maxus did not case off, save or protect the oil as required by the 1938 Coffee lease. We disagree.

Raw Hide's requested special issues asked (1) whether Maxus failed to case off, save or protect the oil and casinghead gas since 1938; (2) the amount of oil that Maxus produced since June 1984 due to the failure to case off, save or protect the oil; (3) whether the failure to case off, save or protect the oil was done with malice; and (4) what sum of money, if any, should be assessed against Maxus as exemplary damages for failure to case off, save or protect the oil.

The 1938 Coffee lease agreement provided that if the gas rights owner "encounter[s] oil in any well ... then [Maxus] shall use reasonable care and caution to case off any such oil and/or casinghead gas that may be encountered therein."

Since there was no evidence that Maxus ever *encountered* oil, there was no error in failing to submit the requested special issues. *Horton v. Harris,* 610 S.W.2d 819, 823 (Tex.Civ.App. —Tyler 1980, writ ref'd n.r.e.). Moreover, the failure to submit the requested special issues could not have caused, and probably did not cause, the rendition of an improper judgment. Tex.R.App.P. 81(b)(1); *Howard v. Faberge, Inc.,* 679 S.W.2d 644, 650 (Tex.App.—Texarkana 1987, writ ref'd n.r.e.). Point of error number seven is overruled.

 **[8]**   In their eighth point of error, Raw Hide contends that the trial court erred in refusing to permit them to present evidence concerning the Powell "C" lease. We conclude that Raw Hide failed to preserve error by an offer of proof or bill of exception, and overrule the point of error.

At a pretrial hearing, the court granted a motion in limine concerning evidence of the Powell "C" lease, operated by Maxus and located approximately ten miles west of the instant tract. In a hearing outside the jury's presence, Raw Hide argued that Maxus opened the door to evidence regarding the Powell "C" lease. No evidence was offered at that hearing. The court ruled that the circumstances did not "authorize the proffer of evidence, and so it will not be allowed in the present state of the record." Shortly thereafter, the court provided Raw Hide an opportunity to make an offer of proof. However, Raw Hide declined, stating that they would prefer to make their offer later.

Prior to the close of the evidence, Raw Hide submitted to the trial court a document entitled "Offer of Proof and Bill of Exception," concerning the Powell "C" lease. The judge stated that he would read it, rule on it, and file it with the clerk. Prior to the charge being read to the jury, Raw Hide asked the judge if he had acted on the bill of exceptions. Viewing the document as a formal bill and not an offer of proof, the judge stated that it was too voluminous for him to act upon at that time and that a ruling would be made later. The record reflects that the trial court did not rule on the offer and no objection was lodged to the failure to rule before the charge was read to the jury.

On February 3, 1988, 105 days after the amended judgment was signed, a hearing was held by conference call on Raw Hide's Offer of Proof and Bill of Exceptions. This document, file marked February 3, 1988, contains approximately twenty pages of facts and arguments, and approximately 140 pages of attached exhibits. The court disallowed the bill of exceptions,

except as to those matters properly and timely shown in the statement of facts.

To preserve error concerning the exclusion of evidence by offer of proof, the appellate record must show that (1) the substance of the evidence sought to be admitted was made known to the court, and (2) the court either ruled adversely to its admission or, after timely request, affirmatively refused to rule. *Disposal Supply Co. Inc. v. Perryman Bros. Trash* **\*275** *Service, Inc.,* 664 S.W.2d 756, 762 (Tex.App.—San Antonio 1983, writ ref'd n.r.e.); *O'Shea v. Coronado Transmission Co.,* 656 S.W.2d 557, 564 (Tex.App.—Corpus Christi 1983, writ ref'd n.r.e.); Tex.R.Civ.Evid. 103(a)(2) & (b); Tex.R.App.P. 52(a). An objection to the trial court's refusal to rule is sufficient to preserve error for appellate complaint. Tex.R.App.P. 52(a). An offer of proof or objection to the refusal to rule on the offer must be made prior to the court's charge being read to the jury. Tex.R.App.P. 52(a) & (b).

Assuming arguendo that Raw Hide timely requested the court to admit the evidence contained in the Offer of Proof and Bill of Exceptions, the court did not rule on the offer and no objection was made to the court's failure to rule prior to the charge being read to the jury. Consequently, Raw Hide did not timely obtain a ruling on the offer nor timely object to the court's failure to rule.

 **[9]**    We must now determine if the Offer of Proof and Bill of Exceptions qualified as a formal bill of exception. [4] A formal bill of exception not approved by the trial court or opposing counsel and not a bystanders bill, is inadequate to preserve appellate complaint. *Sisk v. Randon,* 123 Tex. 326, 70 S.W.2d 689, 692 (1934); *Fountain v. Nelson,* 546 S.W.2d 102, 104 (Tex.Civ.App.—Beaumont 1977, no writ); *Goodpasture v. Coastal Industrial Water Authority,* 490 S.W.2d 883, 885 (Tex.Civ.App.—Houston [1st Dist.] 1973, writ ref'd n.r.e.); *Dyches v. Ellis,* 199 S.W.2d 694, 697 (Tex.Civ.App.—Austin 1947, no writ). We conclude that Raw Hide's Offer of Proof and Bill of Exceptions does not qualify as a formal bill of exception because it was not approved by the trial court or opposing counsel and it is not a bystanders bill. Consequently, point of error number eight is overruled.

We now turn to Raw Hide's factual sufficiency and legal sufficiency points of error numbers four, five, and nine. By their fourth point of error, Raw Hide contends that there is no evidence to support the jury's answer to special issue number three; or, alternatively, the jury's answer is against the great

weight and preponderance of the evidence. [5] By their fifth point of error, Raw Hide contends that the trial court erred in awarding Maxus the funds in the registry of the court because, as a matter of law, there was at least some casinghead gas produced during the court-ordered test period. Finally, by their ninth point of error, Raw Hide contends that there was no evidence to support the jury's answer to special issue number seven; or, in the alternative, the jury's answer was against the great weight and preponderance of the evidence. We find that Raw Hide's contentions are misplaced, and will overrule point of error numbers four, five, and nine for the following reasons.

 **[10]**    **[11]**    Factual sufficiency points of error concede conflicting evidence on an issue, yet maintain that the evidence against the jury's finding is so great as to make the finding erroneous. Factual sufficiency points of error are designated as "insufficient evidence points" or "great weight and preponderance points", depending upon whether the complaining party had the burden of proof. Legal sufficiency points of error assert a complete lack of evidence on an issue. Legal sufficiency points of error are designated as "no evidence points" or "matter of law points", again depending upon whether the complaining party had the burden of proof. The appropriate challenge to a jury finding concerning an issue upon which the complaining party had the burden of proof is either a great weight **\*276** and preponderance point or a matter of law point. Conversely, the appropriate challenge to a jury finding concerning an issue upon which the complaining party does not have the burden of proof is either an insufficient evidence point or a no evidence point. *See* Calvert, "No evidence" and Insufficient evidence" Points of Error, 38 Tex.L.Rev. 361, 364–368 (1960); *Glover v. Texas Gen. Indem. Co.,* 619 S.W.2d 400 (Tex.1981).

Although Raw Hide has inappropriately designated its points of error, we are required to review each attack in its proper context. *O'Neil v. Mack Trucks, Inc.,* 542 S.W.2d 112, 113–114 (Tex.1976).

In reviewing a no evidence point, we must examine the record in the light most favorable to the finding to determine if there is any probative evidence, or reasonable inferences therefrom, which supports the finding, and we must disregard all evidence or reasonable inferences therefrom to the contrary. *Glover v. Texas Gen. Indem. Co.,* 619 S.W.2d at 401; *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965). In reviewing an insufficient evidence point, we must examine the entire record to determine if there is some probative evidence to support the finding, and, if there is, we must determine

whether the evidence supporting the finding is so weak or the answer so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *Garza v. Alviar,* 395 S.W.2d at 823; *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661–62 (1951). In reviewing matter of law points, we must examine the record for evidence that supports the finding, ignoring any evidence to the contrary; and, if there is no evidence to support the finding, we must then examine the entire record to determine if a contrary proposition is established as a matter of law. *Holley v. Watts,* 629 S.W.2d 694, 696 (Tex.1982); *Texas & N.O.R. Co. v. Burden,* 146 Tex. 109, 203 S.W.2d 522, 530 (1947). In reviewing great weight and preponderance points, we must examine the entire record to determine if there is some evidence to support the finding, and then determine whether, in light of the entire record, the finding is manifestly unjust. *Traylor v. Goulding,* 497 S.W.2d 944, 945 (Tex.1973); *In re King's Estate,* 244 S.W.2d at 661.

**[12]**  As discussed under point of error number three above, Raw Hide had the burden of proof on special issue number three, pertaining to the percentage of gas produced from the Raw Hide Fate wells during the court-ordered test period that was gas rights gas and the percentage that was casinghead gas. In that special issue the jury found that 100% of the gas produced from the Raw Hide Fate wells was gas rights gas. Because Raw Hide had the burden of proof on special issue number three, the appropriate standard for our review of point of error number four is whether the jury's finding was inappropriate as a matter of law, or whether such finding is against the great weight and preponderance of the evidence. Furthermore, we conclude that point of error number five, pertaining to the trial court's award of all the funds in the registry of the court to Maxus, presents a matter of law point; and, accordingly, it will be reviewed in that context. Finally, we conclude that Raw Hide did not have the burden of proof with regard to special issue number seven, pertaining to the existence of oil in any of the listed formations under the Fate lease. Accordingly, point of error number nine presents a no evidence or insufficient evidence point.

The record shows that several Maxus representatives were sent to watch well production tests on the Fate lease and fill out forms describing their observations. Data from the production tests was reported on a Railroad Commission form W–2. These tests were conducted in 1985 and Maxus monitored the results on six wells. Maxus' representatives reported that during the 24–hour test period, oil production varied from a low of 7 barrels to a high of 38 barrels per well.

Raw Hide reported that the Raw Hide Fate No. 7 produced about 63 barrels of oil during the test.

Kent Kirkpatrick, a production engineer for Maxus, was not convinced that the test results established that these Raw Hide **\*277**  Fate wells were capable of commercial oil production. Kirkpatrick cited inconsistencies in the test results and the lack of any observed preflow prior to testing. Kirkpatrick testified that preflow would stabilize the well so that a correct reading on the well's oil production could be obtained. Without a preflow, the W–2 test could measure the well's oil production over a longer period of time than the 24–hour test period. For instance, he testified that without a preflow the 24–hour test could measure a well's production for a three-month period.

Kirkpatrick also testified that Maxus' representatives had only observed tank gauges, and could not be certain that the tank contained 100% oil. Kirkpatrick stated that on July 2, 1985, Raw Hide reported total oil production of approximately 299 barrels on the W–2 forms. On January 2, 1986, Maxus' representatives observed the gauging of the tank and only 110 barrels were measured. Kirkpatrick stated that Dan Hipkins, a Raw Hide employee, had reported that no oil was sold on the lease until May 1986. At the end of the court-ordered test, the gauge showed approximately 124 barrels of oil. On May 3, 1986, a Maxus representative observed the tank gauge, indicating approximately 395 barrels of oil. Kirkpatrick could not explain these discrepancies. Kirkpatrick concluded that the court-ordered tests were fair, that no casinghead gas had been produced from the wells, and that Raw Hide had not cased off, saved or protected Maxus' gas.

Richard Strickland studied the Coffee H–1 well and nine other wells on the eight sections surrounding Section 237. The first of these ten wells was completed in July 1936 and the last was completed in May 1953. From the completion date of each well to January 1984, the ten wells collectively produced approximately 270.2 BCF of gas and no oil. Each well was completed in or approximate to the Brown Dolomite formation. The ten wells were completed with open hole casing below the Brown Dolomite. Strickland testified that there was a very small potential, if any, for oil production in the Brown Dolomite. He reported that Section 237 was more likely to be productive of gas because the Brown Dolomite formation under that section has high structural elevation. He later reported that the Brown Dolomite, Moore County Lime, and Arkosic Dolomite formations do not appear productive of oil under Section 237. Assuming that the Arkosic Dolomite

was part of the Moore County Lime, Strickland reported that his opinions would be the same.

Strickland compared the W–2 results to the court-ordered test results. He noted that in both tests gas production was comparable, and water production was significant. However, he stated that very little oil entered the well bores during the court-ordered test, and that such amount of oil could not be considered oil production by any standards. Strickland also compared the per square inch pressures in the casing during the W–2 tests and the court-ordered tests, and concluded that (1) the pressure differences were insignificant, (2) some oil was produced at lower pounds per square inch gauge pressures during the court-ordered tests, (3) the gas produced from the Raw Hide Fate wells was not casinghead gas, and (4) the Raw Hide Fate wells could not produce casinghead gas.

Dan Hipkins, vice-president of Raw Hide Oil, testified that oil was transported to the well-site for use in drilling the wells. He estimated that about 50 barrels of oil were used in each of the wells, and that it was common practice to inject oil when drilling through the Brown Dolomite. Hipkins stated that the injected oil is usually circulated out of the well through the mud pump with other cuttings. Hipkins reported that he conducted the preflow stabilization the day before the W–2 test, when Maxus' representatives were not present. He stated that he generally runs the preflow for about 20 to 24 hours prior to the W–2 test potential. However, he later conceded that he had previously reported that he started the preflow, watched the gas pressure gauge until it stabilized, stopped the test when he saw oil flow into the pit, and then started the W–2 test. He admitted that oil production was so erratic that it was impossible to keep production records.

**\*278** Hipkins testified that the Railroad Commission conducted tests on the Coffee H–1 well and concluded that it was not producing oil. Disagreeing with the way the tests were performed, Hipkins stated that he obtained a sample he believed was oil and sent it to a lab, where an analyst concluded that the sample was oil. However, the Railroad Commission, citing the lab's test results, concluded that the sample was condensed water.

It is uncontroverted that the Raw Hide Fate wells produced some oil; however, the parties disagree whether such oil was native oil or oil previously injected into the wells during drilling. Raw Hide's expert, geologist Gray Johnston, reported that there were many oil wells in Moore County and some were producing from the Brown Dolomite formation at lower depths. Based upon a comparison of well logs from the Christie No. 1, a nearby well, to the Raw Hide Fate No. 10, Johnston further stated that the only way to know for certain was to complete, treat, and attempt to produce the well. Maxus' witness, Kent Kirkpatrick, testified that oil production on the Christie lease was insignificant and similar to that from the Raw Hide Fate lease. Raw Hide also produced evidence that oil existed under their lease, that the fracking of the Raw Hide Fate Nos. 5, 6, 7, and 8 could not have affected the Coffee H–1 well, and that the court-ordered tests were not fair.

**[13]** After reviewing the evidence pursuant to the appropriate standards, we are convinced that the jury's answer to special issue number three, that 100 percent of the gas produced from the Raw Hide Fate wells during the court-ordered test was gas rights gas, is not against the great weight and preponderance of the evidence. We are equally convinced that the contrary position, i.e., that some of the gas produced was casinghead gas, was not established as a matter of law. Accordingly, points of error numbers four and five are overruled.

**[14]** After having reviewed the evidence, we are convinced that the jury's answer to special issue number seven, that no oil exists in certain formations underlying the Raw Hide Fate lease, given the definition of oil which we have approved, has legally sufficient evidentiary support. Furthermore, we find that the evidence supporting the jury's answer to special issue number seven is not so weak, or the answer so contrary to the overwhelming weight of the evidence, as to be clearly wrong and manifestly unjust. From the record, there is expert testimony that (1) the Raw Hide Fate wells are not productive of oil, (2) the oil produced during the court-ordered test was not oil production by any standards, (3) the gas produced from the Raw Hide Fate wells was not casinghead gas, (4) the Coffee H–1 well and the nine nearby gas wells never produced any oil, and (5) oil production was unlikely under the Fate lease due to the high structural elevation of the Brown Dolomite formation in that location. Accordingly, point of error number nine is overruled.

**[15]** In their tenth point of error, Raw Hide contends that the trial court erroneously excluded defense exhibit number 72, arguing that it was relevant to the issues at trial. We find that the exclusion of exhibit number 72 was harmless.

Geologist John B. Rogers testified that he had been the District Director for the Railroad Commission in Pampa from

February 1, 1970, until his retirement in 1985. At a hearing outside the presence of the jury regarding the admission of exhibit number 72, Rogers testified that the exhibit was an excerpt from an annual report compiled by the Oil and Gas Division of the Railroad Commission. Rogers said that compilation of the report commenced in 1952, and that the report had been submitted to the Governor's office on an annual basis. Exhibit number 72 was included in the latest report, which was for 1985. Exhibit number 72 showed the Railroad Commission's classification of different types of oil and gas fields. It illustrated (1) non-associated gas fields, which are fields with gas, (2) associated gas fields, which have gas above with oil below, and (3) dissolved gas fields, which are totally comprised of oil.

**\*279** Rogers identified the 1938 Coffee lease and the Fate lease as being located in an associated gas field as defined by the Railroad Commission. Rogers explained that the only way to change a gas well to an oil and casinghead gas well was for the production ratio to decrease to a point where the gas to oil ratio is less than 100,000 cubic feet of gas per barrel of oil. To change an oil well to a gas well, the gas to oil ratio must exceed 100,000 cubic feet of gas to one barrel. Defense exhibit number 72 is not included in the record before us.

In their brief, Raw Hide argues, without citation to authority, that there can be oil on top of gas and that the oil and gas formations are not necessarily straight formations. Raw Hide reasons that when oil is on top of gas, the oil and casinghead gas owner can perforate the well above the perforations in a nearby gas rights well. Raw Hide argues that the exhibit would show that its right to produce casinghead gas is not limited to perforations below those in the Coffee H–1. Additionally, Raw Hide claims that when exhibit number 72 is combined with the testimony of S.G. Johnston, it demonstrates that Raw Hide was producing from a formation productive of oil, and that the gas was therefore casinghead gas.

Maxus contends that the exclusion of exhibit number 72 did not cause the rendition of an improper judgment. It argues that the 1938 Coffee lease, and not exhibit number 72, controls where Raw Hide could perforate the wells. Maxus also argues that since the jury concluded that no oil exists in the pertinent formations under the Fate lease, the location of the perforations in those formations for the production of gas is irrelevant because casinghead gas cannot be produced where no oil exists.

We agree that the exclusion of exhibit number 72 was not such a denial of Raw Hide's rights as was reasonably calculated to cause and did probably cause the rendition of an improper judgment. Tex.R.App.P. 81(b)(1). In discharging its burden of showing that the exclusion of evidence was prejudicial, the party attacking the ruling need not prove that "but for" the excluded evidence, a different judgment would have necessarily resulted. Said party is only required to show that the excluded evidence probably resulted in the rendition of an improper judgment. *King v. Skelly,* 452 S.W.2d 691 (Tex.1970); *Howard v. Faberge, Inc.,* 679 S.W.2d 644, 648 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.). Reversible error is not generally shown in connection with rulings on the admissibility of evidence unless the whole case turns on the particular evidence excluded. *Atlantic Mut. Ins. Co. v. Middleman,* 661 S.W.2d 182, 185 (Tex.App.—San Antonio 1983, writ ref'd n.r.e.); *Bridges v. City of Richardson,* 349 S.W.2d 644, 649 (Tex.Civ.App.—Dallas 1961, writ ref'd n.r.e.).

**[16]** Here, the jury found that oil cannot be produced from the pertinent formations underlying the Raw Hide Fate lease, and we have determined that the record supports that finding. Since oil is not productive from the pertinent formations under the Fate lease, the location of perforations which produced vapor from these wells was not critical to the outcome of the case because gas produced from those formations could not be casinghead gas by definition. Furthermore, the mere existence of oil within a formation does not mean that all wells producing from that formation are oil wells. *Jinkins v. Bryan,* 763 S.W.2d 539 (Tex.App.—Amarillo, 1988, n.w.h.) (not yet reported). Moreover, the excluded exhibit apparently showed that there were both oil wells and gas wells in the area surrounding the instant tract. Evidence of that fact had already been admitted through Johnston's testimony. Where excluded evidence is admitted elsewhere, error is not generally shown. *Wilson v. John Frantz Co.,* 723 S.W.2d 189, 194 (Tex.App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.). Consequently, the excluded evidence had little or no bearing on the issue of whether oil and casinghead gas was being produced from the pertinent formations under the Fate lease. The instant case did not turn on the excluded evidence and its exclusion did not result in the rendition of an improper judgment. Point of error number eleven is overruled.

**\*280** Having separately disposed of the points of error raised by Raw Hide, we conclude that no reversible error has been

presented. Accordingly, the judgment of the trial court is affirmed.

Before REYNOLDS, C.J., and DODSON, J. [*]

### ON MOTION FOR REHEARING

REYNOLDS, Chief Justice.

Raw Hide Oil & Gas, Inc. and Raw Hide Production Company, Inc. have filed a motion for rehearing, requesting a reconsideration of determinations made in our original opinion. Our reconsideration of the contentions expressed in the motion does not persuade us to change our original judgment of affirmance. Neither are we persuaded to write further upon the reconsideration other than to address Raw Hide's perception of our erroneous reliance upon authority cited in our opinion.

As previously noted, Raw Hide's second-point contention is that the trial judge gave an improper definition of the term "oil" in connection with special issue number seven. The definition, Raw Hide contends, is too restrictive because it required the jury to determine that oil was "producible under normal operating conditions."

Enroute to overruling the contention, we said in the 25th paragraph of our opinion, "In *Dorchester* [*Dorchester Gas Prod. Co. v. Harlow Corp.,* 743 S.W.2d 243 (Tex.App. —Amarillo 1987, writ requested) ], a similar instruction survived attack. *Id.* at 257. In effect we have already concluded that a similar instruction was material." Raw Hide notes that at page 257 of the *Dorchester* opinion there is a discussion of the definition of casinghead gas that was given in that case, and submits that the *Dorchester* opinion does not support the definition of oil, a different substance, that was used in this case.

It is apparent from Raw Hide's perception of our reference that we could have employed more specific language of communication. Nevertheless, the language we used was not an intended reference to the *Dorchester* definition of casinghead gas; rather, it was a reference to that earlier part of the page where it is recorded that the *Dorchester* jury, implicitly deliberating with a similar definition of oil, determined that the formation from which the wells were producing "is not productive of native oil under normal operating conditions." But aside from that, and more pertinent, we immediately followed the referential language with an explanation why the challenged definition was relevant to the issue, a sufficient basis for overruling Raw Hide's second-point contention.

The motion for rehearing is overruled.

Footnotes

1    Raw Hide disputes the existence of the Arkosic Dolomite formation under Section 237; however, resolution of this issue is not germane to this Court's decision.

2    Tex.Civ.Prac. & Rem.Code Ann. § 37.001 *et seq.* (Vernon 1986).

3    The breadth of the permanent injunction has not been challenged by point of error and we are, therefore, not called upon to express an opinion concerning it.

4    We express no opinion as to whether Raw Hide timely filed the bill of exception. In this regard, the record shows that (1) the Offer of Proof and Bill of Exceptions was given to the trial judge on September 22, 1987, (2) the verdict was returned on September 23, 1987, (3) the Amended Final Judgment was signed on October 21, 1987, and (4) the Offer of Proof and Bill of Exceptions was file-marked February 3, 1988. *See* Tex.R.App.P. 52(c)(11).

5    We note that, although we have determined that special issue number three was rendered inconsequential by the jury's answer to special issue number seven, we believe a discussion of the legal and factual sufficiency point of error is appropriate in view of the interrelationship between points of error numbers four, five, and nine.

*    Justice Pirtle, who authored the opinion for the Court on original submission, did not participate in the decision on motion for rehearing because his term of office expired on 31 December 1988.

**End of Document**                                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

576 S.W.2d 607
Supreme Court of Texas.

Nora RAY, Petitioner,
v.
FARMERS' STATE BANK OF
HART, Texas, Respondent.

No. B-7649.  |  Jan. 17, 1979.

Drawer sued drawee bank to recover sum allegedly wrongfully paid out of checking account upon altered check bearing drawer's signature. The District Court, Castro County, John P. Boyd, J., entered judgment for drawer and bank appealed. The Court of Civil Appeals, Robinson, C. J., 565 S.W.2d 103, reversed and rendered judgment for bank, and drawer appealed. The Supreme Court, Pope, J., held that evidence presented fact question as to whether drawer was negligent under circumstances so as to preclude her from asserting alteration against drawee bank.

Court of Civil Appeals reversed.

Denton, J., dissented.

West Headnotes (5)

[1]     **Trial**
          👉 Finding of Fact or Conclusion of Law

Although finding appears among conclusions of law, designation is not controlling on appeal and appellate court may treat it as a finding of fact.

62 Cases that cite this headnote

[2]     **Banks and Banking**
          👉 Negligence of Depositor, and Ratification of Forgery or Fraudulent Alteration

Drawer of check would be precluded from asserting third party's alteration of check against drawee bank if her negligence substantially contributed to the alteration of the check. V.T.C.A., Bus. & C. §§ 3.406, 3.407, 3.407(a)(3).

3 Cases that cite this headnote

[3]     **Negligence**
          👉 Negligence as Question of Fact or Law Generally

Generally, determination of negligence is province of trier of fact.

4 Cases that cite this headnote

[4]     **Appeal and Error**
          👉 Some or Any Evidence

Judgment of trial court will not be set aside if there is any evidence of a probative nature to support it and a Court of Civil Appeals cannot substitute its findings of fact for those of trial court if there is any evidence in the record to sustain the trial court's findings.

70 Cases that cite this headnote

[5]     **Banks and Banking**
          👉 Trial and Judgment

In action brought by check drawer against drawee bank claiming that drawee bank was liable for loss occasioned by check that a third party altered, evidence presented fact question as to whether drawer was negligent under circumstances so as to preclude her from asserting the alteration against bank. V.T.C.A., Bus. & C. §§ 3.406, 3.407, 3.407(a)(3).

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*607** Moran & Miller, Dimmitt, Whittenburg Law Firm, Amarillo, Cary Schachter, Amarillo, for petitioner.

Gibson, Ochsner, Adkins, Harlan & Hankins, A. B. Hankins and Danny M. Needham, Amarillo, for respondent.

**Opinion**

POPE, Justice.

The question presented is whether Mrs. Nora Ray, the drawer, or Farmers' State Bank of Hart, Texas, the drawee, is liable for the loss occasioned by a check that a third party altered. In a case tried before the court without a jury, Mrs. Ray recovered judgment for $1,850.00, which was the amount of the alteration. The court of civil appeals reversed the judgment and rendered judgment that Mrs. Ray take nothing. 565 S.W.2d 103. We reverse the judgment of the court of civil appeals and affirm that of the trial court.

The controlling issue in the case is whether Mrs. Ray was negligent as a matter of law. On May 7, 1975, Mrs. Ray, an eighty-year-old lady, was awakened from a nap by a man who was shaking the screen to her front door. He gave his name as Robert Freeman, said he worked for the utility company, and that he needed to check the electrical system of her home because the power was off along the block. Mrs. Ray testified that when she unlatched the screen to look down the street for a utility vehicle, Freeman pushed his way inside the house. He went around the house placing a device **\*608** in the electrical outlets and then went outside to check in the garage. While he was outside, as she later discovered, he cut the telephone wire to her house. Upon returning, he told Mrs. Ray that he was not through, but that he was awaiting the arrival of someone else from the utility company. He said that he was going to get a hamburger and would return after lunch, but that she should give him $1.50 for the service charge. Mrs. Ray testified that she could not see what he had done to earn $1.50 but was willing to give him the money to get him out of the house. She reached for her purse, but Freeman picked up her checkbook that was lying on the table telling her that his company required payment by check. He proceeded to fill it in, then shoved it over to her to be signed. She noted to herself that the check was for $1.50 and was in ink so it couldn't be changed. She signed the check and Freeman left.

After waiting a considerable period of time, Mrs. Ray concluded that Freeman was not going to return. She decided to phone the bank to stop payment on the check because he had not earned the money. She then discovered the phone was dead. Mrs. Ray walked down the street to use a neighbor's phone but could find nobody at home. About two hours later, when she finally talked to a lady at the bank, she learned that Freeman had cashed the check and that it was for $1,851.50 instead of $1.50.

When Freeman filled out the check at Mrs. Ray's home, he wrote the figures "1.50" far to the right of the dollar mark, leaving space in which he later added the figures "185".

That made the amount appear as $1,851.50. There is some evidence that he also left space on the next line where he wrote the words "one and 50/100". He later placed in front of those words, "Eighteen Hundred & Fifty."

When Freeman presented the check at the bank, the teller required him to produce identification which he did by showing his driver's license and another identification card that showed his picture. Freeman had endorsed the check and beneath his signature he had stamped the words, "Allied Construction and Commercial-Residential."

 **[1]**   The trial court made a number of findings of fact and also filed conclusions of law. The findings relevant to this appeal are:

1a. The Defendant Bank paid the check in question in good faith and in accordance with the reasonable commercial standards of the Bank's business.

2a. The Defendant Bank paid the check in due course of its banking business.

The relevant "conclusion of law" [1] was that the conditions and circumstances under which Nora Ray signed and delivered the check did not amount to negligence substantially contributing to the material alteration of the instrument as required by Section 3.406 of the Uniform Commercial Code to constitute a defense.

We must begin with article 4.401 of the Code [2] since it sets forth the general rule when a bank may charge an item against a customer's account. It states that a bank may charge against a customer's account any item properly payable from that account. Further, the bank may charge the account if it pays in good faith, even though the item has been altered, but only according **\*609** to the original tenor of the altered item. We are here dealing with an alteration as explained by article 3.407(a)(3) [3] since there were additions to Mrs. Ray's check. If we look only to these two statutes, the bank had the right to charge Mrs. Ray's account according to the original tenor of the item $1.50 because, according to the findings, the bank acted in good faith.

**[2]**   We still need, however, to fit article 3.406 [4] into the scheme of the statutes. That article cuts off rights that a person might have against a holder in due course or against a drawee or other payor who pays an instrument in good faith and in accordance with reasonable commercial standards of the drawee's or payor's business. This means that Mrs. Ray would

be precluded from asserting the alteration against Farmers' State Bank if her negligence substantially contributed to the alteration of the check.

In determining whether the bank may charge Mrs. Ray's account, there are steps that must be taken sequentially. First, the instrument must have been paid in good faith and in accordance with the reasonable commercial standards of the drawee's business. Second, the person seeking to assert the alteration must be found negligent. Third, the negligence must have substantially contributed to the alteration of the instrument.

It can be concluded that the bank did pay the check in good faith and in accordance with reasonable commercial standards. There was a finding of fact to this effect by the trial court, and there was no dispute concerning this issue before the court of civil appeals. The trial court and the court of civil appeals, however, differ on the question of negligence. The trial court found that Mrs. Ray was not negligent under the circumstances, but the court of civil appeals found negligence as a matter of law.

Official Comment 3 to this section of the Uniform Commercial Code includes this explanation of how negligence is to be determined.

> 3. No attempt is made to define negligence which will contribute to an alteration. The question is left to the court or the jury upon the circumstances of the particular cases. Negligence usually has been found where spaces are left in the body of the instrument in which words or figures may be inserted.

 **[3]**  **[4]**  As a general rule, the determination of negligence is the province of the trier of fact. Exchange Bank & Trust Co. v. Kidwell Construction Co., 463 S.W.2d 465 (Tex.Civ.App. Tyler), writ ref'd n. r. e. per curiam, 472 S.W.2d 117

(Tex.1971). In determining whether there was any evidence of probative force to sustain the trial judge's finding, the court of civil appeals was required to consider only that evidence favorable to the finding and the judgment rendered thereon and to disregard all evidence to the contrary. The judgment of a trial court will not be set aside if there is any evidence of a probative nature to support it, and a court of civil appeals cannot substitute its findings of fact for those of the trial court if there is any evidence in the record to sustain the trial court's findings. Cavanaugh v. Davis, 149 Tex. 573, 235 S.W.2d 972 (Tex.1951).

 **[5]**  When viewed in the light most favorable to the trial court's judgment, we **\*610** think there is at least some evidence of probative force to support the trial court's finding. At most, the evidence is conflicting. Under such circumstances, the trial court's finding is binding on the court of civil appeals. It is our opinion that the nature of the evidence introduced at trial was such that reasonable minds might differ as to whether Nora Ray was negligent under the circumstances. The court of civil appeals, therefore, erred in reversing the judgment of the trial court and rendering judgment that Nora Ray was negligent as a matter of law. Because of this determination, we do not reach the causation issue.

The judgment of the court of civil appeals is reversed and that of the trial court is affirmed.

Dissenting opinion by DENTON, J.

CAMPBELL and SPEARS, JJ., not sitting.

DENTON, Justice, dissenting.

I respectfully dissent. I agree with the Court of Civil Appeals.

**Parallel Citations**

25 UCC Rep.Serv. 779

Footnotes

1    Although this finding appears among the conclusions of law, the designation is not controlling and we may treat it as a finding of fact. McAshan v. Cavitt, 149 Tex. 147, 229 S.W.2d 1016 (1950).

2    s 4.401. When Bank May Charge Customer's Account
(a) As against its customer, a bank may charge against his account any item which is otherwise properly payable from that account even though the charge creates an overdraft.
(b) A bank which in good faith makes payment to a holder may charge the indicated account of its customer according to
(1) the original tenor of his altered item; or

(2) the tenor of his completed item, even though the bank knows the item has been completed unless the bank has notice that the completion was improper.

Tex.Bus. & Com.Code Ann. s 4.401 (Tex.UCC).

s 3.407. Alteration

(a) Any alteration of an instrument is material which changes the contract of any party thereto in any respect, including any such change in

(1) the number or relations of the parties; or

(2) an incomplete instrument, by completing it otherwise than as authorized; or

(3) the writing as signed, by adding to it or by removing any part of it.

Tex.Bus. & Com.Code Ann. s 3.407 (Tex.UCC).

s 3.406. Negligence Contributing to Alteration or Unauthorized Signature

Any person who by his negligence substantially contributes to a material alteration of the instrument or to the making of an unauthorized signature is precluded from asserting the alteration or lack of authority against a holder in due course or against a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business.

Tex.Bus. & Com.Code Ann. s 3.406 (Tex.UCC).

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Service Corp. Intern. v. Guerra, 348 S.W.3d 221 (2011)

54 Tex. Sup. Ct. J. 1191

348 S.W.3d 221
Supreme Court of Texas.

SERVICE CORPORATION INTERNATIONAL
and SCI Texas Funeral Services, Inc., d/b/
a Mont Meta Memorial Park, Petitioners,

v.

Juanita G. GUERRA, Julie Ann Ramirez, Gracie
Little and Mary Esther Martinez, Respondents.

No. 09–0941.    |    Argued Dec.
19, 2010.    |    Decided June 17, 2011.

**Synopsis**
**Background:** Decedent's daughters and widow brought action against operator of cemetery and its parent corporation for fraud, intentional infliction of emotional distress, negligence, and trespass after decedent's body was moved without their permission. Following jury trial, the 404th District Court, Cameron County, Abel C. Limas, J., entered judgment in favor of widow and daughters for $2.2 million for past mental anguish and $4 million for exemplary damages. Operator and parent appealed. The Court of Appeals, Nelda V. Rodriguez, J., 348 S.W.3d 239, affirmed as modified. Operator and parent petitioned for review which was granted.

**Holdings:** The Supreme Court, Johnson, J., held that:

[1] deemed finding in support of judgment was made;

[2] testimony of cemetery's former general manager was no evidence that former general manager was employed by parent;

[3] evidence was legally insufficient to support findings that any of decedent's daughters suffered compensable mental anguish;

[4] operator and parent did not open the door to evidence of other lawsuits;

[5] evidence of other lawsuits against parent was irrelevant; and

[6] erroneous admission of evidence of other lawsuits was harmful and required remand.

Reversed and remanded.

West Headnotes (28)

[1]    **Appeal and Error**
 Sufficiency of Evidence in Support
**Appeal and Error**
 Total failure of proof
A no-evidence challenge will be sustained when: (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact; evidence is more than a scintilla if it rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.

28 Cases that cite this headnote

[2]    **Evidence**
 Sufficiency to support verdict or finding
If evidence does no more than create a mere surmise or suspicion and is so slight as to necessarily make any inference a guess, then it is no evidence.

13 Cases that cite this headnote

[3]    **Appeal and Error**
 Verdict
When considering no evidence challenge, Supreme Court presumes that jurors made all inferences in favor of the verdict, but only if reasonable minds could do so; jurors may not simply speculate that a particular inference arises from the evidence.

6 Cases that cite this headnote

[4]    **Corporations and Business Organizations**
 Wrongful Acts or Omissions

**Service Corp. Intern. v. Guerra, 348 S.W.3d 221 (2011)**

54 Tex. Sup. Ct. J. 1191

**Labor and Employment**
🔑 Scope of Employment

Corporations are liable for the negligence of corporate employees acting within the scope of their employment.

1 Cases that cite this headnote

**[5]     Corporations and Business Organizations**
🔑 Wrongful Acts or Omissions

**Labor and Employment**
🔑 Relation of Parties

Except for a few circumstances, a corporation is not vicariously liable for the negligence of someone who is not its employee.

Cases that cite this headnote

**[6]     Trial**
🔑 Findings by court on issues not submitted

Deemed finding in support of judgment against operator of cemetery and its parent corporation was made in action by widow and daughters of decedent whose body was moved without their permission for intentional infliction of emotional distress, negligence, and trespass, where the jury charge did not have a separate question asking if any of the actors in incident were employees of parent, there was no objection to the charge on the basis that it omitted the element of employment, and there was no finding regarding whether actors were employees of the parent. Vernon's Ann.Texas Rules Civ.Proc., Rule 279.

1 Cases that cite this headnote

**[7]     Trial**
🔑 Findings by court on issues not submitted

When an element of a claim is omitted from the jury charge without objection and no written findings are made by the trial court on that element, then the omitted element is deemed to have been found by the court in such manner as to support the judgment. Vernon's Ann.Texas Rules Civ.Proc., Rule 279.

2 Cases that cite this headnote

**[8]     Trial**
🔑 Findings by court on issues not submitted

Just as with any other finding, there must be evidence to support a deemed finding.

4 Cases that cite this headnote

**[9]     Corporations and Business Organizations**
🔑 Weight and sufficiency

Testimony of cemetery's former general manager that she was employed by "SCI Texas," which owned and operated cemetery and employed the people who worked there was no evidence that former general manager or any of the other cemetery employees were employed by owner and operator's parent company that also had "SCI" in its name.

Cases that cite this headnote

**[10]     Corporations and Business Organizations**
🔑 Weight and sufficiency

Testimony that "SCI" employed cemetery workers was no evidence they were employed by parent corporation of cemetery operator, where statements that the workers were employed by "SCI" only allowed for speculation that they were employed by the parent because both the parent and the operator had the letters "SCI" as part of their names.

1 Cases that cite this headnote

**[11]     Evidence**
🔑 Sufficiency to support verdict or finding

Findings based on evidence that allow for no more than speculation, a guess, are based on legally insufficient evidence.

2 Cases that cite this headnote

**[12]     Corporations and Business Organizations**
🔑 Weight and sufficiency

Testimony from a former family service counselor supervisor at a cemetery that he was employed by "Service Corporation International" was no evidence that parent

**Service Corp. Intern. v. Guerra, 348 S.W.3d 221 (2011)**

54 Tex. Sup. Ct. J. 1191

corporation, which was called "Service Corporation International," of operator of cemetery at which decedent's body was moved without the permission of his widow and daughters employed the workers who were involved in the movement of the body. Vernon's Ann.Texas Rules Civ.Proc., Rule 279.

Cases that cite this headnote

**[13]    Corporations and Business Organizations**
    👉 Parent and subsidiary corporations

Presence of the "SCI" logo on personnel paperwork of former general manager of cemetery was legally insufficient to support a finding that former general manager was employed by parent corporation of cemetery operator that also had "SCI" in its name; inferences were equal, and the presence of the logo on the documents was as consistent with employment by operator as with parent.

Cases that cite this headnote

**[14]    Corporations and Business Organizations**
    👉 Parent and subsidiary corporations

Heading on employee requisition form that stated "Service Corporation International" which was the name of the parent corporation of cemetery operator was legally insufficient to support a finding that parent employed any cemetery workers, where form also contained a blank space for location or department name which contained the name of cemetery and a funeral home, and president of operator testified that form was supplied by parent, but operator was making a requisition request for itself, rather than for someone to be employed by the parent.

Cases that cite this headnote

**[15]    Damages**
    👉 Nature of Injury or Threat in General

Generally, an award of mental anguish damages must be supported by direct evidence that the nature, duration, and severity of mental anguish was sufficient to cause, and caused, either a substantial disruption in the plaintiff's daily

routine or a high degree of mental pain and distress.

20 Cases that cite this headnote

**[16]    Damages**
    👉 Nature of Injury or Threat in General

Even when an occurrence is of the type for which mental anguish damages are recoverable, evidence of the nature, duration, and severity of the mental anguish is required.

19 Cases that cite this headnote

**[17]    Dead Bodies**
    👉 Civil liabilities

Evidence was legally insufficient to support findings that any of decedent's daughters suffered compensable mental anguish due to the unauthorized movement of decedent's body by cemetery, although daughters experienced very strong emotional reactions that would be expected from the unauthorized moving of a loved one's body; none of the witnesses, including the daughters themselves, identified a specific high degree of mental pain and distress experienced by particular family members, or a substantial disruption of any particular family member's daily routine.

3 Cases that cite this headnote

**[18]    Dead Bodies**
    👉 Civil liabilities

There was some evidence to support the jury's finding that decedent's widow suffered the degree of mental pain and distress that would support damages for mental anguish due to the unauthorized movement of decedent's body by cemetery, even if there was no evidence that her routine was disrupted; lack of evidence of disruption in routine did not negate the evidence that widow suffered compensable mental anguish, and she testified that she suffered burning in her stomach due to the stress and sought medical treatment for the symptoms, continued to have headaches and take medication for anxiety and depression, and that she had been

**Service Corp. Intern. v. Guerra, 348 S.W.3d 221 (2011)**

54 Tex. Sup. Ct. J. 1191

worrying and having fear and anxiety about what might be done to her at the cemetery for nearly six years since the decedent's casket was moved.

10 Cases that cite this headnote

**[19]    Appeal and Error**
   Necessity of timely objection

**Appeal and Error**
   Objections to evidence in general

**Appeal and Error**
   Necessity of Ruling on Objection or Motion

Error is preserved with regard to a ruling that admits evidence if the opponent of the evidence makes a timely, specific objection and obtains a ruling. Rules App.Proc., Rule 33.1; Rules of Evid., Rule 103.

2 Cases that cite this headnote

**[20]    Appeal and Error**
   Arguments and conduct of counsel

The failure to object to an attorney's statements during voir dire of the jury panel, without more, does not waive a later objection to evidence offered during trial, because statements by lawyers during the jury selection process are not evidence.

Cases that cite this headnote

**[21]    Trial**
   Evidence to rebut statements

Operator of cemetery and its parent company did not open the door to evidence of other lawsuits by alluding to other lawsuits in opening statements in action by decedent's widow and daughters for intentional infliction of emotional distress, negligence, and trespass relating to the unauthorized movement of decedent's body, where attorney for decedent's family was the first to allude to other lawsuits in opening statements.

Cases that cite this headnote

**[22]    Appeal and Error**

**Rulings on admissibility of evidence in general**

Supreme Court reviews a trial court's decision to admit evidence for an abuse of discretion.

17 Cases that cite this headnote

**[23]    Evidence**
   Showing Intent or Malice or Motive

Evidence of other wrongs or acts is admissible to show a party's intent, if material, provided the prior acts are so connected with the transaction at issue that they may all be parts of a system, scheme or plan; this can be shown through evidence of similar acts temporally relevant and of the same substantive basis. Rules of Evid., Rule 404.

3 Cases that cite this headnote

**[24]    Evidence**
   Similar wrongful acts

Evidence of other lawsuits, verdicts, and judgments against parent corporation of cemetery operator was irrelevant in action by decedent's widow and daughters against operator and parent for intentional infliction of emotional distress, negligence, and trespass relating to the unauthorized movement of decedent's body, where some evidence concerned suits involving allegations that plots that were sold twice, but decedent's family presented no evidence that those events were so connected to the events in the instant case that they were all part of a system, scheme, or plan, and some evidence concerned suit involving a body being moved without permission, but the events in that case and the instant case occurred more than a year apart at different cemeteries and there was no evidence that any of the same employees were involved or that they occurred under similar circumstances. Rules of Evid., Rule 404.

Cases that cite this headnote

**[25]    Appeal and Error**
   Evidence in General

**Service Corp. Intern. v. Guerra, 348 S.W.3d 221 (2011)**

54 Tex. Sup. Ct. J. 1191

In determining whether error in admitting evidence was harmful, Supreme Court evaluates the entire case from voir dire to closing argument, considering the evidence, strengths, and weaknesses of the case, and the verdict; Court also considers whether counsel emphasized the erroneous evidence and whether the admission of the evidence was calculated or inadvertent.

7 Cases that cite this headnote

[26] **Appeal and Error**
      Documentary evidence; photographs

Erroneous admission of evidence of other lawsuits, verdicts, and judgments was harmful and required the case to be remanded for a new trial in action by decedent's widow and daughters against cemetery operator and its parent corporation for intentional infliction of emotional distress, negligence, and trespass relating to the unauthorized movement of decedent's body, where extensive evidence of other suits against parent, allegations in the suits, and similar evidence was a significant factor in the jury's damages findings, both actual and punitive, and jury awarded daughters $100,000 each even though there was no evidence that they suffered compensable mental anguish.

1 Cases that cite this headnote

[27] **Damages**
      Nature and Theory of Damages Additional to Compensation

The purposes of punitive damages are to deter and punish culpable conduct. V.T.C.A., Civil Practice & Remedies Code § 41.001(5).

1 Cases that cite this headnote

[28] **Dead Bodies**
      Civil liabilities

Evidence that decedent's widow would put any punitive damages she received into a trust to pay for funerals for persons who could not afford them was irrelevant in action by widow and decedent's daughters against

cemetery operator and its parent for intentional infliction of emotional distress, negligence, and trespass relating to the unauthorized movement of decedent's body.

Cases that cite this headnote

**Attorneys and Law Firms**

 **\*225** Mike A. Hatchell, Charles R. Watson Jr., Molly H. Hatchell, Locke Lord Bissell & Liddell LLP, Austin, Charles C. Murray, Lisa D. Powell, Adriana Hernandez Cardenas, Atlas & Hall, L.L.P., McAllen, Sarah B. Duncan, Kirsten M. Castaneda, Locke Lord Bissell & Liddell LLP, Austin, for Petitioners.

Richard G. Roth, Law Offices of Richard G. Roth, South Padre Island, J. Scott McLain, Kristin Ann Gaston, Reed, McLain & Guerrero, LLP, Mark L. Kincaid, Elizabeth Rose Von Kreisler, Kincaid & Horton, L.L.P., Austin, for Respondent.

**Opinion**

Justice JOHNSON delivered the opinion of the Court.

In this appeal we address whether the evidence was sufficient to support jury **\*226** findings that (1) both the corporation that owned and operated a cemetery and its parent corporation were liable for actions of the cemetery's employees, and (2) the daughters and widow of a decedent suffered compensable mental anguish because the decedent's body was disinterred and moved to another grave without permission. We also address whether evidence of other lawsuits against the cemetery owner was properly admitted.

Marcos Guerra was buried at Mont Meta Memorial Park cemetery in a plot that had been sold to someone else. His family refused the cemetery's request that it be allowed to move the body to another burial plot, but the cemetery did so anyway. When family members discovered that Mr. Guerra's body had been moved, his daughters and widow sued both SCI Texas Funeral Services, Inc. d/b/a Mont Meta Memorial Park (SCI Texas), the corporation that owned and operated the cemetery, and its parent corporation, Service Corporation International (SCI International). Pursuant to a jury verdict, the trial court rendered judgment against both corporations for actual and exemplary damages. The court of

Service Corp. Intern. v. Guerra, 348 S.W.3d 221 (2011)

54 Tex. Sup. Ct. J. 1191

appeals modified the judgment as to exemplary damages and otherwise affirmed.

We hold that there was legally insufficient evidence to support either the liability findings against SCI International or the mental anguish findings in favor of Mr. Guerra's daughters. We further hold that the trial court erred by admitting evidence of other lawsuits, verdicts, and judgments against SCI Texas. We reverse and render in part and remand for a new trial in part.

## I. Background

SCI Texas owns and operates several cemeteries in Texas, including Mont Meta Memorial Park in San Benito. Through an intermediary corporation not involved in this litigation, SCI Texas is wholly owned by SCI International.

When Mr. Guerra died unexpectedly on October 5, 2001, his family decided to have him buried at Mont Meta. Two of his three daughters, Julie Ann Ramirez and Gracie Little, went to Mont Meta and made funeral arrangements. Pursuant to the wishes of their mother, Juanita Guerra, Julie and Gracie arranged for Mrs. Guerra to purchase burial plots 5 and 5X at Mont Meta. One of the plots was to be used for Mr. Guerra and one was to eventually be used by Mrs. Guerra.

SCI Texas requires that before a burial takes place a "blind check" of the arrangements must be performed by an employee other than the employee who made the original arrangements. The blind check is to verify (1) the location of the burial plot to be used, (2) that the plot has not been previously sold, and (3) that no one is already buried in the plot. A Mont Meta employee performed the blind check on the day of Mr. Guerra's burial as part of her duties at Mont Meta. She concluded that the cemetery's records showed plot 5, where Mr. Guerra was to be buried, had been previously sold to another family. She brought this to the attention of her supervisor, who concluded that the burial could proceed because plot 5 had been quitclaimed to the Guerras.

Another Mont Meta employee reviewed the paperwork after the funeral and discovered that the supervisor had not been correct: plot 5 had not been quitclaimed to the Guerras. A Mont Meta employee contacted the Guerras and told them that the plot where Mr. Guerra was buried belonged to someone else. The Guerras met with Mont Meta's general manager, Jaye Gaspard, and declined his request that the cemetery be allowed to move Mr. Guerra's body to another plot.

**\*227** Sometime after the meeting with Gaspard, the Guerras noticed that grass on Mr. Guerra's grave appeared to have been disturbed. They contacted Mont Meta about the situation. Gaspard responded with a letter in which he indicated that resodding had taken place in the cemetery and a passageway next to where Mr. Guerra was buried had been converted to a plot to ensure that a place beside Mr. Guerra was available for Mrs. Guerra. When the family received deeds for the plots they had purchased, however, the deeds were for plots 5X and 5XX rather than 5 and 5X. The Guerras suspected that Mr. Guerra's body had been moved and they filed a complaint with the Texas Funeral Commission. Six months later, Vicky Trevino, who was by then general manager at Mont Meta, [1] disclosed to the Guerras that they were correct: Mr. Guerra's body had been moved about 12 to 18 inches laterally into plot 5X.

Mrs. Guerra and her daughters Julie, Gracie, and Mary Ester Martinez (collectively, the Guerras) sued SCI Texas and SCI International. They asserted causes of action for fraud, intentional infliction of emotional distress, negligence, and trespass. A jury found in favor of the Guerras on the three liability theories submitted—intentional infliction of emotional distress, negligence, and trespass—and awarded damages of $2 million for past mental anguish to Mrs. Guerra, $100,000 for past mental anguish to each daughter, and allocated responsibility 70% to SCI International and 30% to SCI Texas. The jury also awarded exemplary damages of $3 million against SCI International and $1 million against SCI Texas, allocated 70% to Mrs. Guerra and 10% to each daughter.

Both defendants appealed. The court of appeals modified the judgment and reduced the exemplary damages to $750,000 for each defendant in accordance with the statutory cap, *see* TEX. CIV. PRAC. & REM.CODE § 41.008(b), but otherwise affirmed. 348 S.W.3d 221 at 226. In this Court the SCI entities argue that (1) there is no evidence to support the finding of liability as to SCI International; (2) there is no evidence to support the award of, or the amounts awarded for, mental anguish damages; (3) the trial court erred by admitting evidence of suits against other SCI Texas cemeteries and of a suit against and settlement entered into in Florida by SCI International; (4) two of the liability theories in the jury charge were not legally viable and it is impossible to determine if the jury awarded damages based on an invalid

**Service Corp. Intern. v. Guerra, 348 S.W.3d 221 (2011)**

54 Tex. Sup. Ct. J. 1191

theory of liability because the charge contained only one damages question conditioned on an affirmative finding to any of the three liability questions; (5) the trial court erred by admitting testimony that Mrs. Guerra would put any punitive damages in a trust for use by people who cannot afford funerals; and (6) the jury's award of damages was influenced by an improper "Golden Rule" argument.

We begin by addressing the challenge to the legal sufficiency of the evidence as to SCI International.

## II. SCI International

The charge submitted three liability questions to the jury: (1) Did either of the Defendants intentionally inflict severe emotional distress on the Plaintiffs; (2) Did the negligence of either Defendant proximately cause the occurrence in question; and (3) Did either Defendant commit a trespass upon the property of the Plaintiffs?[2] Each question required the jury to **\*228** answer separately for SCI International and SCI Texas, and the jury answered "Yes" as to each defendant for each question.

The Guerras argue that the testimony of several cemetery employees who said that they worked for "SCI" and records in Jaye Gaspard's personnel file with the SCI logo and referencing "Service Corporation International" are evidence that SCI International employed the Mont Meta workers and was therefore liable for their actions. We disagree.

### A. Standard of Review

 **[1]**    **[2]**    **[3]**    A no-evidence challenge will be sustained when "(a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact." *King Ranch, Inc. v. Chapman,* 118 S.W.3d 742, 751 (Tex.2003). Evidence is more than a scintilla if it "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Ford Mtr. Co. v. Ridgway,* 135 S.W.3d 598, 601 (Tex.2004). If, however, the evidence does no more than create a mere surmise or suspicion and is so slight as to necessarily make any inference a guess, then it is no evidence. *Id.* We presume that jurors made all inferences in favor of the

verdict, but only if reasonable minds could do so. Jurors may not simply speculate that a particular inference arises from the evidence. *See City of Keller v. Wilson,* 168 S.W.3d 802, 821 (Tex.2005).

### B. Liability Findings

 **[4]**    **[5]**    Corporations are liable for the negligence of corporate employees acting within the scope of their employment. *See St. Joseph Hosp. v. Wolff,* 94 S.W.3d 513, 541 (Tex.2002). But except for a few circumstances which the Guerras do not claim apply in this case, a corporation is not vicariously liable for the negligence of someone who is not its employee. *See id.* at 542–43 (noting that a person may be held liable for the actions of another if he has a certain degree of express or implied control over the actor).

 **[6]**    SCI International first argues that because the jury charge did not contain a separate question asking if any of the actors were SCI International employees, the Guerras must have conclusively proved that they were employees because "all independent grounds of recovery ... not conclusively established under the evidence and no element of which is submitted or requested are waived." *See* TEX.R. CIV. P. 279. We disagree.

Whether the actors involved in this case were SCI International employees was not an independent ground of recovery; the actors' status as employees was an *element* of the Guerras' negligence claim against SCI International. *See Diamond Offshore Mgmt. Co. v. Guidry,* 171 S.W.3d 840, 844 (Tex.2005) (noting that when evidence is conflicting regarding whether an employee was acting in the scope of his employment at the time of an accident—a prerequisite for imposing vicarious liability—a jury finding is required); *see also* COMM. ON PATTERN JURY CHARGES, STATE BAR OF TEX., TEXAS PATTERN JURY CHARGES —GENERAL NEGLIGENCE PJC 7.1 (Comment) (2006) (explaining that a question asking whether an actor is an employee of a defendant should be used "if there is a factual dispute about the employment element essential to a defendant's vicarious liability").

 **[7]**    **[8]**    When an element of a claim is omitted from the jury charge without objection and no written findings are made **\*229** by the trial court on that element then the omitted element is deemed to have been found by the court in such manner as to support the judgment. TEX.R. CIV. P. 279; *In*

**Service Corp. Intern. v. Guerra, 348 S.W.3d 221 (2011)**

54 Tex. Sup. Ct. J. 1191

*re J.F.C.,* 96 S.W.3d 256, 263 (Tex.2002). Here there was no objection to the charge on the basis that it omitted the element nor did the trial court make findings on it, so there is a deemed finding in support of the judgment. But just as with any other finding, there must be evidence to support a deemed finding. Thus, we next address whether legally sufficient evidence supports the finding here. *See In re J.F.C.,* 96 S.W.3d at 276; *Ramos v. Frito–Lay, Inc.,* 784 S.W.2d 667, 668 (Tex.1990).

### C. The Evidence

The Guerras assert that testimony from persons working at Mont Meta supports a finding that they were employed by SCI International. The Guerras point to testimony from several cemetery employees to the effect that they worked for "SCI." For example, the Guerras reference testimony by a foreman at Mont Meta who testified he was employed "[w]ith the SCI company," and testimony by the employee who worked with the Guerras to pick the burial plots that she was employed by "SCI." The Guerras also point out that Raymond McManness, who identified himself as "area vice-president," was asked by the Guerras' attorney about his employment with "SCI" and "SCI" having buried Mr. Guerra in the wrong spot, yet McManness did not clarify what "SCI" meant. Further, the Guerras reference testimony of Mont Meta's former general manager, Vicky Trevino.

 **[9]**   We first address Trevino's testimony. At trial she affirmatively answered a question from the Guerras' attorney inquiring whether she stated in her deposition that she worked for "Service Corporation International, SCI." Although she made the acknowledgment in her trial testimony, her deposition testimony, which was shown to the jury in a video, was actually that Trevino was employed by "SCI." And during her trial cross examination about her deposition testimony, she did not waiver in maintaining that she worked for SCI Texas, SCI Texas operates Mont Meta, and SCI Texas employed the people who worked at Mont Meta. Taking her testimony in context, as we must, it is no evidence that Trevino or any of the other cemetery employees were employed by SCI International. *See City of Keller,* 168 S.W.3d at 812 ("[E]vidence cannot be taken out of context in a way that makes it seem to support a verdict when it in fact never did."); *Bostrom Seating, Inc. v. Crane Carrier Co.,* 140 S.W.3d 681, 684 (Tex.2004) (holding that comments from deposition read out of context at trial were not evidence of a product defect when the comments were considered in context and clarified by the expert who made them).

 **[10]**    **[11]**    Apart from Trevino's testimony, which we have determined was no evidence when properly considered in context, the testimony that the Guerras claim supports a finding that the cemetery workers were employed by SCI International were statements about "SCI." Both SCI entities had the initials SCI in their name and were referred to as SCI by witnesses and the attorneys throughout the trial. Statements that the workers were employed by "SCI" only allow for speculation that they were employed by SCI International. And findings based on evidence that allows for no more than speculation—a guess—are based on legally insufficient evidence. *See City of Keller,* 168 S.W.3d at 827 ("[L]egal-sufficiency review in the proper light must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not."). Thus, under this record, testimony **\*230** that "SCI" employed the cemetery workers is no evidence they were employed by SCI International.

 **[12]**    The Guerras also point to testimony from a former family service counselor supervisor at Highland Memorial Park in Weslaco that he was employed by "Service Corporation International." According to the testimony, Highland Memorial Park was owned by "SCI." But there was no evidence that the Mont Meta workers had the same employer as the Highland Memorial Park workers, even assuming the Highland workers were employed by SCI International. The former Highland Memorial Park employee's testimony is no evidence that Service Corporation International employed the Mont Meta workers.

 **[13]**    The court of appeals referenced the presence of the SCI logo on Jaye Gaspard's personnel paperwork as evidence that he was employed by SCI International. But in contrast to the Guerras' assertions as to SCI International's relationship to the cemetery employees, the President of SCI Texas, William O'Brien, testified that SCI Texas is a wholly owned subsidiary of SCI International; SCI Texas contracted with Mrs. Guerra; SCI International does not have any employees; SCI International does not own or operate any funeral homes or cemeteries; and SCI International's only assets are shares of stock in subsidiary companies. O'Brien also testified that all SCI-related businesses were authorized to use the SCI logo. Thus, the presence of the SCI logo on Gaspard's personnel documents was as consistent with employment by SCI Texas as it was with employment by SCI International, and the inference that SCI International employed Gaspard was no greater than the inference that SCI Texas employed him.

**Service Corp. Intern. v. Guerra, 348 S.W.3d 221 (2011)**

54 Tex. Sup. Ct. J. 1191

Accordingly, the inferences were equal and the presence of the logo on the documents was legally insufficient to support a finding that Gaspard was employed by SCI International. *See id.* at 813 ("When the circumstances are equally consistent with either of two facts, neither fact may be inferred."); *All Star Enters., Inc. v. Buchanan,* 298 S.W.3d 404, 423–24 (Tex.App.-Houston [14th Dist.] 2009, no pet.) (noting that under the equal inference rule, where the names of a number of affiliated companies began with "Antero Resources," invoices addressed to "Antero Resources" were no evidence that the vendors were referring to one particular company); *see also BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 800 (Tex.2002) (finding that use of letterhead containing "BMC Software" by two corporations was not evidence that those corporations failed to observe corporate formalities where both corporations had "BMC Software" as part of their names).

 [14]    The Guerras also assert that an "employee requisition" form in Jaye Gaspard's personnel file is evidence that Mont Meta's funeral director was employed by SCI International because the top of the form states "Service Corporation International." But the form also contained a blank space for "Location or Department Name" which stated "Mont Meta/ Restlawn/Cox Funeral Home." William O'Brien explained that the form was supplied by SCI International but Mont Meta was making a requisition request for Mont Meta. He explicitly denied that the request was for someone to be employed by SCI International. Under this record, the "Service Corporation International" heading on the form was legally insufficient to support a finding that SCI International employed any of the Mont Meta workers.

Citing *Wal-Mart Stores, Inc. v. Middleton,* 982 S.W.2d 468, 470 (Tex.App.-San Antonio 1998, pet. denied), the Guerras also claim that SCI's failure to produce evidence that would show the Mont Meta **\*231**  workers did not work for SCI International is itself evidence that they worked for SCI International. But *Middleton* is a spoliation case, and the Guerras have not asserted that spoliation of evidence was at issue here. *See id.* ("[T]he deliberate spoliation of evidence relevant to a case raises a presumption that the evidence would have been unfavorable to the cause of the spoliator."). Further, SCI presented direct evidence through the testimony of O'Brien, the President of SCI Texas, that the Mont Meta workers were not employed by SCI International.

In sum, we agree with SCI International that there was legally insufficient evidence to support liability findings against it.

That determination requires judgment to be rendered in its favor. Therefore, we will not address SCI International further except as necessary to resolve the issues asserted by SCI Texas. For ease of reference SCI Texas generally will be referred to from now on as "SCI."

### III. Mental Anguish Damages

SCI claims there was legally insufficient evidence to support the jury's findings that the Guerras suffered compensable mental anguish, or in any event, to support the amount of damages awarded. We disagree in part. As to Mrs. Guerra, the evidence was sufficient to support some damages for mental anguish. As to Julie, Gracie, and Mary Ester, the evidence was legally insufficient to support any mental anguish damages.

### A. Nature of Evidence Required

 [15]    [16]    Generally, an award of mental anguish damages must be supported by direct evidence that the nature, duration, and severity of mental anguish was sufficient to cause, and caused, either a substantial disruption in the plaintiff's daily routine or a high degree of mental pain and distress. *Bentley v. Bunton,* 94 S.W.3d 561, 606 (Tex.2002). Citing *Parkway Co. v. Woodruff,* 901 S.W.2d 434, 444 (Tex.1995), the court of appeals stated that such direct evidence is not necessarily required in cases involving particularly shocking or disturbing events or injuries because those events or injuries in and of themselves support an inference that mental anguish accompanied them. 348 S.W.3d at 247. The court noted that one such disturbing event we recognized in *Parkway* is the mishandling of a corpse. *Id.* The Guerras also assert that this is such a case—the events were particularly disturbing and upsetting, permitting the jury to infer mental anguish. They point to our citation in *Pat H. Foley & Co. v. Wyatt,* 442 S.W.2d 904, 907 (Tex.Civ.App.-Houston [14th Dist.] 1969, writ ref'd n.r.e.), where we noted that the mishandling of a corpse involves disturbing events. *Parkway,* 901 S.W.2d at 443. But we cited *Wyatt* as an example of a case involving events that justified mental anguish damages; we did not cite *Wyatt* as a case in which the actions of the defendant or the occurrence itself constituted evidence of mental anguish that, absent other evidence, will support mental anguish damages. *Id.; see City of Tyler v. Likes,* 962 S.W.2d 489, 495 (Tex.1997) (citing *Wyatt* as an example of a contract case dealing with an intensely emotional subject and in which mental anguish is compensable and foreseeable if

Service Corp. Intern. v. Guerra, 348 S.W.3d 221 (2011)

54 Tex. Sup. Ct. J. 1191

a duty is breached). Even when an occurrence is of the type for which mental anguish damages are recoverable, evidence of the nature, duration, and severity of the mental anguish is required. *See Bentley,* 94 S.W.3d at 606 (citing *Parkway,* 901 S.W.2d at 444); *Likes,* 962 S.W.2d at 495.

### B. The Daughters

 **[17]**    There was little evidence from the daughters about how the events specifically **\*232**  affected them. Julie testified that "[t]his has been the hardest thing that I have had to go through with my family and myself. I have had lots of nights that I don't sleep just thinking" and that it had been "very difficult." In her complaint letter to the funeral commission she stated "I cannot begin to express the frustration and agony we have all gone through." She testified that she had continued to work, travel, and participate in volunteer and other activities.

Mary Ester's testimony about how the events affected her was briefer than Julie's. Mary Ester stated that "it's not part of my life. I didn't have to accept that and I do not accept it and I won't accept it."

Gracie's testimony about how she was affected was likewise cursory. She testified "[w]e're not at peace. We're always wondering. You know, we were always wondering where our father was. It was hard to hear how this company stole our father from his grave and moved him. That was hard. And I pray that none of you have to go through this."

The Guerras argue that evidence of the impact on the family also came from third parties. For example, the Mont Meta employee who helped the Guerras select the plots, testified that she believed the family was still bothered by the situation and having to move a body that was buried in the wrong place is devastating to any family that has just gone through the mourning process. The president of SCI Texas testified that the Guerras were "really hurt by this" and that there "certainly is a level of devastation within their family for this." The former manager of Mont Meta agreed that a family that had gone through what the Guerras had would suffer "devastation."

These witnesses generally acknowledged that the Guerra family members experienced very strong emotional reactions that would be expected from the unauthorized moving of a loved one's body. But none of the witnesses, including

the daughters themselves, identified a specific "high degree of mental pain and distress" experienced by particular family members, or a substantial disruption of any particular family member's daily routine. The witnesses agreed with the Guerras' attorney that the family generally suffered "devastation," but generalized, conclusory descriptions of how an event affected a person are insufficient evidence on which to base mental anguish damages. *See Likes,* 962 S.W.2d at 495 ("The invasion of the same legal right may lead to extreme anguish in one person while causing essentially no emotional damage to another."); *Parkway,* 901 S.W.2d at 444 (noting that a factfinder should be provided with adequate details to assess mental anguish claims). The daughters' statements about their emotions, even combined with the statements of the other witnesses, did not support the jury finding that the events caused any of the daughters to suffer a substantial disruption of their daily routine or a high degree of mental pain and distress. *See Gunn Infiniti v. O'Byrne,* 996 S.W.2d 854, 860–61 (Tex.1999) (finding no evidence supported mental anguish damages where claimant testified he had a lot of anguish, grief, severe disappointment, and embarrassment because those did not rise to a level of a high degree of mental pain and distress nor was there evidence of a substantial disruption of his daily routine).

In sum, the evidence was legally insufficient to support findings that any of the daughters suffered compensable mental anguish.

### C. Mrs. Juanita Guerra

 **[18]**    Mrs. Guerra testified that when she found out her late husband's grave had    **\*233**  been tampered with she could not sleep at night and went through a lot of stress. She testified that she suffered burning in her stomach due to the stress and sought medical treatment for the symptoms. She continued to have headaches and take medication for anxiety and depression. She indicated that she had been worrying and having fear and anxiety about what might be done to her at Mont Meta for nearly six years since Mr. Guerra's casket was moved. We conclude that there is some evidence to support the jury's finding that Mrs. Guerra suffered the degree of mental pain and distress that will support damages for mental anguish.

SCI argues that Mrs. Guerra's daily routine was not substantially disrupted because she volunteers at a nursing home, participates in visitation with her church, works in the

**Service Corp. Intern. v. Guerra, 348 S.W.3d 221 (2011)**

54 Tex. Sup. Ct. J. 1191

church kitchen, and travels occasionally. But even assuming there was no evidence her routine was disrupted, that lack of evidence did not negate the evidence that she *did* suffer compensable mental anguish. *See Wackenhut Corr. Corp. v. de la Rosa,* 305 S.W.3d 594, 640 (Tex.App.-Corpus Christi 2009, no pet.) (rejecting a claim that because children who had been awarded mental anguish damages were making good grades in school, they were not suffering mental anguish).

SCI asserts that there was confusion at trial regarding whether Mrs. Guerra's mental anguish concerned future anxiety for which the jury awarded no damages. It points to the Guerras' attorney's statements such as "Mrs. Guerra's main anxiety concern is what is this company going to do to her once she is buried." SCI asserts that this apprehension concerns future anxiety for which damages were not awarded by the jury. But Mrs. Guerra's testimony was that she had worried and anguished in the past about what would happen to her and her husband when she is buried. To the extent the testimony supports mental anguish damages, it supports damages for anguish in the past and the jury's answers reflect that.

SCI urges that if the evidence is legally sufficient to support some damages, it is legally insufficient to support the entire amount of damages awarded to Mrs. Guerra by the jury. *See Saenz v. Fid. & Guar. Ins. Underwriters,* 925 S.W.2d 607, 614 (Tex.1996) ("Not only must there be evidence of the existence of compensable mental anguish, there must also be some evidence to justify the amount awarded."). We do not address the argument because even if we sustained it, the result would be a remand to the court of appeals to consider a remittitur. *See Bentley,* 94 S.W.3d at 607–08. As we explain below, our determination of other issues requires the case to be remanded for a new trial.

## IV. Evidentiary Issues

### A. Other Lawsuits, Verdicts, and Judgments

SCI challenges the trial court's admission of evidence about other lawsuits, verdicts, and judgments against it.[3] SCI asserts **\*234** that the evidence was irrelevant.[4]

### 1. Preservation of Error

The Guerras claim that SCI waived error because although SCI first raised objections to evidence of other suits, verdicts, and judgments by a motion in limine and objected when the evidence was introduced, SCI did not object when the Guerras' attorney referred to the matters during jury selection and opening statement. They cite *Texas Employers' Insurance Ass'n v. Schanen,* 263 S.W.2d 614, 615 (Tex.Civ.App.-San Antonio 1953, no writ), in support of their assertion that attorney's statements made during jury selection must be objected to on pain of waiving error to the introduction of evidence during trial.

But in *Schanen* the trial court overruled a motion for mistrial based on questions propounded to and statements made by a potential juror during voir dire, even though the party moving for mistrial did not object to the questions or answers at the time they occurred. The court of appeals analogized the situation to one in which evidence is received during trial without objection. *See id.* at 614–15. It held that in the absence of a timely objection, the trial court did not err in denying the motion for mistrial. *Id.*

[19] [20] *Schanen* is inapposite. SCI is not seeking a mistrial or complaining about matters that occurred during the jury selection process and to which it did not object; it is complaining about the admission of evidence during trial, to which it timely objected. Error is preserved with regard to a ruling that admits evidence if the opponent of the evidence makes a timely, specific objection and obtains a ruling. TEX.R.APP. P. 33.1; TEX.R. EVID. 103; *Bay Area Healthcare Grp., Ltd. v. McShane,* 239 S.W.3d 231, 235 (Tex.2007). The failure to object to an attorney's statements during voir dire of the jury panel, without more, does not waive a later objection to evidence offered during trial, because statements by lawyers during the jury selection process are not evidence. SCI timely objected when evidence of other lawsuits was introduced and the Guerras do not argue otherwise. SCI preserved error. *See McShane,* 239 S.W.3d at 235.

[21] The Guerras also assert that SCI waived error by referring to the other lawsuits in its own opening statement. This reference, the Guerras argue, "opened the door" to the evidence because if a party or the party's attorney references a matter first, thereby "opening the door" by effectively inviting a response, then the opposing party is entitled to make an appropriate response. *See Sw. Elec. Power Co. v. Burlington N. R.R.,* 966 S.W.2d 467, 473 (Tex.1998) (noting that a party may not complain on appeal of the admission

**Service Corp. Intern. v. Guerra, 348 S.W.3d 221 (2011)**

54 Tex. Sup. Ct. J. 1191

of improper evidence if the party "opened the door" by introducing evidence that is the same or similar in character). But here the Guerras' attorney, not **\*235** SCI's attorney, was the first to allude to other lawsuits in opening statements. The response of SCI's attorney was not inappropriate in manner or substance: he acknowledged that other suits had taken place, but maintained that the trial should be about the Guerra family's claims and the facts underlying those claims. SCI's attorney did not exceed the boundaries of the Guerras' attorney's statements or introduce new matters into the proceedings so that he invited a response. SCI did not open the door or waive error.

## 2. Relevance of the Evidence

 **[22]**   **[23]**   We review a trial court's decision to admit evidence for an abuse of discretion. *In re J.P.B.,* 180 S.W.3d 570, 575 (Tex.2005). Evidence of other wrongs or acts is not admissible to prove character in order to show "action in conformity therewith." TEX.R. EVID. 404. But it is admissible to show a party's intent, if material, provided the prior acts are "so connected with the transaction at issue that they may all be parts of a system, scheme or plan." *Oakwood Mobile Homes, Inc. v. Cabler,* 73 S.W.3d 363, 375 (Tex.App.-El Paso 2002, pet. denied); *see* TEX.R. EVID. 404. This can be shown through evidence of similar acts temporally relevant and of the same substantive basis. *See Durbin v. Dal–Briar Corp.,* 871 S.W.2d 263, 268–69 (Tex.App.-El Paso 1994, writ denied), *overruled, in part, on other grounds by Golden Eagle Archery, Inc. v. Jackson,* 24 S.W.3d 362 (Tex.2000). We agree with SCI that the Guerras failed to demonstrate sufficient connection between the events in this case and the alleged actions in other lawsuits to show the other suits were admissible.

 **[24]**   For most of the other suits referenced by the Guerras, only the plaintiffs' petitions were admitted and testimony encompassed generalizations as to the different suits. The Guerras assert such evidence was admissible because the other suits involved similar facts to those underlying their claim—double sale of a plot or moving a body without the family's permission. [5]

As for the suits involving allegations that plots that had already been purchased and were sold a second time to someone else, the Guerras presented no evidence that those events were so connected to the events here that they were all part of a system, scheme, or plan. For example, the Guerras

provided the most details about a case involving Rudy Garza, who was buried at Highland Memorial Park in Weslaco in 1977. Another family—the Rogers—purchased four side-by-side plots at Highland Memorial in 1982. One of the plots was the plot where Garza was buried. When a member of the Rogers family died in 2002 and was to be buried, a Memorial Park employee discovered that Garza was buried in a plot that had been sold to the Rogers. The cemetery employees tried to conceal the mistake, then asked Garza's family for permission to move his body. The family denied permission and the body was not moved.

The resale of Garza's plot occurred in a different cemetery before it was owned by SCI Texas and nearly twenty years before the events in this case. There was no evidence that any of the same employees were involved in both the Garza case and the Guerras' case, that the events were **\*236** somehow connected, or that circumstances surrounding the sales were similar.

The Guerras presented few details about the other cases they alleged involved sales of plots that already belonged to someone else. To the extent details were provided, they showed that the sales were at different cemeteries and each took place at least two years before the events underlying the Guerras' case. The area vice-president over Mont Meta at the time of Mr. Guerra's burial was in charge of some of the other cemeteries when plots were sold twice, but there was no evidence he had any involvement in the sales or that anyone involved in the Guerra events was involved in the other sales.

The Guerras claim that the other cases were relevant to show a pattern of indifference amounting to a common scheme and show that SCI took no action to avoid recurrences of misconduct. But without evidence of the actual facts and circumstances involved, the evidence does not show a sufficient connection to the events at issue to support their being relevant. *See Durbin,* 871 S.W.2d at 268–69 (finding that a trial court abused its discretion in a workers' compensation wrongful discharge case by excluding evidence of other retaliatory acts by a corporation involving the same supervisory personnel, the same workplace, and the same pattern of conduct).

In regard to suits with claims allegedly similar to the Guerras' claim for moving Mr. Guerra's body without permission, the trial court admitted evidence of one suit in which a body was moved without permission. The evidence in that case showed that when Estella Cooper's husband was buried in 2003 at

Service Corp. Intern. v. Guerra, 348 S.W.3d 221 (2011)

54 Tex. Sup. Ct. J. 1191

Sunset Memorial Gardens in Odessa, a cemetery owned by SCI Texas, he was buried in the wrong plot. Cooper knew on the day of her husband's burial that he was not being buried in the plot she had purchased, but she did not say anything. When she later went to visit the grave, his body had been moved to the plot she had purchased. Cooper testified that she sued "SCI" and a jury awarded her and her family $3.5 million.

Although both the Guerras' case and the Cooper case involved cemetery employees moving a body without permission, that is where the similarities end. The events occurred at different cemeteries and there was no evidence that any of the same employees were involved or that they occurred under similar circumstances. The events also occurred more than a year apart. There is no evidence that the events were part of a system, scheme, or plan.

We conclude that the trial court erred by admitting irrelevant evidence of other lawsuits, verdicts, and judgments. We next consider whether the errors were harmful.

### 3. Harm

[25]    An error in admitting evidence requires reversal if it probably caused the rendition of an improper judgment. TEX.R.APP. P. 61.1; *Nissan Motor Co. v. Armstrong,* 145 S.W.3d 131, 144 (Tex.2004). In determining whether the error was harmful we evaluate the entire case from voir dire to closing argument, considering the evidence, strengths and weaknesses of the case, and the verdict. *Reliance Steel & Aluminum Co. v. Sevcik,* 267 S.W.3d 867, 871 (Tex.2008). We also consider whether counsel emphasized the erroneous evidence and whether the admission of the evidence was calculated or inadvertent. *Id.* at 874; *Nissan Motor Co.,* 145 S.W.3d at 144 ("[W]hether erroneous admission is harmful is more a matter of judgment than precise measurement.").

*237    The Guerras' attorney colorfully and skillfully emphasized the evidence of suits, verdicts, and judgments against other cemeteries from voir dire through closing argument. For example, during voir dire he asked some venire members who had family buried in Buena Vista cemetery which was owned by "SCI," questions such as "have they ever from Buena Vista told you that they also had allegations and lawsuits filed against them in this county for selling plots when people were still—were already buried in them?" He commented in his opening statement about evidence

that SCI illegally dug up bodies "not just in this case but you'll hear others" and "[w]e'll also be showing you again they have been involved in other lawsuits." During trial the Guerras' attorney questioned SCI representatives about the suits, sometimes reading allegations from the pleadings which had been admitted as evidence. And during closing argument, the Guerras' attorney continued to emphasize the other lawsuits, verdicts, and judgments. For example, he argued that "Odessa awarded $3.5 [million] to that lady who they did the same thing to in Midland." Manifestly, the Guerras' attorney intended the evidence to be a significant and pervasive part of the trial. *See Reliance Steel,* 267 S.W.3d at 874 ("[A] party's insistence on introducing inadmissible testimony 'indicates how important he thought it was to his case.' " (quoting *Alvarado v. Farah Mfg. Co.,* 830 S.W.2d 911, 917 (Tex.1992))).

[26]    In this case there was no evidence three of the four plaintiffs suffered compensable mental anguish, yet the jury awarded each of the three mental anguish damages of $100,000. Because there was no evidence to support a finding of compensable mental anguish, the jury's findings must have been based on something other than properly admitted evidence, and we have no doubt that the extensive evidence of other suits, allegations in the suits, and similar evidence was a significant factor in the jury's damages findings, both actual and punitive. *See id.* at 872. We conclude that the erroneous admission of evidence of other lawsuits, verdicts, and judgments was harmful and requires the case to be remanded for a new trial.

### B. Punitive Damages in a Trust

Although we have concluded that the case should be remanded for a new trial, in order to provide guidance to the trial court on retrial we next address SCI's claim that the trial court improperly admitted evidence that Mrs. Guerra would put any punitive damages she received into a trust to pay for funerals for persons who could not afford them. [6] *See MCI Sales & Serv. v. Hinton,* 329 S.W.3d 475, 495 n. 19 (Tex.2010). The questions and answers of which SCI complains are as follows:

Q. You're also asking the jury to award punitive damages for this criminal behavior of theirs, correct?

A. Of course.

Service Corp. Intern. v. Guerra, 348 S.W.3d 221 (2011)

54 Tex. Sup. Ct. J. 1191

Q. But you don't want a dime of that yourself do you?

A. No.

Q. In fact, you want that put in a trust to pay for people who are not able to afford their own funeral?

A. That's right.

Q. That's where any monies they award will go and you've got a trust set up to do that, correct?

A. Yes, sir.

SCI claims that this evidence is irrelevant.

 [27]    Evidence is relevant, and therefore admissible, if it has any tendency to **\*238** "make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." TEX.R. EVID. 401, 402. The purposes of punitive damages are to deter and punish culpable conduct. *Horizon/CMS Healthcare Corp. v. Auld,* 34 S.W.3d 887, 896 (Tex.2000); *see* TEX. CIV. PRAC. & REM.CODE § 41.001(5) (providing that exemplary damages, including punitive damages, are "damages awarded as a penalty or by way of punishment"). The Legislature has set out several factors to be considered when determining the amount of exemplary damages. These include the nature of the wrong, the character of the conduct involved, the wrongdoer's degree of culpability, and the situation and sensibilities of the parties. *Id.* § 41.011. Evidence about what Mrs. Guerra planned to do with any punitive damages was not relevant to proving any of these factors or to penalizing or punishing SCI. *See* TEX.R. EVID. 401; *see also Honeywell v. Sterling Furniture Co.,* 310 Or. 206, 797 P.2d 1019, 1021 (1990) ("[I]nstructing a jury that a portion of any punitive damage award will be used to pay the plaintiff's attorney or to contribute to a worthy cause, such as help for victims of crime, does nothing to further or even to inform the jury as to the proper goals of punitive damage awards. Instead, the instruction distracts the jury from the appropriate line of analysis that this Court has said a jury should follow in cases involving potential awards of punitive damages....").

The Guerras argue that the evidence was relevant to their claim for injunctive relief in which they requested SCI be required to fund a program to study and monitor their cemeteries and implement procedures to ensure proper record keeping. But Mrs. Guerra's plans to set up a trust to pay for funerals for people who could not afford them were simply not relevant to the issue of whether she was entitled to an injunction regarding monitoring of SCI cemeteries.

The Guerras also assert that the evidence was relevant to rebut SCI's attorney's statement during voir dire that the case was about the amount of damages. We disagree. During voir dire SCI's attorney stated "[w]e are not fighting about the circumstances of what happened because we admit that it's wrong, but how much money." That was simply a statement focusing the jury's attention on the damages issues that would be submitted to them. The statement did not change the focus of the jury to what the Guerras would do with any money they received.

 [28]    The Guerras claim that SCI waived its complaint by offering similar evidence—evidence that SCI accommodates families who are needy—because a party may not complain on appeal of the improper admission of evidence if the complaining party introduced the same evidence or evidence of a similar character. *See Sw. Elec. Power Co.,* 966 S.W.2d 467 at 473. After Mrs. Guerra testified that she would put any punitive damages into a trust, SCI presented evidence that it has a program to help families who cannot afford funeral services. SCI's evidence was not exactly the same as Mrs. Guerra's testimony, but in context it seems to have been an attempt to blunt the effect of her testimony about how she planned to use any exemplary damages. Because the case will be remanded for a new trial for other reasons, we need not decide whether Mrs. Guerra's testimony was harmful or whether SCI waived its complaint. But for the trial court's benefit on retrial we note that Mrs. Guerra's testimony about what she planned to do with any punitive damages award was not relevant and was not admissible.

**\*239  V. Other Issues**

SCI also claims that (1) the jury was improperly influenced by an improper "Golden Rule" argument in which it claims the Guerras' attorney asked the jury to put themselves in the Guerras' place and award what they would want to be awarded, and (2) because there was only one damages question based on three theories of liability, it cannot be determined whether the damages were supported by the one cause of action that SCI asserts was viable. These issues may not recur during the new trial on remand and we do not address them. *See Columbia Rio Grande Healthcare, L.P. v. Hawley,* 284 S.W.3d 851, 865 (Tex.2009).

## VI. Conclusion

We reverse the judgment of the court of appeals. We render judgment that (1) Julie, Gracie, and Mary Ester take nothing from SCI International and SCI Texas and (2) Mrs. Guerra take nothing from SCI International. Mrs. Guerra's claim against SCI Texas is remanded for a new trial.

## Parallel Citations

54 Tex. Sup. Ct. J. 1191

Footnotes

1 Gaspard died after the meeting with the Guerra family.

2 The Guerras did not assert veil-piercing theories such as alter ego or use of the corporate form to perpetuate a fraud.

3 The SCI entities also challenge admission of evidence of other lawsuits and allegations of wrongdoing against SCI International. That evidence, involving cemeteries outside Texas, was similar to the type of evidence of other suits that was admitted against SCI Texas —but more inflammatory. It included allegations made in class-action pleadings, settlements, allegations of criminal wrongdoing, newspaper articles involving various allegations, reports of interviews with persons involved, and facts that for the most part were not similar to those involving the Guerras, and did not involve any of the Mont Meta employees who dealt with the Guerras, nor the decisions and actions taken to move Mr. Guerra's body. And at least some of the events described took place before SCI Florida, an SCI International subsidiary, owned one of the cemeteries involved in the other suits.

Our failure to address the admission of that evidence should not be taken as approval of its admission. We do not address it in depth because SCI International will not be part of the trial on remand and the evidence was not connected with SCI Texas except through SCI Texas's relationship to SCI International.

4 SCI also asserts that the admission of this evidence unconstitutionally impacted punitive damages. We do not address this constitutional issue because we only decide constitutional questions when we cannot resolve issues on other grounds. *In re B.L.D.,* 113 S.W.3d 340, 349 (Tex.2003).

5 The Guerras also claim that other suits involving burial of a body in the wrong space were similar to the facts of this case. But this case did not involve burial of a body in the wrong space. Mr. Guerra was buried in the space his family selected and purchased for him. Therefore, evidence of those suits was not admissible to show part of a system, scheme, or plan.

6 SCI also asserts that the admission of this evidence violates due process. We do not address the constitutional question. *See In re B.L.D.,* 113 S.W.3d at 349.

---

**End of Document**  © 2015 Thomson Reuters. No claim to original U.S. Government Works.

278 S.W.3d 806
Court of Appeals of Texas,
Houston (14th Dist.).

Dan TURNER and Henry Bonaparte, Appellants,

v.

Troy PERRY, Appellee.

No. 14–07–01060–CV. | Jan. 27,
2009. | Rehearing Overruled Feb. 26, 2009.

**Synopsis**
**Background:** Terminated school district police officer
brought First Amendment, due process, slander and
intentional infliction of emotional distress action against
sergeant and captain. The 215th District Court, Harris
County, Steven E. Kirkland, J., denied defendants' motions
for partial summary judgment, and defendants filed
interlocutory appeal.

**Holdings:** The Court of Appeals, Eva M. Guzman, J., held
that:

[1] police officer's release of gang-related information to
website maintained by Department of Public Safety (DPS)
was not speech protected by the First Amendment;

[2] police officer's report to county district attorney that
sergeant and captain entered his office and removed a traffic
citation he had written on a teacher was speech protected by
the First Amendment;

[3] sergeant and captain were not entitled to qualified
immunity on claim that they violated officer's First
Amendment rights by terminating him for reporting their
removal of traffic citation;

[4] officer had a protected property right in his job, for
purposes of procedural due process;

[5] department's grievance procedure did not provide officer
with the procedural due process to which he was entitled; and

[6] genuine issue of material fact precluded summary
judgment on issue of whether sergeant and captain were
entitled to official immunity on terminated officer's slander
claim.

Reversed and rendered in part, affirmed in part, and
remanded.

West Headnotes (30)

**[1]    Civil Rights**
         Good faith and reasonableness; knowledge
         and clarity of law; motive and intent, in general
         Qualified immunity protects governmental
         officials performing discretionary functions
         from suit if their actions were objectively
         reasonable in the light of then clearly-established
         law.

         Cases that cite this headnote

**[2]    Civil Rights**
         Good faith and reasonableness; knowledge
         and clarity of law; motive and intent, in general
         The question of whether an official may be
         held personally liable for an allegedly unlawful
         official action, under the doctrine of qualified
         immunity, is determined by examining the
         objective legal reasonableness of the action in
         light of the laws that were clearly established at
         that time.

         Cases that cite this headnote

**[3]    Civil Rights**
         Good faith and reasonableness; knowledge
         and clarity of law; motive and intent, in general
         An official's subjective belief that his conduct
         was lawful is irrelevant to the qualified
         immunity analysis, as the official's actions are
         measured against a standard of objective legal
         reasonableness.

         Cases that cite this headnote

**[4]    Civil Rights**
         Government Agencies and Officers
         In analyzing whether qualified immunity applies
         in an action against a governmental official,

courts first determine if the facts, taken in the light most favorable to the party asserting injury, showed that the official's conduct violated a constitutional right.

Cases that cite this headnote

**[5]    Civil Rights**
   🔑 Good faith and reasonableness;  knowledge and clarity of law;  motive and intent, in general

In analyzing whether qualified immunity applies in an action against a governmental official, if the facts as alleged constitute a constitutional violation, courts consider whether the right was clearly established in light of the specific context of the case.

Cases that cite this headnote

**[6]    Civil Rights**
   🔑 Employment practices

A constitutional right was clearly established, when determining whether qualified immunity applies in an employee's action against a governmental official, if the contours of the law at the time of the conduct at issue gave fair warning that such conduct would violate the employee's constitutional rights.

Cases that cite this headnote

**[7]    Constitutional Law**
   🔑 Public or private concern;  speaking as "citizen"
   **Constitutional Law**
   🔑 Efficiency of public services

To apply the *Pickering* test in determining whether a public employer unconstitutionally penalized an employee for engaging in protected speech, courts balance: (1) the interest of the employee, as a citizen, in commenting upon matters of public concern, and (2) the interest of the governmental agency, as an employer, in promoting the efficiency of the public services it performs. U.S.C.A. Const.Amend. 1.

Cases that cite this headnote

**[8]    Civil Rights**
   🔑 Employment practices

In analyzing the constitutionality of a public employer's actions against an employee, for purposes of qualified immunity, courts look to the facts as the employer reasonably found them to be.

Cases that cite this headnote

**[9]    Constitutional Law**
   🔑 Public or private concern;  speaking as "citizen"

Whether an employee's speech addresses a matter of public concern, for purposes of determining whether a public employer's reaction violated the First Amendment, is determined by the content, form, and context of a given statement, as revealed by the whole record. U.S.C.A. Const.Amend. 1.

1 Cases that cite this headnote

**[10]   Constitutional Law**
   🔑 Public or private concern;  speaking as "citizen"

Although not a general standard against which statements must be judged, factors that can be considered when applying the content-form-context test to determine whether a governmental employee's statements touched upon a matter of public concern and were constitutionally protected include: (1) whether the speech was merely an extension of an employment dispute; (2) whether the speech was focused on gathering ammunition for another round of controversy with the employee's superiors; (3) whether the speech occurred at work or on the speaker's own time and outside of the working areas of the office; (4) whether the speech impeded the ability of the speaker or other employees to perform their duties; (5) whether the employee sought to inform the public that the employer was not discharging its governmental responsibilities in the investigation and prosecution of criminal cases; and (6) whether the employee sought to bring to light actual or potential wrongdoing or

breach of public trust on the part of superiors. U.S.C.A. Const.Amend. 1.

Cases that cite this headnote

**[11]    Constitutional Law**
☞ Public or private concern;  speaking as "citizen"

**Constitutional Law**
☞ Efficiency of public services

The inquiry regarding whether a governmental employee's speech is constitutionally protected involves three considerations: (1) a court must determine whether the employee's speech was made pursuant to his or her official duties, and, if so, then the speech is not protected by the First Amendment, as restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen; (2) if the speaker did not engage in the speech pursuant to official duties then the court must determine whether the speech touched upon a matter of public concern; and (3) if the speech does pertain to a matter of public concern the court applies the *Pickering/ Connick* test to balance the employee's interest in expressing his concerns with the governmental employer's interest in performing its services efficiently. U.S.C.A. Const.Amend. 1.

1 Cases that cite this headnote

**[12]    Constitutional Law**
☞ Public or private concern;  speaking as "citizen"

That the employee's speech concerns facts learned while working is not dispositive, when determining whether a governmental employee's speech is constitutionally protected under the First Amendment. U.S.C.A. Const.Amend. 1.

1 Cases that cite this headnote

**[13]    Constitutional Law**
☞ Discipline or reprimand

**Education**

☞ Grounds for removal or other adverse action

School district police officer's release of gang-related information to website maintained by Department of Public Safety (DPS) was not speech protected by the First Amendment, and thus sergeant and captain did not violate officer's constitutional rights by disciplining him for such action, as the information was collected by officer while performing his duties as a gang officer, officer's statements were firmly within the scope of his employment responsibilities and pursuant to his official duties, private citizens could not post information on DPS website, officer could not directly access the DPS website without authorization from a superior, officer did not obtain permission from his superiors as required before such information was indirectly posted on website, and the posting of such information created an increase risk of gang violence. U.S.C.A. Const.Amend. 1.

Cases that cite this headnote

**[14]    Constitutional Law**
☞ Public or private concern;  speaking as "citizen"

**Education**

☞ Grounds for removal or other adverse action

Action by subsequently terminated school district police officer in reporting to county district attorney that sergeant and captain had unlawfully tampered with a government record by entering his office and removing a traffic citation he had written on a teacher was speech protected by the First Amendment; officer was not acting pursuant to his employment responsibilities when he made the report as the speech consisted of the report to the district attorney rather than the creation of the citation, reporting unlawful conduct by police was inherently a subject of public concern, and interest of officer and the general public in allowing reports of unlawful police conduct outweighed any alleged interest of police department in promoting efficiency and maintaining integrity by discouraging such

reports, as the absence of protection for such reports would undermine efficiency and integrity. U.S.C.A. Const.Amend. 1.

Cases that cite this headnote

**[15]     Civil Rights**
         Employment practices

Sergeant and captain in school district police department were not entitled to qualified immunity on claim by police officer that sergeant and captain violated his First Amendment rights by disciplining and terminating him after he reported to county district attorney that they had unlawfully tampered with a government record by entering his office and removing a traffic citation he had written on a teacher, as at the time the incidents occurred it was well-established that a legitimate report of unlawful police conduct was protected by the First Amendment, and whistleblower statute expressly protected governmental employees, including police officers, from adverse employment actions when employees in good faith reported a violation of the law by an employing governmental entity to an appropriate law enforcement authority. U.S.C.A. Const.Amend. 1; V.T.C.A., Government Code § 554.002.

1 Cases that cite this headnote

**[16]     Constitutional Law**
         Balancing of interests
       **Constitutional Law**
         Disruption or interference

Balancing the interests of a governmental employee and the interest of the employer, when determining whether speech by the employee was speech protected by the First Amendment, involves determining whether the speech: (1) was likely to generate controversy and disruption; (2) impeded the employer's general performance and operation; and (3) affected working relationships necessary to the employer's proper functioning. U.S.C.A. Const.Amend. 1.

2 Cases that cite this headnote

**[17]     Civil Rights**
         Employment practices

For a constitutional right of a governmental employee to be considered clearly established, such that the violation of that right by a governmental official is not protected by qualified immunity, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.

Cases that cite this headnote

**[18]     Officers and Public Employees**
         Grounds for removal or other adverse action

The whistleblower statute is intended to: (1) enhance openness in government by protecting public employees who inform proper authorities of legal violations, and (2) secure governmental compliance with the law on the part of those who direct and conduct governmental affairs. V.T.C.A., Government Code § 554.002.

1 Cases that cite this headnote

**[19]     Constitutional Law**
         Source of right or interest

A property interest protected by procedural due process arises where an individual has a legitimate claim of entitlement that is created, supported, or secured by rules or mutually explicit understandings. U.S.C.A. Const.Amend. 14.

2 Cases that cite this headnote

**[20]     Constitutional Law**
         Source of right or interest

Property interests protected by procedural due process can be created by state law. U.S.C.A. Const.Amend. 14.

2 Cases that cite this headnote

**[21]     Constitutional Law**
         Termination or discharge

**Education**

👈 Grounds for removal or other adverse action

**Education**

👈 Proceedings and review

School district police officer, disciplined and terminated after he released gang-related information to website maintained by Department of Public Safety (DPS) and reported to county district attorney that sergeant and captain unlawfully tampered with a government record by entering his office and removing a traffic citation he had written on a teacher, had a property interest in his job that was protected by procedural due process, as statute, which was adopted in police department's policy manual, barred disciplinary action against a law enforcement officer in the absence of a complaint that was signed, delivered, investigated and supported by evidence. U.S.C.A. Const.Amend. 14; V.T.C.A., Government Code §§ 614.022, 614.023.

3 Cases that cite this headnote

[22] **Constitutional Law**

👈 Factors considered; flexibility and balancing

Generally, procedural due process is measured by a flexible standard that depends on the practical requirements of the circumstances. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

[23] **Constitutional Law**

👈 Factors considered; flexibility and balancing

Flexible standard used to determine the due process required to protect a protected property interest includes three factors: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative

burdens that the additional or substitute procedural requirement would entail. U.S.C.A. Const.Amend. 14.

1 Cases that cite this headnote

[24] **Constitutional Law**

👈 Termination or discharge

**Education**

👈 Grounds for removal or other adverse action

**Education**

👈 Proceedings and review

School district police department's grievance procedure did not provide police officer, who was terminated after he released gang-related information to website maintained by Department of Public Safety (DPS), reported to district attorney that sergeant and captain unlawfully removed a traffic citation he had written on a teacher, engaged in alleged inappropriate actions with students and complained to other officers about the department, with procedural due process to which he was entitled; by statute before disciplinary action could be taken against law enforcement officers complaints had to be signed, delivered, investigated and supported by evidence, sergeant and captain acted on complaints that expressed conclusions of other officers based on general allegations of unidentified people, there was no investigation of officer's release of information to website, and department's human resource director believed that officer could be fired for any reason or no reason. U.S.C.A. Const.Amend. 14; V.T.C.A., Government Code §§ 614.022, 614.023.

3 Cases that cite this headnote

[25] **Officers and Public Employees**

👈 Liabilities for official acts

Official immunity under common law is based on the need for public servants to act in the public interest with confidence and without the hesitation that could arise from having their judgment continually questioned by extended litigation.

Cases that cite this headnote

**[26]** **Officers and Public Employees**
Liabilities for official acts

Official immunity is an affirmative defense barring state law claims against a governmental employee's performance: (1) of discretionary duties; (2) within the scope of the employee's authority; (3) provided that the employee acts in good faith.

Cases that cite this headnote

**[27]** **Officers and Public Employees**
Liabilities for official acts

Doctrine of official immunity is based on the theory that the threat of liability will make public officials unduly timid in carrying out their official duties, and effective government will be promoted if officials are freed of the costs of vexatious and frivolous litigation.

Cases that cite this headnote

**[28]** **Officers and Public Employees**
Liabilities for official acts

Official immunity from state-law claims is intended to insulate essential governmental functions from the harassment of litigation and remove the deterrent to public service posed by the threat of heavy personal liability for errors in judgment.

Cases that cite this headnote

**[29]** **Officers and Public Employees**
Liabilities for official acts

When determining whether a public official has acted in good faith, for purposes of official immunity, courts apply the objective standard of whether a reasonably prudent official, under the same or similar circumstances, could have believed that his conduct was justified based on the information he possessed when the conduct occurred.

Cases that cite this headnote

**[30]** **Judgment**
Public officers and employees, cases involving

Genuine issue of material fact as to whether sergeant and captain in school district police department acted in good faith when they represented to others that terminated police officer engaged in inappropriate interactions with students, precluded summary judgment on issue of whether sergeant and captain were entitled to official immunity, in terminated officer's slander action.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*811** Jon Erik Nichols, Kristi Michelle Huer Herring, Jonathan Griffin Brush, Houston, for appellants.

James L. Reed, Michael Antoine Ackal, III, Houston, for appellee.

Panel consists of Chief Justice HEDGES and Justices GUZMAN and BROWN.

**OPINION**

EVA M. GUZMAN, Justice.

In this accelerated interlocutory appeal, police officers Dan Turner and Henry Bonaparte challenge the trial court's denial of their assertions of qualified and official immunity. Appellee Troy Perry sued appellants, his former supervisors, alleging that they took adverse employment actions against him and slandered him in retaliation for his official complaint accusing them of unlawful conduct. Appellants contend that (a) they acted in response to unprotected speech, (b) their employer's grievance process provided Perry with adequate due process, and (c) their representations of Perry's conduct were made in good faith. We reverse the trial court's denial of summary judgment based on qualified immunity to one of Perry's First Amendment claims, affirm the trial court's ruling in all other respects, and remand for further proceedings.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Alief Independent School District ("AISD") employed appellee Troy Perry as a "Peace Officer–Gang Enforcement Officer" in 2004. Sergeant Henry Bonaparte was Perry's direct supervisor, and Captain Dan Turner was the captain of the AISD police department. As a police officer responsible for investigating gang-related activity, Perry interviewed students and obtained and evaluated documents containing gang-related information. According to Plaintiff's Seventh Amended Petition, Perry completed an application in July 2004 to submit AISD's "gang database" to the Department of Public Safety ("DPS"); however, Turner did not sign the application, and the appellants did not allow Perry to release the information to DPS.

In April 2005, information Perry had learned through his work as a gang officer caused him concern that there would be an increased risk of gang-related violence at several AISD schools on May 5 and May 16, 2005. He communicated the information he had gathered to gang investigators of several police agencies and the office of **\*812** the Texas Attorney General. On April 21 and 22, 2005, he emailed the information to Turner, Bonaparte, and other law enforcement agencies and personnel. According to Perry, DPS employee Vicki Norris contacted him and asked if he would allow her to post this information to a website on his behalf. The website, referred to in the record as "CLEO," is a password-protected site accessible to criminal-justice personnel. To obtain access, an officer must complete a written application, which must also be signed by the officer's supervisor. Perry had completed an application, but because appellants refused to sign it, he could not access CLEO directly. Perry therefore authorized Norris to post the information for him.

After the information was published on the CLEO website, Bonaparte emailed Perry that "the [AISD] superintendent's office had been inundated with calls for information in reference to the warning you had posted on the CLEO web site." On May 4, 2005, Bonaparte again emailed Perry, stating, "From this point on no information[ ] regarding activities in and around this district will be given out without prior written approval from [a] departmental supervisor. Your decision to export data is causing a number of problems; this directive includes both written and verbal communications." In addition, Perry was demoted from his position as a gang officer to a position as a patrol officer and placed on a

"growth plan" on July 15, 2005. According to Perry, both Turner and Bonaparte informed him that these disciplinary measures were, in part, a response to the CLEO posting. Perry filed a grievance concerning that action, and in an undated memorandum, Bonaparte summarized the discussion that occurred during Perry's grievance hearing on September 13, 2005. According to Bonaparte, Perry contended that he was reassigned from his position as a gang officer to a position as a patrol officer as a "direct result of his disclosure of a gang[-]related issue via a national web site." Bonaparte further stated that "Perry did not perform in a satisfactory fashion during his tenure as a gang officer and he will not be returned to the position." He concluded that "Perry has had problems with following the chain of command and has disseminated information to other outlets without supervisory approval."

While these events were unfolding, Perry allegedly learned that Bonaparte and Turner had entered Perry's office while he was away and removed a traffic citation he had written concerning an AISD teacher. According to Perry, Bonaparte told him that the citation was removed because the teacher was "politically connected." On July 20, 2005, Perry asked the advice of an acquaintance at the Harris Count District Attorney's Police Integrity Unit, and he was told that he should collect evidence of the alleged misconduct. Perry then obtained still photographs from a surveillance tape that reportedly shows Bonaparte and Turner entering Perry's office and leaving with a piece of paper. On or about October 18, 2005, Perry lodged an official complaint with an assistant district attorney in which he alleged that Bonaparte and Turner had unlawfully tampered with a government record. According to Perry, an assistant district attorney told him that the cited teacher said Turner had assured her that he would "take care of" the citation.

On October 27, 2005, Perry filed a complaint with the school district in which he alleged that appellants had retaliated against him for reporting their conduct to the district attorney's office. In connection with this grievance, Perry also related that he arrested a female student at Elsik High School on September 21, 2005, and at Turner's instruction, transported the student **\*813** to the AISD police station for processing. At the station, Perry telephoned an assistant district attorney who accepted Perry's charge that the student resisted arrest. Perry also intended to arrest the student for "Disorderly Conduct—Abusive Language," but he was notified by the police dispatcher that Turner had ordered him to leave the student in the custody of Officer Wayne Cox

and return to Elsik High School. While he was away, Cox issued the student a citation for "Disruption of Class" and released her. In a subsequent letter to Bonaparte, Perry stated that he advised the assistant district attorney that Cox had erroneously released the student, and the attorney advised Perry to complete the charges and process the arrest at a later date. Perry also complained about the release to Turner, who allegedly responded that he, Turner, had been "ordered to issue all students who were arrested at Elsik citations and release them." Perry asserts that he completed an offense report on the day of these events regarding the charges against the student, and appellants expressed no objection to the report at that time.

The charges against the Elsik High School student were entered into the Juvenile Offender Tracking system on September 29, 2005, [1] and Perry attempted unsuccessfully to apprehend the student on the same day. When he returned to the station, he was given a letter of reprimand, dated September 28, 2005, in which Turner stated that Perry violated AISD's procedural requirement that all officers notify an AISD police supervisor of an alleged criminal offense before contacting the Harris County District Attorney's office to institute charges. The letter continued, "You are notified by receipt of this memorandum that you are required to contact an AISD Police Supervisor prior to contacting any ADA for charges." Perry concluded that the reprimand, "arbitrarily enforcing an unwritten practice," was issued to retaliate against him for reporting Bonaparte and Turner to the Harris County District Attorney's office for illegal conduct.

Perry filed further grievances on October 11, November 2, and November 11, 2005. After he filed the November 11th grievance, AISD's Director of Human Relations, Rose Benitez, summoned Perry to her office. In a meeting between Benitez, Perry, and Bonaparte, AISD terminated Perry's employment. On November 17, 2005, Benitez wrote to Perry and stated that, at her November 11th meeting with him, they discussed issues concerning Perry's job performance, including his "[i]nappropriate interaction with students." Benitez further stated that a copy of the letter would be placed in Perry's personnel file. [2]

On January 12, 2006, Perry sued Turner, Bonaparte, and AISD. He alleged that AISD terminated his employment in retaliation against him for reporting violations of law by Turner and Bonaparte. He asserted claims against Turner and Bonaparte in their individual capacities for slander and intentional infliction of emotional distress. In addition, he alleged that they took adverse employment actions against him in violation of his rights under the First and Fourteenth Amendments.

Turner and Bonaparte moved for partial traditional summary judgment on the grounds that they are protected from suit by qualified immunity and official immunity, and Perry failed to exhaust administrative **\*814** remedies. The trial court denied the motion on November 26, 2007, and this accelerated interlocutory appeal timely ensued.

## II. ISSUES PRESENTED

In their first issue, Turner and Bonaparte contend the trial court erred in denying their summary-judgment motion asserting qualified immunity to Perry's claims that they violated his constitutional rights to freedom of speech and due process. In their second issue, appellants contest the trial court's failure to grant summary judgment based on appellants' assertions of official immunity to Perry's claims of slander. [3]

## III. STANDARD OF REVIEW

To succeed in a motion for traditional summary judgment under *Texas Rule of Civil Procedure 166a(c)*, the movant must establish that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *W. Invs., Inc. v. Urena,* 162 S.W.3d 547, 550 (Tex.2005) (citing *Lear Siegler, Inc. v. Perez,* 819 S.W.2d 470, 471 (Tex.1991)). In reviewing a summary judgment, we consider the evidence in the light most favorable to the non-movant and resolve any doubts in the non-movant's favor. *Id.* (citing *Nixon v. Mr. Prop. Mgmt. Co.,* 690 S.W.2d 546, 548–49 (Tex.1985)).

## IV. ANALYSIS

### A. Qualified Immunity

[1] [2] [3] Qualified immunity protects governmental officials performing discretionary functions from suit if their actions were objectively reasonable in the light of then clearly-established law. *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). Stated differently, the question of whether an official

may be held personally liable for an allegedly unlawful official action is determined by examining the objective legal reasonableness of the action in light of the laws that were clearly established at that time. *Id.* at 639, 107 S.Ct. at 3038 (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818–19, 102 S.Ct. 2727, 2738–39, 73 L.Ed.2d 396 (1982)). Because the official's actions are measured against a standard of objective legal reasonableness, the official's subjective belief that his conduct was lawful is irrelevant to the analysis. *Id.* at 641, 107 S.Ct. at 3040.

 [4]  [5]  [6]  In analyzing whether qualified immunity applies, we first determine if the facts, taken in the light most favorable to the party asserting injury, showed that the official's conduct violated a constitutional right. *See Scott v. Harris,* 550 U.S. 372, 377–78, 127 S.Ct. 1769, 1774–75, 167 L.Ed.2d 686 (2007) (noting that, when reviewing ruling on an official's motion for summary judgment claiming qualified immunity, the court usually adopts the plaintiff's version of the facts). If the facts as alleged constitute such a violation, we consider whether the right was clearly established in light of the specific context of the case. *Id.* 127 S.Ct. at 1774; *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). The right was "clearly established" if the contours of the law at the time of the conduct at issue gave fair warning that such conduct would violate the employee's constitutional rights. *See Hope v. Pelzer,* 536 U.S. 730, 741, 122 S.Ct. 2508, 2516, 153 L.Ed.2d 666 (2002) (citing **\*815** *United States v. Lanier,* 520 U.S. 259, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997)); *Saucier v. Katz,* 533 U.S. 194, 202, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001) ("The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."); *Eastland County Coop. Dispatch v. Poyner,* 64 S.W.3d 182, 195–96 (Tex.App.-Eastland 2001, pet. denied) (applying *Saucier* ).

### 1. Claims Arising from Alleged Violations of Perry's First Amendment Rights

 [7]  [8]  [9]  Since 1968, courts have followed the *Pickering* balancing test to determine if the speech of a public employee is protected by the First Amendment. *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will County, Ill.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). To apply the *Pickering* test in determining whether a public employer unconstitutionally penalized an employee for engaging in protected speech, we balance (a) the interest of the employee,

as a citizen, in commenting upon matters of public concern, and (b) the interest of the governmental agency, as an employer, in promoting the efficiency of the public services it performs. *Id.* at 568, 88 S.Ct., at 1734–35. In analyzing the constitutionality of the employer's actions, "courts look to the facts as the employer *reasonably* found them to be." *Waters v. Churchill,* 511 U.S. 661, 677–78, 114 S.Ct. 1878, 1889, 128 L.Ed.2d 686 (1994) (plurality op.). [4] Whether an employee's speech addresses a matter of public concern is determined by the content, form, and context of a given statement, as revealed by the whole record. *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).

 [10]  In *Connick*, the Court discussed several facts on which it relied in analyzing whether speech "touched upon a matter of public concern." *Id.* at 149, 103 S.Ct. at 1691. These factors included:

- whether the speech was merely an extension of an employment dispute; [5]

- whether the speech was focused on "gather[ing] ammunition for another round of controversy" with the employee's superiors; [6]

- whether the speech occurred at work or on the speaker's own time and outside of the working areas of the office; [7]

- whether the speech impeded the ability of the speaker or other employees to perform their duties; [8]

- whether the employee sought to inform the public that the employer "was not discharging its governmental responsibilities in the investigation and prosecution of criminal cases"; [9] and

- whether the employee "[sought] to bring to light actual or potential **\*816** wrongdoing or breach of public trust" on the part of superiors. [10]

Although these factors are not a general standard against which statements must be judged, they illustrate the application of the "content-form-context" test required by *Pickering. See id.* at 147, 103 S.Ct. at 1690.

In 2006, the United States Supreme Court decided *Garcetti v. Ceballos,* in which it further refined the First Amendment balancing test applicable to governmental employees. 547

U.S. 410, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006). As the Fifth Circuit Court of Appeals explained, *Garcetti* "added a threshold layer" to the *Pickering/Connick* analysis. *Davis v. McKinney,* 518 F.3d 304, 312 (5th Cir.2008).[11] In *Garcetti,* a supervising district attorney was disciplined after writing a memorandum that his employer considered inflammatory. *Garcetti,* 547 U.S. at 420–23, 126 S.Ct. at 1959–61. The Court explained that the employee wrote the memorandum "as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case." *Id.* at 421, 126 S.Ct. at 1960. Significantly, the Court held that, as a threshold matter, employees are not speaking as citizens for First Amendment purposes when they speak "pursuant to their official duties." *Id.* Thus, under *Garcetti,* the reviewing court must shift its initial focus "from the content of the speech to the role the speaker occupied when he said it." *Williams v. Dallas Indep. Sch. Dist.,* 480 F.3d 689, 692 (5th Cir.2007) (per curiam).

 [11]     [12]     In sum, the inquiry regarding whether a governmental employee's speech is constitutionally protected now involves three considerations. First, we must determine whether the employee's speech was made pursuant to his or her official duties. *Davis,* 518 F.3d at 312.[12] If so, then the speech is not protected by the First Amendment, because "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." *Garcetti,* 547 U.S. at 421–22, 126 S.Ct. at 1960. Second, if the speaker did not engage in the speech pursuant to official duties, then we must determine whether the speech touched upon a matter of public concern. *Davis,* 518 F.3d at 312. Third, if the speech does pertain to a matter of public concern, we apply the *Pickering/Connick* test to balance the employee's interest in expressing his concerns with the governmental employer's interest in performing its services efficiently. *Id.*

Subsequent cases have further clarified *Garcetti*'s effect on the *Pickering/Connick* test. For example, in *Nixon v. City of* **\*817** *Houston,* the Fifth Circuit Court of Appeals considered a police officer's statements to the media criticizing, among other things, his employer's high-speed pursuit policy. 511 F.3d 494, 496–97 (5th Cir.2007). Some of the statements were made at an accident scene while the officer was in uniform and on duty; others appeared in magazine articles written by the officer. *Id.* In the articles, the officer also "characterized inner-city minority residents as 'rats,' women with cats

as mentally unstable, homeless people as 'criminals,' and children with problems as 'freaks.' " *Id.* at 500 n. 9.

On appeal, the court held that the statements at the accident scene were made pursuant to the officer's employment responsibilities, and thus, were not subject to First Amendment protection. *Id.* at 498. As the court explained, "the fact that [the police officer] performed his job incorrectly, in an unauthorized manner, or in contravention of the wishes of his superiors does not convert his statement ... into protected citizen speech." *Id.* at 498–99. Although the court did not determine whether the officer acted pursuant to his professional duties in writing the magazine articles, it held that the articles were unprotected under the *Pickering* test in any event because they brought " 'the mission of the [police department] and the professionalism of its officers into serious disrepute,' " thereby undermining citizen confidence in the department and impairing the performance of its functions. *Id.* at 500–01 (quoting *City of San Diego v. Roe,* 543 U.S. 77, 81, 125 S.Ct. 521, 524, 160 L.Ed.2d 410 (2004)).[13] In reaching this conclusion, the court emphasized that it was "mindful of the paramilitary structure of the police department and the greater latitude given their decisions regarding discipline and personnel regulations." *Id.* at 501.

**a. Causing Gang–Related Information to be Posted on CLEO**

 [13]     In their first issue, appellants contend that the trial court erred in denying their motion for qualified immunity to Perry's claims arising from his release of gang-related information for posting to the CLEO website. According to Perry, this speech was protected by the First Amendment, and thus, appellants violated his constitutional rights by subjecting him to employment discipline for engaging in this speech. Appellants assert that this speech is not protected under *Garcetti* because it relates to Perry's employment. We agree.

Although the parties have not identified the statement in the record and we do not know its exact content, Perry's own characterizations of the statement and the context in which it was made place it firmly within the scope of his employment responsibilities. For example, in his petition, Perry repeatedly states that he was "retaliated against for performing [his] job." *See, e.g.,* Pl.'s Seventh Am. Pet., ¶ 17 ("Because [Perry] sought to properly perform his job, including making relevant and material communication with appropriate officials, [Perry] was the target of retaliation

by [appellants].”). Activities undertaken in the course of performing one's job, even if unauthorized, are conducted pursuant to official duties. *Nixon,* 511 F.3d at 497–99 (citing *Williams,* 480 F.3d at 693).

We further note that CLEO can be accessed only by law enforcement personnel **\*818** who have been given passwords, and Perry could not obtain a password without a superior's authorization. He previously sought and was denied permission to obtain a password to access CLEO directly. Moreover, the summary-judgment evidence includes Perry's testimony that the speech at issue was related to his position as a gang officer performing an investigation as provided in his job description:

> If you look at my job description for the gang officer, it specifically says that I am to deal with other agencies. So, did I have prior—I already had prior permission to—to deal with other agencies. It was part of my job. It was part of what I did.
>
> ...
>
> The event [i.e., the gang violence expected in May 2005] was something I had heard about. I was in the investigation stage. If you read the content of what I sent out, it simply was asking for information.
>
> ...
>
> Again, my job description and—and what I understand my —my job to be and what the policy says is that I—if I had evidence of a specific incident then I need to make that appropriate—to make that known. I was gathering that inform—all I had was—was minor information at this time when I sent that out, and I was looking for more confirmation. So, do I—did I feel it was necessary [to obtain permission before releasing the information]? No, I was doing what I was supposed to be doing in that I was trying to gather information to see how valid what I had heard from another source and what I had been hearing in the district was.

According to his own testimony, Perry was investigating gang activity and requesting confirmation of information he learned in his investigation. Although a job description alone is not dispositive of the scope of an employee's duties, Perry's understanding of his job responsibilities is supported by AISD policies included in the summary-judgment record. [14]

Because private citizens do not have a right to post gang-related information to CLEO, there is “no relevant analogue to speech by citizens who are not government employees.” *Garcetti,* 547 U.S. at 424, 126 S.Ct. at 1961. This assessment is unchanged by the fact that Perry released information to another governmental employee for posting to the site, thereby accomplishing indirectly what he had been denied permission to do directly. Appellants produced evidence that Perry's conduct was insubordinate in that it circumvented their decision to refuse authorization for him to access CLEO directly. In addition, they produced uncontroverted evidence that Perry's conduct generated ill-will and threatened to disrupt the school district's normal functioning on the days identified by Perry as posing an increased risk for gang violence.

In his response to the motion for summary judgment, Perry stated that he released information for posting on the CLEO website “as a concerned citizen who is concerned not only about the public welfare, but also as a citizen concerned about the safety of other law enforcement personnel.” [15] This statement is insufficient **\*819** to bring the communication at issue—i.e., statements by a gang officer to other law enforcement personnel regarding his investigation of gang-related activity—within the protection of the First Amendment. *See Davis v. Ector County, Tex.,* 40 F.3d 777, 782 (5th Cir.1994) (“[A] proper inquiry does not elevate motive to a determinative factor; instead, we are to examine the form, content, and context of the statement.”). Given the forum in which the speech occurred, Perry's inability to access the website directly without his supervisor's authorization, the particularized roles of the speaker and the audience, and the content of the speech as described by Perry, we conclude that his disclosure of information for posting to the CLEO website was performed pursuant to his responsibilities as a gang officer, and as such, is not protected. We therefore agree with appellants' contention that this speech was not protected by the First Amendment, and we sustain their first issue as it pertains to this communication.

### b. Reporting Appellants' Allegedly Unlawful Conduct to the Harris County District Attorney

In the remainder of their first issue, appellants contend the trial court erred in denying them qualified immunity from Perry's claims arising from his report to the Harris County District Attorney that appellants unlawfully removed a citation from Perry's citation book. Again, *Garcetti* dictates that we begin our analysis by determining if Perry

engaged in the speech at issue pursuant to his employment responsibilities.

Because Perry is a police officer and his speech consisted of reporting his suspicions of unlawful activity, appellants contend that Perry engaged in this speech pursuant to his employment. In support of this argument, appellants emphasize that they were accused of unlawfully removing a citation. They contend that Perry "only had the authority to write tickets because he was a police officer; his reporting of the removal of a ticket, therefore, is necessarily related to [his] employment as a police officer."

 **[14]** This argument is without merit. The speech at issue consists of Perry's report to the district attorneys' office alleging that appellants unlawfully tampered with an existing government record; the identity of the person who created the record is irrelevant.

Appellants also contend that this speech is unprotected pursuant to *Garcetti* because Perry communicated his allegations to the district attorney's office while at work and in the course of performing his duties. Perry, however, testified without contradiction that he communicated with the district attorney's office via cell phone, and did not recall using the office telephone for that purpose. Because appellants' argument relies on facts that are not established in the record, it cannot support reversal. *See Scott,* 550 U.S. at 379–81, 127 S.Ct. at 1775–76; TEX.R. CIV. P. 166a(c); *Green v. Alford,* 274 S.W.3d 5, 17 (Tex.App.-Houston [14th Dist.] 2008, no pet. h.) (op. on en banc reh'g) (noting that an appellate court will reverse the trial court's denial of a qualified-immunity summary-judgment motion "only if the evidence conclusively proves facts establishing his entitlement to official immunity as a matter of law").

 **[15]** Having concluded that Perry was not acting pursuant to his employment responsibilities when reporting his suspicions of misconduct to the district attorney's office, we proceed to the *Pickering/Connick* test and determine whether the speech addressed a matter of public interest. Some issues are inherently subjects of public concern. **\*820** *Connick,* 461 U.S. at 148, 103 S.Ct. at 1691 n. 8 (racial discrimination) (citing *Givhan v. W. Line Consol. Sch. Dist.,* 439 U.S. 410, 415–16, 99 S.Ct. 693, 696–97, 58 L.Ed.2d 619 (1979)). The report of unlawful conduct by police officers is one such issue. *Id.* at 148, 103 S.Ct. at 1690–91 (communications to inform the public that the employer "was not discharging its governmental responsibilities in the investigation and

prosecution of criminal cases" is a matter of public concern); *id.* (public has an interest in speech intended "to bring to light actual or potential wrongdoing or breach of public trust" on the part of public employees); *Brawner v. City of Richardson, Tex.,* 855 F.2d 187, 191–92 (5th Cir.1988) ("The disclosure of misbehavior by public officials is a matter of public interest and therefore deserves constitutional protection, *especially when it concerns the operation of a police department.*") (emphasis added, footnote omitted). We therefore conclude, as a matter of law, that the speech at issue addressed a matter of public concern.

 **[16]** Finally, we must balance (a) the interests of Perry and the general public in allowing Perry to participate in speech on this issue, and (b) AISD police department's legitimate purpose in "promot[ing] efficiency and integrity in the discharge of official duties," [16] and maintaining " 'proper discipline in the public service.' " [17] "This involves whether the speech: (1) was likely to generate controversy and disruption, (2) impeded the department's general performance and operation, and (3) affected working relationships necessary to the department's proper functioning." *Brawner,* 855 F.2d at 192. Significantly, however, the absence of protection for the kind of speech at issue here would undermine rather than promote efficiency and integrity. "[I]f the allegations of internal misconduct are indeed true, [Perry's] statements could not have adversely affected the proper functioning of the department since the statements were made for the very reason that the department was not functioning properly due to corruption." *Id.* On this record, the public's interest in Perry's speech outweighs the legitimate interests of his governmental employer; thus, application of the *Pickering/ Connick* test leads us to conclude that Perry's speech to the district attorney's office was protected by the First Amendment.

 **[17]** Appellants contend that they nevertheless are entitled to qualified immunity because they did not violate a clearly established right protecting Perry's speech. To be considered clearly established, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039. According to appellants, "[t]he act in question in this case, disciplining a subordinate employee for violating a policy or procedure, does not constitute a clearly established violation of [Perry's] constitutional rights."

At the time of these events, however, it was well-established that a legitimate report of unlawful police conduct is protected by the First Amendment. *See, e.g., Davis v. Ector County, Tex.,* 40 F.3d 777, 782 (5th Cir.1994); *Brawner,* 855 F.2d at 192; *Lott v. Andrews Ctr.,* 259 F.Supp.2d 564, 568 (E.D.Tex.2003) (filing a legitimate criminal complaint with law enforcement officials constitutes an exercise of the First Amendment right); *see also* **\*821** *Wal–Mart Stores, Inc. v. Rodriguez,* 92 S.W.3d 502, 507 (Tex.2002) ("A citizen has a clear legal right to report criminal misconduct to authorities...."); *Tex. Dep't of Transp. v. Needham,* 82 S.W.3d 314, 320–21 (Tex.2002) (clarifying that a report of an alleged violation of law may be in good faith even though incorrect, if a reasonable person with the employee's level of training and experience would also have believed that a violation had occurred). The only policy identified by appellants which such speech could have violated was the policy communicated to Perry by Turner on September 29, 2005: "You are notified by receipt of this memorandum that you are required to contact an AISD Police Supervisor prior to contacting any [assistant district attorney] for charges." [18]

**[18]** Such a policy cannot be applied lawfully to authorize adverse employment action against a public employee "who in good faith reports a violation of law by the employing governmental entity or another public employee to an appropriate law enforcement authority." *See* TEX. GOV'T CODE ANN. § 554.002(a) (Vernon 2004). [19] To the contrary, section 554.002 is intended to (1) enhance openness in government by protecting public employees who inform proper authorities of legal violations, and (2) secure governmental compliance with the law on the part of those who direct and conduct governmental affairs. *Town of Flower Mound v. Teague,* 111 S.W.3d 742, 752 (Tex.App.-Fort Worth 2003, pet. denied) (op. on reh'g) (citing *Upton County v. Brown,* 960 S.W.2d 808, 817 (Tex.App.-El Paso 1997, no pet.) and *Tarrant County v. Bivins,* 936 S.W.2d 419, 421 (Tex.App.-Fort Worth 1996, no writ)). Law enforcement officers are not exempted from the statute's protections. *See* TEX. GOV'T CODE ANN. § 554.002; *Harris County Precinct Four Constable Dep't v. Grabowski,* 922 S.W.2d 954, 955–56 (Tex.1996) (per curiam); *Teague,* 111 S.W.3d at 752–754; *see also United Mine Workers of Am., Dist. 12 v. Ill. State Bar Ass'n,* 389 U.S. 217, 222, 88 S.Ct. 353, 356,19 L.Ed.2d 426 (1967) ( "The First Amendment would, however, be a hollow promise if it left government free to destroy or erode its guarantees by indirect restraints...."). Moreover, AISD expressly incorporated the "whistleblower protection"

of section 554.002 among the employee rights and privileges enumerated in its printed policies.

Because Turner and Bonaparte failed to demonstrate their entitlement to official immunity for Perry's claims arising from his report of appellants' suspected misconduct, we overrule the remainder of appellants' first issue as it pertains to this speech.

### *2. Claims Arising from Alleged Violations of Fourteenth Amendment Rights*

Appellants next challenge the trial court's failure to grant summary judgment against Perry on his claim that appellants took adverse employment action against him in violation of his Fourteenth Amendment right to due process. We begin our analysis by determining whether Perry was deprived of a protected interest, and, if so, what process was his due. *See Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 428, 102 S.Ct. 1148, 1154, 71 L.Ed.2d 265 (1982); *Univ. of Tex. Med. Sch. at* **\*822** *Houston v. Than,* 901 S.W.2d 926, 929 (Tex.1995).

**[19]** **[20]** A property interest protected by procedural due process arises where an individual has a legitimate claim of entitlement that is created, supported, or secured by rules or mutually explicit understandings. *Alford v. City of Dallas,* 738 S.W.2d 312, 316 (Tex.App.-Dallas 1987, no writ). Property interests also can be created by state law. *Town of Castle Rock, Colo. v. Gonzales,* 545 U.S. 748, 756, 125 S.Ct. 2796, 2803, 162 L.Ed.2d 658 (2005). In their motion for traditional summary judgment regarding Perry's Fourteenth Amendment claim for violation of his due process rights, Turner and Bonaparte asserted that Perry was an at-will employee with no property interest in continued employment. Perry responded that he had a protected property interest in continued employment pursuant to Texas Government Code sections 614.021–.023, which were expressly adopted in AISD's policy manual and which Turner and Bonaparte had previously applied to Perry. *See* TEX. GOV'T CODE ANN. §§ 614.021–.023 (Vernon 2004 and Supp.2008).

**[21]** Section 614.022 of the Texas Government Code, entitled "Complaint to be in Writing and Signed by Complainant," provides, "To be considered by the head of a state agency or by the head of a fire department or local law enforcement agency, the complaint must be: (1) in writing; and (2) signed by the person making the complaint." *Id. §* 614.022. Section 614.023, entitled "Copy of Complaint to be Given to Officer or Employee," further provides:

(a) A copy of a signed complaint against a law enforcement officer of this state ... or peace officer appointed or employed by a political subdivision of this state shall be given to the officer or employee within a reasonable time after the complaint is filed.

(b) Disciplinary action may not be taken against the officer or employee unless a copy of the signed complaint is given to the officer or employee.

(c) In addition to the requirement of Subsection (b), the officer or employee may not be indefinitely suspended or terminated from employment based on the subject matter of the complaint unless:

(1) the complaint is investigated; and

(2) there is evidence to prove the allegation of misconduct.

*Id.* § 614.023. [20] We previously construed these statutes and concluded that the complaint must be in writing and signed by the person who claims to be the victim of misconduct. *Guthery v. Taylor,* 112 S.W.3d 715, 721–23 (Tex.App.-Houston [14th Dist.] 2003, no pet.). Here, state law and AISD policy [21] created a property interest: in the absence of complaints that were signed, delivered, investigated, and supported by evidence, Perry had a legitimate expectation of continued employment secured by sections 614.021–023 of the Texas Government Code.

**\*823** **[22]** **[23]** Having determined that Perry had a protected property interest, we must now identify the process required to protect that interest. Generally, due process is measured by a flexible standard that depends on the practical requirements of the circumstances. *Mathews v. Eldridge,* 424 U.S. 319, 334, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976). This standard includes three factors: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *Id.* at 335, 96 S.Ct. at 903.

**[24]** According to appellants, the grievance process provided Perry with any due process to which he was entitled. We cannot agree that this substitute procedure protected Perry's due process rights. By enacting sections 614.021–023, of the Government Code, the State provided covered employees with procedural safeguards to reduce the risk that adverse employment actions would be based on unsubstantiated complaints. Moreover, the State determined that the value of these protections outweighs the fiscal and administrative burdens incurred by complying with statutory requirements. In contrast, the summary-judgment evidence demonstrates that the procedures appellants followed impaired Perry's ability to investigate or defend against the complaints made against him.

Rather than requiring complaints of alleged misconduct to be signed by the victim, appellants accepted and acted upon complaints that did not identify the true complainant. Instead, these complaints expressed the conclusions of other peace officers based on general allegations of unidentified people. For example, Officer Wayne Cox wrote,

> In speaking with fellow officers, who wish to remain anonymous, I feel that Officer Troy Perry is threatening to undermine your authority as chief and erode the good order and discipline of the department. I respectfully request that he not be allow[ed] to interact with students at the Elsik campus as he tends to incite or inflame already volatile situations by his demeanor.... I opine that Officer Perry should never have any contact with the public as he is the antithesis of a professional police officer.

Cox's partner, Officer William Britton, similarly wrote,

> It has been brought to my attention by my fellow officers that Officer Perry has been speaking ill of the department. I have been with Officer Perry on several occassions [sic] at Elsik and I feel that his actions with the students at Elsik are not that of a professional police officer. I have observed him shout, yell and degrade students with whom he was interacting.

Officer Karen Meier emailed Bonaparte that the "morale in the department and overall tension level among officers is very strained" and "most of this could be avoided if Officer Perry could keep whatever problems he has with the department and supervisors to himself and not drag everyone into it."

Deposition testimony demonstrated further problems with the procedure followed by appellants. Benitez testified that one of her job responsibilities requires her to investigate whether accusations are verifiable and truthful. Nevertheless, there was no investigation concerning Perry's release of information for posting on the CLEO website, and she does not know that any AISD employee, other than law **\*824** enforcement personnel, saw the posting. She further agreed that there is "nothing in writing, no dates, no names and no way to investigate" the allegations against Perry. Benitez conceded that she did not develop enough specific data to allow Perry to investigate "and give his side of the case," and stated her opinion that Perry could be terminated "for any reason or no reason." Rather than investigating, Benitez relied on statements concerning unidentified students, including statements from Turner and Bonaparte. Turner, however, testified that he does not remember any specific incident in which he observed Perry behaving inappropriately with students, and Bonaparte asserted his rights under the Fifth Amendment and refused to answer questions concerning this suit. [22]

In sum, appellants' failure to follow statutory procedure magnified the risk that adverse employment action would be taken based on unsubstantiated complaints. *Cf.* TEX. GOV'T CODE ANN. §§ 614.022, 614.023 [23] (requiring complaints against police officers to be written, signed, investigated, and supported by evidence if they are used as the basis for adverse employment action). On this record, we cannot conclude that the trial court erred in denying appellants' motion for summary judgment regarding Perry's Fourteenth Amendment claims.

## B. Official Immunity

[25]  [26]  [27]  [28]  In their second issue, appellants argue that they are entitled to official immunity from Perry's claims of slander, [24] and thus, the trial court erred in failing to grant summary judgment on this basis. Official immunity under common law is based on the need for public servants "to act in the public interest with confidence and without

the hesitation that could arise from having their judgment continually questioned by extended litigation." *Ballantyne v. Champion Builders, Inc.,* 144 S.W.3d 417, 424 (Tex.2004). It is an affirmative defense barring state law claims against a governmental employee's performance (1) of discretionary duties, (2) within the scope of the employee's authority, (3) provided that the employee acts in good faith. *Id.* at 422; *Univ. of Houston v. Clark,* 38 S.W.3d 578, 580–81 (Tex.2000); *City of Lancaster v. Chambers,* 883 S.W.2d 650, 653 (Tex.1994). The doctrine is based on the theory that the threat of liability will make public officials unduly timid in carrying out their official duties, and effective government will be promoted if officials are freed of the costs of vexatious and frivolous litigation. *Westfall v. Erwin,* 484 U.S. 292, 295, 108 S.Ct. 580, 583, 98 L.Ed.2d 619 (1988), *superseded by statute on other grounds,* 28 U.S.C. §§ 2671–2679 (1989 Supp.), *as recognized in United States v. Smith,* 499 U.S. 160, 111 S.Ct. 1180, 113 L.Ed.2d 134 (1991). Thus, immunity from state-law claims is intended to insulate essential governmental functions from the harassment of litigation and remove the deterrent to public service posed by the threat of heavy personal liability for errors in judgment. *See Ballantyne,* **\*825** 144 S.W.3d at 424; *Kassen v. Hatley,* 887 S.W.2d 4, 8 (Tex.1994).

[29]  On appeal, the parties have focused their arguments on the element of good faith. To determine whether a public official has acted in good faith, we look to the objective standard adopted in *Chambers,* 883 S.W.2d at 656. The summary-judgment movant must produce evidence that a reasonably prudent official, under the same or similar circumstances, could have believed that his conduct was justified based on the information he possessed when the conduct occurred. *Wadewitz v. Montgomery,* 951 S.W.2d 464, 467 (Tex.1997).

[30]  Appellants, however, failed to produce evidence that a reasonable officer in the same or similar circumstances could have believed that statements such as those made by Turner and Bonaparte were justified. In their affidavits in support of summary judgment, both Turner and Bonaparte stated:

It is within my job duties to report to ... administration, and specifically the Human Resources Department, what I believe, using my discretion, to be relevant in determining a subordinate's employment or disciplinary future.

This was the case when reporting to the administration regarding Troy Perry and his job performance. I made the determination, using my discretion and judgment, as to

what would be relevant to the administration in making a decision as to Troy Perry's employment with Alief or any disciplinary measure taken. I performed these discretionary duties believing that my reporting to the administration as to Troy Perry was in the best interest of the District and believing what I reported to be true.

I received reports from various administrators within the District that Troy Perry's behavior, with respect to his interactions with students, parents, and faculty, was inappropriate. I used my judgment and found these reports to be reliable and in the interest of Alief and its students and faculty, I reported my findings as well as my observations to ... Human Resources. This was done without malice....

It is not my understanding that my issuance of disciplinary measures, such as my issuance of a verbal or written directive; the assignment of a growth plan; or even recommendation of termination, for violation of District or department policy or procedures, in any way violates the Constitutional rights of any officers under my supervision.

In effect, each appellant states that he felt justified in making the statements and reports at issue regarding Perry's conduct; however, in analyzing claims of official immunity, "consideration of *subjective* evidence of the good faith element of official immunity is inappropriate." *Ballantyne,* 144 S.W.3d at 419 (emphasis added).

Because Turner and Bonaparte failed to produce evidence that a reasonably prudent officer, in the same or similar circumstances, could have believed that their representations of Perry's conduct were justified, the trial court properly denied summary judgment on this ground. We therefore overrule appellants' second issue.

## V. CONCLUSION

We conclude that Perry did not engage in protected speech when he released information for publication to a law-enforcement website. Consequently, appellants are entitled to qualified immunity against Perry's claims that they violated his First Amendment rights in connection with this communication. We therefore reverse the trial court's order and render judgment **\*826** that appellants are immune from liability arising from adverse employment actions taken in response to Perry's release of information for publication to the CLEO website. In all other respects, we affirm the trial court's order denying summary judgment, and we remand the case for further proceedings consistent with this opinion.

**Parallel Citations**

243 Ed. Law Rep. 933

Footnotes

1    Perry attributes the delay in entering the charges into the computer system to school closures in connection with Hurricane Rita.

2    Perry filed another grievance on November 28, 2005, and an unsuccessful grievance hearing was held on January 19, 2006.

3    On appeal, the parties do not address Perry's claim for intentional infliction of emotional distress or appellants' contention that Perry failed to exhaust administrative remedies.

4    The plurality opinion may be taken to state the holding of the Court. As J. Souter explained in a concurring opinion, a majority of the Court agreed that, in the absence of pretext, employers whose conduct survives the plurality's reasonableness test cannot be held constitutionally liable. *Waters,* 511 U.S. at 685–86, 114 S.Ct. at 1893 (Souter, J., concurring). A different majority agreed that employers whose conduct fails the plurality's reasonableness test have violated the Free Speech Clause. *Id.*

5    *Id.* at 148, 103 S.Ct. at 1690.

6    *Id.* at 148, 103 S.Ct. at 1691.

7    *Id.* at 152–53, 103 S.Ct. at 1693.

8    *Id.* at 151, 103 S.Ct. at 1692.

9    *Id.* at 148, 103 S.Ct. at 1690–91.

10    *Id.*

11    Although the events in this case predate *Garcetti,* we apply its threshold requirement when determining whether Perry engaged in protected speech. *See Harper v. Va. Dep't of Taxation,* 509 U.S. 86, 97, 113 S.Ct. 2510, 2517, 125 L.Ed.2d 74 (1993) (explaining that the Supreme Court's announcement of a rule of federal law applies to all open cases and events, regardless of whether such events predate or postdate the Court's announcement of the rule). We do not, however, consider *Garcetti* as part of the law that was "clearly established" at the time appellants are alleged to have violated Perry's constitutional rights. *See Hope,* 536 U.S. at 741, 122 S.Ct. at 2516 (describing the test for ascertaining the "clearly established" law at the time of the alleged violations).

12 That the employee's speech concerns facts learned while working is not dispositive. *See Charles v. Grief,* 522 F.3d 508, 513–14 (5th Cir.2008) (Texas Lottery Commission employee's allegations of Commission misconduct, made to members of the Texas legislature with oversight over the Commission, is protected even though the speech concerned facts learned at work).

13 In *City of San Diego,* the Supreme Court held that the police department had a legitimate and substantial interest in preventing one of its officers from selling pornographic videos of himself on eBay where the officer identified himself as a law enforcement officer, appeared in uniform, and performed indecent acts. *Nixon,* 511 F.3d at 500–01 (citing *City of San Diego,* 543 U.S. at 81, 125 S.Ct. 521).

14 For example, a policy entitled "Alief ISD Policy CKE (Legal)" states that a "peace officer may provide assistance to another law enforcement agency...."

15 In Perry's Seventh Amended Petition, however, he alleged that he "was reprimanded even though the AISD Gang Officer's stated responsibilities included protecting AISD students and personnel, and the responsibility to work with other agencies to track, monitor and document criminal gang sets, affiliates and associates."

16 *Arnett v. Kennedy,* 416 U.S. 134, 168, 94 S.Ct. 1633, 1651, 40 L.Ed.2d 15 (1974) (Powell, J., concurring).

17 *Connick,* 461 U.S. at 150–51, 103 S.Ct. at 1692 (quoting *Ex parte Curtis,* 106 U.S. 371, 1 S.Ct. 381, 384, 27 L.Ed. 232 (1882)).

18 During his deposition, Turner testified that it was part of AISD police department's "procedure" to obtain prior approval from a supervisor before disseminating "juvenile information and information that could cause alarm." Turner denied that this was a "policy."

19 An appropriate law enforcement authority includes governmental entities that the employee in good faith believes are authorized to investigate or prosecute a violation of criminal law. *Id.* § 554.002(b)(2).

20 Act of May 16, 1969, 61st Leg., R.S., ch. 407, § 1, 1969 Tex. Gen. Laws 1333, 1333–34 (formerly codified as Vernon's Ann. Civ. St. art. 6252–20, eff. June 2, 1969), *recodified by* Act of May 4, 1993, 73rd Leg., R.S., ch. 268, § 1, 1993 Tex. Gen. Laws 583, 678–79, *amended by* Act of May 19, 2005, 79th Leg., R.S., ch. 507, § 1, 2005 Tex. Gen. Laws 1394, 1394, eff. Sept. 1, 2005.

21 *See County of Dallas v. Wiland,* 216 S.W.3d 344, 348 (Tex.2007) (stating that at-will employment of public employees may be modified by agreement with the employer, as in a personnel manual). Here, the AISD police force expressly adopted the state statutes as its own policy.

22 *Cf. Fudge v. Haggar,* 621 S.W.2d 196, 197–98 (Tex.App.-Texarkana 1981, writ ref'd n.r.e.) (holding that a written, signed complaint by an internal investigator concerning police officer's improper release of prisoner, supported by affidavits from "pretrial release employees," fulfilled statutory requirements because "the entire investigation began within the police department").

23 To the contrary, Benitez testified that she did not investigate the complaints.

24 Perry's slander claim is primarily based on appellants' representations that he engaged in "inappropriate interactions with students."

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

827 S.W.2d 833
Supreme Court of Texas.

Charles F. WALKER and Mary
Jeanette Walker et al., Relators,

v.

The Honorable Anne PACKER, Judge, Respondent.

No. C–9403.  |  Feb. 19, 1992.  |  Rehearing
Overruled May 6, 1992.  |  Dissenting
Opinion by Justice Gammage May 7, 1992.

Parents of child born with brain damage, who had brought action against obstetrician, hospital where child was born, and nurse attending at delivery, brought petition for writ of mandamus arguing that the trial court abused its discretion by refusing to order hospital to produce documents from its insurer's files and by ordering that portions of other responsive documents be stricken. The Supreme Court, Phillips, C.J., held that: (1) plaintiffs had not presented sufficient record to demonstrate that trial court clearly abused its discretion in failing to grant plaintiffs requested discovery from one of defendants, and (2) plaintiffs had adequate remedy by way of appeal as to documents they sought from nonparty for impeachment purposes.

Petition denied.

Gonzalez, J., concurred with opinion.

Doggett, J., dissented with opinion in which Mauzy, J., joined.

Gammage, J., dissented with opinion.

West Headnotes (18)

[1]  **Mandamus**
  Presumptions and Burden of Proof
  Party seeking mandamus relief has burden of providing Supreme Court with sufficient record to establish right to mandamus relief.

  463 Cases that cite this headnote

[2]  **Mandamus**

  Presumptions and Burden of Proof
  Party seeking mandamus relief had burden of providing not only a petition and affidavit, but also a statement of facts from evidentiary hearing that had been held. Rules App.Proc., Rule 121(a)(2)(C, F).

  20 Cases that cite this headnote

[3]  **Mandamus**
  Presumptions and Burden of Proof
  Plaintiffs bringing motion for leave to file petition for writ of mandamus arguing that trial court clearly abused its discretion by refusing to order defendant to produce documents from insurer's files and by ordering that portions of other responsive documents be stricken failed to meet their burden of providing Court of Appeals with record upon which they could establish their right to mandamus relief; plaintiffs failed to provide Supreme Court with statement of facts from evidentiary hearing. Rules App.Proc., Rule 121(a)(2)(C, F).

  824 Cases that cite this headnote

[4]  **Pretrial Procedure**
  Request, Notice, or Motion and Response or Objection
  Trial court erred in mechanically applying *Russell* decision, which disapproved of global discovery of documents merely to impeach potential witness, to deny discovery of documentary evidence by medical malpractice plaintiffs to impeach one of defendants' expert witnesses, a faculty member in obstetrics; plaintiffs presented to trial court evidence of hospital's policy restricting faculty's freedom to testify for plaintiffs, raising the possibility that the faculty member was biased, and plaintiffs' request was narrowly tailored. Vernon's Ann.Texas Rules Civ.Proc., Rule 166b, subd. 2, par. a; Rules of Civ.Evid., Rule 613(b).

  9 Cases that cite this headnote

[5]  **Mandamus**
  Scope of Inquiry and Powers of Court

Trial court clearly abuses its discretion, for purposes of mandamus, with respect to resolution of factual issues or matters committed to trial court's discretion, only if trial court could reasonably have reached only one decision; reviewing court may not substitute its judgment for that of trial court.

777 Cases that cite this headnote

**[6] Mandamus**

👉 Matters of Discretion

On mandamus review of trial court's determination of legal principles, clear failure by trial court to analyze or apply the law correctly will constitute abuse of discretion, and may result in appellate reversal by extraordinary writ.

1796 Cases that cite this headnote

**[7] Mandamus**

👉 Scope of Inquiry and Powers of Court

On mandamus review of trial court's erroneous denial of requested discovery in medical malpractice case on sole basis of *Russell*, Supreme Court would consider the trial court's decision as a legal conclusion to be reviewed with limited deference.

20 Cases that cite this headnote

**[8] Mandamus**

👉 Proceedings in Civil Actions in General

Trial court's erroneous denial of plaintiffs' requested discovery in medical malpractice case to impeach one of defendants' expert witnesses on sole basis of *Russell* constituted clear abuse of discretion, for purposes of mandamus relief.

385 Cases that cite this headnote

**[9] Mandamus**

👉 Remedy by Appeal or Writ of Error

Requirement that person seeking mandamus relief establish lack of adequate appellate remedy is "fundamental tenet" of mandamus practice.

92 Cases that cite this headnote

**[10] Mandamus**

👉 Remedy by Appeal or Writ of Error

Mandamus will not issue where there is adequate remedy by appeal.

276 Cases that cite this headnote

**[11] Mandamus**

👉 Modification or Vacation of Judgment or Order

Party seeking review of discovery order by mandamus must demonstrate that the remedy offered by an ordinary appeal is inadequate.

24 Cases that cite this headnote

**[12] Mandamus**

👉 Remedy by Appeal or Writ of Error

Appellate remedy is not inadequate, for purposes of mandamus, merely because it may involve more expense or delay than obtaining an extraordinary writ.

135 Cases that cite this headnote

**[13] Mandamus**

👉 Modification or Vacation of Judgment or Order

Party will not have adequate remedy by way of appeal, for purposes of mandamus, when appellate court would not be able to cure the trial court's discovery error, which occurs when trial court erroneously orders disclosure of privileged information which will materially affect the rights of the aggrieved party.

175 Cases that cite this headnote

**[14] Mandamus**

👉 Remedy by Appeal or Writ of Error

Appeal will not be an adequate remedy, for purposes of mandamus, where the party's ability to present viable claim or defense at trial is vitiated or severely compromised by trial court's

discovery error, but it is not enough to show merely the delay, inconvenience or expense of an appeal, rather, the relator must establish the effective denial of reasonable opportunity to develop the merits of his or her case.

389 Cases that cite this headnote

**[15]** **Mandamus**
 Modification or Vacation of Judgment or Order

When trial court imposes discovery sanctions which have effect of precluding decision on merits of party's claims, party's remedy by eventual appeal is inadequate, for purposes of mandamus, unless sanctions are imposed simultaneously with rendition of final, appealable judgment.

97 Cases that cite this headnote

**[16]** **Mandamus**
 Modification or Vacation of Judgment or Order

Remedy by appeal may be inadequate, for purposes of mandamus, where trial court disallows discovery and missing discovery cannot be made part of appellate record, or trial court after proper request refuses to make it part of record, and reviewing court is unable to evaluate effect of trial court's error on the record before it.

45 Cases that cite this headnote

**[17]** **Mandamus**
 Proceedings in Civil Actions in General

If trial court disallows discovery and missing discovery cannot be made part of appellate record, or trial court after proper request refuses to make it part of record, and reviewing court is unable to evaluate effect of trial court's error on record before it, court must carefully consider all relevant circumstances, such as claims and defenses asserted, type of discovery sought, what it is intended to prove, and presence or lack of other discovery, to determine whether

mandamus is appropriate. Vernon's Ann.Texas Rules Civ.Proc., Rule 166b, subd. 4.

18 Cases that cite this headnote

**[18]** **Mandamus**
 Modification or Vacation of Judgment or Order

Medical malpractice plaintiff seeking documents from defendant hospital to impeach one of defendant's expert witnesses had adequate remedy by appeal, and, thus, mandamus was inappropriate way to compel discovery, where the information was not privileged, burdensome or harassing, nor did it vitiate or severely compromise the plaintiffs' ability to present a viable claim, the materials were considered below, and there was no reason why they would not be available on appeal.

121 Cases that cite this headnote

**Attorneys and Law Firms**

 **\*835** Les Weisbrod and Michael S. Box, Dallas, for relators.

Philipa Remington, Stephen W. Johnson, James A. Williams, Kevin J. Keith, Martha L. Strother, Gary W. Sibley, Dallas and Delmar L. Cain, Austin, for respondent.

**OPINION**

PHILLIPS, Chief Justice.

This original mandamus action involves two pre-trial discovery requests sought by **\*836** relators, plaintiffs in a medical malpractice lawsuit. The first discovery dispute involves documents which the plaintiffs seek from one of the defendants, while the second involves documents which they seek from a nonparty for impeachment purposes. As to the first matter, we hold that relators have not presented a sufficient record to demonstrate that the trial court clearly abused its discretion in failing to grant them all requested relief. As to the second, we hold that relators have an adequate remedy by appeal. Thus, mandamus is inappropriate, and we deny the writ.

### *The St. Paul and Aetna Records*

Catherine Johanna Walker sustained brain damage at birth in January 1983. In January 1985, her parents, Charles F. and Mary Jeanette Walker, sued Dr. Paul Crider, the obstetrician, St. Paul Hospital, where Catherine was born, and Iris Jean White, a nurse attending at the delivery.

In August 1987, the Walkers served on St. Paul their third request for production of documents pursuant to Tex.R.Civ.P. 167. One request asked for:

> Any and all writings, notes, documents, letters, etc., concerning, mentioning, alluding to, or making reference to (either directly or indirectly), the tape recorded statement given by Nurse White to an Aetna adjuster, including but not limited to any notes or entries in any Aetna adjuster's file, any attorney's file, or any file or writing in possession of any employee, representative or agent of St. Paul Hospital. This request is in reference to the tape recorded statement which you have been unable to locate, but which was previously requested....

St. Paul responded as follows:

> In an effort to respond to this request, this Defendant again checked with all appropriate personnel and files at St. Paul Hospital and the law firm of Bailey and Williams. No such statement or taped recording was found. For the third time the Aetna Casualty and Surety Company was asked to check its records and files and a partially transcribed statement was located, a copy of which is attached. No taped recording was located.

Nearly two years later, the Walkers filed a motion to compel under Tex.R.Civ.P. 215, asserting that St. Paul failed to respond completely to the request. [1] The Walkers complained that "St. Paul Hospital did not even respond to what was requested in the request for production—that is, writings, notes, and notations in the adjuster's file or attorney's file mentioning, alluding to, or making reference to the tape recorded statement of Nurse White." At about the same time, the Walkers also served on Aetna Casualty and Surety Company, St. Paul's insurer, an "Amended Notice of Intention to Take Deposition Upon Written Questions —Duces Tecum," seeking, among other things, the same documents. Aetna moved to quash the notice.

The trial judge appointed a special master to review the Walkers' motion to compel and Aetna's motion to quash. After an evidentiary hearing on September 5, 1989, the master prepared findings, which formed the basis for two extensive orders signed by the trial court on September 20, 1989. In the first order, the court found that the Walkers were "entitled to all documentation sought in [the request] from the files of Defendant St. Paul or its attorney of record, but not from the files of Aetna Insurance Company, except as they may appear in the files of St. Paul or the attorneys of record of St. Paul." The court also stated that it "has been advised that St. Paul has supplied all documentation that is responsive to [the request], but that additional documentation will be made available **\*837** to the Court for in camera review." The court therefore *sustained* the Walkers' motion to compel "to the extent that on Friday, September 8, 1989 the Special Master will review in the Chambers of the 134th District Court the relevant portions of the St. Paul files and their attorney [sic] files, which may be in response to Plaintiff's request...." The court, however, did not order St. Paul to produce documents from Aetna's files for *in camera* inspection. [2]

After the master's September 8 *in camera* inspection, the court ordered discovery of three additional documents from the files of St. Paul and its attorneys, which it found "relate to the matters sought in discovery and should be supplied after irrelevant portions of such documents are stricken."

After unsuccessfully seeking relief in the court of appeals, the Walkers moved for leave to file a petition for writ of mandamus with this court, arguing that the trial court clearly abused its discretion by refusing to order St. Paul to produce the documents from Aetna's files and by ordering that portions of the other responsive documents be stricken. The Walkers contend that the order was a clear abuse of discretion because St. Paul 1) never objected to the Walkers' request for production, 2) had a superior right to the Walkers to compel production of the documents in Aetna's possession, and 3) never asked that any parts of the documents be excised.

The record before us does not include the statement of facts from the evidentiary hearing on the Walkers' motion to compel production. Without it, we cannot determine on what basis the trial judge and the special master reached their conclusions. Since we cannot assess whether or not the trial court's order was correct, we obviously cannot take the additional step of determining that the court's order, if incorrect, constituted a clear abuse of discretion.

 **[1]**  **[2]**  **[3]**  As the parties seeking relief, the Walkers had the burden of providing this Court with a sufficient record to establish their right to mandamus relief. Since an evidentiary hearing was held, the Walkers had the burden of providing us not only a petition and affidavit, *see* Tex.R.App.P. 121(a) (2)(C) and (F), but also a statement of facts from the hearing. *See, e.g., Cameron County v. Hinojosa,* 760 S.W.2d 742, 744 (Tex.App.—Corpus Christi 1988, orig. proceeding); *Greenstein, Logan & Co. v. Burgess Mktg. Inc.,* 744 S.W.2d 170, 177 (Tex.App.—Waco 1987, writ denied); *see also Western Casualty & Surety Co. v. Spears,* 730 S.W.2d 821, 822 (Tex.App.—San Antonio 1987, orig. proceeding). [3] Having failed to meet this burden, the Walkers have not provided us with a record upon which they can establish their right to mandamus relief against St. Paul.

### *The Obstetrics Faculty Records*

 **[4]**  The second discovery dispute arises out of the Walkers' attempt to secure documentary evidence to impeach one of the defendants' expert witnesses, Dr. Larry Gilstrap, a faculty member in obstetrics at the University of Texas Health Science Center at Dallas ("the Center"). Gilstrap testified at his deposition that expert witness fees earned by obstetrics faculty members are deposited into a "fund" in the obstetrics "billing department"; that obstetrics faculty members get paid "indirectly" from this fund; that the fund is handled by Judy Wagers, a Center employee; and that he was unaware of any obstetrics department policy restricting faculty members from testifying for plaintiffs in medical malpractice cases.

 **\*838** Thereafter, the Walkers noticed Wagers' deposition, requesting that she provide all documents regarding (1) the operation of the above-mentioned "fund" from 1985 to 1988; and (2) limitations placed upon obstetrics faculty members relating to their testimony in medical malpractice cases. The Center, on behalf of Wagers, moved to quash the notice, arguing that the request for documents was "vague and

overly broad" and that production would be "costly and burdensome."

Two months later, in an unrelated lawsuit, the Walkers' counsel deposed Dr. Alvin L. Brekken, another obstetrics faculty member at the Center. Dr. Brekken testified that the obstetrics department's official policy, distributed in writing to all faculty members, requires a doctor to obtain authorization from other faculty members before testifying for any plaintiff in a medical malpractice case. Based on this testimony, the Walkers sought a court order to depose Wagers and obtain the requested documents.

After reviewing the Gilstrap and Brekken depositions and pleadings of counsel, the trial court ordered the Center to produce the documents for *in camera* review by the special master. Subsequently, in her September 20, 1989 order, the trial judge denied the discovery, stating in part:

> [S]uch requested discovery is improper pursuant to the Rulings of the Supreme Court of Texas in *Russell v. Young* [452 S.W.2d 434 (Tex.1970) ], as the potential witness is not a party to the suit and the records do not relate to the subject matter of the suit, but are sought solely for the purpose of impeachment, according to the Plaintiffs' pleadings.

Although noting that some of the documents "would be relevant to this cause of action," the court nevertheless denied discovery because "all such documents are controlled by the *Russell* decision."

In *Russell,* a party sought wholesale discovery of financial records of a potential medical expert witness who was not a party to the lawsuit. [4] The documents requested did not relate directly to the subject matter of the suit, but were sought solely in an attempt to impeach the potential witness by showing bias or prejudice. The credibility of the witness, however, had not yet been put in doubt. Under these circumstances, we held that the documents were not discoverable, and we directed the trial court to vacate its order allowing the requested discovery. 452 S.W.2d at 435. We reasoned that "[t]here is ... a limit beyond which pre-trial discovery should not be allowed." *Id.* at 437.

The present case is distinguishable. Here, the Walkers presented to the trial court evidence of a specific circumstance

—the Center's policy restricting the faculty's freedom to testify for plaintiffs—raising the possibility that Dr. Gilstrap is biased. Thus, the Walkers are not engaged in global discovery of the type disapproved in *Russell;* rather, they narrowly seek information regarding the potential bias suggested by the witness' own deposition testimony and that of his professional colleague.

Our rules of civil procedure, and the federal rules upon which they are based, mandate a flexible approach to discovery. A party may seek any information which "appears reasonably calculated to lead to the **\*839** discovery of admissible evidence." Tex.R.Civ.P. 166b(2)(a). Evidence of bias of a witness is relevant and admissible. *See* Tex.R.Civ.Evid. 613(b). [5]

The trial court erred in failing to apply the foregoing rules to determine whether the documents were discoverable. Instead, the trial court simply read *Russell* as an absolute bar to discovery, even though the circumstances here are quite distinguishable. In so doing, the trial court misapplied the *Russell* holding. We expressly disapprove such a mechanical approach to discovery rulings. [6]

Having concluded that the trial court erred in denying the discovery based solely on *Russell,* we now must determine whether the appropriate remedy lies by writ of mandamus. "Mandamus issues only to correct a clear abuse of discretion or the violation of a duty imposed by law when there is no other adequate remedy by law." *Johnson v. Fourth Court of Appeals,* 700 S.W.2d 916, 917 (Tex.1985). [7] We therefore examine whether the trial court's error in the present case constituted a clear abuse of discretion and, if so, whether there is an adequate remedy by appeal.

## 1. *Clear Abuse of Discretion*

Traditionally, the writ of mandamus issued only to compel the performance of a ministerial act or duty. *See Wortham v. Walker,* 133 Tex. 255, 277, 128 S.W.2d 1138, 1150 (1939); *Arberry v. Beavers,* 6 Tex. 457 (1851); Helen A. Cassidy, *The Instant Freeze–Dried Guide to Mandamus Procedure in Texas Courts,* 31 S.Tex.L.Rev. 509, 510 (1990); Comment, *The Expanding Use of Mandamus to Review Texas District Court Discovery Orders: An Immediate Appeal Is Available,* 32 Sw.L.J. 1283, 1288 (1979).

Since the 1950's, however, this Court has used the writ to correct a "clear abuse of discretion" committed by the trial

court. *See, e.g., Joachim v. Chambers,* 815 S.W.2d 234, 237 (Tex.1991); *Jampole v. Touchy,* 673 S.W.2d 569, 574 (Tex.1984); *West v. Solito,* 563 S.W.2d 240, 244 (Tex.1978); *Womack v. Berry,* 156 Tex. 44, 50, 291 S.W.2d 677, 682 (1956). *See generally,* David W. Holman & Byron C. Keeling, *Entering the Thicket? Mandamus Review of Texas District Court Witness Disclosure Orders,* 23 St. Mary's L.J. 365, 390 (1991); Cassidy, 31 S.Tex.L.Rev. at 510; Note, *The Use of Mandamus to Review Discovery Orders in Texas: An Extraordinary Remedy,* 1 Rev.Litig. 325, 326–27 (1981); Comment, 32 Sw.L.J. at 1290.

A trial court clearly abuses its discretion if "it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law." *Johnson v. Fourth Court of Appeals,* 700 S.W.2d at 917. This standard, however, has different applications in different circumstances.

[5] With respect to resolution of factual issues or matters committed to the trial court's discretion, for example, the reviewing court may not substitute its judgment for that of the trial court. *See Flores v. Fourth Court of Appeals,* 777 S.W.2d 38, 41–42 (Tex.1989) (holding that determination **\*840** of discoverability under Tex.R.Civ.P. 166b(3)(d) was within discretion of trial court); *Johnson,* 700 S.W.2d at 918 (holding that trial court was within discretion in granting a new trial "in the interest of justice and fairness"). The relator must establish that the trial court could reasonably have reached only one decision. *Id.* at 917. Even if the reviewing court would have decided the issue differently, it cannot disturb the trial court's decision unless it is shown to be arbitrary and unreasonable. *Johnson,* 700 S.W.2d at 918.

[6] On the other hand, review of a trial court's determination of the legal principles controlling its ruling is much less deferential. A trial court has no "discretion" in determining what the law is or applying the law to the facts. Thus, a clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion, and may result in appellate reversal by extraordinary writ. *See Joachim v. Chambers,* 815 S.W.2d 234, 240 (Tex.1991) (trial court abused discretion by misinterpreting Code of Judicial Conduct); *NCNB Texas National Bank v. Coker,* 765 S.W.2d 398, 400 (Tex.1989) (trial court abused discretion by failing to apply proper legal standard to motion to disqualify counsel); *Eanes ISD v. Logue,* 712 S.W.2d 741, 742 (Tex.1986) (trial court abused discretion by erroneously finding constitutional violation).

**[7]** **[8]** In determining whether the trial court abused its discretion in the present case, we treat the trial court's erroneous denial of the requested discovery on the sole basis of *Russell* as a legal conclusion to be reviewed with limited deference to the trial court. This is consistent with our approach in previous mandamus proceedings arising out of the trial court's interpretation of legal rules. *Cf. Axelson, Inc. v. McIlhany,* 798 S.W.2d 550, 555 (Tex.1990); *Barnes v. Whittigton,* 751 S.W.2d 493, 495–96 (Tex.1988); *Terry v. Lawrence,* 700 S.W.2d 912, 913–14 (Tex.1985). Under this analysis, the trial court's erroneous interpretation of the law constitutes a clear abuse of discretion.

### 2. *Adequate Remedy by Appeal*

In order to determine whether the writ should issue, however, we must further decide whether the Walkers have an adequate remedy by appeal.

**[9]** Mandamus will not issue where there is "a clear and adequate remedy at law, such as a normal appeal." *State v. Walker,* 679 S.W.2d 484, 485 (Tex.1984). Mandamus is intended to be an extraordinary remedy, available only in limited circumstances. The writ will issue "only in situations involving manifest and urgent necessity and not for grievances that may be addressed by other remedies." *Holloway v. Fifth Court of Appeals,* 767 S.W.2d 680, 684 (Tex.1989) (quoting James Sales, *Original Jurisdiction of the Supreme Court and the Courts of Civil Appeals of Texas* in *Appellate Procedure in Texas,* § 1.4[1] [b] at 47 (2d ed. 1979)). The requirement that persons seeking mandamus relief establish the lack of an adequate appellate remedy is a "fundamental tenet" of mandamus practice. *Holloway,* 767 S.W.2d at 684.

**[10]** Our requirement that mandamus will not issue where there is an adequate remedy by appeal is well-settled. [8] On a few occasions, however, we have not focused **\*841** on this requirement when applying mandamus review of discovery orders. For example, in *Barker v. Dunham,* 551 S.W.2d 41 (Tex.1977), the trial court refused to compel defendant's representative to answer certain deposition questions, and the plaintiff applied to this Court for a writ of mandamus. We concluded that the trial court had abused its discretion, and ordered that the writ conditionally issue. We never discussed the well-settled requirement of inadequate remedy by appeal.

A few months later, in *Allen v. Humphreys,* 559 S.W.2d 798 (Tex.1977), the Court again conditionally issued a writ of mandamus to correct a discovery abuse without considering whether the relator had an adequate remedy by appeal. The real party in interest in *Allen* raised this argument, but the Court avoided the issue by citing *Barker. Id.* at 801.

Commentators quickly criticized the *Barker* and *Allen* opinions. *See* James Sales, *Pre–Trial Discovery in Texas,* 31 Sw.L.J. 1017, 1033 (1977); Comment, *The Expanding Use of Mandamus to Review Texas District Court Discovery Orders: An Immediate Appeal Is Available,* 32 Sw.L.J. 1283, 1300 (1979) (In most cases "forcing a party to await the completion of the trial in order to seek appellate review will not endanger his substantial rights...."); Note, *Mandamus May Issue To Compel A District Judge to Order Discovery,* 9 Tex.Tech L.Rev. 782 (1978) (mandamus should not be a substitute for appeal).

In *Jampole v. Touchy,* 673 S.W.2d 569 (Tex.1984), the Court again used the extraordinary writ of mandamus to compel discovery which had been denied by the trial court. Unlike in *Barker* and *Allen,* however, the Court in *Jampole* addressed whether relator had an adequate appellate remedy. The underlying suit in *Jampole* was a products liability action, and the disputed discovery materials included alternate design and assembly documents. The Court held that relator did not have an adequate remedy by appeal because denial of this discovery effectively prevented relator from proving the material allegations of his lawsuit. 673 S.W.2d at 576. Remedy by appeal in a discovery mandamus is not adequate where a party is required "to try his lawsuit, debilitated by the denial of proper discovery, only to have that lawsuit rendered a certain nullity on appeal...." *Id.*

Although the Court in *Jampole* recognized the need to address whether relator had an adequate remedy by appeal, it expressly refused to overrule *Barker* and *Allen. Id.* Perhaps because of this, we have on several occasions since *Jampole* used mandamus to correct discovery errors without considering whether the relator had an adequate appellate remedy. *See Loftin v. Martin,* 776 S.W.2d 145 (Tex.1989); *Barnes v. Whittington,* 751 S.W.2d 493 (Tex.1988); *Lunsford v. Morris,* 746 S.W.2d 471 (Tex.1988); *Turbodyne Corp. v. Heard,* 720 S.W.2d 802 (Tex.1986); *Terry v. Lawrence,* 700 S.W.2d 912 (Tex.1985); *Lindsay v. O'Neill,* 689 S.W.2d 400 (Tex.1985).

On many other occasions, however, we have still required a showing of inadequate **\*842** remedy by appeal in mandamus proceedings involving other types of pre-trial orders, even

those involving discovery. *See, e.g., TransAmerican Natural Gas Corp. v. Powell,* 811 S.W.2d 913, 919 (Tex.1991); *Hooks v. Fourth Court of Appeals,* 808 S.W.2d 56, 59–60 (Tex.1991); *Bell Helicopter Textron, Inc., v. Walker,* 787 S.W.2d 954, 955 (Tex.1990); *Stringer v. Eleventh Court of Appeals,* 720 S.W.2d 801, 801–02 (Tex.1986). In *Hooks,* for example, we reaffirmed that the "cost or delay of having to go through trial and the appellate process does *not* make the remedy at law inadequate." 808 S.W.2d at 60.

 **[11]**    The requirement that mandamus issue only where there is no adequate remedy by appeal is sound, and we reaffirm it today. No mandamus case has ever expressly rejected this requirement, or offered any explanation as to why mandamus review of discovery orders should be exempt from this "fundamental tenet" of mandamus practice. Without this limitation, appellate courts would "embroil themselves unnecessarily in incidental pre-trial rulings of the trial courts" and mandamus "would soon cease to be an extraordinary writ." *Braden v. Downey,* 811 S.W.2d 922, 928 (Tex.1991). We thus hold that a party seeking review of a discovery order by mandamus must demonstrate that the remedy offered by an ordinary appeal is inadequate. We disapprove of *Barker, Allen,* and any other authorities to the extent they might be read as abolishing or relaxing this rule.

 **[12]**    We further hold that an appellate remedy is not inadequate merely because it may involve more expense or delay than obtaining an extraordinary writ. As we observed in *Iley v. Hughes,* the "delay in getting questions decided through the appellate process ... will not justify intervention by appellate courts through the extraordinary writ of mandamus. Interference is justified only when parties stand to lose their substantial rights." 158 Tex. at 368, 311 S.W.2d at 652.

On some occasions, this Court has used, or at least mentioned, the more lenient standard first articulated in *Cleveland v. Ward,* 116 Tex. 1, 14, 285 S.W. 1063, 1068 (Tex.1926), that the remedy by appeal must be "equally convenient, beneficial, and effective as mandamus." *See, e.g., Jampole v. Touchy,* 673 S.W.2d 569, 576 (Tex.1984); *Crane v. Tunks,* 160 Tex. 182, 190, 328 S.W.2d 434, 439 (Tex.1959). This standard, literally applied, would justify mandamus review whenever an appeal would arguably involve more cost or delay than mandamus. This is unworkable, both for individual cases and for the system as a whole. Mandamus disrupts the trial proceedings, forcing the parties to address in an appellate court issues that otherwise might have been resolved as

discovery progressed and the evidence was developed at trial. Moreover, the delays and expense of mandamus proceedings may be substantial. This proceeding, for example, involving rulings on collateral discovery matters, has delayed the trial on the merits for over two years. The impact on the appellate courts must also be considered. We stated in *Braden* that "[t]he judicial system cannot afford immediate review of every discovery sanction." 811 S.W.2d 922, 928. It follows that the system cannot afford immediate review of every discovery order in general. [9] We therefore disapprove of *Cleveland, Crane, Jampole* and any other authorities to the extent that they imply that a remedy by appeal is inadequate merely because it might involve more delay or cost than mandamus.

Justice Doggett's dissent argues that because discovery errors often constitute harmless errors under Tex.R.App.P. 81(b)(1), parties denied mandamus relief will be deprived of any remedy since the **\*843** error will not provide a basis for appellate reversal. This is nothing more than a thinly disguised attack on the harmless error rule. Avoiding interlocutory appellate review of errors that, in the final analysis, will prove to be harmless, is one of the principal reasons that mandamus should be restricted.

Justice Doggett's dissent also suggests that we will be unable to develop a coherent body of discovery law without unrestricted mandamus review. We do not think, however, that losing parties will be reluctant to raise perceived discovery errors on appeal, nor will an appellate court be foreclosed from writing on discovery issues, even when the error may be harmless. *See, e.g., Lovelace v. Sabine Consolidated, Inc.,* 733 S.W.2d 648, 652–53 (Tex.App.— Houston [14th Dist.] 1987, writ denied).

Nor are we impressed with the dissenters' claim that strict adherence to traditional mandamus standards will signal an end to effective interlocutory review for some parties or classes of litigants. There are many situations where a party will not have an adequate appellate remedy from a clearly erroneous ruling, and appellate courts will continue to issue the extraordinary writ. In the discovery context alone, at least three come to mind.

 **[13]**    First, a party will not have an adequate remedy by appeal when the appellate court would not be able to cure the trial court's discovery error. This occurs when the trial court erroneously orders the disclosure of privileged information which will materially affect the rights of the aggrieved party,

such as documents covered by the attorney-client privilege, *West v. Solito,* 563 S.W.2d 240 (Tex.1978), or trade secrets without adequate protections to maintain the confidentiality of the information. *Automatic Drilling Machines v. Miller,* 515 S.W.2d 256 (Tex.1974). As we noted in *Crane:* "After the [privileged documents] had been inspected, examined and reproduced ... a holding that the court had erroneously issued the order would be of small comfort to relators in protecting their papers." 160 Tex. at 190, 328 S.W.2d at 439. It may also occur where a discovery order compels the production of patently irrelevant or duplicative documents, such that it clearly constitutes harassment or imposes a burden on the producing party far out of proportion to any benefit that may obtain to the requesting party. *See, e.g., Sears, Roebuck & Co. v. Ramirez,* 824 S.W.2d 558, 35 Tex.Sup.Ct.J. 454 (1992) (demand for tax returns); *General Motors Corp. v. Lawrence,* 651 S.W.2d 732 (Tex.1983) (demand for information about all vehicles for all years).

 **[14]**     **[15]**     Second, an appeal will not be an adequate remedy where the party's ability to present a viable claim or defense at trial is vitiated or severely compromised by the trial court's discovery error. It is not enough to show merely the delay, inconvenience or expense of an appeal. Rather, the relator must establish the effective denial of a reasonable opportunity to develop the merits of his or her case, so that the trial would be a waste of judicial resources. We recently held that when a trial court imposes discovery sanctions which have the effect of *precluding a decision on the merits of a party's claims*—such as by striking pleadings, dismissing an action, or rendering default judgment—a party's remedy by eventual appeal is inadequate, unless the sanctions are imposed simultaneously with the rendition of a final, appealable judgment. *TransAmerican Natural Gas Corp. v. Powell,* 811 S.W.2d 913, 919 (Tex.1991). Similarly, a denial of discovery going to the heart of a party's case may render the appellate remedy inadequate.

 **[16]**     **[17]**     Finally, the remedy by appeal may be inadequate where the trial court disallows discovery and the missing discovery cannot be made part of the appellate record, or the trial court after proper request refuses to make it part of the record, and the reviewing court is unable to evaluate the effect of the trial court's error **\*844** on the record before it. *See Tom L. Scott, Inc. v. McIlhany,* 798 S.W.2d 556, 558 (Tex.1990) ("[M]andamus is the only remedy because the protective order shields the witnesses from deposition and thereby prevents the evidence from being part of the record."); *see generally Jampole,* 673 S.W.2d at

576 ("Because the evidence exempted from discovery would not appear in the record, the appellate courts would find it impossible to determine whether denying the discovery was harmful."). If the procedures of Tex.R.Civ.P. 166b(4) are followed, this situation should only rarely arise. If and when it does, however, the court must carefully consider all relevant circumstances, such as the claims and defenses asserted, the type of discovery sought, what it is intended to prove, and the presence or lack of other discovery, to determine whether mandamus is appropriate. [10]

 **[18]**     In the present case, the Walkers seek documents from the Center to impeach one defendant's expert witness. This information is not privileged, burdensome or harassing, nor does it vitiate or severely compromise the Walkers' ability to present a viable claim. In fact, as we have already noted, the trial court may ultimately conclude that it is not admissible or even discoverable. Finally, although the materials are not before us, they were considered below, and we know of no reason why they would not be available on appeal. Therefore, under our traditional standards of mandamus review, as measured by the factors we mention above, the Walkers have an adequate remedy by appeal and mandamus is inappropriate.

For the above reasons, we conclude that the Walkers have not established their right to relief by mandamus on either discovery matter. Therefore, we deny the Walkers' petition for writ of mandamus.

GONZALEZ, J., concurs and files an opinion.

DOGGETT, J., dissents and files an opinion, joined by MAUZY, J.

GAMMAGE, J., dissents and files an opinion.

GONZALEZ, Justice, concurring.

I agree with the court's disposition of this cause but disagree with the court's opinion regarding the "Obstetrics Faculty Records." Specifically, I disagree with the court's attempt to distinguish *Russell v. Young,* 452 S.W.2d 434 (Tex.1970). Nevertheless, I concur in the result.

*Russell* holds that wholesale discovery of the private records of a *non-party witness* is not permitted if the sole purpose for discovery is to impeach the credibility of the non-party. [1] 452 S.W.2d at 435. The policy considerations of *Russell* still apply

today. By disapproving of *Russell* as "a mechanical approach to discovery rulings," at 839, the court forces trial courts to get further involved in discovery matters. This increases the backlog, delay, and cost of litigation by creating the need for more hearings.

In the instant case, the plaintiffs sought to discover documents from the University of Texas Health Science Center to confirm the existence of a written policy restricting faculty members from testifying for plaintiffs in medical malpractice cases. This policy was sought for use in impeaching defendant's expert witness, Dr. Gilstrap. In refusing discovery, the trial court concluded **\*845** that the relevance of this material was limited to impeachment. As such, the requested documents fell squarely within the prohibition of *Russell.*

Despite the court's mischaracterization of *Russell,* the issues and type of evidence sought here and in *Russell* are identical. Just as in *Russell,* the records sought in the instant case did not relate directly to the subject matter of the suit. The only difference between the present case and *Russell* is the identity of the party seeking the information. In *Russell,* a defendant sought evidence to impeach the plaintiffs' expert; here, the plaintiff sought evidence to impeach a defendant's expert. Surely, we cannot have a rule that changes in application depending on whether the relator is a plaintiff or a defendant in the trial court.

In my opinion, the court strains to distinguish *Russell.* The court suggests that the trial judge made a mistake in her ruling by failing to read *Russell* in conjunction with the rules of civil procedure and evidence. However, when we adopted the new Texas Rules of Civil Evidence, there was no discussion whatsoever that, by their adoption, we intended to reject the settled rule that information sought solely for impeachment of a non-party is not discoverable. *Russell,* 452 S.W.2d at 435; *see also* *W.W. Rodgers & Sons Produce Co. v. Johnson,* 673 S.W.2d 291, 294–95 (Tex.App.—Dallas 1984, orig. proceeding). Furthermore, the scope of discovery has not changed in the twenty years since *Russell* has been on the books. When *Russell* was decided, the scope of discovery was codified in Texas Rule of Civil Procedure 186a. It provided in pertinent part that:

> [p]arties may obtain discovery regarding any matter which is relevant to the subject matter in the pending action whether it relates to the claim or defense of the party seeking discovery

or the claim or defense of any other party.

This same text is now codified in Rule 166b(2)(a). Clearly, impeachment evidence regarding *collateral matters* would not relate to the subject matter of the pending action.

Implicitly, the court concludes that the credibility of a non-party witness alone is a relevant avenue of inquiry and, thus, is a matter properly open to discovery under some new, broader definition of relevancy.

While I agree that the definition of relevance in Rule 401 of the Texas Rules of Civil Evidence includes matters bearing on credibility, this alone does not explain or distinguish *Russell.* A witness' credibility has always been a relevant matter. As the United States Supreme Court has said: "[p]roof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony." *United States v. Abel,* 469 U.S. 45, 52, 105 S.Ct. 465, 469, 83 L.Ed.2d 450 (1984). Yet in *Russell,* we said that a trial court lacked "authority" to order discovery from a *non-party* solely for purposes of impeachment. 452 S.W.2d at 435. We chose to withdraw all discretion in this particular area of discovery. *Russell* concedes that impeachment evidence may be relevant and admissible at trial, but holds that it cannot be discovered from a non-party for its own sake prior to trial. 452 S.W.2d at 436.

The fact that a matter may have some relevance yet not be subject to discovery is hardly a novel concept. The basic premise of the rules of discovery is to weigh the legitimate needs of litigation against the other rights and values that would be irreparably harmed by unfettered discovery. *Russell* strikes the proper balance by protecting non-party witnesses from indiscriminate invasions into their private lives where the information sought would not appreciably shed light on the issues of the case.

Furthermore, the decision in *Russell was not* grounded on whether the credibility of the witness had been placed in doubt. Instead, the court highlighted the fact that **\*846** the witness had not offered testimony at trial nor was his deposition introduced into evidence at trial. The court said:

> Relator has not yet taken the witness stand nor has his deposition been introduced into evidence because there has not yet been a trial;

relator's records cannot possibly have impeachment value because there is nothing yet to impeach and there may never be anything to impeach, depending upon the contents of the testimony, if any, which is introduced during the trial of the lawsuit.

*Russell,* 452 S.W.2d at 437. Thus, it is evident that the court has today reinterpreted *Russell* with little or nothing to gain in a way that further obscures the proper scope of discovery.

I am concerned that as a result of today's ruling, some *non-parties* will be subjected to harassment and intrusion into their private lives, and that trial courts will be inundated with hearings on collateral issues far afield from the merits of the cause of action or defense. The court has attempted to fix something that was not broken. This reinterpretation of *Russell* will further tax our overburdened judicial system without appreciably benefiting the litigants or the system.

Finally, for the reasons expressed in *Joachim v. Chambers,* 815 S.W.2d 234, 241 (Tex.1991) (Gonzalez, J., dissenting), I agree with the clarification of the standards for the issuance of mandamus.

DOGGETT, Justice, dissenting.

> *Them that's got shall get*
>
> *Them that's not shall lose*
> —*God Bless The Child* [1]

With a double standard, the majority strikes a devastating blow at the most direct method of curbing abuses of judicial power. Many judicial excesses far beyond the scope of anything alleged in this particular case will henceforth receive only an official nod and wink from the Texas Supreme Court.

Mandamus is the legal tool by which appellate courts can promptly correct arbitrary and capricious rulings by trial judges. Today's opinion announces that this remedy will be available to support concealment of the truth but not its disclosure. Mandamus is officially declared a one-way street in the Texas courts—our judiciary can help to hide but not to detect.

Despite a determination that a "clear abuse of discretion" has occurred in this particular case, at 840, all relief is denied.

Finding a wrong and denying a remedy echoes the logic of the majority's recent conclusion that a tax is unconstitutional but must be paid anyway. *See Carrollton–Farmers Branch Indep. Sch. Dist. v. Edgewood Indep. Sch. Dist.,* 826 S.W.2d 489, 524 (1992) (*Edgewood III* ) (Doggett, J., dissenting). Rather than correcting the abuse, the court simply gives the Walkers the same message it gave Texas taxpayers—wait. Only after a full jury trial based upon incomplete discovery will the judiciary even consider any possibility of relief.

For those who have previously sought more specific guidelines for the use of mandamus concerning discovery orders, the majority responds with not one but two standards for reviewing trial court action: orders compelling discovery may be immediately corrected; review of denied discovery is postponed indefinitely in a manner to ensure that no meaningful relief will ever be forthcoming.

### I.

What a different path this court now pursues than that so recently proclaimed in its unanimous decision that

> Discovery is ... the linchpin of the search for truth, as it makes "a trial less **\*847** a game of blind man's bluff and more a fair contest with the issues and facts disclosed to the fullest practicable extent."

*State v. Lowry,* 802 S.W.2d 669, 671 (Tex.1991) (quoting *United States v. Proctor & Gamble Co.,* 356 U.S. 677, 682, 78 S.Ct. 983, 986, 2 L.Ed.2d 1077 (1958)). Similarly ignored are our recent, unanimous writings in *Axelson, Inc. v. McIlhany,* 798 S.W.2d 550, 553, 555 (Tex.1990, orig. proceeding) ("[Discovery should provide] the fullest knowledge of the facts and issues prior to trial.... [T]he ultimate purpose of discovery ... is to seek the truth...."); and *Tom L. Scott, Inc. v. McIlhany,* 798 S.W.2d 556, 559 (Tex.1990, orig. proceeding) ("The primary policy behind discovery is to seek truth so that disputes may be decided by facts that are revealed rather than concealed."). Without mandamus review to add meaning to these laudatory expressions, they are just hollow words. The new signal is clear—circumvent discovery and conceal information.

Today's opinion reflects the radical change in philosophy which has taken firm hold in this court—discovery is no longer a search for truth, it is merely a game of hide and seek. No longer may appellate courts intercede through mandamus even for the trial court's complete abuse of discretion in

denying access to vital data; under the newly-announced double standard, intervention can, however, be accorded for those who persevere in evasion.

When a local business is defrauded, when a community is exposed to dangerous toxic wastes, when a manufacturer ignores reports that a safety design change would reduce user injuries, when a monopoly extorts unfair gain from the public, when discrimination results in job loss, and in numerous other circumstances, the burden of proving wrongdoing is exceedingly difficult to satisfy without obtaining evidence of that wrong from the files of the perpetrator. In such situations denial of discovery effectively means denial of all relief. That reality does not go unrecognized by today's majority.

Entities that begin litigation in control of most of the relevant evidence can often defeat their adversaries simply by denying them the power of information:

> [T]hose with established positions of power are more likely to ... win by preventing their adversaries from producing evidence; they are less likely to be in the position of having to extract evidence from their opponents to make out their case.

23 Charles A. Wright & Kenneth W. Graham, Jr., *Federal Practice & Procedure* § 5422, at 674 (1980). With its separate and unequal treatment of litigants, the majority gives yet another edge to the already advantaged. Providing immediate review for orders that start the flow of information but refusing to consider those that stop it, the majority once again expresses its preference for helping the powerful over the seemingly powerless. Those opposing meaningful discovery

> tend to be institutions rather than individuals, and tend to be among the more wealthy and powerful segments of society. A review system that gives priority (that is, immediate review) to the complaints of privilege holders, but which consigns the complaints of parties seeking discovery until after final judgment, gives an advantage to those wealthy institutional litigants. They have the power to achieve more favorable results during the pretrial process; their opponents must wait.

Elizabeth G. Thornburg, *Interlocutory Review of Discovery Orders: An Idea Whose Time Has Come,* 44 Sw.L.J. 1045, 1082 (1990) (hereinafter *Review of Discovery Orders* ) (footnote omitted).[2] In this way the **\*848** majority ensures that the scales of justice—which at the onset of litigation are often in reality uneven—never achieve balance.

Until this court included discovery orders within the scope of mandamus review, very few reported opinions addressed this important subject. Trial judges were effectively accorded unlimited discretion with a "resulting atmosphere [that] was very hostile to discovery." *Id.* at 1071. As a practical matter, discovery battles, often both complex and time-consuming, were shunned. When the party controlling vital data exercises the power of withholding it, fighting every important request, the judicial command "go work it out" often amounts to a denial of meaningful discovery. The mud-wrestling that frequently ensues in such contests may discourage a trial judge from determining who is acting fairly and who started the fight. If mandamus is not available to correct ill-considered or hasty denials, the hope for ultimate justice in complex litigation is prematurely crushed. The majority's decision today marks a return to those dark ages when discovery was regularly denied as the path of least resistance and greatest convenience for the judiciary.

## II.

By its very nature, discovery involves a search for what is largely unknown from someone who may have an incentive to make that search as long and tortuous as possible. Efforts to prevent discovery have been limited only by the boundless imagination of the top legal talent in America. Requests are either too broad or too narrow; records produced are either minimal or in such voluminous, disorganized form as to make locating relevant information most difficult; vital documents vanish in "routine document destruction" programs or are misplaced. Accordingly, our discovery rules have required continual revision to cope with the newest ways invented by those intent on subverting the process. Each revision of the Texas Rules of Civil Procedure during the last decade has included attempted clarification and improvement of discovery procedures. This has produced a body of law that is "complex and rapidly evolving." David W. Holman & Byron C. Keeling, *Entering the Thicket? Mandamus Review of Texas District Court Witness Disclosure Orders,* 23 St. Mary's L.J.

365, 375 (1991) (hereinafter *Mandamus of Disclosure Orders* ).

Given the creativity of those who would thwart discovery, rules of procedure cannot be drawn to provide clear guidance in every situation; judicial interpretation is essential. The more complicated the rule, the more necessary the construction and the greater the likelihood for misinterpretation. *See id.* at 386 ("Erroneous interpretations of these changes ... are likely with the absence of prior significant precedent.... [and] could have a substantial effect on the subsequent course of a lawsuit."). This court's responsibility does not and cannot end when the text of promulgated amendments appears in the *Texas Bar Journal.* Rather, the court has a duty *both* to make the rules *and* to interpret them.

Our American system of jurisprudence is founded on the precept that it is of great benefit to have a written body of case law construing controlling legal principles and applying them to particular facts. This approach is undeniably desirable in the discovery context:

> In a system where trial court decisions are unreported and have no precedential value, the creation of a body of reported appellate case law regarding discovery has substantial value. Case law on discovery promotes uniform interpretation of the discovery rules and, in time, decreases the opportunity for individual **\*849** judge's biases to shape discovery outcomes. Reported decisions develop clear rules, where rules are possible, and narrow the range of judicial discretion in other areas simply by providing numerous cases finding that the trial court did or did not abuse its discretion. Such case law can be particularly helpful in a jurisdiction that has recently amended its discovery rules. Over time, the existence of discovery case law may even clarify the rules sufficiently so as to decrease the number of disputes in the trial court.

*Review of Discovery Orders* at 1080 (footnotes omitted). Appellate opinions properly applying mandamus produce,

then, both more consistency and more accuracy in trial court decisions. *See id.* at 1077. [3]

The role of this court is particularly important in answering novel or significant questions of discovery law. *See Mandamus of Disclosure Orders* at 376 ("[P]re-trial appellate review of [important discovery] questions could lend critical guidance to the development of Texas discovery practice."). Rather than avoiding its responsibility, this court should utilize mandamus review to reduce the abuse of judicial power when "a unique question of discovery" law is presented. David West, Note, *The Use of Mandamus to Review Discovery Orders in Texas: An Extraordinary Remedy,* 1 Rev.Litigation 325, 327 (1981) (hereinafter *The Use of Mandamus* ).

Most trial court mistakes denying discovery result from the need to make repeated, quick decisions based upon limited information. Recognizing this circumstance, trial judges sometimes actually encourage litigants to raise disputed rulings affecting truly vital matters for appellate examination through mandamus by automatically staying their orders. Refusal of prompt appellate review not only denies a party its rights but may also deprive a trial court of desired guidance.

Today's opinion appropriately recognizes that "this Court will not grant mandamus relief unless we determine that the error is of such importance to the jurisprudence of the state as to require correction." At 839 n. 7. But under the standard announced, questions of importance concerning judicially-approved concealment of facts will never be considered. The significance to the state's jurisprudence of a ruling should certainly not be controlled by whether the order granted or denied discovery.

### III.

With mandamus now severely limited, many important issues will not be reviewed. *See generally Review of Discovery Orders* at 1056; *The Use of Mandamus* at 337 & n. 94. Abuses of judicial power will go forever uncorrected when the party disallowed discovery, realizing the difficulty of proving a case with less than full information and the uphill task of maintaining a successful appeal, is either forced to settle or forgoes a costly and extended appeal following defeat on the entire case. Nor will improper rulings ever be reviewed where one denied discovery, although severely handicapped, nonetheless prevails at trial.

Where appeals do occur, remedies will be rare even for egregious pretrial rulings. To succeed in this endeavor, one must show that

> the error complained of amounted to such a denial of the rights of appellant as **\*850** was reasonably calculated to cause and probably did cause rendition of an improper judgment in the case, or was such as probably prevented the appellant from making a proper presentation of the case to the appellate court.

Tex.R.App.P. 81(b). This standard is universally regarded as a "more difficult hurdle" than abuse of discretion. Helen A. Cassidy, *The Instant Freeze–Dried Guide to Mandamus Procedure in Texas Courts,* 31 S.Tex.L.Rev. 509, 512 (1990). As another commentator has aptly concluded,

> only an unusual discovery order would be dispositive enough to show the harmful error that most jurisdictions require for appellate reversal. Many appellants, therefore, would not even raise the discovery points on appeal.

*Review of Discovery Orders* at 1056; *see also Mandamus of Disclosure Orders* at 376 n. 40 (observing that, because of the harmless error rule, many discovery rulings are not pursued on appeal). In denying mandamus today, the majority closes and locks the appellate courthouse door to any meaningful consideration of numerous significant matters.

## IV.

Only with the tragic recent change in course by this court's majority has such denial of access become acceptable. Previously both this court and the courts of appeals had employed their writ power as necessary to correct the abusive refusal of discovery. Among those cases providing the foundation for appropriate mandamus review is *Barker v. Dunham,* 551 S.W.2d 41 (Tex.1977, orig. proceeding), in which the trial court had overruled a motion to complete an expert witness's deposition and to compel production of his work papers. We interceded, stating that: "It is settled that the writ of mandamus may issue in a discovery proceeding to correct a clear abuse of discretion by a trial judge." *Id.* at 42.

Similarly, in *Allen v. Humphreys,* 559 S.W.2d 798 (Tex.1977, orig. proceeding), the trial court refused to order discovery of tests, surveys and complaints by similarly affected persons. This court found an abuse of discretion and granted the writ, despite the argument that the plaintiff had "an adequate remedy via the normal appellate process." *Id.* at 801. It is difficult to perceive, in light of this argument and the court's subsequent grant of mandamus relief, how the majority can now claim that "we [had] not focused" on the requirement of an inadequate remedy by appeal in *Allen* and on, admittedly, a "few [other] occasions." At 840–841.

Following these two opinions, this court has not hesitated to consider and correct the wrongful denial of discovery. By issuing mandamus to rectify an erroneous trial court ruling refusing discovery in *Jampole v. Touchy,* 673 S.W.2d 569 (Tex.1984, orig. proceeding), this court recognized that appeal is not an adequate remedy:

> [R]equiring a party to try his lawsuit, debilitated by the denial of proper discovery, only to have that lawsuit rendered a certain nullity on appeal, falls well short of a remedy by appeal that is "equally convenient, beneficial, and effective as mandamus."

*Id.* at 576 (quoting *Crane v. Tunks,* 160 Tex. 182, 190, 328 S.W.2d 434, 439 (1959) (citation omitted)); *see also Cleveland v. Ward,* 116 Tex. 1, 14, 285 S.W. 1063, 1068 (Tex.1926).

A trial court's unwillingness to order the production of accident scene photographs was overturned by mandamus in *Terry v. Lawrence,* 700 S.W.2d 912 (Tex.1985, orig. proceeding). In *Lindsey v. O'Neill,* 689 S.W.2d 400, 402 (Tex.1985, orig. proceeding) (per curiam), the court overturned by mandamus an order limiting the scope of a deposition and quashing the accompanying document request. A blanket order protecting hospital records was similarly vacated by mandamus in *Barnes v. Whittington,* 751 S.W.2d 493 (Tex.1988, orig. proceeding). In *Lunsford v. Morris,* 746 S.W.2d 471 (Tex.1988, orig. proceeding), this court again granted mandamus to remedy a trial court's erroneous disallowance **\*851** of relevant discovery. *See also Loftin v. Martin,* 776 S.W.2d 145 (Tex.1989, orig. proceeding) (correcting by mandamus wrongful denial of discovery); *Turbodyne Corp. v. Heard,* 720 S.W.2d 802 (Tex.1986, orig. proceeding) (per curiam) (mandamus directing trial court to rescind order denying discovery of documents from insurer in subrogation action); *Ginsberg v. Fifth Court of Appeals,* 686 S.W.2d 105 (Tex.1985, orig.

proceeding) (erroneous bar of deposition by court of appeals cured by mandamus).[4]

It is only after fifteen years of repeated judicial reliance upon *Barker* and *Allen* in the issuance of numerous opinions that we learn these precedents of our court are not good law. This is all the more strange in that we had explicitly refused to overrule them. When that very request was urged in *Jampole, 673 S.W.2d at 576,* our answer was unmistakable: "We decline to do so." But the majority's new answer is simple: "Line them up against the wall." What does it matter that a dozen or more Texas Supreme Court cases and countless decisions of the courts of appeals are to the contrary? They can be disposed of in a mass execution of precedent.[5] Today's firing squad announces that it is only answering the command of Jim Sales and two law students who separately criticized the court during the period 1977–79. At 840–841. It thereby rationalizes constructing so distorted a standard on the corpses of so many prior authorities.

One of the most significant casualties is *Jampole v. Touchy,* which has formed the centerpiece for discovery in litigation over defective products and toxic substances for almost a decade. The majority, in a massive understatement, "disapproves" *Jampole* "to the extent [it implies] that a remedy by appeal is inadequate merely because it might involve more delay or cost than mandamus." At 842. Although leaving untouched for now this court's prior writing on the proper scope of discovery, the majority has in fact overruled that landmark precedent in its entirety. Despite a gross abuse of discretion in denying critical discovery in *Jampole,* the majority's only correction by mandamus would be to require inclusion of the disputed materials in **\*852** the record, to await a deferred and meaningless appellate review.

## V.

Instead of affording the relief that prior rulings demand, the majority announces, after considerable mental gymnastics, that "at least three [discovery situations] come to mind" where mandamus is justified, at 843; then it strangely proceeds to describe six. The first three instances where remedy by appeal is inadequate stem from a trial court's wrongful allowance of discovery. First, mandamus will issue if "disclosure of privileged information ... will materially affect the rights of the aggrieved party." At 843. This requisite is easily fulfilled with discovery objections that include an assertion of privilege, the violation of which necessarily impinges on the objecting party's rights.

Second, mandamus will issue when a trial court orders the disclosure of "trade secrets without adequate protections to maintain the confidentiality of the information." At 843 (citing, without discussion, *Automatic Drilling Machs., Inc. v. Miller,* 515 S.W.2d 256 (Tex.1974, orig. proceeding)). Posing numerous problems, this hastily-drawn exception has no relevance to the instant case and was concocted by the majority without any briefing or argument by counsel. One privilege is thereby unjustifiably elevated above all others. Moreover, the writing implies an absolute protection of trade secrets from discovery when in fact this privilege is most definitely qualified, as recognized by *Automatic Drilling,* 515 S.W.2d at 259,[6] the rule itself, Tex.R.Civ.Evid. 507 (trade secrets not protected when nondisclosure conceals fraud or works injustice), and even Mr. Sales, whose writing purportedly warranted today's brash action.[7] Nor does this exception consider the availability in some cases of the interlocutory appeal mechanism provided in Tex.R.Civ.P. 76a(8) to address the adequacy of a protective order. *See Eli Lilly & Co. v. Marshall,* Order Granting Leave to File Petition for Writ of Mandamus (Doggett, J., dissenting), 829 S.W.2d 156 (Tex.1991).

The third situation requiring mandamus is an "order [that] compels the production of patently irrelevant or duplicative documents, such that it clearly constitutes harassment or imposes a burden on the producing party far out of proportion to any benefit that may obtain to the requesting party." At 843. This "catch-all" exception indeed makes the extraordinary writ of mandamus an ordinary one. In almost any complex litigation, the claim of burden is essentially a form objection to discovery. It is difficult to perceive a dispute in which the party seeking to obstruct the process could not and, after today's decision, will not claim harassment or imposition of an undue burden. *See, e.g., Sears, Roebuck & Co. v. Ramirez,* 824 S.W.2d 558 (Tex.1992) (per curiam) (granting mandamus to preclude disclosure of corporate tax returns on the basis of undue burden and unnecessary expense, not privilege).[8]

A fourth exception, based on **\*853** *Transamerican Natural Gas Corp. v. Powell,* 811 S.W.2d 913 (Tex.1991, orig. proceeding),* is described when the trial court imposes "discovery sanctions ... precluding a decision on the merits of a party's claims ... unless the sanctions are imposed simultaneously with the rendition of a final, appealable

judgment." At 843 (emphasis deleted). The majority falsely suggests that today's standard creates a symmetry with *Transamerican.* Unlike *Transamerican,* which treated the striking of a petition in the same manner as the entry of a default judgment, this ruling creates a double standard. Unlike *Transamerican,* which involved a readily-perceptible wrong such as an order of dismissal, a determination of whether hidden documents "go to the heart of a party's case," at 843, involves significant uncertainties.

More importantly, *Transamerican* was issued at a time when the announced policy of this court was to deter abuses of discretion without regard to whether discovery was granted or denied. A wide spectrum of sanction orders arising from discovery rulings are immediately appealable. *See Braden v. Downey,* 811 S.W.2d 922 (Tex.1991, orig. proceeding). Superimposing *Transamerican* and *Braden* on today's double standard sends a clear message to the rare trial court that would impose significant penalties on those who obstruct discovery with deceit and delay—be careful. There is no real danger of immediate and genuine appellate examination of an order denying discovery, but there is a constant threat of appellate review of an order granting discovery or imposing meaningful sanctions on obstructionists. Once again the majority provides an incentive for concealment.

The remaining two situations address the wrongful denial of discovery, and constitute a narrow path in the woods compared to the expressway for resisting discovery constructed in the previous four exceptions. Mandamus is possible when

> the missing discovery cannot be made part of the appellate record, or the trial court after proper request refuses to make it part of the record, and the reviewing court is unable to evaluate the effect of the trial court's error on the record before it.

At 843–844. The quick fix of including materials in the appellate record is both ingenious and ingenuous. It has the immediate "benefit" of excluding a great number of errors in the discovery area from mandamus review. As the majority in fact recognizes, "this situation should only rarely arise." At 844.[9] And if it ever does, the majority guarantees that no relief will be forthcoming, by directing that the reviewing court

carefully consider all relevant circumstances, such as the claims and defenses asserted, the type of discovery sought, what it is intended to prove, and the presence or lack of other discovery, to determine whether mandamus is appropriate.

At 844. Within these constraints, there will always be a readily available excuse to deny both discovery and mandamus.

In most cases the materials can be boxed up, file-stamped, and sent to the appellate court. How this will accomplish anything more than cluttering the judicial chambers is quite another matter. No clue is given as to how to resolve the obvious difficulties inherent in appellate determination, without any effective argument and analysis by counsel, of whether each item would have affected the result. Moreover, this approach improperly requires courts of appeals to act as juries while denying to the true fact-finder evidence that may be highly **\*854** relevant to the proceeding. This distrust of juries—of ordinary people resolving factual disputes—is increasingly reflected in the majority's decisions.[10]

The only hope for review of a trial court's order denying discovery is upon proof that a claim has been "vitiated or severely compromised by the trial court's discovery error." At 843. It must be shown "that the trial would be a waste of judicial resources," at 843, and that "a denial of discovery [goes] to the heart of a party's case." At 843. It is far from clear whether these encompass one or three different standards. What is clear is that few cases, if any, will satisfy whatever standard is applied.

The majority offers no example of a case in which a party has ever met such a heavy burden. Apparently an applicant for mandamus in this court must confess that, without the discovery sought, the trial court should and must direct a contrary verdict. Any semblance of a chance at prevailing prevents a determination that the trial would be a "waste of judicial resources" or that the discovery denied goes "to the heart of a party's case." While this situation may theoretically arise in the future, it will be most unlikely. Nor is there any explanation of how a party can be expected to show such a probability without having any of the materials in question. We have previously recognized the hardship inherent in showing need for documents when their contents are unknown. *State v. Lowry,* 802 S.W.2d 669, 673 (Tex.1991) ("It is difficult for the [relators] to make a more particularized showing of need for these documents, the contents of which are unknown to them.").

Application of today's font of mandamus law to the Walkers' situation is most revealing. The majority summarily concludes that the trial court's misapplication of the law to deprive them of relevant evidence "does [not] vitiate or severely compromise the Walkers' ability to present a viable claim." At 844. Most ironically, today's announcement imposes one type of double standard on top of another alleged double standard. The Walkers claim they have uncovered a double standard at a taxpayer-financed institution that encourages faculty to defend those accused of medical malpractice while discouraging professional advice on behalf of the alleged victim. It is the merits of this revelation that the majority so eagerly seals away from both the Walkers and the public.

Fully aware of the impact of expert credibility on the outcome of much medical malpractice litigation, the majority denies the Walkers the very information that could perhaps demonstrate the bias of a key witness. An official blessing is thus provided for trial court action that may have a material, adverse effect on their ability to present a viable case. Having now learned that the denial of impeachment evidence is never susceptible to mandamus, it remains to be seen what other critical information will next be similarly viewed as unimportant to this majority.

While the nature of the double standard approved by today's writing requires that this dissent focus on wrongful denials, I recognize that the wrong can be every bit as real from improper grants of discovery. As a practical matter there is probably less danger that a trial judge will capriciously ignore properly established objections and privileges to accord too much information instead of too little. Nevertheless, I favor the use of mandamus to control abuse without regard to how it occurs or whom is helped. What I deplore is the discrimination which the majority officially substitutes for even-handedness. Scholars viewing **\*855** the so-called "*Walker* mandamus standard" should recognize that it is not a standard but an excuse for ignoring wrongdoing.

After today's decision, discovery disputes will no longer be resolved on a level playing field. I believe that mandamus should be available to correct any trial court abuse concerning a subject that is important to the jurisprudence of the state and which substantially affects rights of an aggrieved party. If this requisite is satisfied, relief should be accorded without regard to whether the trial court has granted or denied discovery.

## VI.

In supporting today's opinion, Justice Gonzalez insists that we must stem what he claims is an alarming increase in the number of mandamus filings. At 844–846 (Gonzalez, J., concurring). The view that "the sky is falling" is best reflected in the gruesome statistics and conclusions of his dissenting opinion in *Joachim v. Chambers,* 815 S.W.2d 234, 241 (Tex.1991). *See also Jampole,* 673 S.W.2d at 578 (Barrow, J., dissenting); *cf.* C.L. Ray & M.R. Yogi McKelvey, *The Mandamus Explosion,* 28 S.Tex.L.Rev. 413, 413–14 (1987).

Blaming an ever-increasing caseload for the Texas courts on the advent of the discovery mandamus is wholly insupportable. These petitions most often present emergency situations requiring expedited review and, consequently, are frequently viewed as a thorn in the side of appellate courts. *See Review of Discovery Orders* at 1059 n. 99. But I cannot agree that justice should be denied or delayed solely to accommodate appellate judges.

Recent studies have debunked the myth of the mandamus explosion. The *Joachim* dissent, to which Justice Gonzalez once again points with pride today, is based upon an analysis that fails to segregate filings arising from discovery disputes. A more detailed study of Supreme Court experience during a period of more than ten years correctly concluded that:

> [I]nterlocutory review of discovery orders ... has [had] a positive effect.... The increase [in appellate caseloads] has been an extremely small and manageable one....

. . . . .

> The numbers, then, suggest that while the availability of interlocutory review of discovery orders added cases to the appellate docket, interlocutory review has not added a large or burdensome number of cases.

*Review of Discovery Orders* at 1047, 1059.

The fact is that most petitions are denied, with fewer than 3% granted by us during fiscal year 1991. Most of these were handled expeditiously, with over half resolved within one month of filing. Moreover, Justice Gonzalez completely ignored the fact that mandamus requests in this court actually decreased over the last three years. There were 202 of these in fiscal 1991, down from 257 and 258, respectively, in fiscal 1989 and 1990. Although the court's overall workload is

expanding, the contribution of mandamus filings is certainly not uncontrollable. [11] "In deciding whether courts should permit interlocutory **\*856** review in specific cases, judges and commentators tend to emphasize the needs of court administration over the needs of the litigants." *Id.* at 1049. While cutting off the right to mandamus review when discovery is denied may reduce the appellate workload, the result will be a significant decline in the quality of justice. The inconvenience caused by the unexpected arrival of a petition that often demands immediate action is the price paid "to assure that ... trial proceedings are fair and equitable to *all* concerned parties.... '[W]e must not sacrifice justice upon the altar of expediency.' " *Mandamus Review of Disclosure Orders* at 422 (quoting David W. Holman & Byron C. Keeling, *Disclosure of Witnesses in Texas: The Evolution and Application of Rules 166b(6) and 215(5) of the Texas Rules of Civil Procedure,* 42 Baylor L.Rev. 405, 458 (1990)) (emphasis added).

## VII.

The majority announces here not a standard, but a pseudo-standard. In reality, the rule is little more than "how can we help those whom we want to help?" The only true precedent for this is *Terrazas v. Ramirez,* 829 S.W.2d 712 (Tex.1991), where *R*epublican *r*elators in *r*edistricting were accorded relief in the Supreme Court never sought in any other forum. This "triple R exception to mandamus," *id.* at 760–61 (Mauzy, J., dissenting), only presages the continued pursuit of this goal.

If doubts remain as to the one-sidedness of the standard announced today, its application to currently pending cases should resolve them. *See, e.g., Remington Arms Co. v. Canales,* No. D–1867, 35 Tex.S.Ct.J. 245 (Dec. 13, 1991) (trial court order which found documents relating to firearm safety relevant and required their production stayed despite no timely response or objection being made); *Eli Lilly & Co. v. Marshall,* No. D–1827, 35 Tex.S.Ct.J. 168, 354 (Dec. 3, 1991 and Jan. 23, 1992) (stays of trial court order directing production of information relating to the drug Prozac); *see id.* at 189 (Order Granting Leave to File Petition for Writ of Mandamus) (Doggett, J., dissenting); *Valley Baptist Medical Center v. Bennett,* No. D–1193, 34 Tex.S.Ct.J. 668 (June 18, 1991) (stay issued to protect hospital from disclosure of materials relating to policy of informing patients of risk of treatment), and 35 Tex.S.Ct.J. 452 (Feb. 12, 1992) (motion for leave to file granted). One interested in verifying the true meaning of the majority's carefully chosen words will do well to observe how the court actually disposes of each of these matters.

## VIII. CONCLUSION

In an apparent attempt to cope with a false "mandamus explosion," today's opinion has offered us an explosion of another type—a reverberating detonation of this court's prior rulings. True the majority has considerable experience in disregarding precedent as merely a lifeless thing of the past. *See Edgewood III,* 826 S.W.2d at 516, 517 (Doggett, J., dissenting); *Terrazas,* 829 S.W.2d at 739 (Mauzy, J., dissenting); *Stewart Title Guaranty Co. v. Sterling,* 822 S.W.2d 1, 12 (Tex.1991) (Doggett, J., dissenting). But a dozen or more Texas Supreme Court authorities and even more rulings from the courts of appeals cut down at one time is not a modest accomplishment. Precedent, no matter how voluminous or how well-established, will clearly not restrain this majority from accomplishing its preconceived social policy objectives.

Through both deed and now word, the majority invites a true explosion in mandamus filings. What does an attorney whose client faces the possibility of a judgment for significant damages have to lose from accepting the beneficence of a majority of this court ever willing to serve as protector of the privileged? Will a deposition site other than that ordered by the trial court **\*857** be more costly and inconvenient to the claimant? Get a stay from the Texas Supreme Court, even if your petition is still pending in the court of appeals. *See Continental Can Co. v. Wittig,* No. D–2015, 35 Tex.S.Ct.J. 355, 1992 WL 17415 (Jan. 29, 1992) (stay of trial court order directing engineering employee of products liability defendant to be deposed in Houston rather than Chicago even though mandamus petition was pending in court of appeals). Did the trial court resolve a conflict in deposition schedules in a manner unacceptable to an insurance company? Don't worry, the Texas Supreme Court will stay proceedings even without bothering to get a response from the affected judge. *See Cigna Corp. v. Spears,* No. D–2069, 35 Tex.S.Ct.J. 463 (Feb. 19, 1992). Any attorney whose client desires to make more difficult access to information that will jeopardize its credibility, suggest its liability or defeat its defenses would be foolish to accept a trial court discovery order. A majority of the Texas Supreme Court is ready and willing to interfere for the asking.

The ripple effect created by today's refusal to accord mandamus review to pretrial discovery orders will swell to tidal-wave proportion, and sweep before it any hope of fair and consistent application of our Texas discovery rules. In many cases it will leave buried in the sand any possibility of trials directed by the full and truthful revelation of the underlying facts. Juries will be forced to resolve critical disputes based not on truths but rather upon whatever half-truths can be discovered. Left in the wreckage on the beach will be the tattered remains of the many prior decisions of this court and others that viewed litigation as a search for truth in which fair and prompt appellate review of an order denying discovery was vital.

MAUZY, J., joins in this dissenting opinion.

GAMMAGE, Justice, dissenting.

I dissent. Today's decision departs from previous instances where this court has provided mandamus relief to correct a wrongful denial of discovery, and labors too hard to conclude that appeal is an adequate remedy for a party who is denied adequate discovery.

I would hold that mandamus is available to correct a trial court error which negatively and materially affects the right of aggrieved parties to adequately present their cases, whether the particular party is seeking discovery or resisting it. *See Iley v. Hughes,* 158 Tex. 362, 368, 311 S.W.2d 648, 652 (1958); *see also* Elizabeth G. Thornburg, *Interlocutory Review of Discovery Orders: An Idea Whose Time Has Come,* 44 SW.L.J. 1045 (1990). In the case before us, the trial court's denial of discovery has a material and adverse effect on the Walkers' ability to present their case. The information they seek could impugn the credibility of key expert witnesses at trial. Because their medical malpractice claim, like all such claims, will likely stand or fall on the credibility of the expert witnesses, I would hold that the Walkers are entitled to the information they seek, and that relief by appeal is inadequate.

Discovery is the "linchpin of the search for truth," and "[a]ffording parties full discovery promotes the fair resolution of disputes by the judiciary." *State v. Lowry,* 802 S.W.2d 669, 671 (Tex.1991). Today the court removes and disposes of that "linchpin" and abandons enforcement of fair and adequate discovery. Because I believe that mandamus relief should be readily available when a court allows *either* too much *or* too little discovery, I dissent.

Footnotes

1    St. Paul contends that the Walkers' request for mandamus relief is barred by laches since the Walkers delayed almost two years before seeking to compel production. Because we find that the Walkers have failed to establish the requirements for mandamus relief, we do not reach this issue.

2    The court also sustained Aetna's motion to quash, holding that the discovery requested was improper under the investigation exemption, the attorney-client privilege, and the work-product privilege. The Walkers do not complain to us about this ruling.

3    Even if no evidence had been presented, the Walkers would have had the burden of filing an affidavit so stating. *See Barnes v. Whittington,* 751 S.W.2d 493, 495 (Tex.1988) ("The undisputed fact that no testimony was adduced at any of the hearings, as set forth in the affidavit of relator's counsel, satisfies the relator's burden under Rule 121.").

4    The records sought in *Russell* included, among others:

(2) All appointment books maintained by [the expert physician] during 1969;

(3) All statements, listings, ledgers, or other books showing the accounts receivable of [the expert physician] during 1969;

(4) All deposit slips or tickets showing deposits into bank accounts of [the expert physician] during 1969;

(5) All statements, listings, ledgers, journals, or other books showing receipt of payments, either in cash, by check or by any other means [by the expert physician] during 1969;

(6) All statements of account or bills for services rendered [by the expert physician] during 1969;

(7) All accounting ledgers, journals or other books of account of [the expert physician] maintained during 1969; and

(8) All financial statements showing income and expenses of [the expert physician] during 1969.

452 S.W.2d at 435.

5    Evidence of bias is not admissible if the witness "unequivocally admits such bias or interest" at trial. Tex.R.Civ.Evid. 613(b). To date, however, Dr. Gilstrap has not admitted any bias, but rather has flatly denied it. In this situation, such evidence should be discoverable.

6    We do not decide whether the documents were properly discoverable, only that the trial court erred in denying discovery based solely on *Russell.* If the Walkers sought the documents solely to attack the credibility of Dr. Gilstrap by showing that his deposition testimony was untrue, for instance, the information would probably not be reasonably calculated to lead to the discovery of admissible

evidence. *See* Tex.R.Civ.Evid. 608(b). ("Specific instances of the conduct of a witness [other than criminal convictions], for the purpose of attacking ... his credibility, may not be ... proved by extrinsic evidence.").

7 Additionally, this Court will not grant mandamus relief unless we determine that the error is of such importance to the jurisprudence of the state as to require correction. *Cf.* Tex.Gov't Code § 22.001(a)(6); Tex.R.App.P. 140(b). This issue, however, is properly resolved in deciding whether to grant leave to file the petition, not in its disposition.

8 *See, e.g., TransAmerican Natural Gas Corp. v. Powell,* 811 S.W.2d 913, 919 (Tex.1991) (imposition of discovery sanctions); *Schultz v. Fifth Judicial District Court of Appeals,* 810 S.W.2d 738, 739 n. 4 (Tex.1991) (refusal to enforce turnover order by contempt); *Joachim v. Chambers,* 815 S.W.2d 234, 240 (Tex.1991) (refusal to bar judicial officer from testifying as expert witness); *Hooks v. Fourth Court of Appeals,* 808 S.W.2d 56, 59–60 (Tex.1991) (refusal to grant nonsuit); *Bell Helicopter Textron, Inc., v. Walker,* 787 S.W.2d 954, 955 (Tex.1990) (refusal to dismiss for lack of subject-matter jurisdiction); *Champion Int'l Corp. v. Twelfth Court of Appeals,* 762 S.W.2d 898, 899 (Tex.1988) (grant of new trial); *Stringer v. Eleventh Court of Appeals,* 720 S.W.2d 801, 801–02 (Tex.1986) (imposition of discovery sanction); *Johnson v. Fourth Court of Appeals,* 700 S.W.2d 916, 917 (Tex.1985) (grant of new trial); *Abor v. Black,* 695 S.W.2d 564, 566 (Tex.1985) (denial of plea in abatement); *State v. Walker,* 679 S.W.2d 484, 485 (Tex.1984) (refusal to reinstate temporary injunction); *Pat Walker & Co. v. Johnson,* 623 S.W.2d 306, 309 (Tex.1981) (refusal to extend time for filing statement of facts); *State Bar of Texas v. Heard,* 603 S.W.2d 829, 833 (Tex.1980) (refusal to suspend attorney); *Pope v. Ferguson,* 445 S.W.2d 950, 953 (Tex.1969) (refusal to dismiss criminal case pending against relator), *cert. denied,* 397 U.S. 997, 90 S.Ct. 1138, 25 L.Ed.2d 405 (1970); *Crane v. Tunks,* 160 Tex. 182, 190, 328 S.W.2d 434, 439 (1959) (discovery order); *Iley v. Hughes,* 158 Tex. 362, 367–68, 311 S.W.2d 648, 652 (1958) (bifurcation of trial); *Harrell v. Thompson,* 140 Tex. 1, 1, 165 S.W.2d 81, 81 (1942) (restriction of oil and gas production by Railroad Commission); *Ben C. Jones & Co. v. Wheeler,* 121 Tex. 128, 130, 45 S.W.2d 957, 958 (1932) (refusal to enter judgment nunc pro tunc); *Cleveland v. Ward,* 116 Tex. 1, 14, 285 S.W. 1063, 1068 (1926) (refusal to enter judgment); *Aycock v. Clark,* 94 Tex. 375, 376–77, 60 S.W. 665, 666 (1901) (refusal to enter injunction); *Screwmen's Benevolent Ass'n v. Benson,* 76 Tex. 552, 555, 13 S.W. 379, 380 (1890) (expulsion of member from charitable corporation).

9 We recently held that a mandamus action was never required to preserve error on appeal. *Pope v. Stephenson,* 787 S.W.2d 953 (Tex.1990). We explained: "The decision not to pursue the extraordinary remedy of mandamus does not prejudice or waive a party's right to complain on appeal." *Id.* at 954.

10 Courts use a similar approach in determining whether a witness has properly invoked the Fifth Amendment privilege against self-incrimination. It is often impossible for a witness to prove that an answer might incriminate him without actually answering and thereby forfeiting the privilege. Therefore, rather than requiring actual proof of the privilege, courts sustain the privilege if it is "evident from the implications of the question, in the setting in which it is asked, that a responsive answer [might be incriminating]." *Hoffman v. United States,* 341 U.S. 479, 487, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951).

1 If the records have relevance apart from their potential for impeachment, however, *Russell* does not bar discovery. *See Ex Parte Shepperd,* 513 S.W.2d 813, 816 (Tex.1974).

1 Billie Holiday, *God Bless the Child* (Okeh Records 1941) (words and music by Arthur Herzog, Jr. & Billie Holiday).

2 These entities rarely need information to prevail:

> Even when an institutional litigant appears as a plaintiff suing an individual defendant as, for example, when a corporation sues an individual on a debt, the institutional litigant tends to already have the information needed to prove its case.

> *Review of Discovery Orders* at 1070 n. 162. They are also less likely to require information from an opponent to establish affirmative defenses. *Id.* at 1070.

3 With no appellate opinions setting forth appropriate limitations upon trial court discretion, "litigants may receive widely divergent rulings from different judges, even in the same geographical location." *Id.* at 1077. Proper use of mandamus discourages forum shopping to obtain a trial judge more likely to provide a more favorable ruling and allows for greater consistency and accountability:

> [Such] review ... even[s] out inconsistencies in trial court rulings, and ... allows trial judges to operate with a more accurate understanding of the meaning of the discovery rules.... If the appellate court is consistent, it can fix disparities and inequities produced by the trial courts and promote consistency among the trial level decisionmakers.

> *Id.* at 1047, 1077 (footnotes omitted).

4 Intermediate appellate courts have also recognized the importance of mandamus to avoid trial court abuse in improperly limiting or denying discovery. *See, e.g., Kentucky Fried Chicken Nat'l Mgmt. Co. v. Tennant,* 782 S.W.2d 318 (Tex.App.—Houston [1st Dist.] 1989, orig. proceeding) (writ granted when discovery of plaintiff's psychiatric records denied); *Foster v. Heard,* 757 S.W.2d 464 (Tex.App.—Houston [1st Dist.] 1988, orig. proceeding) (mandamus issued against trial court's denial of discovery of post-accident investigation report); *Super Syndicate, Ltd. v. Salazar,* 762 S.W.2d 749 (Tex.App.—Houston [14th Dist.] 1988, orig. proceeding) (granting mandamus against trial court's denial of discovery of claims investigator's files); *Goodspeed v. Street,* 747 S.W.2d 526 (Tex.App.—Fort Worth 1988, orig. proceeding) (trial court's denial of discovery of hospital records based on privilege without presentation of evidence overturned); *Estate of Gilbert v. Black,* 722 S.W.2d 548, 551 (Tex.App.—Austin 1987, orig. proceeding)

(denial of discovery of insurer's internal communications overturned on mandamus, despite argument that "mandamus is proper only [for] improperly ordered discovery of privileged material, not when the trial court has denied discovery."); *Essex Crane Rental Corp. v. Kitzman,* 723 S.W.2d 241 (Tex.App.—Houston [1st Dist.] 1986, orig. proceeding) (writ granted to correct trial court's order quashing deposition); *Velasco v. Haberman,* 700 S.W.2d 729, 730 (Tex.App.—San Antonio 1985, orig. proceeding) (mandamus appropriate "not only where the trial court order improperly grants discovery, but the writ may also issue where the trial court improperly limits or denies discovery."); *Aztec Life lns. Co. v. Dellana,* 667 S.W.2d 911 (Tex.App.—Austin 1984, orig. proceeding) (mandamus issued against trial court for denying discovery of claims files).

The majority identifies by name five cases in conflict with today's writing, declaring that: "We disapprove of *Barker* and *Allen,* and any other authorities," at 842, and "[we] disapprove of *Cleveland, Crane, Jampole,* and any other authorities," at 842, to the extent they conflict with the new *Walker* standard. Subsumed within the "other" designation are a great number of additional cases from this court and the courts of appeals that would grant to the Walkers relief when the trial court has clearly abused its discretion in denying discovery. The court's willingness to sweepingly erase whole unidentified categories of recent precedent is exemplified by their signing of a blank check: "any other authorities," meaning all other authorities, are now endangered.

The few cases citing *Automatic Drilling* do not expand its holding to that suggested by the court today. *See Jampole,* 673 S.W.2d at 574–75 ("We hold that discovery cannot be denied because of an asserted proprietary interest in the requested documents when a protective order would sufficiently preserve that interest."); *Firestone Photographs, Inc. v. Lamaster,* 567 S.W.2d 273, 278 (Tex.Civ.App.—Texarkana 1978, no writ) ("[T]he claim of trade secrets ... does not necessarily defeat the right of discovery.").

James B. Sales, *Pretrial Discovery in Texas Under the Amended Rules: Analysis and Commentary,* 27 S.Tex.L.Rev. 305, 345–46 (1986), stating that:

> Trade secrets ... are not, per se, exempt from discovery. The trial court is obligated to weigh the need for discovery against the interests on secrecy.... The need to protect the confidentiality of documents does not constitute an absolute bar to discovery....

Although also citing *General Motors Corp. v. Lawrence,* 651 S.W.2d 732 (Tex.1983, orig. proceeding), as allowing mandamus relief from an allegedly burdensome trial court discovery order, the majority fails to note the very expansive discovery permitted in that case. The efforts of General Motors to limit discovery to results from tests performed on the particular type of truck and the particular type of impact involved in the subject incident were rejected, and it was directed to supply all impact test results for all types of trucks manufactured over a 23–year period.

If the trial court "refuses to make [the discovery] part of the record," At 843, presumably the only relief accorded under today's standard would be issuance of a writ directing inclusion of these materials.

*See Caller Times Publishing Co. v. Triad Communications,* 826 S.W.2d 576, 597–608 (Tex.1992) (Doggett, J., dissenting) (addressing court's refusal to allow evidence of predatory intent); *see also Greater Houston Transp. Co. v. Phillips,* 801 S.W.2d 523, 527 (Tex.1990) (Doggett, J., dissenting); *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Co.,* 823 S.W.2d 591, 596 & n. 1 (Tex.1992) (Mauzy, J., dissenting); *Reagan v. Vaughn,* 804 S.W.2d 463, 488 (Tex.1990) (Doggett, J., concurring and dissenting).

### Supreme Court Filings

| Year | Mandamus Discovery Orders | All Mandamus Filings | Total Mandamus and Applications for Writ | Discovery as Percentage of Total |
|---|---|---|---|---|
| 1979 | 24 | 129 | 933 | 2.6% |
| 1981 | 17 | 98 | 943 | 1.8% |
| 1989 | 51 | 257 | 1078 | 4.7% |
| 1991 | 64 | 202 | 1257 | 5.1% |

*Interlocutory Review of Discovery Orders* at 1058–59; the 1989 and 1991 figures are derived from my review of court filings.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

CIVIL PRACTICE AND REMEDIES CODE

TITLE 2. TRIAL, JUDGMENT, AND APPEAL

SUBTITLE D. APPEALS

CHAPTER 51. APPEALS

SUBCHAPTER A. APPEALS FROM JUSTICE COURT

Sec. 51.001.  APPEAL FROM JUSTICE COURT TO COUNTY OR DISTRICT COURT.  (a)  In a case tried in justice court in which the judgment or amount in controversy exceeds $250, exclusive of costs, or in which the appeal is expressly provided by law, a party to a final judgment may appeal to the county court.

(b)  In a county in which the civil jurisdiction of the county court has been transferred to the district court, a party to a final judgment in a case covered by this section may appeal to the district court.

Acts 1985, 69th Leg., ch. 959, Sec. 1, eff. Sept. 1, 1985. Amended by:

Acts 2007, 80th Leg., R.S., Ch. 553 (S.B. 1413), Sec. 2, eff. September 1, 2007.


Sec. 51.002.  CERTIORARI FROM JUSTICE COURT.  (a)  After final judgment in a case tried in justice court in which the judgment or amount in controversy exceeds $250, exclusive of costs, a person may remove the case from the justice court to the county court by writ of certiorari.

(b)  In a county in which the civil jurisdiction of the county court has been transferred from the county court to the district court, a person may remove a case covered by this section from the justice court to the district court by writ of certiorari.

(c)  If a writ of certiorari to remove a case is served on a justice of the peace, the justice shall immediately make a certified copy of the entries made on his docket and of the bill of costs, as provided in cases of appeals, and shall immediately send them and the

original papers in the case to the clerk of the county or district court, as appropriate.

(d)  This section does not apply to a case of forcible entry and detainer.

Acts 1985, 69th Leg., ch. 959, Sec. 1, eff. Sept. 1, 1985.
Amended by:
Acts 2007, 80th Leg., R.S., Ch. 553 (S.B. 1413), Sec. 3, eff. September 1, 2007.


SUBCHAPTER B. APPEALS FROM COUNTY OR DISTRICT COURT

Sec. 51.011.  APPEAL FROM COUNTY OR DISTRICT COURT AFTER CERTIORARI FROM JUSTICE COURT.  If a county or district court hears a case on certiorari from a justice court, a person may take an appeal or writ of error from the judgment of the county or district court. The appeal or writ of error is subject to the rules that apply in a case appealed from a justice court.

Acts 1985, 69th Leg., ch. 959, Sec. 1, eff. Sept. 1, 1985.


Sec. 51.012.  APPEAL OR WRIT OF ERROR TO COURT OF APPEALS.  In a civil case in which the judgment or amount in controversy exceeds $250, exclusive of interest and costs, a person may take an appeal or writ of error to the court of appeals from a final judgment of the district or county court.

Acts 1985, 69th Leg., ch. 959, Sec. 1, eff. Sept. 1, 1985.
Amended by:
Acts 2009, 81st Leg., R.S., Ch. 1351 (S.B. 408), Sec. 1, eff. September 1, 2009.


Sec. 51.013.  TIME FOR TAKING WRIT OF ERROR TO COURT OF APPEALS. In a case in which a writ of error to the court of appeals is allowed, the writ of error may be taken at any time within six months after the date the final judgment is rendered.

Acts 1985, 69th Leg., ch. 959, Sec. 1, eff. Sept. 1, 1985.

Sec. 51.014.  APPEAL FROM INTERLOCUTORY ORDER.  (a)  A person may appeal from an interlocutory order of a district court, county court at law, statutory probate court, or county court that:

(1)  appoints a receiver or trustee;

(2)  overrules a motion to vacate an order that appoints a receiver or trustee;

(3)  certifies or refuses to certify a class in a suit brought under Rule 42 of the Texas Rules of Civil Procedure;

(4)  grants or refuses a temporary injunction or grants or overrules a motion to dissolve a temporary injunction as provided by Chapter 65;

(5)  denies a motion for summary judgment that is based on an assertion of immunity by an individual who is an officer or employee of the state or a political subdivision of the state;

(6)  denies a motion for summary judgment that is based in whole or in part upon a claim against or defense by a member of the electronic or print media, acting in such capacity, or a person whose communication appears in or is published by the electronic or print media, arising under the free speech or free press clause of the First Amendment to the United States Constitution, or Article I, Section 8, of the Texas Constitution, or Chapter 73;

(7)  grants or denies the special appearance of a defendant under Rule 120a, Texas Rules of Civil Procedure, except in a suit brought under the Family Code;

(8)  grants or denies a plea to the jurisdiction by a governmental unit as that term is defined in Section 101.001;

(9)  denies all or part of the relief sought by a motion under Section 74.351(b), except that an appeal may not be taken from an order granting an extension under Section 74.351;

(10)  grants relief sought by a motion under Section 74.351(l);

(11)  denies a motion to dismiss filed under Section 90.007; or

Text of subdivision as added by Acts 2013, 83rd Leg., R.S., Ch. 44, Sec. 1

(12)   denies a motion for summary judgment filed by an electric utility regarding liability in a suit subject to Section 75.0022

Text of subdivision as added by Acts 2013, 83rd Leg., R.S., Ch. 1042, Sec. 4

(12)   denies a motion to dismiss filed under Section 27.003.

Text of subsection as amended by Acts 2013, 83rd Leg., R.S., Ch. 1042 (H.B. 2935), Sec. 4

(b)   An interlocutory appeal under Subsection (a), other than an appeal under Subsection (a)(4), stays the commencement of a trial in the trial court pending resolution of the appeal.  An interlocutory appeal under Subsection (a)(3), (5), (8), or (12) also stays all other proceedings in the trial court pending resolution of that appeal.

Text of subsection as amended by Acts 2013, 83rd Leg., R.S., Ch. 916 (H.B. 1366), Sec. 1

(b)   An interlocutory appeal under Subsection (a), other than an appeal under Subsection (a)(4) or in a suit brought under the Family Code, stays the commencement of a trial in the trial court pending resolution of the appeal.  An interlocutory appeal under Subsection (a)(3), (5), or (8) also stays all other proceedings in the trial court pending resolution of that appeal.

(c)   A denial of a motion for summary judgment, special appearance, or plea to the jurisdiction described by Subsection (a)(5), (7), or (8) is not subject to the automatic stay under Subsection (b) unless the motion, special appearance, or plea to the jurisdiction is filed and requested for submission or hearing before the trial court not later than the later of:

(1)   a date set by the trial court in a scheduling order entered under the Texas Rules of Civil Procedure;  or

(2)   the 180th day after the date the defendant files:

        (A)   the original answer;

        (B)   the first other responsive pleading to the plaintiff's petition;  or

        (C)   if the plaintiff files an amended pleading that alleges a new cause of action against the defendant and the defendant is able to raise a defense to the new cause of action under Subsection (a)(5), (7), or (8), the responsive pleading that raises that defense.

    (d)   On a party's motion or on its own initiative, a trial court in a civil action may, by written order, permit an appeal from an order that is  not otherwise appealable if:

      (1)   the order to be appealed involves a controlling question of law as to which there is a substantial ground for difference of opinion; and

      (2)   an immediate appeal from the order may materially advance the ultimate termination of the litigation.

    (d-1)   Subsection (d) does not apply to an action brought under the Family Code.

    (e)   An appeal under Subsection (d) does not stay proceedings in the trial court unless:

      (1)   the parties agree to a stay; or

      (2)   the trial or appellate court orders a stay of the proceedings pending appeal.

    (f)   An appellate court may accept an appeal permitted by Subsection (d) if the appealing party, not later than the 15th day after the date the trial court signs the order to be appealed, files in the court of appeals having appellate jurisdiction over the action an application for interlocutory appeal explaining why an appeal is warranted under Subsection (d).  If the court of appeals accepts the appeal, the appeal is governed by the procedures in the Texas Rules of Appellate Procedure for pursuing an accelerated appeal.  The date the court of appeals enters the order accepting the appeal starts the time applicable to filing the notice of appeal.

Acts 1985, 69th Leg., ch. 959, Sec. 1, eff. Sept. 1, 1985.  Amended by Acts 1987, 70th Leg., ch. 167, Sec. 3.10, eff. Sept. 1, 1987;  Acts 1989, 71st Leg., ch. 915, Sec. 1, eff. June 14, 1989;  Acts 1993, 73rd Leg., ch. 855, Sec. 1, eff. Sept. 1, 1993;  Acts 1997, 75th Leg., ch. 1296, Sec. 1, eff. June 20, 1997;  Acts 2001, 77th Leg., ch. 1389,

Sec. 1, eff. Sept. 1, 2001;  Acts 2003, 78th Leg., ch. 204, Sec. 1.03, eff. Sept. 1, 2003.

Amended by:

    Acts 2005, 79th Leg., Ch. 97 (S.B. 15), Sec. 5, eff. September 1, 2005.

    Acts 2005, 79th Leg., Ch. 1051 (H.B. 1294), Sec. 1, eff. June 18, 2005.

    Acts 2005, 79th Leg., Ch. 1051 (H.B. 1294), Sec. 2, eff. June 18, 2005.

    Acts 2011, 82nd Leg., R.S., Ch. 203 (H.B. 274), Sec. 3.01, eff. September 1, 2011.

    Acts 2013, 83rd Leg., R.S., Ch. 44 (H.B. 200), Sec. 1, eff. May 16, 2013.

    Acts 2013, 83rd Leg., R.S., Ch. 604 (S.B. 1083), Sec. 1, eff. September 1, 2013.

    Acts 2013, 83rd Leg., R.S., Ch. 916 (H.B. 1366), Sec. 1, eff. September 1, 2013.

    Acts 2013, 83rd Leg., R.S., Ch. 961 (H.B. 1874), Sec. 1, eff. September 1, 2013.

    Acts 2013, 83rd Leg., R.S., Ch. 1042 (H.B. 2935), Sec. 4, eff. June 14, 2013.


        Sec. 51.015.  COSTS OF APPEAL.  In the case of an appeal brought pursuant to Section 51.014(6), if the order appealed from is affirmed, the court of appeals shall order the appellant to pay all costs and reasonable attorney fees of the appeal;  otherwise, each party shall be liable for and taxed its own costs of the appeal.

Added by Acts 1993, 73rd Leg., ch. 855, Sec. 1, eff. Sept. 1, 1993.


        Sec. 51.016.  APPEAL ARISING UNDER FEDERAL ARBITRATION ACT.  In a matter subject to the Federal Arbitration Act (9 U.S.C. Section 1 et seq.), a person may take an appeal or writ of error to the court of appeals from the judgment or interlocutory order of a district court, county court at law, or county court under the same circumstances that an appeal from a federal district court's order or decision would be permitted by 9 U.S.C. Section 16.

Added by Acts 2009, 81st Leg., R.S., Ch. 820 (S.B. 1650), Sec. 1, eff.
September 1, 2009.